ORAL ARGUMENT SCHEDULED FOR DECEMBER 9, 2025

No. 25-5320

# United States Court of Appeals
## for the
## District of Columbia Circuit

———————————

MAKE THE ROAD NEW YORK; MARY AND HER SON, JOHN,
*Plaintiffs-Appellees*,

v.

KRISTI NOEM, *et al.*,
*Defendants-Appellants.*

———————————

**On Appeal from the United States District Court
for the District of Columbia**

District Court Case No. 1:25-cv-00190 (Cobb, J.)

———————————

**BRIEF FOR STATES OF CALIFORNIA, ARIZONA, COLORADO,
CONNECTICUT, DELAWARE, HAWAI'I, ILLINOIS, MAINE,
MARYLAND, MASSACHUSETTS, MICHIGAN, MINNESOTA,
NEVADA, NEW JERSEY, NEW MEXICO, NEW YORK, OREGON,
VERMONT, AND WASHINGTON,
AND THE DISTRICT OF COLUMBIA AS AMICI CURIAE
IN SUPPORT OF APPELLEES AND AFFIRMANCE**

———————————

ROB BONTA
*Attorney General of California*
MICHAEL L. NEWMAN
*Senior Assistant Attorney General*

VILMA PALMA-SOLANA
ROBIN L. GOLDFADEN
*Supervising Deputy Attorneys General*
LUCIA CHOI
CHRISTOPHER TENORIO
*Deputy Attorneys General*
300 S. Spring Street, #1700
Los Angeles, CA 90013
Telephone: (213) 269-6000
Vilma.Solana@doj.ca.gov

*(Additional counsel listed on signature page)*

# TABLE OF CONTENTS

**Page**

INTRODUCTION & STATEMENT OF INTEREST OF AMICI .............. 1

ARGUMENT ......................................................................................... 4

    I.    The Challenged Expansion of Expedited Removal Is Unconstitutional ...................................................................... 4

        A.    A Century of Supreme Court Precedent Holds that Noncitizens in the United States Are Entitled to Due Process............................................................................. 4

        B.    The 2025 Designation's Expansion of Expedited Removal Violates Due Process ...................................... 6

        C.    Amici States' Experience Shows That Procedural Protections in Various Contexts Are Available and Administrable ................................................................ 10

    II.    Equitable Considerations Strongly Favor the District Court's Stay of the 2025 Designation .................................... 15

        A.    The Public Interest is Harmed by the Expansion of Expedited Removal ....................................................... 15

        B.    Amici States Will be Harmed Because the Threat of Immediate Removal Without Due Process Will Stifle Basic Civic Engagement and Access to Critical Services ........................................................... 20

        C.    Erroneous Removals Will Cause Lasting Harm to States and Their Residents ........................................... 22

CONCLUSION .......................................................................... 27

# TABLE OF AUTHORITIES

**Page**

CASES

*A. A. R. P. v. Trump*
605 U.S. 91 (2025)....................................................................4, 6

*Department of Homeland Security v. Thuraissigiam*
591 U.S. 103 (2020)...............................................................5, 6, 8

*Fong Yue Ting v. United States*
149 U.S. 698 (1893)...................................................................9

*Jean v. Nelson*
711 F.2d 1455 (11th Cir. 1983) .............................................6, 7

*Landon v. Plasencia*
459 U.S. 21 (1982).....................................................................6

*Lyttle v. United States*
867 F.Supp.2d 1256 (M.D. Ga. 2012) ......................................20

*Make the Rd. N.Y. v. Noem*
No. 25-CV-190 (JMC), 2025 WL 2494908 (D.D.C. Aug. 29,
2025) ...............................................................................*passim*

*Make the Rd. N.Y. v. Wolf*
962 F.3d 612 (D.C. Cir. 2020).....................................................7

*Maldonado-Sandoval v. INS*
518 F.2d 278 (9th Cir. 1975) ......................................................6

*Mathews v. Diaz*
426 U.S. 67 (1976).......................................................................4

*Mathews v. Eldridge*
424 U.S. 319 (1976)................................................................9, 10

*Noem v. Vasquez Perdomo*
-- U.S. --, 2025 WL 2585637, at *9....................................17, 19

# TABLE OF AUTHORITIES
## (continued)

Page

*Shaughnessy v. United States ex rel. Mezei*
    345 U.S. 206 (1953).......................................................................5

*Trump v. J. G. G.*
    604 U.S. 670 (2025)..................................................................4, 6

*Vazquez Perdomo v. Noem*
    790 F. Supp. 3d 850 (C.D. Cal. 2025) ......................................17

*Wong Wing v. United States*
    163 U.S. 228 (1896).......................................................................4

*Yamataya v. Fisher*
    189 U.S. 86 (1903).........................................................................5

*Yick Wo v. Hopkins*
    118 U.S. 356 (1886).......................................................................4

*Zadvydas v. Davis*
    533 U.S. 678 (2001)..................................................................4, 5

**STATUTES**

8 U.S.C.
    § 1182(a)(9)(A)(i) ........................................................................9
    § 1225(b)(1) ...............................................................................14
    § 1225(b)(1)(A)(i) ......................................................................14
    § 1229a .......................................................................................11
    § 1229a(b)(4)(A) ........................................................................10
    § 1252 .........................................................................................11
    § 1252(e)(2) ...............................................................................14

Illegal Immigration Reform and Immigrant Responsibility Act of
    1996, Pub. L. No. 104-208, 110 Stat. 3009, div. C (1996)...........6

**TABLE OF AUTHORITIES**
**(continued)**

Page

110 Stat. 3009, div. C, § 302 (codified at 8 U.S.C. § 1225)..............................7

110 Stat. 3009, div. C, § 304................................................................................7

N.C. Gen. Stat. § 115C-390.8 (2024) ...............................................................13

S.C. Code Ann. § 1-23-610 (2025) ....................................................................13

Texas Educ. Code § 37.009(f) (2025)................................................................13

Va. Code Ann. § 15.2-2209 (2025) ....................................................................13

W. Va. Code § 29A-5-4 (2025) ..........................................................................13

**CONSTITUTIONAL PROVISIONS**

U.S. Const. Amendment V ....................................................................................4

**REGULATORY MATERIALS**

8 C.F.R. § 235.3(b)(7)........................................................................................14

8 C.F.R. § 1003.1(d)(2)......................................................................................11

Designating Aliens for Expedited Removal, 69 Fed. Reg. 48,877
(Aug. 11, 2004) ..............................................................................................8

Designating Aliens for Expedited Removal, 84 Fed. Reg. 35,409
(July 23, 2019) ...............................................................................................9

Designating Aliens for Expedited Removal, 90 Fed. Reg. 8,139
(Jan. 24, 2025)........................................................................................*passim*

Inspection and Expedited Removal of Aliens; Detention and
Removal of Aliens; Conduct of Removal Proceedings;
Asylum Procedures, 62 Fed. Reg. 10,312 (Mar. 6, 1997)...........................8

# TABLE OF AUTHORITIES
## (continued)

Page

Memorandum from Benjamine C. Huffman, Acting DHS Sec'y
on Guidance Regarding How to Exercise Enforcement
Discretion (Jan. 23, 2025) ............................................................... 1

Memorandum from Sirce E. Owen, Acting Dir., Exec. Off.
Immigr. Rev., to All of Exec. Off. Immigr. Rev. on Case
Priorities and Immigration Court Performance Measures,
Appendix A (Sept. 12, 2025) ....................................................... 10

Notice Designating Aliens Subject to Expedited Removal Under
Section 235(b)(1)(A)(iii) of the Immigration and Nationality
Act, 67 Fed. Reg. 68,924 (Nov. 13, 2002) ................................. 8-9

## OTHER AUTHORITIES

Alison Siskin & Ruth Ellen Wasem, Cong. Rsch. Serv.,
RL33109, *Immigration Policy on Expedited Removal of
Aliens* (2005) ................................................................................ 9

Ana Martinez-Donate et al., *Between the Lines: A Mixed-
Methods Study on the Impacts of Parental Deportation on the
Health and Well-Being of U.S. Citizen Children*, 9 J. of
Migration & Health 100233 (May 2024) .................................... 23

Arthur Jones II, *Immigrant Families Fear Trump's Deportations
as Children Return to School*, ABC News (Aug. 19, 2025) ....... 21

BIA Practice Manual § 8.2(a) (Apr. 2025) ....................................... 10

Bri Hatch*, In Increasingly Hispanic Memphis schools,
Immigration Enforcement Surge Brings Fear, Absences*,
Chalkbeat Tennessee (Oct. 28, 2025) ......................................... 21

Class Action Settlement Agreement and Release at 19, *Gonzalez
v. Immigr. and Customs Enf't*, No. CV 13-04416-AB-FFM
(C.D. Cal. Nov. 25, 2024) ECF No. 195 .................................... 20

# TABLE OF AUTHORITIES
## (continued)

Page

*Contest a Ticket*, Me. Jud. Branch (last visited Oct. 24, 2025) ...................... 12

*Contesting Your Citation*, Superior Ct. of Cal. - Cnty. of Inyo
    (last visited Oct. 24, 2025)........................................................................ 12

Dana Leigh Marks, *Immigration Judge: Death Penalty Cases in
    a Traffic Court Setting*, CNN (June 26, 2014) .......................................... 11

David J. Bier, *One in Five ICE Arrests Are Latinos on the Streets
    with No Criminal Past or Removal Order*, Cato Institute
    (Aug. 5, 2025) ............................................................................................ 17

*The Economic Impact of Mass Deportation in California*, Bay
    Area Council Economic Institute (June 2025) .......................................... 27

Elvia Malagón & Esther Yoon-Ji Kang, *Many Home Care
    Workers are Immigrants. Now, Some Are Afraid to Go to
    Work*, WBEZ Chicago (Aug. 6, 2025) ...................................................... 25

Emily Baumgaertner Nunn et al., *Migrants Are Skipping Medical
    Care, Fearing ICE, Doctors Say*, New York Times (May 9,
    2025) .......................................................................................................... 21

Felipe Ruiz Mazin & Felix Reichling, *Mass Deportation of
    Unauthorized Immigrants: Fiscal and Economic Effects*,
    Univ. of Pa. Penn Wharton (July 28, 2025)............................................... 26

*Information about Traffic Cases; Options for Responding to a
    Traffic Ticket*, Harris Cnty. Just. Cts. (last visited Oct. 24,
    2025) .......................................................................................................... 12

Jack Wasserman, *Representation of an Alien in Exclusion,
    Rescission and Deportation Hearings*, 26 Am. Juris. Trials
    327, pt. IX .................................................................................................... 7

## TABLE OF AUTHORITIES
### (continued)

Page

James Queally, *Fearing Deportation, Many Domestic Violence Victims Are Steering Clear of Police and Courts*, L.A. Times (Oct. 9, 2017) ................................................................................22

Jazmine Ulloa et al. *'I'm From Here!': U.S. Citizens Are Ending Up in Trump's Dragnet*, New York Times (Sept. 29, 2025) .....................18

Jillian Andres Rothschild et al., *Who Lacks ID in America Today? An Exploration of Voter ID Access, Barriers, and Knowledge*, Center for Democracy and Civic Engagement (Jan. 2024)..............................................................................20

Jonathan Ong et al., *Latino ICE Arrests Surge Under Trump*, UCLA Center for Neighborhood Knowledge (Oct. 2025).........................17

Kavitha Surana, *How Racial Profiling Goes Unchecked in Immigration Enforcement*, ProPublica & Phila. Inquirer (June 8, 2018) ......................................................................................16

Lenore S. Azaroff et al., *Deporting Immigrants May Further Shrink the Health Care Workforce*, 333 JAMA 22 (Apr. 3, 2025) ....................................................................................25

Luis Andres Henao & Tiffany Stanley, *Immigration Crackdown Stokes Fear and Solidarity at a Catholic Church in DC*, Associated Press (Oct. 27, 2025)..............................................21

Luis Ferré-Sadurni & Hamed Aleaziz, *How a Former Trump Golf Club Worker Was Mistakenly Deported to Mexico*, N.Y. Times (Oct. 30, 2025) ..............................................................16

Maira Khwaja et al., *Federal Agents Storm South Shore Building, Detaining Families and Children*, South Side Weekly (Oct. 6, 2025) ....................................................................................19

*Mass Deportation: Devastating Costs to America, Its Budget and Economy*, Am. Immigr. Council (Oct. 2, 2024) .........................................24

## TABLE OF AUTHORITIES
### (continued)

Page

*Mass Deportations Would Deliver a Catastrophic Blow to the
U.S. Economy*, U.S. Cong. Joint Econ. Comm. (Dec. 2024)......................25

Matthew Lisiecki & Gerard Apruzzese, *Proposed 2024 Mass
Deportation Program Would Socially and Economically
Devastate American Families*, Center for Migration Studies
(Oct. 10, 2024) ............................................................22

*Municipal Court Self-Help*, N.J. Cts. (last visited Oct. 24, 2025)..................12

*New Analysis: Millions of Americans Lack ID Required to Vote*,
VoteRiders (Apr. 13, 2023) ........................................................20

Nicholas Bogel-Burroughs et al., *A Squalid Building, a Tip to the
Feds, and Then 'Straight-Up Chaos'* (Oct. 19, 2025)................................19

Nicole Foy, *We Found That More Than 170 U.S. Citizens Have
Been Held by Immigration Agents. They've Been Kicked,
Dragged and Detained for Days*, ProPublica (Oct. 16, 2025) ..................18

*Profile of the Unauthorized Population: California*, Migration
Policy Institute ..............................................................16

*Profile of the Unauthorized Population: United States*, Migration
Policy Institute ..............................................................15

Robert G. Lynch et al., *Warning Signs of the Economic Harms
from Deportations* (Aug. 9, 2025) ................................................26

Robert Lynch & Michael Ettlinger, *The Economic Impact on
Citizens and Authorized Immigrants of Mass Deportation*,
Univ. of N.H. Carsey Sch. of Pub. Pol'y (Aug. 29, 2024) ..................24, 26

Robert Warren & Donald Kerwin, *Mass Deportations Would
Impoverish US Families and Create Immense Social Costs*,
Ctr. for Migration Stud. (2017).....................................................24

## TABLE OF AUTHORITIES
### (continued)

                                                                            **Page**

Romina Tome et al., *Heightened Immigration Enforcement
    Impacts US Citizens' Birth Outcomes: Evidence from Early
    ICE Interventions in North Carolina*, Duke Univ. Sanford
    Sch. of Pub. Pol'y (Feb. 3, 2021) ................................................24

Ronald B. Cox et al., *Validation of the Family Fear of
    Deportation Scale for Youth*, 72 Fam. Rels. 3 (July 1, 2022) ...................23

Sezer Kisa & Adnan Kisa, *"No Papers, No Treatment": A
    Scoping Review of Challenges Faced by Undocumented
    Immigrants in Accessing Emergency Healthcare*, 23 Int'l J.
    for Equity in Health 184 (2024)............................................24, 25

Sofía Mejías-Pascoe, *Border Patrol Criminally Citing
    Immigrants for Not Carrying Their Papers Under Decades-
    Old Law*, Inewsource (July 16, 2025).........................................19

Steve Benen, *Just How Many 'Kavanaugh Stops' Have American
    Citizens Been Forced to Endure?*, MSNBC (Oct. 17, 2025) ...................17

Suzanne Gamboa & Nicole Acevedo, *Trump Immigration Raids
    Snag U.S. Citizens, Raising Profiling Fears*, NBC News (Jan.
    28, 2025) ...................................................................19

Tanya Golash-Boza, *The Deportation Crisis for Latino
    Immigrant Men and Their Families*, Scholars Strategy
    Network (Apr. 9, 2014)......................................................17

Tim Sullivan, *Lawsuit Filed Against Immigration Authorities
    After U.S. Citizen's Arrests in Raids*, AP News (Oct. 1, 2025)..................18

Tom K. Wong, *The Effects of Sanctuary Policies on Crime and
    the Economy*, Ctr. for Am. Progress (Jan. 26, 2017)................................22

*Traffic Offenses; Disputing Your Traffic Citation*, Utah State Cts.
    (last visited Oct. 24, 2025)..................................................13

**TABLE OF AUTHORITIES**
**(continued)**

Page

*Traffic*, Superior Ct. of Cal. - Cnty. of Sacramento (last visited
   Oct. 24, 2025) ............................................................... 12

*Traffic Violations*, N.C. Jud. Branch (last visited Oct. 24, 2025) ................... 12

*U.S. Citizen Children Impacted by Immigration Enforcement*,
   Am. Immigr. Council (June 24, 2021) ........................................ 23

*Unauthorized Immigrant Population Profiles, Migration Policy
   Institute*, Migration Policy Institute ........................................ 16

Uriel J. García et al., *"A Lot of Fear Going On": Texas
   Immigrant Community on Edge During Trump's First Weeks*,
   Tex. Trib. (Jan. 31, 2025) .................................................... 16, 21

Veronica Miracle, *How ICE Raids Turned Parts of Los Angeles
   Into Ghost Towns*, CNN (July 4, 2025) ...................................... 21

Wendy Cervantes et al., *The Day That ICE Came: How Worksite
   Raids Are Once Again Harming Children and Families*, The
   Ctr. for Law & Soc. Pol'y (July 13, 2020) ................................. 23

## INTRODUCTION & STATEMENT OF INTEREST OF AMICI

Amici States[1] write in support of Plaintiffs-Appellees ("Plaintiffs") and their challenge to the Department of Homeland Security's expansion of expedited removal to noncitizens, found anywhere in the United States, who have been living in this country for up to two years. *See* Designating Aliens for Expedited Removal, 90 Fed. Reg. 8,139 (Jan. 24, 2025) ("2025 Designation"). The District Court properly issued a stay of the January 2025 Designation Notice, concluding that "individuals subject to the 2025 Designation are entitled to due process" and "that the 2025 Designation . . . fail[s] to afford those individuals a sufficiently meaningful opportunity to be heard" prior to removal. *Make the Rd. N.Y. v. Noem*, No. 25-CV-190 (JMC), 2025 WL 2494908, at *10 (D.D.C. Aug. 29, 2025).[2] As the District Court observed, it is "settled principle," *id.* at *11, that the Fifth Amendment's due process guarantees apply to those "who have entered the United

---

[1] Amici States are California, Arizona, Colorado, Connecticut, Delaware, Hawaiʻi, Illinois, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, New Mexico, New York, Oregon, Vermont, and Washington, and the District of Columbia.

[2] The District Court also stayed the Memorandum that announced the transmission of the Designation to the Federal Register insofar as the Memorandum implements the Designation Notice. *Make the Rd. N.Y.*, 2025 WL 22494908, at *23; *see* Memorandum from Benjamine C. Huffman, Acting DHS Sec'y on Guidance Regarding How to Exercise Enforcement Discretion (Jan. 23, 2025), https://www.dhs.gov/sites/default/files/2025-01/25_0123_er-and-parole-guidance.pdf ("Huffman Memorandum").

1

States" and also well-established that they "have a liberty interest in remaining—no matter how they entered," *id.* From that conclusion, the District Court also correctly held that Plaintiffs are "substantially likely to prevail on [the] claim that the current procedures do not satisfy the minimal requirements of due process when applied to the population affected by the 2025 Designation"—namely, persons with an established presence in the United States. *Id.* at *13.

Amici States submit this brief to address their concerns with the expansion of expedited removal into the interior to persons who have a long-recognized right to due process, and to address equitable considerations that support the District Court's stay. More than a century of case law establishes that individuals in the United States have a right to due process before they are removed. The individuals subject to the 2025 Designation have not only entered the United States but have established a presence in the country. The expedited removal process as applied to these individuals fails to satisfy the constitutional minimums of due process. As the District Court found, the process "hardly affords individuals any opportunity, let alone a 'meaningful' one, to demonstrate that they have been present in the United States for two years," *id*. at *17, and there is "an intolerably high risk that they will be erroneously removed via expedited removal," *id.* at *15.

To be sure, due process is a flexible concept, and a wide range of procedures may satisfy the constitutional standard. Amici States know this from their own

2

experience of implementing procedures in a variety of contexts involving deprivations of liberty, property, or other interests. Amici do not contend that every facet of their practices, alone or in combination, is required by the Constitution, but Amici States' experiences highlight that a variety of procedural protections are available to governmental entities, including in cases involving deprivations far less severe than removal, and they demonstrate that the weight of any asserted administrative or fiscal burdens in the overall due process balancing would not support the extension of expedited removal under the 2025 Designation.

Equitable considerations also strongly support the stay. Expansion of expedited removal into the interior of the United States threatens to result in the detention and deportation of U.S. citizens and others who are lawfully present or who have grounds to adjust their immigration status. In addition, the 2025 Designation will diminish the engagement of longtime residents in civic life and their access to education, basic healthcare, and public safety services. Amici States will suffer harms flowing from wrongful removals and the predictable consequences of such removals: separated families, traumatized children, diminished workforces, and harms to States' economies. Amici States have a substantial interest in ensuring that individuals who have entered the United States are afforded due process and are free to live without fear that they may be

erroneously detained or removed at any moment. The District Court's Order

staying the 2025 Designation and the Huffman Memorandum should be affirmed.

## ARGUMENT

I. **THE CHALLENGED EXPANSION OF EXPEDITED REMOVAL IS UNCONSTITUTIONAL**

### A. A Century of Supreme Court Precedent Holds that Noncitizens in the United States Are Entitled to Due Process

The Fifth Amendment protects *all* persons in the United States from the

deprivation of life, liberty, or property without due process of law. U.S. Const.

amend. V; *Mathews v. Diaz*, 426 U.S. 67, 77 (1976). Since first recognizing the

Due Process Clause's application to noncitizens, in *Yick Wo v. Hopkins*, 118 U.S.

356 (1886), and then *Wong Wing v. United States*, 163 U.S. 228 (1896), the

Supreme Court has not wavered. *See, e.g.*, *Trump v. J. G. G.*, 604 U.S. 670, 673

(2025) ("'It is well established that the Fifth Amendment entitles aliens to due

process of law' in the context of removal proceedings." (citation omitted)); *accord*

*A. A. R. P. v. Trump*, 605 U.S. 91, 94 (2025).

The right to due process is not contingent on citizenship nor lawful

immigration status. "[O]nce [a noncitizen] enters the country, the legal

circumstance changes, for the Due Process Clause applies to all 'persons' within

the United States, including [noncitizens], whether their presence here is lawful,

unlawful, temporary, or permanent." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001);

*accord Mathews*, 426 U.S. at 77. "The distinction between a [noncitizen] who has

4

effected an entry into the United States and one who has never entered runs

throughout immigration law," and it is a distinction that makes all the difference.

*Zadvydas*, 533 U.S. at 693; *see Shaughnessy v. United States ex rel. Mezei*, 345

U.S. 206, 212 (1953) ("[A]liens who have once passed through our gates, even

illegally, may be expelled only after proceedings conforming to traditional

standards of fairness encompassed in due process of law."); *Yamataya v. Fisher*,

189 U.S. 86, 101 (1903) (distinguishing between noncitizens who had entered the

United States and those who had not).

      Defendants-Appellants ("Defendants") invoke the Supreme Court's decision

in *Department of Homeland Security v. Thuraissigiam*, 591 U.S. 103, 139 (2020),

to argue that the use of expedited removal does not violate due process for

individuals subject to the 2025 Designation. Brief of Defendants-Appellants at 3-4,

*Make the Rd. N.Y. v. Noem*, No. 25-5320 (D.C. Cir. Oct. 20, 2025), ECF No.

2141259. But they misunderstand *Thuraissigiam*. *Thuraissigiam* concerned the

expedited removal of an individual apprehended within 25 yards of the border. In

the Court's view, Thuraissigiam was no different from others stopped at a port of

entry and thus "'on the threshold.'" 591 U.S. at 140 (quoting *Mezei*, 345 U.S. at

212). Thuraissigiam's ephemeral presence in the United States prior to his

apprehension, feet from the border, is not at all similar to the circumstances of

those who will be encountered elsewhere in the United States, with no indicia of

5

having just been "on the threshold." As the District Court recognized, the individuals subject to the Designation have far more than an ephemeral presence in the country, and to interpret *Thuraissigiam* as Appellants wish "would be to undermine more than a century of precedent holding that those who have entered the United States have a liberty interest in remaining—no matter how they entered." *Make the Rd. N.Y. v. Noem*, 2025 WL 2494908, at *11 (noting Supreme Court's recent reaffirmation of "century-old principle" in *J. G. G.*, 604 U.S. 670, and *A. A. R. P.*, 605 U.S. at 94).

### B. The 2025 Designation's Expansion of Expedited Removal Violates Due Process

Before the enactment of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Pub. L. No. 104-208, 110 Stat. 3009, div. C (1996), exclusion hearings were "the usual means of proceeding against [a noncitizen] outside the United States seeking admission," and deportation hearings were "the usual means of proceeding against [a noncitizen] already physically in the United States." *Landon v. Plasencia*, 459 U.S. 21, 25 (1982). The differences between the two hearing types were significant, with those in exclusion proceedings enjoying fewer procedural protections. *See Jean v. Nelson*, 711 F.2d 1455, 1467 (11th Cir. 1983); *Maldonado-Sandoval v. INS*, 518 F.2d 278, 280 n.3 (9th Cir. 1975) (citing *Leng May Ma v. Barber*, 357 U.S. 185, 187 (1958)). IIRIRA combined these two previously distinct forms of proceedings into the single form

6

of removal proceedings. 110 Stat. 3009, div. C, § 304. Regardless of whether

charged with inadmissibility or deportability, individuals in removal proceedings

are afforded a host of procedural protections. *See Make the Rd. N.Y. v. Noem*, 2025

WL 2494908, at *2 (discussing protections).

IIRIRA simultaneously created the highly truncated expedited removal

system. 110 Stat. 3009, div. C, § 302 (codified at 8 U.S.C. § 1225). With expedited

removal, Congress sought to "substantially shorten and speed up the removal

process." *Make the Rd. N.Y. v. Wolf*, 962 F.3d 612, 618 (D.C. Cir. 2020).[3] As this

Court has observed:

> Expedited removal lives up to its name. Under IIRIRA, an
> immigration officer may determine that an individual is inadmissible
> because she does not have a valid entry document or other suitable
> travel document, or because she has obtained a visa through
> misrepresentation. If that individual falls within the class of persons
> subject to expedited removal, an immigration "officer shall order the
> alien removed * * * without further hearing or review unless the alien
> indicates either an intention to apply for asylum * * * or a fear of
> persecution." Absent such an indication, all that stands between that
> individual and removal is a paper review by the officer's supervisor.

*Id.* at 619 (citations omitted). And "[t]he process is scarcely more involved for

individuals who assert an intention to apply for asylum or a fear of persecution."

---

[3] Those subjected to expedited removal receive less procedural protection
than was available in exclusion proceedings. *See Jean*, 711 F.2d at 1467; Jack
Wasserman, *Representation of an Alien in Exclusion, Rescission and Deportation
Hearings*, 26 Am. Juris. Trials 327, pt. IX (providing overview of law on exclusion
proceedings) (2025 ed.).

*Id.* (citing 8 U.S.C. § 1225(b)(1)(A)). A line officer decides if an individual has met the "credible fear of persecution" standard, and if the officer decides that the individual has not, the individual's only recourse is "highly expedited" review by an immigration judge, "meant to conclude within 24 hours." *Id.* (citing 8 U.S.C. § 1225(b)(1)(B)(iii)(III)). That review is final—no further administrative or judicial review is available. *Id.* (citing 8 U.S.C. §§ 1225(b)(1)(C), 1252(a)(2)(A)(iii)); *Thuraissigiam*, 591 U.S. at 112.

In recognition that "application of the expedited removal provisions to [persons] already in the United States w[ould] involve more complex determinations of fact and w[ould] be more difficult to manage," the federal government initially applied expedited removal only to "arriving" noncitizens at the border.[4] While DHS expanded its authority more than 20 years ago to give officers the ability to apply expedited removal to those within 100 miles of the border and 14 days of arrival,[5] only the first and current Trump administrations

---

[4] Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures, 62 Fed. Reg. 10,312, 10,313 (Mar. 6, 1997).

[5] Designating Aliens for Expedited Removal, 69 Fed. Reg. 48,877, 48,879 (Aug. 11, 2004). In response to concerns about "mass" migration by Haitians and a ship's arrival in Florida, carrying 216 Haitian and Dominican individuals who were attempting to enter illegally, expedited removal was expanded in 2002 to apply more broadly to migrants who arrived by sea without valid visas or other advance permission. Notice Designating Aliens Subject to Expedited Removal Under Section 235(b)(1)(A)(iii) of the Immigration and Nationality Act, 67 Fed.

(continued…)

8

have sought to expand its application to potentially anyone encountered anywhere in the United States. *See Make the Rd. N.Y. v. Noem*, 2025 WL 2494908, at *4-5; *see also* Designating Aliens for Expedited Removal, 84 Fed. Reg. 35,409 (July 23, 2019).

As discussed by the District Court, there can be no genuine dispute that persons who will be subjected to the 2025 Designation are entitled to due process. *Id.* at *10-13, 17; *see supra* Section I.A. And the 2025 Designation's expansion of expedited removal lacks critical procedural protections that are part of standard removal proceedings—even though the stakes for the individual are enormous and the risk of an erroneous deprivation is unacceptably high. *See Mathews v. Eldridge*, 424 U.S. 319, 335 (1976); *see also, e.g.*, *Fong Yue Ting v. United States*, 149 U.S. 698, 740 (1893) ("[D]eportation is punishment. Every one [*sic*] knows that to be forcibly taken away from home and family and friends and business and property, and sent across the ocean to a distant land, is punishment, and that oftentimes most severe and cruel.").[6]

---

Reg. 68,924 (Nov. 13, 2002); Alison Siskin & Ruth Ellen Wasem, Cong. Rsch. Serv., RL33109, *Immigration Policy on Expedited Removal of Aliens* 6 (2005), https://tracreports.org/tracfed/tracker/dynadata/2005_12/RL33109_20050930.pdf. Amici are unaware of any evidence the 2002 expansion has been applied to persons who could not otherwise have been subjected to expedited removal.

[6] Removal typically also imposes a multi-year bar to returning to the United States and can render one ineligible for future immigration benefits. *See* 8 U.S.C. § 1182(a)(9)(A)(i).

### C.    Amici States' Experience Shows That Procedural Protections in Various Contexts Are Available and Administrable

 "(D)ue process is flexible and calls for such procedural protections as the particular situation demands." *Mathews*, 424 U.S. at 334 (citation omitted). The balancing involved leaves room for governments to craft regulatory regimes that reflect reasoned judgments about the circumstances involved. *See id.* at 334-35.

Still, there can come a point when a regime is insufficient as a constitutional matter. Removal from the United States can be among the most severe and consequential deprivations of liberty an individual can experience—it can mean loss of one's home, family, and for some, life itself. Most noncitizens facing removal therefore are afforded basic procedural protections that are intended to minimize the risk of erroneous orders of removal. These protections are not elaborate: a merits hearing routinely consists of a short trial lasting a few hours before an administrative law judge;[7] a noncitizen is represented only if they can secure their own attorney;[8] appellate review is on the papers;[9] and the Board of

---

[7] Memorandum from Sirce E. Owen, Acting Dir., Exec. Off. Immigr. Rev., to All of Exec. Off. Immigr. Rev. on Case Priorities and Immigration Court Performance Measures, Appendix A (Sept. 12, 2025), https://www.justice.gov/eoir/media/1413981/dl?inline, (setting benchmark that "[n]inety-five percent (95%) of all merits hearings should be completed on the initial scheduled individual merits hearing date").

[8] 8 U.S.C. § 1229a(b)(4)(A) (recognizing a right to counsel of the individual's choosing, at no expense to the government).

[9] BIA Practice Manual § 8.2(a) (Apr. 2025) ("Oral argument is held at the discretion of the Board and is rarely granted.").

Immigration Appeals is permitted to summarily dismiss an appeal it deems to lack merit.[10] Indeed, even "regular" (non-expedited) removal hearings have been criticized as deficient. One now-retired immigration judge and former head of the National Association of Immigration Judges described immigration court cases as "death penalty cases heard in traffic court settings."[11] Despite their shortcomings, however, ordinary removal proceedings incorporate basic but important procedural protections: the opportunity and ability to present testimony and other evidence, the right to be represented by counsel at one's own expense, the right to examine the government's evidence and witnesses, and the right to appeal and seek judicial review. *See* 8 U.S.C. §§ 1229a, 1252. These basic features are absent in the 2025 Designation's expansion of expedited removal, notwithstanding that they are the very procedural safeguards that previously were available to those whom the 2025 Designation would now subject to expedited removal. Ironically, these individuals would now receive greater protection against a potentially erroneous traffic ticket than in facing years-long and potentially permanent exile.

---

[10] 8 C.F.R. § 1003.1(d)(2) (authorizing the Board of Immigration Appeals to issue prompt orders of summary dismissal where a party's appeal lacks an arguable basis).

[11] Dana Leigh Marks, *Immigration Judge: Death Penalty Cases in a Traffic Court Setting*, CNN (June 26, 2014), https://www.cnn.com/2014/06/26/opinion/immigration-judge-broken-system.

As described below, Amici States have substantial experience implementing legal and administrative procedures in cases involving deprivations of far lesser severity than deportation. Amici do not intend to suggest that the specific procedures described below are constitutionally required. Instead, Amici highlight these procedures to note that they are available and administrable even in contexts involving deprivations less severe than removals.

For example, in California, individuals who receive a traffic citation can contest the ticket, including via an adjudicative process; such persons can plead their case before a judge, provide evidence, and question the officer who issued the ticket.[12] Similarly, in Texas, a person disputing a traffic citation is entitled to a trial, may be represented by counsel, has the right to present evidence and cross-examine witnesses, and has the right of appeal.[13] Other states offer much the same process.[14]

---

[12] *See, e.g., Traffic*, Superior Ct. of Cal. – Cnty. of Sacramento (last visited Oct. 24, 2025), https://www.saccourt.ca.gov/traffic/traffic.aspx; *Contesting Your Citation*, Superior Ct. of Cal. – Cnty. of Inyo (last visited Oct. 24, 2025), https://www.inyo.courts.ca.gov/divisions/traffic/contesting-your-citation.

[13] *See, e.g.*, *Information about Traffic Cases; Options for Responding to a Traffic Ticket*, Harris Cnty. Just. Cts. (last visited Oct. 24, 2025), http://www.jp.hctx.net/traffic/responding.htm#gsc.tab=0.

[14] *See, e.g.*, *Municipal Court Self-Help*, N.J. Cts. (last visited Oct. 24, 2025), https://www.njcourts.gov/self-help/municipal-court.; *Contest a Ticket*, Me. Jud. Branch (last visited Oct. 24, 2025), https://www.courts.maine.gov/courts/traffic/contest.html; *Traffic Violations*, N.C. Jud. Branch (last visited Oct. 24, 2025), https://www.nccourts.gov/help-

(continued…)

States also offers students subject to suspensions an opportunity to contest such discipline at a hearing. For example, in North Carolina, students facing longer term suspensions have the right to a formal hearing, to be represented by counsel, to cross-examine witnesses, and to appeal.[15]

As another illustration, states offer substantial protections in code enforcement citation procedures. For example, in Virginia, an allegation of a zoning code violation gives rise to a panoply of procedural rights, including a trial and judicial review.[16] Other states provide similar rights.[17] Notably the burden of proof in these matters does not rest on the individual, in contrast to the assignment of the burden of proof to individuals subject to the 2025 Designation "to affirmatively show that he or she has the required continuous physical presence in the United States," alongside "procedures [that] do not afford individuals meaningful notice of a key element of the 'case against' them—the allegation that

_____

topics/traffic-and-vehicles/traffic-violations; *Traffic Offenses; Disputing Your Traffic Citation*, Utah State Cts. (last visited Oct. 24, 2025), https://www.utcourts.gov/en/self-help/case-categories/criminal-justice/traffic.html.

[15] *See* Elementary and Secondary Education, Long-Term Suspension Procedures, N.C. Gen. Stat. § 115C-390.8 (2024); *see also, e.g.*, Texas Educ. Code § 37.009(f) (2025) (setting forth procedures for school suspensions).

[16] *See* Civil Penalties for Violations of Zoning Ordinance, Va. Code Ann. § 15.2-2209 (2025).

[17] *See, e.g.*, State Administrative Procedures, Judicial Review of Contested Cases, W. Va. Code § 29A-5-4 (2025); State Agency Rule Making and Adjudication of Contested Cases. Judicial Review of Final Decision of Administrative Law Judge; Stay of Enforcement of Decision, S.C. Code Ann. § 1-23-610 (2025).

they have been present in the country for less than two years—or the 'opportunity

to meet' that allegation." *Make the Rd. N.Y.,* 2025 WL 2494908, *17 (citations

omitted).

Defendants do not dispute that the 2025 Designation's expansion of

expedited removal lacks various features commonly found in administrative

proceeding, such as an opportunity for a hearing, to present witnesses, to be

represented by counsel, and to seek judicial review to address mistakes or

violations of law.[18] A line-level immigration officer, with the simple concurrence

of a supervisor, determines that a noncitizen is subject to expedited removal, and

this decision is final "without further hearing or review." 8 U.S.C. §

1225(b)(1)(A)(i); 8 C.F.R. § 235.3(b)(7). Amici States' experience shows that a

variety of procedural protections are available to governmental entities, including

in cases involving deprivations of liberties far less severe than removal.

---

[18] The sole limited exception, found in 8 U.S.C. § 1252(e)(2), is judicial review in habeas proceedings of the limited questions of whether the petitioner is a noncitizen, whether he was ordered removed under 8 U.S.C. § 1225(b)(1) [i.e., the expedited removal statute], or whether the petitioner can prove by a preponderance of the evidence that he is lawful permanent resident, was admitted as a refugee, or was granted asylum and such status was not subsequently terminated.

## II. EQUITABLE CONSIDERATIONS STRONGLY FAVOR THE DISTRICT COURT'S STAY OF THE 2025 DESIGNATION

### A. The Public Interest is Harmed by the Expansion of Expedited Removal

There is no dispute that the 2025 Designation extends the geographic and temporal reach of expedited removal. *Make the Rd. N.Y.*, 2025 WL 2494908, at *10 ("Under the previous regime, only those who had 'a close spatial and temporal nexus to the border" were eligible for expedited removal.'" (citation omitted)). In doing so, the 2025 Designation requires determinations that are more complex than has previously been the case in the application of expedited removal and more prone to error. *Id.* at *17; *cf. id.* at *14-16 (discussing errors documented in the application of expedited removal to the less complex circumstances of the border). And yet the Administration has not explained how, in a population of more than 340 million, plus tourists and others visiting lawfully, it would identify fairly and accurately the fraction of individuals who were not inspected and admitted or paroled, and who have been continuously present in the United States for less than two years. In fact, only 32% of people without legal status in the United States have lived here for less than 10 years.[19] In California, only 11% have resided in the

---

[19] *Profile of the Unauthorized Population: United States*, Migration Policy Institute, https://www.migrationpolicy.org/data/unauthorized-immigrant-population/state/US.

15

United States for fewer than five years.[20] In States on the southwest border, 45-58% of those who lack immigration authorization have been present more than 20 years.[21] These, among others, are the longtime residents put at risk for summary removal without ever seeing an immigration judge.[22] As the District Court found, "the expedited removal process has in place woefully inadequate procedures for accurately determining whether a noncitizen has been present for two years." *Id.* at *16.

The harms of arbitrary enforcement will not be borne equally among our Nation's residents.[23] Latinos, in particular, have experienced immigration

---

[20] *Profile of the Unauthorized Population: California*, https://www.migrationpolicy.org/data/unauthorized-immigrant-population/state/CA.

[21] *See Unauthorized Immigrant Population Profiles, Migration Policy Institute*, Migration Policy Institute, https://www.migrationpolicy.org/programs/us-immigration-policy-program-data-hub/unauthorized-immigrant-population-profiles [for Arizona (57%), California (58%), New Mexico (56%), and Texas (45%)].

[22] *Cf., e.g.*, Luis Ferré-Sadurni & Hamed Aleaziz, *How a Former Trump Golf Club Worker Was Mistakenly Deported to Mexico*, N.Y. Times (Oct. 30, 2025), https://www.nytimes.com/2025/10/30/nyregion/immigrant-wrongly-deported-mexico.html (reporting on mistaken deportation of 22-year-long resident and father of a U.S. Marine prior to any hearing); Uriel J. García et al., *"A Lot of Fear Going On": Texas Immigrant Community on Edge During Trump's First Weeks*, Tex. Trib. (Jan. 31, 2025), https://www.texastribune.org/2025/01/31/texas-immigrants-undocumented-trump-deportation/ (reporting on a daughter's unsuccessful attempts to reach her father in Border Patrol custody to provide documents, including utility bills, tax documents and property records, showing he had lived in the U.S. for more than 20 years, before he was removed to Mexico).

[23] *See, e.g.*, Kavitha Surana, *How Racial Profiling Goes Unchecked in Immigration Enforcement*, ProPublica & Phila. Inquirer (June 8, 2018),

(continued…)

16

enforcement in numbers disproportionate to their representation among persons who are undocumented.[24] And as courts have recently concluded, the federal government has relied on factors like evident race and language to conduct stops, even though "officer[s] cannot rely solely on generalizations that, if accepted, would cast suspicion on large segments of the law-abiding population." *Vazquez Perdomo v. Noem*, 790 F. Supp. 3d 850, 890 (C.D. Cal. 2025) (quoting *United States v. Manzo-Jurado*, 457 F. 3d 928, 935 (9th Cir. 2006)); *see also Noem v. Vasquez Perdomo*, -- U.S. --, 2025 WL 2585637, *9 (Sotomayor, J., dissenting). Expansion of expedited removal into the interior can be expected to worsen disparities in enforcement.[25]

---

https://www.propublica.org/article/racial-profiling-ice-immigration-enforcement-pennsylvania.

[24] *See, e.g.*, Jonathan Ong et al., *Latino ICE Arrests Surge Under Trump*, UCLA Center for Neighborhood Knowledge (Oct. 2025), https://knowledge.luskin.ucla.edu/wp-content/uploads/2025/10/Unseen_Latino-Ice-Arrests-Surge-Under-Trump_20251027.pdf (finding Latinos accounted for approximately nine in 10 ICE arrests during the first six months of the current administration); Tanya Golash-Boza, *The Deportation Crisis for Latino Immigrant Men and Their Families*, Scholars Strategy Network (Apr. 9, 2014), https://scholars.org/brief/deportation-crisis-latino-immigrant-men-and-their-families ("Although Asians and Europeans make up about a quarter of undocumented immigrants in the United States, over 97 percent of deportees are from Latin America or the Caribbean.").

[25] *See, e.g.*, Steve Benen, *Just How Many 'Kavanaugh Stops' Have American Citizens Been Forced to Endure?*, MSNBC (Oct. 17, 2025), https://www.msnbc.com/rachel-maddow-show/maddowblog/kavanaugh-stops-american-citizens-ice-detention-rcna238194; David J. Bier, *One in Five ICE Arrests Are Latinos on the Streets with No Criminal Past or Removal Order*, Cato

(continued…)

17

Citizens and noncitizens with lawful status alike will suffer these harms. A recent investigation found more than 170 U.S. citizens have already been held by immigration agents, at least 20 of whom "were held for more than a day without being able to phone lawyers or loved ones."[26] As one example, masked officers entered the auto business of U.S. citizen Brian Gavidia in California, with guns drawn, ignoring his plea, "I am an American."[27] Agents then took away co-owner Javier Ramirez by gunpoint, drove him around in a van for hours, and did not permit him to speak to a lawyer or family member for three days.[28] Another Latino U.S. citizen reportedly was targeted by immigration officers at two different worksites.[29] Other examples come from a recent raid at a Chicago apartment

Institute (Aug. 5, 2025), https://www.cato.org/blog/1/5-ice-arrests-are-latinos-streets-no-criminal-past-or-removal-order.

[26] Nicole Foy, *We Found That More Than 170 U.S. Citizens Have Been Held by Immigration Agents. They've Been Kicked, Dragged and Detained for Days*, ProPublica (Oct. 16, 2025), https://www.propublica.org/article/immigration-dhs-american-citizens-arrested-detained-against-will.

[27] Jazmine Ulloa et al. *'I'm From Here!': U.S. Citizens Are Ending Up in Trump's Dragnet*, New York Times (Sept. 29, 2025), https://www.nytimes.com/2025/09/29/us/trump-immigration-agents-us-citizens.html.

[28] *Id*.

[29] Tim Sullivan, *Lawsuit Filed Against Immigration Authorities After U.S. Citizen's Arrests in Raids*, AP News (Oct. 1, 2025), https://apnews.com/article/trump-immigration-crackdown-lawsuit-courts-citizens-latino-alabama-a6bfae9528e03243ec08e9ade182da2f.

complex, where dozens of U.S. citizens, including children, were pulled from their homes, with some reportedly zip-tied while in pajamas.[30]

Many who ostensibly are not covered by the 2025 Designation will be vulnerable to immediate summary removal. There are those who do not carry proof of citizenship on their person; some leave home without proof of their valid immigration status,[31] and very few carry documents showing how long they have been in the United States. *Cf. Noem v. Vasquez Perdomo*, -- U.S. --, 2025 WL 2585637, *14 (Sotomayor, J., dissenting) (warning of "improperly shift[ing] the burden onto an entire class of citizens to carry enough documentation to prove that they deserve to walk freely"). Immigration officers will have little reason to take people's word for when they arrived, and government databases often contain

---

[30] Nicholas Bogel-Burroughs et al., *A Squalid Building, a Tip to the Feds, and Then 'Straight-Up Chaos'*, (Oct. 19, 2025), https://www.nytimes.com/2025/10/19/us/chicago-south-shores-border-patrol-raid.html; Maira Khwaja et al., *Federal Agents Storm South Shore Building, Detaining Families and Children*, South Side Weekly (Oct. 6, 2025), https://southsideweekly.com/federal-agents-storm-south-shore-building-detaining-families-and-children/.

[31] *Cf., e.g.*, Sofia Mejías-Pascoe, *Border Patrol Criminally Citing Immigrants for Not Carrying Their Papers Under Decades-Old Law*, Inewsource (July 16, 2025), https://inewsource.org/2025/07/16/border-patrol-criminally-citing-immigrants-not-carrying-papers/; Suzanne Gamboa & Nicole Acevedo, *Trump Immigration Raids Snag U.S. Citizens, Raising Profiling Fears*, NBC News (Jan. 28, 2025), https://www.nbcnews.com/news/latino/trump-immigration-raids-citizens-profiling-accusations-native-american-rcna189203.

inaccuracies,[32] while those without prior contact with DHS may not exist in DHS databases. Seniors, young people, people of color, and persons with low income will be disproportionately at risk, as they are less likely to possess photo identification,[33] and people with disabilities will be especially vulnerable.[34]

### B. Amici States Will be Harmed Because the Threat of Immediate Removal Without Due Process Will Stifle Basic Civic Engagement and Access to Critical Services

Separate from the harms suffered by individuals, Amici States will also suffer distinct harms. Fear of expanded expedited removal will profoundly shape the way residents of Amici States engage in civil society, with effects reaching far beyond those who are undocumented. Across the country, there have already been

---

[32] *Cf.* Class Action Settlement Agreement and Release at 19, *Gonzalez v. Immigr. and Customs Enf't*, No. CV 13-04416-AB-FFM (C.D. Cal. Nov. 25, 2024) ECF No. 195, https://immigrantjustice.org/sites/default/files/uploaded-files/no-content-type/2025-01/Gonzalez-Detainers-Class-Settlement-Agreement_Nov2024.pdf (providing that "ICE may not establish probable cause to believe that the subject is a noncitizen who is removable from the United States solely based on evidence of foreign birth and the absence of records in available databases").

[33] *See, e.g.*, Jillian Andres Rothschild et al., *Who Lacks ID in America Today? An Exploration of Voter ID Access, Barriers, and Knowledge*, Center for Democracy and Civic Engagement (Jan. 2024), https://cdce.umd.edu/sites/cdce.umd.edu/files/pubs/Voter%20ID%202023%20survey%20Key%20Results%20Jan%202024%20%281%29.pdf; *New Analysis: Millions of Americans Lack ID Required to Vote*, VoteRiders (Apr. 13, 2023), https://www.voteriders.org/analysis-millions-lack-voter-id/.

[34] An illustrative example is that of Mark Lyttle, a U.S. citizen with mental disabilities whose diminished capacity was known to immigration officials. Mr. Lyttle was deported *despite* evidence he was a citizen. *See Lyttle v. United States*, 867 F.Supp.2d 1256, 1269-71 (M.D. Ga. 2012).

reports of residents being afraid to leave their homes, even for basic necessities like food or to go to church.[35] Healthcare workers throughout the country are "increasingly concerned that people with serious medical conditions, including injuries, chronic illnesses and high-risk pregnancies, are forgoing medical care out of fear of being apprehended by immigration officials."[36] Families have kept children home from school out of fear.[37] The impact goes beyond those who are undocumented and members of mixed-status families. Entire communities have been described as "ghost towns" in the wake of recent raids.[38]

---

[35] *See, e.g.*, Luis Andres Henao & Tiffany Stanley, *Immigration Crackdown Stokes Fear and Solidarity at a Catholic Church in DC*, Associated Press (Oct. 27, 2025), https://apnews.com/article/immigration-crackdown-catholic-church-washington-874e6deca9e54a4e14081c63adca7718; Uriel J. García et al., *"A Lot of Fear Going On": Texas Immigrant Community on Edge During Trump's First Weeks*, Tex. Trib. (Jan. 31, 2025), https://www.texastribune.org/2025/01/31/texas-immigrants-undocumented-trump-deportation/.

[36] Emily Baumgaertner Nunn et al., *Migrants Are Skipping Medical Care, Fearing ICE, Doctors Say*, New York Times (May 9, 2025), https://www.nytimes.com/2025/05/08/health/migrants-health-care-trump.html.

[37] Bri Hatch, *In Increasingly Hispanic Memphis schools, Immigration Enforcement Surge Brings Fear, Absences*, Chalkbeat Tennessee (Oct. 28, 2025), https://www.chalkbeat.org/tennessee/2025/10/28/memphis-ice-law-enforcement-surge-brings-fear-absences-for-students/; Arthur Jones II, *Immigrant Families Fear Trump's Deportations as Children Return to School*, ABC News (Aug. 19, 2025), https://abcnews.go.com/Politics/immigrant-families-fear-trumps-deportations-children-return-school/story?id=124753982.

[38] Veronica Miracle, *How ICE Raids Turned Parts of Los Angeles Into Ghost Towns*, CNN (July 4, 2025), https://www.cnn.com/2025/07/04/us/los-angeles-ghost-towns.

Fear of removal, or of putting a loved one at risk for removal, also makes victims and witnesses reluctant to report crime, to testify in court, and even to seek safety in a domestic violence shelter.[39] When law enforcement agencies are unable to obtain evidence of crimes and maintain witness cooperation at trial, public safety suffers.[40] And while these harms are associated with more general concerns about enforcement, they are exacerbated when residents fear they may be summarily deported without due process.

### C.   Erroneous Removals Will Cause Lasting Harm to States and Their Residents

Removals lead to family separations and cause lasting damage to the mental health and well-being of children who reside in the Amici States. Most of these children are U.S. citizens—nearly half (48%) of households with at least one undocumented resident are the home of at least one U.S.-born child, with 5.5 million U.S.-born children living in mixed status households.[41] Children in

---

[39] James Queally, *Fearing Deportation, Many Domestic Violence Victims Are Steering Clear of Police and Courts*, L.A. Times (Oct. 9, 2017), https://www.latimes.com/local/lanow/la-me-ln-undocumented-crime-reporting-20171009-story.html.

[40] *See, e.g.*, Tom K. Wong, *The Effects of Sanctuary Policies on Crime and the Economy*, Ctr. for Am. Progress (Jan. 26, 2017), https://www.americanprogress.org/article/the-effects-of-sanctuary-policies-on-crime-and-the-economy/ (sanctuary counties have lower crime rates than comparable nonsanctuary counties).

[41] Matthew Lisiecki & Gerard Apruzzese, *Proposed 2024 Mass Deportation Program Would Socially and Economically Devastate American Families*, Center

(continued…)

families at risk frequently experience persistent anxiety, driven by the constant fear

that a family member may be deported,[42] and a child's risk of experiencing mental

health difficulties increases following the detention or removal of a parent.[43]

Children in these circumstances also suffer significantly worse health status,

behavioral problems, material hardship, and academic outcomes.[44] Expanded

expedited removal additionally puts children at risk of being left behind in broken

families or the foster care system.[45] More broadly, when family breadwinners are

deported, family members who remain experience substantially decreased income

for Migration Studies, at 3 (Oct. 10, 2024), https://cmsny.org/wp-content/uploads/2024/10/CMS-REPORT-Proposed-2024-Mass-Deportation-Program-Would-Socially-and-Economically-Devastate-American-Families.pdf.

[42] Ronald B. Cox et al., *Validation of the Family Fear of Deportation Scale for Youth*, 72 Fam. Rels. 3 at 736 (July 1, 2022), https://onlinelibrary.wiley.com/doi/10.1111/fare.12719.

[43] *See, e.g.*, Wendy Cervantes et al., *The Day That ICE Came: How Worksite Raids Are Once Again Harming Children and Families*, The Ctr. for Law & Soc. Pol'y, at 7-9 (July 13, 2020), https://www.clasp.org/wp-content/uploads/2022/01/CLASP_Worksite_Raid_Report_final4.pdf. **Error! Hyperlink reference not valid.**

[44] Ana Martinez-Donate et al., *Between the Lines: A Mixed-Methods Study on the Impacts of Parental Deportation on the Health and Well-Being of U.S. Citizen Children*, 9 J. of Migration & Health 100233, at 7-8 (May 2024), https://www.sciencedirect.com/science/article/pii/S2666623524000230.

[45] *U.S. Citizen Children Impacted by Immigration Enforcement*, Am. Immigr. Council, at 3-4 (June 24, 2021), https://www.americanimmigrationcouncil.org/wp-content/uploads/2025/01/us_citizen_children_impacted_by_immigration_enforcement_0.pdf.

and are often pushed below the poverty line, with many experiencing housing instability and food insecurity.[46] States are then called upon to provide a safety net.

Public health will also be adversely impacted. When immigrants or their family members are reluctant to seek primary care or emergency medical treatment due to fears of detention and removal,[47] the consequences can include the spread of infectious diseases, higher healthcare costs for untreated chronic illnesses, and pregnancy complications.[48] Undocumented women, for example, are less likely to receive needed healthcare and preventative screenings than the general U.S.

---

[46] *See, e.g.*, Robert Lynch & Michael Ettlinger, *The Economic Impact on Citizens and Authorized Immigrants of Mass Deportation*, Univ. of N.H. Carsey Sch. of Pub. Pol'y, at 2, 5 (Aug. 29, 2024), https://carsey.unh.edu/sites/default/files/media/2024-08/economic-impact-mass-deportation-lit-review.pdf; *Mass Deportation: Devastating Costs to America, Its Budget and Economy*, Am. Immigr. Council, at 3-5 (Oct. 2, 2024), https://www.americanimmigrationcouncil.org/wp-content/uploads/2025/01/mass_deportation_report_2024.pdf; Robert Warren & Donald Kerwin, *Mass Deportations Would Impoverish US Families and Create Immense Social Costs*, Ctr. for Migration Stud. (2017), https://cmsny.org/publications/mass-deportations-impoverish-us-families-create-immense-costs/.

[47] *See, e.g.*, Sezer Kisa & Adnan Kisa, *"No Papers, No Treatment": A Scoping Review of Challenges Faced by Undocumented Immigrants in Accessing Emergency Healthcare*, 23 Int'l J. for Equity in Health 184, at 2, 6, 8 (2024), https://pmc.ncbi.nlm.nih.gov/articles/PMC11401389/pdf/12939_2024_Article_2270.pdf.

[48] *Id*. at 11; Romina Tome et al., *Heightened Immigration Enforcement Impacts US Citizens' Birth Outcomes: Evidence from Early ICE Interventions in North Carolina*, Duke Univ. Sanford Sch. of Pub. Pol'y (Feb. 3, 2021), https://doi.org/10.1371/journal.pone.0245020.

population, leading to significantly higher rates of conditions like cervical cancer, birth complications, neonatal morbidity, and seizures for newborns.[49]

Increased removals will harm the health of U.S. citizens in another respect. Approximately one million people working in healthcare—17% of all healthcare workers—are not citizens, and some reportedly have been avoiding work because they fear being caught up in mass enforcement.[50] Rapid, large-scale removals "could especially compromise long-term care, where immigrants play a large role" and often hold jobs that other Americans are reluctant to take or could not replace sufficiently.[51]

Amici States will also suffer harms to their economies and tax bases. The overall impact of mass enforcement is expected by some to be "catastrophic."[52]

---

[49] Kisa & Kisa, *supra* note 47, at 4-5.

[50] Elvia Malagón & Esther Yoon-Ji Kang, *Many Home Care Workers are Immigrants. Now, Some Are Afraid to Go to Work*, WBEZ Chicago (Aug. 6, 2025), https://www.wbez.org/immigration/2025/08/06/immigrants-deportations-shrinking-health-care-workforce.

[51] *See* Lenore S. Azaroff et al., *Deporting Immigrants May Further Shrink the Health Care Workforce*, 333 JAMA 22 (Apr. 3, 2025), https://jamanetwork.com/journals/jama/fullarticle/2832246.

[52] *Mass Deportations Would Deliver a Catastrophic Blow to the U.S. Economy*, U.S. Cong. Joint Econ. Comm. (Dec. 2024), https://www.jec.senate.gov/public/_cache/files/6cde181a-1c61-46f7-97fe-6ab3cbc96141/mass-deportations-would-deliver-a-catastrophic-blow-to-the-u.s.-economy.pdf.

Impacts are already being seen.[53] One source estimates that real gross domestic product (GDP) could decline by as much as 6.2% by 2028, prices would increase, U.S. tax revenues would decline, and unemployment rates for American workers would increase.[54] Another recent study, by the Wharton School, concluded that mass deportations would increase primary deficits by $900 billion in 10 years, in addition to $170 billion for border security, interior enforcement, and deportations.[55] The wages of all high-skill workers in the United States (63% of the population), whose jobs are complemented by the low-skilled jobs disproportionately occupied by unauthorized immigrants, would also decrease 2.8%, and lower their tax contributions.[56] In California alone, mass removals would result in the loss of $275 billion from the State's economy and in $23 billion

---

[53] Robert G. Lynch et al., *Warning Signs of the Economic Harms from Deportations* (Aug. 9, 2025), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=5384966 (examining losses in employment and other economic measures in the construction, agriculture and leisure and hospitality industries).

[54] *See* Lynch & Ettlinger, *supra* note 46, at 2, 4-6.

[55] Felipe Ruiz Mazin & Felix Reichling, *Mass Deportation of Unauthorized Immigrants: Fiscal and Economic Effects*, Univ. of Pa. Penn Wharton (July 28, 2025), https://budgetmodel.wharton.upenn.edu/issues/2025/7/28/mass-deportation-of-unauthorized-immigrants-fiscal-and-economic-effects.

[56] *Id*.

in lost tax revenue each year.[57] The District Court's Order staying the 2025

Designation properly accounts for these harms.

## CONCLUSION

The Court should affirm the District Court's Order staying the 2025

Designation and the Huffman Memorandum.

Dated: November 10, 2025                      Respectfully submitted,

                                             **ROB BONTA**
                                             Attorney General for California
                                             MICHAEL L. NEWMAN
                                             Senior Assistant Attorney General

                                             By: */s/ Vilma Palma-Solana*
                                             VILMA PALMA-SOLANA
                                             ROBIN L. GOLDFADEN
                                             *Supervising Deputy Attorneys*
                                             *General*
                                             LUCIA CHOI
                                             CHRISTOPHER TENORIO
                                             *Deputy Attorneys General*
                                             300 S. Spring Street, #1700
                                             Los Angeles, CA 90013
                                             Telephone: (213) 269-6000
                                             vilma.solana@doj.ca.gov

                                             *Attorneys for State of California*

---

[57] *The Economic Impact of Mass Deportation in California*, Bay Area Council Economic Institute at 2, 30 (June 2025), https://www.bayareaeconomy.org/files/pdf/Economic%20Impact%20of%20Mass%20Deportation_June%202025.pdf.

27

**KRISTIN K. MAYES**
Attorney General of Arizona
2005 North Central Avenue
Phoenix, Arizona 85004

**PHILIP J. WEISER**
Attorney General of Colorado
1300 Broadway, 10th Floor
Denver, Colorado 80203

**KATHLEEN JENNINGS**
Attorney General of Delaware
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801

**WILLIAM TONG**
Attorney General
State of Connecticut
165 Capitol Avenue
Hartford, CT 06106

**ANNE E. LOPEZ**
Attorney General of Hawai'i
425 Queen Street
Honolulu, HI 96813

**KWAME RAOUL**
Attorney General for Illinois
100 W. Randolph Street
Chicago, Illinois 60603

**AARON M. FREY**
Attorney General of Maine
6 State House Station
Augusta, ME 04333-0006

**ANTHONY G. BROWN**
Attorney General for Maryland
200 Saint Paul Place
Baltimore, Maryland 21202

**ANDREA JOY CAMPBELL**
Attorney General
Commonwealth of Massachusetts
One Ashburton Place
Boston, MA  02108

**DANA NESSEL**
Michigan Attorney General
P.O. Box 30212
Lansing, Michigan 48909

**KEITH ELLISON**
Attorney General
State of Minnesota
102 State Capitol
75 Rev. Dr. Martin Luther King Jr.
Blvd.
St. Paul, MN 55155

**AARON D. FORD**
Attorney General of Nevada
100 North Carson Street
Carson City, NV 89701

**MATTHEW J. PLATKIN**
Attorney General of New Jersey
Richard J. Hughes Justice Complex
25 Market Street
Trenton, NJ 08625

**LETITIA JAMES**
Attorney General of New York
1 Empire State Plaza
Albany, NY 12224

**CHARITY R. CLARK**
Attorney General
State of Vermont
109 State Street
Montpelier, VT 05609

**BRIAN L. SCHWALB**
Attorney General for the District of
Columbia
400 6th Street, NW, Suite 8100
Washington, DC 20001

**RAÚL TORREZ**
Attorney General for New Mexico
408 Galisteo Street
Santa Fe, New Mexico 87501

**DAN RAYFIELD**
Attorney General of Oregon
1162 Court Street NE
Salem, OR 97301

**NICHOLAS W. BROWN**
Attorney General
State of Washington
Attorney General
State of Washington
P.O. Box 40100
Olympia, WA 98504

30

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(g)(1) of the Federal Rules of Appellate Procedure, Vilma Palma-Solana, an employee in the Office of the Attorney General of the State of California, hereby certifies that according to the word count feature of the word processing program used to prepare this brief, the brief contains 6,199 words and complies with the typeface requirements and length limits of Rules 29 and 32(a)(5)-(7) and the corresponding local rules.


/s/ *Vilma Palma-Solana*

## CERTIFICATE OF SERVICE

I hereby certify that, on November 10, 2025, I electronically filed the foregoing Amicus Brief for States of California, Arizona, Colorado, Connecticut, Delaware, Hawaiʻi, Illinois, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, New Mexico, New York, Oregon, Vermont, and Washington and the District of Columbia as Amici Curiae in Support of Appellee for Affirmance using the Court's CM/ECF system and that, therefore, service was accomplished upon counsel of record by the Court's CM/ECF system.

Dated:     November 10, 2025

/s/ *Vilma Palma-Solana*