Oral Argument Scheduled December 9, 2025

No. 25-5320

---

### IN THE UNITED STATES COURT OF APPEALS
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————

MAKE THE ROAD,
*Appellee*,

v.

KRISTI NOEM, in her official capacity as
Secretary of Homeland Security, *et al.*,
*Appellants*.

———————————

On Appeal from the U.S. District Court
for the District of Columbia
No. 1:25-cv-00190 (Cobb, J.)

———————————

### REPLY BRIEF FOR APPELLANTS

———————————

ELISSA P. FUDIM
JOSEPH McCARTER
CAROLINE McGUIRE
*Trial Attorneys*
U.S. Department of Justice,
Civil Division
Office of Immigration Litigation
General Litigation & Appeals
P.O. Box 878, Ben Franklin
Station
Washington, DC 20044

BRETT A. SHUMATE
*Assistant Attorney General*

DREW C. ENSIGN
*Deputy Assistant Attorney General*

TYLER J. BECKER
*Counsel to the Assistant Attorney General*
U.S. Department of Justice,
Civil Division
950 Pennsylvania Avenue, NW
Washington, DC 20530
(202) 514-2000

# TABLE OF CONTENTS

INTRODUCTION ........................................................................ 1

ARGUMENT .............................................................................. 4

    I.    The Government Is Likely to Succeed on the Merits ............ 4

        A.    The District Court's Stay Violates 8 U.S.C. §1252(f)(1) ..................................................................... 4

        B.    The 2025 Designation Complies With Due Process Because Unadmitted Aliens Are Entitled to Only the Protections the Political Branches Provide ............ 7

        C.    Even if the Aliens Here Possess a Liberty Interest in Remaining, the Expedited Removal Procedures Provide Sufficient Process ......................................... 17

        D.    Plaintiff's Facial Due Process Claim Fails ................. 27

    II.    The Other Equitable Factors Favor the Government. ........ 28

    III.    The District Court's Universal Relief Exceeded Its Authority ................................................................. 30

CONCLUSION ........................................................................ 35

# TABLE OF AUTHORITIES

## Cases

*A.A.R.P. v. Trump,*
605 U.S. 91 (2025).................................................................. 13

*Am. Immigration Lawyers Ass'n v. Reno,*
18 F. Supp. 2d 38 (D.D.C. 1998) ........................................ 18

*Cannon v. District of Columbia,*
717 F.3d 200 (D.C. Cir. 2013) ............................................ 25

*Career Coll. & Schools of Texas v. DOE,*
98 F.4th 220 (5th Cir. 2024)............................................... 32

*Darby v. Cisneros,*
509 U.S. 137 (1993)............................................................. 33

*Dep't of State v. Muñoz,*
602 U.S. 899 (2024)............................................................... 8

*DHS v. Thuraissigiam,*
591 U.S. 103 (2020)........................ 7, 12, 14, 15, 16, 18, 19, 20, 21, 22

*Dupree v. Younger,*
598 U.S. 729 (2023)............................................................. 17

*Garland v. Aleman Gonzalez,*
596 U.S. 543 (2022)....................................................... 2, 4, 5

*Hecht Co. v. Bowles,*
321 U.S. 321 (1944)............................................................. 31

*Immigrant Defs. L. Ctr. v. Noem,*
145 F.4th 972 (9th Cir. 2025)...................................... 3, 6, 31

*eBay Inc. v. MercExchange, L.L.C.,*
547 U.S. 388 (2006).......................................................... 27, 32

*Kaplan v. Tod,*
    267 U.S. 228 (1925) ............................................................... 2, 11

*Knauff v. Shaughnessy,*
    338 U.S. 537 (1950) ................................................................. 11

*Landon v. Plasencia,*
    459 U.S. 21 (1982) ................................................................... 15

*Lewis v. Casey,*
    518 U.S. 343 (1996) ................................................................. 20

*Loughrin v. United States,*
    573 U.S. 351 (2014) ................................................................... 5

*M.M.V. v. Garland,*
    1 F.4th 1100 (D.C. Cir. 2021) ................................................. 21

*Make the Road N.Y. v. Wolf,*
    962 F.3d 612 (D.C. Cir. 2020) ................................................ 26

*Mathews v. Eldridge,*
    424 U.S. 319 (1976) ............................................................ 21, 23

*Mitchell v. Scully,*
    746 F.2d 951 (2d Cir. 1984) ................................................... 24

*Mullane v. Cent. Hanover Bank & Trust Co.,*
    339 U.S. 306 (1950) ................................................................. 16

*New York v. Meta Platforms, Inc.,*
    66 F.4th 288 (D.C. Cir. 2023) ................................................ 24

*Nishimura Ekiu v. United States,*
    142 U.S. 651 (1892) .............................................................. 8, 11

*Nken v. Holder*,
  556 U.S. 418 (2009)............................................................... 5

*Olim v. Wakinekona*,
  461 U.S. 238 (1983)............................................................. 22

*Shaughnessy v. United States ex rel. Mezei*,
  345 U.S. 206 (1953)............................................................. 11

*Starbucks Corp. v. McKinney*,
  602 U.S. 339 (2024)................................................ 31, 32, 33

*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009)............................................. 19, 20, 35

*Trump v. CASA, Inc.*,
  606 U.S. 831 (2025)................................................... 3, 30

*United States v. Bronstein*,
  849 F.3d 1101 (D.C. Cir. 2017) ........................................... 6

*United States v. Peralta-Sanchez*,
  847 F.3d 1124 (9th Cir. 2017) ........................................... 26

*United States v. Salerno*,
  481 U.S. 739 (1987)................................................... 3, 27

*Winter v. NRDC*,
  555 U.S. 7 (2008)................................................................ 31

*Wong Yang Sung v. McGrath*,
  339 U.S. 33 (1950)............................................................. 13

*Yamataya v. Fisher*,
  189 U.S. 86 (1903)........................................ 11, 12, 13, 24

## **Statutes**

5 U.S.C. §702...................................................................... 33

5 U.S.C. §705.............................. 6, 8, 9, 10, 11, 33, 34, 35, 36, 37, 38, 39

8 U.S.C. §1252(e)(3) ................................................. 21, 27, 34

8 U.S.C. §1252(e)(3)(A) ....................................................... 26

8 U.S.C. §1252(f)(1)........................................................ 1, 3, 4

8 U.S.C. §1252(e)(2) ............................................................ 17

8 U.S.C. §1252(f)(2)........................................................... 4, 5

## INTRODUCTION

Congress enacted expedited removal nearly three decades ago to enable the Government to swiftly remove a class of inadmissible aliens who have no right to remain in the country without placing them in backlogged Immigration and Nationality Act (INA) §240 proceedings. Since 2002, it has been applied to unadmitted aliens who have been in this country for upwards of two years regardless of their distance from the border, so long as they arrived by sea. It has also applied for more than two decades to aliens encountered within 100 miles of a land border and within 14 days of arrival.

Earlier this year, the Department of Homeland Security (DHS) chose to extend the rule that has long applied for sea arrivals to land arrivals too, thereby expanding expedited removal to the full extent permitted by statute. The district court below nonetheless issued a nationwide stay under 5 U.S.C. §705, concluding the expansion of expedited removal violated the Due Process Clause.

The district court's stay is indefensible. *First*, the court lacked jurisdiction to enter the stay because it "restrain[s]" the Government from expeditiously removing an entire class of aliens until it adopts

1

further procedures.   8 U.S.C. §1252(f)(1); *see Garland v. Aleman Gonzalez*, 596 U.S. 543, 551 (2022).

*Second*, the district court's universal stay contravenes the longstanding due-process principles the Supreme Court has recently reaffirmed in *DHS v. Thuraissigiam*, 591 U.S. 103 (2020). *Thuraissigiam* reiterated the Supreme Court's century-old doctrine that the due process rights of aliens who have not been lawfully admitted to the country consist *solely* of the procedures that Congress provided by statute.  The district court squarely contravened this bedrock principle by holding that due process requires additional procedures for aliens who broke our nation's laws.  It did so by reasoning that those aliens had effected an entry and thereby adversely possessed additional due process rights by virtue of their unlawful entry. That holding is legally unsound and defies logic: providing more process for aliens who unlawfully entered the United States than for those who were *lawfully* paroled into the country for upwards of nine years but never admitted.  *See Kaplan v. Tod*, 267 U.S. 228, 229-30 (1925).

In any event, the expedited removal procedures exceed whatever process the Constitution compels.  The district court and Plaintiff Make

the Road may desire additional procedures as a policy matter, but that is a question entrusted to the political branches. The district court further erred by granting facial relief without ever requiring Plaintiff to "establish that no set of circumstances exist[ed] under which the [statute and its implementing regulations] would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987).

The district court's universal stay is also overbroad. A §705 stay is a form of "interim equitable relief" and must operate within traditional equitable limits. *Immigrant Defs. L. Ctr. v. Noem*, 145 F.4th 972, 995-96 (9th Cir. 2025). Therefore, a §705 stay, like any other equitable remedy, cannot go beyond awarding a party complete relief. *Trump v. CASA, Inc.*, 606 U.S. 831, 859 (2025).

The district court's stay inflicts severe consequences because it universally invalidates a vital immigration enforcement tool. And it does so when efficient removals are a paramount priority of the Executive Branch, to redress the consequences of millions of illegal entrants.

This Court should reverse.

# ARGUMENT

## I.    The Government Is Likely to Succeed on the Merits

### A.    The District Court's Stay Violates 8 U.S.C. §1252(f)(1)

Section 1252(f)(1) precludes the district court's 5 U.S.C. §705 stay because it "enjoin[s] or restrain[s] the operation of" the INA provisions governing expedited removal and applies "beyond an individual alien against whom proceedings … have been initiated." 8 U.S.C. §1252(f)(1); *see* Br.28-33.

Echoing the district court, Plaintiff insists that §1252(f)(1) does not apply because that provision is confined to "injunctive relief," and the district court issued a stay. Appellee Br.40-41; Br.30; JA-20. But Plaintiff ignores the provision's text, which goes beyond orders that "enjoin," to include those that "restrain" a covered statute's operation.   8 U.S.C. §1252(f)(1); Br.30.  Section 1252(f)(1) thus broadly reaches all relief that prohibits the Government from "carry[ing] out" any covered provisions. *Aleman Gonzalez*, 596 U.S. at 549-50.  Regardless of whether the district court's §705 stay enjoins expedited removals, there is simply no colorable argument that the stay does not "restrain" them.  Just as in *Aleman Gonzalez*, the court's order "require[s] officials to … refrain from actions

4

that," "in the Government's view," "are allowed by" sections 1225(b)(1)(A) and 1182(a)(6). 596 U.S. at 551.

Plaintiff relies on *Nken v. Holder*, 556 U.S. 418 (2009), to juxtapose the effect of injunctive relief with that of a temporary §705 stay. Appellee Br.43,45. But *Nken* focused on whether an alien's request to stay removal proceedings was barred by a separate provision, §1252(f)(2) ("Particular Cases"). In §1252(f)(2), Congress used only the word "enjoin"—*not* "restrain." Section 1252(f)(1) does include the word "restrain," and that deliberate addition must be given effect. *See Loughrin v. United States*, 573 U.S. 351, 358 (2014) ("When Congress includes particular language in one section of a statute but omits it in another, this Court presumes that Congress intended a difference in meaning." (cleaned up)). Moreover, the *Nken* Court's express refusal to distinguish between preliminary or final injunctions in interpreting the meaning of "enjoin" dispels Plaintiff's irrelevant contention that "Section 1252(f)(2) permits only *final* injunctions[.]" *Compare* Appellee Br.45 *with Nken*, 556 U.S. at 428 ("[A] court [order] which commands or forbids is an injunction[,]" "whether the injunction is preliminary or final.").

5

Plaintiff argues that "restrain" has no independent effect and "enjoin or restrain" is merely a "textbook example of these 'common doublets in legal writing" or a reference to "the two kinds of injunctive relief: injunctions and temporary restraining orders." Appellee Br.43-44. But the "surplusage canon of statutory interpretation must be applied with the statutory context in mind." *United States v. Bronstein*, 849 F.3d 1101, 1110 (D.C. Cir. 2017). And here, the very next provision (§1252(f)(2)) undermines Plaintiff's position that a putative doublet exists here, demonstrating that Congress meant for "restrain" to have independent meaning.

Plaintiff's characterization of a §705 stay as a "temporary form of [§706] vacatur" does not help. Appellee Br.42. Even assuming §1252(f)(1) does not apply to vacaturs, a §705 stay is a form of interim equitable relief like a preliminary injunction that prevents the Government from using an otherwise available source of legal authority, *i.e. restraining* the Government's conduct. *See Immigrant Defs.*, 145 F.4th at 995-96.

6

**B.    The 2025 Designation Complies With Due Process Because Unadmitted Aliens Are Entitled to Only the Protections the Political Branches Provide**

The district court's decision violates a fundamental constitutional principle that controls this case: Aliens never lawfully admitted are entitled to no greater process than what the political branches provide. Br.33-41.

1. Plaintiff contends that Defendants have "expansively overread[]" the Supreme Court's decision in *Thuraissigiam* to "abrogate[]" longstanding precedent and hold that only aliens who have been lawfully admitted have due process rights in remaining.    Appellee Br.17. Throughout Plaintiff's brief, it insists that the Government argues that because unadmitted aliens receive no more process than what Congress provides, these aliens possess no due process rights.    Plaintiff's contention misconstrues the Government's argument and *Thuraissigiam* itself.

As the Government argued in its opening brief, the *Mathews v. Eldridge* standard does not apply in this context because it presupposes the existence of a liberty or property interest that could require additional procedures under the Due Process Clause.    Aliens who have

7

not been lawfully admitted lack any right to remain in the country, and there is no right "deeply rooted in this Nation's history and tradition" indicating otherwise.  Br.42 (quoting *Dep't of State v. Muñoz*, 602 U.S. 899, 910 (2024)).  But that does not mean that these aliens lack any due process rights at all in defending against removal from the United States under Title 8; it just means that these aliens receive only the due process that the political branches provide.

*Thuraissigium* did not hold otherwise.  There, the Court held that "the due process rights of an alien seeking initial entry" are simply "[w]hatever the procedure[s] authorized by Congress." *Thuraissigium*, 591 U.S. at 139 (citation omitted).  The Court concluded as much, relying on more than a century of Supreme Court precedent holding that for unadmitted aliens, "the decisions of executive and administrative officers, acting within the powers expressly conferred by Congress, are due process of law." *Nishimura Ekiu v. United States*, 142 U.S. 651, 660 (1892).

Plaintiff argues that *Thuraissigium* is a narrow holding, limited to its facts—where the respondent there was detained a mere 25 yards into the United States.  Appellee Br.17-18.  While it is true that

*Thuraissigiam* involved an alien apprehended shortly after entry, the Court's reasoning was not so geographically or temporally limited. To the contrary, the *Thuraissigiam* Court emphasized broader principles: "An alien who tries to enter the country illegally is treated as an 'applicant for admission.'" 591 U.S. at 139-40. And "aliens who arrive at ports of entry—*even those paroled elsewhere in the country for years pending removal*—are 'treated' for due process purposes 'as if stopped at the border[.]'" *Id.* (emphasis added).

Plaintiff argues (at 17) that if the Court's reference to respondent being "detained shortly after unlawful entry," signaled that the decision must rest on the timing or proximity of his arrest, rather than on his lack of lawful admission. Appellee Br.18-19. Not so. *Thuraissigiam* reaffirmed that for constitutional purposes, an alien does not "effect[] an entry" until he has been lawfully admitted. 591 U.S. at 138-40. The decision's logic does not turn on whether the alien was stopped 50 yards, 50 miles, or 500 miles past the border; it turns on whether the alien has been lawfully admitted. Br.22-24,36-38.

Plaintiff also argues that the long-established "entry fiction," whereby unadmitted aliens are treated for due-process purposes as if

stopped at the border, does not apply here. Appellee Br.19-20. Specifically, Plaintiff contends that the entry fiction is a narrow, port-of-entry exception that does not extend to aliens already inside the country. *Id.* But that argument misreads *Thuraissigiam*. The *Thuraissigiam* Court extended the entry fiction beyond the literal border. The Court never suggested that its application of the entry fiction would have been different if the alien was seized further from the border; rather, the Court focused on whether the alien had been admitted to the country or not.

Plaintiff's theory would produce a perverse and untenable result. If, as Plaintiff asserts, the entry fiction applies only to aliens detained or paroled at a port of entry, but not to those who deliberately evade inspection and cross the border unlawfully, then aliens who violate federal law would enjoy *greater* constitutional protections than those who comply with it. That cannot be the law. The entry fiction rests on whether an alien has been lawfully admitted—not on where the alien is encountered. *Thuraissigiam*, 591 U.S. at 139 (explaining that "the reason for our century-old rule regarding the due process rights of an alien seeking initial entry [] rests on [the] fundamental proposition[]" that that the "power to admit or exclude aliens is a sovereign prerogative."

*Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212, 215 (1953) (same); *Nishimura Ekiu*, 142 U.S. at 659-60) (same); *see also Kaplan*, 267 U.S. at 230-31 (holding that child paroled into the care of relatives for nearly nine years must be "regarded as stopped at the boundary line").

Plaintiff does not meaningfully dispute this anomalous double standard, instead suggesting that any inequity is "a problem of Defendants' own making" because the Government historically did not apply expedited removal to parolees.  Appellee Br.20-21.  But the Government's historical practices cannot alter the Supreme Court's established interpretation of constitutional protections.  The Supreme Court has long held that the procedures that due process require turn on lawful admission, not physical presence or agency discretion.  *See, e.g., Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950). Congress's creation of expedited-removal procedures to cover recent unlawful entrants simply reflects this settled principle: aliens who have not been lawfully admitted remain, for constitutional purposes, "as if stopped at the border." *Thuraissigiam*, 591 U.S. at 139.

2. Like the district court, Plaintiff relies on *Yamataya v. Fisher*, 189 U.S. 86 (1903), to argue that aliens who have unlawfully entered the

country have a weighty liberty interest in remaining. Appellee Br.14;

J.A.24-25. Plaintiff notes that the alien in *Yamataya* was arrested and

detained four days after she entered the country "surreptitiously,

clandestinely, unlawfully, and without any authority," and nonetheless,

the Supreme Court held that she could not be "deprived of her liberty"

without receiving "due process of law." Appellee Br.14 (quoting

*Yamataya*, 189 U.S. at 100-01). According to Plaintiff, *Yamataya*

demonstrates that even aliens who entered the country illegally are

entitled to due process. Appellee Br.14. Not so.

At the outset, the *Yamataya* Court expressly disclaimed reaching

any relevant constitutional holding: it explicitly "left on [the] side the

question whether an alien can rightfully invoke the due process clause of

the Constitution who has entered the country clandestinely[.]" *Id*. at 100.

Moreover, Yamataya did not enter the country "surreptitiously or

clandestinely." She arrived from Japan aboard a ship that docked at a

lawful port-of-entry. *Id*. at 94. The Court noted that an immigration

inspector *contended* a few days later that her entry was surreptitious and

clandestine, not because she snuck into the country, but because she was

likely to become a public charge—which rendered her statutorily

12

inadmissible. *Id*. The *Yamataya* Court interpreted the scope of that statute—*i.e.*, the process Congress thought due as a matter of *statute*— and held that the appellant was afforded all the required statutory processes. *Id*. at 100; *see Wong Yang Sung v. McGrath*, 339 U.S. 33, 49-50 (1950).

Although the Court recognized that "no person shall be deprived of his liberty without opportunity, at some time, to be heard," it declined to define what constituted due process for aliens like the alien in the case, other than to state that adequate process depends upon the "action contemplated by Congress." *Yamataya*, 189 U.S. at 101. Thus, *Yamataya* is consistent with *Thuraissigiam*, which provides that aliens who have not been lawfully admitted are entitled only to the process provided by Congress.

Plaintiff also contends that the Supreme Court's decision in *A.A.R.P. v. Trump*, 605 U.S. 91, 94 (2025) refutes the Government's reading of *Yamataya*. Appellee Br.15. Not so. In *A.A.R.P.*, the Supreme Court reiterated the unremarkable proposition that aliens are entitled to due process of law in removal proceedings. 605 U.S. at 94. The question here, however, is not whether aliens—even unadmitted aliens—are

13

entitled to due process; the question is what constitutes due process for such aliens in their removal. *Thuraissigiam* answered that question: aliens never lawfully admitted are entitled only to whatever process is provided for by statute when it comes to their removal under Title 8.

Further, in *A.A.R.P.*, the Court was reviewing actions taken under the Alien Enemies Act, a distinct statutory framework grounded in the Government's war powers—and did so in a context where the government had designated aliens not just as alien enemies but also members of a gang that was a foreign terrorist organization. The Court's discussion of due process was tethered to that unique statutory context—it did not constitute a general expansion of constitutional protections to all alien categories. Br.34-39. The Court invoked due process principles only as a means of interpreting the procedures Congress mandated there. That approach mirrors *Thuraissigiam's* recognition that the scope of due process in immigration depends on the statutory scheme Congress has enacted.

3. Plaintiff further argues that "Defendants [] advance a different theory than their admission-based test: that due process rights depend on whether a noncitizen has established connections in the United States

14

and that whether such connections exist is a political judgment that falls to the political branches." Appellee Br.21 (cleaned up), citing Br.38. That misconstrues Defendants' position. Defendants have consistently maintained that aliens who unlawfully enter the country remain stopped at the border for due-process purposes, and thus, are only entitled to the process Congress provides. Br.33-42.

This position aligns with an unbroken line of Supreme Court precedent. For example, in *Landon v. Plasencia*, 459 U.S. 21 (1982), the Court observed that only "*once an alien gains admission* to our country and begins to develop the ties that go with permanent residence [does] his constitutional status change[]." 459 U.S. at 32 (emphasis added). In *Thuraissigiam*, the Court reiterated that "established connections" contemplate "an alien's *lawful entry* into this country." 591 U.S. at 106-07 (emphasis added). Thus, in stating that whether an alien has "established connections" sufficient to merit additional process is a political judgment for the political branches, the Government did not propose an "alternate" due process test. Rather, the Government emphasized that "established connections," as described in *Plasencia* and

*Thuraissigiam*, only trigger additional due process procedures *if*—and *only if*—aliens have been lawfully admitted.

4. Plaintiff also insists that *Mathews* provides the relevant standard for what due-process protections are necessary for the removal of unadmitted aliens, and even if *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306 (1950), provides the proper standard, the outcome here would be the same. Appellee Br.23-24.

Assuming that the Due Process Clause could require any additional procedures for unadmitted aliens, *Mullane* provides the relevant standard—notice and an opportunity to be heard—not *Mathews* balancing. 339 U.S. 314. *Mathews* presupposes the existence of a liberty or property interest. But unadmitted aliens have no substantive right to remain in the country—they are instead applicants for admission who receive only the procedure authorized by Congress. Br.42. In fact, the Supreme Court did not even rely on *Mathews* balancing for the due process analysis in *J.G.G.* and *A.A.R.P.*—the decisions on which Plaintiff primarily relies. Br.41.

The district court below applied *Mathews* without any analysis of the proper standard. That legal error itself merits reversal. *See, e.g.*,

16

*Dupree v. Younger*, 598 U.S. 729, 738 (2023).  Regardless, the procedures providing notice and an opportunity to be heard—the cornerstone of the *Mullane* analysis—are adequate here.  *Infra* pp.19-29.

**C.** **Even if the Aliens Here Possess a Liberty Interest in Remaining, the Expedited Removal Procedures Provide Sufficient Process**

Even assuming *arguendo* the district court's conclusion that unadmitted aliens may receive more due-process protections than the political branches provide, the expedited procedures that have been in place for decades satisfy the Constitution.

1. Aliens placed into expedited removal proceedings receive notice of the charges against them, notice that they are subject to expedited removal, and an opportunity to respond.  Br.43.  Aliens who indicate an intention to apply for asylum, or express a fear of persecution or torture, may receive three levels of review of whether they have a "credible fear", including before an immigration judge.  *Thuraissigiam*, 591 U.S. at 110; *see* Br.43-44.  Only if aliens cannot establish a "significant possibility" that they could establish asylum eligibility or other protection before three decisionmakers will they be expeditiously removed.  Br.44-45.  And Congress provided for targeted judicial review of expedited-removal

17

orders through habeas proceedings, including allowing courts to review whether the individuals are U.S. citizens or lawful permanent residents, or have other lawful status. 8 U.S.C. §1252(e)(2). These procedures have been in place for decades and far exceed whatever the Constitution demands. Br.45-46; *Am. Immigration Lawyers Ass'n v. Reno*, 18 F. Supp. 2d 38, 58 (D.D.C. 1998), *aff'd*, 199 F.3d 1352 (D.C. Cir. 2000).

2. Plaintiff repeats many of the district court's conclusions that expedited-removal procedures violate due process. None of those conclusions are correct.

a. Like the district court, Plaintiff relies on a study indicating that 15% of aliens who express an intention to apply for asylum or a fear of persecution are not referred for a credible fear interview, which they contend demonstrates an "unacceptably 'high risk'" that aliens who express fear will not be referred for such interviews. Appellee Br.32. Like the district court, Plaintiff misses that under *Mathews*, courts are supposed to evaluate the risk of error and value of additional protections by looking at the "generality of cases, not the rare exceptions," and must balance that small alleged error rate against the government's interest in enforcing immigration laws. 424 U.S. at 344; *see* Br.46.

18

b.   Plaintiff, again echoing the district court, argues that the "rushed credible fear interview and review process" amounts to a due-process violation.  Appellee Br.33; *see* JA-32-34.  Yet that cannot be squared with the fact that the overwhelming majority of credible-fear screenings result in an affirmative credible-fear finding.  Br.47.  Nor do the three levels of review, including before an immigration judge, afforded to credible-fear determinations violate due process.  Br.47-48.

c.   Plaintiff also echoes the district court's conclusion that the procedures for determining whether an alien has established two-years of continuous presence, and thus is ineligible for expedited removal under the 2025 Designation, are inadequate.  Plaintiff lacks standing to challenge such procedures because it fails to identify a *single alien* who has *ever* been injured by the purportedly deficient procedures.

In any event, those procedures satisfy the Constitution.

i.   Plaintiff lacks associational standing to pursue this claim because it fails to identify any Make the Road members who "had suffered or would suffer" harm on this basis.  *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009); *see* Br.48-49.  Plaintiff responds that "'only one plaintiff must have standing'" to challenge the relevant actions on

19

due-process grounds, so even members who have been in the country for fewer than two years count. Appellee Br.30. But Article III standing is required "for each claim," *Summers*, 555 U.S. at 499, and is not "dispensed in gross," *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996). Plaintiff thus cannot secure relief for an injury that it has failed to show will affect *any* of its members.

Next, Plaintiff points to *unidentified* members who have been present for longer than two years and would have difficulty demonstrating two years of continuous presence. But *Summers* requires identification of a plaintiff with standing, 555 U.S. at 498—which Plaintiff has failed to do.

Lastly, Plaintiff contends that because some of its identified members are beginning to cross over the two-year mark of presence, it has standing to challenge the continuous-presence procedures. Appellee Br.31. The district court accepted that theory, reasoning that Plaintiff had standing because those members "are at risk of being placed in expedited removal pursuant to the 2025 Designation[.]" JA-43. But Article III and *Summers* demand *imminent* injury. 555 U.S. at 498-99.

Merely being placed "at risk" at some unidentified future time does not suffice.

ii.  Plaintiff's challenge is also untimely because the procedures at issue have been used for aliens who arrived by sea and were encountered within two years of arrival anywhere in the United States for *decades*. Plaintiff does not identify any new procedures for assessing duration of presence in the United States.  8 U.S.C. §1252(e)(3) establishes a 60-day jurisdictional bar for challenges to "regulation[s], or a written policy directive, written policy guideline, or written procedure" implementing expedited removal.  *M.M.V. v. Garland*, 1 F.4th 1100, 1109 (D.C. Cir. 2021).  Nothing about those procedures is new.  Nor does Plaintiff identify why arrival by sea or land would be of any constitutional dimension. Unlike Paul Revere—who was very much concerned with whether aliens were arriving by land or by sea—there is no reason to believe that the Due Process Clause places any significance on that distinction.

iii.  Regardless, the procedures for demonstrating continuous presence provide all the process that is due for unadmitted aliens.  The district court incorrectly asserted that there were no procedures to identify aliens who have been continuously present for more than two

years.  JA-35-38.  The statute, regulations, and guidance allow aliens to raise claims that they have been continuously present for longer than two years, even if Form I-867A does not expressly solicit such claims with a designated question.  Br.50.  The alien has the burden to prove two years of continuous presence, 8 U.S.C. §1225(b)(1)(A)(iii)(II), something that should not be difficult to demonstrate.  And DHS guidance provides a non-exhaustive list of documents officers may consider (*i.e.*, banknotes, leases, and employment records); if the alien cannot provide such documents immediately, the alien receives a "brief but reasonable opportunity" to obtain the evidence or contact a third party to obtain it. 2025 Guidance at 3.

Regardless, the district court's conclusion that this process is insufficient is legally immaterial because "an expectation of process is not … a liberty interest protected by the Due Process Clause." *Olim v. Wakinekona*, 461 U.S. 238, 250 n.12 (1983).  Aliens who lack any entitlement to remain in the country lack any due-process interest in process for process's sake.

iv. Plaintiff asserts that the process for determining continuous presence violates due process, as the district court concluded.  Plaintiff

complains that because immigration officers issue the notice of expedited removal and removal order together, Appellee Br.26, but that contemporaneity does not negate an alien's opportunity to present evidence to defend against expedited removal.

Plaintiff also complains that "there is no requirement to even *ask* about length of continuous presence." Appellee Br.26. But ICE has mandated that immigration officers, as well as Office of Principal Legal Advisor (OPLA) Attorneys, undergo training about the applicable legal requirements of expedited removal, immigration officers obtain supervisory approval prior to applying expedited removal, and consultation between supervisors and OPLA "prior to approving the application of expedited removal." 2025 Guidance at 4. The notion that there is a legally cognizable risk of expedited removal being applied to many aliens who have been continuously present for longer than two years is incorrect given these layers of review. Regardless, the statute places the burden on the alien to demonstrate continuous presence, making proving continuous presence of at least two years analogous to an affirmative defense to expedited removal. And like in criminal cases, "[a]n affirmative defense stands differently; due process

23

does not require that a defendant be advised of every basis on which he might escape or receive a lesser punishment for an offense that he has committed." *Mitchell v. Scully*, 746 F.2d 951, 956-57 (2d Cir. 1984).

Plaintiff contends that there is "no requirement that noncitizens be guaranteed an opportunity to gather and present evidence bearing on their continuous presence," Appellee Br.27, but that is belied by DHS guidance. *Infra* p.26-27. Plaintiff also complains that there is no neutral review of a continuous presence claims, Appellee Br.28, but the use of an administrative process without formal judicial review has long been held sufficient in removal proceedings. Br.52; *e.g.*, *Yamataya*, 189 U.S. at 100.

Plaintiff urges the Court to ignore the 2025 guidance document governing how aliens may prove continuous presence because it was not presented below. Appellee Br.26, 29. But federal courts "may take judicial notice of 'a fact that is not subject to reasonable dispute' if the fact 'can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.'" *New York v. Meta Platforms, Inc.*, 66 F.4th 288 (D.C. Cir. 2023) (quoting FED. R. EVID. 201(b)). Both requirements are satisfied here. There is no dispute about the

document's authenticity; Plaintiff complains only that the guidance was not presented earlier.

As to procedures for demonstrating continuous presence, the document is materially identical to guidance issued in 2019—the last time expedited removal was expanded to the statutory limits—and was presented in Plaintiff's suit challenging the 2019 Designation. Dkt.25-1, *Make the Road N.Y. v. McAleenan*, No. 1:19-cv-02369 (D.D.C. Aug. 28, 2019). And the source of the document—a government website—has been regularly found sufficient for judicial notice. *E.g.*, *Cannon v. District of Columbia*, 717 F.3d 200, 205 n.2 (D.C. Cir. 2013).

Plaintiff also protests that the guidance document is "insufficient" for due-process purposes on two grounds. Appellee Br.30. First, Plaintiff asserts that because the guidance is addressed only to ICE and not to Border Patrol agents, it is insufficient. But ICE is primarily responsible for processing expedited removal for aliens encountered in the interior. Second, Plaintiff asserts that the guidance does not require notice to the alien about the ability to demonstrate two years of continuous presence. But as discussed, *supra* p.25, the Due Process Clause does not require immigration officers to provide notice of every affirmative defense to

expedited removal. Aliens' ability to prove such a defense and opportunity to gather evidence to do so satisfies the Constitution.

v. Plaintiff proposes a panoply of additional safeguards that it says "would 'mitigate the risk'" of erroneous expedited removals, including the right to counsel, a chance to consult with friends, family, and/or counsel, and a neutral adjudicator. Appellee Br.34-37. In doing so, Plaintiff essentially asks this Court to rewrite the statute, and to do so in a manner that undermines the purpose of the expedited removal scheme. But "Congress adopted IIRIRA's expedited removal scheme to substantially shorten and speed up the removal process." *Make the Road N.Y. v. Wolf*, 962 F.3d 612, 618 (D.C. Cir. 2020). Plaintiff does not challenge the statute's constitutionality, and any such challenge would be decades late. *See* 8 U.S.C. §1252(e)(3)(A).

Likewise, Plaintiff's proposed procedures must be weighed against the fact that "requiring more process would fundamentally alter Congress's scheme without adding any significant protection for aliens in expedited removal proceedings." *United States v. Peralta-Sanchez*, 847 F.3d 1124, 1137 (9th Cir. 2017) (subsequent history omitted). The procedures already provide aliens with ample protections. *See* Br.8-9,42-

46. And additional procedures would cause a significant impediment to the Government's efforts to combat unlawful immigration.

### D. Plaintiff's Facial Due Process Claim Fails

Plaintiff brought a facial challenge to the 2025 Designation. To justify the facial relief it received, Plaintiff was required to establish that under "no set of circumstances" was the 2025 Designation constitutional. Br.54 (citing *Salerno*, 481 U.S. at 745). Notably, *Salerno* itself involved a due-process claim.

Plaintiff argues that *Salerno* does not apply to challenges under 8 U.S.C. §1252(e)(3). Appellee Br.37-39. Plaintiff fails to cite any caselaw for this proposition and instead reasons that Congress must have intended to exempt §1252(e)(3) from *Salerno*. Such deviations from traditional equitable principles require clear statements. *See*, *e.g.*, *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). And §1252(e)(3) does not supply any such clear statement. Indeed, the obvious intent of §1252(e)(3) was to *limit* programmatic challenges compared to ordinary APA suits (which can generally be brought anywhere in the United States within six years of a claim accruing).

Indeed, nothing in §1252(e)(3) indicates it authorizes challenges to the system that are untethered from a specific removal order or as applied to aliens who are non-parties. In fact, §1252(e)(1)(B) specifically prohibits any court from "certify[ing] a class under Rule 23 … in any" (e)(3) action, demonstrating the provision's focus on individual plaintiffs.

## II.    The Other Equitable Factors Favor the Government.

Plaintiff failed to establish irreparable injury. Plaintiff waited nearly *five months* after the challenged actions were first initiated to seek a §705 stay. Br.56-57, 59. Plaintiff parrots the district court's conclusion that the delay was excusable because the Government's implementation of the 2025 Designation became more "aggressive" later. Appellee Br.46. But Plaintiff never denies that it had full awareness of its alleged injury earlier. And the Administration's intent to enforce immigration laws robustly was hardly a secret.

Plaintiff next claims it established that its members are at imminent risk of being subject to the 2025 Designation because it provided evidence that DHS was "'targeting individuals attending their immigration court proceedings for placement in expedited removal." Appellee Br.46 (quoting JA-43). But the declarations did not specify

whether the individuals referenced therein were even Make the Road members, never mind specifically identify them as *Summers* requires. Br.59-60. Plaintiff's only identified member with an immigration court date was able to leave the courthouse. Br.60.

Plaintiff cites one other member (John Doe 4) whose §240 proceedings were dismissed and who was thereafter subject to expedited removal. Appellee Br.47. But this member *expressly* disclaimed seeking relief in Plaintiff's §705 stay motion. Br.49. Plaintiff also does not dispute that the credible fear process would provide any members placed in expedited removal the opportunity to establish a "significant possibility" they have meritorious claims for asylum or protection. Appellee Br.47. Plaintiff failed to show why any member could not demonstrate a "significant possibility" they would be eligible for asylum or protection and thus placed in §240 proceedings. Br.56-57.

Meanwhile, the district court's order is causing serious harm to the Government and the public. The court's universal stay significantly interferes with the Government's ability to enforce the immigration laws in the face of a surge of millions of illegal aliens who have entered the country over the last few years. Br.59. The court's stay eliminated an

indispensable tool that allows the Government to swiftly remove unadmitted aliens with no right to remain in the country, including many who have criminal records.  Br.57-59.

Plaintiff asserts that the court's order does not harm the Government because the prior designation limiting expedited removal to unadmitted aliens encountered within 100 miles of the border "was the status quo for decades."  Appellee Br.48.  That position overlooks the current immigration crisis that the 2025 Designation seeks to address.  It also relies on the erroneous proposition that the Government cedes legal authority by electing not to exercise it.  The Executive Branch must be permitted to respond to changing circumstances within its statutory authority, as it has done here.

## III.   The District Court's Universal Relief Exceeded Its Authority

The district court's §705 stay is governed by traditional equitable principles, which require that the court's order "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs."  Br.61 (quoting *CASA*, 606 U.S. at 852).  Indeed, §705 stays are evaluated using the same framework as preliminary injunctions, and the statute lacks the clear congressional command needed to overcome

the presumption that traditional equitable principles—including *CASA*'s complete relief principle—apply. Br.61-65 (citing, *inter alia*, *Starbucks Corp. v. McKinney*, 602 U.S. 339 (2024), *Hecht Co. v. Bowles*, 321 U.S. 321 (1944)). The Ninth Circuit recognized this and accordingly applied the complete-relief principle articulated in *CASA* to §705 stays. *Immigrant Defs.*, 145 F.4th at 995-96; Br.61.

Notably, Plaintiff fails to grapple with the language in §705 that invokes traditional principles of equity. Section 705 provides that a court may award interim relief only "to the extent necessary to prevent irreparable injury," which refers only to irreparable injury to the plaintiff, not third parties. *Winter v. NRDC*, 555 U.S. 7, 20 (2008). Moreover, §705 provides that a court "may" (not "shall") grant relief, and the word "may" clearly invokes a court's equitable discretion. Br.63. And §705 grants courts authority to award only "necessary and appropriate process." *Id.* When confronted with similar statutory language ("just and proper"), the Supreme Court concluded that the phrase incorporates "the normal equitable rules." *See Starbucks*, 602 U.S. at 347.

To the extent Plaintiff responds at all, it argues that traditional equitable principles do not apply to §705 stays because they are a

31

temporary form of vacatur. Appellee Br.50-52; JA-47-48. But the question §706 presents regarding universal vacatur is different from the question whether §705 permits courts to grant universal, temporary relief. Congress notably used mandatory language in §706 ("shall" "set aside") but used discretionary language in §705 ("may" issue "necessary and appropriate process"). Br.65. Plaintiff fails to sufficiently address these differences. Plaintiff cites an out-of-circuit, pre-*CASA* case concluding that §705's "necessary and appropriate process" language means that relief should be limited to only the parts of the rule Plaintiff challenges, not that relief cannot be provided to third parties, Appellee Br.52 (citing *Career Coll. & Schools of Texas v. DOE*, 98 F.4th 220, 255 (5th Cir. 2024)). Even if that were correct, neither Plaintiff nor the Fifth Circuit addressed §705's equally discretionary "may issue" language. *See also eBay*, 547 U.S. at 392.

Further, Plaintiff fails to show that Congress desired to depart from traditional equitable practice in §705. *See Starbucks*, 602 U.S. at 347. Limiting §705 relief to the parties before the court does not, as Plaintiff claims, "add[] words found nowhere in the statute," Appellee Br.52. Instead, it merely gives effect to the discretionary language that §705

does use, which *confirms* rather than displaces traditional equitable principles, *Starbucks*, 602 U.S. at 347-48. Plaintiff dismisses *Starbucks*, *Hecht*, and other like cases as "inapposite" because those involved injunctions. Appellee Br.52. But those cases apply with equal force here because Congress did not plainly depart from traditional equitable principles in §705.

Plaintiff is wrong that 5 U.S.C. §702's preservation of a reviewing court's duty to deny relief on any equitable ground "has no bearing on the scope of relief" a court may order. Appellee Br.64. Section 702 preserves courts' duty to deny relief on other equitable grounds, including on judicially-created grounds like exhaustion. *See Darby v. Cisneros*, 509 U.S. 137, 153 (1993). Limiting relief to the parties before the Court is another such equitable ground.

Plaintiff also argues (Appellee Br.53) that the committee report discussing §705 at the time Congress was debating the legislation does not support the conclusion that §705 is an equitable remedy. But Plaintiff does not dispute the report's plain statement that "[t]he authority granted [in §705] is equitable." H. Rep. No. 1980, 79th Cong., 2d Sess. 43, 277 (1946).

Similarly unavailing is Plaintiff's argument that Congress intended §705 relief to be universal for an 8 U.S.C. §1252(e)(3) challenge, because §1252(e)(3) includes a short 60-day statute of limitations that does not lend itself to "piecemeal as-applied challenges." Appellee Br.54. Even under Plaintiff's reasoning, it is unclear why this argument helps it, given that limiting courts' power to grant interim equitable relief under §705 would not impact courts' ability to grant vacatur under §706.

Plaintiff next contends that, in any event, a universal stay was necessary for complete interim relief. Appellee Br.54-56. But in support of that argument, Plaintiff offers nothing more than speculation that disclosing its members would somehow invite retaliation—a principle that would permit organizations to flout *CASA* and obtain universal relief in virtually every case. And while Plaintiff suggests that disclosing its impacted members' names would infringe upon their First Amendment rights, Appellee Br.55, that throwaway contention hardly makes out a constitutional violation.

Plaintiff also contends the district court's stay should not be limited to the context of aliens who entered unlawfully (rather than, who entered lawfully and subsequently lost their lawful status). *See* Appellee Br.56.

34

Plaintiff argues against such a limitation even though it concedes that it has not identified a single member who entered the country lawfully through, for example, humanitarian parole, and later had that parole revoked. Br.67. Thus, Plaintiff fails to explain how the court had jurisdiction to stay the 2025 Designation and Huffman Memorandum as to aliens who entered the country *lawfully*—something that Plaintiff's members do not appear to be in the habit of doing. *See Summers*, 555 U.S. at 498.

## CONCLUSION

This Court should reverse the district court's grant of a §705 stay.

Respectfully submitted,

ELISSA P. FUDIM
JOSEPH McCARTER
CAROLINE McGUIRE
*Trial Attorneys*
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
P.O. Box 868 Ben Franklin Station
Washington, DC 20044

BRETT A. SHUMATE
*Assistant Attorney General*

/s/ *Drew C. Ensign*
DREW C. ENSIGN
*Deputy Assistant Attorney General*

Drew.C.Ensign@usdoj.gov
(202) 514-2000

TYLER J. BECKER
*Counsel to the Assistant Attorney General*
U.S. Department of Justice, Civil Division
950 Pennsylvania Avenue, NW
Washington, DC 20530

Dated: November 10, 2025

35

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because:

1. This brief contains 6,491 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(ii) and D.C. Circuit Rule 32(e)(1).

2. The brief complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Century Schoolbook font.


/s/ *Drew C. Ensign*
Drew C. Ensign

Dated: November 10, 2025        Attorney for Appellants

## CERTIFICATE OF SERVICE

I hereby certify that on November 10, 2025, I electronically filed the foregoing motion with the Clerk of the Court for the United States Court of Appeals for the D.C. Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.


/s/ *Drew C. Ensign*
Drew C. Ensign

Dated:  November 10, 2025          Attorney for Appellants