## EXHIBITS

Exhibit A…………………………………… District Court Opinion (Doc. 64)

Exhibit B…………………………………… District Court Order (Doc. 65)

Exhibit C…………………………………… Declaration of Liana J. Castano, Interim Assistant Director for the Field Operations Division, U.S. Department of Homeland Security (DHS), U.S. Immigration and Customs Enforcement (ICE), Enforcement and Removal Operations (ERO), dated September 8, 2025

# EXHIBIT "A"

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MAKE THE ROAD NEW YORK, *et al.*,

               Plaintiffs,

    v.

KRISTI NOEM, in her official capacity as Secretary of Homeland Security, *et al.*,

               Defendants.

Case No. 25-cv-190 (JMC)

## MEMORANDUM OPINION

For nearly three decades, the federal government has subjected noncitizens apprehended at the border to fast-paced summary removal. Using that procedure, these people are quickly turned back across the border, typically after a single conversation with an immigration officer. This process, known as expedited removal, has long been applied to noncitizens "who are apprehended immediately proximate to the land border and [who] have negligible ties or equities in the [United States]." Designating Aliens for Expedited Removal, 69 Fed. Reg. 48877-01, 48879 (Aug. 11, 2004).[1]

Recently, the Government departed from this longstanding practice. In January 2025, the Government expanded the scope of expedited removal to noncitizens apprehended anywhere in the United States. And in the last few months, the Government has made aggressive use of its newly expanded expedited removal power. When people have appeared in immigration courts for their normally paced immigration proceedings, for instance, the Government has moved to dismiss

---

[1] Unless otherwise indicated, the formatting of citations has been modified throughout this opinion, for example, by omitting internal quotation marks, emphases, citations, and alterations and by altering capitalization. All pincites to documents filed on the docket in this case are to the automatically generated ECF Page ID number that appears at the top of each page.

(Page 3 of Total)

those proceedings, promptly arrested individuals inside of those courts, and then shuttled them into much faster moving—and much less procedurally robust—expedited removal proceedings. Days later, these people find themselves removed.

The problem, though, is that unlike the group of people who have traditionally been subject to expedited removal—those detained at or near the border shortly after crossing—the group of people the Government is now subjecting to expedited removal have long since entered our country. That means that they have a weighty liberty interest in remaining here and therefore must be afforded due process under the Fifth Amendment. When it exponentially expanded the population subject to expedited removal, the Government did not, however, in any way adapt its procedures to this new group of people.

But when it comes to people living in the interior of the country, prioritizing speed over all else will inevitably lead the Government to erroneously remove people via this truncated process. That is because most noncitizens living in the interior have been here longer than two years, rendering them ineligible for expedited removal, and many are seeking asylum or another form of immigration relief, entitling them to further process before they can be removed. The procedures the Government currently uses in expedited removal, however, create a significant risk that it will not identify these disqualifying criteria before quickly ordering someone removed. And the lack of available review means that once the removal happens, it is largely too late to correct the error.

In defending this skimpy process, the Government makes a truly startling argument: that those who entered the country illegally are entitled to no process under the Fifth Amendment, but instead must accept whatever grace Congress affords them. Were that right, not only noncitizens, but everyone would be at risk. The Government could accuse you of entering unlawfully, relegate you to a bare-bones proceeding where it would "prove" your unlawful entry, and then immediately

remove you. By merely accusing you of entering unlawfully, the Government would deprive you of any meaningful opportunity to disprove its allegations. Fortunately, that is not the law. The Constitution guarantees that "no person shall be removed from the United States without opportunity, at some time, to be heard." *A. A. R. P. v. Trump*, 145 S. Ct. 1364, 1367 (2025). That is equally true of those here unlawfully, who are "entitle[d] . . . to due process of law in the context of removal proceedings." *Id.*

Plaintiff Make the Road has made a strong showing that the Government's expansion of expedited removal violates the due process rights of those it affects. So too has the organization demonstrated that its members will be irreparably harmed if the designation and guidance effectuating the expansion are not stayed. Because the public interest and equities also favor Make the Road, the Court will **GRANT** the requested stay. In so holding, the Court does not cast doubt on the constitutionality of the expedited removal statute, nor on its longstanding application at the border. It merely holds that in applying the statute to a huge group of people living in the interior of the country who have not previously been subject to expedited removal, the Government must afford them due process. The procedures currently in place fall short.

## I.    BACKGROUND

In another case related to the Government's recent expansion of expedited removal, this Court detailed the statutory and regulatory framework governing expedited removal, as well as the history of its application, at length. *See Coal. for Humane Immigrant Rts. v. Noem* (*CHIR*), No. 25-cv-872, 2025 WL 2192986, at *3–6, *9–10 (D.D.C. Aug. 1, 2025). The Court offers an abbreviated account of that history and the challenged Government actions here.

(Page 5 of Total)

**A. Statutory and Regulatory Framework**

**1. Expedited Removal**

In the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA or the Act), Congress established two main processes for removing noncitizens deemed ineligible to enter or remain in the United States.[2] *See* IIRIRA, Pub. L. 104-208, 110 Stat. 3009, div. C (1996). The first, commonly referred to as "section 240" proceedings due to the section of the Act in which it appears, is the standard mechanism for removing inadmissible noncitizens. Section 240 removal proceedings take place before an immigration judge (IJ), an employee of the Department of Justice who must be a licensed attorney and has a duty to develop the record in cases before them. 8 U.S.C. § 1229a(a)(1), (b)(1); 8 C.F.R. § 1003.10(a). They are adversarial proceedings in which the noncitizen has the right to hire counsel, examine and present evidence, and cross-examine witnesses. 8 U.S.C. § 1229a(b)(4). Section 240 proceedings typically take place over the course of multiple hearings. *See CHIR*, 2025 WL 2192986, at *3. This allows time for individuals to gather and present evidence in support of petitions for relief available in immigration court (like asylum) and to seek collateral relief from other components of the Department of Homeland Security (like adjustment of status on the basis of marriage or family). *See* 8 U.S.C. §§ 1229a(b)(4)(B), (c)(4), 1229b. After an IJ renders a decision, either party may appeal to the Board of Immigration Appeals. 8 C.F.R. §§ 1240.15, 1003.1. If the Board upholds a removal order, the noncitizen can appeal that decision to a federal court of appeals. 8 U.S.C. § 1252. The Congress that passed IIRIRA referred to the new section 240 as a "streamline[d]" removal process relative to what came

---

[2] The statute and regulations at issue typically use the term "aliens" rather than "noncitizens." However, as this Court has previously explained, *CHIR*, 2025 WL 2192986, at *3 n.3, it will use the term "noncitizen" unless quoting from a statute, regulation, or case that uses "alien."

4

before it because, among other things, it removed a layer of appellate review. H.R. Rep. 104-469(I), 12, 107–08 (1996).

Still, IIRIRA included a second, even more streamlined, form of proceeding applicable only to certain noncitizens: expedited removal. Relative to section 240 removal, "[e]xpedited removal lives up to its name." *Make the Rd. N.Y. v. Wolf*, 962 F.3d 612, 619 (D.C. Cir. 2020). In expedited removal, an immigration officer, not an IJ, conducts the initial fact-finding. 8 C.F.R. § 235.3(b)(2)(i). The immigration officer asks a short series of questions to determine (a) the individual's "identity, alienage, and inadmissibility," and (b) whether they intend to apply for asylum, fear persecution or torture, or fear returning to their country of origin. *Id.* § 235.3(b)(2)(i), (b)(4). Noncitizens are not entitled to counsel during this questioning. *See United States v. Guzman*, 998 F.3d 562, 567 (4th Cir. 2021) ("[I]t is undisputed that the text of the INA's expedited removal procedure does not require that the alien be advised of a right to counsel or be accommodated in an effort to obtain counsel."). If the noncitizen is inadmissible and does not indicate that they intend to apply for asylum or fear persecution, the inspecting officer issues a Notice and Order of Expedited Removal, and the noncitizen may respond in a sworn statement. 8 C.F.R.§ 235.3(b)(2)(i). Once a supervising officer reviews and signs off on the inspecting officer's determination, the noncitizen is ordered removed. *See id.* The noncitizen has no right to appeal that decision to an IJ, the Board of Immigration Appeals, or (with one exception discussed below) any court. *Id.* § 235.3(b)(2)(ii); 8 U.S.C. § 1252(a)(2)(A)(i).

"The process is scarcely more involved" if the noncitizen "assert[s] an intention to apply for asylum or a fear of persecution." *Make the Rd.*, 962 F.3d at 619. If the noncitizen so indicates, the inspecting officer must refer them for a "credible fear interview," to be conducted by an asylum officer. 8 C.F.R. § 235.3(b)(4). If that asylum officer finds the noncitizen to have a credible fear

5

of persecution, the noncitizen will be moved either to full section 240 removal proceedings or to administrative asylum proceedings. *Id.* § 208.30(f). If, however, the officer makes a negative credible fear determination, a supervisor will review the determination. *Id.* § 208.30(e)(8). If the supervisor agrees with the negative determination, the noncitizen can then request review by an IJ. 8 U.S.C. § 1225(b)(1)(B)(iii)(III). The IJ's review "is meant to conclude within 24 hours" and is final. *Make the Rd.*, 962 F.3d at 619. With narrow exceptions discussed below, no further administrative or judicial review is available. *Id.*

Unlike section 240 proceedings, which often take place over the course of several months, the expedited removal order is "usually issued within a few days, if not hours." ECF 50-16, Hartzler Decl. ¶ 13.[3] As a result, noncitizens subject to expedited removal have "almost no opportunity to prepare a defense to the charge of removal." *Id.* Also unlike section 240 proceedings, individuals subject to expedited removal typically do not have an opportunity to review the government's evidence against them or cross-examine witnesses. *Id.* And because noncitizens are usually detained during expedited removal proceedings, often far from their families or any counsel, they face significant barriers in gathering materials that they might use as evidence in the proceedings. *See* 8 U.S.C. § 1225(b)(1)(B)(iii)(IV); 8 C.F.R. § 235.3(b)(2)(iii); ECF 50-21, Cooper Decl. ¶¶ 6–7 (explaining that detention centers do not provide confidential

---

[3] Make the Road put forward evidence from a large number of attorneys and organizations that have represented people in both section 240 and expedited removal proceedings, including attorneys who previously worked for the Government in those proceedings. *See, e.g.*, ECF 50-18, Lunn Decl. ¶ 2; *see generally* ECF 50-2–50-22. Make the Road also offered reports addressing these removal processes prepared by the Department of Homeland Security, congressionally authorized committees, and others, as well as public reporting on the Government's recent statements. *See, e.g.*, ECF 50-23, Steinberg Decl. at 28; ECF 50-24, Steinberg Decl. at 214; *see generally* ECF 50-23 Steinberg Decl. at 1–2 (exhibit list). The Government has not contested these materials' description of the expedited removal process, nor has it put forward *any* evidence of its own about how the process works. The Government does make a single passing reference to the inclusion of hearsay, without developing any argument about any particular piece of evidence. *See* ECF 56 at 44. Although "the Federal Rules of Evidence do not apply" to proceedings for preliminary relief, the Court has considered the "relevance and reliability" of Make the Road's evidence. *FTC v. RAG-Stiftung*, 436 F. Supp. 3d 278, 313 n.29 (D.D.C. 2020) (discussing rule for preliminary injunction hearing). Having done so, the Court finds that the evidence accompanying the motion is "relevan[t] and relia[ble]" and therefore credits and relies on it in describing the expedited removal process. *Id.*

emails, fax, or other means of receiving documents other than mail, which on average takes 5–10 days to reach detained clients).

Key to the speed of expedited removal is the lack of almost any judicial review. The Act provides that "no court shall have jurisdiction to review" issues related to expedited removal unless they fall into a narrow set of exceptions outlined in section 1252(e). 8 U.S.C. § 1252(a)(2)(A). Under that provision, two forms of judicial review are available. First, a noncitizen may file a habeas petition to challenge their expedited removal. However, that habeas proceeding is limited to determining (a) "whether the petitioner is an alien," (b) whether the petitioner was ordered removed under the expedited removal provision, and (c) whether the petitioner can prove that they were lawfully admitted or granted asylum. *Id.* § 1252(e)(2). Second, noncitizens may challenge expedited removal determinations, as well as the implementation of the expedited removal statute, in this Court. *Id.* § 1252(e)(3)(A). In such suits, referred to in the statute as "[c]hallenges on validity of the system," a plaintiff may challenge only (i) whether the statute's expedited removal section, or any regulation implementing it, is constitutional, or (ii) "whether such a regulation, or a written policy directive, written policy guideline, or written procedure issued by or under the authority of the Attorney General to implement such section, is not consistent with applicable provisions of this subchapter or is otherwise in violation of law." *Id.* § 1252(e)(3). This kind of suit must be filed within 60 days after the date the challenged statutory provision or agency action is first implemented, *id.* § 1252(e)(3)(B), and it may not be a class action, *id.* § 1252(e)(1)(B).

The expedited removal regulations provide a few additional avenues for noncitizens to prove that they are not in fact eligible for expedited removal. During the initial interview with an immigration officer, a noncitizen may "claim[] to have been lawfully admitted for permanent residence, admitted as a refugee under section 207 of the Act, granted asylum under section 208

of the Act, or claim[] to be a U.S. citizen." 8 C.F.R. § 235.3(b)(5)(i). If the immigration officer

can verify any of those claims, the (alleged) noncitizen will not be removed. *Id.* § 235.3(b)(5)(ii)–

(iv). If the immigration officer cannot verify the claim, but the (alleged) noncitizen makes the

claim under penalty of perjury, the case is referred for review by an immigration judge. *Id.*

§ 235.3(b)(5)(iv). In addition, the regulations permit the noncitizen to "establish that he or she was

admitted or paroled into the United States." *Id.* § 235.3(b)(6). The noncitizen must be given "a

reasonable opportunity to establish to the satisfaction of the examining immigration officer that he

or she was admitted or paroled into the United States following inspection at a port-of-entry." *Id.*

"If the alien establishes that he or she was lawfully admitted or paroled," the regulation continues,

the agency reviews whether the noncitizen's parole "has been, or should be, terminated." *Id.* If the

noncitizen cannot establish that they were "lawfully admitted or paroled," they "will be ordered

removed pursuant to" the expedited removal provision. *Id.*

##    2.    Expedited Removal Designations

Noncitizens may be eligible for expedited, rather than section 240, removal if they are

inadmissible because they either lack proper entry documents or falsified or misrepresented their

application for admission. 8 U.S.C. § 1225(b)(1)(A)(i); *see id.* § 1182(a)(6)(C), (a)(7) (grounds of

inadmissibility). Among that set, only two still narrower categories of noncitizens are eligible for

expedited removal: (1) noncitizens "arriving in the United States," and (2) noncitizens who "ha[ve]

not been admitted or paroled into the United States" and cannot affirmatively show that they have

been "physically present in the United States continuously for the 2-year period immediately prior

to the date of the determination of inadmissibility." *Id.* § 1225(b)(1)(A)(i)–(iii).[4] The statute

---

[4] In addition, the statute exempts from expedited removal noncitizens who are "native[s] or citizen[s] of a country in
the Western Hemisphere with whose government the United States does not have full diplomatic relations and who
arrives by aircraft at a port of entry." 8 U.S.C. § 1225(b)(1)(F).

permits the Attorney General (who has since delegated the authority to the DHS Secretary) to designate the population of noncitizens within that second category who will be subject to expedited removal. *Id.* § 1225(b)(1)(A)(iii)(I).

Initially, DHS's predecessor agency[5] did not make any designation, thereby limiting expedited removal only to "arriving aliens." Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures, 62 Fed. Reg. 10312-01, 10313 (Mar. 6, 1997). In so doing, the agency "acknowledge[d] that application of the expedited removal provisions to aliens already in the United States w[ould] involve more complex determinations of fact and w[ould] be more difficult to manage." *Id.* Since then, though, DHS has made designations. One of those extended expedited removal to noncitizens who arrive by sea and who have been present for fewer than two years, and another to noncitizens apprehended within 100 air miles of any U.S. international land border who entered within the last 14 days.[6] And that was the state of play at the beginning of this year, with the only people eligible for expedited removal being (1) "arriving aliens," (2) those who arrived by sea within the last two years, and (3) those apprehended within 100 miles of the border and 14 days of entry. Then, in January, the Government issued the designation—which the Court will refer to as the 2025 Designation—at issue here.

The 2025 Designation authorized DHS "to exercise the full scope of its statutory authority" in utilizing expedited removal. Designating Aliens for Expedited Removal, 90 Fed. Reg. 8139,

---

[5] The Commissioner of the Immigration and Nationalization Service used to make this designation before that agency was abolished and DHS was created in 2002. *See Make the Rd. N.Y. v. McAleenan*, 405 F. Supp. 3d 1, 16 n.7 (D.D.C. 2019) (K.B. Jackson, J.) (citing Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135 (Nov. 25, 2002); 6 U.S.C. § 557).

[6] *See* Notice Designating Aliens Subject to Expedited Removal Under Section 235(b)(1)(A)(iii) of the Immigration and Nationality Act, 67 Fed. Reg. 68924, 68924 (Nov. 13, 2002); Designating Aliens For Expedited Removal, 69 Fed. Reg. 48877, 48879 (Aug. 11, 2004).

8139 (Jan. 24, 2025).[7] Thus, as of January 21, 2025, DHS asserts the authority to apply expedited removal to noncitizens "who are encountered anywhere in the United States more than 100 air miles from a U.S. international land border, and who have been continuously present in the United States for at least 14 days but for less than two years." *Id.* In supplementing the previous designations that remained in effect with the 2025 Designation, DHS has applied expedited removal to the maximum extent permitted by section 1255(b)(1)(A). This is a significant change: Aside from a brief window in 2019,[8] expedited removal has always been limited to (at the most) those arriving by sea, or those within 100 miles of the border who had not been in the country for more than 14 days. *See CHIR*, 2025 WL 2192986, at *6 & n.9.

Days after the 2025 Designation was made, Acting Secretary of DHS Benjamine Huffman issued guidance—which is also challenged here—explaining that on "January 21, 2025, [he] signed and transmitted to the Federal Register a notice entitled Designating Aliens for Expedited Removal." Dep't of Homeland Sec., Memorandum from Acting Secretary Benjamine C. Huffman on Guidance Regarding How to Exercise Enforcement Discretion (Jan. 23, 2025), https://perma.cc/W3CL-SNDN [*hereinafter* Huffman Memorandum]. "That notice expands the scope of expedited removal to the statutory maximum under 8 U.S.C. § 1225(b)(l) which, as further

---

[7] This Notice was effective on January 21, 2025, and was published in the Federal Register on January 24, 2025. *See* 90 Fed. Reg. at 8139.

[8] That period of time in 2019 should not be overstated, either. The 2019 Designation Notice that extended expedited removal to the same population subject to the 2025 Designation was preliminarily enjoined around two months after it was issued. *See Make the Rd.*, 405 F. Supp. 3d at 72. The D.C. Circuit reversed that preliminary injunction the following year, in June 2020. *See Make the Rd.*, 962 F.3d at 635. And in February 2021, President Biden directed DHS to consider rescinding the 2019 designation, which it later did. *See* Exec. Order 14010, 86 Fed. Reg. 8267, 8270–71 (Feb. 2, 2021). During the short period the 2019 Designation was in effect, DHS used it in an "exceedingly small number of cases." ECF 50-23, Steinberg Decl. at 250–51 (data shared by DHS suggests that the 2019 Designation was used to deport around 17 people during the first Trump administration and four people during the early months of the Biden administration).

explained in the notice, includes certain aliens who have not been continuously present in the United States for two years." *Id.*

Make the Road challenges here both the 2025 Designation Notice and the Huffman Memorandum implementing the notice. ECF 50 at 1.[9] Because the 2025 Designation added to, but did not alter, prior designations covering noncitizens who arrive by sea and noncitizens apprehended within 100 miles of the border and 14 days of entry, Make the Road's challenge does not affect the application of expedited removal to either of those populations.

## B.  Factual and Procedural Background

### 1.  Recent Efforts to Enforce the 2025 Designation

During the first few months it was in effect, the Government was slow to implement the 2025 Designation. In May, however, enforcement efforts significantly ramped up.

Make the Road has put forward evidence—which the Government has not disputed—that the Government set a goal that month of making 3,000 immigration arrests each day. *See* ECF 50-23, Steinberg Decl. at 300. Apparently in an effort to meet that goal, the Government began targeting for expedited removal people already in section 240 removal proceedings, many of whom are pursuing asylum and other collateral relief. *See* ECF 50-23, Steinberg Decl. at 282 (describing new initiative involving "courthouse arrests"). In its declarations, Make the Road details numerous arrests of individuals at their immigration court hearings. ECF 50-3, Umana Decl. ¶ 11; ECF 50-4, Levenson Decl. ¶ 27; *see also* ECF 50-9, Rowland-Kain Decl. ¶ 16 (arrests in the elevator of New York immigration court); ECF 50-10, Koop Decl. ¶¶ 7, 10 (arrests in hallway of Chicago Immigration Court); ECF 50-11, Gilliam Decl. ¶ 4 (arrests in hallway of Seattle Immigration

---

[9] The Huffman Memorandum also offered guidance on the implementation of other agency action. *See* ECF 50-23, Steinberg Decl. at 9–10. The Court only addresses here the Huffman Memorandum's guidance on the implementation of the January 21, 2025 "notice entitled Designating Aliens for Expedited Removal." *Id.*

Court); ECF 50-14, Yang Decl. ¶ 15–16 (arrests in hallway, lobby, and parking lot of San Antonio Immigration Court). These arrests follow a common pattern, with DHS first moving orally (without any advance notice) to dismiss the individual's pending section 240 proceedings, then arresting the individual at the courthouse immediately upon the dismissal of their section 240 proceedings, and then, finally, placing the individual in expedited removal proceedings through which they can be deported far more quickly, and with far less process, than they would have been in the section 240 proceedings.[10] Using this method, the Government has deported people within days of dismissing their section 240 proceedings. *See* ECF 50-2, Fontaine Decl. ¶ 39; ECF 50-15, Botsch Decl. ¶ 4.

The record reveals that the Government's expanded expedited removal efforts have not been limited to courthouses. In June 2025, the Government also launched a series of workplace raids as part of a "new phase of the Trump administration's immigration crackdown." ECF 50-24, Steinberg Decl. at 382. White House "border czar" Thomas D. Homan warned: "You're going to see more work site enforcement than you've ever seen in the history of this nation." *Id.* And a DHS spokesperson stated that "2,000 immigrants per day were arrested" during the first week in June. *Id.* at 383. Given these enforcement efforts, Make the Road calls it a "near-certainty that even more people"—including its members—"will be placed in expedited removal pursuant to the" 2025 Designation and its implementing guidance. ECF 50-1 at 14.

### 2. Plaintiff Make the Road

Make the Road New York is a nonprofit, membership-based community organization that offers education, legal, health, and community services to low-income and immigrant New Yorkers. ECF 50-2, Fontaine Decl. ¶¶ 2, 7. Make the Road's "mission is to build the power of

---

[10] *See* ECF 50-9, Rowland-Kain Decl. ¶¶ 5, 8, 16; ECF 50-12, Dojaquez-Torres Decl. ¶ 3; ECF 50-8, Eugenio Decl. ¶¶ 7, 10, 12; ECF 50-10, Koop Decl. ¶¶ 6–7, 10; ECF 50-11, Gilliam Decl. ¶ 4; ECF 50-14, Yang Decl. ¶ 15–16.

immigrant and working-class communities to achieve dignity and justice." *Id.* ¶ 3. It has over 28,000 members "residing in New York City, Westchester County, and Long Island." *Id.* ¶ 13. Make the Road brings this lawsuit on behalf of its members, asserting associational standing to vindicate their rights. *See* ECF 44 at 12.

Make the Road's members include noncitizens who have been in the country for between 14 days and two years, and who are therefore subject to expedited removal under the 2025 Designation. *See* ECF 50-2, Fontaine Decl. ¶ 17. Those members appear regularly for section 240 proceedings and are at risk of being apprehended there or elsewhere in their communities and summarily removed under the expedited removal policies currently being implemented. *Id.* ¶¶ 23, 25, 29. They are therefore now at risk of being "removed from the United States without sufficient opportunity to show that they have the right to remain . . . or to assert claims for immigration relief for which they are eligible." *Id.* ¶ 17.

Two such members who are newly subject to expedited removal have submitted pseudonymous declarations. John Doe 4 came to the United States in October 2023, "escaping for [his] life," and has since filed an asylum application. ECF 50-2, MRNY-John Doe 4 Decl. at 15 ¶ 2. He has "tried to do everything correctly here," but is at risk of being put into expedited removal at one of his upcoming removal proceedings prior to the processing of his pending asylum application. *Id.* at 15 ¶ 5. Jane Doe 2 came to the United States with her partner and children in March 2024, fleeing persecution and threats from "government-aligned gangs." *Id.*, MRNY-Jane Doe 2 Decl. at 18 ¶ 2. She is currently in section 240 removal proceedings. *Id.* at 18 ¶ 3. Her family has similarly "tried to do everything correctly." *Id.* at 18 ¶ 5. They applied for asylum within their first year, have received employment authorization, and have attended their appointments with ICE. *Id.* She remains at risk of being placed into expedited removal and "being detained and

separated from [her] children, who would have no one to care for them." *Id.* at 18 ¶ 4. She also stands to lose her "opportunity to apply for asylum and to include [her] children as derivatives on [her] asylum application and of not having the opportunity to testify and share [her] story with an immigration judge." *Id.*

Make the Road's members also include noncitizens who have been continuously present for longer than 2 years, but who "may be erroneously placed into expanded expedited removal either because they do not have, or do not carry, documentation of their continuous length of residence or would not be able to present that documentation on the short timeline envisioned by the [2025 Designation], especially if they are detained by immigration authorities." *Id.* ¶ 18. Make the Road put forward evidence confirming that this risk exists for its members who have been present for longer than two years. One Make the Road attorney, for example, recounted that a man who had been present for three years was detained at an immigration court in New York after his section 240 proceedings were dismissed. *See* ECF 50-4, Levenson Decl. ¶¶ 23–24.

Plaintiffs Mary and John—who also filed this suit with Make the Road—similarly demonstrate the risk that Make the Road's members who have been here longer than two years will be put into expedited removal. While Mary and John do not seek interim relief through this motion, *see* ECF 50-1 at 4 n.1, Mary did submit a declaration in support of the motion. Mary first entered the United States on a visa in January 2015 and had been continuously present in the country since February 8, 2015, much longer than two years. ECF 50-7, Mary Doe Decl. ¶¶ 9–10. She has five children—John, who is 18-years old and a plaintiff in this suit, and 15-, 11-, 8-, and 6-year-olds. *Id.* ¶¶ 2, 7. On January 27, 2025, Mary and John were apprehended by immigration officers after a traffic stop and detained for expedited removal processing. *Id.* ¶ 12. While detained, Mary and John were not allowed to make any calls or contact an attorney. *Id.* ¶¶ 15–18. By 9 AM

the next day, they were issued a Notice and Order of Expedited Removal. *Id.* ¶ 19; *see also id.* at 6. They were "never asked or given the option to sign [their] deportation orders," and were instead taken to "a border bridge in a car and told to walk across." *Id.* ¶¶ 20–21.

### 3. This Suit

Make the Road filed a complaint in this Court on January 22, 2025, a day after the 2025 Designation Notice became effective, alleging that the designation violated the Due Process Clause of the Fifth Amendment, exceeded DHS's statutory authority under IIRIRA, the Immigration and Nationality Act, and the Administrative Procedure Act (APA); was arbitrary and capricious in violation of the APA; and violated the APA's notice and comment requirements. ECF 1 ¶¶ 101–18. Make the Road sued DHS Secretary Kristi Noem along with several other executive branch officials, all in their official capacities. *Id.* at 1. On March 22, 2025, Make the Road amended its complaint to add Mary and John as plaintiffs, to challenge the Huffman Guidance, and to add an additional claim for relief that the challenged actions were not in accordance with law and exceeded DHS's statutory authority. ECF 27.

In April 2025, the Government moved to dismiss the complaint. ECF 36. In that motion, it argued that a variety of jurisdictional and threshold defects bar Make the Road's claims and that the complaint fails to plausibly state a claim on the merits. *See id.* While that motion remained pending, in June 2025, Make the Road filed a motion under 5 U.S.C. § 705 to stay "Defendants' decision"—implemented by the 2025 Designation and the Huffman Memorandum—"to apply expedited removal to certain noncitizens arrested anywhere in the country who cannot show 'to the satisfaction of an immigration officer' that they have been continuously present in the United States for longer than two years." ECF 50 at 1. In its motion, Make the Road submitted evidence that expedited removals of its members and others in their communities had ramped up in the weeks prior and that they therefore faced irreparable harm. *See supra* 11–12. The Government

15

filed an opposition, raising the same arguments as in its motion to dismiss along with some new ones, ECF 56,[11] and Make the Road replied, ECF 58. The Court then heard argument on the motion. *See* July 9, 2025 Min. Entry.

For purposes of its stay motion, Make the Road advances four claims. First, that the 2025 Designation violates the due process rights of those it affects by subjecting them to removal without constitutionally sufficient procedures.[12] ECF 50-1 at 16. Second, that the 2025 Designation violates IIRIRA by failing to provide the procedures the statute requires. *Id.* at 31. Third, that the designation contravenes the statute because the statute does not authorize the expedited removal of noncitizens who have already entered the United States on the basis that they lack valid entry documents. *Id.* at 36. And finally, that, by applying expedited removal to asylum applicants, the Huffman Memorandum violates the regulations implementing the asylum statute. *Id.* at 39. Because the Court holds, as will be explained below, that Make the Road is likely to succeed on the merits of its due process claim, it does not address the other grounds upon which it moves.

## II.    LEGAL STANDARD

Section 705 of the APA authorizes courts to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. The court may do so "[o]n such conditions as may be required and to the extent necessary to prevent irreparable injury." *Id.*

---

[11] The only threshold issue raised in the Government's motion to dismiss, but not in its opposition to this motion for a stay, is an argument that Make the Road lacks organizational standing. ECF 36 at 22–25. However, Make the Road has clarified that it asserts associational standing, not organizational standing. ECF 44 at 12.

[12] Make the Road expressly disclaimed any challenge to the constitutionality of applying expedited removal proceedings to anyone covered by a previous designation. *See* Hrg. Tr. 16:4–6 (conceding that any potential constitutional issues with prior designations are "water under the bridge" and are not before the Court).

The factors governing issuance of a section 705 stay are the same as those that govern the grant of a preliminary injunction. *See District of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 15 (D.D.C. 2020) (citing, *inter alia*, *Cuomo v. U.S. Nuclear Regul. Comm'n*, 772 F.2d 972, 974 (D.C. Cir. 1985)). To prevail on such a motion, the movant "must show (1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the [stay] were not granted, (3) that a[] [stay] would not substantially injure other interested parties, and (4) that the public interest would be furthered by the [stay]." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). In a case like this one, where the Government is the non-movant, the third and fourth factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## III.    ANALYSIS

Turning now to the application of those factors, the Court holds that each favors a stay. The Court will therefore stay the 2025 Designation and the guidance implementing that designation. The Court addresses the scope of the remedy at the close of this section.

### A. Make the Road Is Substantially Likely to Succeed on the Merits.

Before turning to Make the Road's likelihood of succeeding in this lawsuit, a few words about what is, and is not, before the Court. Make the Road has not challenged the constitutionality of the expedited removal statute. Nor has it challenged the lawfulness of any agency decision implementing the statute prior to 2025. *See supra* 12 n.10. Nothing in the Court's opinion, then, affects previous designations by which DHS has applied expedited removal to noncitizens who arrive by sea, or who are detained within 14 days of arriving and within 100 miles of the border. The *only* things challenged are the 2025 Designation and the Huffman Memorandum implementing that designation. The Court therefore only addresses the lawfulness of applying expedited removal to noncitizens who are detained more than 100 miles from the border and who have been present in the country for at least 14 days but less than two years. And the Court only

17

addresses the lawfulness of doing so pursuant to the 2025 Designation and the Huffman Memorandum.

In addressing the lawfulness of these two agency actions, the Court does, however, also consider the procedural due process rights of those who have been in the country for *longer* than two years. That is because, in a procedural due process case like this one, the question is whether the process provided sufficiently guards against "*mistaken or unjustified* deprivation[s] of life, liberty, or property." *A. A. R. P.*, 145 S. Ct. at 1367 (emphasis added). As the Court explains below, the record evidence (and indeed the experience of Plaintiffs Mary and John) demonstrate that people who have been here longer than two years—and who are therefore not eligible for expedited removal under the statute—are at risk of being removed this way as the Government implements the 2025 Designation. The Court therefore accounts for that group of noncitizens when determining whether the processes deployed in expedited removal are adequate.

With the issue properly framed, the Court must first decide whether there is a substantial likelihood that it has jurisdiction to hear Make the Road's constitutional claim. *See Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015). After concluding that there is, the Court turns to the merits of the due process claim. There too Make the Road has established a substantial likelihood of success.[13]

---

[13] Because the Court holds that Make the Road has established that it is likely to succeed on the merits of its due process claim, it does not address any other claim that Make the Road says also supports the grant of a stay. *See Mid-Atl. Equity Consortium v. U.S. Dep't of Educ.*, --- F. Supp. 3d ---, 2025 WL 2158340, at *14 n.6 (D.D.C. July 30, 2025). And although courts usually try to avoid answering constitutional questions by addressing non-constitutional claims first, this Court follows the lead of others that have focused on the most substantial, and seemingly strongest, claims—even if they are constitutional ones—when confronted with "the need for a prompt ruling on [a] request for preliminary . . . relief." *Saravia v. Sessions*, 280 F. Supp. 3d 1168, 1182 (N.D. Cal. 2017) ("address[ing] only" the constitutional claim despite fact plaintiffs were also pressing statutory claims); *see also, e.g.*, *Media Matters for Am. v. Paxton*, 732 F. Supp. 3d 1, 12, 27 (D.D.C. 2024) (addressing only the plaintiffs' First Amendment retaliation claim and not considering two statutory claims); *Booth v. Bowser*, 597 F. Supp. 3d 1, 10 (D.D.C. 2022) (addressing only Free Exercise claim despite fact plaintiffs were also pressing a statutory RFRA claim); *W.D. ex rel. M.J.D. v. Minn. State High Sch. League*, No. 12-cv-2892, 2012 WL 5985514, at *3 n.3 (D. Minn. Nov. 29, 2012) ("The Court will only address Plaintiffs' procedural due process claim" and not other non-constitutional claims "because it appears, at this preliminary stage, to be Plaintiffs' strongest claim.").

1.    **Neither Jurisdictional nor Procedural Bars Prevent the Court from Reaching the Merits.**

At the threshold, the Government throws up a slew of barriers that it insists prevent the Court from addressing Make the Road's constitutional claim. *See* ECF 56 at 21–35. The Government argues that section 1252(f)(1) of the Immigration and Nationality Act strips this Court of its jurisdiction to grant a stay, that the Court cannot stay agency action that has already gone into effect, that a separate provision in section 1252(e)(1) of the Act bars preliminary relief, and that Make the Road's claims are time barred. The Government made identical arguments in another case that was recently before this Court challenging the same designation and memorandum that are at issue in this case. *See CHIR*, 2025 WL 2192986, at *13–16, *18–21. The Court rejects those arguments here for the same reasons it did there and incorporates its analysis in that case by reference. Section 1252(f)(1) is only a limit on "injunctive relief," but Make the Road is seeking a stay; courts can stay agency actions already in effect; binding D.C. Circuit precedent forecloses the Government's reading of section 1252(e)(1); and the claims are timely, because they were brought within 60 days of the Government's issuance of the 2025 Designation and the Huffman Memorandum. *See id.*

The Government does make one additional argument that requires a quick word. Citing the D.C. Circuit's decision in *Make the Road New York v. Wolf*, 962 F.3d 612 (D.C. Cir. 2020), it says that this Court cannot reach Make the Road's due process claim "because Congress committed the designation-making authority to the agency's discretion." ECF 56 at 37. That argument, though, ignores what *Make the Road* actually held: "that there is no cause of action under the APA to scrutinize the Secretary's designation decision *so long as it falls within statutory and constitutional bounds*." 962 F.3d at 635 (emphasis added). Make the Road's due process claim here is that the designation falls *outside* of "constitutional bounds," so it is not barred by that decision. *Id.* And

19

Section 1225(b)(1)(A)(iii)'s delegation to the Secretary of "sole and unreviewable discretion" to make designations does not evince a sufficiently "clear expression of contrary congressional intent" to "preclude consideration of colorable constitutional claims arising out of the actions of the [Secretary] pursuant to that section." *Lincoln v. Vigil*, 508 U.S. 182, 195 (1993); *Webster v. Doe*, 486 U.S. 592, 603 (1988). In fact, quite the opposite is true. Another section of the Act expressly grants this Court jurisdiction to "review . . . determinations under section 1225(b)" for the purpose of deciding whether "any regulation[s] issued to implement [the] section [are] constitutional." 8 U.S.C. § 1252(e)(3)(A). The Government affirmatively argued at the hearing on the motion that this section "permits this Court to make determinations and have judicial review over whether a challenged provision is constitutional." Hrg. Tr. 35:18–20. The Government got it right there, and there's nothing in Section 1225(b)(1) that bars this Court's review of Make the Road's constitutional claim.[14]

### 2. The 2025 Designation Likely Violates the Due Process Clause.

The Fifth Amendment guarantees that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. When evaluating a due process claim, courts "undertake a two-part inquiry." *Patchak v. Jewell*, 828 F.3d 995, 1004 (D.C. Cir. 2016). First, a court must "determine whether constitutional safeguards apply at all, *i.e.*, whether a private party has a property or liberty interest that triggers Fifth Amendment due process protection." *Reeve Aleutian Airways, Inc. v. United States*, 982 F.2d 594, 598 (D.C. Cir. 1993). If

---

[14] The Government makes two other arguments here that it did not make in *CHIR*, insisting that Make the Road lacks standing to press one of its APA claims, and that all of its APA claims "fail because the Secretary's expedited removal designation decisions are committed to agency discretion." ECF 56 at 32, 36. The Court need not address those arguments because it does not reach Make the Road's APA claims, instead ruling only on the constitutional claim. Likewise, the Government's argument that Make the Road cannot sue because it is "outside the zone of interests of the expedited removal statute" only applies to Make the Road's APA claims. ECF 56 at 34 ("The APA does not allow suit by every person suffering injury in fact." (internal quotations omitted)). Regardless, this Court has already explained why "membership associations" like Make the Road have prudential standing to bring APA claims like the ones Make the Road brings here. *CHIR*, 2025 WL 2192986, at *20 (citing *Make the Rd.*, 962 F.3d at 628).

20

so, the court "ask[s] whether the procedures followed . . . were constitutionally sufficient." *Del. Riverkeeper Network v. FERC*, 895 F.3d 102, 107 (D.C. Cir. 2018) (citing *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011)).

The Court takes each step in turn and concludes first, that individuals subject to the 2025 Designation are entitled to due process and second, that the 2025 Designation and Huffman Memorandum fail to afford those individuals a sufficiently meaningful opportunity to be heard. Accordingly, Make the Road is likely to succeed on its due process claim.

### a. Individuals who have effected entry to the United States are entitled to due process.

Although certain constitutional protections do not extend to noncitizens "outside of our geographic borders," once a noncitizen "enters the country, the legal circumstance changes, for the Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001). Indeed, once they are present in the United States, noncitizens have a "weighty" liberty interest in remaining, as they "stand[] to lose the right to stay and live and work in this land of freedom," and "may lose the right to rejoin [their] immediate family, a right that ranks high among the interests of the individual." *Landon v. Plasencia*, 459 U.S. 21, 34 (1982).

That's true regardless of how someone entered the country: "[O]nce passed through our gates, *even illegally*," noncitizens "may be expelled only after proceedings conforming to traditional standards of fairness encompassed in due process of law." *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212 (1953) (emphasis added); *see also Mathews v. Diaz*, 426 U.S. 67, 77 (1976) ("Even one whose presence in this country is unlawful, involuntary, or transitory is entitled to that constitutional protection."). The Supreme Court has therefore "long held that no person shall be removed from the United States" without due process of law. *A. A. R. P.*, 145 S.

Ct. at 1367; *see also Reno v. Flores*, 507 U.S. 292, 306 (1993) ("It is well established that the Fifth Amendment entitles aliens to due process of law in deportation proceedings.").

The 2025 Designation plainly subjects people who have "passed through our gates"—and who therefore have a liberty interest in remaining—to expedited removal. Under the previous regime, only those who had "a close spatial and temporal nexus to the border" were eligible for expedited removal. 69 Fed. Reg. 48877, 48879 (Aug. 11, 2004). In practice, that meant the procedure was applied to people "apprehended immediately proximate to the land border" who had "negligible ties or equities in the U.S." *Id.* The 2025 Designation sweeps much further. By design, it affects people who have neither "a close spatial [nor] temporal nexus to the border," *id.*—those who have been in the country more than 14 days, who were apprehended more than 100 miles from the border. *See* 90 Fed. Reg. at 8139. Because the 2025 Designation subjects to expedited removal those who have long since crossed the "threshold" and effected entry into the country, *Mezei*, 345 U.S. at 212, the procedures used to remove them must adequately protect their interest in remaining. Make the Road's members are among those whose liberty interests are so implicated. *See* ECF 50-2, Fontaine Decl. ¶¶ 19–26 (identifying Make the Road members who have been living in the United States for between 15 and 20 months).

The Government tries to wave away this straightforward conclusion. Relying principally on *Department of Homeland Security v. Thuraissigiam*, 591 U.S. 103 (2020), it claims that unless and until a person is "*admitted* or . . . *lawfully* present in this country," the only process they are due is the process that Congress has provided. ECF 56 at 39 (citing *Thuraissigiam*, 591 U.S. at 138–39). Because the individuals subject to the 2025 Designation are afforded that congressionally mandated process, the Government reasons, Make the Road's due process claim fails.

The Government's reading of *Thuraissigiam* is untenable. To adopt its view would be to undermine more than a century of precedent holding that those who have entered the United States have a liberty interest in remaining—no matter how they entered. *See Yamataya v. Fisher*, 189 U.S. 86, 100–01 (1903) (noncitizen who entered country in violation of law cannot be "deprived of [her] liberty" without receiving "due process of law"). Not only is it beyond this Court's power to disregard those Supreme Court decisions, but so too has the Supreme Court recently reaffirmed that century-old principle. In a pair of cases considering what process was due to Venezuelan nationals alleged to be members of a foreign terrorist organization and subject to removal under the Alien Enemies Act, the Supreme Court stressed the "well established" rule "that the Fifth Amendment entitles aliens to due process of law." *Trump v. J. G. G.*, 145 S. Ct. 1003, 1006 (2025); *A. A. R. P.*, 145 S. Ct. at 1367. That was so even though the executive branch claimed that these Venezuelan nationals had "unlawfully infiltrated the United States" and "engage[d] in mass illegal migration." Proclamation No. 10903, 90 Fed. Reg. 13033, 13033 (Mar. 14, 2025). In so holding, the Court cited the seminal early-20th-century decision holding that noncitizens—in that case, a woman who had entered unlawfully and was present in the country for four days before the government sought to remove her—cannot be removed "without opportunity, at some time, to be heard." *A. A. R. P.*, 145 S. Ct. at 1367 (citing *Yamataya*, 189 U.S. at 101).

In short, the Court has not departed from the settled principle. And far from an abrogation, *Thuraissigiam* is entirely consistent with this rule. That decision reflects the equally settled proposition that noncitizens "on the threshold of initial entry stand[] on a different footing" than those who have "passed through our gates." *Mezei*, 345 U.S. at 212. For the former, "[w]hatever the procedure authorized by Congress, it is due process as far as" the noncitizen "denied entry is concerned." *Id.* In *Thuraissigiam*, the Court held that a noncitizen detained almost immediately

23

after crossing the border, who had made it only 25 yards into the United States, was still "on the threshold," no matter that he had technically, but just barely, crossed. 591 U.S. at 114, 140; *see also* Br. for the United States at 2, *Thuraissigiam*, 591 U.S. 103 (No. 19-161), 2019 WL 6727092, at *2 ("CBP[] agents apprehended him almost immediately thereafter, 25 yards north of the border."). The Court in *Thuraissigiam* did not overturn more than a century of precedent; it merely held that noncitizens "*in [the] respondent's position*"—those detained close to the border "shortly after unlawful entry"—have not yet "effected an entry." 591 U.S. at 140 (emphasis added).

From that holding, the Government tries to draw a much more startling rule—that unless and until someone is lawfully admitted, they are entitled to zero process beyond whatever courtesy Congress might offer. If that was right, Congress could subject noncitizens who had spent decades in the United States to immediate removal, without any advance notice or right to a hearing, and the Constitution would have nothing to say about it. When pressed on the point at the hearing, the Government effectively conceded as much. *See* Hrg. Trans. 25:13–26:19. The Supreme Court's cases, though, say otherwise. In *Yamataya*, for instance, having spent merely four days in the country after entering unlawfully entitled the noncitizen to due process before removal. *See* 189 U.S. at 87.

Distinguishing between those on the threshold and those who have effected entry makes sense. In this context as in others, the government's power "is at its zenith at the international border." *United States v. Flores-Montano*, 541 U.S. 149, 152 (2004) (discussing "the longstanding right of the sovereign to protect itself by stopping and examining persons and property *crossing into* this country" (emphasis added)). That is why noncitizens attempting to enter, who have not "acquired any domicil or residence within the United States," receive all the process that is required so long as executive officers "act[] within the powers expressly conferred by Congress."

24

*Thuraissigiam*, 591 U.S. at 138. And the sovereign's power at the border does not vanish because a person happens to be apprehended moments after they cross. *See id.*[15]

But in the country's interior, the Constitution requires the Government to "turn square corners." *See Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 24 (2020). That means affording due process. Requiring anything less would pose extraordinary dangers: Recall that "[p]rocedural due process rules are meant to protect against the *mistaken* or unjustified deprivation of life, liberty, or property." *A. A. R. P.*, 145 S. Ct. at 1367 (emphasis added). As Make the Road explains, "in the mine run of cases, there is little question" that noncitizens detained at or near the border are "arriving in the United States." ECF 50-1 at 28. But when people are "arrested at courthouses or off the street" in the interior of the country—as has been happening under the 2025 Designation—it is far more likely that the Government will sweep in people who "have lived in this country for years or [who] may even be U.S. citizens." *Id.* Those people, however, are not eligible for expedited removal, and the Government must provide sufficient process to minimize the risk that they are erroneously removed that way.

The Government makes one more attempt at justifying its harsh rule, claiming that "binding precedent" from the D.C. Circuit—*American Immigration Lawyers Association v. Reno* (*AILA*), 199 F.3d 1352 (D.C Cir. 2000)—holds that anyone subject to the expedited removal statute has no liberty interest in remaining in the United States. ECF 56 at 41. That is doubly

---

[15] That is why those detained at the border and then paroled into the country are treated "as if" they remained "stopped at the border." *Mezei*, 345 U.s at 213–15. That rule reflects the historical practice of allowing ships containing noncitizens to land in American harbors rather than staying at sea—largely to serve "humanitarian ends"—while immigration authorities determined the admissibility of the noncitizens. Eunice Lee, *The End of Entry Fiction*, 99 N.C. Law. Rev. 565, 584–96 (2021). The Supreme Court held that the temporary portage, which was akin to parole, did not amount to an entry into the country. *See Mezei*, 345 U.S. at 213; *Leng May Ma v. Barber*, 357 U.S. 185, 188 (1958). That explains the Court's statement in *Thuraissigiam*, on which the Government relies, that "aliens who arrive at ports of entry—even those paroled elsewhere in the country for years pending removal—are 'treated' for due process purposes 'as if stopped at the border.'" *See Thuraissigiam*, 591 U.S. at 139. Just as *Thuraissigiam* cannot swallow the general rule that those who have effected entry are entitled to due process, neither can the legal fiction that the Court crafted for parolees.

wrong. For one, the government misstates what was decided by the D.C. Circuit in that case. The individual plaintiffs there did bring procedural due process claims in the district court. *See AILA*, 199 F.3d at 1356. But they did not appeal the district court's dismissal of those claims. *See id.* at 1356 n.6 (individual plaintiffs "appeal only the dismissal of their statutory claims"); *see also* Br. of Plaintiff-Appellants, *AILA*, 199 F.3d 1352 (No. 98-5463), 1999 WL 34833431, at *n.24 (The plaintiffs "do not challenge the court's ruling that" they did not "state[] a due process claim."). So the due process claims were never before the D.C. Circuit. And while that puts an end to the Government's claim of "binding precedent" that "[f]oreclose[s]" Make the Road's due process claim, ECF 56 at 41, considering the district court's resolution of the case does not help the Government, either. Like in *Thuraissigiam*, the plaintiffs in *AILA* had not effected entry into the United States, and instead remained at the threshold of "initial admission." *Am. Immigr. Laws. Ass'n v. Reno*, 18 F. Supp. 2d 38, 58–60 (D.D.C. 1998). The court therefore concluded that the plaintiffs lacked a liberty interest in *initial entry*, as "initial entrants have no due process rights with respect to their admission." *Id.* at 60. Because the 2025 Designation affects those who *have* entered, rather than just those seeking initial entry, *AILA* has little to say here.

The Court therefore rejects the Government's extraordinary request to treat as falling outside of the Constitution's due process guarantee the millions of immigrants who, although they may have entered unlawfully, have established lives here and made this country home. Instead, as the Supreme Court has long held and just recently reaffirmed, "the Fifth Amendment entitles aliens to due process of law." *J. G. G.*, 145 S. Ct. at 1006.

### b. Those subject to the 2025 Designation are entitled, at minimum, to a meaningful opportunity to contest the predicate bases for expedited removal.

Because those subject to the 2025 Designation are entitled to due process, the Court turns to the next step in the inquiry: determining whether "the procedures used by the Government in

26

effecting the deprivation 'comport with due process.'" *Ralls Corp. v. Comm. on Foreign Inv. in U.S.*, 758 F.3d 296, 315 (D.C. Cir. 2014) (quoting *Am. Mfrs. Mut. Ins. v. Sullivan*, 526 U.S. 40, 59 (1999)).

Make the Road identifies four claimed defects in expedited removal proceedings, any one of which it says render the procedure constitutionally inadequate when applied to the population affected by the 2025 Designation. *See* ECF 50-1 at 16–17. First, individuals do not receive sufficient notice and opportunity to contest the predicate bases of eligibility for expedited removal. *Id.* Second, the process impermissibly places the burden of proof on the individual, rather than the Government. *Id.* Third, the Government is not required to allow noncitizens the time or opportunity to "hire a lawyer or seek the assistance of any third party," and, fourth, there is no neutral adjudicator, with many cases decided only by an "immigration enforcement officer who serves as both prosecutor and judge." *Id.* at 17.

Under the familiar three-part balancing test from *Mathews v. Eldridge*, 424 U.S. 319 (1976), the Court holds that it is substantially likely that the expedited removal process does not include sufficient procedural safeguards when applied to those covered by the 2025 Designation. The Court does not foreclose the Government from subjecting those covered by the designation to expedited removal proceedings. Nor does it prescribe the specific process the government must use when doing so or hold that any one of the procedural safeguards proposed by Make the Road must be implemented to remedy the constitutional problem. All the Court holds is that Make the Road is substantially likely to prevail on its claim that the current procedures do not satisfy the minimal requirements of due process when applied to the population affected by the 2025 Designation.

27

### i.    A weighty private interest is at stake.

Courts first consider "the private interest that will be affected" by the government action. *Mathews*, 424 U.S. at 335. As discussed above, individuals who have effected entry to the United States have a "weighty" liberty interest in staying. *Landon*, 459 U.S. at 34. "[D]eportation . . . may result in poverty, persecution, and even death." *Bridges v. Wixon*, 326 U.S. 135, 164 (1945) (Murphy, J., concurring); *see also Ng Fung Ho v. White*, 259 U.S. 276, 284 (1922) (Deportation "may result . . . in loss of both property and life, or of all that makes life worth living."). Many people subject to expedited removal risk separation from their family members or have pending asylum applications and may be persecuted if deported. *See, e.g.*, ECF 50-4, Levenson Decl. ¶¶ 18–24 (describing courthouse arrests of asylum seeker married to a U.S. citizen who had been present for three years, asylum seeker whose partner was 8 months pregnant, and gay couple who feared persecution).

The Government's only answer is to recycle its argument that, under *Thuraissigiam* and *AILA*, Make the Road's members have no liberty interest against removal.[16] ECF 56 at 45. For reasons already explained, the Court rejects this argument. *See supra* 23–24. The first factor thus weighs heavily in Make the Road's favor.

---

[16] The Government also seemingly relies on the district court's decision in *AILA* to foreclose the second step of the due process analysis. ECF 56 at 46. But the district court there rejected the due process claim at step one (finding no entitlement to due process protections) and had no occasion to consider the constitutional sufficiency of the procedures under step two. *See* 18 F. Supp. 2d at 60. At most, the court considered whether the agency's regulations implementing IIRIRA were consistent with the statute (not the Constitution). *See id.* at 56. And on those APA claims, the court relied on (former) *Chevron* deference to conclude the regulations were reasonable. *Id.* ("Because IIRIRA is silent as to the nature of any required notice and rebuttal opportunity, the Court must defer to the Attorney General's determination as to what procedures are appropriate, so long as that determination is reasonable."). That holding is immaterial to Make the Road's constitutional claim here.

**ii.    There is a significant risk of the erroneous deprivation of that interest, and additional safeguards are of high value.**

Make the Road has identified procedural inadequacies that create a significant risk that the 2025 Designation will lead to the unlawful removal of individuals who are not eligible for expedited removal. "[A]dditional . . . procedural safeguards" could substantially mitigate that risk, so this factor too cuts in Make the Road's favor. *Mathews*, 424 U.S. at 335.

Before removing someone through expedited removal, the Government must make several threshold determinations: whether the individual has been continually present in the United States for two years; whether they have previously been admitted or paroled; whether they are inadmissible on one of the grounds that make them eligible for expedited removal; whether they have a credible fear of persecution; and whether they are a citizen, lawful permanent resident, refugee, or asylee. *See* 8 U.S.C. § 1225(b)(1)(A), (B)(ii); 8 C.F.R. § 235.3(b)(5). If the Government finds that one of these criteria is not satisfied, it either—depending on which criteria it is—must utilize section 240 removal proceedings or cannot remove the person at all.

Make the Road has put forward substantial evidence indicating that there is a "high risk of error" in making these determinations. ECF 50-1 at 23. That includes evidence of "recurring errors," for example, instances in which citizens, unaccompanied minors (who are not eligible for expedited removal), and those claiming asylum have been unlawfully removed. *See id.* at 24, 26–27 (citing examples from habeas cases and declarations attached in support of motion). For instance, one study found that 15% of the noncitizens who "expressed a fear of return" were not referred for a credible fear interview, as is required by statute. ECF 50-23, Steinberg Decl. at 46; 8 U.S.C.§ 1225(b)(1)(A)(ii); *see also* 8 C.F.R. § 235.3(b)(4) (an "inspecting officer *shall not*

29

proceed further with removal of the alien until the alien has been referred for an interview by an asylum officer" (emphasis added)).[17]

    That rate of error in referring people for credible fear interviews is related to the procedural shortcomings of the process. The decision whether to refer an individual for a credible fear interview is made by an immigration officer, and that decision is not reviewable by anyone else. *See* 8 U.S.C. § 1225(b)(1)(A)(i) (once immigration officer "order[s] the alien removed" there is no "further hearing or review"). Entrusting the entirety of that decision making process to the executive branch official prosecuting the case leads, unsurprisingly, to problems. *See Williams v. Pennsylvania*, 579 U.S. 1, 8 (2016) ("[T]he Court has determined that an unconstitutional potential for bias exists when the same person serves as both accuser and adjudicator in a case."). Make the Road presents evidence that this structural flaw has in fact played out in predictable ways, with inspecting officers "regularly" recording "false information" during expedited removal interviews, coercing individuals to sign interview forms including false information, or otherwise rushing individuals through a cursory process. ECF 50-17, Warden-Hertz Decl. ¶¶ 6–7; *see also* ECF 50-16, Hartzler Decl. ¶¶ 10–12; ECF 50-14, Yang Decl. ¶ 7. Although the Government tries to wave these problems away as "isolated" incidents, ECF 56 at 43, both the study of the congressionally authorized Commission—identifying the 15% error rate—and the experiences of repeat player attorneys suggest otherwise. And vesting immigration officers with the unreviewable authority to refer, or not refer, noncitizens for credible fear interviews compounds other "troubl[ing] . . . problems . . . in the U.S. government's treatment of asylum seekers in expedited removal—including flawed screening and documentation practices, a lack of training and quality

---

[17] To be clear, the 15% error rate in referring individuals for credible fear interviews is neither the sole nor decisive factor in the Court's conclusion that the risk of error is too high. Instead, it is merely one of several examples of ways in which the procedures used lead to erroneous deprivations. *See Mathews*, 424 U.S. at 347 (describing an error rate as "relevant" but not "controlling" in assessing the adequacy of procedures).

control, [and] inadequate information for noncitizens in the process." ECF 50-23, Steinberg Decl.

at 121 (findings from 2024 study published by congressionally authorized United States

Commission on International Religious Freedom).

But even if a noncitizen is referred for a credible fear interview, there is still an intolerably

high risk that they will be erroneously removed via expedited removal. *Contra* 8 C.F.R.

§ 208.30(e)(2)–(3), (f) (requiring DHS to refer to section 240 proceedings noncitizens who

demonstrate a "significant possibility" of eligibility for asylum, withholding of removal, or

protection under the Convention Against Torture). That is because noncitizens are not afforded the

"opportunity to *effectively* be heard" at their credible fear interviews. *Ralls Corp.*, 758 F.3d at 318

(emphasis added).

Credible fear interviews are regularly conducted "as little as 24 hours" after a noncitizen's

initial interview with an immigration officer. ECF 50-10, Koop Decl. ¶ 31. While the regulations

say a noncitizen "*may* consult" with third parties prior to that interview, they also provide that such

consultation "*shall* be at no expense to the Government and *shall* not unreasonably delay the

process." 8 C.F.R. § 208.30(d)(4) (emphases added). Some of the detention facilities where

noncitizens are held charge cost-prohibitive rates for attorney-client phone calls and have long

wait-times (more than 24 hours) for scheduling calls after they are requested. ECF 50-10, Koop

Decl. ¶ 32. In practice, then, the Government's procedures prevent noncitizens from "contact[ing]

counsel or other support [to] gather information that they . . . need to . . . assert a credible fear" in

their interview. *Id.* ¶ 31. That leaves noncitizens unable to obtain "medical records" and other

proof that would substantiate their claims of fear. ECF 50-11, Gilliam Decl. ¶ 22. And even the

lucky few who have counsel are often unable to rely on their help during their interviews, given

the Government's regular failure to notify attorneys in advance of said interviews—even where

those attorneys have entered appearances on behalf of their clients. ECF 50-18, Lunn Decl. ¶ 20. That runs afoul of the Supreme Court's long-ago pronouncement that, "in any case, civil or criminal," to "arbitrarily . . . refuse to hear a party by counsel, employed by and appearing for him," is a "denial of a hearing, and, therefore, of due process in the constitutional sense." *Chandler v. Fretag*, 348 U.S. 3, 10 (1954).

That the noncitizen can nominally appeal an adverse decision from the credible fear interview to an immigration judge does not cure the risk of error either. *See* 8 U.S.C. § 1225(b)(1)(B)(iii)(III). The lack of any meaningful opportunity to prepare for that appeal—either with the help of third parties or even on one's own—undermines the reliability of this stage of the proceeding too. The hearing before the immigration judge takes place "to the maximum extent practicable within 24 hours, but in no case later than 7 days after" the initial adverse credible fear determination is made. *Id.* In that short time, noncitizens are not provided with the records that were made in their credible fear interview and when they appear before the immigration judge they regularly "do not know the basis for their failing the credible fear interview." ECF 50-13, Schacher Decl. ¶ 14; *see also* ECF 50-19, Willis Decl. ¶ 16 ("It [is] very common for applicants to be scheduled for an Immigration Judge review of their negative [credible fear interview] without having had an opportunity to see or review the USCIS Asylum Officer's decision."). What's more, immigration judges "[t]ypically . . . do not allow noncitizens to explain discrepancies in their previous statements" during credible fear interviews "or to provide additional evidence or information not detailed in the credible fear interview." ECF 50-13, Schacher Decl. ¶ 15. Instead, the noncitizens are "frequently limit[ed] . . . to yes or no answers." *Id.* So noncitizens are not afforded a meaningful opportunity to prepare for or present evidence at their credible fear interviews, are stuck with the record they make during those interviews, and must appeal the

adverse determinations coming out of those interviews without knowing the basis for the negative findings. Given these procedural shortcomings, there is little chance that erroneous credible fear findings will be corrected by immigration judges.

Errors in correctly determining whether a noncitizen's fear of being removed disqualifies them from expedited removal are far from the only problem in the process. Equally troubling is the significant risk that the 2025 Designation will lead to the expedited removal of individuals who have been present in the United States for at least two years. According to a DHS report, the "vast majority" of undocumented immigrants in the United States have been living here for longer than two years. ECF 50-24, Steinberg Decl. at 58 (estimating that 79 percent of the undocumented population as of 2022 "entered before 2010"). Another study concluded that, as of 2022, only 12.4% of the undocumented population had been present for less than two years. ECF 50-23, Steinberg Decl. at 258. Most noncitizens, then, are not eligible for expedited removal—even if they entered unlawfully, and even if they are subject to removal.

But the expedited removal process has in place woefully inadequate procedures for accurately determining whether a noncitizen has been present for two years. The regulations require immigration officers to read individuals a statement from a form, and then ask them a series of four questions from another form. *See* 8 C.F.R. § 235.3(b)(2)(i). The recited statement does not inform individuals that they are only subject to expedited removal if they have been present less than two years, instead telling individuals only that they should inform the immigration officer if they "fear or have a concern about being removed from the United States or about being sent home." ECF 50-23, Steinberg Decl. at 94 (text of Form I-867A). The four questions officers ask do not prompt the individual to say anything about how long they have been in the country either:

1.  Why did you leave your home country or country of last residence?

33

2. Do you have any fear or concern about being returned to your home country or being removed from the United States?
3. Would you be harmed if you are returned to your home country or country of last residence?
4. Do you have any questions or is there anything else you would like to add?

*Id.* (questions from Form I-867B). So while both the statement and questions provide at least some "opportunity to be heard" about asylum claims, *Propert v. District of Columbia*, 948 F.2d 1327, 1332 (D.C. Cir. 1991), there is nothing in the expedited removal interview process that would prompt an individual to put forward the "affirmative[]" evidence of continuous two-year presence that is required under the statute, 8 U.S.C. § 1225(b)(1)(A)(iii)(II).

But once the interview is complete, the individual is not afforded any other opportunity to present evidence about their continual presence. If the officer determines that they are subject to expedited removal and receives supervisor sign-off, she serves the Form I-860, which combines both the notice of and order for expedited removal. 8 C.F.R. § 235.3(b)(2)(i). Individuals are then ordered removed "without further hearing or review." 8 U.S.C. § 1225(b)(1)(A)(i). And while the regulations provide for additional layers of review for individuals who indicate an intent to apply for asylum or fear of return, 8 C.F.R. § 235.3(b)(4), who claim to be U.S. citizens, lawful permanent residents, refugees, or asylees, *id.* § 235.3(b)(5), or who claim to have been paroled into the United States, *id.* § 235.3(b)(6), there is no additional process for individuals who claim to have resided in the United States for more than two years.

Finally, even if an individual somehow knows that they can contest their eligibility for expedited removal on the basis of continual presence, and even if they know that they need to do so in the initial interview because they will not have any further opportunity, the procedures make it exceedingly difficult for them to meet their burden. While the regulations guarantee individuals the opportunity to "present evidence or provide sufficient information" to prove ineligibility for expedited removal on another basis, 8 C.F.R. § 235.3(b)(6), there is no similar requirement or

34

procedure for presenting evidence bearing on continuous presence. Nor is there an opportunity, as is provided for those claiming parole, *see id.*, to contact a third-party to assist with gathering such evidence. Nor are officers explicitly required to verify residence claims—as they must for those claiming lawful status. *See id.* § 235.3 (b)(5). Nor is there a referral to an immigration judge to review an expedited removal order based on unverified or disputed residence facts—as there is for unverified lawful status. *See id.* Nor must the supervisor review any claims of continual presence before signing off on expedited removal, as they "must" for "any claim of lawful admission or parole." *Id.* § 235.3 (b)(7).

So even though the "burden of proof" rests with the individual "to affirmatively show that he or she has the required continuous physical presence in the United States," *id.* § 235.3(b)(1)(ii), the procedures used do not afford individuals meaningful notice of a key element of the "case against" them—the allegation that they have been present in the country for less than two years—or the "opportunity to meet" that allegation. *Mathews*, 424 U.S. at 348.

That flaw in the process creates a significant risk when expedited removal is applied to people in the interior of country. Continuous presence is unlikely to be seriously contested when it comes to those apprehended in close temporal and spatial proximity to the border, who are likely to have crossed recently. Not so with those living elsewhere in the United States. The Government has previously made this point: "The Department acknowledges that application of the expedited removal provisions to aliens already in the United States will involve more complex determinations of fact and will be more difficult to manage." 62 Fed. Reg. 10313; *see also* 87 Fed. Reg. 16022, 16023–24 (recognizing that "the operational complexities of implementing" expedited removal to the full interior of the United States, as opposed to only recent entrants, "would involve complex new challenges for the ICE workforce").

With expedited removal no longer cabined to the border, the complete lack of process for an individual to demonstrate how long they have been present therefore creates a significant risk of erroneous removal. It is unsurprising, then, that the Government has recently swept into expedited removal proceedings, and ordered removed, people who have lived here far longer than two years. *See* ECF 50-4, Levenson Decl. ¶¶ 23–24 (courthouse arrest of person present more than two years); *Castillo Lachapel v. Joyce*, --- F. Supp. 3d ---, 2025 WL 1685576, at *1–2 (E.D.N.Y. June 16, 2025) (person present more than two years arrested at courthouse and issued expedited removal order); ECF 50-7, Mary Doe Decl. ¶¶ 2–12 (Plaintiffs Mary and John, who have lived here for ten years, discussing arrest during traffic stop); *Co Tupul v. Noem*, No. 25-cv-02748, 2025 WL 2426787, at *1 (D. Ariz. Aug. 4, 2025) (person present for 30 years arrested during traffic stop, "placed in expedited removal proceedings[,] and [ordered] removed in one to three weeks").

In short, the expedited removal process hardly affords individuals any opportunity, let alone a "meaningful" one, to demonstrate that they have been present in the United States for two years. *Contra Propert*, 948 F.2d at 1332. Such a "complete denial of the opportunity to be heard on a material issue is a violation of due process." *United States v. Smith*, 30 F.4th 1334, 1338 (11th Cir. 2022). And although this shortcoming might not create a huge risk of error when expedited removal is used at or near the border, it creates an intolerable risk when expedited removal is deployed throughout the United States. That is because *most* noncitizens have been present for more than two years, and those living far away from the border are less likely to have recently crossed.  *See* ECF 50-24, Steinberg Decl. at 58 (DHS study).

Any of the additional safeguards Make the Road proposes could mitigate the risk that the Government erroneously removes people via expedited removal. The Government could, for

example, easily revise its forms to ensure that individuals are asked about, and have an opportunity to contest, their eligibility based on continuous presence grounds. The "opportunity for [an individual affected by government action] to present his side of the case is . . . *of obvious value* in reaching an accurate decision." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 543 (1985) (emphasis added); *see also Conn. Dep't of Pub. Safety v. Doe*, 538 U.S. 1, 7 (2003) ("[D]ue process require[s] the government to accord the plaintiff a hearing to prove or disprove a particular fact or set of facts . . . [that are] relevant to the inquiry at hand.").

The Government could also afford individuals with a meaningful opportunity to ask counsel or third parties for help in gathering evidence to prove either a credible fear or their continual presence. That would substantially improve the reliability of the proceedings. As Make the Road explains, many of its "members [] would have difficulty affirmatively demonstrating two years of physical presence, particularly if suddenly detained or given only a short period of time to do so." ECF 50-2, Fontaine Decl. ¶ 42. So too do people trying to substantiate their claims of credible fear need access to "medical records" or other documentation, some of which must be secured from other countries. *See* ECF 50-11, Gilliam Decl. ¶ 22. The Government's current procedures, however, make it exceedingly difficult to gather these documents. *See* ECF 50-21, Cooper Decl. ¶¶ 6–7 (explaining that detention centers do not provide confidential emails, fax, or other means of receiving documents other than mail, which takes 5–10 days to reach detained clients). Affording people a real opportunity to collect documents by calling on third parties for help would be an easy way to decrease the risk of erroneous removals that currently exists. That is the kind of fix the D.C. Circuit has previously required to remedy procedural due process problems. *See, e.g.*, *Gray Panthers v. Schweiker*, 652 F.2d 146, 148, 172 (D.C. Cir. 1980) (plaintiffs must "be informed of or have access to the evidence on which the [decision maker]

relied" and "an opportunity to present evidence (in oral or written form) in support of" their position before they can be deprived of Medicare benefits of $100 or less); *Nat'l Council of Resistance of Iran v. Dep't of State*, 251 F.3d 192, 209 (D.C. Cir. 2001) (due process "require[s] that the [government] afford to entities considered for imminent designation [as a terrorist organization] the opportunity to present, at least in written form, such evidence as those entities may be able to produce to rebut the administrative record or otherwise negate the proposition that they are foreign terrorist organizations").

The Government does not offer much in response to the procedural deficiencies and concordant risks that Make the Road has identified. In conclusory fashion, the Government asserts that "the risk of erroneous application is not high" because "[w]hether an alien may be subject to expedited removal proceedings is straightforward: the immigration officer must determine only whether an alien was admitted or paroled and has valid entry documents or has misrepresented material information about himself and then determine whether the alien has been present for fewer than two years." ECF 56 at 47.

Saying it doesn't make it so. The Government does not meaningfully engage with the evidence suggesting that the residence determination is anything but straightforward when applied to the interior, especially in communities that lack readily available documentation proving presence. *See* ECF 50-2, Fontaine Decl. ¶¶ 41–43. It does not have anything to say about the evidence that the flaws in its processes lead it to "erroneously return[] asylum seekers to countries where they could face persecution." ECF 50-23, Steinberg Decl. at 121. And its reassurances that this supposedly simple process does not lead to erroneous results ignores the "troubling reality" that, because of the general lack of oversight or any meaningful "check[s]" to ensure that individuals "underst[and] the proceedings, ha[ve] an interpreter, or enjoy[] any other safeguards,"

38

the "procedure is fraught with risk of arbitrary, mistaken, or discriminatory behavior." *Khan v. Holder*, 608 F.3d 325, 329 (7th Cir. 2010). Indeed, the Court finds the Government's hand-waving regarding the "straightforwardness" of implementing the 2025 Designation hard to square with its prior express recognition of the factual complexities associated with expanding expedited removal beyond the border and into the interior. *See* 62 Fed. Reg. 10312–13; 87 Fed. Reg. 16022, 16024.

In terms of safeguards, the Government claims that the regulations already provide individuals with protections: "[I]f the alien asserts that he should not be subject to expedited removal, because he is a lawful permanent resident, refugee, or asylee, or claims to be a U.S. citizen, the regulations require that a thorough inquiry occur prior to any removal proceedings, both before the immigration officer and an immigration judge." ECF 56 at 47, 50. But even if those procedural safeguards were sufficient to avoid erroneous determinations on those eligibility questions—as the Court has already explained, they are not—the Government does not claim that a similar "thorough inquiry" is undertaken to determine whether someone has been in the country for two years. Indeed, the Government's briefing had nothing to say about how immigration officers determine whether an individual has been present for fewer than two years and nothing in the 2025 Designation affords individuals with a meaningful opportunity to disprove that threshold element. When asked at oral argument what would happen if, for example, an individual unexpectedly apprehended at a court hearing wants "to demonstrate that they've been here for a period of two years but they don't have any paperwork on them," the Government came up empty, offering only "to take that back to the agency to give [the Court] an answer." Hr'g Tr. 26:20–27:10. The Government has yet to provide an answer.[18]

---

[18] The Government also argues that because Make the Road raises a facial constitutional attack, it must show that the 2025 Designation "is always unconstitutional—not that it may sometimes be, as applied." ECF 56 at 44 (emphasis omitted) (citing *United States v. Salerno*, 481 U.S. 739, 745 (1987)). But Make the Road has identified facial defects

### iii. The Government's interests are outweighed by the value of additional safeguards and the significant liberty interest at stake.

Finally, the Government's countervailing interests are insufficient to overcome the weight of the constitutional deprivation here.

Given the potential for erroneous deprivation and clear value of additional safeguards, Make the Road contends that individuals "facing expedited removal must be given a reasonable opportunity to contest whether they are actually subject to expedited removal"—no matter the countervailing governments interest at stake. ECF 50-1 at 29–31. The Government counters that any additional process would interfere with its interest in enforcing immigration law, noting that "Congress determined that expedited removal is necessary 'to expedite the removal from the United States of aliens who indisputably have no authorization to be admitted,' and for dealing with the 'crisis at the land border' that involves 'hundreds of thousands of illegal aliens' entering each year." ECF 56 at 51 (quoting H.R. Rep. 104-828 at 209; H.R. Rep. No. 104-469 at 107). The Government also claims that adding further safeguards would turn expedited removal into comprehensive removal proceedings (akin to those available in section 240 proceedings) as opposed to the truncated system Congress envisioned. *See id.*

The Government's argument depends on a false premise. The Court is decidedly *not* holding that expedited removal must emulate section 240 proceedings to satisfy due process. Nor is it barring the Government from subjecting the group of people affected by the 2025 Designation to expedited removal. It holds only that Make the Road has made a sufficiently strong showing

---

in the expedited removal process that make it unconstitutional to apply it to those subject to the 2025 Designation. These procedural inadequacies apply in every case. It is no defense to a procedural due process claim to argue that *in some individual cases* the Government reaches the right answer *despite* the procedural flaws. The whole point of procedural due process rules is that they help to "*minimize* substantively unfair or mistaken deprivations of life, liberty, or property." *Carey v. Piphus*, 435 U.S. 247, 259–60 (1978) (emphasis added). That the Government does not make a mistake in every single case does not mean that its procedures are constitutionally adequate. *See id.* at 266 ("[T]he right to procedural due process is 'absolute' in the sense that it does not depend upon the merits of a claimant's substantive assertions.").

that the procedures *currently in place* likely do not afford those affected by the 2025 Designation with an adequate "opportunity to challenge their removal." *J. G. G.*, 145 S. Ct. at 1006. That showing entitles Make the Road to a stay. The Government, however, remains free to issue new rules or guidance implementing any of the modest procedural safeguards Make the Road has identified (or indeed others it chooses) to ensure that this same class of people can be subjected to expedited removal through constitutionally adequate procedures.

The Court recognizes, and heeds, the Government's "weighty" "interest in efficient administration of the immigration laws at the border." *Landon*, 459 U.S. at 34. But that interest must always be "pursued in a manner consistent with the Constitution." *A. A. R. P.*, 145 S. Ct. at 1368. And the Government has not explained why it is unable to efficiently enforce the immigration laws, including the expedited removal statute, while also affording individuals with their "core" due process right: "notice and a meaningful opportunity to be heard." *LaChance v. Erickson*, 522 U.S. 262, 266 (1998). Because Make the Road has made a strong showing that the procedures can be "tailored . . . to the capacities and circumstances of those who are to be heard . . . to insure that they are given a meaningful opportunity to present their case" without substantially undermining the Government's interests, the Court concludes that Make the Road is likely to prevail on the merits of its due process claim. *Mathews*, 424 U.S. at 349.

**B. Make the Road Faces Irreparable Harm.**

In addition to showing a likelihood of success on the merits, Make the Road must also establish that it is likely to face irreparable injury absent the requested preliminary relief. *See Nat'l Min. Ass'n v. Jackson*, 768 F. Supp. 2d 34, 50 (D.D.C. 2011); *Chaplaincy*, 454 F.3d at 297. To constitute irreparable injury, the injury "must be 'both certain and great,' 'actual and not theoretical,' 'beyond remediation,' and 'of such *imminence* that there is a clear and present need

41

for equitable relief to prevent irreparable harm.'" *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015) (quoting *Chaplaincy*, 454 F.3d at 297) (emphasis in original)).

Make the Road offers evidence of three categories of ongoing or imminent irreparable harm to their members: (1) wrongful removal of individuals statutorily ineligible for expedited removal; (2) detention and family separation during expedited removal proceedings; and (3) risks of persecution and death if and when noncitizens subject to expedited removal are removed. ECF 50-1 at 43–44; ECF 58 at 31–32. The Government raises two responses. First, that Make the Road fails to identify "imminent harm" because it has not "shown that apprehension in immigration court for the purposes of expedited removal is an imminent injury for any of [its] members." ECF 56 at 65. Second, that Make the Road's purported delay in filing the stay motion—five months after the 2025 Designation took effect—undercuts its position that it will be irreparably harmed. *Id.* Both arguments miss the mark.

The first simply ignores the significant evidence Make the Road has put forward. Its declarations are replete with uncontested evidence that the Government is systematically targeting individuals attending their immigration court proceedings for placement into expedited removal, in New York and beyond. *See, e.g.*, ECF 50-9, Rowland-Kain Decl. ¶¶ 5, 8 (arrests at Varick Street and Broadway Immigration Courts in New York City and Buffalo Immigration Court beginning in May 2025); ECF 50-8, Eugenio Decl. ¶¶ 7, 10 (arrests at Federal Plaza Immigration Court in New York City). And Make the Road has identified a number of its members who are at risk of being placed in expedited removal pursuant to the 2025 Designation, some of whom have impending immigration court dates, others of whom have already had their section 240 proceedings dismissed. *See* ECF 50-2, Fontaine Decl. ¶¶ 17–25 (identifying members John Doe 1, John Doe 2, John Doe 3, John Doe 4, Jane Doe 1, Jane Doe 2 who are subject to expedited removal

under the 2025 Designation). Given that the Government has been dismissing section 240 proceedings as a predicate to placing people in expedited removal proceedings, the foreseeable next step is that some of these members will be put into expedited removal. *See, e.g.*, *id*. at 15–17 (Government's motion to dismiss member's section 240 case is pending); *id.* ¶ 22 (member who is in removal proceedings); *id.* ¶ 25 (same with hearing date scheduled). And merely being removed is not the only risk those members face. Jane Doe 2, for instance, risks "being detained and separated from [her] children, who would have no one to care for them" and "losing [her] opportunity to apply for asylum." *Id.* at 18 ¶ 4. "[T]he harm from detention surely cannot be remediated after the fact" and is a quintessential irreparable harm. *Ramirez v. ICE*, 310 F. Supp. 3d 7, 31 (D.D.C. 2018). And "the prospect of expulsion without any opportunity to apply for asylum or withholding of removal," after which "a judicial remedy may be unavailable," is no less irreparable. *Huisha-Huisha v. Mayorkas*, 560 F. Supp. 3d 146, 172 (D.D.C. 2021), *affirmed in relevant part* 27 F.4th 718, 733–34 (D.C. Cir. 2022).

Even more fundamentally, the injury Make the Road's members face is a "threatened invasion of [their] constitutional right" to due process, and after removal there is little possibility that the Court can order the Government to provide them with the process they were denied. *Davis v. District of Columbia*, 158 F.3d 1342, 1346 (D.C. Cir. 1998). In these circumstances, the "prospective violation of a constitutional right constitutes irreparable injury," full stop. *Id.*; *see also Talbott v. United States*, 775 F. Supp. 3d 283, 332 (D.D.C. 2025) (collecting cases). The Court thus agrees with Make the Road that its members face imminent, irreparable injury, and rejects the Government's contrary argument as flatly inconsistent with both the record and the law.

The Government's delay argument is similarly unavailing. The Government contends that the time between issuance of the 2025 Designation (January 2025) and the filing of Make the

43

Road's motion (June 2025) undermines its claim of irreparable harm. ECF 56 at 65–66 (citing *Fund for Animals v. Frizzell*, 530 F.2d 982, 987 (D.C. Cir. 1975) (finding that a delay of 44 days before bringing action for injunctive relief was "inexcusable" where plaintiff "knew" the claimed irreparable harm was impending), and *Western Watersheds Project v. Bernhardt*, 468 F. Supp. 3d 29, 50 (D.D.C. 2020) (similar)). But the caselaw the Government relies on is inapposite, as it stands only for the proposition that plaintiffs' "*unexplained delays* in seeking emergency relief undermine their contention that they will be irreparably harmed." *Bernhardt*, 468 F. Supp. 3d at 50 (emphasis added); *see also Newdow v. Bush*, 355 F. Supp. 2d 265, 292 (D.D.C. 2005) (explaining that "[a]n unexcused delay in seeking extraordinary injunctive relief may be grounds for denial because such delay implies a lack of urgency and irreparable harm" and collecting cases to that effect). Here, Make the Road's delay is neither unexplained nor unexcused. Make the Road articulated and supported with record evidence an explanation for the timing of its motion: the Government's recent efforts beginning in May 2025 to aggressively implement the 2025 Designation, in New York and nationwide. *See e.g.*, ECF 50-23, Steinberg Decl. at 300 (reporting in May 2025 of Government's announced 3,000 daily arrests target); ECF 50-24, Steinberg Decl. at 383 (reporting on 2,000 arrests per day effectuated during the first week of June); *supra* 12 n.10 (declarations detailing massive wave of courthouse arrests in May and June 2025). Accordingly, Make the Road's sudden "urgency" is "justified by . . . new facts [and] allegations." *Guttenberg v. Emery*, 26 F. Supp. 3d 88, 103 (D.D.C. 2014). The delay therefore in no way undermines its claims of irreparable harm. And because the record fully substantiates Make the Road's claim that its members face such harm, this prerequisite for the grant of a stay is satisfied.

### C. The Balance of the Equities and the Public Interest Favor a Stay.

The final two stay factors, which merge here, plainly cut in Make the Road's favor. For one, Make the Road has made a strong showing that the 2025 Designation is unconstitutional, and

44

"there is generally no public interest in the perpetuation of unlawful agency action." *Shawnee Tribe v. Mnuchin*, 984 F.3d 94, 102 (D.C. Cir. 2021). For another, "the public has an interest 'in preventing [noncitizens] from being wrongfully removed, particularly to countries where they are likely to face substantial harm.'" *A.B.-B. v. Morgan*, 548 F. Supp. 3d 209, 222 (D.D.C. 2020) (quoting *Nken*, 556 U.S. at 436). Absent a stay, that is likely to happen.

 While the Government has correctly asserted its weighty interest in enforcing the immigration laws, it has not explained how a stay would inappropriately interfere with that interest. First, the Government claims that a stay of the 2025 Designation would "improper[ly] intru[de]" into the workings of the executive branch, especially because "Congress did not intend for judicial review in this area." ECF 56 at 67. That argument misstates the law: Congress expressly provided for judicial review of the kind of claim Make the Road presses here, and it dictated that such review occur in this Court. *See* 8 U.S.C. § 1252(e)(3); *supra* 19–20. Nor can the Government get any mileage out of its citation to Justice O'Connor's in-chambers opinion in *I.N.S. v. Legalization Assistance Project*. *See* ECF 56 at 67. In that case, Justice O'Connor reasoned that the balance of the equities tipped in favor of staying a lower-court decision that constituted an "improper intrusion by a federal court into the workings of a coordinate branch of Government." 510 U.S. 1301, 1306 (1993) (O'Connor, J., in chambers). But there, the lower-court's decision was an "improper intrusion" because it permitted a suit by plaintiffs without prudential standing. *See id.* ("Moreover, if the above analysis [about standing] is correct the order is not merely an erroneous adjudication of a lawsuit between private litigants, but an improper intrusion[.]"). Here, by contrast, Make the Road is a proper plaintiff. *See CHIR*, 2025 WL 2192986, at *19–21 (explaining reasoning on this issue). The order is therefore not an "improper intrusion" of the kind that concerned Justice O'Connor.

The Government next asserts that the public interest "favors the efficient administration of the immigration laws at the border," and that the requested stay "would frustrate the 'public interest in effective measures to prevent the entry of illegal aliens' at the Nation's borders." ECF 56 at 67 (quoting *Innovation L. Lab v. McAleenan*, 924 F.3d 503, 510 (9th Cir. 2019); *United States v. Cortez*, 449 U.S. 411, 421 n.4 (1981)). But the Government's argument, and the cases on which it relies, concern the public interest in enforcing immigration laws "*at the border*." And, as Make the Road explains, "the [2025 Designation] and [Huffman Memorandum] apply in the interior, not at the border." ECF 58 at 32. Thus, the Government's interest in effectuating border-control would be undisturbed by this Court's stay of the 2025 Designation. And, even granting the Government's interest in enforcing immigration laws in the interior, doing so without sufficient due process violates the law. *See Shawnee Tribe*, 984 F.3d at 102.

The Government tries one final argument: "[t]he government has a substantial interest in implementing the President's policies," and "vigorous enforcement of the immigration laws and the prompt removal of inadmissible aliens is one of the President's top priorities." ECF 56 at 64. Maybe so. But "[t]he Constitution . . . does not permit [the Government] to prioritize any policy goal over the Due Process Clause, and enforcement of an unconstitutional law is always contrary to the public interest." *Karem v. Trump*, 960 F.3d 656, 668 (D.C. Cir. 2020).

**D.  The 2025 Designation and Implementing Guidance are Stayed in their Entirety, No Bond Is Required, and the Court Will Not Administratively Stay its Order.**

Because all four factors favor it, the Court will stay the 2025 Designation. In a footnote on the last page of its brief, the Government asks this Court to limit any stay to Make the Road's members who are "currently in expedited removal and actually identified by Make the Road in this suit." ECF 56 at 67 n.15; *but see Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 766 n.2 (D.C. Cir. 2022) ("[A]n inchoate argument made only in a footnote is forfeited."). That request

46

is a nonstarter. As the D.C. Circuit has repeatedly held, vacatur of the agency action—not merely exempting plaintiffs from the agency action— is the normal remedy under APA section 706. *Nat'l Min. Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998). This Court and courts in this and other circuits have applied that same rule to section 705 stays. *See CHIR*, 2025 WL 2192986, at *37 (collecting cases). "Those decisions track the text of section 705, which authorizes the reviewing court to 'postpone the effective date of an agency action or preserve status or rights' full stop, not only as to plaintiffs before the court." *Id.* (quoting 5 U.S.C. § 705).

The Government also asks the Court to, if it grants relief, require Make the Road to put forward a bond pursuant to Federal Rule of Civil Procedure 65(c). The Court declines to do so. As explained in *CHIR*, that rule requires the Court when issuing a preliminary injunction or temporary restraining order to order the movant to "give[] security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). A stay under APA section 705 is neither a preliminary injunction nor a temporary restraining order. *See CHIR*, 2025 WL 2192986, at *38. Rule 65(c) therefore does not apply.

Finally, the Government moved at oral argument for a 14-day administrative stay of this Court's order "because this ruling will directly impact agency operations" and to "give the Solicitor General's office an opportunity to determine whether an appeal is appropriate." Hr'g Tr. 41:3–9. The Court denies that request. There is no motion before this Court that requires "time to deliberate." *United States v. Texas*, 144 S. Ct. 797, 798 (2024) (Barrett, J., concurring) (describing the purpose of an administrative stay).

## IV.    CONCLUSION

For the foregoing reasons, Plaintiff's motion for a stay of agency action, ECF 50, is **GRANTED**. The Challenged Actions (the January 21 Designation Notice and the January 23

is a nonstarter. As the D.C. Circuit has repeatedly held, vacatur of the agency action—not merely

exempting plaintiffs from the agency action— is the normal remedy under APA section 706. *Nat'l*

*Min. Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998). This Court and

courts in this and other circuits have applied that same rule to section 705 stays. *See CHIR*,

2025 WL 2192986, at *37 (collecting cases). "Those decisions track the text of section 705, which

authorizes the reviewing court to 'postpone the effective date of an agency action or preserve status

or rights' full stop, not only as to plaintiffs before the court." *Id.* (quoting 5 U.S.C. § 705).

The Government also asks the Court to, if it grants relief, require Make the Road to put

forward a bond pursuant to Federal Rule of Civil Procedure 65(c). The Court declines to do so. As

explained in *CHIR*, that rule requires the Court when issuing a preliminary injunction or temporary

restraining order to order the movant to "give[] security in an amount that the court considers

proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined

or restrained." Fed. R. Civ. P. 65(c). A stay under APA section 705 is neither a preliminary

injunction nor a temporary restraining order. *See CHIR*, 2025 WL 2192986, at *38. Rule 65(c)

therefore does not apply.

Finally, the Government moved at oral argument for a 14-day administrative stay of this

Court's order "because this ruling will directly impact agency operations" and to "give the

Solicitor General's office an opportunity to determine whether an appeal is appropriate." Hr'g Tr.

41:3–9. The Court denies that request. There is no motion before this Court that requires "time to

deliberate." *United States v. Texas*, 144 S. Ct. 797, 798 (2024) (Barrett, J., concurring) (describing

the purpose of an administrative stay).

## IV.    CONCLUSION

For the foregoing reasons, Plaintiff's motion for a stay of agency action, ECF 50, is

**GRANTED**. The Challenged Actions (the January 21 Designation Notice and the January 23

Huffman Memorandum insofar as it implements the January 21 Designation Notice) are hereby

**STAYED**, pending conclusion of these review proceedings.

A separate order accompanies this memorandum opinion.

**SO ORDERED.**

_____
JIA M. COBB
United States District Judge

Date: August 29, 2025

48

# EXHIBIT "B"

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MAKE THE ROAD NEW YORK, *et al.*,

                Plaintiffs,

      v.

KRISTI NOEM, in her official capacity as Secretary of Homeland Security, *et al.*,

                Defendants.

Case No. 25-cv-190 (JMC)

## ORDER

For the reasons stated in the accompanying memorandum opinion, it is hereby **ORDERED** that Plaintiffs' Motion for a Stay of Agency Action under 5 U.S.C. § 705, ECF 22, is **GRANTED**.

It is further **ORDERED** that, to preserve status or rights pending conclusion of the review proceedings, the effective dates of implementation and enforcement of the January 21 Designation Notice and the January 23 Huffman Memorandum, insofar as it implements the January 21 Designation Notice, are immediately postponed and stayed.

      **SO ORDERED.**

                _Jia M. Cobb_____
                JIA M. COBB
                United States District Judge

Date: August 29, 2025

# EXHIBIT "C"

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

MAKE THE ROAD NEW YORK, *et al.*,

Plaintiffs,                    Case No. 25-cv-190

v.

KRISTI NOEM, in her official capacity as
Secretary of Homeland Security, *et al.*,

Defendants.

**DECLARATION OF LIANA J. CASTANO**

I, Liana J. Castano, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury as follows:

1.     I am the Interim Assistant Director (AD) for the Field Operations Division, within the U.S. Department of Homeland Security (DHS), U.S. Immigration and Customs Enforcement (ICE), Enforcement and Removal Operations (ERO). I have held this position since July 14, 2025. I joined ERO in 2006 and have held several leadership positions, including Interim Assistant Director for the Removal Division, Assistant Director for the Law Enforcement Systems and Analysis Division, and Field Office

Director for the Washington Field Office. As the AD for ERO field operations, I manage ERO's 25 field offices as well as programs and initiatives to identify, arrest, prosecute, and remove priority aliens.

2.     This declaration is based upon my professional knowledge and experience, information obtained from other individuals employed by ICE, and information obtained from DHS official records.

3.     I am familiar with the district court's August 29, 2025 order in this case.

4.     Expedited removal (ER) is a streamlined processing pathway for certain inadmissible aliens under the Immigration and Nationality Act (INA). ER results in shorter periods of detention and more efficient removal processing than removal under INA § 240. Specifically, certain aliens may be processed for ER if the alien lacks valid entry documents or engaged in fraud or willful misrepresentation of a material fact and meets other requirements. Such aliens may be ordered removed without further hearing or review. If the alien claims fear of persecution or an intention to apply for asylum, the alien is referred for a credible fear process.

5.     The order issued in this case will cause significant hardship to ICE's enforcement and removal mission. In compliance with the court's order, ICE will no longer be able to place aliens apprehended more than 14 days after entry or 100 miles from the border into expedited removal. Instead, ICE will have to place such aliens into INA § 240 removal proceedings, even though such aliens are inadmissible to the United States because they lack valid entry documents or engaged in fraud or willful misrepresentation, were not admitted or paroled into the United States, and have not

established to ICE's satisfaction physical presence in the country continuously for the two-year period immediately preceding ICE's determination of their inadmissibility.

6.     The alien has the burden of proof to establish his continuous presence in the United States for more than two years. Evidence that may demonstrate an alien's continuous physical presence in the United States includes, but is not limited to, banknotes, leases, deeds, licenses, bills, church records, receipts, birth records, school records, employment records, tax records, and or the alien's statements to an immigration officer or agent. An officer considers this non-exhaustive list of documents under the totality of the circumstances in determining whether an alien has demonstrated at least two years of continuous physical presence in the United States to such officer's satisfaction.

7.     Requiring such aliens to be processed for INA § 240 removal proceedings rather than ER would have significant negative operational effects. Removal proceedings administered by immigration judges under INA § 240 involve various stages, including pleadings, removability determinations, filing of applications for relief or protection from removal, adjudication of those applications, and potential adjudication of appeals by the Board of Immigration Appeals and petitions for review by the U.S. Courts of Appeals wherein immigration judges' factual and legal findings are subject to appellate review. These proceedings can take years to complete, on account of overburdened immigration courts and the unpredictable length of time for further appellate review.

8.     ICE databases reflect that from January 20, 2025 to August 30, 2025, aliens served with a charging document for ER spent less time in ICE custody than those served with charging documents for INA § 240 proceedings. While most aliens remain detained throughout the entirety of ER, many aliens in INA § 240 proceedings are released from

custody before their proceedings conclude, including aliens released from detention and transferred to the Executive Office for Immigration Review's non-detained docket, adding to the years-long non-detained immigration court backlog. For those aliens detained pending their removal proceedings, placement in 240 proceedings instead of ER significantly strain limited detention resources; significantly reduce bed space availability; increase the average custody times for aliens; and require the additional expenditure of administrative resources and time for ERO personnel to manage cases.

9.  As of September 2, 2025, there were 6,114,816 aliens in pending INA § 240 removal proceedings on ERO's non-detained docket and 41,243 aliens in pending INA § 240 removal proceedings on ERO's detained docket. These figures highlight the current nationwide immigration court backlog, which in the aggregate constitute historically unprecedented high numbers. Transferring aliens from ER to INA § 240 proceedings will only further worsen these all-time high numbers.

10.  ICE databases also reflect that many of the 27,026 aliens processed for ER since January 20, 2025 have serious criminal records, including but not limited to: Aggravated Assaults (236), Assault (387), Amphetamine-related crimes (37), Battery (70), Burglary-related crimes (122), Cocaine-related crimes (246), Dangerous Drugs (141), Domestic Violence (162), DUI-Drugs/Liquor (926), Drug Trafficking (193), Forgery related crimes (45), Fraud related crimes (210), Homicide related crimes (31), Kidnapping related crimes (21), Larceny related crimes (228), Obstructing Police (50), Rape related crimes (18), Resisting Officer (113), Robbery related crimes (62), Sex Assault related crimes (55), Sexual Exploitation of a minor related crimes (11), Smuggling related crimes (121), and Trespassing (411). As evidenced by this data, ICE

leverages ER as an efficient processing pathway to expeditiously remove high priority criminal aliens from the United States.

11. ICE, on average, spends approximately $152 per day to detain and house an alien in ICE custody. The total detention cost for an alien increases proportionally based on an alien's length of detention, which on average increases when an alien is processed for INA § 240 proceedings in lieu of ER. Ultimately, ICE incurs higher costs and expends more appropriated funding when its ER authority is significantly curtailed such that ER is not a viable processing pathway for aliens otherwise amenable to ER.

12. ICE's inability to use expedited removal for aliens apprehended more than 14 days after entry and over 100 miles from the border reduces available detention space for higher-priority removals. When ER is limited, ICE must allocate detention space to aliens for a longer duration of time, thereby limiting ICE's ability to detain newly encountered and apprehended aliens with serious criminal records or other derogatory information. The inability to swiftly detain aliens with criminal or derogatory information due to space constraints hampers ICE's ability to effectively administer the immigration laws and may negatively impact public safety.

13. Operationally, ICE must also account for limited flight schedules and logistical constraints. Removal flights are often scheduled weeks in advance and require advance coordination with foreign governments. ER facilitates this process by allowing ICE to identify and finalize aliens for travel within a relatively short timeframe, so that manifests can be completed and flights can depart at or near capacity. When ER is not available, it extends aliens' detention timeline, reducing the number of aliens who are removal-ready when manifests must be finalized, which in turn may result in flights

that are not filled to capacity, creating additional challenges for ICE in planning and carrying out removals efficiently.

14.    Undoubtedly, the district court's August 29, 2025 order in this case will operationally and financially burden ICE by impairing its ability to invoke ER for aliens who are apprehended more than 14 days after entry, are more than 100 miles from the border, are inadmissible to the United States because they lack valid entry documents or engaged in fraud or willful misrepresentation, and were not admitted or paroled into the United States.

Pursuant to 28 U.S.C. § 1746, I declare, under penalty of perjury, that the foregoing is true and correct based upon reasonable inquiry, knowledge, information, and belief.

Executed this 8th day of September, 2025.

Digitally signed by LIANA J CASTANO
Date: 2025.09.08 16:04:58 -04'00'

Liana J. Castano
Interim Assistant Director (AD) for Field Operations
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
Washington, D.C.