# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

―――――――――

MAKE THE ROAD,
*Appellee,*

v.

KRISTI NOEM, in her official capacity as
Secretary of Homeland Security, *et al.,*
*Appellants.*

―――――――――

On Appeal from the U.S. District Court
for the District of Columbia
No. 1:25-cv-00190 (Cobb, J.)

―――――――――

## BRIEF FOR APPELLANTS

―――――――――

ELISSA P. FUDIM
JOSEPH MCCARTER
CAROLINE McGUIRE
*Trial Attorneys*
U.S. Department of Justice,
Civil Division
Office of Immigration Litigation
General Litigation & Appeals
P.O. Box 878, Ben Franklin
Station
Washington, DC 20044

BRETT A. SHUMATE
*Assistant Attorney General*

DREW C. ENSIGN
*Deputy Assistant Attorney General*

TYLER J. BECKER
*Counsel to the Assistant Attorney
General*
U.S. Department of Justice,
Civil Division
950 Pennsylvania Avenue, NW
Washington, DC 20530
(202) 514-2000

# TABLE OF CONTENTS

INTRODUCTION ........................................................................ 1

STATEMENT OF JURISDICTION ........................................... 6

STATUTES AND REGULATIONS ........................................... 6

STATEMENT OF THE ISSUES ................................................ 7

STATEMENT OF THE CASE .................................................... 7

    A. Expedited Removal. ........................................................ 7

    B. Prior Designations. ....................................................... 12

    C. 2025 Designation. ......................................................... 15

    D. Huffman Memorandum. ................................................ 18

    E. District Court Proceedings. .......................................... 18

    F. Proceedings In This Court. ........................................... 20

SUMMARY OF THE ARGUMENT ......................................... 21

STANDARD OF REVIEW ....................................................... 27

ARGUMENT ............................................................................ 28

    I.     The Government Is Likely to Succeed on the Merits .......... 28

         A.    The District Court's Stay Is Prohibited by 8 U.S.C. §1252(f)(1). ................................................................. 28

         B.    The 2025 Designation Complies With Due Process, Because the Affected Aliens Are Entitled to No Additional Process Beyond What the Political Branches Provide ......................................................... 33

         C.    Even if the Aliens Here Possess a Liberty Interest

in Remaining, the Expedited Removal Procedures
Provide Sufficient Process ............................................ 42

II.     The Other Equitable Factors Favor the Government. ......... 55

III.    The District Court's Overbroad Relief Exceeded Its
        Authority ................................................................... 60

CONCLUSION ........................................................................ 67

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## **Cases**

*A.A.R.P. v. Trump,*
 605 U.S. 91 (2025) ............................................................40, 41

*American Immigration Lawyers Ass'n v. Reno,*
 18 F. Supp. 2d 38 (D.D.C. 1998) .........................................45

*American Immigration Lawyers Ass'n v. Reno,*
 199 F.3d 1352 (D.C. Cir. 2000) ...........................................12

*Amoco Prod. Co. v. Gambell,*
 480 U.S. 531 (1987) ..............................................................62

*Bouarfa v. Mayorkas,*
 604 U.S. 6 (2024) ...........................................................63, 67

*Chaplaincy of Full Gospel Churches v. England,*
 454 F.3d 290 (D.C. Cir. 2006) ..................................55, 56, 60

*Children's Health Def. v. FCC,*
 25 F.4th 1045 (D.C. Cir. 2022) ............................................54

*Coal. for Humane Immigrant Rights v. Noem,*
 2025 WL 2192986 (D.D.C Aug. 1, 2025) ...........30, 32, 60, 67

*Corley v. United States,*
 556 U.S. 303 (2009) ..............................................................31

*Cuomo v. NRC,*
 772 F.2d 972 (D.C. Cir. 1985) .............................................27

*Dep't of State v. Muñoz,*
 602 U.S. 899 (2024) ..............................................................42

*DHS v. Thuraissigiam*,
 591 U.S. 103 (2020)...3, 4, 8, 9, 23, 24, 25, 26, 33, 34, 35, 36, 37, 38, 42, 43, 47, 48

*Fund for Animals v. Frizzell*,
 530 F.2d 982 (D.C. Cir. 1975) ................................................56

*Garland v. Aleman Gonzalez*,
 596 U.S. 543 (2022) ................................2, 22, 28, 29, 30

*Halo Electronics, Inc. v. Pulse Electronics, Inc.*,
 579 U.S. 93 (2016) ................................................63

*Hecht Co. v. Bowles*,
 321 U.S. 321 (1944) ................................................61, 62

*Immigrant Defs. L. Ctr. v. Noem*,
 145 F.4th 972 (9th Cir. 2025) ................5, 6, 27, 32, 61, 66

*INS v. Lopez-Mendoza*,
 468 U.S. 1032 (1984) ................................................54

*J. Roderick MacArthur Found. v. FBI*,
 102 F.3d 600 (D.C. Cir. 1996) ................................................49

*Kaplan v. Tod*,
 267 U.S. 228 (1925) ................................4, 23, 34, 37

*Knauff v. Shaughnessy*,
 338 U.S. 537 (1950) ................................................36, 42

*Landon v. Plasencia*,
 459 U.S. 21 (1982) ................................23, 24, 35, 37, 53

*Leng May Ma v. Barber*,
 357 U.S. 185 (1958) ................................................37

*Lewis v. Casey*,
518 U.S. 343 (1996) ............................................................50

*Mackey v. Montrym*,
443 U.S. 1 (1979) ........................................................46, 52

*Make the Rd. N.Y. v. Wolf*,
962 F.3d 612 (D.C. Cir. 2020) ....................................27, 33

*Mathews v. Eldridge*,
424 U.S. 319 (1976) ..............................................41, 42, 46

*Mullane v. Central Hanover Bank & Trust*,
339 U.S. 306 (1950) ................................................3, 41, 42

*N.S. v. Dixon*,
141 F.4th 279 (D.C. Cir. 2025) ....................................28, 29

*Nielsen v. Preap*,
586 U.S. 392 (2019) ............................................................28

*Nishimura Ekiu v. United States*,
142 U.S. 651 (1892) ..............................................23, 33, 37

*Nken v. Holder*,
556 U.S. 418 (2009) ............................................................62

*Noem v. Nat'l TPS All.*,
145 S. Ct. 2728 (2025) ........................................................6

*Noem v. Perdomo*,
606 U.S. __, 2025 WL 2585637 (Sept. 8, 2025) ..............6, 46, 53, 57, 58

*Olim v. Wakinekona*,
461 U.S. 238 (1983) ....................................................51, 55

*Qatanani v. Att'y Gen.*,
144 F.4th 485 (3d Cir. 2025) ............................................39

iii

*Rafiyev v. Mukasey,*
    536 F.3d 853 (8th Cir. 2008) ................................................................54

*Russello v. United States,*
    464 U.S. 16 (1983) ................................................................31

*S. Utah Wilderness All. v. Norton,*
    542 U.S. 55 (2004) ................................................................65

*Shaughnessy v. United States ex rel. Mezei,*
    345 U.S. 206 (1953) ................................................................23, 37

*Starbucks Corp. v. McKinney,*
    602 U.S. 339 (2024) ................................................................61, 62, 63, 67

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.,*
    600 U.S. 181 (2023) ................................................................48

*Summers v. Earth Island Inst.,*
    555 U.S. 488 (2009) ................................................................49, 60

*Trump v. CASA, Inc.,*
    606 U.S. 831 (2025) ................................................................5, 26, 27, 57, 60, 61, 62, 63, 66

*Trump v. J.G.G.,*
    604 U.S. 670 (2025) ................................................................39, 41

*U.S. ex rel. Turner v. Williams,*
    194 U.S. 279 (1904) ................................................................4, 35

*United States v. Burr,*
    25 F.Cas. 30 (C.C.D. Va. 1807) ................................................................63

*United States v. Oakland Cannabis Buyers' Coop.,*
    532 U.S. 483 (2001) ................................................................62

*United States v. Salerno,*
  481 U.S. 739 (1987) ...................................................................54

*Weinberger v. Romero-Barcelo,*
  456 U.S. 305 (1982) ...................................................................62

*Winter v. NRDC, Inc.,*
  555 U.S. 7 (2008) .......................................................................62

*W.M.M. v. Trump,*
  __ 4th __, 2025 WL 2508869 (5th Cir. Sept. 2, 2025)............................41

*Wong Yang Sung v. McGrath,*
  339 U.S. 33 (1950) ..................................................34, 35, 40, 41

*Yamataya v. Fisher,*
  189 U.S. 86 (1903) .........................................................39, 40, 52

*Zadvydas v. Davis,*
  533 U.S. 678 (2001) ...........................................................38, 39

## Statutes

5 U.S.C. §702 ...............................................................................6

5 U.S.C. §703 .............................................................................64

5 U.S.C. §705 .... 1, 2, 5, 6, 19, 21, 26, 27, 32, 60, 61, 62, 63, 64, 65, 66, 67

8 U.S.C. 1225(b)(1)(A)(ii), (B) ...................................................8

8 U.S.C. §1182(a) ......................................................14, 16, 17, 18

8 U.S.C. §1225(b)(1) ...................................................7, 11, 42, 45

8 U.S.C. §1225(b)(1)(A)(ii) .........................................................9

8 U.S.C. §1225(b)(1)(A)(iii) ...................................................8, 12

8 U.S.C. §1225(b)(1)(A)(iii)(I) ....................................... 14

8 U.S.C. §1225(b)(1)(A)(iii)(II)...................................... 53

8 U.S.C. §1225(b)(1)(B) ............................................. 43

8 U.S.C. §1225(b)(1)(B)(iii)(III) ........................... 9, 44, 48

8 U.S.C. §1225(b)(1)(B)(v) .................................... 44, 45

8 U.S.C. §1225(b)(1)(C) ............................................ 10

8 U.S.C. §1229a(c)(5) ............................................... 45

8 U.S.C. §1252(a)(1)(A) ............................................ 33

8 U.S.C. §1252(a)(1)(B) ............................................ 33

8 U.S.C. §1252(e)(2) ........................................... 11, 45

8 U.S.C. §1252(e)(3)(A) ............................................ 12

8 U.S.C. §1252(e)(3)(B) ............................................ 12

8 U.S.C. §1252(e)(5) ........................................... 11, 45

8 U.S.C. §1252(f)(1).................... 1, 2, 7, 21, 22, 28, 29, 30, 31, 32

8 U.S.C. §1252(f)(2)................................................ 31

8 U.S.C. § 1225(a)(1) .......................................... 36, 42

28 U.S.C. §1292(a)(1) ............................................... 6

**Rules**

D.C. Circuit Rule 8 ................................................. 20

D.C. Circuit Rule 32(e)(1)........................................... 69

Fed. R. App. P. 8(a)(2) ................................................20

Fed. R. App. P. 32(a)(7)(B) ....................................69

Fed. R. App. P. 32(a)(7)(B)(iii) ...............................69

Fed. R. App. P. 32(a)(5) ..........................................69

Fed. R. App. P. 32(a)(6) ..........................................69

## **Regulations**

8 C.F.R. §208.30..............................................9, 43

8 C.F.R. §208.30(d)(4), (5) ...................................9

8 C.F.R. §208.30(e)(8) .....................................9, 44

8 C.F.R. §208.30(f) .............................................44

8 C.F.R. §235.3(b)(1)(ii) ..........................10, 25, 50

8 C.F.R. §235.3(b)(2)(i) ...................................8, 43

8 C.F.R. §235.3(b)(4) .......................................8, 43

8 C.F.R. §235.3(b)(7) ...........................................11

8 C.F.R. §1003.42(c)...........................................9

8 C.F.R. §1003.42(d)(1) ...................................10, 45

8 C.F.R. § 1208.30(g) ......................................10, 45

*Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures*,
62 Fed. Reg. 10,312 (Mar. 6, 1997)..................................................12, 13

*Notice Designating Aliens Subject to Expedited Removal Under Section 235(b)(1)(A)(iii) of the Immigration and Nationality Act*,
67 Fed. Reg. 68,924 (Nov. 13, 2002).......................................................13

*Designating Aliens for Expedited Removal*,
69 Fed. Reg. 48,877 (Aug. 11, 2004)..................................................13, 14

*Eliminating Exception To Expedited Removal Authority for Cuban Nationals Encountered in the United States or Arriving by Sea*,
82 Fed. Reg. 4,902 (Jan. 17, 2017) .......................................................14

*Designating Aliens for Expedited Removal*,
84 Fed. Reg. 35,409 (July 23, 2019) ......................................................14

*Rescission of the Notice of July 23, 2019, Designating Aliens for Expedited Removal*,
87 Fed. Reg. 16,022 (Mar. 21, 2022).....................................................15

*Designating Aliens for Expedited Removal*,
90 Fed. Reg. 8139 (Jan. 24, 2025) ........................................................16

*Guaranteeing the States Protection Against Invasion*,
90 Fed. Reg. 8333 (Jan. 29, 2025) ....................................................5, 57

## Other Authorities

*Implementation Guidance for January 2025 Federal Register Notice, Designating Aliens for Expedited Removal*, U.S. Immig. & Customs Enforcement (Feb. 28, 2025) ("2025 Guidance")
...........................................................................10, 17, 50, 51

**INTRODUCTION**

Congress established the expedited-removal system nearly three decades ago and authorized the Executive Branch to apply those procedures to a defined class of aliens who have limited ties to the United States. Earlier this year, the Department of Homeland Security (DHS) chose to extend expedited-removal procedures to the fullest extent authorized by law. DHS did not alter any aspect of the expedited-removal procedures that have been applied across Administrations; nor did it attempt to extend those procedures beyond what Congress has expressly authorized. Nevertheless, the district court stayed this decision nationwide under 5 U.S.C. §705. That decision was an egregious error. And it is visiting serious harm on the Government, now deprived of an essential tool to combat the unprecedented surge of illegal immigration over the past few years.

To start, the district court lacked jurisdiction to issue its universal stay. Foremost, §1252(f)(1) prohibits any lower federal court from issuing non-party-specific relief that "restrains" the Government from carrying out expedited removal. *Garland v. Aleman Gonzalez*, 596 U.S. 543, 550-51 (2022). That describes the stay below to the letter: It applies

nationwide to all illegal aliens covered by DHS's expansion of expedited removal; and it restrains the Government from placing those aliens into expedited removal until it adopts further procedures. That is precisely the sort of order that *Aleman Gonzalez* bars.

The district court held otherwise, primarily on the ground that §1252(f)(1) is limited to injunctions. But that construction defies §1252(f)(1)'s plain text, which is limited to orders that "enjoin *or* restrain" (emphasis added). Nor does it make sense: The same Congress that barred non-individualized injunctions did not welcome universal §705 stays that have the exact same effect. There is simply no way to square §1252(f)(1)'s bar on non-individualized relief with the district court's nationwide order.

Even excusing its jurisdictional defects, the district court's order is indefensible on the merits. As the Supreme Court underscored just five years ago, the political branches have "plenary authority … to set the procedures to be followed in determining whether an alien should be admitted," and thus unadmitted aliens receive no additional due process rights beyond what the political branches provide with respect to their admission. *DHS v. Thuraissigiam*, 591 U.S. 103, 139-40 (2020). That is

fatal to the decision below. Regardless, whatever process aliens lacking deep ties to the United States could claim, the longstanding procedures for expedited removal readily satisfy any due-process requirement. Those procedures guarantee aliens "three levels" of independent administrative review to make the basic showing there is a "significant possibility" that they might be eligible for asylum or another protection from removal—at which point, they are placed in  removal proceedings. *Id.* at 109-10.  And Congress has further provided for tailored judicial review to ensure anyone placed in expedited removal does not have an established connection to this country.  This interlocking system of administrative and judicial review provides abundant process "appropriate to the nature of the case." *Mullane v. Central Hanover Bank & Trust*, 339 U.S. 306, 313 (1950).

The district court's rationales otherwise are untenable.  The district court held that the Due Process Clause guarantees aliens additional process as soon as they reach the interior of the United States—cabining *Thuraissigiam* to its facts as a case about an alien stopped within 25 yards of the border.  But that contravenes both the logic of *Thuraissigiam* and the decades of cases it rested on.  The Court has never held that due-

process protections follow physical presence; it has always underscored that additional due-process rights attach following *lawful* entry. Most clearly, the Court has held for over a century that aliens paroled into the country are treated as if stopped at the border—*i.e.*, that they receive no greater process than what the political branches offer. In *Kaplan v. Tod*, for example, the alien in question had been lawfully paroled (but not admitted) into the United States, had been present in the interior of the United States for more than *eight years* and was living with her naturalized-citizen father at the time of decision—yet the same rule applied to her. 267 U.S. 228, 229-30 (1925).

It is implausible that the Due Process Clause treats aliens paroled into America *worse* than those who simply enter the country illegally. That is particularly true as an alien "does not become one of the people to whom these things are secured by our Constitution by an attempt to enter, forbidden by law." *U.S. ex rel. Turner v. Williams*, 194 U.S. 279, 292 (1904). And the district court's other due-process arguments—which are either legally immaterial, or factually misplaced—fare no better.

At minimum, the district court's universal stay was overbroad. As the Ninth Circuit has recently recognized, a stay issued under §705 of the

APA is a form of "interim equitable relief," and must operate within traditional equitable limits. *Immigrant Defs. L. Ctr. v. Noem*, 145 F.4th 972, 995-96 (9th Cir. 2025). Chief among those limits is the principle that an equitable remedy cannot go beyond awarding a party complete-relief. *Trump v. CASA, Inc.*, 606 U.S. 831, 859 (2025). If nothing else, the district court's universal stay—which stretches well beyond Plaintiff and its members—violates that clear limit and should be set aside on that basis.

Moreover, the district court's universal stay inflicts severe consequences. It bars the Government from applying expedited removal to potentially hundreds of thousands, or millions, of inadmissible aliens with no right to remain in the country. And it does so when efficient removals are a paramount priority of the Executive Branch, to redress the consequences of millions of illegal entrants. *See Guaranteeing the States Protection Against Invasion*, 90 Fed. Reg. 8333 (Jan. 29, 2025); *Noem v. Perdomo*, 606 U.S. __, 2025 WL 2585637, at *3-5 (Sept. 8, 2025) (No. 25A169) (Kavanaugh, J., concurring). This Court should reverse.

## STATEMENT OF JURISDICTION

This Court has appellate jurisdiction under 28 U.S.C. §1292(a)(1) to review the district court's nationwide stay of agency action issued pursuant to 5 U.S.C. §705.

Section 1292(a)(1) provides courts of appeals jurisdiction to review "[i]nterlocutory orders of the district courts of the United States … granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions." The district court's stay operates no differently than an injunction and is thus appealable under §1292(a)(1). In fact, the district court's stay is premised on the same factors as a preliminary injunction. JA-17-18.

The Supreme Court and other Circuits have repeatedly "hear[d] interlocutory appeals of orders labeled as 5 U.S.C. §705 stays." *Immigrant Defs.*, 145 F.4th at 984 n.6 (collecting cases); *see Noem v. Nat'l TPS All.*, 145 S. Ct. 2728, 2728-29 (2025) (granting a stay of a § 705 stay). This Court has appellate jurisdiction.

## STATUTES AND REGULATIONS

Relevant statutes and regulations are included in an addendum.

## STATEMENT OF THE ISSUES

1. Whether 8 U.S.C. §1252(f)(1) precluded the district court from granting a stay of agency action where such action "enjoins or restrains" the operation of 8 U.S.C. §1225(b)(1).

2. Whether the district court erred in holding that expedited removal violates the Due Process Clause when applied to its fullest extent authorized by law.

3. Whether the district court exceeded its authority in granting relief, not only to Plaintiff's members, but also to nonparties.

## STATEMENT OF THE CASE

**A. Expedited Removal.**  In 1996, Congress authorized the removal of certain inadmissible aliens from the United States through a streamlined process.  *See* 8 U.S.C. §1225(b)(1).  Under this expedited-removal system, certain aliens inadmissible based on the lack of valid entry documents or material misrepresentation "shall" be subject to expedited removal.  8 U.S.C. §§ 1225(b)(1)(A)(i), 1182(a)(6)(C), (a)(7).  Expedited-removal procedures shall be applied to any alien found "arriving in the United States." 8 U.S.C. §1225(b)(1)(A)(i).  The DHS Secretary may also designate for expedited removal "any or all aliens"

who have not been admitted or paroled into the United States and have not been "continuously" present for two years preceding the date of determination of inadmissibility. 8 U.S.C. §1225(b)(1)(A)(iii); *see Thuraissigiam*, 591 U.S. at 108-09. Congress explicitly provided that the Secretary's designation for applying expedited removal was "in [her] sole and unreviewable discretion," and further provided that all such designations "may be modified at any time." 8 U.S.C. §1225(b)(1)(A)(iii).

The procedures for expedited removal have been in place for decades. Among other things, immigration officers must "advise the alien of the charges against him or her," provide "an opportunity to respond … in the sworn statement," and provide an interpreter if needed. 8 C.F.R. §235.3(b)(2)(i). If an alien is inadmissible, he shall be ordered removed by that officer, without any further review. 8 U.S.C. §1225(b)(1)(A)(i).

That streamlined process, however, includes added protections for aliens who express a fear of persecution or torture or a fear of return to his or her country, or express an intent to apply for asylum. *See* 8 U.S.C. 1225(b)(1)(A)(ii), (B); 8 C.F.R. §235.3(b)(4). Such aliens receive a non-adversarial interview with an asylum officer, who determines whether

the alien has a "credible fear of persecution" or torture. 8 U.S.C. §1225(b)(1)(A)(ii), (b)(1)(B)(iii)(II), (b)(1)(B)(iv), (v); *see* 8 C.F.R. §208.30. "If the asylum officer finds that the applicant does not have a credible fear, a supervisor will review the asylum officer's determination." *Thuraissigiam*, 519 U.S. at 110 (citing 8 C.F.R. §208.30(e)(8)). "If the supervisor agrees with it, the applicant may appeal to an immigration judge, who can take further evidence and 'shall make a de novo determination.'" *Id.* (quoting 8 C.F.R. §§1003.42(c), (d)(1) and citing 8 U.S.C. §1225(b)(1)(B)(iii)(III)). The immigration judge's review is *de novo*. 8 U.S.C. §1225(b)(1)(B)(iii)(III); 8 C.F.R. §§1003.42(d), 1208.30(g). "An alien subject to expedited removal thus has an opportunity at three levels to obtain an asylum hearing, and the applicant will obtain one unless the asylum officer, a supervisor, and an immigration judge all find that the applicant has not asserted a credible fear." *Thuraissigiam*, 591 U.S. at 110. During the credible fear process, aliens may consult with attorneys or representatives and engage interpreters. 8 C.F.R. §208.30(d)(4), (5).

Aliens are also afforded an opportunity to contest their eligibility for expedited removal—*e.g.*, establish that they have been admitted or paroled, have been physically present continuously for the 2-year period

preceding the determination of inadmissibility, or are a U.S. citizen. *See* 8 U.S.C. §1225(b)(1)(C); 8 C.F.R. §235.3(b)(1)(ii). As to continuous presence, aliens may use "bankbooks, leases, deeds, licenses, bills, receipts, letters, birth records, church records, school records, employment records, evidence of prior law enforcement encounters or tax payments, and/or the alien's credible sworn testimony." *Implementation Guidance for January 2025 Federal Register Notice, Designating Aliens for Expedited Removal*, U.S. Immig. & Customs Enforcement (Feb. 28, 2025) ("2025 Guidance"), *available at* https://www.ice.gov/doclib/foia/policy/jan2025_ExpeditedRemovalImpGuidance.pdf (last visited Oct. 20, 2025). And "[i]f an alien is unable to personally provide such evidence at the time of encounter but claims to have access to such evidence, the alien shall be permitted a brief but reasonable opportunity to obtain it or communicate with a third party to obtain such evidence." *Id.* "[A]ny removal order," the "sworn statement," and any claims concerning an alien's status, "must be reviewed and approved by the appropriate supervisor before the order is considered final." 8 C.F.R. §235.3(b)(7).

Finally, Congress has also provided limited judicial review of expedited removal through habeas corpus. In such a proceeding, the court may review the petitioner's claim that he is not in fact an alien; that he has not been ordered removed under §1225(b)(1); or that he has been admitted as a lawful permanent resident, refugee, or asylee and retains such status. 8 U.S.C. §1252(e)(2). As a result, habeas review remains available to ensure that an expedited-removal order "in fact was issued and … relates to the" particular alien. 8 U.S.C. §1252(e)(5). This layer of judicial review protects those individuals who assert that they have a legal status that reflects substantial connections to this Nation.

In addition, Congress has narrowly provided for judicial review of challenges to the expedited-removal system itself. Specifically, it has authorized review of expedited-removal orders to determine whether the expedited-removal statute, "or any regulation issued to implement" it, "is constitutional," and of whether any expedited-removal "regulation, or a written policy directive, written policy guideline, or written procedure" is inconsistent with the INA or is otherwise unlawful. 8 U.S.C. §1252(e)(3)(A); *see American Immigration Lawyers Ass'n v. Reno*, 199 F.3d 1352, 1358-64 (D.C. Cir. 2000). The District Court for the District

of Columbia has exclusive jurisdiction over such challenges, which must be filed within "60 days after the date the challenged section" or policy has been "first implemented." 8 U.S.C. §1252(e)(3)(A)-(B).

**B. Prior Designations.** The Secretary (and earlier, the Attorney General and INS Commissioner) has designated aliens for expedited removal under §1225(b)(1)(A)(iii) on five occasions.

In 1997, the Attorney General, exercising her discretionary authority under 8 U.S.C. §1225(b)(1)(A)(i), issued a regulation applying expedited removal to aliens arriving in the United States at a port of entry and aliens interdicted in international or United States waters. *Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures*, 62 Fed. Reg. 10,312 (Mar. 6, 1997). The Attorney General observed that "a proposed expansion of the expedited removal procedures may occur at any time and may be driven either by specific situations such as a sudden influx of illegal aliens motivated by political or economic unrest or other events or by a general need to increase the effectiveness of enforcement operations at one or more locations." 62 Fed. Reg. at 10,314.

In 2002, the Immigration and Naturalization Service (INS) Commissioner designated for expedited removal of aliens "who arrive in the United States by sea, … who are not admitted or paroled" into the United States, and who "have not been physically present in the United States continuously for the two-year period prior to the determination of inadmissibility under" the designation. *Notice Designating Aliens Subject to Expedited Removal Under Section 235(b)(1)(A)(iii) of the Immigration and Nationality Act*, 67 Fed. Reg. 68,924 (Nov. 13, 2002).

Subsequently, in 2004, the Secretary of Homeland Security utilized his discretionary authority limiting DHS officials to apply expedited removal to certain aliens encountered within 100 air miles of the border and within fourteen days of their date of illegal entry regardless of the alien's arrival method. *Designating Aliens for Expedited Removal*, 69 Fed. Reg. 48,877 (Aug. 11, 2004). The 2004 Notice placed geographic limitations given limited agency resources "upon unlawful entries that have a close spatial and temporal nexus to the border," and noted that the 2004 designation did not implement "the full nationwide expedited removal authority available to DHS." *Id.* at 48,879. The Secretary did, however, expressly reserve DHS's option of "implementing the full

nationwide enforcement authority of the statute through publication of a subsequent Federal Register notice." *Id.*

In 2017, the Secretary extended all prior designations to Cuban nationals, who had previously been exempted from expedited removal. *See Eliminating Exception To Expedited Removal Authority for Cuban Nationals Encountered in the United States or Arriving by Sea*, 82 Fed. Reg. 4,902 (Jan. 17, 2017).

In 2019, the Acting Secretary of Homeland Security invoked 8 U.S.C. §1225(b)(1)(A)(iii)(I) to add a discretionary temporal limitation for expedited removal in that "aliens determined to be inadmissible under [8 U.S.C. §1182(a)(6)(C) or (a)(7)] who have not been admitted or paroled into the United States, and who have not affirmatively shown, to the satisfaction of an immigration officer, that they have been physically present in the United States continuously for the two-year period immediately preceding the date of the determination of inadmissibility," who were not covered by previous designations. *Designating Aliens for Expedited Removal*, 84 Fed. Reg. 35,409 (July 23, 2019). The Acting Secretary utilized the discretionary authority to once again place restrictions based on agency resources as "the large number of aliens who

entered illegally and were apprehended and detained within the interior of the United States, and DHS's insufficient detention capacity both along the border and in the interior of the United States," and explained that the designation would allow DHS "to use more effectively and efficiently its limited resources to fulfill its mission to enforce the immigration laws and ensure the security of the Nation's borders." *Id.* at 35,411.

In 2022, the 2019 Designation was rescinded. *Rescission of the Notice of July 23, 2019, Designating Aliens for Expedited Removal*, 87 Fed. Reg. 16,022 (Mar. 21, 2022). All of the other expedited-removal designations noted above—including the one extending expedited removal to aliens who have been here for under two years, so long as they arrive by sea—remained in effect and continue to be in effect today.

**C. 2025 Designation.** On January 24, 2025, the Acting Secretary of Homeland Security published a Federal Register notice rescinding the 2022 recission of the 2019 designation, thus restoring the scope of expedited removal to "the fullest extent authorized by Congress." JA-190-91 (90 Fed. Reg. 8,139 (Jan. 24, 2025)). The notice enabled DHS "to place in expedited removal, with limited exceptions, aliens determined to

be inadmissible under [8 U.S.C. §1182(a)(6)(C) or (a)(7)] who have not been admitted or paroled into the United States and who have not affirmatively shown, to the satisfaction of an immigration officer, that they have been physically present in the United States continuously for the two-year period immediately preceding" the inadmissibility determination. *Id.* Simply put, the 2025 Designation extended expedited removal to all eligible illegal aliens not covered by previous designations, yet retained the discretionary temporal limit of two-years.

The notice explained that this action was necessary to "enhance national security and public safety—while reducing government costs—by facilitating prompt immigration determinations" and would "enable DHS to address more effectively and efficiently the large volume of aliens who are present in the United States unlawfully … and ensure [their] prompt removal." *Id.*

On February 28, 2025, the Acting Director of Immigration and Customs Enforcement (ICE) established internal guidance regarding implementation of the 2025 Designation. The guidance provided information to ICE officers about how to exercise their enforcement discretion to apply expedited removal to aliens covered by the 2025

Designation and the required training immigration officers would need to undergo to ensure that its use of the 2025 Designation was "consistent with applicable law." *See* 2025 Guidance at 2, 4. The guidance also established procedures for immigration officers regarding determination of whether aliens demonstrated two years of continuous presence. The guidance provided that aliens bore the statutory burden to demonstrate continuous presence over the "two-year period immediately preceding the date of the determination of inadmissibility." *Id.* at 3. Aliens could present evidence including, but not limited to, "bankbooks, leases, deeds, licenses, bills, receipts, letters, birth records, church records, school records, employment records, evidence of prior law enforcement encounters or tax payments, and/or the alien's credible sworn testimony." *Id.* In addition, the guidance provided that "[i]f an alien is unable to personally provide such evidence at the time of encounter but claims to have access to such evidence, the alien shall be permitted a brief but reasonable opportunity to obtain it or communicate with a third party to obtain such evidence." *Id.*

With respect to continuous presence, the guidance is materially identical to the 2019 guidance ICE issued the last time expedited removal

was expanded to the full statutory allowance.  *See Implementation of July 2019 Designation of Aliens Subject to Expedited Removal* (July 24, 2019) ("2019 Guidance"); Dkt.25-1, *Make the Road N.Y. v. McAleenan*, 1:19-cv-02369 (D.D.C. Aug. 28, 2019).

**D. The Huffman Memorandum.**  On January 23, 2025, the Acting DHS Secretary published an internal memorandum explaining "how to exercise enforcement discretion in implementing these policies." JA-192-93 (Memorandum from Benjamine C. Huffman ("Huffman Memorandum"), Acting Secretary to [Senior DHS Officials] re *Guidance Regarding How to Exercise Enforcement Discretion* (Jan. 23, 2025)).  The Huffman Memorandum instructs immigration enforcement to take "all steps necessary to review [an] alien's case" to evaluate and consider whether individuals should be placed into expedited removal.  *Id.* Moreover, the memorandum prompts consideration of, *inter alia*, "aliens eligible for expedited removal who failed to apply for asylum within the statutory deadline."  *Id.* (citations omitted).

**E. District Court Proceedings:** On January 22, 2025, Plaintiff, Make the Road, filed this suit seeking to invalidate the 2025 Designation. Dkt. 1.  Plaintiff amended its complaint in March, adding new claims and

additional parties, namely two Doe Defendants who were allegedly placed in expedited removal proceedings and removed on January 28. JA-360 ¶¶12, 13; JA-383 ¶105. Make the Road asserted associational standing on behalf of four members who entered the country illegally, are not in expedited removal proceedings, and lack final orders of removal. JA-382 ¶¶98-101. One of these individuals allegedly filed a pending asylum application with USCIS. *Id.* ¶99.

Plaintiff alleged various claims, including that the 2025 Designation violates the Due Process Clause. JA-383 ¶¶107-109. Plaintiff Make the Road moved to stay the agency action under 5 U.S.C. §705. JA-101-04. Only Plaintiff Make the Road brought that motion, not the individual Plaintiffs, who expressly disclaimed seeking relief in Plaintiffs' §705 motion. JA-108 n.1.

On August 29, 2025, the district court granted Plaintiff's motion for a 5 U.S.C. §705 stay, concluding that it was likely to succeed on its due-process claim. JA-27-40. By its terms, the order stays "implementation and enforcement" of the 2025 Designation and Huffman Memorandum. JA-1. The court made clear that its stay applied universally and thus granted relief to all aliens made eligible for expedited removal by the

2025 Designation, even if they have no affiliation with Plaintiff. JA-47-48.

On September 5, the district court denied Defendants' motion for a stay pending appeal. Dkt. 70.

**F. Proceedings in this Court:** On September 9, 2025, Defendants filed in this Court a motion for an immediate administrative stay and emergency stay pending appeal of the district court's order. *See* FED. R. APP. P. 8(a)(2); D.C. Cir. R. 8. Later that day, this Court issued a briefing schedule on the motion and advised the parties that Defendants' request for an administrative stay "remains pending." Order, *Make the Road N.Y. v. Noem*, No. 25-5320 (D.C. Cir. Sept. 9, 2025). Judge Rao noted that she "would grant an immediate administrative stay." *Id.* The parties completed briefing on Defendants' motion on September 17, 2025, and the Court held oral argument on the motion on October 6, 2025. After argument, the Court ordered an expedited briefing schedule on the merits of the district court's order and advised that "[a] decision on [Defendants'] emergency motion for an administrative stay and a stay pending appeal is forthcoming." *Make the Road N.Y. v. Noem*, No. 25-

5320 (D.C. Cir. Oct. 6, 2025). Defendants' motion for an administrative stay and a stay pending appeal remains pending.

## SUMMARY OF THE ARGUMENT

Expedited removal has been a mainstay of federal immigration enforcement since 1996 and has been applied to aliens who have been in this country for upwards of two years since 2002 (so long as they arrive by sea). The district court nonetheless held the 2025 Designation and Huffman Memorandum—which do nothing more than extend existing expedited-removal procedures to the full class of statutorily eligible aliens—violates the Due Process Clause and issued a universal stay under 5 U.S.C. §705. This Court should reverse the district court's sweeping stay, which the court had no authority to issue, violates long-established Supreme Court due process precedents, and is overbroad in any event.

The district court lacked authority to issue relief here. 8 U.S.C. §1252(f)(1), by its terms, strips district courts from issuing any order that commands "federal officials to take or refrain from taking actions to enforce, implement, or otherwise carry out the specific statutory provisions," except in regard to "individual cases." *Aleman Gonzalez*, 596

U.S. at 550. The district court's order here cannot be squared with the plain text of the statute. It plainly "restrain[s]" the operation of one of the covered provisions. Indeed, the reference to both enjoin and restrain in 8 U.S.C. §1252(f)(1) indicates that a court may not impose coercive relief that "interfere[s] with the Government's efforts to operate" the covered provisions in a particular way. *Id.* at 551. That meaning comfortably encompasses the stay of agency action in this case. A contrary interpretation would read the word "restrain" out of the statute and violate ordinary principles of statutory interpretation.

Even if this Court reaches the merits, Plaintiff's due process claim fails. Aliens who have never been lawfully admitted lack any more due process rights than the political branches provide. The mere fact of unlawful physical presence in the United States is not synonymous with "entry"—a term of art that requires *lawful* admission. The Supreme Court has never held that due-process protections follow physical presence; instead, additional due-process rights attach following *lawful* entry. To that end, the district court cannot cabin the Supreme Court's decision in *Thuraissigiam* to its facts: an alien who was apprehended 25 yards from the border. JA-24-25. The Supreme Court's reasoning and

holding was far broader, reaching all aliens entering the United States unlawfully: "An alien who tries to enter the country illegally is treated as an 'applicant for admission.'" *Thuraissigiam*, 591 U.S. at 139-40 ("[A]liens who arrive at ports of entry—*even those paroled elsewhere in the country for years pending removal*—are 'treated' for due process purposes 'as if stopped at the border[.]'") (emphasis added). Indeed, the *Thuraissigiam* Court articulated a more tailored rule, that Congress may authorize streamlined removal procedures for individuals who are treated, for legal purposes, as if they are still at the threshold of entry. 591 U.S. at 139-40.

Indeed, that has been the law for at least 13 decades. *See Nishimura Ekiu v. United States*, 142 U.S. 651, 660 (1892). And it was reiterated multiple times in the 130 years between *Nishimura* and *Thuraissigiam*. *See, e.g., Landon v. Plasencia*, 459 U.S. 21, 32 (1982); *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 232 (1953); *Kaplan v. Tod*, 267 U.S. 228, 230 (1925).

But the district court flouted this venerable and bedrock principle of immigration law. Indeed, the district court effectively deemed *Thuraissigiam* a ticket for one ride only—strictly limited to its facts of

aliens caught almost immediately after illegally crossing and within 25 yards of the border. While *Thuraissigiam*, *Nishimura*, *Landon*, *Mezei*, and *Kaplan* all drew the relevant line at whether the alien has been *lawfully admitted* into the United States, the district court upended all of those precedents in favor of a standard of its own devising. In its view, the relevant question was only whether aliens had *physically* entered— whether lawfully or not. It thus reasoned that that "[d]istinguishing between those on the threshold and those who have *effected entry* makes sense." JA-24 (emphasis added).

That was manifest error that contravened more than a century of unbroken precedent. The relevant question for due process purposes has *never* been whether an alien has effected mere physical presence in the United States.

What's more, the longstanding procedures for expedited removal satisfy whatever process is due. Those procedures guarantee aliens "three levels" of independent administrative review to show eligibility for asylum or another protection from removal—at which point, they are placed within full removal proceedings. *Thuraissigiam*, 591 U.S. at 109-10. Congress has also provided for tailored judicial review to ensure

anyone placed in expedited removal does not have an established connection to this country.

As for proving continuous presence, Plaintiff lacks Article III standing to raise this claim. Plaintiff fails to identify any members that were placed or were likely to be placed in expedited removal after being in the United States for more than two years. Indeed, Plaintiff admits its Doe members were never placed in expedited removal proceedings at all, and the only identified members in removal proceedings are in §240 proceedings, not expedited ones. Regardless, the procedures for demonstrating continuous presence satisfy due process. As for proving continuous presence, the statute and regulations plainly allow such claims to be raised and considered. The alien has the burden to demonstrate that they are not subject to expedited removal, including by showing two years of continuous physical presence, 8 C.F.R. §235.3(b)(1)(ii), and can do so by offering, *inter alia*, banknotes, leases, deeds, licenses, bills, receipts, employment records, and the like. If aliens do not have those documents on their person, they are provided a reasonable time to gather the documents. The procedures satisfy due process.

The equities favor the Government because the district court's nationwide stay inflicts severe consequences. It bars the Government from applying expedited removal to potentially hundreds of thousands of inadmissible aliens with no right to remain the country. Expedited removal is a critical enforcement tool that allows DHS to remove aliens expeditiously as Congress intended without the more cumbersome and duplicative proceedings under §240. *Thuraissigiam*, 591 U.S. at 108-09.

Moreover, the district court exceeded its authority by issuing a *universal* stay. Section 705 only allows courts to issue stays "to the extent necessary to prevent irreparable injury," 5 U.S.C. §705, and "irreparable injury" in the context of interim equitable relief refers to the plaintiff— not third parties, *CASA*, 606 U.S. at 841-46. But the district court's order wholesale invalidates a vital immigration-enforcement tool. Specifically, this nationwide order potentially impacts hundreds of thousands of inadmissible aliens, and thus, is overbroad. As the Ninth Circuit has recently recognized, a stay issued under §705 of the APA is a form of "interim equitable relief," and must operate within traditional equitable limits. *Immigrant Defs. L. Ctr. v. Noem*, 145 F.4th 972, 995-96 (9th Cir. 2025). Thus, an equitable remedy cannot go beyond awarding a party

complete-relief. *CASA*, 606 U.S. at 859. And the district court's universal stay—which stretches well beyond Plaintiff and its members—violates that parameter, and should be set aside on that basis.

The district court's issuance of a universal stay under 5 U.S.C. §705 should be reversed.

## STANDARD OF REVIEW

A stay of agency action under 5 U.S.C. §705 requires Plaintiff to establish the same factors as a required for a preliminary injunction, namely that the Plaintiff is likely to succeed on merits, likely to be irreparably harmed absent a stay, and that the equities favor granting a stay. *Cuomo v. NRC*, 772 F.2d 972, 974 (D.C. Cir. 1985). Thus, like when reviewing a preliminary injunction, this Court reviews the issuance of a stay "for an abuse of discretion," but reviews "[t]he district court's underlying legal conclusions … *de novo*[.]" *See Make the Rd. N.Y. v. Wolf*, 962 F.3d 612, 623 (D.C. Cir. 2020) (reviewing grant of preliminary injunction).

## ARGUMENT

## I.   The Government Is Likely to Succeed on the Merits

### A.   The District Court's Stay Is Prohibited by 8 U.S.C. §1252(f)(1)

Section 1252(f)(1) strips the lower federal courts of the "jurisdiction or authority" to "enjoin or restrain the operation of" certain INA provisions—including those governing expedited removal—"other than with respect to the application of such provisions to an individual alien against whom proceedings ... have been initiated."  8 U.S.C. §1252(f)(1); *see Nielsen v. Preap*, 586 U.S. 392, 402 (2019).  By its terms, this provision bars the lower federal courts from issuing any order that commands "federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specific statutory provisions," except in regard to "individual cases."  *Aleman Gonzalez*, 596 U.S. at 550; *see N.S. v. Dixon*, 141 F.4th 279, 288-90 (D.C. Cir. 2025).

The district court's order clearly violates §1252(f)(1).  The order runs to "an entire class of aliens," *Aleman Gonzalez*, 596 U.S. at 550-51—*i.e.*, every alien covered by the 2025 Designation who would not otherwise be eligible for expedited removal—rather than any "individual alien," 8

U.S.C. §1252(f)(1).  JA-1.  And it "restrain[s] the operation" of one of the covered provisions, *Aleman Gonzalez*, 596 U.S. at 550-51.  JA-1.

Indeed, that was the entire point.  The district court barred the government from subjecting additional aliens to expedited removal, until the district court adopted its own indeterminate set of procedures to cure any due-process problem.  JA-47-49.  Put otherwise, the court ordered the government to "refrain" from "carry[ing] out" its expedited-removal authority under §1225(b)(1), until certain conditions set by the court were met.  *Aleman Gonzalez*, 596 U.S. at 550; *see N.S.*, 141 F.4th at 289-90 (holding that §1252(f)(1) barred a court order that "directly and substantially restricts the ability of those federal officials to 'carry out' provisions covered by §1252(f)(1) and pro tanto frustrates enforcement of the law").

That is exactly the type of order that *Aleman Gonzalez* held §1252(f)(1) forbids.  There, the Supreme Court vacated an order that enjoined the Government class-wide from taking actions under a specified provision (detaining aliens under §1231(a)(6)) until it provided additional process (a bond hearing).  596 U.S. at 547.  And here, the district court has issued a universal stay that bars the Government from

subjecting certain aliens to expedited removal, unless it adopts an (indeterminate) set of procedures purportedly compelled by due process. That is the exact same error. The nationwide stay below "'enjoin[s] or restrain[s] the operation' of [§1225(b)(1)] because [it] require[s] officials to take actions that (in the Government's view) are not required," and to "refrain from actions that (again in the Government's view) are allowed by [§1225(b)(1)]." *Id.* at 551.

The district court held otherwise, primarily on the ground that §1252(f)(1) bars only injunctions—and the order below is a stay. JA-20 (incorporating *Coal. for Humane Immigrant Rights v. Noem*, ("*CHIR*"), 2025 WL 2192986, at *13-15 (D.D.C Aug. 1, 2025)). But §1252(f)(1)'s text extends beyond injunctions, to expressly include any order that "restrain[s]" the operation of a covered statute. And as the Supreme Court held, those terms have independent meaning and cut broadly to prevent orders that prohibit the Government from "carry[ing] out" any of the covered provisions. *Aleman Gonzalez*, 596 U.S. at 549-50. So regardless of whether a stay effectively "enjoins" an action, there is no colorable argument that a stay preventing the Government from taking

certain actions does not "restrain" the Government from taking those actions.

Moreover, the district court's reading violates bedrock principles of statutory interpretation. While Congress used the words "enjoin or restrain" in §1252(f)(1), Congress used only "enjoin" in the very next provision. Section 1252(f)(2) bars courts from "enjoin[ing] the removal of any alien pursuant to a final order under this section" absent certain conditions. 8 U.S.C. §1252(f)(2). Reading §1252(f)(1) as limited to injunctions would not only render the term "restrain" superfluous— contrary to the "cardinal principle of statutory construction" that courts must "give effect, if possible, to every clause and word of a statute." *Corley v. United States*, 556 U.S. 303, 314 (2009) (quotation marks omitted). It would also violate the principle that "where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion. *Russello v. United States*, 464 U.S. 16, 23 (1983) (cleaned up). Congress's deliberate inclusion of the broader phrase "enjoin or restrain" in §1252(f)(1), when considered alongside its use of only "enjoin" in

§1252(f)(2), confirms that §1252(f)(1) cannot plausibly be read to apply only to injunctions.

And in all events, the district court's distinction makes little sense on its own terms. Section 1252(f)(1) is plainly concerned with the *effect* of a remedy on the operation of covered INA provisions. *Id.* at 551. There is no reason why the same Congress that prohibited non-party-specific injunctions would be content with universal stays that accomplished the same ends under a different label; instead, it adopted a broad provision that prevents any order that "enjoins or restrains" one of the specified provisions.

The district court also reasoned that §1252(f)(1) cannot apply to §705 stays, because it does not apply to §706 vacaturs. JA-20 (incorporating *CHIR*, 2025 WL 2192986, at *13). But even assuming the latter premise, the conclusion does not follow. A §705 stay is a form of "interim equitable relief" that functions exactly as a preliminary injunction—*i.e.*, it prevents the Government from using an otherwise available source of legal authority. *Immigrant Defs.*, 145 F.4th at 995-96. Vacatur, by contrast, removes the source of authority itself. That is,

it is not a remedy that naturally "enjoins or restrains" the use of a given power; instead, it *eliminates* that power in the first place.[1]

**B.  The 2025 Designation Complies With Due Process, Because the Affected Aliens Are Entitled to No Additional Process Beyond What the Political Branches Provide**

Even if this Court were to reach the merits, the decision below rests on a fundamental constitutional error: Illegal aliens are entitled to no greater process than what the political branches provide.  Accordingly, the district court had no legal basis for staying the 2025 Designation and Huffman Memorandum on due-process grounds.

1.  The Supreme Court has long held that "the due process rights of an alien seeking initial entry" are simply "[w]hatever the procedure[s] authorized by Congress" and no more.  *Thuraissigiam*, 591 U.S. at 139 (citation omitted).  For such aliens, "the decisions of executive or administrative officers, acting within powers expressly conferred by

---

[1] Plaintiff must also overcome other jurisdictional bars.  As Judge Rao explained previously, Sections 1252(a)(2)(A) and (B) independently stripped the district court here of jurisdiction.  *See Make the Road*, 962 F.3d at 638-45 (Rao, J., dissenting).  The Government preserves those arguments for further review.

Congress, *are due process* of law." *Nishimura Ekiu v. United States*, 142 U.S. 651, 660 (1892) (emphasis added).

The Supreme Court has also long applied this so-called "entry fiction" to aliens beyond those literally seeking entry at the border. For instance, "aliens who arrive at ports of entry … are treated for due process purposes as if stopped at the border." *Thuraissigiam*, 591 U.S. at 139 (quotations omitted). Moreover, aliens who have been "paroled elsewhere in the country" pending removal are likewise treated as if stopped at the border, even if they remain in this country "for years." *Id.*; *accord Kaplan*, 267 U.S. at 230-31. In *Kaplan*, the alien in question had been lawfully paroled (but not admitted) into the United States and had been in the country's interior for more than *eight years* at the time of decision. 267 U.S. at 229-30. Yet the Court applied the rule that the alien was entitled to no more process than what was provided by statute. *Id.* at 230-31.

Across its cases, the Supreme Court has distinguished between aliens who have at some point been lawfully admitted into the United States, and those whose presence has never been sanctioned. While the former (*e.g.*, an alien who overstays a visa, or is later determined to have

been admitted in error) may claim due-process protections beyond what Congress has provided, even when their legal status changes, *see Wong Yang Sung v. McGrath*, 339 U.S. 33, 49-50 (1950), the Supreme Court has never held that aliens who have entered the country clandestinely are entitled to such additional rights.  That is, "once an alien gains admission to our country and begins to develop the ties that go with permanent residence"—a status that, by definition, excludes unlawful entrants like Plaintiff's members—"his constitutional status changes accordingly."  *Landon v. Plasencia*, 459 U.S. 21, 32 (1982).  But before then, an alien who clandestinely enters "does not become one of the people to whom these things are secured by our Constitution by an attempt to enter, forbidden by law."  *United States ex rel. Turner v. Williams*, 194 U.S. 279, 292 (1904); *accord Wong Yang Sung*, 339 U.S. at 49-50.

Those principles control this case—as the Supreme Court affirmed in *Thuraissigiam*.  There, the Court upheld the current expedited removal system against a due-process challenge.  591 U.S. at 140.  It held that where an alien is legally "treated" as an "applicant for admission," he is entitled to only what process the political branches provide.  *Id.*  And

that describes those aliens covered by the 2025 Designation and Huffman Memorandum: Where—as here—an alien "has not been admitted" lawfully into this country at any point, he is treated under the federal immigration laws as an "applicant for admission."  8 U.S.C. § 1225(a)(1). For them, "[w]hatever the procedure authorized by Congress is, it is due process." *Thuraissigiam*, 591 U.S. at 139 (quoting *Knauff v. Shaughnessy*, 338 U.S. 537, 544 (1950)).[2]

2.    The district court sought to distinguish *Thuraissigiam* by essentially cabining that decision to its facts and holding that it applies to those stopped at the border—and "25 yards" beyond—but not to any aliens who had reached the "interior" of the country, one way or another. JA-12-13.  That is untenable and contrary to the Secretary's statutory authority.

To start, the court's rationale is irreconcilable with *Thuraissigiam* itself.  The reason *Thuraissigiam* was able to extend the entry fiction into

---

[2] Plaintiff identifies only members who entered the country unlawfully, not aliens subject to the 2025 Designation who entered lawfully, such as aliens who were paroled into the country but have had their parole revoked.  Plaintiff thus lacks standing to assert claims of the latter group, *see infra* p. 67.  Regardless, neither group of aliens has ever been "admitted."

the interior of the country so readily is the longstanding precedent that an alien does not "effect[] an entry" for constitutional purposes until he is lawfully admitted. 591 U.S. at 138-40 (citing *Landon*, 459 U.S. at 32; *Leng May Ma v. Barber*, 357 U.S. 185, 188-90 (1958); *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212, 215 (1953); *Kaplan*, 267 U.S. at 230-31; *Nishimura Ekiu*, 142 U.S. at 659-60)). This is because an alien's physical presence is not what is necessary for him to "effect[] an entry" into the United States; he must be "admitted into the country pursuant to law" at some point. *Thuraissigiam*, 591 U.S. at 138-40 (quotations omitted). Nowhere did the Court suggest that its analysis would be different if the alien was seized 50 yards into the country; or 50 miles; or 500 miles. And as noted, the Court has applied the entry fiction to parolees who have lived within the interior of the country for years, pending proceedings. *See, e.g.*, *Kaplan*, 267 U.S. at 230-31 (holding that an intellectually disabled girl paroled into the care of relatives for nearly nine years must be "regarded as stopped at the boundary line").

It would be wholly nonsensical for the Constitution to treat *worse* those aliens who the United States has decided to parole *lawfully* into the nation, than those who simply barge lawlessly past the border,

against our consent. Neither the Due Process Clause nor the Supreme Court's precedents on it offer a windfall for those who successfully flout our laws. The notion that Plaintiff's members can somehow adversely possess additional due-process rights by their unlawful actions is wrong.

The district court's contrary view would also thrust the federal courts into an area that the Constitution exclusively assigns to the political branches. Whether an alien has "established connections" sufficient to merit additional process is a political judgment that falls to the political branches, *see Thuraissigiam*, 591 U.S. at 107, and courts lack any judicially manageable standard to make such a determination. Even Plaintiff agrees that aliens here for short periods of time can be subject to expedited removal, JA-17 n.12, but offer no cogent principle for courts to determine whether due process attaches at 14 days, 3 months, or 5 years. The difficulty with such line-drawing is one reason the Court has long recognized that "the power to set the procedures to be followed in determining whether an alien should be admitted" falls to the political branches. *Thuraissigiam*, 591 U.S. at 139.

Putting *Thuraissigiam* aside, the district court also misread other Supreme Court precedents. The court relied on *Zadvydas v. Davis*, 533

U.S. 678, 693 (2001), for the proposition that the Due Process Clause "applies to all persons within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent," so even aliens who are not lawfully present in the country must receive more process in their removal proceedings than is granted by statute. *See* JA-22. But *Zadvydas* involved due-process objections to the potentially indefinite *detention* of aliens with final orders of removal—not the constitutionality of procedures used to determine removability. 533 U.S. at 682. That is a crucial distinction. The Court has never held—and in *Zadvydas* rejected—the notion that the political branches have plenary authority to set the procedures for detention, which implicate an alien's liberty interests regardless of his legal status. The opposite is true, however, for purposes of *admission and removal*. For that, as explained, the Supreme Court has been clear that the Due Process Clause compels nothing more than what the political branches provide with respect to illegal aliens never lawfully admitted. *See Qatanani v. Att'y Gen.*, 144 F.4th 485, 507-508 (3d Cir. 2025) (Matey, J., dissenting).

Likewise, the district court invoked decisions like *Yamataya v. Fisher*, 189 U.S. 86 (1903), *Trump v. J.G.G.*, 604 U.S. 670 (2025), and *A.A.R.P. v. Trump*, 605 U.S. 91 (2025). JA-24-25. But those decisions are similarly inapposite. As for *Yamataya*, the Supreme Court *disclaimed* the proposition that the district court cited it for—that aliens "have a liberty interest in remaining—no matter how they entered." JA-12-13. In fact, the *Yamataya* Court expressly declined to answer "whether an alien can rightfully invoke the due process clause of the Constitution who has entered the country clandestinely, and who has been here for too brief a period to have become, in any real sense, a part of our population." 189 U.S. at 100. That disclaimer makes sense: Unlike this case, *Yamataya* did not involve an alien who entered without inspection, but instead one who lawfully entered at a port of entry, who was then placed into statutory procedures as a public charge. *Id.* at 87, 100-01. *Yamataya* interpreted the scope of that statute—*i.e.*, the process Congress thought due—and held that the statutory processes satisfied due process. *Id.* at 100; *see Wong Yang Sung*, 339 U.S. at 49-50.

Likewise, with *J.G.G.* and *A.A.R.P.*, the Court was reviewing actions taken under the Alien Enemies Act—a statute where Congress

set forth procedures that were required under *that* source of law. Of course, the Supreme Court applied established due-process principles to inform that analysis. *A.A.R.P.*, 605 U.S. at 94-95; *J.G.G.*, 604 U.S. 670, 672-73. But in so doing, it did not disrupt a century-plus-worth of precedent that has used a clear constitutional distinction turning on whether an alien has been lawfully admitted. *See supra* pp. 34-39.

3. Because inadmissible aliens lack a liberty interest in obtaining additional procedures to contest removal, the district court thus further erred in applying the balancing test from *Mathews v. Eldridge*, 424 U.S. 319 (1976), to evaluate the constitutionality of expedited-removal procedures available under §1225(b).

Indeed, in *A.A.R.P.* and *J.G.G.*, the Supreme Court did not invoke *Mathews* at all. Instead, the Court relied upon *Mullane*, 339 U.S. at 314. *A.A.R.P.*, 605 U.S. at 94-95; *J.G.G.*, 604 U.S. at 673; *cf. W.M.M. v. Trump*, __ F.4th __, 2025 WL 2508869, at *76 (5th Cir. Sept. 2, 2025) (Oldham, J., dissenting), *vacated and rehearing en banc granted*, 2025 WL 2784957 (Sept. 30, 2025). *Mullane* stands for the proposition that the cornerstone of due process is notice and an opportunity to be heard—not *Mathews* balancing. 339 U.S. at 314. *Mullane* instructs courts to look to "general

principles" rather than "any formula" prescribing the appropriate notice "in a particular proceeding." *Mullane*, 339 U.S. at 314.

*Mullane* governs here instead of *Mathews*, because *Matthews* presupposes the existence of a liberty or property interest. 424 U.S. at 332, 335. But there is simply no right "deeply rooted in this Nation's history and tradition" for aliens not lawfully admitted to remain in the country. *See Dep't of State v. Muñoz*, 602 U.S. 899, 910 (2024) (quotations omitted). "On the contrary, the through line of history is recognition of the Government's sovereign authority to set the terms governing the admission and exclusion of noncitizens." *Id.* at 911-12. Aliens subject to expedited removal under §1225(b)(1) are "applicants for admission." 8 U.S.C. §1225(a)(1). Such individuals, at least those present for less than two years, are entitled only to "[w]hatever the procedure authorized by Congress is," and nothing more. *Thuraissigiam*, 591 U.S. at 139 (quoting *Knauff*, 338 U.S. at 544).

### C. Even if the Aliens Here Possess a Liberty Interest in Remaining, the Expedited Removal Procedures Provide Sufficient Process

Even if the illegal aliens covered by the 2025 Designation are entitled to some measure of constitutional due-process protections beyond what the political branches provide, the longstanding expedited

removal system established by Congress and implemented by the Executive readily satisfies whatever the Constitution requires. The district court's holding otherwise, JA-27-40, was badly mistaken at each turn.

1.  The expedited removal system that Congress has had in place for decades is constitutional as applied to the full range of aliens eligible for its procedures.

As described above, if an alien is placed into expedited-removal proceedings, he receives "notice" of the charges against him on "Form I-860, Notice and Order of Expedited Removal," and receives an "opportunity to respond to those charges in [a] sworn statement." 8 C.F.R. §235.3(b)(2)(i). If the alien indicates an intention to apply for asylum, or expresses a fear of persecution or torture, he is then given three opportunities to demonstrate a "credible fear" of removal. *Thuraissigiam*, 591 U.S. at 110. First, aliens have an interview with an asylum officer, who decides whether aliens demonstrate a credible fear of persecution or torture. 8 U.S.C. §1225(b)(1)(B); 8 C.F.R. §208.30; 8 C.F.R. §235.3(b)(4). Individuals who express a fear of return are referred for a credible fear interview with an asylum officer. If the officer makes

an affirmative credible fear determination, §240 removal proceedings evaluate consideration of that claim.  *See* 8 C.F.R. §208.30(f).  Second, a supervisory asylum officer reviews and approves negative credible-fear determinations.  8 C.F.R. §208.30(e)(8).  Third, if aliens request additional review, an immigration judge conducts a hearing.  8 U.S.C. §1225(b)(1)(B)(iii)(III).  If an alien is able to prove to any of the three officials above that there is a "significant possibility" of "eligibility for asylum" or other protection, they are placed in removal proceedings under §240, 8 U.S.C. §1225(b)(1)(B)(v).  That is, before such an alien is removed, several decisionmakers—the asylum officer, his supervisor, and then an immigration judge—will independently assess whether the alien is a viable candidate for asylum or other protection.

Moreover, the credible-fear screening process is just that: A screening process Congress deemed adequate for weeding out claims of asylum or protection from removal that are least likely to succeed on the merits.  Thus, asylum officers and the immigration judge may determine that an alien lacks a credible fear of persecution or torture only where the alien cannot put forth a "significant possibility" that he "could establish eligibility for asylum" or other protection.  8 U.S.C.

§1225(b)(1)(B)(v); 8 C.F.R. §1003.42(d). And if the alien is found to have a credible fear, the alien is placed in removal proceedings under §240; may appeal to the Board of Immigration Appeals; and then, may seek review in a court of appeals. 8 U.S.C. §§1225(b)(1)(B)(iii), 1229a(c)(5), 1252(a).

Finally, as previewed above, Congress also provided for targeted judicial review of expedited-removal orders through a writ of habeas corpus. In such a proceeding, the court may review the petitioner's claim that he is not in fact an alien or is a U.S. citizen; that he has not been ordered removed under §1225(b)(1); or that he has been admitted as a lawful permanent resident, refugee, or asylee and retains such status. 8 U.S.C. §1252(e)(2). As a result, habeas review remains available to ensure that an expedited-removal order "in fact was issued and … relates to the" particular alien. 8 U.S.C. §1252(e)(5). This layer of judicial review protects those individuals who assert that they have a legal status that reflects substantial connections to the United States.

Whatever the Constitution demands, these procedures far exceed it. *See, e.g.*, *American Immigration Lawyers Ass'n v. Reno*, 18 F. Supp. 2d 38, 58-60 (D.D.C. 1998) (rejecting due-process challenge to expedited

removal), *aff'd*, 199 F.3d 1352 (D.C. Cir. 2000).  Congress established the framework for expedited removal in 1996—and it has been applied to aliens who have been here for upwards of two years since the George W. Bush Administration (so long as they arrive by sea).  *See supra* pp. 12-15.  That longstanding practice is perfectly constitutional.

2.  The district court's critique of the expedited-removal procedures fails to establish a due-process violation.

a.  First, the district court cited a study indicating that 15% of aliens who express a fear of removal are not referred for credible-fear screening. JA-30-32.  Under *Mathews*, however, courts are supposed to evaluate the "risk of error" and value of additional procedures by examining "generality of cases, not the rare exceptions."  424 U.S. at 344; *accord Mackey v. Montrym*, 443 U.S. 1, 14 (1979).  Yet, even accepting the statistics cited by the district court, the court looked only at the rare cases to determine which additional procedures are needed.  Regardless, under *Mathews*, that small error rate must be balanced against the government's weighty interest in enforcing the immigration laws. *Perdomo*, 2025 WL 2585637, at *4 (Kavanaugh, J., concurring).

b.  Next, the district court concluded that aliens are not "effectively" heard with respect to credible-fear claims because they have too little time to prepare for the interviews and it can allegedly be too costly for aliens to contact third parties prior to the interviews.  JA-32 (citation and emphasis omitted).  The alleged inadequacy of procedures cannot be squared with the fact that "nearly 77% of screenings have resulted in a finding of credible fear."  *See Thuraissigiam*, 591 U.S. at 111.  Another 11% of claims "were closed for administrative reasons, including the alien's withdrawal of the claim."  *Id.*  As the Supreme Court said in *Thuraissigiam*, these statistics demonstrate that "[a]s a practical matter, … the great majority of asylum seekers who fall within the category subject to expedited removal do not receive expedited removal and are instead afforded the same procedural rights as other aliens."  *Id.*  These aliens are thus effectively heard and in fact most are not removed through expedited removal.

The district court acknowledged that aliens have the ability to seek review of adverse credible-fear determinations by an immigration judge but concluded even that review is insufficient to cure the due-process problem the court found.   JA-33-34   (citing   8   U.S.C.

§ 1225(b)(1)(B)(iii)(III)). Such a conclusion is untenable. As the Supreme Court recognized in *Thuraissigium*, "[a]n alien subject to expedited removal thus has an opportunity at three levels to obtain an asylum hearing, and the applicant will obtain one unless the asylum officer, a supervisor, and an immigration judge all find that the applicant has not asserted a credible fear." 591 U.S. at 110. That satisfies the Constitution.

c. Next, the district court concluded that inadequate procedures exist for aliens to challenge eligibility for expedited removal, *i.e.*, demonstrating that they have been continuously present for more than two years in the United States. JA-34-37. Plaintiff lacks Article III standing to raise this claim, and regardless it is factually wrong and legally immaterial.

To start, Plaintiff never identifies anyone who contests expedited removal on this basis and thus lacks associational standing to pursue such a claim. For Plaintiff to sue on behalf of its members, it must demonstrate that its members would have "standing to sue in their own right." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023) (quotations omitted). Absent

identification of "at least one identified member had suffered or would suffer harm," the group lacks associational standing. *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009). But here, Make the Road was the only Plaintiff who requested preliminary relief; Mary and John Doe, who were allegedly subject to expedited removal after more than two years of continuous presence, expressly disclaimed "seek[ing] interim relief through this motion." JA-108 n.1. Moreover, none of Make the Road's allegations assert that any members were placed or were likely to be placed in expedited removal after being in the United States for more than two years. JA-382 ¶¶98-101; JA-166-68 (Decl. of John Doe 4); JA-169-71 (Decl. of Jane Doe 2). Indeed, Plaintiff admits its Doe members were never placed in expedited removal proceedings at all, and the only identified members in removal proceedings are in §240 proceedings, not expedited ones. *See* JA-382 ¶¶98, 100-101; JA-166-68 (Decl. of John Doe 4);JA-169-71 (Decl. of Jane Doe 2). Make the Road lacks associational standing for this claim. *See J. Roderick MacArthur Found. v. FBI*, 102 F.3d 600, 606 (D.C. Cir. 1996). Plaintiff cannot secure relief for an injury that it has failed to show will affect *any* of its members. *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996).

Regardless, Plaintiff's claim fails on the merits because the statute, regulations, and relevant guidance provide all the process due for allowing an alien to demonstrate continuous presence. The district court was incorrect to assert that no procedures exist to identify individuals who have been present for more than two years. JA-35-38. While there is no express prompt on Form I-867A for immigration officers to expressly ask, JA-34, the statute and regulations plainly allow such claims to be raised and considered. The alien has the burden to demonstrate that they are not subject to expedited removal, including by showing two years of continuous physical presence, 8 C.F.R. §235.3(b)(1)(ii)—something that should not be difficult to prove. As with the 2019 expansion of expedited removal, the DHS guidance issued to its officers provides both a list of documents aliens can use to establish continuous presence and provides aliens time to gather those documents. An alien has an opportunity to demonstrate continuous presence by offering evidence, *inter alia*, banknotes, leases, deeds, licenses, bills, receipts, employment records, and the like. 2025 Guidance at 3; *see also* 2019 Guidance; Declaration of Liana J. Castano ("Castano Decl."), Exh. C, ¶6. And "[i]f an alien is unable to personally provide such evidence at the time of

encounter but claims to have access to such evidence, the alien shall be permitted a brief but reasonable opportunity to obtain it or communicate with a third party to obtain such evidence." 2025 Guidance at 3; *see also* 2019 Guidance.

Moreover, the district court's conclusion that the process for determining continuous presence is inadequate is legally immaterial. The Due Process Clause does not care about process for determining a later process—*i.e.*, the process for determining whether an alien receives the expedited removal process or §240 proceedings for adjudicating their removal—so long as the later process is adequate to adjudicate a cognizable liberty interest. *See Olim v. Wakinekona*, 461 U.S. 238, 250 n.12 (1983) ("[A]n expectation of receiving process is not, without more, a liberty interest protected by the Due Process Clause."). For aliens who do not have a legal entitlement to be here (*e.g.*, an asylum claim), they have no constitutional footing to insist on process for its own sake—*i.e.*, more layers to adjudicate a concededly lawful removal. The Due Process Clause cares only about whether procedures are adequate for handling a cognizable legal interest. And if the credible-fear screening process

described above does so, then there is no separate constitutional defect with being placed in that process to begin with.

3. Plaintiff additionally claimed that a panoply of procedural reforms—including the requirement of a "neutral adjudicator," inverting the burden of proof, or requiring something close to a right-to-counsel—are necessary to cure the alleged due-process problems here. *See* JA-122-23. The district court countenanced those procedures, JA-28, and the Government would be pressed to adopt them if the order below stands. None of those procedures is required by due process, however.

a. Plaintiff asserted that the lack of a "neutral adjudicator" to determine issues like removability and continuous presence violates due process. JA-123. This is no due-process violation. The administrative process has long been held to be sufficient for due process in the removal context. *See, e.g.*, *Yamataya*, 189 U.S. at 100. That makes sense, given that the power to admit or exclude aliens belongs to the political branches, not the courts. *See id.*; *supra* pp. 2, 38. Requiring judicial review in expedited removal would also effectively eliminate any expedition in the process, in direct contradiction of the political branches' intent in enacting expedited removal in 1996. *Supra* pp. 7-8. Requiring

a neutral adjudicator would be a policy judgment, but "the Judiciary does not set immigration policy." *Perdomo*, 2025 WL 2585637, at *4 (Kavanaugh, J., concurring).

b. Plaintiff also claimed that placing the burden to demonstrate more than two years of continuous presence violates due process given the stakes. JA-123. Yet, admission to the United States has always been a "privilege" and the burden to demonstrate eligibility has long rested with the alien—including in section 240 proceedings. *See, e.g., Landon*, 459 U.S. at 32. Additionally, that allocation of the burden of proof also comes from the expedited-removal statute *itself,* which Congress enacted in 1996, and Plaintiff claimed not to challenge and the district court claimed to not find unlawful. *See* 8 U.S.C. §1225(b)(1)(A)(iii)(II); JA-4 ("[T]he Court does not cast doubt on the constitutionality of the expedited removal statute ….").

c. Plaintiff further asserted that expedited removal violates due process because the government is not required to permit aliens time to obtain counsel. *E.g.*, JA-130, 132. But it is black-letter law that there is no Sixth Amendment right to counsel in removal proceedings because a deportation proceeding is a "civil," not criminal, action. *See INS v. Lopez-*

*Mendoza*, 468 U.S. 1032, 1038 (1984). And there is no reason to import such a requirement for removal proceedings through the Due Process Clause, as multiple circuits have held. *See, e.g.*, *Rafiyev v. Mukasey*, 536 F.3d 853, 860 (8th Cir. 2008) (collecting cases). This is especially true with regard to expedited removal, where the focus is on making a threshold determination about whether an alien has a sufficient credible fear of returning to their home country that makes additional procedures necessary.

4. At minimum, Plaintiff has no coherent answer to justify the facial relief it received. Plaintiff was thus required to establish that the procedures were constitutional under "no set of circumstances," *United States v. Salerno*, 481 U.S. 739, 745 (1987); *see Children's Health Def. v. FCC*, 25 F.4th 1045, 1052 (D.C. Cir. 2022).

Yet the district court never differentiated between categories of aliens who fall under the 2025 Designation, treating as a single group both: (1) aliens who assert substantive immigration claims, such as asylum eligibility or protection under the Convention Against Torture ("CAT"); and (2) those whose claims are purely procedural—for example, those claiming they have been continuously present in the United States

for more than two years.  As discussed, aliens with no legal entitlement to remain in the country—such as those who claim continuous presence of two years or more but lack any claim to asylum—do not have any cognizable due-process interest.  Instead, their asserted interest is at most an interest in receiving additional process, which is "not … a liberty interest protected by the Due Process Clause." *See Olim*, 461 U.S. at 250 n.12.  The district court's failure to differentiate these groups, one with a cognizable due process interest and one without, demonstrates that the facial relief ordered was inappropriate here.

## II.    The Other Equitable Factors Favor the Government.

The remaining considerations all favor the Government.  Plaintiff failed to demonstrate irreparable harm, and both the balance of equities and public interest decisively cut against the decision below, which disables the Government from using an indispensable tool amidst a crisis of illegal immigration.

1.  Plaintiff did not establish irreparable harm.  This Circuit "has set a high standard for irreparable injury.  First, the injury must be both certain and great; it must be actual and not theoretical." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)

(quotations omitted).  "The moving party must show" that the "injury complained of is of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm." *Id.* (quotations omitted).  "Second, the injury must be beyond remediation"; "[m]ere injuries, however substantial, ... are not enough." *Id.* (quotations omitted).

Plaintiff failed that standard.  For starters, Plaintiff waited nearly five months after filing suit to move for a stay, which strongly undercuts any claim of imminent irreparable harm. *See Fund for Animals v. Frizzell*, 530 F.2d 982, 987 (D.C. Cir. 1975) (finding a delay of 44 days before bringing action for injunctive relief was "inexcusable," and "bolstered" the "conclusion that an injunction should not issue," particularly where the moving party knew of the pending, alleged irreparable harm).  Moreover, Plaintiff did not even allege that any of its members are currently in expedited-removal proceedings and only identified two members who were ever subject to them. *See supra* pp. 49-50.  Plaintiff also never explained why any specific member, if placed in expedited removal, would face any imminent or irreparable harm by that prospect: Again, expedited removal requires only that an alien to show a

"significant possibility" he may ultimately obtain asylum or protection. Plaintiff has never explained why its identified members will be unable to show *that*, especially since some have already put together asylum claims.

2. On the other side of the ledger, the district court's order significantly harms the Government and public. The Government "suffers a form of irreparable injury" "[a]ny time [it] is enjoined by a court from effectuating statutes enacted by representatives of its people." *CASA*, 606 U.S. at 861 (quotations omitted). That is "particularly" true "given the millions of individuals illegally in the United States, the myriad significant economic and social problems caused by illegal immigration, and the Government's efforts to prioritize stricter enforcement of the immigration laws enacted by Congress." *Perdomo*, 2025 WL 2585637, at *4 (Kavanaugh, J., concurring) (cleaned up).

Due to the court's order, the Government is prohibited from applying expedited removal to hundreds of thousands, or even millions, of recently-arrived inadmissible aliens. *See* JA-41. A surge of "countless millions" of illegal aliens entered the United States undetected over the last four years alone. *Guaranteeing the States Protection Against*

*Invasion*, 90 Fed. Reg. 8,333 (Jan. 29, 2025); *see Perdomo*, 2025 WL 2585637, at *1 (Kavanaugh, J., concurring). Given that unprecedented challenge, the United States Government expanded expedited removal to the maximum extent allowable under law. Nearly thirty-thousand aliens have been removed using expedited-removal since January 2025, including many who have serious criminal records. Castano Decl. ¶10. The district court's order eliminates this indispensable tool allowing for the prompt removal of hundreds of thousands of aliens with no right to remain in the country and channels those aliens to an already overburdened §240 system suffering a historic "backlog" with over six-million pending cases. *Id.* ¶9. The consequence is reduced detention capacity for aliens who are removal priorities. *Id.* ¶12. And longer detention times from initiating §240 removal proceedings mean the government is incurring an increased cost to detain those aliens. *Id.* ¶11.

3. The district court acknowledged the Government's "weighty interest in enforcing the immigration laws," but then insisted that its order would not "inappropriately interfere with that interest." JA-46. That is wrong. The district court's stay—which effectively enjoins the 2025 Designation until the Government adopts further process (and the

court below approves it)—contemplates reforms that would essentially remove the expedition from expedited removal, as explained above. That directly and significantly interferes with the Government's ability to enforce the law, and keep our Nation safe.

At the same time, the district court erred in assessing Plaintiff's claimed harms. The court excused Plaintiff's nearly five-month delay in seeking a stay because it credited Plaintiff's explanation that DHS had only later began "aggressively" implementing the 2025 Designation. JA-45. But on Plaintiff's own account, the point of its lawsuit is to *prevent* the 2025 Designation from ever applying to its members. JA-387. And even if the Government has just started to "aggressively" implement the 2025 Designation, that makes Plaintiff's inability to identify any members actually affected by the Designation all the more revealing.

On that score, the district court also found that Plaintiff had identified "a number of its members" who are at imminent risk of being subjected to the 2025 Designation. JA-43-44 (citing declarations). But, while Plaintiff referenced individuals who may or may not have been detained for expedited removal purposes in immigration court, *see* JA-161-62 ¶36, it did not clarify whether these individuals are Make the

Road members, much less specifically identify them, as Supreme Court precedent requires. *See Summers*, 555 U.S. at 498. And although Plaintiff identified one member with a recent immigration court date, that individual "was able to leave the courthouse." JA-161 ¶35. Thus, Plaintiff's claimed "injury is far too speculative" to warrant a stay. *England*, 454 F.3d at 298. The district court erred in finding otherwise.

## III. The District Court's Overbroad Relief Exceeded Its Authority

The Supreme Court held in *CASA* that the district courts' equitable powers do not include the authority to grant universal equitable relief. 606 U.S. at 841. The district court below declined to apply that rule to §705 stays under the APA, relying on its analysis in another case, and issued a universal stay of the 2025 Designation and Huffman Memorandum. JA-47-48 (citing *CHIR*, 2025 WL 2192986, at *37). At minimum, that overbroad remedy must be reversed.

Section 705 states:

> On such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court … may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending the conclusion of review proceedings.

5 U.S.C. §705.  When a court grants interim relief under that provision, it must adhere to the traditional equitable principle that equitable remedies "should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *CASA*, 606 U.S. at 852 (citation and emphasis omitted).   The Ninth Circuit recently concluded as much, and "limit[ed a] district court's §705 Stay order" to plaintiff's clients on the basis that *CASA*'s "complete-relief principle provides some useful guidance for crafting interim equitable relief" in §705 cases, which use the same traditional equitable principles that govern the preliminary injunctions at issue in *CASA*.  *Immigrant Defs.*, 145 F.4th at 995-96.  That decision is undoubtedly correct.

Congress ordinarily legislates against the backdrop of "established principles" of equity.  *Starbucks Corp. v. McKinney*, 602 U.S. 339, 346 (2024).  If Congress seeks to "depar[t] from traditional equity practice," it ordinarily "ma[kes] its desire plain." *Hecht Co. v. Bowles*, 321 U.S. 321, 330 (1944).  Courts therefore must presume that a statute adheres to longstanding equitable principles "absent a clear command" to the contrary.   *Starbucks*, 602 U.S. at 346.   The Supreme Court has "consistently employed this presumption when interpreting a wide

variety of statutes." *Id.*; *see, e.g.*, *Nken v. Holder*, 556 U.S. 418, 433-36 (2009); *United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 496 (2001); *Amoco Prod. Co. v. Gambell*, 480 U.S. 531, 542-544 (1987); *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982); *Hecht Co.*, 321 U.S. at 330. Section 705, however, contains no clear statement displacing "the party-specific principles that permeate our understanding of equity." *CASA*, 606 U.S. at 844.

To the contrary, §705 provides that a court may award interim relief only "to the extent necessary to prevent irreparable injury." 5 U.S.C. §705. The phrase "irreparable injury," in the context of interim equitable relief, refers to irreparable injury to the plaintiff—not irreparable injury to third parties. *See, e.g.*, *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008) ("A plaintiff seeking a preliminary injunction must establish … that *he* is likely to suffer irreparable harm in the absence of preliminary relief." (emphasis added)). Granting relief to non-parties is in no way "necessary to prevent irreparable injury" to the plaintiff. 5 U.S.C. §705.

Other language in §705, too, signals that the provision incorporates traditional equitable principles. Section 705 provides that a court "may"

(not "shall") grant relief. 5 U.S.C. §705. The word "may" connotes discretion. *See Bouarfa v. Mayorkas*, 604 U.S. 6, 13 (2024). Discretion, of course, "is not whim." *Halo Electronics, Inc. v. Pulse Electronics, Inc.*, 579 U.S. 93, 103 (2016) (citation omitted). "A motion to [a court's] discretion is a motion, not to its inclination, but to its judgment; and its judgment is to be guided by sound legal principles." *United States v. Burr*, 25 F.Cas. 30, 35 (C.C.D. Va. 1807) (Marshall, C.J., riding circuit). Those principles include the "elementary principle that a court cannot adjudicate directly upon" the rights of bystanders to the litigation, *CASA*, 606 U.S. at 844 (citation omitted).

Section 705 also authorizes a court to award only "necessary and appropriate process." 5 U.S.C. §705. In *Starbucks*, the Supreme Court interpreted a similar statutory phrase, "just and proper," to incorporate "the normal equitable rules." 602 U.S. at 347. "The word 'proper' means 'appropriate,'" the Court explained, and crafting "'appropriate' equitable relief" requires following "'traditional rules.'" *Id.* (citations omitted). So too here.

Statutory context confirms that reading of §705. The APA elsewhere makes clear that APA suits ordinarily take the form of

63

challenges for equitable relief—specifically, "actions for declaratory judgments or writs of prohibitory or mandatory injunction." 5 U.S.C. §703. It therefore makes sense that interim relief in such suits would comport with traditional equitable principles. In addition, the APA provision that creates a right of judicial review states: "Nothing herein … affects … the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground." 5 U.S.C. §702. That language expressly preserves the reviewing court's "duty" to "deny relief" on the "equitable ground" that such relief is unnecessary to provide complete relief to the plaintiff.

Contemporaneous sources reinforce that interpretation of §705. While Congress was debating the legislation, a congressional committee report explained that the authority granted by the provision now codified at §705 "is equitable" and that relief would "normally, if not always, be limited to the parties complainant." H. Rep. No. 1980, 79th Cong., 2d Sess. 43, 277 (1946). And soon after the enactment of the statute, the Attorney General explained that the "power to stay agency action [under §705] is an equitable power" and that courts must exercise that power consistent with the "historic" rules of "equity jurisdiction." U.S. Dep't of

Justice, *Attorney General's Manual on the Administrative Procedure Act* 106 (1947); *see S. Utah Wilderness All. v. Norton*, 542 U.S. 55, 63-64 (2004) (noting the Court has often found the Manual's reasoning persuasive).

The district court's contrary reading is untenable. The court's principal justification for its overbroad relief is that §705 stays are essentially temporary §706 vacaturs, which need not be limited to the parties before the court. JA-47-48. But the question of whether a court may grant universal interim relief under §705 is distinct from the question whether a court may grant universal vacatur under §706. Sections 705 and 706 use different language: The former provides that a court "may" issue "necessary and appropriate process" "to the extent necessary to prevent irreparable injury," 5 U.S.C. §705, while the latter provides that a court "shall" "set aside" unlawful agency action, *id.* §706. As a practical matter, moreover, it is one thing for a court to grant universal vacatur at the end of a case based on a definitive determination that agency action is unlawful; it is quite another for a court to grant universal relief at a preliminary stage based on a tentative finding that the plaintiff is likely to succeed on the merits.

Moreover, the district court's contrary reading of §705 is internally inconsistent. The court applied the traditional multi-factor test for equitable relief, considering the likelihood of success on the merits, irreparable injury, the balance of the equities, and the public interest. JA-18. Section 705, however, explicitly refers only to "irreparable injury"; it does not mention the other three factors. 5 U.S.C. §705. In nonetheless considering those factors, the district court effectively acknowledged that §705 incorporates at least *some* background equitable principles— namely, the principles governing the factors that courts must consider when granting equitable relief. *See Immigrant Defs.*, 145 F.4th at 995-96. The district court did not identify any statutory language that selectively incorporates those factors while jettisoning the equally "fundamental" principle that equitable relief must be party-specific. *CASA*, 604 U.S. at 844 (citation omitted). In fact, the district court's own prior opinion—which the court cited here, JA-47-48—reasons that because 5 U.S.C. §705 does not include a clear statement that relief must be limited to the parties, such as directing that relief may be provided "to the extent necessary to prevent irreparable injury *to the plaintiffs*," §705 must not be so limited. *CHIR*, 2025 WL 2192986, at *38 (emphasis in

original).  Such reasoning would turn the rule that statutes incorporate longstanding equitable principles "absent a clear command" otherwise on its head.  *Starbucks*, 602 U.S. at 346.

At minimum, this Court should at least make clear that the district court's stay applies only to aliens who were never lawfully present in the country.  Plaintiff asserted associational standing on behalf of four members who all entered the country unlawfully.  *See* JA-382 ¶¶98-101; *supra* p. 19.  Plaintiff does not identify any member who *entered* the country *lawfully*, *i.e.*, because they were granted humanitarian parole that was subsequently revoked.  In fact, at the stay stage, Plaintiff admitted that it was not "suing on behalf of parolees" and claimed that the district court's stay applies only to "nonparolees," even though the order applies universally.  Stay Hear. Tr. 83:01-05 (D.C. Cir. Oct. 6, 2025).  The district court therefore lacked jurisdiction to stay agency actions beyond the context of aliens who entered the country unlawfully and are subject to expedited removal

## CONCLUSION

This Court should reverse the district court's grant of a §705 stay.

Respectfully submitted,

ELISSA P. FUDIM
JOSEPH MCCARTER
CAROLINE McGUIRE
*Trial Attorneys*
U.S. Department of Justice,
Civil Division
Office of Immigration
Litigation
P.O. Box 868 Ben Franklin
Station
Washington, DC 20044

Dated: October 20, 2025

BRETT A. SHUMATE
*Assistant Attorney General*

/s/ *Drew C. Ensign*
DREW C. ENSIGN
*Deputy Assistant Attorney General*

Drew.C.Ensign@usdoj.gov
(202) 514-2000

TYLER J. BECKER
*Counsel to the Assistant Attorney General*
U.S. Department of Justice, Civil
Division
950 Pennsylvania Avenue, NW
Washington, DC 20530

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because:

1.     This brief contains 12,974 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and D.C. Circuit Rule 32(e)(1).

2.     The brief complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Century Schoolbook font.


/s/ *Drew C. Ensign*
Drew C. Ensign

Dated: October 20, 2025          Attorney for Appellants

**CERTIFICATE OF SERVICE**

I hereby certify that on October 20, 2025, I electronically filed the foregoing motion with the Clerk of the Court for the United States Court of Appeals for the D.C. Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

/s/ *Drew C. Ensign*
Drew C. Ensign

Dated:  October 20, 2025          Attorney for Appellants