# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————

MAKE THE ROAD,
*Appellee,*

v.

KRISTI NOEM, in her official capacity as
Secretary of Homeland Security, *et al.,*
*Appellants.*

———————————

On Appeal from the U.S. District Court
for the District of Columbia
No. 1:25-cv-00190 (Cobb, J.)

———————————

## JOINT APPENDIX

———————————

ANAND BALAKRISHNAN
American Civil Liberties Union
Foundation,
Immigrants' Rights Project
125 Broad Street, 18th Floor
New York, NY 10004
Washington, DC 20044
(212) 549-2660
*Appellee's Counsel*

DREW C. ENSIGN
*Deputy Assistant Attorney General*
U.S. Department of Justice,
Civil Division
950 Pennsylvania Avenue, NW
Washington, DC 20530
(202) 514-2000
*Appellants' Counsel*

# TABLE OF CONTENTS

| Document | ECF No. | Page Nos. |
|---|---|---|
| Order Granting Plaintiffs' Motion to Postpone Effective Date of Agency Action under 5 U.S.C. §705 | 65 | 001 |
| Memorandum Opinion | 64 | 002-049 |
| Transcript of the Motions Hearing before the Honorable Jia M. Cobb, U.S. District Judge | N/A | 050-100 |
| Plaintiffs' Motion to Postpone Effective Date of Agency Action under 5 U.S.C. §705 | 50 | 101-104 |
| Plaintiffs' Memorandum of Law in support of Motion to Postpone Effective Date of Agency Action under 5 U.S.C. §705 | 50-1 | 105-152 |
| Declaration of Sienna Fontaine, Co-Executive Director, Make the Road New York | 50-2 | 153-165 |
| Declaration of MRNY-John Doe 4, Member of Make the Road New York | 50-2 | 166-168 |
| Declaration of MRNY-Jane Doe 2, Member of Make the Road New York | 50-2 | 169-171 |
| Declaration of Rachel Levenson | 50-4 | 172-179 |
| Declaration of Mary | 50-7 | 180-189 |
| Designating Aliens for Expedited Removal, 90 Fed. Reg. 8,139 (Jan. 24, 2025) | 50-23 | 190-191 |
| Memorandum of Benjamine C. Huffman | 50-23 | 192-193 |
| U.S. Comm'n on Int'l Religious Freedom, Report on Asylum Seekers in Expedited Removal: Volume I: Findings & Recommendations (2005) | 50-23 | 194-242 |
| U.S. Comm'n on Int'l Religious Freedom, Barriers to Protection: The Treatment of Asylum Seekers in Expedited Removal (2016) | 50-23 | 243-278 |
| U.S. Comm'n on Int'l Religious Freedom, Barriers to Protection as of 2024 (2025) | 50-23 | 279-306 |
| Borderland Immigr. Council, Discretion to Deny: Family Separation, Prolonged Detention, and Deterrence of Asylum Seekers at the | 50-24 | 307-354 |

i

| | | |
|---|---|---|
| Hands of Immigration Authorities Along the US-Mexico Border (Feb. 2017) | | |
| [Sample] Form I-860, Notice and Order of Expedited Removal | 50-24 | 355 |
| Plaintiffs' First Amended Complaint | 27 | 356-388 |

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MAKE THE ROAD NEW YORK, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> KRISTI NOEM, in her official capacity as Secretary of Homeland Security, *et al.*, <br><br> Defendants. | Case No. 25-cv-190 (JMC) |

## ORDER

For the reasons stated in the accompanying memorandum opinion, it is hereby **ORDERED** that Plaintiffs' Motion for a Stay of Agency Action under 5 U.S.C. § 705, ECF 22, is **GRANTED**.

It is further **ORDERED** that, to preserve status or rights pending conclusion of the review proceedings, the effective dates of implementation and enforcement of the January 21 Designation Notice and the January 23 Huffman Memorandum, insofar as it implements the January 21 Designation Notice, are immediately postponed and stayed.

**SO ORDERED.**

_Jia M. Cobb_____
JIA M. COBB
United States District Judge

Date: August 29, 2025

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

MAKE THE ROAD NEW YORK, *et al.*,

　　　　　　　　Plaintiffs,

　　v.

KRISTI NOEM, in her official capacity as
Secretary of Homeland Security, *et al.*,

　　　　　　　　Defendants.

Case No. 25-cv-190 (JMC)

## MEMORANDUM OPINION

For nearly three decades, the federal government has subjected noncitizens apprehended at the border to fast-paced summary removal. Using that procedure, these people are quickly turned back across the border, typically after a single conversation with an immigration officer. This process, known as expedited removal, has long been applied to noncitizens "who are apprehended immediately proximate to the land border and [who] have negligible ties or equities in the [United States]." Designating Aliens for Expedited Removal, 69 Fed. Reg. 48877-01, 48879 (Aug. 11, 2004).[1]

Recently, the Government departed from this longstanding practice. In January 2025, the Government expanded the scope of expedited removal to noncitizens apprehended anywhere in the United States. And in the last few months, the Government has made aggressive use of its newly expanded expedited removal power. When people have appeared in immigration courts for their normally paced immigration proceedings, for instance, the Government has moved to dismiss

---

[1] Unless otherwise indicated, the formatting of citations has been modified throughout this opinion, for example, by omitting internal quotation marks, emphases, citations, and alterations and by altering capitalization. All pincites to documents filed on the docket in this case are to the automatically generated ECF Page ID number that appears at the top of each page.

those proceedings, promptly arrested individuals inside of those courts, and then shuttled them into much faster moving—and much less procedurally robust—expedited removal proceedings. Days later, these people find themselves removed.

The problem, though, is that unlike the group of people who have traditionally been subject to expedited removal—those detained at or near the border shortly after crossing—the group of people the Government is now subjecting to expedited removal have long since entered our country. That means that they have a weighty liberty interest in remaining here and therefore must be afforded due process under the Fifth Amendment. When it exponentially expanded the population subject to expedited removal, the Government did not, however, in any way adapt its procedures to this new group of people.

But when it comes to people living in the interior of the country, prioritizing speed over all else will inevitably lead the Government to erroneously remove people via this truncated process. That is because most noncitizens living in the interior have been here longer than two years, rendering them ineligible for expedited removal, and many are seeking asylum or another form of immigration relief, entitling them to further process before they can be removed. The procedures the Government currently uses in expedited removal, however, create a significant risk that it will not identify these disqualifying criteria before quickly ordering someone removed. And the lack of available review means that once the removal happens, it is largely too late to correct the error.

In defending this skimpy process, the Government makes a truly startling argument: that those who entered the country illegally are entitled to no process under the Fifth Amendment, but instead must accept whatever grace Congress affords them. Were that right, not only noncitizens, but everyone would be at risk. The Government could accuse you of entering unlawfully, relegate you to a bare-bones proceeding where it would "prove" your unlawful entry, and then immediately

2

remove you. By merely accusing you of entering unlawfully, the Government would deprive you of any meaningful opportunity to disprove its allegations. Fortunately, that is not the law. The Constitution guarantees that "no person shall be removed from the United States without opportunity, at some time, to be heard." *A. A. R. P. v. Trump*, 145 S. Ct. 1364, 1367 (2025). That is equally true of those here unlawfully, who are "entitle[d] . . . to due process of law in the context of removal proceedings." *Id.*

Plaintiff Make the Road has made a strong showing that the Government's expansion of expedited removal violates the due process rights of those it affects. So too has the organization demonstrated that its members will be irreparably harmed if the designation and guidance effectuating the expansion are not stayed. Because the public interest and equities also favor Make the Road, the Court will **GRANT** the requested stay. In so holding, the Court does not cast doubt on the constitutionality of the expedited removal statute, nor on its longstanding application at the border. It merely holds that in applying the statute to a huge group of people living in the interior of the country who have not previously been subject to expedited removal, the Government must afford them due process. The procedures currently in place fall short.

## I.    BACKGROUND

In another case related to the Government's recent expansion of expedited removal, this Court detailed the statutory and regulatory framework governing expedited removal, as well as the history of its application, at length. *See Coal. for Humane Immigrant Rts. v. Noem* (*CHIR*), No. 25-cv-872, 2025 WL 2192986, at *3–6, *9–10 (D.D.C. Aug. 1, 2025). The Court offers an abbreviated account of that history and the challenged Government actions here.

### A. Statutory and Regulatory Framework

#### 1. Expedited Removal

In the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA or the Act), Congress established two main processes for removing noncitizens deemed ineligible to enter or remain in the United States.[2] *See* IIRIRA, Pub. L. 104-208, 110 Stat. 3009, div. C (1996). The first, commonly referred to as "section 240" proceedings due to the section of the Act in which it appears, is the standard mechanism for removing inadmissible noncitizens. Section 240 removal proceedings take place before an immigration judge (IJ), an employee of the Department of Justice who must be a licensed attorney and has a duty to develop the record in cases before them. 8 U.S.C. § 1229a(a)(1), (b)(1); 8 C.F.R. § 1003.10(a). They are adversarial proceedings in which the noncitizen has the right to hire counsel, examine and present evidence, and cross-examine witnesses. 8 U.S.C. § 1229a(b)(4). Section 240 proceedings typically take place over the course of multiple hearings. *See CHIR*, 2025 WL 2192986, at *3. This allows time for individuals to gather and present evidence in support of petitions for relief available in immigration court (like asylum) and to seek collateral relief from other components of the Department of Homeland Security (like adjustment of status on the basis of marriage or family). *See* 8 U.S.C. §§ 1229a(b)(4)(B), (c)(4), 1229b. After an IJ renders a decision, either party may appeal to the Board of Immigration Appeals. 8 C.F.R. §§ 1240.15, 1003.1. If the Board upholds a removal order, the noncitizen can appeal that decision to a federal court of appeals. 8 U.S.C. § 1252. The Congress that passed IIRIRA referred to the new section 240 as a "streamline[d]" removal process relative to what came

---

[2] The statute and regulations at issue typically use the term "aliens" rather than "noncitizens." However, as this Court has previously explained, *CHIR*, 2025 WL 2192986, at *3 n.3, it will use the term "noncitizen" unless quoting from a statute, regulation, or case that uses "alien."

4

before it because, among other things, it removed a layer of appellate review. H.R. Rep. 104-469(I), 12, 107–08 (1996).

Still, IIRIRA included a second, even more streamlined, form of proceeding applicable only to certain noncitizens: expedited removal. Relative to section 240 removal, "[e]xpedited removal lives up to its name." *Make the Rd. N.Y. v. Wolf*, 962 F.3d 612, 619 (D.C. Cir. 2020). In expedited removal, an immigration officer, not an IJ, conducts the initial fact-finding. 8 C.F.R. § 235.3(b)(2)(i). The immigration officer asks a short series of questions to determine (a) the individual's "identity, alienage, and inadmissibility," and (b) whether they intend to apply for asylum, fear persecution or torture, or fear returning to their country of origin. *Id.* § 235.3(b)(2)(i), (b)(4). Noncitizens are not entitled to counsel during this questioning. *See United States v. Guzman*, 998 F.3d 562, 567 (4th Cir. 2021) ("[I]t is undisputed that the text of the INA's expedited removal procedure does not require that the alien be advised of a right to counsel or be accommodated in an effort to obtain counsel."). If the noncitizen is inadmissible and does not indicate that they intend to apply for asylum or fear persecution, the inspecting officer issues a Notice and Order of Expedited Removal, and the noncitizen may respond in a sworn statement. 8 C.F.R.§ 235.3(b)(2)(i). Once a supervising officer reviews and signs off on the inspecting officer's determination, the noncitizen is ordered removed. *See id.* The noncitizen has no right to appeal that decision to an IJ, the Board of Immigration Appeals, or (with one exception discussed below) any court. *Id.* § 235.3(b)(2)(ii); 8 U.S.C. § 1252(a)(2)(A)(i).

"The process is scarcely more involved" if the noncitizen "assert[s] an intention to apply for asylum or a fear of persecution." *Make the Rd.*, 962 F.3d at 619. If the noncitizen so indicates, the inspecting officer must refer them for a "credible fear interview," to be conducted by an asylum officer. 8 C.F.R. § 235.3(b)(4). If that asylum officer finds the noncitizen to have a credible fear

5

JA-006

of persecution, the noncitizen will be moved either to full section 240 removal proceedings or to administrative asylum proceedings. *Id.* § 208.30(f). If, however, the officer makes a negative credible fear determination, a supervisor will review the determination. *Id.* § 208.30(e)(8). If the supervisor agrees with the negative determination, the noncitizen can then request review by an IJ. 8 U.S.C. § 1225(b)(1)(B)(iii)(III). The IJ's review "is meant to conclude within 24 hours" and is final. *Make the Rd.*, 962 F.3d at 619. With narrow exceptions discussed below, no further administrative or judicial review is available. *Id.*

Unlike section 240 proceedings, which often take place over the course of several months, the expedited removal order is "usually issued within a few days, if not hours." ECF 50-16, Hartzler Decl. ¶ 13.[3] As a result, noncitizens subject to expedited removal have "almost no opportunity to prepare a defense to the charge of removal." *Id.* Also unlike section 240 proceedings, individuals subject to expedited removal typically do not have an opportunity to review the government's evidence against them or cross-examine witnesses. *Id.* And because noncitizens are usually detained during expedited removal proceedings, often far from their families or any counsel, they face significant barriers in gathering materials that they might use as evidence in the proceedings. *See* 8 U.S.C. § 1225(b)(1)(B)(iii)(IV); 8 C.F.R. § 235.3(b)(2)(iii); ECF 50-21, Cooper Decl. ¶¶ 6–7 (explaining that detention centers do not provide confidential

---

[3] Make the Road put forward evidence from a large number of attorneys and organizations that have represented people in both section 240 and expedited removal proceedings, including attorneys who previously worked for the Government in those proceedings. *See, e.g.*, ECF 50-18, Lunn Decl. ¶ 2; *see generally* ECF 50-2–50-22. Make the Road also offered reports addressing these removal processes prepared by the Department of Homeland Security, congressionally authorized committees, and others, as well as public reporting on the Government's recent statements. *See, e.g.*, ECF 50-23, Steinberg Decl. at 28; ECF 50-24, Steinberg Decl. at 214; *see generally* ECF 50-23 Steinberg Decl. at 1–2 (exhibit list). The Government has not contested these materials' description of the expedited removal process, nor has it put forward *any* evidence of its own about how the process works. The Government does make a single passing reference to the inclusion of hearsay, without developing any argument about any particular piece of evidence. *See* ECF 56 at 44. Although "the Federal Rules of Evidence do not apply" to proceedings for preliminary relief, the Court has considered the "relevance and reliability" of Make the Road's evidence. *FTC v. RAG-Stiftung*, 436 F. Supp. 3d 278, 313 n.29 (D.D.C. 2020) (discussing rule for preliminary injunction hearing). Having done so, the Court finds that the evidence accompanying the motion is "relevan[t] and relia[ble]" and therefore credits and relies on it in describing the expedited removal process. *Id.*

6

emails, fax, or other means of receiving documents other than mail, which on average takes 5–10 days to reach detained clients).

Key to the speed of expedited removal is the lack of almost any judicial review. The Act provides that "no court shall have jurisdiction to review" issues related to expedited removal unless they fall into a narrow set of exceptions outlined in section 1252(e). 8 U.S.C. § 1252(a)(2)(A). Under that provision, two forms of judicial review are available. First, a noncitizen may file a habeas petition to challenge their expedited removal. However, that habeas proceeding is limited to determining (a) "whether the petitioner is an alien," (b) whether the petitioner was ordered removed under the expedited removal provision, and (c) whether the petitioner can prove that they were lawfully admitted or granted asylum. *Id.* § 1252(e)(2). Second, noncitizens may challenge expedited removal determinations, as well as the implementation of the expedited removal statute, in this Court. *Id.* § 1252(e)(3)(A). In such suits, referred to in the statute as "[c]hallenges on validity of the system," a plaintiff may challenge only (i) whether the statute's expedited removal section, or any regulation implementing it, is constitutional, or (ii) "whether such a regulation, or a written policy directive, written policy guideline, or written procedure issued by or under the authority of the Attorney General to implement such section, is not consistent with applicable provisions of this subchapter or is otherwise in violation of law." *Id.* § 1252(e)(3). This kind of suit must be filed within 60 days after the date the challenged statutory provision or agency action is first implemented, *id.* § 1252(e)(3)(B), and it may not be a class action, *id.* § 1252(e)(1)(B).

The expedited removal regulations provide a few additional avenues for noncitizens to prove that they are not in fact eligible for expedited removal. During the initial interview with an immigration officer, a noncitizen may "claim[] to have been lawfully admitted for permanent residence, admitted as a refugee under section 207 of the Act, granted asylum under section 208

of the Act, or claim[] to be a U.S. citizen." 8 C.F.R. § 235.3(b)(5)(i). If the immigration officer

can verify any of those claims, the (alleged) noncitizen will not be removed. *Id.* § 235.3(b)(5)(ii)–

(iv). If the immigration officer cannot verify the claim, but the (alleged) noncitizen makes the

claim under penalty of perjury, the case is referred for review by an immigration judge. *Id.*

§ 235.3(b)(5)(iv). In addition, the regulations permit the noncitizen to "establish that he or she was

admitted or paroled into the United States." *Id.* § 235.3(b)(6). The noncitizen must be given "a

reasonable opportunity to establish to the satisfaction of the examining immigration officer that he

or she was admitted or paroled into the United States following inspection at a port-of-entry." *Id.*

"If the alien establishes that he or she was lawfully admitted or paroled," the regulation continues,

the agency reviews whether the noncitizen's parole "has been, or should be, terminated." *Id.* If the

noncitizen cannot establish that they were "lawfully admitted or paroled," they "will be ordered

removed pursuant to" the expedited removal provision. *Id.*

### 2. Expedited Removal Designations

Noncitizens may be eligible for expedited, rather than section 240, removal if they are

inadmissible because they either lack proper entry documents or falsified or misrepresented their

application for admission. 8 U.S.C. § 1225(b)(1)(A)(i); *see id.* § 1182(a)(6)(C), (a)(7) (grounds of

inadmissibility). Among that set, only two still narrower categories of noncitizens are eligible for

expedited removal: (1) noncitizens "arriving in the United States," and (2) noncitizens who "ha[ve]

not been admitted or paroled into the United States" and cannot affirmatively show that they have

been "physically present in the United States continuously for the 2-year period immediately prior

to the date of the determination of inadmissibility." *Id.* § 1225(b)(1)(A)(i)–(iii).[4] The statute

---

[4] In addition, the statute exempts from expedited removal noncitizens who are "native[s] or citizen[s] of a country in the Western Hemisphere with whose government the United States does not have full diplomatic relations and who arrives by aircraft at a port of entry." 8 U.S.C. § 1225(b)(1)(F).

permits the Attorney General (who has since delegated the authority to the DHS Secretary) to designate the population of noncitizens within that second category who will be subject to expedited removal. *Id.* § 1225(b)(1)(A)(iii)(I).

Initially, DHS's predecessor agency[5] did not make any designation, thereby limiting expedited removal only to "arriving aliens." Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures, 62 Fed. Reg. 10312-01, 10313 (Mar. 6, 1997). In so doing, the agency "acknowledge[d] that application of the expedited removal provisions to aliens already in the United States w[ould] involve more complex determinations of fact and w[ould] be more difficult to manage." *Id.* Since then, though, DHS has made designations. One of those extended expedited removal to noncitizens who arrive by sea and who have been present for fewer than two years, and another to noncitizens apprehended within 100 air miles of any U.S. international land border who entered within the last 14 days.[6] And that was the state of play at the beginning of this year, with the only people eligible for expedited removal being (1) "arriving aliens," (2) those who arrived by sea within the last two years, and (3) those apprehended within 100 miles of the border and 14 days of entry. Then, in January, the Government issued the designation—which the Court will refer to as the 2025 Designation—at issue here.

The 2025 Designation authorized DHS "to exercise the full scope of its statutory authority" in utilizing expedited removal. Designating Aliens for Expedited Removal, 90 Fed. Reg. 8139,

---

[5] The Commissioner of the Immigration and Nationalization Service used to make this designation before that agency was abolished and DHS was created in 2002. *See Make the Rd. N.Y. v. McAleenan*, 405 F. Supp. 3d 1, 16 n.7 (D.D.C. 2019) (K.B. Jackson, J.) (citing Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135 (Nov. 25, 2002); 6 U.S.C. § 557).

[6] *See* Notice Designating Aliens Subject to Expedited Removal Under Section 235(b)(1)(A)(iii) of the Immigration and Nationality Act, 67 Fed. Reg. 68924, 68924 (Nov. 13, 2002); Designating Aliens For Expedited Removal, 69 Fed. Reg. 48877, 48879 (Aug. 11, 2004).

8139 (Jan. 24, 2025).[7] Thus, as of January 21, 2025, DHS asserts the authority to apply expedited removal to noncitizens "who are encountered anywhere in the United States more than 100 air miles from a U.S. international land border, and who have been continuously present in the United States for at least 14 days but for less than two years." *Id.* In supplementing the previous designations that remained in effect with the 2025 Designation, DHS has applied expedited removal to the maximum extent permitted by section 1255(b)(1)(A). This is a significant change: Aside from a brief window in 2019,[8] expedited removal has always been limited to (at the most) those arriving by sea, or those within 100 miles of the border who had not been in the country for more than 14 days. *See CHIR*, 2025 WL 2192986, at *6 & n.9.

Days after the 2025 Designation was made, Acting Secretary of DHS Benjamine Huffman issued guidance—which is also challenged here—explaining that on "January 21, 2025, [he] signed and transmitted to the Federal Register a notice entitled Designating Aliens for Expedited Removal." Dep't of Homeland Sec., Memorandum from Acting Secretary Benjamine C. Huffman on Guidance Regarding How to Exercise Enforcement Discretion (Jan. 23, 2025), https://perma.cc/W3CL-SNDN [*hereinafter* Huffman Memorandum]. "That notice expands the scope of expedited removal to the statutory maximum under 8 U.S.C. § 1225(b)(l) which, as further

---

[7] This Notice was effective on January 21, 2025, and was published in the Federal Register on January 24, 2025. *See* 90 Fed. Reg. at 8139.

[8] That period of time in 2019 should not be overstated, either. The 2019 Designation Notice that extended expedited removal to the same population subject to the 2025 Designation was preliminarily enjoined around two months after it was issued. *See Make the Rd.*, 405 F. Supp. 3d at 72. The D.C. Circuit reversed that preliminary injunction the following year, in June 2020. *See Make the Rd.*, 962 F.3d at 635. And in February 2021, President Biden directed DHS to consider rescinding the 2019 designation, which it later did. *See* Exec. Order 14010, 86 Fed. Reg. 8267, 8270–71 (Feb. 2, 2021). During the short period the 2019 Designation was in effect, DHS used it in an "exceedingly small number of cases." ECF 50-23, Steinberg Decl. at 250–51 (data shared by DHS suggests that the 2019 Designation was used to deport around 17 people during the first Trump administration and four people during the early months of the Biden administration).

explained in the notice, includes certain aliens who have not been continuously present in the United States for two years." *Id.*

Make the Road challenges here both the 2025 Designation Notice and the Huffman Memorandum implementing the notice. ECF 50 at 1.[9] Because the 2025 Designation added to, but did not alter, prior designations covering noncitizens who arrive by sea and noncitizens apprehended within 100 miles of the border and 14 days of entry, Make the Road's challenge does not affect the application of expedited removal to either of those populations.

## B. Factual and Procedural Background

### 1. Recent Efforts to Enforce the 2025 Designation

During the first few months it was in effect, the Government was slow to implement the 2025 Designation. In May, however, enforcement efforts significantly ramped up.

Make the Road has put forward evidence—which the Government has not disputed—that the Government set a goal that month of making 3,000 immigration arrests each day. *See* ECF 50-23, Steinberg Decl. at 300. Apparently in an effort to meet that goal, the Government began targeting for expedited removal people already in section 240 removal proceedings, many of whom are pursuing asylum and other collateral relief. *See* ECF 50-23, Steinberg Decl. at 282 (describing new initiative involving "courthouse arrests"). In its declarations, Make the Road details numerous arrests of individuals at their immigration court hearings. ECF 50-3, Umana Decl. ¶ 11; ECF 50-4, Levenson Decl. ¶ 27; *see also* ECF 50-9, Rowland-Kain Decl. ¶ 16 (arrests in the elevator of New York immigration court); ECF 50-10, Koop Decl. ¶¶ 7, 10 (arrests in hallway of Chicago Immigration Court); ECF 50-11, Gilliam Decl. ¶ 4 (arrests in hallway of Seattle Immigration

---

[9] The Huffman Memorandum also offered guidance on the implementation of other agency action. *See* ECF 50-23, Steinberg Decl. at 9–10. The Court only addresses here the Huffman Memorandum's guidance on the implementation of the January 21, 2025 "notice entitled Designating Aliens for Expedited Removal." *Id.*

JA-012

Court); ECF 50-14, Yang Decl. ¶ 15–16 (arrests in hallway, lobby, and parking lot of San Antonio Immigration Court). These arrests follow a common pattern, with DHS first moving orally (without any advance notice) to dismiss the individual's pending section 240 proceedings, then arresting the individual at the courthouse immediately upon the dismissal of their section 240 proceedings, and then, finally, placing the individual in expedited removal proceedings through which they can be deported far more quickly, and with far less process, than they would have been in the section 240 proceedings.[10] Using this method, the Government has deported people within days of dismissing their section 240 proceedings. *See* ECF 50-2, Fontaine Decl. ¶ 39; ECF 50-15, Botsch Decl. ¶ 4.

The record reveals that the Government's expanded expedited removal efforts have not been limited to courthouses. In June 2025, the Government also launched a series of workplace raids as part of a "new phase of the Trump administration's immigration crackdown." ECF 50-24, Steinberg Decl. at 382. White House "border czar" Thomas D. Homan warned: "You're going to see more work site enforcement than you've ever seen in the history of this nation." *Id.* And a DHS spokesperson stated that "2,000 immigrants per day were arrested" during the first week in June. *Id.* at 383. Given these enforcement efforts, Make the Road calls it a "near-certainty that even more people"—including its members—"will be placed in expedited removal pursuant to the" 2025 Designation and its implementing guidance. ECF 50-1 at 14.

### 2. Plaintiff Make the Road

Make the Road New York is a nonprofit, membership-based community organization that offers education, legal, health, and community services to low-income and immigrant New Yorkers. ECF 50-2, Fontaine Decl. ¶¶ 2, 7. Make the Road's "mission is to build the power of

---

[10] *See* ECF 50-9, Rowland-Kain Decl. ¶¶ 5, 8, 16; ECF 50-12, Dojaquez-Torres Decl. ¶ 3; ECF 50-8, Eugenio Decl. ¶¶ 7, 10, 12; ECF 50-10, Koop Decl. ¶¶ 6–7, 10; ECF 50-11, Gilliam Decl. ¶ 4; ECF 50-14, Yang Decl. ¶ 15–16.

JA-013

immigrant and working-class communities to achieve dignity and justice." *Id.* ¶ 3. It has over 28,000 members "residing in New York City, Westchester County, and Long Island." *Id.* ¶ 13. Make the Road brings this lawsuit on behalf of its members, asserting associational standing to vindicate their rights. *See* ECF 44 at 12.

Make the Road's members include noncitizens who have been in the country for between 14 days and two years, and who are therefore subject to expedited removal under the 2025 Designation. *See* ECF 50-2, Fontaine Decl. ¶ 17. Those members appear regularly for section 240 proceedings and are at risk of being apprehended there or elsewhere in their communities and summarily removed under the expedited removal policies currently being implemented. *Id.* ¶¶ 23, 25, 29. They are therefore now at risk of being "removed from the United States without sufficient opportunity to show that they have the right to remain . . . or to assert claims for immigration relief for which they are eligible." *Id.* ¶ 17.

Two such members who are newly subject to expedited removal have submitted pseudonymous declarations. John Doe 4 came to the United States in October 2023, "escaping for [his] life," and has since filed an asylum application. ECF 50-2, MRNY-John Doe 4 Decl. at 15 ¶ 2. He has "tried to do everything correctly here," but is at risk of being put into expedited removal at one of his upcoming removal proceedings prior to the processing of his pending asylum application. *Id.* at 15 ¶ 5. Jane Doe 2 came to the United States with her partner and children in March 2024, fleeing persecution and threats from "government-aligned gangs." *Id.*, MRNY-Jane Doe 2 Decl. at 18 ¶ 2. She is currently in section 240 removal proceedings. *Id.* at 18 ¶ 3. Her family has similarly "tried to do everything correctly." *Id.* at 18 ¶ 5. They applied for asylum within their first year, have received employment authorization, and have attended their appointments with ICE. *Id.* She remains at risk of being placed into expedited removal and "being detained and

separated from [her] children, who would have no one to care for them." *Id.* at 18 ¶ 4. She also stands to lose her "opportunity to apply for asylum and to include [her] children as derivatives on [her] asylum application and of not having the opportunity to testify and share [her] story with an immigration judge." *Id.*

Make the Road's members also include noncitizens who have been continuously present for longer than 2 years, but who "may be erroneously placed into expanded expedited removal either because they do not have, or do not carry, documentation of their continuous length of residence or would not be able to present that documentation on the short timeline envisioned by the [2025 Designation], especially if they are detained by immigration authorities." *Id.* ¶ 18. Make the Road put forward evidence confirming that this risk exists for its members who have been present for longer than two years. One Make the Road attorney, for example, recounted that a man who had been present for three years was detained at an immigration court in New York after his section 240 proceedings were dismissed. *See* ECF 50-4, Levenson Decl. ¶¶ 23–24.

Plaintiffs Mary and John—who also filed this suit with Make the Road—similarly demonstrate the risk that Make the Road's members who have been here longer than two years will be put into expedited removal. While Mary and John do not seek interim relief through this motion, *see* ECF 50-1 at 4 n.1, Mary did submit a declaration in support of the motion. Mary first entered the United States on a visa in January 2015 and had been continuously present in the country since February 8, 2015, much longer than two years. ECF 50-7, Mary Doe Decl. ¶¶ 9–10. She has five children—John, who is 18-years old and a plaintiff in this suit, and 15-, 11-, 8-, and 6-year-olds. *Id.* ¶¶ 2, 7. On January 27, 2025, Mary and John were apprehended by immigration officers after a traffic stop and detained for expedited removal processing. *Id.* ¶ 12. While detained, Mary and John were not allowed to make any calls or contact an attorney. *Id.* ¶¶ 15–18. By 9 AM

the next day, they were issued a Notice and Order of Expedited Removal. *Id.* ¶ 19; *see also id.* at 6. They were "never asked or given the option to sign [their] deportation orders," and were instead taken to "a border bridge in a car and told to walk across." *Id.* ¶¶ 20–21.

### 3. This Suit

Make the Road filed a complaint in this Court on January 22, 2025, a day after the 2025 Designation Notice became effective, alleging that the designation violated the Due Process Clause of the Fifth Amendment, exceeded DHS's statutory authority under IIRIRA, the Immigration and Nationality Act, and the Administrative Procedure Act (APA); was arbitrary and capricious in violation of the APA; and violated the APA's notice and comment requirements. ECF 1 ¶¶ 101–18. Make the Road sued DHS Secretary Kristi Noem along with several other executive branch officials, all in their official capacities. *Id.* at 1. On March 22, 2025, Make the Road amended its complaint to add Mary and John as plaintiffs, to challenge the Huffman Guidance, and to add an additional claim for relief that the challenged actions were not in accordance with law and exceeded DHS's statutory authority. ECF 27.

In April 2025, the Government moved to dismiss the complaint. ECF 36. In that motion, it argued that a variety of jurisdictional and threshold defects bar Make the Road's claims and that the complaint fails to plausibly state a claim on the merits. *See id.* While that motion remained pending, in June 2025, Make the Road filed a motion under 5 U.S.C. § 705 to stay "Defendants' decision"—implemented by the 2025 Designation and the Huffman Memorandum—"to apply expedited removal to certain noncitizens arrested anywhere in the country who cannot show 'to the satisfaction of an immigration officer' that they have been continuously present in the United States for longer than two years." ECF 50 at 1. In its motion, Make the Road submitted evidence that expedited removals of its members and others in their communities had ramped up in the weeks prior and that they therefore faced irreparable harm. *See supra* 11–12. The Government

JA-016

filed an opposition, raising the same arguments as in its motion to dismiss along with some new ones, ECF 56,[11] and Make the Road replied, ECF 58. The Court then heard argument on the motion. *See* July 9, 2025 Min. Entry.

For purposes of its stay motion, Make the Road advances four claims. First, that the 2025 Designation violates the due process rights of those it affects by subjecting them to removal without constitutionally sufficient procedures.[12] ECF 50-1 at 16. Second, that the 2025 Designation violates IIRIRA by failing to provide the procedures the statute requires. *Id.* at 31. Third, that the designation contravenes the statute because the statute does not authorize the expedited removal of noncitizens who have already entered the United States on the basis that they lack valid entry documents. *Id.* at 36. And finally, that, by applying expedited removal to asylum applicants, the Huffman Memorandum violates the regulations implementing the asylum statute. *Id.* at 39. Because the Court holds, as will be explained below, that Make the Road is likely to succeed on the merits of its due process claim, it does not address the other grounds upon which it moves.

## II.    LEGAL STANDARD

Section 705 of the APA authorizes courts to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. The court may do so "[o]n such conditions as may be required and to the extent necessary to prevent irreparable injury." *Id.*

---

[11] The only threshold issue raised in the Government's motion to dismiss, but not in its opposition to this motion for a stay, is an argument that Make the Road lacks organizational standing. ECF 36 at 22–25. However, Make the Road has clarified that it asserts associational standing, not organizational standing. ECF 44 at 12.

[12] Make the Road expressly disclaimed any challenge to the constitutionality of applying expedited removal proceedings to anyone covered by a previous designation. *See* Hrg. Tr. 16:4–6 (conceding that any potential constitutional issues with prior designations are "water under the bridge" and are not before the Court).

The factors governing issuance of a section 705 stay are the same as those that govern the grant of a preliminary injunction. *See District of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 15 (D.D.C. 2020) (citing, *inter alia*, *Cuomo v. U.S. Nuclear Regul. Comm'n*, 772 F.2d 972, 974 (D.C. Cir. 1985)). To prevail on such a motion, the movant "must show (1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the [stay] were not granted, (3) that a[] [stay] would not substantially injure other interested parties, and (4) that the public interest would be furthered by the [stay]." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). In a case like this one, where the Government is the non-movant, the third and fourth factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## III.    ANALYSIS

Turning now to the application of those factors, the Court holds that each favors a stay. The Court will therefore stay the 2025 Designation and the guidance implementing that designation. The Court addresses the scope of the remedy at the close of this section.

### A.  Make the Road Is Substantially Likely to Succeed on the Merits.

Before turning to Make the Road's likelihood of succeeding in this lawsuit, a few words about what is, and is not, before the Court. Make the Road has not challenged the constitutionality of the expedited removal statute. Nor has it challenged the lawfulness of any agency decision implementing the statute prior to 2025. *See supra* 12 n.10. Nothing in the Court's opinion, then, affects previous designations by which DHS has applied expedited removal to noncitizens who arrive by sea, or who are detained within 14 days of arriving and within 100 miles of the border. The *only* things challenged are the 2025 Designation and the Huffman Memorandum implementing that designation. The Court therefore only addresses the lawfulness of applying expedited removal to noncitizens who are detained more than 100 miles from the border and who have been present in the country for at least 14 days but less than two years. And the Court only

JA-018

addresses the lawfulness of doing so pursuant to the 2025 Designation and the Huffman Memorandum.

In addressing the lawfulness of these two agency actions, the Court does, however, also consider the procedural due process rights of those who have been in the country for *longer* than two years. That is because, in a procedural due process case like this one, the question is whether the process provided sufficiently guards against "*mistaken or unjustified* deprivation[s] of life, liberty, or property." *A. A. R. P.*, 145 S. Ct. at 1367 (emphasis added). As the Court explains below, the record evidence (and indeed the experience of Plaintiffs Mary and John) demonstrate that people who have been here longer than two years—and who are therefore not eligible for expedited removal under the statute—are at risk of being removed this way as the Government implements the 2025 Designation. The Court therefore accounts for that group of noncitizens when determining whether the processes deployed in expedited removal are adequate.

With the issue properly framed, the Court must first decide whether there is a substantial likelihood that it has jurisdiction to hear Make the Road's constitutional claim. *See Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015). After concluding that there is, the Court turns to the merits of the due process claim. There too Make the Road has established a substantial likelihood of success.[13]

---

[13] Because the Court holds that Make the Road has established that it is likely to succeed on the merits of its due process claim, it does not address any other claim that Make the Road says also supports the grant of a stay. *See Mid-Atl. Equity Consortium v. U.S. Dep't of Educ.*, --- F. Supp. 3d ---, 2025 WL 2158340, at *14 n.6 (D.D.C. July 30, 2025). And although courts usually try to avoid answering constitutional questions by addressing non-constitutional claims first, this Court follows the lead of others that have focused on the most substantial, and seemingly strongest, claims—even if they are constitutional ones—when confronted with "the need for a prompt ruling on [a] request for preliminary . . . relief." *Saravia v. Sessions*, 280 F. Supp. 3d 1168, 1182 (N.D. Cal. 2017) ("address[ing] only" the constitutional claim despite fact plaintiffs were also pressing statutory claims); *see also, e.g.*, *Media Matters for Am. v. Paxton*, 732 F. Supp. 3d 1, 12, 27 (D.D.C. 2024) (addressing only the plaintiffs' First Amendment retaliation claim and not considering two statutory claims); *Booth v. Bowser*, 597 F. Supp. 3d 1, 10 (D.D.C. 2022) (addressing only Free Exercise claim despite fact plaintiffs were also pressing a statutory RFRA claim); *W.D. ex rel. M.J.D. v. Minn. State High Sch. League*, No. 12-cv-2892, 2012 WL 5985514, at *3 n.3 (D. Minn. Nov. 29, 2012) ("The Court will only address Plaintiffs' procedural due process claim" and not other non-constitutional claims "because it appears, at this preliminary stage, to be Plaintiffs' strongest claim.").

### 1. Neither Jurisdictional nor Procedural Bars Prevent the Court from Reaching the Merits.

At the threshold, the Government throws up a slew of barriers that it insists prevent the Court from addressing Make the Road's constitutional claim. *See* ECF 56 at 21–35. The Government argues that section 1252(f)(1) of the Immigration and Nationality Act strips this Court of its jurisdiction to grant a stay, that the Court cannot stay agency action that has already gone into effect, that a separate provision in section 1252(e)(1) of the Act bars preliminary relief, and that Make the Road's claims are time barred. The Government made identical arguments in another case that was recently before this Court challenging the same designation and memorandum that are at issue in this case. *See CHIR*, 2025 WL 2192986, at *13–16, *18–21. The Court rejects those arguments here for the same reasons it did there and incorporates its analysis in that case by reference. Section 1252(f)(1) is only a limit on "injunctive relief," but Make the Road is seeking a stay; courts can stay agency actions already in effect; binding D.C. Circuit precedent forecloses the Government's reading of section 1252(e)(1); and the claims are timely, because they were brought within 60 days of the Government's issuance of the 2025 Designation and the Huffman Memorandum. *See id.*

The Government does make one additional argument that requires a quick word. Citing the D.C. Circuit's decision in *Make the Road New York v. Wolf*, 962 F.3d 612 (D.C. Cir. 2020), it says that this Court cannot reach Make the Road's due process claim "because Congress committed the designation-making authority to the agency's discretion." ECF 56 at 37. That argument, though, ignores what *Make the Road* actually held: "that there is no cause of action under the APA to scrutinize the Secretary's designation decision *so long as it falls within statutory and constitutional bounds.*" 962 F.3d at 635 (emphasis added). Make the Road's due process claim here is that the designation falls *outside* of "constitutional bounds," so it is not barred by that decision. *Id.* And

JA-020

Section 1225(b)(1)(A)(iii)'s delegation to the Secretary of "sole and unreviewable discretion" to make designations does not evince a sufficiently "clear expression of contrary congressional intent" to "preclude consideration of colorable constitutional claims arising out of the actions of the [Secretary] pursuant to that section." *Lincoln v. Vigil*, 508 U.S. 182, 195 (1993); *Webster v. Doe*, 486 U.S. 592, 603 (1988). In fact, quite the opposite is true. Another section of the Act expressly grants this Court jurisdiction to "review . . . determinations under section 1225(b)" for the purpose of deciding whether "any regulation[s] issued to implement [the] section [are] constitutional." 8 U.S.C. § 1252(e)(3)(A). The Government affirmatively argued at the hearing on the motion that this section "permits this Court to make determinations and have judicial review over whether a challenged provision is constitutional." Hrg. Tr. 35:18–20. The Government got it right there, and there's nothing in Section 1225(b)(1) that bars this Court's review of Make the Road's constitutional claim.[14]

### 2. The 2025 Designation Likely Violates the Due Process Clause.

The Fifth Amendment guarantees that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. When evaluating a due process claim, courts "undertake a two-part inquiry." *Patchak v. Jewell*, 828 F.3d 995, 1004 (D.C. Cir. 2016). First, a court must "determine whether constitutional safeguards apply at all, *i.e.*, whether a private party has a property or liberty interest that triggers Fifth Amendment due process protection." *Reeve Aleutian Airways, Inc. v. United States*, 982 F.2d 594, 598 (D.C. Cir. 1993). If

---

[14] The Government makes two other arguments here that it did not make in *CHIR*, insisting that Make the Road lacks standing to press one of its APA claims, and that all of its APA claims "fail because the Secretary's expedited removal designation decisions are committed to agency discretion." ECF 56 at 32, 36. The Court need not address those arguments because it does not reach Make the Road's APA claims, instead ruling only on the constitutional claim. Likewise, the Government's argument that Make the Road cannot sue because it is "outside the zone of interests of the expedited removal statute" only applies to Make the Road's APA claims. ECF 56 at 34 ("The APA does not allow suit by every person suffering injury in fact." (internal quotations omitted)). Regardless, this Court has already explained why "membership associations" like Make the Road have prudential standing to bring APA claims like the ones Make the Road brings here. *CHIR*, 2025 WL 2192986, at *20 (citing *Make the Rd.*, 962 F.3d at 628).

so, the court "ask[s] whether the procedures followed . . . were constitutionally sufficient." *Del. Riverkeeper Network v. FERC*, 895 F.3d 102, 107 (D.C. Cir. 2018) (citing *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011)).

The Court takes each step in turn and concludes first, that individuals subject to the 2025 Designation are entitled to due process and second, that the 2025 Designation and Huffman Memorandum fail to afford those individuals a sufficiently meaningful opportunity to be heard. Accordingly, Make the Road is likely to succeed on its due process claim.

### a. Individuals who have effected entry to the United States are entitled to due process.

Although certain constitutional protections do not extend to noncitizens "outside of our geographic borders," once a noncitizen "enters the country, the legal circumstance changes, for the Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001). Indeed, once they are present in the United States, noncitizens have a "weighty" liberty interest in remaining, as they "stand[] to lose the right to stay and live and work in this land of freedom," and "may lose the right to rejoin [their] immediate family, a right that ranks high among the interests of the individual." *Landon v. Plasencia*, 459 U.S. 21, 34 (1982).

That's true regardless of how someone entered the country: "[O]nce passed through our gates, *even illegally*," noncitizens "may be expelled only after proceedings conforming to traditional standards of fairness encompassed in due process of law." *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212 (1953) (emphasis added); *see also Mathews v. Diaz*, 426 U.S. 67, 77 (1976) ("Even one whose presence in this country is unlawful, involuntary, or transitory is entitled to that constitutional protection."). The Supreme Court has therefore "long held that no person shall be removed from the United States" without due process of law. *A. A. R. P.*, 145 S.

Ct. at 1367; *see also Reno v. Flores*, 507 U.S. 292, 306 (1993) ("It is well established that the Fifth Amendment entitles aliens to due process of law in deportation proceedings.").

The 2025 Designation plainly subjects people who have "passed through our gates"—and who therefore have a liberty interest in remaining—to expedited removal. Under the previous regime, only those who had "a close spatial and temporal nexus to the border" were eligible for expedited removal. 69 Fed. Reg. 48877, 48879 (Aug. 11, 2004). In practice, that meant the procedure was applied to people "apprehended immediately proximate to the land border" who had "negligible ties or equities in the U.S." *Id.* The 2025 Designation sweeps much further. By design, it affects people who have neither "a close spatial [nor] temporal nexus to the border," *id.*—those who have been in the country more than 14 days, who were apprehended more than 100 miles from the border. *See* 90 Fed. Reg. at 8139. Because the 2025 Designation subjects to expedited removal those who have long since crossed the "threshold" and effected entry into the country, *Mezei*, 345 U.S. at 212, the procedures used to remove them must adequately protect their interest in remaining. Make the Road's members are among those whose liberty interests are so implicated. *See* ECF 50-2, Fontaine Decl. ¶¶ 19–26 (identifying Make the Road members who have been living in the United States for between 15 and 20 months).

The Government tries to wave away this straightforward conclusion. Relying principally on *Department of Homeland Security v. Thuraissigiam*, 591 U.S. 103 (2020), it claims that unless and until a person is "*admitted* or . . . *lawfully* present in this country," the only process they are due is the process that Congress has provided. ECF 56 at 39 (citing *Thuraissigiam*, 591 U.S. at 138–39). Because the individuals subject to the 2025 Designation are afforded that congressionally mandated process, the Government reasons, Make the Road's due process claim fails.

22

The Government's reading of *Thuraissigiam* is untenable. To adopt its view would be to undermine more than a century of precedent holding that those who have entered the United States have a liberty interest in remaining—no matter how they entered. *See Yamataya v. Fisher*, 189 U.S. 86, 100–01 (1903) (noncitizen who entered country in violation of law cannot be "deprived of [her] liberty" without receiving "due process of law"). Not only is it beyond this Court's power to disregard those Supreme Court decisions, but so too has the Supreme Court recently reaffirmed that century-old principle. In a pair of cases considering what process was due to Venezuelan nationals alleged to be members of a foreign terrorist organization and subject to removal under the Alien Enemies Act, the Supreme Court stressed the "well established" rule "that the Fifth Amendment entitles aliens to due process of law." *Trump v. J. G. G.*, 145 S. Ct. 1003, 1006 (2025); *A. A. R. P.*, 145 S. Ct. at 1367. That was so even though the executive branch claimed that these Venezuelan nationals had "unlawfully infiltrated the United States" and "engage[d] in mass illegal migration." Proclamation No. 10903, 90 Fed. Reg. 13033, 13033 (Mar. 14, 2025). In so holding, the Court cited the seminal early-20th-century decision holding that noncitizens—in that case, a woman who had entered unlawfully and was present in the country for four days before the government sought to remove her—cannot be removed "without opportunity, at some time, to be heard." *A. A. R. P.*, 145 S. Ct. at 1367 (citing *Yamataya*, 189 U.S. at 101).

In short, the Court has not departed from the settled principle. And far from an abrogation, *Thuraissigiam* is entirely consistent with this rule. That decision reflects the equally settled proposition that noncitizens "on the threshold of initial entry stand[] on a different footing" than those who have "passed through our gates." *Mezei*, 345 U.S. at 212. For the former, "[w]hatever the procedure authorized by Congress, it is due process as far as" the noncitizen "denied entry is concerned." *Id.* In *Thuraissigiam*, the Court held that a noncitizen detained almost immediately

after crossing the border, who had made it only 25 yards into the United States, was still "on the threshold," no matter that he had technically, but just barely, crossed. 591 U.S. at 114, 140; *see also* Br. for the United States at 2, *Thuraissigiam*, 591 U.S. 103 (No. 19-161), 2019 WL 6727092, at *2 ("CBP[] agents apprehended him almost immediately thereafter, 25 yards north of the border."). The Court in *Thuraissigiam* did not overturn more than a century of precedent; it merely held that noncitizens "*in [the] respondent's position*"—those detained close to the border "shortly after unlawful entry"—have not yet "effected an entry." 591 U.S. at 140 (emphasis added).

From that holding, the Government tries to draw a much more startling rule—that unless and until someone is lawfully admitted, they are entitled to zero process beyond whatever courtesy Congress might offer. If that was right, Congress could subject noncitizens who had spent decades in the United States to immediate removal, without any advance notice or right to a hearing, and the Constitution would have nothing to say about it. When pressed on the point at the hearing, the Government effectively conceded as much. *See* Hrg. Trans. 25:13–26:19. The Supreme Court's cases, though, say otherwise. In *Yamataya*, for instance, having spent merely four days in the country after entering unlawfully entitled the noncitizen to due process before removal. *See* 189 U.S. at 87.

Distinguishing between those on the threshold and those who have effected entry makes sense. In this context as in others, the government's power "is at its zenith at the international border." *United States v. Flores-Montano*, 541 U.S. 149, 152 (2004) (discussing "the longstanding right of the sovereign to protect itself by stopping and examining persons and property *crossing into* this country" (emphasis added)). That is why noncitizens attempting to enter, who have not "acquired any domicil or residence within the United States," receive all the process that is required so long as executive officers "act[] within the powers expressly conferred by Congress."

24

*Thuraissigiam*, 591 U.S. at 138. And the sovereign's power at the border does not vanish because a person happens to be apprehended moments after they cross. *See id.*[15]

But in the country's interior, the Constitution requires the Government to "turn square corners." *See Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 24 (2020). That means affording due process. Requiring anything less would pose extraordinary dangers: Recall that "[p]rocedural due process rules are meant to protect against the *mistaken* or unjustified deprivation of life, liberty, or property." *A. A. R. P.*, 145 S. Ct. at 1367 (emphasis added). As Make the Road explains, "in the mine run of cases, there is little question" that noncitizens detained at or near the border are "arriving in the United States." ECF 50-1 at 28. But when people are "arrested at courthouses or off the street" in the interior of the country—as has been happening under the 2025 Designation—it is far more likely that the Government will sweep in people who "have lived in this country for years or [who] may even be U.S. citizens." *Id.* Those people, however, are not eligible for expedited removal, and the Government must provide sufficient process to minimize the risk that they are erroneously removed that way.

The Government makes one more attempt at justifying its harsh rule, claiming that "binding precedent" from the D.C. Circuit—*American Immigration Lawyers Association v. Reno* (*AILA*), 199 F.3d 1352 (D.C Cir. 2000)—holds that anyone subject to the expedited removal statute has no liberty interest in remaining in the United States. ECF 56 at 41. That is doubly

---

[15] That is why those detained at the border and then paroled into the country are treated "as if" they remained "stopped at the border." *Mezei*, 345 U.S at 213–15. That rule reflects the historical practice of allowing ships containing noncitizens to land in American harbors rather than staying at sea—largely to serve "humanitarian ends"—while immigration authorities determined the admissibility of the noncitizens. Eunice Lee, *The End of Entry Fiction*, 99 N.C. Law. Rev. 565, 584–96 (2021). The Supreme Court held that the temporary portage, which was akin to parole, did not amount to an entry into the country. *See Mezei*, 345 U.S. at 213; *Leng May Ma v. Barber*, 357 U.S. 185, 188 (1958). That explains the Court's statement in *Thuraissigiam*, on which the Government relies, that "aliens who arrive at ports of entry—even those paroled elsewhere in the country for years pending removal—are 'treated' for due process purposes 'as if stopped at the border.'" *See Thuraissigiam*, 591 U.S. at 139. Just as *Thuraissigiam* cannot swallow the general rule that those who have effected entry are entitled to due process, neither can the legal fiction that the Court crafted for parolees.

JA-026

wrong. For one, the government misstates what was decided by the D.C. Circuit in that case. The individual plaintiffs there did bring procedural due process claims in the district court. *See AILA*, 199 F.3d at 1356. But they did not appeal the district court's dismissal of those claims. *See id.* at 1356 n.6 (individual plaintiffs "appeal only the dismissal of their statutory claims"); *see also* Br. of Plaintiff-Appellants, *AILA*, 199 F.3d 1352 (No. 98-5463), 1999 WL 34833431, at *n.24 (The plaintiffs "do not challenge the court's ruling that" they did not "state[] a due process claim."). So the due process claims were never before the D.C. Circuit. And while that puts an end to the Government's claim of "binding precedent" that "[f]oreclose[s]" Make the Road's due process claim, ECF 56 at 41, considering the district court's resolution of the case does not help the Government, either. Like in *Thuraissigiam*, the plaintiffs in *AILA* had not effected entry into the United States, and instead remained at the threshold of "initial admission." *Am. Immigr. Laws. Ass'n v. Reno*, 18 F. Supp. 2d 38, 58–60 (D.D.C. 1998). The court therefore concluded that the plaintiffs lacked a liberty interest in *initial entry*, as "initial entrants have no due process rights with respect to their admission." *Id.* at 60. Because the 2025 Designation affects those who *have* entered, rather than just those seeking initial entry, *AILA* has little to say here.

The Court therefore rejects the Government's extraordinary request to treat as falling outside of the Constitution's due process guarantee the millions of immigrants who, although they may have entered unlawfully, have established lives here and made this country home. Instead, as the Supreme Court has long held and just recently reaffirmed, "the Fifth Amendment entitles aliens to due process of law." *J. G. G.*, 145 S. Ct. at 1006.

### b. Those subject to the 2025 Designation are entitled, at minimum, to a meaningful opportunity to contest the predicate bases for expedited removal.

Because those subject to the 2025 Designation are entitled to due process, the Court turns to the next step in the inquiry: determining whether "the procedures used by the Government in

effecting the deprivation 'comport with due process.'" *Ralls Corp. v. Comm. on Foreign Inv. in U.S.*, 758 F.3d 296, 315 (D.C. Cir. 2014) (quoting *Am. Mfrs. Mut. Ins. v. Sullivan*, 526 U.S. 40, 59 (1999)).

Make the Road identifies four claimed defects in expedited removal proceedings, any one of which it says render the procedure constitutionally inadequate when applied to the population affected by the 2025 Designation. *See* ECF 50-1 at 16–17. First, individuals do not receive sufficient notice and opportunity to contest the predicate bases of eligibility for expedited removal. *Id.* Second, the process impermissibly places the burden of proof on the individual, rather than the Government. *Id.* Third, the Government is not required to allow noncitizens the time or opportunity to "hire a lawyer or seek the assistance of any third party," and, fourth, there is no neutral adjudicator, with many cases decided only by an "immigration enforcement officer who serves as both prosecutor and judge." *Id.* at 17.

Under the familiar three-part balancing test from *Mathews v. Eldridge*, 424 U.S. 319 (1976), the Court holds that it is substantially likely that the expedited removal process does not include sufficient procedural safeguards when applied to those covered by the 2025 Designation. The Court does not foreclose the Government from subjecting those covered by the designation to expedited removal proceedings. Nor does it prescribe the specific process the government must use when doing so or hold that any one of the procedural safeguards proposed by Make the Road must be implemented to remedy the constitutional problem. All the Court holds is that Make the Road is substantially likely to prevail on its claim that the current procedures do not satisfy the minimal requirements of due process when applied to the population affected by the 2025 Designation.

### i.    A weighty private interest is at stake.

Courts first consider "the private interest that will be affected" by the government action. *Mathews*, 424 U.S. at 335. As discussed above, individuals who have effected entry to the United States have a "weighty" liberty interest in staying. *Landon*, 459 U.S. at 34. "[D]eportation . . . may result in poverty, persecution, and even death." *Bridges v. Wixon*, 326 U.S. 135, 164 (1945) (Murphy, J., concurring); *see also Ng Fung Ho v. White*, 259 U.S. 276, 284 (1922) (Deportation "may result . . . in loss of both property and life, or of all that makes life worth living."). Many people subject to expedited removal risk separation from their family members or have pending asylum applications and may be persecuted if deported. *See, e.g.*, ECF 50-4, Levenson Decl. ¶¶ 18–24 (describing courthouse arrests of asylum seeker married to a U.S. citizen who had been present for three years, asylum seeker whose partner was 8 months pregnant, and gay couple who feared persecution).

The Government's only answer is to recycle its argument that, under *Thuraissigiam* and *AILA*, Make the Road's members have no liberty interest against removal.[16] ECF 56 at 45. For reasons already explained, the Court rejects this argument. *See supra* 23–24. The first factor thus weighs heavily in Make the Road's favor.

---

[16] The Government also seemingly relies on the district court's decision in *AILA* to foreclose the second step of the due process analysis. ECF 56 at 46. But the district court there rejected the due process claim at step one (finding no entitlement to due process protections) and had no occasion to consider the constitutional sufficiency of the procedures under step two. *See* 18 F. Supp. 2d at 60. At most, the court considered whether the agency's regulations implementing IIRIRA were consistent with the statute (not the Constitution). *See id.* at 56. And on those APA claims, the court relied on (former) *Chevron* deference to conclude the regulations were reasonable. *Id.* ("Because IIRIRA is silent as to the nature of any required notice and rebuttal opportunity, the Court must defer to the Attorney General's determination as to what procedures are appropriate, so long as that determination is reasonable."). That holding is immaterial to Make the Road's constitutional claim here.

### ii. There is a significant risk of the erroneous deprivation of that interest, and additional safeguards are of high value.

Make the Road has identified procedural inadequacies that create a significant risk that the 2025 Designation will lead to the unlawful removal of individuals who are not eligible for expedited removal. "[A]dditional . . . procedural safeguards" could substantially mitigate that risk, so this factor too cuts in Make the Road's favor. *Mathews*, 424 U.S. at 335.

Before removing someone through expedited removal, the Government must make several threshold determinations: whether the individual has been continually present in the United States for two years; whether they have previously been admitted or paroled; whether they are inadmissible on one of the grounds that make them eligible for expedited removal; whether they have a credible fear of persecution; and whether they are a citizen, lawful permanent resident, refugee, or asylee. *See* 8 U.S.C. § 1225(b)(1)(A), (B)(ii); 8 C.F.R. § 235.3(b)(5). If the Government finds that one of these criteria is not satisfied, it either—depending on which criteria it is—must utilize section 240 removal proceedings or cannot remove the person at all.

Make the Road has put forward substantial evidence indicating that there is a "high risk of error" in making these determinations. ECF 50-1 at 23. That includes evidence of "recurring errors," for example, instances in which citizens, unaccompanied minors (who are not eligible for expedited removal), and those claiming asylum have been unlawfully removed. *See id.* at 24, 26–27 (citing examples from habeas cases and declarations attached in support of motion). For instance, one study found that 15% of the noncitizens who "expressed a fear of return" were not referred for a credible fear interview, as is required by statute. ECF 50-23, Steinberg Decl. at 46; 8 U.S.C.§ 1225(b)(1)(A)(ii); *see also* 8 C.F.R. § 235.3(b)(4) (an "inspecting officer *shall not*

proceed further with removal of the alien until the alien has been referred for an interview by an asylum officer" (emphasis added)).[17]

That rate of error in referring people for credible fear interviews is related to the procedural shortcomings of the process. The decision whether to refer an individual for a credible fear interview is made by an immigration officer, and that decision is not reviewable by anyone else. *See* 8 U.S.C. § 1225(b)(1)(A)(i) (once immigration officer "order[s] the alien removed" there is no "further hearing or review"). Entrusting the entirety of that decision making process to the executive branch official prosecuting the case leads, unsurprisingly, to problems. *See Williams v. Pennsylvania*, 579 U.S. 1, 8 (2016) ("[T]he Court has determined that an unconstitutional potential for bias exists when the same person serves as both accuser and adjudicator in a case."). Make the Road presents evidence that this structural flaw has in fact played out in predictable ways, with inspecting officers "regularly" recording "false information" during expedited removal interviews, coercing individuals to sign interview forms including false information, or otherwise rushing individuals through a cursory process. ECF 50-17, Warden-Hertz Decl. ¶¶ 6–7; *see also* ECF 50-16, Hartzler Decl. ¶¶ 10–12; ECF 50-14, Yang Decl. ¶ 7. Although the Government tries to wave these problems away as "isolated" incidents, ECF 56 at 43, both the study of the congressionally authorized Commission—identifying the 15% error rate—and the experiences of repeat player attorneys suggest otherwise. And vesting immigration officers with the unreviewable authority to refer, or not refer, noncitizens for credible fear interviews compounds other "troubl[ing] . . . problems . . . in the U.S. government's treatment of asylum seekers in expedited removal—including flawed screening and documentation practices, a lack of training and quality

---

[17] To be clear, the 15% error rate in referring individuals for credible fear interviews is neither the sole nor decisive factor in the Court's conclusion that the risk of error is too high. Instead, it is merely one of several examples of ways in which the procedures used lead to erroneous deprivations. *See Mathews*, 424 U.S. at 347 (describing an error rate as "relevant" but not "controlling" in assessing the adequacy of procedures).

control, [and] inadequate information for noncitizens in the process." ECF 50-23, Steinberg Decl. at 121 (findings from 2024 study published by congressionally authorized United States Commission on International Religious Freedom).

But even if a noncitizen is referred for a credible fear interview, there is still an intolerably high risk that they will be erroneously removed via expedited removal. *Contra* 8 C.F.R. § 208.30(e)(2)–(3), (f) (requiring DHS to refer to section 240 proceedings noncitizens who demonstrate a "significant possibility" of eligibility for asylum, withholding of removal, or protection under the Convention Against Torture). That is because noncitizens are not afforded the "opportunity to *effectively* be heard" at their credible fear interviews. *Ralls Corp.*, 758 F.3d at 318 (emphasis added).

Credible fear interviews are regularly conducted "as little as 24 hours" after a noncitizen's initial interview with an immigration officer. ECF 50-10, Koop Decl. ¶ 31. While the regulations say a noncitizen "*may* consult" with third parties prior to that interview, they also provide that such consultation "*shall* be at no expense to the Government and *shall* not unreasonably delay the process." 8 C.F.R. § 208.30(d)(4) (emphases added). Some of the detention facilities where noncitizens are held charge cost-prohibitive rates for attorney-client phone calls and have long wait-times (more than 24 hours) for scheduling calls after they are requested. ECF 50-10, Koop Decl. ¶ 32. In practice, then, the Government's procedures prevent noncitizens from "contact[ing] counsel or other support [to] gather information that they . . . need to . . . assert a credible fear" in their interview. *Id.* ¶ 31. That leaves noncitizens unable to obtain "medical records" and other proof that would substantiate their claims of fear. ECF 50-11, Gilliam Decl. ¶ 22. And even the lucky few who have counsel are often unable to rely on their help during their interviews, given the Government's regular failure to notify attorneys in advance of said interviews—even where

those attorneys have entered appearances on behalf of their clients. ECF 50-18, Lunn Decl. ¶ 20. That runs afoul of the Supreme Court's long-ago pronouncement that, "in any case, civil or criminal," to "arbitrarily . . . refuse to hear a party by counsel, employed by and appearing for him," is a "denial of a hearing, and, therefore, of due process in the constitutional sense." *Chandler v. Fretag*, 348 U.S. 3, 10 (1954).

That the noncitizen can nominally appeal an adverse decision from the credible fear interview to an immigration judge does not cure the risk of error either. *See* 8 U.S.C. § 1225(b)(1)(B)(iii)(III). The lack of any meaningful opportunity to prepare for that appeal—either with the help of third parties or even on one's own—undermines the reliability of this stage of the proceeding too. The hearing before the immigration judge takes place "to the maximum extent practicable within 24 hours, but in no case later than 7 days after" the initial adverse credible fear determination is made. *Id.* In that short time, noncitizens are not provided with the records that were made in their credible fear interview and when they appear before the immigration judge they regularly "do not know the basis for their failing the credible fear interview." ECF 50-13, Schacher Decl. ¶ 14; *see also* ECF 50-19, Willis Decl. ¶ 16 ("It [is] very common for applicants to be scheduled for an Immigration Judge review of their negative [credible fear interview] without having had an opportunity to see or review the USCIS Asylum Officer's decision."). What's more, immigration judges "[t]ypically . . . do not allow noncitizens to explain discrepancies in their previous statements" during credible fear interviews "or to provide additional evidence or information not detailed in the credible fear interview." ECF 50-13, Schacher Decl. ¶ 15. Instead, the noncitizens are "frequently limit[ed] . . . to yes or no answers." *Id.* So noncitizens are not afforded a meaningful opportunity to prepare for or present evidence at their credible fear interviews, are stuck with the record they make during those interviews, and must appeal the

adverse determinations coming out of those interviews without knowing the basis for the negative findings. Given these procedural shortcomings, there is little chance that erroneous credible fear findings will be corrected by immigration judges.

Errors in correctly determining whether a noncitizen's fear of being removed disqualifies them from expedited removal are far from the only problem in the process. Equally troubling is the significant risk that the 2025 Designation will lead to the expedited removal of individuals who have been present in the United States for at least two years. According to a DHS report, the "vast majority" of undocumented immigrants in the United States have been living here for longer than two years. ECF 50-24, Steinberg Decl. at 58 (estimating that 79 percent of the undocumented population as of 2022 "entered before 2010"). Another study concluded that, as of 2022, only 12.4% of the undocumented population had been present for less than two years. ECF 50-23, Steinberg Decl. at 258. Most noncitizens, then, are not eligible for expedited removal—even if they entered unlawfully, and even if they are subject to removal.

But the expedited removal process has in place woefully inadequate procedures for accurately determining whether a noncitizen has been present for two years. The regulations require immigration officers to read individuals a statement from a form, and then ask them a series of four questions from another form. *See* 8 C.F.R. § 235.3(b)(2)(i). The recited statement does not inform individuals that they are only subject to expedited removal if they have been present less than two years, instead telling individuals only that they should inform the immigration officer if they "fear or have a concern about being removed from the United States or about being sent home." ECF 50-23, Steinberg Decl. at 94 (text of Form I-867A). The four questions officers ask do not prompt the individual to say anything about how long they have been in the country either:

1.  Why did you leave your home country or country of last residence?

33

2. Do you have any fear or concern about being returned to your home country or being removed from the United States?

3. Would you be harmed if you are returned to your home country or country of last residence?

4. Do you have any questions or is there anything else you would like to add?

*Id.* (questions from Form I-867B). So while both the statement and questions provide at least some "opportunity to be heard" about asylum claims, *Propert v. District of Columbia*, 948 F.2d 1327, 1332 (D.C. Cir. 1991), there is nothing in the expedited removal interview process that would prompt an individual to put forward the "affirmative[]" evidence of continuous two-year presence that is required under the statute, 8 U.S.C. § 1225(b)(1)(A)(iii)(II).

But once the interview is complete, the individual is not afforded any other opportunity to present evidence about their continual presence. If the officer determines that they are subject to expedited removal and receives supervisor sign-off, she serves the Form I-860, which combines both the notice of and order for expedited removal. 8 C.F.R. § 235.3(b)(2)(i). Individuals are then ordered removed "without further hearing or review." 8 U.S.C. § 1225(b)(1)(A)(i). And while the regulations provide for additional layers of review for individuals who indicate an intent to apply for asylum or fear of return, 8 C.F.R. § 235.3(b)(4), who claim to be U.S. citizens, lawful permanent residents, refugees, or asylees, *id.* § 235.3(b)(5), or who claim to have been paroled into the United States, *id.* § 235.3(b)(6), there is no additional process for individuals who claim to have resided in the United States for more than two years.

Finally, even if an individual somehow knows that they can contest their eligibility for expedited removal on the basis of continual presence, and even if they know that they need to do so in the initial interview because they will not have any further opportunity, the procedures make it exceedingly difficult for them to meet their burden. While the regulations guarantee individuals the opportunity to "present evidence or provide sufficient information" to prove ineligibility for expedited removal on another basis, 8 C.F.R. § 235.3(b)(6), there is no similar requirement or

procedure for presenting evidence bearing on continuous presence. Nor is there an opportunity, as is provided for those claiming parole, *see id.*, to contact a third-party to assist with gathering such evidence. Nor are officers explicitly required to verify residence claims—as they must for those claiming lawful status. *See id.* § 235.3 (b)(5). Nor is there a referral to an immigration judge to review an expedited removal order based on unverified or disputed residence facts—as there is for unverified lawful status. *See id.* Nor must the supervisor review any claims of continual presence before signing off on expedited removal, as they "must" for "any claim of lawful admission or parole." *Id.* § 235.3 (b)(7).

So even though the "burden of proof" rests with the individual "to affirmatively show that he or she has the required continuous physical presence in the United States," *id.* § 235.3(b)(1)(ii), the procedures used do not afford individuals meaningful notice of a key element of the "case against" them—the allegation that they have been present in the country for less than two years— or the "opportunity to meet" that allegation. *Mathews*, 424 U.S. at 348.

That flaw in the process creates a significant risk when expedited removal is applied to people in the interior of country. Continuous presence is unlikely to be seriously contested when it comes to those apprehended in close temporal and spatial proximity to the border, who are likely to have crossed recently. Not so with those living elsewhere in the United States. The Government has previously made this point: "The Department acknowledges that application of the expedited removal provisions to aliens already in the United States will involve more complex determinations of fact and will be more difficult to manage." 62 Fed. Reg. 10313; *see also* 87 Fed. Reg. 16022, 16023–24 (recognizing that "the operational complexities of implementing" expedited removal to the full interior of the United States, as opposed to only recent entrants, "would involve complex new challenges for the ICE workforce").

35

With expedited removal no longer cabined to the border, the complete lack of process for an individual to demonstrate how long they have been present therefore creates a significant risk of erroneous removal. It is unsurprising, then, that the Government has recently swept into expedited removal proceedings, and ordered removed, people who have lived here far longer than two years. *See* ECF 50-4, Levenson Decl. ¶¶ 23–24 (courthouse arrest of person present more than two years); *Castillo Lachapel v. Joyce*, --- F. Supp. 3d ---, 2025 WL 1685576, at *1–2 (E.D.N.Y. June 16, 2025) (person present more than two years arrested at courthouse and issued expedited removal order); ECF 50-7, Mary Doe Decl. ¶¶ 2–12 (Plaintiffs Mary and John, who have lived here for ten years, discussing arrest during traffic stop); *Co Tupul v. Noem*, No. 25-cv-02748, 2025 WL 2426787, at *1 (D. Ariz. Aug. 4, 2025) (person present for 30 years arrested during traffic stop, "placed in expedited removal proceedings[,] and [ordered] removed in one to three weeks").

In short, the expedited removal process hardly affords individuals any opportunity, let alone a "meaningful" one, to demonstrate that they have been present in the United States for two years. *Contra Propert*, 948 F.2d at 1332. Such a "complete denial of the opportunity to be heard on a material issue is a violation of due process." *United States v. Smith*, 30 F.4th 1334, 1338 (11th Cir. 2022). And although this shortcoming might not create a huge risk of error when expedited removal is used at or near the border, it creates an intolerable risk when expedited removal is deployed throughout the United States. That is because *most* noncitizens have been present for more than two years, and those living far away from the border are less likely to have recently crossed.  *See* ECF 50-24, Steinberg Decl. at 58 (DHS study).

Any of the additional safeguards Make the Road proposes could mitigate the risk that the Government erroneously removes people via expedited removal. The Government could, for

example, easily revise its forms to ensure that individuals are asked about, and have an opportunity to contest, their eligibility based on continuous presence grounds. The "opportunity for [an individual affected by government action] to present his side of the case is . . . *of obvious value* in reaching an accurate decision." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 543 (1985) (emphasis added); *see also Conn. Dep't of Pub. Safety v. Doe*, 538 U.S. 1, 7 (2003) ("[D]ue process require[s] the government to accord the plaintiff a hearing to prove or disprove a particular fact or set of facts . . . [that are] relevant to the inquiry at hand.").

The Government could also afford individuals with a meaningful opportunity to ask counsel or third parties for help in gathering evidence to prove either a credible fear or their continual presence. That would substantially improve the reliability of the proceedings. As Make the Road explains, many of its "members [] would have difficulty affirmatively demonstrating two years of physical presence, particularly if suddenly detained or given only a short period of time to do so." ECF 50-2, Fontaine Decl. ¶ 42. So too do people trying to substantiate their claims of credible fear need access to "medical records" or other documentation, some of which must be secured from other countries. *See* ECF 50-11, Gilliam Decl. ¶ 22. The Government's current procedures, however, make it exceedingly difficult to gather these documents. *See* ECF 50-21, Cooper Decl. ¶¶ 6–7 (explaining that detention centers do not provide confidential emails, fax, or other means of receiving documents other than mail, which takes 5–10 days to reach detained clients). Affording people a real opportunity to collect documents by calling on third parties for help would be an easy way to decrease the risk of erroneous removals that currently exists. That is the kind of fix the D.C. Circuit has previously required to remedy procedural due process problems. *See, e.g.*, *Gray Panthers v. Schweiker*, 652 F.2d 146, 148, 172 (D.C. Cir. 1980) (plaintiffs must "be informed of or have access to the evidence on which the [decision maker]

relied" and "an opportunity to present evidence (in oral or written form) in support of" their position before they can be deprived of Medicare benefits of $100 or less); *Nat'l Council of Resistance of Iran v. Dep't of State*, 251 F.3d 192, 209 (D.C. Cir. 2001) (due process "require[s] that the [government] afford to entities considered for imminent designation [as a terrorist organization] the opportunity to present, at least in written form, such evidence as those entities may be able to produce to rebut the administrative record or otherwise negate the proposition that they are foreign terrorist organizations").

The Government does not offer much in response to the procedural deficiencies and concordant risks that Make the Road has identified. In conclusory fashion, the Government asserts that "the risk of erroneous application is not high" because "[w]hether an alien may be subject to expedited removal proceedings is straightforward: the immigration officer must determine only whether an alien was admitted or paroled and has valid entry documents or has misrepresented material information about himself and then determine whether the alien has been present for fewer than two years." ECF 56 at 47.

Saying it doesn't make it so. The Government does not meaningfully engage with the evidence suggesting that the residence determination is anything but straightforward when applied to the interior, especially in communities that lack readily available documentation proving presence. *See* ECF 50-2, Fontaine Decl. ¶¶ 41–43. It does not have anything to say about the evidence that the flaws in its processes lead it to "erroneously return[] asylum seekers to countries where they could face persecution." ECF 50-23, Steinberg Decl. at 121. And its reassurances that this supposedly simple process does not lead to erroneous results ignores the "troubling reality" that, because of the general lack of oversight or any meaningful "check[s]" to ensure that individuals "underst[and] the proceedings, ha[ve] an interpreter, or enjoy[] any other safeguards,"

38

the "procedure is fraught with risk of arbitrary, mistaken, or discriminatory behavior." *Khan v. Holder*, 608 F.3d 325, 329 (7th Cir. 2010). Indeed, the Court finds the Government's hand-waving regarding the "straightforwardness" of implementing the 2025 Designation hard to square with its prior express recognition of the factual complexities associated with expanding expedited removal beyond the border and into the interior. *See* 62 Fed. Reg. 10312–13; 87 Fed. Reg. 16022, 16024.

In terms of safeguards, the Government claims that the regulations already provide individuals with protections: "[I]f the alien asserts that he should not be subject to expedited removal, because he is a lawful permanent resident, refugee, or asylee, or claims to be a U.S. citizen, the regulations require that a thorough inquiry occur prior to any removal proceedings, both before the immigration officer and an immigration judge." ECF 56 at 47, 50. But even if those procedural safeguards were sufficient to avoid erroneous determinations on those eligibility questions—as the Court has already explained, they are not—the Government does not claim that a similar "thorough inquiry" is undertaken to determine whether someone has been in the country for two years. Indeed, the Government's briefing had nothing to say about how immigration officers determine whether an individual has been present for fewer than two years and nothing in the 2025 Designation affords individuals with a meaningful opportunity to disprove that threshold element. When asked at oral argument what would happen if, for example, an individual unexpectedly apprehended at a court hearing wants "to demonstrate that they've been here for a period of two years but they don't have any paperwork on them," the Government came up empty, offering only "to take that back to the agency to give [the Court] an answer." Hr'g Tr. 26:20–27:10. The Government has yet to provide an answer.[18]

---

[18] The Government also argues that because Make the Road raises a facial constitutional attack, it must show that the 2025 Designation "is always unconstitutional—not that it may sometimes be, as applied." ECF 56 at 44 (emphasis omitted) (citing *United States v. Salerno*, 481 U.S. 739, 745 (1987)). But Make the Road has identified facial defects

### iii. The Government's interests are outweighed by the value of additional safeguards and the significant liberty interest at stake.

Finally, the Government's countervailing interests are insufficient to overcome the weight of the constitutional deprivation here.

Given the potential for erroneous deprivation and clear value of additional safeguards, Make the Road contends that individuals "facing expedited removal must be given a reasonable opportunity to contest whether they are actually subject to expedited removal"—no matter the countervailing governments interest at stake. ECF 50-1 at 29–31. The Government counters that any additional process would interfere with its interest in enforcing immigration law, noting that "Congress determined that expedited removal is necessary 'to expedite the removal from the United States of aliens who indisputably have no authorization to be admitted,' and for dealing with the 'crisis at the land border' that involves 'hundreds of thousands of illegal aliens' entering each year." ECF 56 at 51 (quoting H.R. Rep. 104-828 at 209; H.R. Rep. No. 104-469 at 107). The Government also claims that adding further safeguards would turn expedited removal into comprehensive removal proceedings (akin to those available in section 240 proceedings) as opposed to the truncated system Congress envisioned. *See id.*

The Government's argument depends on a false premise. The Court is decidedly *not* holding that expedited removal must emulate section 240 proceedings to satisfy due process. Nor is it barring the Government from subjecting the group of people affected by the 2025 Designation to expedited removal. It holds only that Make the Road has made a sufficiently strong showing

---

in the expedited removal process that make it unconstitutional to apply it to those subject to the 2025 Designation. These procedural inadequacies apply in every case. It is no defense to a procedural due process claim to argue that *in some individual cases* the Government reaches the right answer *despite* the procedural flaws. The whole point of procedural due process rules is that they help to "*minimize* substantively unfair or mistaken deprivations of life, liberty, or property." *Carey v. Piphus*, 435 U.S. 247, 259–60 (1978) (emphasis added). That the Government does not make a mistake in every single case does not mean that its procedures are constitutionally adequate. *See id.* at 266 ("[T]he right to procedural due process is 'absolute' in the sense that it does not depend upon the merits of a claimant's substantive assertions.").

that the procedures *currently in place* likely do not afford those affected by the 2025 Designation with an adequate "opportunity to challenge their removal." *J. G. G.*, 145 S. Ct. at 1006. That showing entitles Make the Road to a stay. The Government, however, remains free to issue new rules or guidance implementing any of the modest procedural safeguards Make the Road has identified (or indeed others it chooses) to ensure that this same class of people can be subjected to expedited removal through constitutionally adequate procedures.

The Court recognizes, and heeds, the Government's "weighty" "interest in efficient administration of the immigration laws at the border." *Landon*, 459 U.S. at 34. But that interest must always be "pursued in a manner consistent with the Constitution." *A. A. R. P.*, 145 S. Ct. at 1368. And the Government has not explained why it is unable to efficiently enforce the immigration laws, including the expedited removal statute, while also affording individuals with their "core" due process right: "notice and a meaningful opportunity to be heard." *LaChance v. Erickson*, 522 U.S. 262, 266 (1998). Because Make the Road has made a strong showing that the procedures can be "tailored . . . to the capacities and circumstances of those who are to be heard . . . to insure that they are given a meaningful opportunity to present their case" without substantially undermining the Government's interests, the Court concludes that Make the Road is likely to prevail on the merits of its due process claim. *Mathews*, 424 U.S. at 349.

**B. Make the Road Faces Irreparable Harm.**

In addition to showing a likelihood of success on the merits, Make the Road must also establish that it is likely to face irreparable injury absent the requested preliminary relief. *See Nat'l Min. Ass'n v. Jackson*, 768 F. Supp. 2d 34, 50 (D.D.C. 2011); *Chaplaincy*, 454 F.3d at 297. To constitute irreparable injury, the injury "must be 'both certain and great,' 'actual and not theoretical,' 'beyond remediation,' and 'of such *imminence* that there is a clear and present need

for equitable relief to prevent irreparable harm.'" *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015) (quoting *Chaplaincy*, 454 F.3d at 297) (emphasis in original)).

Make the Road offers evidence of three categories of ongoing or imminent irreparable harm to their members: (1) wrongful removal of individuals statutorily ineligible for expedited removal; (2) detention and family separation during expedited removal proceedings; and (3) risks of persecution and death if and when noncitizens subject to expedited removal are removed. ECF 50-1 at 43–44; ECF 58 at 31–32. The Government raises two responses. First, that Make the Road fails to identify "imminent harm" because it has not "shown that apprehension in immigration court for the purposes of expedited removal is an imminent injury for any of [its] members." ECF 56 at 65. Second, that Make the Road's purported delay in filing the stay motion—five months after the 2025 Designation took effect—undercuts its position that it will be irreparably harmed. *Id.* Both arguments miss the mark.

The first simply ignores the significant evidence Make the Road has put forward. Its declarations are replete with uncontested evidence that the Government is systematically targeting individuals attending their immigration court proceedings for placement into expedited removal, in New York and beyond. *See, e.g.*, ECF 50-9, Rowland-Kain Decl. ¶¶ 5, 8 (arrests at Varick Street and Broadway Immigration Courts in New York City and Buffalo Immigration Court beginning in May 2025); ECF 50-8, Eugenio Decl. ¶¶ 7, 10 (arrests at Federal Plaza Immigration Court in New York City). And Make the Road has identified a number of its members who are at risk of being placed in expedited removal pursuant to the 2025 Designation, some of whom have impending immigration court dates, others of whom have already had their section 240 proceedings dismissed. *See* ECF 50-2, Fontaine Decl. ¶¶ 17–25 (identifying members John Doe 1, John Doe 2, John Doe 3, John Doe 4, Jane Doe 1, Jane Doe 2 who are subject to expedited removal

under the 2025 Designation). Given that the Government has been dismissing section 240 proceedings as a predicate to placing people in expedited removal proceedings, the foreseeable next step is that some of these members will be put into expedited removal. *See, e.g.*, *id*. at 15–17 (Government's motion to dismiss member's section 240 case is pending); *id.* ¶ 22 (member who is in removal proceedings); *id.* ¶ 25 (same with hearing date scheduled). And merely being removed is not the only risk those members face. Jane Doe 2, for instance, risks "being detained and separated from [her] children, who would have no one to care for them" and "losing [her] opportunity to apply for asylum." *Id.* at 18 ¶ 4. "[T]he harm from detention surely cannot be remediated after the fact" and is a quintessential irreparable harm. *Ramirez v. ICE*, 310 F. Supp. 3d 7, 31 (D.D.C. 2018). And "the prospect of expulsion without any opportunity to apply for asylum or withholding of removal," after which "a judicial remedy may be unavailable," is no less irreparable. *Huisha-Huisha v. Mayorkas*, 560 F. Supp. 3d 146, 172 (D.D.C. 2021), *affirmed in relevant part* 27 F.4th 718, 733–34 (D.C. Cir. 2022).

Even more fundamentally, the injury Make the Road's members face is a "threatened invasion of [their] constitutional right" to due process, and after removal there is little possibility that the Court can order the Government to provide them with the process they were denied. *Davis v. District of Columbia*, 158 F.3d 1342, 1346 (D.C. Cir. 1998). In these circumstances, the "prospective violation of a constitutional right constitutes irreparable injury," full stop. *Id.*; *see also Talbott v. United States*, 775 F. Supp. 3d 283, 332 (D.D.C. 2025) (collecting cases). The Court thus agrees with Make the Road that its members face imminent, irreparable injury, and rejects the Government's contrary argument as flatly inconsistent with both the record and the law.

The Government's delay argument is similarly unavailing. The Government contends that the time between issuance of the 2025 Designation (January 2025) and the filing of Make the

Road's motion (June 2025) undermines its claim of irreparable harm. ECF 56 at 65–66 (citing *Fund for Animals v. Frizzell*, 530 F.2d 982, 987 (D.C. Cir. 1975) (finding that a delay of 44 days before bringing action for injunctive relief was "inexcusable" where plaintiff "knew" the claimed irreparable harm was impending), and *Western Watersheds Project v. Bernhardt*, 468 F. Supp. 3d 29, 50 (D.D.C. 2020) (similar)). But the caselaw the Government relies on is inapposite, as it stands only for the proposition that plaintiffs' "*unexplained delays* in seeking emergency relief undermine their contention that they will be irreparably harmed." *Bernhardt*, 468 F. Supp. 3d at 50 (emphasis added); *see also Newdow v. Bush*, 355 F. Supp. 2d 265, 292 (D.D.C. 2005) (explaining that "[a]n unexcused delay in seeking extraordinary injunctive relief may be grounds for denial because such delay implies a lack of urgency and irreparable harm" and collecting cases to that effect). Here, Make the Road's delay is neither unexplained nor unexcused. Make the Road articulated and supported with record evidence an explanation for the timing of its motion: the Government's recent efforts beginning in May 2025 to aggressively implement the 2025 Designation, in New York and nationwide. *See e.g.*, ECF 50-23, Steinberg Decl. at 300 (reporting in May 2025 of Government's announced 3,000 daily arrests target); ECF 50-24, Steinberg Decl. at 383 (reporting on 2,000 arrests per day effectuated during the first week of June); *supra* 12 n.10 (declarations detailing massive wave of courthouse arrests in May and June 2025). Accordingly, Make the Road's sudden "urgency" is "justified by . . . new facts [and] allegations." *Guttenberg v. Emery*, 26 F. Supp. 3d 88, 103 (D.D.C. 2014). The delay therefore in no way undermines its claims of irreparable harm. And because the record fully substantiates Make the Road's claim that its members face such harm, this prerequisite for the grant of a stay is satisfied.

### C.  The Balance of the Equities and the Public Interest Favor a Stay.

The final two stay factors, which merge here, plainly cut in Make the Road's favor. For one, Make the Road has made a strong showing that the 2025 Designation is unconstitutional, and

"there is generally no public interest in the perpetuation of unlawful agency action." *Shawnee Tribe v. Mnuchin*, 984 F.3d 94, 102 (D.C. Cir. 2021). For another, "the public has an interest 'in preventing [noncitizens] from being wrongfully removed, particularly to countries where they are likely to face substantial harm.'" *A.B.-B. v. Morgan*, 548 F. Supp. 3d 209, 222 (D.D.C. 2020) (quoting *Nken*, 556 U.S. at 436). Absent a stay, that is likely to happen.

While the Government has correctly asserted its weighty interest in enforcing the immigration laws, it has not explained how a stay would inappropriately interfere with that interest. First, the Government claims that a stay of the 2025 Designation would "improper[ly] intru[de]" into the workings of the executive branch, especially because "Congress did not intend for judicial review in this area." ECF 56 at 67. That argument misstates the law: Congress expressly provided for judicial review of the kind of claim Make the Road presses here, and it dictated that such review occur in this Court. *See* 8 U.S.C. § 1252(e)(3); *supra* 19–20. Nor can the Government get any mileage out of its citation to Justice O'Connor's in-chambers opinion in *I.N.S. v. Legalization Assistance Project*. *See* ECF 56 at 67. In that case, Justice O'Connor reasoned that the balance of the equities tipped in favor of staying a lower-court decision that constituted an "improper intrusion by a federal court into the workings of a coordinate branch of Government." 510 U.S. 1301, 1306 (1993) (O'Connor, J., in chambers). But there, the lower-court's decision was an "improper intrusion" because it permitted a suit by plaintiffs without prudential standing. *See id.* ("Moreover, if the above analysis [about standing] is correct the order is not merely an erroneous adjudication of a lawsuit between private litigants, but an improper intrusion[.]"). Here, by contrast, Make the Road is a proper plaintiff. *See CHIR*, 2025 WL 2192986, at *19–21 (explaining reasoning on this issue). The order is therefore not an "improper intrusion" of the kind that concerned Justice O'Connor.

The Government next asserts that the public interest "favors the efficient administration of the immigration laws at the border," and that the requested stay "would frustrate the 'public interest in effective measures to prevent the entry of illegal aliens' at the Nation's borders." ECF 56 at 67 (quoting *Innovation L. Lab v. McAleenan*, 924 F.3d 503, 510 (9th Cir. 2019); *United States v. Cortez*, 449 U.S. 411, 421 n.4 (1981)). But the Government's argument, and the cases on which it relies, concern the public interest in enforcing immigration laws "*at the border.*" And, as Make the Road explains, "the [2025 Designation] and [Huffman Memorandum] apply in the interior, not at the border." ECF 58 at 32. Thus, the Government's interest in effectuating border-control would be undisturbed by this Court's stay of the 2025 Designation. And, even granting the Government's interest in enforcing immigration laws in the interior, doing so without sufficient due process violates the law. *See Shawnee Tribe*, 984 F.3d at 102.

The Government tries one final argument: "[t]he government has a substantial interest in implementing the President's policies," and "vigorous enforcement of the immigration laws and the prompt removal of inadmissible aliens is one of the President's top priorities." ECF 56 at 64. Maybe so. But "[t]he Constitution . . . does not permit [the Government] to prioritize any policy goal over the Due Process Clause, and enforcement of an unconstitutional law is always contrary to the public interest." *Karem v. Trump*, 960 F.3d 656, 668 (D.C. Cir. 2020).

### D. The 2025 Designation and Implementing Guidance are Stayed in their Entirety, No Bond Is Required, and the Court Will Not Administratively Stay its Order.

Because all four factors favor it, the Court will stay the 2025 Designation. In a footnote on the last page of its brief, the Government asks this Court to limit any stay to Make the Road's members who are "currently in expedited removal and actually identified by Make the Road in this suit." ECF 56 at 67 n.15; *but see Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 766 n.2 (D.C. Cir. 2022) ("[A]n inchoate argument made only in a footnote is forfeited."). That request

is a nonstarter. As the D.C. Circuit has repeatedly held, vacatur of the agency action—not merely exempting plaintiffs from the agency action— is the normal remedy under APA section 706. *Nat'l Min. Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998). This Court and courts in this and other circuits have applied that same rule to section 705 stays. *See CHIR*, 2025 WL 2192986, at *37 (collecting cases). "Those decisions track the text of section 705, which authorizes the reviewing court to 'postpone the effective date of an agency action or preserve status or rights' full stop, not only as to plaintiffs before the court." *Id.* (quoting 5 U.S.C. § 705).

The Government also asks the Court to, if it grants relief, require Make the Road to put forward a bond pursuant to Federal Rule of Civil Procedure 65(c). The Court declines to do so. As explained in *CHIR*, that rule requires the Court when issuing a preliminary injunction or temporary restraining order to order the movant to "give[] security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). A stay under APA section 705 is neither a preliminary injunction nor a temporary restraining order. *See CHIR*, 2025 WL 2192986, at *38. Rule 65(c) therefore does not apply.

Finally, the Government moved at oral argument for a 14-day administrative stay of this Court's order "because this ruling will directly impact agency operations" and to "give the Solicitor General's office an opportunity to determine whether an appeal is appropriate." Hr'g Tr. 41:3–9. The Court denies that request. There is no motion before this Court that requires "time to deliberate." *United States v. Texas*, 144 S. Ct. 797, 798 (2024) (Barrett, J., concurring) (describing the purpose of an administrative stay).

## IV.    CONCLUSION

For the foregoing reasons, Plaintiff's motion for a stay of agency action, ECF 50, is **GRANTED**. The Challenged Actions (the January 21 Designation Notice and the January 23

Huffman Memorandum insofar as it implements the January 21 Designation Notice) are hereby

**STAYED**, pending conclusion of these review proceedings.

A separate order accompanies this memorandum opinion.

**SO ORDERED.**

_____
JIA M. COBB
United States District Judge

Date: August 29, 2025

JA-049

**[Transcript Pages 1 – 50 of 50]**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MAKE THE ROAD NEW YORK, et al.,

           Plaintiffs,

    vs.

KRISTI NOEM, et al.,

          Defendants.

Civil Action
No. 1:25-cv-00190

July 9, 2025
10:00 a.m.

Washington, D.C.

_____

TRANSCRIPT OF THE MOTIONS HEARING
BEFORE THE HONORABLE JIA M. COBB
UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the Plaintiffs:    Morgan Russell, Esq.
                        AMERICAN CIVIL LIBERTIES UNION
                        FOUNDATION
                        425 California Street
                        Suite 7th Floor
                        San Francisco, CA 94104

                        Anand Balakrishnan, Esq.
                        AMERICAN CIVIL LIBERTIES UNION
                        FOUNDATION
                        125 Broad Street
                        18th Floor
                        New York, NY 10004

For the Defendants:    Caroline McGuire, Esq.
                        U.S. DEPARTMENT OF JUSTICE
                        P.O. Box 868
                        Ben Franklin Station
                        Washington, DC 20044

Court Reporter:        Stacy Johns, RPR, RCR
                        Official Court Reporter


Proceedings recorded by mechanical stenography, transcript
produced by computer-aided transcription

1      **P R O C E E D I N G S**

2          DEPUTY CLERK:  Good morning, Your Honor.  We are on

3      the record in Civil Case 25-190, Make the Road New York, et al,

4      versus Noem, et al.

5          Starting with plaintiffs' counsel, please approach the

6      podium and state your appearance for the record.

7          MR. RUSSELL:  Morgan Russell for the plaintiffs, Your

8      Honor.  And with the Court's permission, I'll share argument

9      today with my colleague, Mr. Balakrishnan.

10         THE COURT:  Okay.

11         MR. RUSSELL:  And if it's all right, I will plan to

12     address defendant's special arguments concerning the zone of

13     interests and action committed to agency discretion, as well as

14     timeliness and the merits of our due process claim and our

15     claim concerning Section 1225(b)(1), the expedited removal

16     statute, interpreted in light of constitutional avoidance.

17         And that will be our focus or our plan to focus on

18     this morning, Your Honor.

19         THE COURT:  Okay.

20         MR. RUSSELL:  But if Your Honor has questions about

21     our other claims or about the equitable stay factors or the

22     availability of relief under Section 705, then Mr. Balakrishnan

23     can speak to those issues.

24         THE COURT:  All right.  And then counsel for

25     defendants, state your name for the record, please.

1      MS. MCGUIRE:  Good morning, Your Honor.  Caroline

2  McGuire appearing on behalf of defendants.  I will be handling

3  argument in whole on behalf of the government.

4      THE COURT:  Good morning, everyone.  I will hear from

5  plaintiffs first.

6      MR. RUSSELL:  Thank you, Your Honor.  And I'm happy to

7  sort of start from the top, as it were, unless there's

8  somewhere in particular that would be most helpful for Your

9  Honor to begin.

10      THE COURT:  Well, I guess I want to get into the due

11  process question, and then I'll let you make whatever

12  presentation you want.

13      But, I guess, is it your position that the statute --

14  put aside any time bar considerations.  Is it your position

15  that this statute is unconstitutional?  Are you essentially

16  suggesting that it is unconstitutional to subject people who

17  have been here for periods of months or years, or who otherwise

18  aren't at the threshold, to an expedited removal procedure?  Is

19  that essentially what you're saying?

20      MR. RUSSELL:  Yes, Your Honor.  That's essentially the

21  position.  People who have entered the country and are within

22  the United States, we think the regime, the procedures that the

23  rule and guidance apply to that population, are inadequate.

24      THE COURT:  Well, taking a step back.  I'm just saying

25  on the face of the statute itself.  Are you saying that it

1    would be -- because, obviously, expedited removal contemplates

2    a procedure that is more truncated than a 240 proceeding or

3    other types of proceedings.

4          So are you saying that, again, putting aside time bar,

5    but is it your position that the statute is unconstitutional to

6    the extent it allows the government to subject people who have

7    been here for a period of months or even years to an expedited

8    removal proceeding?  Or are you not going that far?

9          MR. RUSSELL:  Well, I think we're not going that far,

10   Your Honor.  I mean, partly because we're simply not

11   challenging the statute in this case.

12         THE COURT:  So there is no problem with subjecting

13   people who have been here for periods of months or up to

14   two years to an expedited removal proceeding, which is distinct

15   from other removal proceedings?

16         MR. RUSSELL:  Well, no.  I mean, we think there is a

17   constitutional problem with that.  And that's why we think the

18   rule and guidance, which --

19         THE COURT:  Right.  So I guess I'm trying to divide

20   between what the expedited removal proceeding looks like and

21   then just the idea that someone can be subjected to a truncated

22   process that doesn't have all of the procedure that a formal

23   removal proceeding would have.

24         You're not saying that people who have been here for

25   months or years can only be removed through that removal

1   process; that subjecting them to any kind of expedited removal

2   process, which would limit the process that they receive

3   because it's an expedited process, there are less opportunities

4   for review, that's okay.

5          It's just how the process has been applied or what the

6   regulations provide in terms of the process, is what your

7   argument is?

8          MR. RUSSELL:  Yes.  Well, I think the constitutional

9   argument is that the sort of current regime under the

10  preexisting regulations that the rule and guidance apply to

11  this population of people who categorically have already

12  entered the United States and are within the United States, the

13  rule and guidance are unconstitutional for that reason.

14         And in terms --

15         THE COURT:  Okay.  And then --

16         MR. RUSSELL:  I'm sorry.  I don't mean to interrupt.

17         THE COURT:  No, no.  Go ahead.

18         MR. RUSSELL:  In terms of the statute, we do also make

19  a constitutional avoidance argument about the statute, itself.

20  And we think the statute can be -- is ambiguous in the respects

21  that we identified in the brief in terms of the process to

22  determine removability, the process to determine continual

23  presence and the process for determining whether someone needs

24  to be referred to an asylum screening interview.

25         We think the government has acknowledged that the

1  statute is ambiguous in those ways.  And so I think -- you

2  know, that's also part of why I don't think we're arguing that

3  the statute is constitutional, because we think the statute is

4  actually ambiguous in these various respects and can be

5  interpreted to require reasonable notice or reasonable

6  opportunity to contest these predicates of expedited removal.

7         And so I think on that basis, we would urge Your Honor

8  to interpret the statute to require meaningful process in those

9  ways.

10        And then as -- we think the rule and the guidance are

11  unconstitutional, or rather violate the statute, because they

12  fail to provide what would be reasonable notice, meaningful

13  opportunity and actual opportunity to contest expedited removal

14  as to this population of people to whom they apply:  People who

15  have been here longer than 14 days, up to two years, and

16  therefore have, by definition, we think, entered the country

17  and are within the country.  Which raises the substantial

18  constitutional question.

19        THE COURT:  So can you just walk me through your

20  argument about the ambiguity of the statute and what you're

21  contending is ambiguous?

22        MR. RUSSELL:  Yes, Your Honor.

23        So I think the first thing we focus on is the

24  phrase -- with respect to removability, the statute says:  "An

25  immigration officer shall determine whether the noncitizen is

1     inadmissible on one of the specified grounds for expedited

2     removal."  But the statute doesn't describe what it means to

3     determine that, what the process is required.

4           I think on that point, the government in a formal

5     rulemaking last year, admitted that the statute was ambiguous

6     in that way.  It said as much, specifically.

7           And the same is true for the point about the language

8     about whether a noncitizen needs to be referred to an asylum

9     screening interview.  The statute says:  "If a noncitizen

10    indicates an intention to apply for asylum or a fear of

11    persecution, they shall be referred to an interview."

12          But the statute is ambiguous as to what it means for a

13    noncitizen to indicate that.  And the government, itself, in

14    the rulemaking last year recognized that ambiguity, and it used

15    it in order to try to interpret that provision in a certain

16    way.

17          I think a second point that defendants have pointed

18    out is that Judge Sullivan, in his decision in the AILA case,

19    actually found the expedited removal statute ambiguous in the

20    ways that we identify.

21          Judge Sullivan said that the statute is ambiguous as

22    to whether noncitizens need to be given reasonable advance

23    notice of the charges for expedited removal, whether they need

24    to be given a meaningful opportunity to respond, including

25    whether they need to have an ability to consult with counsel or

1   others during inspection for expedited removal.

2        Now, in that decision, Judge Sullivan went on to apply

3   Chevron deference.  And so in the claim in that case, which

4   didn't involve invocation of the canon of constitutional

5   avoidance, Judge Sullivan found that the regulations were

6   reasonable, applying Chevron deference.

7        But since there was no invocation of constitutional

8   avoidance there, I think what's important from AILA and really

9   the only way in which AILA is directly relevant to this case is

10   the fact that Judge Sullivan found the statute ambiguous in

11   precisely the ways that we argue.

12        And because constitutional avoidance trumps Chevron

13   deference, as the D.C. Circuit has stated repeatedly, here,

14   where there is an argument of constitutional avoidance, and we

15   think we have identified a significant constitutional issue, we

16   think Your Honor can and should interpret those same

17   ambiguities in the statute that Judge Sullivan identified in

18   AILA, that the government acknowledged exist in the rulemaking

19   last year, and interpret them to require reasonable notice that

20   predicates expedited removal and a meaningful and real

21   opportunity to contest them, including the ability to consult

22   with counsel or others who could bring other relevant evidence.

23        THE COURT:  What does that decision look like?  I

24   would interpret the statute as requiring specific procedures

25   that are not identified in the statute or regulation?  Is it

1    your contention that I could do something like that?

2          MR. RUSSELL:  No, Your Honor.  I don't think it would

3    be anywhere near that sort of detailed.  I think that Your

4    Honor could follow the example of cases like, Zadvydas v. Davis

5    and Clark v. Martinez that are cited in our briefs, where the

6    Supreme Court interpreted an ambiguous silence in a different

7    immigration statute to require reasonableness, essentially.

8          And I think that's all we would ask, Your Honor, to

9    interpret the statute to require:  Reasonable notice,

10   reasonable and meaningful opportunity to contest the charges.

11         And we think that reasonableness gives flexibility, so

12   that it doesn't mean, for example, that interpreting the

13   statute in this way means that expedited removal as applied at

14   the border to people who come to the port of entry or who are

15   apprehended just across the border line, as in the Supreme

16   Court's decision in DHS v. Thuraissigiam, for example.

17         What's reasonable in that context would, I think, be

18   much less process and could be, essentially, the very minimal

19   process that the government has provided when expedited removal

20   has been confined to essentially those populations who don't

21   have a liberty interest in coming into or remaining in the

22   United States.

23         But we think for this population, that reasonableness

24   requirement of the statute, as properly interpreted, requires

25   more process than the regime that the rule and guidance impose

1  on noncitizens who have been here longer than 14 days, have

2  affected their entry into the country and do have a liberty

3  interest in remaining here.

4          And we think because the rule and guidance failed to

5  provide the reasonable notice, reasonable opportunity to

6  contest charges that we think the statute requires, the rule

7  and guidance violate the statute and are unlawful and should be

8  stayed on that basis.

9          THE COURT:  And then can you explain in terms of your

10  position that the Constitution requires a neutral adjudicator,

11  are you suggesting that that would have to be an IJ?

12          MR. RUSSELL:  So I think in terms of the

13  constitutional avoidance argument, I think the -- that's an

14  area of neutral review, neutral adjudication, where I think

15  there's not the same leeway in the statute.

16          THE COURT:  That was going to be my next question.

17          MR. RUSSELL:  Right.  That's why it's all the more

18  important, that kind of what reasonable notice and reasonable

19  meaning to contest for this population needs to be there, needs

20  to be enforced, because where there's not -- obviously, what

21  kind of processes do involves a balancing of the different

22  factors.

23          And so where neutral adjudication, neutral review of

24  certain critical issues isn't available under the statutory

25  scheme, if you're interpreting the statute I think that this

1  makes it all the more important that where there is this

2  ambiguity and leeway in the statute, to be properly interpreted

3  to require reasonable notice, meaningful opportunity to

4  contest, that those have real substance, so as to sort of

5  balance against the risk of error that comes from not having

6  neutral adjudication by enforcement officers.

7         THE COURT:  And then in terms of the process afforded,

8  so there is language that seems to suggest that a person has an

9  opportunity to establish, for example, that they've been here

10  for a continuous period for two years.

11         So what's problematic about a process that affords --

12  I mean, you might say in practice that's not happening.  But

13  just on the face of what's written there seems to contemplate

14  an opportunity for a person to make that showing and

15  demonstration.  So what's the problem with that from your

16  perspective?

17         MR. RUSSELL:  So we think the kind of current scheme

18  under the regulations that the rule and guidance impose on this

19  new population of people, there is nothing in the regulations

20  that require a reasonable notice of a need to establish that to

21  your continuous residents, nothing that requires a meaningful

22  opportunity to present evidence.

23         And I think you can contrast that with there is a

24  provision in the regulations at 8 C.F.R. Section 235.3(b) -- I

25  forgot the subsection at the moment, but there is a provision

1    in there that speaks to if someone is making a claim that they

2    have been previously lawfully admitted, there there's reference

3    in the regulations to a person shall be given a reasonable

4    opportunity to try to make that showing.

5         There's nothing similar in the regulations about

6    establishing meaningful presence -- or rather establishing a

7    continuous presence, excuse me.  We think that difference is

8    significant and, as Your Honor noted, I think the practical

9    reality under the regulations is that these determinations are

10   made essentially right away.

11        The notice of expedited removal is on the same form as

12   the officer's determination that someone is removable.  A

13   continuous presence determination is made sort of right along

14   with that determination, and we don't think that kind of the

15   timing of that, that there is no kind of advance notice of what

16   somebody will need to show and kind of whether they'll be given

17   a reasonable amount of time to make that showing, is dictated

18   by the statute or by the regulations.

19        THE COURT:  And then just, we were talking about the

20   Thuraissigiam case.  There's language in that opinion that says

21   aliens who arrive at ports of entry, even those paroled

22   elsewhere in the country for years pending removal, are treated

23   for due process purposes as if stopped at the border?  How do

24   you interpret that passage?

25        MR. RUSSELL:  That's discussing kind of a separate

exception that the Supreme Court has recognized to the basic

fundamental principle that people who are within the United

States have due process rights and have a liberty interest in

being here and remaining here and, therefore, in contesting

their removal.

So that's speaking to sort of a situation where it --

this kind of parole situation that evolved out of an early

practice of letting someone literally kind of off the boat and

be detained on shore, and that wasn't giving them more rights

than if they had been forced to stay on the boat, or eventually

kind of letting them be paroled into the country and not giving

them more rights than if they had remained detained at the port

of entry.

So that's a very specific legal fiction the Supreme

Court has recognized in that context, for people who come to

ports of entry and are paroled and by kind of an act of

administrative grace, are let come into the country while their

proceedings are pending.

I think in the Thuraissigiam case, the Supreme Court

recognized another limited exception to the general principle

that people who are here have a liberty interest in being in

the country. And that was for people who had not yet -- could

not yet be said to have affected an entry, like the noncitizen

in Thuraissigiam itself, who was apprehended 25 yards from the

border line, just after crossing.

1    But in Thuraissigiam, the Supreme Court -- that case

2    turned on the fact that, as the Court emphasized, the

3    noncitizen there, "could not be said to have affected entry."

4    And so we think, certainly, the Supreme Court has not

5    extended either of those exceptions to people who are within

6    the United States, have affected an entry.  And that principle

7    goes back over a century, all the way back to the Supreme

8    Court's decision in Yamataya v. Fisher in 1903.

9    The Supreme Court has reaffirmed that principle

10    repeatedly over the years.  In Mezei in 1953, the Court said

11    that once a noncitizen passes through our gates, even if

12    illegally, they can only be expelled following a procedure that

13    accords with the requirements of due process.

14    And the Court repeated that rule in 2001 in Zadvydas

15    v. Davis, citing back to Mezei, which in turn cited back to

16    Yamataya.  And in the Supreme Court's decisions just this year

17    in the Alien Enemies Act context, in the latest case, AARP v.

18    Trump, the Court cited again to Yamataya or the principle that

19    noncitizens -- that no person can be removed from the United

20    States without meaningful opportunity to be heard in accordance

21    with due process.

22    And we think that is significant.  I mean, both of the

23    courts cited to Yamataya, and on the face of that Alien Enemies

24    Act proclamation, the first sentence of the proclamation that's

25    at issue in that case, this is at 90 Federal Register 13033,

1    the first sentence is:  "Tren de Aragua," which is the gang at

2    issue, "is a designated foreign terrorist organization with

3    thousands of members, many of whom have unlawfully infiltrated

4    the United States."

5         The third sentence in the proclamation begins:  "Tren

6    de Aragua has engaged in and continues to engage in mass

7    illegal immigration to the United States."

8         But nowhere in either of the Supreme Court's decisions

9    in JGG or AARP this spring did the Supreme Court indicate that

10   there was a lawful admission threshold to the application of

11   due process and removal proceedings.

12        And so we think that rule from Yamataya that's been

13   repeatedly reaffirmed since applies.  And the government's kind

14   of contrary rule that due process rights attach only when after

15   someone has been lawfully admitted to the country, we think is

16   not supported even by the main case they cite, Thuraissigiam,

17   which again turned on the fact that the noncitizen there,

18   quote, could not be said to have affected an entry.

19        THE COURT:  Let me just ask you.  In your view, the

20   line is 14 days?

21        MR. RUSSELL:  I think in our view the line is -- the

22   determination is whether someone has affected their entry into

23   the country and is within the United States.

24        As a practical matter, I think -- we think that the

25   14-day -- the 2004 designation that went up to 14 days and

1  within 100 miles of the border is probably overbroad as a

2  categorical matter.  I think there's probably lots of people

3  who would have entered the country well within before 14 days.

4         But in a sense, that's water under the bridge because

5  that designation can't be challenged because of the time limit

6  provision in 1252(e)(3)(B).

7         And then, also, I think, even if someone had tried to

8  challenge it at that time, that would have been a much more

9  difficult challenge in this case, because also within that

10 population of people right at the border up to 14 days, the

11 vast majority of those cases as expedited removal is actually

12 applied at the border are people like the noncitizen in

13 Thuraissigiam who's apprehended right at the border line or who

14 present themselves to officials right across the border line in

15 order to try to seek asylum.

16     THE COURT:  I guess I'm just trying to figure out

17 where and how to draw the constitutional lines and what the

18 authority is.  So your line is for those who have affected

19 entry into the United States, they have due process rights that

20 entitles them to more -- well, I could read into the statute a

21 requirement of certain minimal due process rights or find as a

22 constitutional matter that this is unconstitutional regulation

23 because it doesn't afford those rights.

24         And so affected entry means what?

25     MR. RUSSELL:  I think affected entry means having

1   completed your entry into the United States. I think as a

2   practical matter, that might mean something like coming to

3   repose, not being surveilled or pursued by immigration

4   authorities at the border, you've kind of come into the

5   country, you are among the population, as it was phrased in

6   Yamataya.

7         The noncitizen in Yamataya had been in the country for

8   just four days, had taken up residence in Seattle with her

9   uncle, who she had come in with. And the Supreme Court there

10   said that she had due process rights, that deportation

11   implicated liberty interest.

12         So we think that -- but, again, the reality is that

13   because Congress has restricted as-applied challenges to

14   expedited removal, normally I think there could be case-by-case

15   litigation about whether someone who is, say, in that 14-day --

16   under-14-day category, subject to the 2004 designation that

17   applied expedited removal between ports of entry at the border,

18   there could be a case-by-case federal litigation kind of

19   applying that constitutional line in individual cases. But

20   Congress hasn't permitted that kind of as-applied litigation.

21         THE COURT: And what about the substantial connections

22   language that is in some of the case law? What is your

23   position on how to read that over what's at issue in this case?

24         MR. RUSSELL: So the substantial connection language

25   comes from cases that are about people like lawful permanent

residents who are returning to the United States.  So it's not imposing a requirement that people have substantial connections if they are contesting their removal from within the United States.

Rather, those cases, like Mezei, which we discussed in the brief, are kind of creating an exception from the general rule that people who are on the threshold have no liberty interest in entering the country and saying, well, we're not going to apply that rule in the same way to people, even if they're noncitizens who have lived here before, have substantial connections to the country, like lawful permanent residents or others.

So we don't think the Supreme Court has ever applied a substantial connection test for due process rights with respect to removal of people who are within the United States and are contesting their removal from the country or no longer on the threshold.  So I do think it would be a mistake to sort of read those cases to impose such a requirement on people who are within the country.

And I would note that the government goes even further than that.  They don't even advocate a substantial connections test.  They advocate that people literally have no due process rights unless and until they are lawfully admitted to the country.

And I think they suggest that it might require lawful

1    admission and then maybe also substantial connections after

2    that to require due process rights.  I think the implications

3    of that position are just untenable.

4         I mean, if that's correct then Congress could

5    constitutionally amend the statute to impose the same expedited

6    removal regime on people who have lived in the country for

7    five years, ten years, 25 years, however long, if they entered

8    without inspection and have not been lawfully admitted, instead

9    of two years under the current law.

10        And I just don't think that that position is tenable.

11   I mean, as the Supreme Court said in Boumediene, Congress does

12   not have the ability to unilaterally turn the Constitution on

13   and off in that way.

14        THE COURT:  Do you want to say anything about the

15   response of either the time bar or standing issues that the

16   government has raised?

17        MR. RUSSELL:  Yes, Your Honor, sure.  Let me take

18   standing quickly first.  First, I think they don't really

19   contest the zone of interests in the way that we are asserting

20   it, which is based on Make the Road New York's members.

21        THE COURT:  And also, I didn't read your complaint as

22   asserting any organizational standing.

23        MR. RUSSELL:  I mean, you can ask the government.  I

24   think the beginning of the Fontaine declaration sort of

25   describes Make the Road New York in a way that maybe could

1    suggest that it describes their legal service provision, their

2    work in kind of other ways than just as a membership

3    organization.

4         But I think it's clear that we are asserting

5    membership standing, associational standing and asserting that

6    as to the zone of interest, also.

7         So with respect to Article III standing, I think the

8    government actually only challenges it with respect to our

9    claims concerning affirmative asylum seekers, but I think the

10    fact is that Make the Road New York's members are directly

11    regulated by the rule and the guidance, and they have

12    identified multiple members who are subject to expedited

13    removal at any time under the rule and guidance, including

14    member John Doe Two, who has a pending affirmative asylum

15    application now and could be subjected to the guidance in a way

16    that we argue is unlawful.

17         And we think that's sufficient to confer Article III

18    standing, as then Judge Jackson correctly concluded in Make the

19    Road New York v. McAleenan, where, again, there is membership

20    standing asserted on behalf of members.

21         And in that situation, not just none of the members

22    had been identified as having been actually subjected to the

23    2019 rule that was at issue there, but no one across the

24    country had yet been subjected because there wasn't a situation

25    like that we're confronting now where there had been a huge

1    ramp up in enforcement.  It hadn't really been applied yet.

2          THE COURT:  Are you aware, since this expedited

3    removal procedure -- which I think was late 1990s; is that

4    right?

5          MR. RUSSELL:  Yes.

6          THE COURT:  Are you aware of the government ever

7    applying it to people who have been here closer to two years or

8    more than a year, for periods of months or years?

9          MR. RUSSELL:  So there was two previous kind of

10   expansion designations that could theoretically have kind of

11   swept in those people.  And the most recent one was, of course,

12   the 2019 designation that was litigated in the last round of

13   Make the Road litigation, and I'm not entirely sure but I think

14   by the end of the first Trump administration, sort of after the

15   appeal in that litigation, they did employ it at some small

16   scale, although it was sort of very slow to happen.

17         THE COURT:  Prior to that are you familiar with --

18         MR. RUSSELL:  And the one other time it could have

19   happened is there was a 2002 designation concerning people who

20   entered the country by sea.  But I don't know if the government

21   can speak to this better.

22         THE COURT:  Okay.

23         MR. RUSSELL:  But I'll tell you my sense just kind of

24   from the face of that 2002 designation is that, although it

25   says technically that it applies to sea entrants who can't show

1    they've been in the country for two years or longer, I think

2    the language on the face of that designation makes fairly plain

3    that what is being envisioned there is apprehending people kind

4    of right at the shoreline, people coming in, say, to the coast

5    of Florida, apprehending them quickly.

6          The language from that designation -- this is 67

7    Federal Register 68925.  It says:  "This notice will ensure

8    that all aliens who arrive illegally by sea, whether

9    interdicted or not, will be subject to expedited removal

10   because interdicted noncitizens were already subject to

11   expedited removal because they had been interpreted to be

12   arriving aliens."

13         And the designation continues:  "This designation is

14   necessary to remove quickly from the United States aliens who

15   arrive illegally by sea and who do not establish credible fear.

16   This will deter additional aliens from taking to the sea and

17   traveling illegally to the United States."

18         So I think what's being envisioned there is kind of

19   apprehending people quickly at the shoreline and then removing

20   them quickly.

21         And I think that understanding of it is borne out by

22   the 2002 recession of the 2019 expansion designation.  It's at

23   87 Federal Register 16022 at Page 16024.

24         And there the administration explained that retaining

25   the expanded expedited removal authority would require time and

1    fact-intensive training for all current officers, agents and

2    supervisors, which I think, at the very least, strongly

3    suggests that there wasn't an ongoing practice of applying the

4    2002 designation within the interior of the country for

5    two decades by that point.

6          And frankly, as a practical matter, it seems like it

7    would be difficult to try to kind of assess who would be

8    specifically sea entrants once they're in the interior of the

9    country for weeks or months, or up to two years.

10         THE COURT:  Okay.  I don't have any other questions.

11    If you have anything -- at this point; I can't promise you I

12    won't have any more after I hear from the government.  But if

13    there's anything else that you wanted to cover, I'll hear from

14    you.  Otherwise, I'll hear from the government.

15         MR. RUSSELL:  Yeah, maybe just one last point, Your

16    Honor, which is I think that this regime that the rule and

17    guidance impose under the D.C. Circuit's decision in Propert v.

18    District of Columbia that we cite in the briefs, this kind of

19    regime, with no neutral adjudication, no advance notice, no

20    meaningful opportunity to respond to charges, can't even

21    lawfully be applied to deprive somebody of a rundown vehicle.

22         And so we certainly don't think it can be applied

23    consistent with due process to deprive someone of a liberty

24    interest and remaining in the United States.  Thank you.

25         THE COURT:  Okay.  I'll hear from the government.

1    But before we get started, is it the government's
2  position that anyone who's here unlawfully, regardless of how
3  long, doesn't have due process rights?
4          MS. MCGUIRE:  No, Your Honor.
5          THE COURT:  Okay.  What -- can you just -- can you
6  tell me what your position is in terms of when such rights
7  attach?
8          MS. MCGUIRE:  Such rights --
9          THE COURT:  Due process rights.  Where do I draw the
10 line or where does the Constitution draw the line about when a
11 person who is here, who the government contends is here without
12 lawful status, at what point or where is the line in which
13 they're entitled to due process under the Constitution?
14         MS. MCGUIRE:  So that line would be found in 1225(b),
15 specifically (b)(1)(A)(iii)(I).  And there, expedited removal
16 is cabined from a two-year time limit and for aliens that are
17 not admitted or paroled.
18         So removal proceedings would attach for someone
19 outside the scope of those parameters.
20         THE COURT:  Okay.  So I guess that means that it's
21 your position that Congress has set that line.  But I'm asking
22 just in terms of me reviewing for constitutional requirements,
23 what authority suggests that the Constitution sets the line
24 where the statute and regulations have set it?
25         MS. MCGUIRE:  So we can look to 8 U.S.C. 110(a)(13).

1    And there Congress delegated the secretary authority to, quote,

2    fill out the details of the expedited removal statute.

3            So while we understand that it's plaintiff's position

4    that 1225(b) is ambiguous per the word "determined," this

5    specific statute erases that stated ambiguity.  And there are

6    regulations and procedures, although truncated, for people that

7    are in expedited removal proceedings.  And that can be found in

8    8 CFR 235.3.

9            THE COURT:  I'm going to ask you about that, but I

10   guess I just want your position.  So your position is that the

11   line is two years?

12           MS. MCGUIRE:  Correct, Your Honor.

13           THE COURT:  Okay.  And I understand that that's what

14   the statute says.  I'm asking in terms of the Constitution or

15   Supreme Court precedent, et cetera, what authority would I rely

16   on to find that that's the appropriate line?

17           MS. MCGUIRE:  So -- and pardon my pronunciation --

18   Thuraissigiam decided that aliens -- the question is not

19   whether certain inadmissible aliens present in the United

20   States for more than two weeks can be removed throughout due

21   process.

22           The question is what constitutes that due process.

23   And in that case, SCOTUS announced that foreigners who have not

24   been admitted to the country, it is up to the executive or

25   administrative officers acting within the powers expressly

1  conferred by Congress to decide what due process is in that

2  context.

3      THE COURT:  So you're reading the case as to allow

4  Congress to determine what the Constitution requires?

5      MS. MCGUIRE:  Yes, Your Honor.

6      THE COURT:  Let's turn to the process afforded.  What

7  is your response to plaintiff's argument that the regulations

8  don't afford reasonable notice or an opportunity to demonstrate

9  that you've been in the country for a continuous period of at

10  least two years or the other points that they're raising?

11      MS. MCGUIRE:  This Circuit in AILA found that that

12  process was enough.  And while it is true that the plaintiffs

13  in AILA were seeking entry legally, this is a distinction

14  without a difference.  Aliens subject to the 2025 designation,

15  by definition, are inadmissible and subject to expedited

16  removal.  Congress treats them as standing at the border for

17  due process purposes.

18      So our position would be that this Court would be

19  bound by AILA's decision as to those procedures.

20      THE COURT:  And just kind of on the ground, because

21  plaintiffs have provided just some information through

22  declarations about what's happening.  What is your

23  understanding -- I'm curious -- about a person who, let's say,

24  is picked up when they're at a court hearing?  So they don't

25  know they're about to be picked up.  And they want to

1  demonstrate that they've been here for a period of two years

2  but they don't have any paperwork on them.

3       What is your understanding of what happens on the

4  ground?  What does it mean to afford the person the opportunity

5  to establish to the satisfaction of the immigration officer

6  that they've been here for that period?

7       MS. MCGUIRE:  Understood, Your Honor.  So what the

8  regulations say -- but I understand your question is different

9  and I would have to take that back to the agency to give you an

10 answer.

11      THE COURT:  Okay.  All right.  I'm sorry, I think you

12 were about to talk about something else and I cut you off to

13 ask that question.

14      MS. MCGUIRE:  Okay.  Does Your Honor want to keep on

15 due process or should I pivot to the argument?

16      THE COURT:  You can proceed.

17      MS. MCGUIRE:  Okay.  Make the Road, the only plaintiff

18 bringing this application, again tries to halt the Secretary's

19 sole and unreviewable discretion to expand expedited removal to

20 the fullest extent authorized by Congress.  Sole and

21 unreviewable discretion means just that, that the Secretary's

22 discretion is not subject to judicial review.

23      The Court should decline plaintiff's application for

24 three reasons.  First --

25      THE COURT:  Wait, can I ask you a question?  It's not

1    subject to judicial review except to the extent it raises a

2    constitutional question, correct?  I mean, they can challenge

3    constitutional questions?  And the Court has the authority to

4    opine and rule on those.

5            MS. MCGUIRE:  To the extent that it falls within

6    1252(e)(3).

7            THE COURT:  Okay.  Continue.

8            MS. MCGUIRE:  First, threshold bars blocked judicial

9    review and a stay of the effective date of agency action.

10   Specifically looking to 1252(f)(1), the language of

11   Section 705, the jurisdictional bar in 1252(e)(3)(B), the

12   previous Make the Road decision, Circuit decision, all bar

13   judicial review here.

14           THE COURT:  Of the APA challenge, which plaintiffs

15   kind of concede, right?  I mean, the Make the Road case didn't

16   deal or opine about constitutional questions, or do you

17   disagree?

18           MS. MCGUIRE:  We agree that the Circuit did not

19   directly determine those constitutional questions, but it would

20   be our position that the decision applies to foreclose this

21   challenge.  And that is true to the extent that plaintiffs are

22   making an arbitrary and capricious claim as to claim 6.

23           And for due process, plaintiffs are not necessarily

24   arguing that the due process received is in excess of the

25   designation authority, but that more due process is due.  And

1    the Circuit at Page 633 of the opinion said Congress

2    deliberately chose the designation to commit enforcement and

3    resources judgment to the Secretary's sole and unreviewable

4    discretion.

5              So to dovetail with the due process arguments iterated

6    in our briefs, we would contend that the due process provided

7    is enough.

8              THE COURT:  What's your authority that 1252(f)(1)

9    applies to this type of relief?

10             MS. MCGUIRE:  So the language of 1252(f)(1) generally

11   prohibits lower courts from entering injunctions that order

12   federal officials to refrain from taking actions to enforce,

13   implement or otherwise carry out provisions of part 4.  Part 4

14   encompasses 8 U.S.C. 1221 through 1232.

15             THE COURT:  Is there a case that says that a stay

16   pursuant to 705 is an injunction?  I thought the case law

17   suggested that vacatur was distinct from an injunction.  The

18   relief that they would be seeking in this case is distinct from

19   an injunction.  And so, by extension, then I guess a stay would

20   be distinct from an injunction in this context.

21             But do you have any authority in which a court has

22   looked at a motion pursuant to 705 and determined that it fell

23   within the class of what's prohibited?

24             MS. MCGUIRE:  Two responses to Your Honor's question.

25   First, although the Court was not looking at a 705 stay, this

1  Circuit in N.S. versus Dixon decided on June 27th or 26th of
2  this year, analyzed 1252(f)(1) against the backdrop of Aleman
3  Gonzalez, and explicitly stated that they were reading, in
4  light of Aleman Gonzalez, that there was a change in circuit
5  law from when they decided Grace v. Barr, that Aleman Gonzalez
6  expanded what they interpreted 1252(f)(1) to cover.

7         And as a second response, there is effectively no
8  difference between a stay and an injunction here.  And that is
9  because a standard for a 705 stay and an injunction is the
10 same.

11        Pausing the effective date of an agency action would
12 restrain, as 1252(f)(1) contemplates, the government from
13 implementing and carrying out the ruling guidance, just as an
14 injunction would.

15        And looking to plaintiff's prayer for relief is
16 telling.  They seek vacatur, declaratory relief, injunctive
17 relief, but the effect of granting any of that requested relief
18 would be to restrain the government from applying the
19 designation as written.

20        THE COURT:  So you're saying vacatur is the same as a
21 permanent injunction?

22        MS. MCGUIRE:  In this context, yes, Your Honor.

23        THE COURT:  And why in this context but not in the
24 typical or general context?

25        MS. MCGUIRE:  Because of the practical effect of

1    granting that relief in that the government would not be able

2    to apply the 2025 designation as written operationally.

3         THE COURT:  Okay.  Continue.

4         MS. MCGUIRE:  Additionally, the plain language of

5    Section 705 also precludes relief here.  705 says the statute

6    permits -- sorry, to postpone the effective date of an agency

7    action.  The word "postpone" means to put off or defer.

8    However, this statute does not permit the Court to postpone the

9    effective date of an agency action already in effect.

10        And we can look to Safety Clean (ph.) as illustrative,

11   where there we see an agency suspending the rule, not the

12   court.  But because the language "postponed the effective date"

13   appears in the provision for the agency's authority and the

14   court's authority, the use of identical phrasing in the first

15   and second sentences must be presumed to be intentional.

16        So under that construction of 705, it's also

17   defendant's position that the Court cannot enter plaintiff's

18   requested relief here.

19        Plaintiff is also unlikely to succeed on the merits

20   because the Court cannot even reach them.  And here the

21   government relies on the jurisdictional bar in 1252(e)(3)(B),

22   which states that any action instituted under this paragraph

23   must be filed no later than 60 days after the date the

24   challenged section, regulation, directive, guideline or

25   procedure described in romanette i or ii of subparagraph A is

1    first implemented.

2          This jurisdictional bar runs from a fixed point rather

3    than from this date of application of the challenged procedures

4    to a particular alien.

5          And here the government has two positions on when the

6    60-day time bar can begin to run.

7          Our first position is that the deadline was April 1st,

8    1997, because the 2025 designation animates expedited removal

9    authority that existed since expedited removal was implemented

10   in 1997.  And that is especially here because the Secretary has

11   expanded it to the fullest extent authorized by Congress.

12         THE COURT:  Let me ask you a question.  If at that

13   time the administration wasn't applying that designation to

14   people who -- I'm just going to say periods of months or years,

15   you're contending then that this organization would have had

16   standing to bring the same case they're bringing now at that

17   point?

18         MS. MCGUIRE:  Perhaps, depending on the contours of

19   that complaint.  But that is because the statute runs from when

20   the guidance is first implemented, not when it's first applied.

21         THE COURT:  What about the recent guidance that

22   they're challenging?

23         MS. MCGUIRE:  I'm sorry, Your Honor --

24         THE COURT:  So they're suggesting that there's been an

25   expansion of this process that encompasses more people than it

1    has previously.  And I guess that was my question before, in

2    that before could they have brought this challenge if it wasn't

3    being -- I mean, what would the standing be if no one was

4    enforcing it?

5          Wouldn't the government say this is speculative and

6    we've never enforced this and they've not shown that they're at

7    risk of this being enforced?

8          MS. MCGUIRE:  So the District Court in MMV addressed

9    this argument.  And there the Court compartmentalized issues of

10   standing and ripeness from the jurisdictional instructions

11   espoused in 1252(e)(3)(B).

12         THE COURT:  Okay.

13         MS. MCGUIRE:  And those instructions are separate from

14   ripeness and standing.  They're separate and aside.

15         THE COURT:  Okay.

16         MS. MCGUIRE:  And that is because this statute

17   dictates this Court's subject matter jurisdiction; it's not

18   really a statute of limitations.  But at a minimum, this

19   expansion was first implemented on July 23, 2019, when the

20   first Trump administration first implemented the expansion of

21   expedited removal to the fullest extent authorized by Congress.

22         And we can look to the 2025 Federal Register notice as

23   illustrative.  It specifically says the designation this notice

24   restores, the scope of expedited removal to the fullest extent

25   authorized by Congress as was previously established in the

1  July 23rd, 2019, notice.

2          Restore means to reinstate, put back, reinstitute.

3          1252(e)(3)(B) first starts the 60 days when it was

4  first implemented, and the use of the word "first" is critical

5  here.  The designation restores what was first implemented on

6  July 23rd, 2019.

7          Congress intended for there to be no or limited review

8  under this timeline, despite the fact that plaintiffs would

9  raise standing and ripeness defenses and it would offer a very

10 limited purview of judicial review.

11         THE COURT:  Can I ask you the same question I asked

12 plaintiffs?  And that is prior to 2019, I suppose, the limited

13 window where this process was expanded, are you aware of any

14 other administration or any history of applying expedited

15 removal to people who have been in the country for a period of

16 months or years?

17         MS. MCGUIRE:  I would need to take that back to the

18 agency.  But to that point, the 2002 designation did not

19 similarly cabin expedited removal to 14 days and a hundred air

20 miles as the 2004 designation did.

21         And because those parameters were not instituted, it

22 did give the agency authority to implement expedited removal to

23 the extent that an individual arrived by sea.

24         THE COURT:  I want to go back to understand what you

25 think the scope of the Court's authority is under this statute.

1  Because the statute does provide for review in this Court, and

2  so what is the government's position about what -- if there's a

3  provision that provides for jurisdiction in the DDC under 1252,

4  what are you arguing the scope of the Court's authority is?

5  What can I do and what can't I do under this statute in terms

6  of review?

7          MS. MCGUIRE:  So pursuant to the jurisdictional bar in

8  1252(e)(3)(B), it's the government's position that the Court

9  lacks jurisdiction over this case because it was not timely

10  brought.

11          THE COURT:  Okay.  What could a Court review with

12  respect to the statute?  What is in my jurisdiction?  I'm

13  taking it out the context of this case.  You're seeming to

14  suggest that relief under 705 is barred, and so I'm asking you

15  what does this Court have the authority to consider under this

16  statute.

17          MS. MCGUIRE:  So taking my answer out of what's

18  happening in this case, 1252(e)(3)(A) permits this Court to

19  make determinations and have judicial review over whether a

20  challenged provision is constitutional or otherwise in

21  violation of the law.

22          THE COURT:  Isn't that what we're doing here?

23          MS. MCGUIRE:  Correct, Your Honor.  However, it's the

24  government's position that 1252(e)(3)(B) imposes jurisdictional

25  consequences for this challenge not being timely brought.

1    THE COURT:  So but for the time bar, you don't contend

2  that I don't have the authority to rule on the question before

3  me?

4    MS. MCGUIRE:  The government would add one more point

5  and that is just to preserve our argument on zone of interests.

6    THE COURT:  Okay.

7    MS. MCGUIRE:  And so we would contend that Make the

8  Road is outside the zone of interest of what 1225(b) seeks to

9  protect.

10    THE COURT:  Does the prior Make the Road Circuit

11  decision answer the question of standing?

12    MS. MCGUIRE:  It does, Your Honor.

13    THE COURT:  What about the distinction between

14  organizational and associational standing?  Meaning

15  organizational standing might not be permitted, but I thought

16  that the question about whether this type of associational or

17  membership standing, I thought the Circuit said that that was

18  not a problem.

19    MS. MCGUIRE:  This Circuit did say that, Your Honor.

20  Our argument is a little bit different and it relies on 5

21  U.S.C. 702.  The APA provides a cause of action only to those

22  adversely affected or aggrieved by agency action within the

23  meaning of the relevant statute.

24    And so it's the government's position that 1225 --

25  neither 1225 nor 1252 regulate Make the Road's conduct or

1    create any benefits for which it may be eligible.  So

2    therefore, it's outside the zone of interest of what the

3    statute sought to protect.

4           THE COURT:  Okay.  You can continue.

5           MS. MCGUIRE:  In addition, the Secretary's designation

6    authority is committed to agency discretion by law.  And

7    Congress made clear that any designation made pursuant to the

8    statute is committed to agency discretion, which the Circuit's

9    decision in Make the Road affirms, and that is because

10   1225(b)(1) provides no discernible standards by which the Court

11   could evaluate the Secretary's judgment.

12          And here the Secretary has expanded this limit to the

13   fullest extent authorized by Congress.

14          THE COURT:  Can I go back?  I want to put the time bar

15   issue aside.  That's thoroughly briefed by the parties and I'll

16   consider that.  But there's no question that the Court has

17   jurisdiction and authority to review constitutional challenges,

18   correct?

19          MS. MCGUIRE:  Correct, Your Honor.

20          THE COURT:  So what is the government's position of

21   the relief that the Court is entitled to order?  If I can

22   conduct that kind of review but can't enjoin or vacate in this

23   context, what is the appropriate relief if I find or if a court

24   finds a constitutional violation?

25          MS. MCGUIRE:  I think that is precisely speaking to

1    defendant's point that there is no subject matter jurisdiction

2    to review this issue.

3         THE COURT:  But I thought that you said that the

4    statute specifically carves out constitutional challenges as --

5    do you remember I asked what is the government's position about

6    what a court could review, just in a vacuum outside of this

7    case?  And the first -- was it (e)(3)(B)?  The first thing you

8    said was the constitutional review and then you raised the fact

9    that this was time barred.

10        So I'm saying assume there was no issue with time bar

11   and this was just a constitutional challenge, the government

12   agrees that under the statute courts, particularly this Court,

13   has jurisdiction to review constitutional challenges?

14        MS. MCGUIRE:  Assuming there was no time bar issue.

15        THE COURT:  Yes.

16        MS. MCGUIRE:  Then that's correct.

17        THE COURT:  Okay.  So then my question is if the Court

18   has the authority to review, what remedies is the government

19   contending would be appropriate upon a finding of a

20   constitutional issue or violation?

21        MS. MCGUIRE:  Should the Court be inclined to issue

22   plaintiff any remedy, the government's position is that it

23   should be limited to Make the Road members.

24        THE COURT:  Right.  We'll talk about that in a minute.

25   But what remedies are available to the Court upon --

1    I'm just saying in a vacuum, not even this case.  I'm

2  not suggesting that I've decided that there is such a violation

3  or that you've conceded anything.  I'm just trying to

4  understand the government's position with respect to the scope

5  of available remedies.

6    So in the event that a court finds a constitutional

7  violation, we all agree the Court has jurisdiction and

8  authority under the statute to conduct a review of cases for

9  those constitutional questions.  What remedies are available to

10  the Court upon finding of a violation?

11    MS. MCGUIRE:  I think the Court would have to strike

12  down the statute.

13    THE COURT:  And that would not be an injunction?

14    MS. MCGUIRE:  No.

15    THE COURT:  Your argument before about essentially

16  prohibiting the government from enforcing its policies,

17  regulations, et cetera, if I found a constitutional problem, I

18  would be essentially saying the government can't do that,

19  right?

20    MS. MCGUIRE:  That's correct.

21    THE COURT:  And that's perfectly appropriate from your

22  perspective under the statute?  That's not a prohibited

23  injunction.

24    MS. MCGUIRE:  The government can provide supplemental

25  briefing.  I understand Your Honor's question.  I think the

1  government can answer it in the negative, which is not helpful

2  to the Court.

3      We would say it's not a stay, it's not an injunction,

4  and that declaratory and vacatur relief would mirror the

5  practical effects of what we say is prohibited by 1252(f)(1)

6  and the language of Section 705.

7      THE COURT:  And then your point about relief being

8  limited to the plaintiffs in this case, obviously I'm up to

9  speed on recent precedent concerning universal injunctions.  I

10  had thought that there was a carve-out or a distinction in

11  cases involving agency action.  What's the government's

12  position on that?

13      MS. MCGUIRE:  The government's position is even

14  acknowledging any APA carve-outs in those cases, that we would

15  still ask this Court to limit relief to Make the Road members

16  currently in expedited removals, and that can actually be

17  identified by plaintiff in this suit.

18      THE COURT:  And what's the authority for that?

19      MS. MCGUIRE:  Madsen versus Women's Health Center,

20  which is a Supreme Court case, 512 U.S. 753 pincite 765, and

21  the year of that case is 1994.

22      And there the Supreme Court found that in the context

23  of an injunction, that relief should be no more burdensome to

24  the defendant than necessary to provide complete relief to

25  plaintiffs.

1    THE COURT:  Okay.  I don't have any further questions.

2    If you have anything else you want to highlight, you can, and

3    then I'll let plaintiff respond.

4    MS. MCGUIRE:  Okay.  One more thing that I must say.

5    If the Court is inclined to grant plaintiff's relief,

6    defendants would ask that the Court stay the effect of the

7    ruling for 14 days, and that is because this ruling will

8    directly impact agency operations and it will also give the

9    Solicitor General's office an opportunity to determine whether

10   an appeal is appropriate.

11   THE COURT:  Okay.  Thank you.

12   MS. MCGUIRE:  Thank you, Your Honor.

13   THE COURT:  All right.  Yes.

14   MR. RUSSELL:  Your Honor, just a few points on the

15   threshold issues that you just discussed with the government.

16   First, on committed to agency discretion, Your Honor

17   had suggested that sort of even if that were an issue, you

18   could review constitutional claims.  But I would say that we

19   think that under the APA, this simply isn't committed to agency

20   discretion, the kinds of claims that we bring.

21   And Your Honor has authority both under the systemic

22   expedited removal review statute, Section 1252(e)(3),

23   specifically to review both arguments that a written directive

24   is unconstitutional or also otherwise in violation of law,

25   including statutory and regulatory violations like the ones

1  that we've raised.

2  And we also think that it's clear that the kinds of

3  constitutional and statutory violations that we allege are not

4  committed to agency discretion.

5  I think that a good recent Supreme Court case for that

6  point, which isn't cited in the briefs but is cited in the Make

7  the Road New York v. Wolf decision from the Circuit, is the

8  Supreme Court's 2019 decision in Department of Commerce v. New

9  York.

10  There, there was a claim that a decision by the

11  Secretary of Commerce was committed to agency discretion.  That

12  included claims that there was violations of some provisions of

13  the Census Act.

14  The Supreme Court said that those statutory claims

15  were amenable to review for compliance with those provisions of

16  the Census Act, which supplied law to apply.  We think here

17  also the due process clause and the statutes and regulations we

18  cite provide law to apply for Your Honor to make those claims

19  amenable to review.

20  I think kind of a textual point on the timeliness

21  argument under Section 1252(e)(3)(B).  Under that section, the

22  focus for the time limit is on the date of first implementation

23  of, quote, the challenged directive or guideline.

24  And here, as the complaint makes perfectly clear, the

25  only agency actions that plaintiffs challenge are the new rule,

1  as we call it, and the guidance.  We're not challenging the

2  regulations.  We're not seeking to stay or ultimately vacate

3  the regulations.  We are not seeking to strike down the

4  statute.

5          So I think both kind of in terms of the plain text of

6  that time limit provision, those are the agency actions that

7  are at issue, and I think also in terms of just final agency

8  action under the APA, those writings are clearly both new

9  expedited removal written policies within the terms of

10  Section 1252(e)(3), as well as new final agency actions under

11  the APA.

12          I think the Biden v. Texas case, which is discussed in

13  the briefs on another point, but I think rejects a similar sort

14  of -- in its discussion of final agency action under the APA,

15  rejects a similar sort of attempt that government just raised

16  to try to look behind the latest agency action to sort of

17  something behind it.

18          And the Supreme Court made it clear that something

19  like this that's a new written directive from an agency is a

20  new and final agency action.

21          I think one point in terms of the remedy, I think --

22  that are available under Section 1252(e)(3) actions, I think as

23  we point out in the briefs, the D.C. Circuit's decision in

24  Grace held that Section 1252(e)(3) does not limit the kinds of

25  remedies that are available.

1            I think on the sort of other points about the

2    availability of Section 705 relief, I think we would

3    essentially rest on the briefs.

4            The N.S. v. Dixon recent decision from the D.C.

5    Circuit that my friend on the other side mentioned, that's a

6    case about a class-wide injunction that enjoined federal

7    officials from making certain arrests of noncitizens.

8            So I think both in the subject matter and in the fact

9    that it was explicitly a class-wide injunction was just clearly

10   within the heart line -- the heartland, rather, of

11   Section 1252(f)(1).  It doesn't speak at all to whether vacatur

12   or stays under the APA also fall into that section.

13           THE COURT:  And then before you sit down, we didn't

14   talk about irreparable harm.  Can you explain kind of what

15   irreparable harm and kind of timeline and urgency in terms of

16   getting this relief?

17           MR. RUSSELL:  Yes, Your Honor.  If it's all right,

18   Mr. Balakrishnan is prepared to speak to those factors.

19           THE COURT:  All right.

20           MR. BALAKRISHNAN:  Thank you, Your Honor.  Anand

21   Balakrishnan for plaintiff Make the Road.  I'll be brief on the

22   irreparable harm because I believe it's clear.

23           Since the designation has been in full force and

24   effect over the past few weeks, primarily and initially in

25   courthouses but also in at-large arrests around the country,

1  our plaintiff organizational members are -- they themselves

2  have been targeted for potential placement in ER.  They could

3  be picked up at any time.

4          The procedures themselves, as has already been

5  discussed, provides for almost no process internally to the

6  system and no process under the government's view to obtain any

7  judicial review of any determination, even if it is facially

8  and plainly erroneous.

9          That harm for the members is not only to those who are

10  placed in ER but also to their family members.  I think the

11  declarations are clear about the trauma that this is causing to

12  individuals who are placed in ER and their families who are

13  otherwise obeying and following directives to go to court for

14  their hearings.

15          And, of course, outside of the members and the

16  organization, itself, its scope is clearly being felt across

17  the country, with countless people being put in.  That's

18  reflected in the declarations from advocates and lawyers sort

19  of reporting on what occurred from a few weeks ago.

20          I think that sort of is the irreparable harm in a

21  nutshell and we do think that -- that's the reason we're here

22  asking for sort of a stay in the preliminary lawsuit.

23          THE COURT:  Okay.  Thank you.

24          And then I do have another due process-related

25  question for plaintiffs.  I think it would be helpful for you

1    to nail down and just put a finer point on kind of what your

2    position is about what process the Constitution requires for

3    this type of proceeding and authority that supports that.

4         So if you could get granular in terms of this is what

5    the constitutional floor is and this is the best case that

6    explains why those specific procedures are required.

7         MR. RUSSELL:  Well, I guess, I'm sorry, I'm not sure

8    if I have a great case that sort of, like, says just what's

9    permissible at the floor line.  I think the D.C. Circuit's

10   decision in Propert v. District of Columbia is -- it's in a

11   different context about destruction of junk vehicles.

12        But I think the kind of regime there has a number of

13   elements that are similar to this.  There is very little notice

14   there, although more notice than is provided in expedited

15   removal.  There was a sticker placed on the car for 72 hours.

16   And that was held to be insufficient notice.

17        There was a sort of subjective determination made by

18   an enforcement officer about what constituted a junk vehicle,

19   and I think that mirrors in important respects the kind of

20   subjective determination about whether someone has shown,

21   quote, to the satisfaction of an immigration officer, whether

22   they've been in the country continuously for two years or

23   longer.  And there was no sort of specified process to be able

24   to meaningfully contest whether the car was junk.

25        It sort of happened on an ad hoc basis and whether

1  people had a real chance to present evidence was, again, kind

2  of at the whims of the enforcement officers.  So I think in all

3  those respects, that decision, although it's from back in 1991

4  and kind of a different context, obviously, speaks to a number

5  of the elements here.

6          I think the case from this District that we cite,

7  Daskalea, I believe, versus Washington Humane Society, from

8  2007, that's cited in the briefs is, I think, another good

9  example, again, from a different context about the Humane

10  Society serving as a municipal agency in a capacity to kind of

11  take people's allegedly neglected pets away from them.

12          So, again, a very different context but I think had

13  some of the same missing elements here about neutral view,

14  notice, meaningful opportunity to be heard.

15          And then I think in terms of notice that has to be

16  provided, I would point to the Supreme Court's decisions this

17  year.  Again, the Alien Enemies Act cases, JGG and AARP.

18          AARP, the Supreme Court said that 24-hour notice was

19  insufficient of the charge of being an alien enemy.  And that

20  was true even where the sort of process that would be available

21  if someone was able to take advantage of it would be full

22  habeas in District Court for a neutral district judge.

23          So the kind of process once it's accessed there would

24  be much more robust than what's provided under this regime.  In

25  an expedited removal, there's even less notice than 24 hours to

1    try to gather evidence or contest the charges of removal.

2           So I think those are kind of the cases that come to

3    mind in terms of identifying some deficiencies in process that

4    I think are analogous to the regime here.

5           THE COURT:  Thank you.  All right.  I will take this

6    under advisement -- oh, I'm sorry, I had another question for

7    the government.

8           I wanted you to respond to plaintiff's arguments about

9    the time bar and how they're challenging a specific new written

10   directive, and why that doesn't -- why the clock doesn't start

11   from that point.

12          MS. MCGUIRE:  So to respond to that specific argument,

13   it's the government's position that the clock started on

14   July 23rd, 2019.  And that's because the 2025 Federal Register

15   notice said that it was restoring what was expanded in 2019.

16   And looking at the plain meaning of the word "restore," it

17   means to put back, to reinstitute.

18          The language of the Federal Register notice also says,

19   as was previous -- I don't have my notes in front of me, Your

20   Honor -- as was previously, like, instated in the 2019 notice.

21   And so the 2025 Federal Register notice is not creating new

22   law.  It's, as a first position, animating law that was given

23   to the executive in 1997 or, as a second position, reinstating

24   what was expanded in 2019.

25          THE COURT:  I guess my question is why doesn't that

1    start the clock?  I mean, a subsequent regulation is always in

2    reference to a prior statute, or guidance might be in reference

3    to a prior regulation.

4         But obviously, there's some determination by the

5    executive that there needs to be further elucidation on what's

6    in the regulation or statute, and why can't a plaintiff

7    challenge a written directive, even though it refers to or

8    applies to something that was promulgated prior.

9         I mean, any regulation is going to be referring to a

10    prior statute, for example.  Right?  So couldn't the government

11    make that argument, like, well, you can't challenge this

12    because it is elucidating or explaining or providing guidance

13    as to something that was passed years ago?

14         MS. MCGUIRE:  So that's because the language in

15    1252(e)(3)(B) uses the magic words "first implemented."  And

16    the word "first" there is really important because it really

17    does mean when it was first implemented, which here was on

18    July 23rd, 2019.

19         THE COURT:  And then at some point it was rescinded?

20         MS. MCGUIRE:  Correct.

21         THE COURT:  Okay.  And then it was reimplemented?

22         MS. MCGUIRE:  Correct.  So the language the 2025

23    notice uses is the word "restore," which means to put back or

24    to reinstate what was first implemented on July 23rd, 2019.

25         THE COURT:  Okay.  Thanks, everyone.  I'm taking this

1    under advisement.

2        (Proceedings concluded at 11:22 AM)

3

4

5                    C E R T I F I C A T E

6

7            I, Stacy Johns, certify that the foregoing is an

8            accurate transcription of the proceedings in the

9            above-entitled matter.

10

11

12        /s/ Stacy Johns              Date: July 23, 2025

13        Stacy Johns, RPR, RCR
         Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| MAKE THE ROAD NEW YORK, et al., | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | No. 1:25-cv-00190-JMC |
| v. | ) | |
| KRISTI NOEM, Secretary of the U.S. Department of Homeland Security, in her official capacity, et al., | ) | |
| | ) | |
| *Defendants*. | ) | |
| | ) | |
| | ) | |

**MOTION TO POSTPONE EFFECTIVE DATE OF AGENCY ACTION**

Plaintiff Make the Road New York moves under 5 U.S.C. § 705 of the Administrative Procedure Act ("APA") to postpone the effective date of agency action. Plaintiff seeks an order postponing the effective dates of two actions: (1) Defendants' decision to apply expedited removal to certain noncitizens arrested anywhere in the country who cannot show "to the satisfaction of an immigration officer" that they have been continuously present in the United States for longer than two years, U.S. Dep't of Homeland Sec., Designating Aliens for Expedited Removal, 90 Fed. Reg. 8,139 (Jan. 24, 2025) ("Rule"); and (2) Defendants' Guidance implementing the Rule, Memorandum from Benjamine C. Huffman, Acting Sec'y, Dep't of Homeland Sec., to Caleb Vitello, Acting Dir., Immigr. & Customs Enf't, et al., Guidance Regarding How to Exercise Enforcement Discretion (Jan. 23, 2025) ("Guidance"). Defendants oppose this motion.

1

**JA-101**

Plaintiff files this motion to prevent the irreparable harm that its members, their families, and the public will suffer absent postponement of the Rule and Guidance. As detailed in Plaintiff's Memorandum of Law, over the past weeks, Defendants have moved aggressively to subject large numbers of individuals who have been living in the United States to expedited removal, both in New York and in other states across the country. Defendants have targeted noncitizens who are in ongoing removal proceedings before an immigration judge ("IJ"), where they have been pursuing asylum and other defenses against and relief from removal. Defendants have sought the dismissal of individuals' removal proceedings in immigration courts across the country, regardless of the progress of those proceedings; arrested and detained those individuals after they appear for court hearings without any notice; and abruptly placed them in expedited removal for swift deportation. Plaintiff Make the Road New York's membership includes individuals who are currently in removal proceedings and are vulnerable to Defendants' new enforcement tactics. Defendants' aggressive pursuit of expedited removal, pursuant to the Rule and Guidance, places Plaintiff's members at imminent risk of deportation without due process and separation from their families and communities in the United States.

This Motion is based upon this Motion; the accompanying Memorandum of Law; the supporting declarations and evidence filed concurrently herewith; the pleadings and filings in this case; any additional matter of which the Court may take judicial notice; and such further evidence or argument as may be presented before, at, or after a hearing on this Motion.

Dated: June 10, 2025                          Respectfully submitted,

                                              /s/ Anand Balakrishnan
                                              Anand Balakrishnan
Cody Wofsy (D.D.C. Bar No. CA00103)
Stephen B. Kang (D.D.C. Bar No. CA00090)      Michael K.T. Tan (D.D.C. Bar No. NY0636)
Morgan Russell                                Lee Gelernt (D.D.C. Bar No. NY0408)

Hannah Steinberg
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
425 California Street, Suite 700
San Francisco, CA 94104
(415) 343-0770
*cwofsy@aclu.org*
*skang@aclu.org*
*mrussell@aclu.org*
*hsteinberg@aclu.org*

Amy Belsher
Robert Hodgson
NEW YORK CIVIL LIBERTIES UNION
FOUNDATION
125 Broad St., 19th Floor
New York, NY 10004
(212) 607-3300
*abelsher@nyclu.org*
*rhodgson@nyclu.org*

Omar C. Jadwat
Sidra Mahfooz
Grace Choi
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2660
*abalakrishnan@aclu.org*
*m.tan@aclu.org*
*lgelernt@aclu.org*
*ojadwat@aclu.org*
*smahfooz@aclu.org*
*gchoi@aclu.org*

Arthur B. Spitzer (D.C. Bar No. 235960)
Aditi Shah (D.C. Bar No. 90033136)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF THE DISTRICT OF COLUMBIA
529 14th Street, NW, Suite 722
Washington, D.C. 20045
(202) 457-0800
*aspitzer@acludc.org*
*ashah@acludc.org*

*Attorneys for Plaintiffs*

3

## CERTIFICATE OF SERVICE

I hereby certify on June 10, 2025, I caused a copy of the foregoing to be transmitted to all Defendants through the CM/ECF filing system.

/s/ Anand Balakrishnan
Anand Balakrishnan
American Civil Liberties Union Foundation
Immigrants' Rights Project
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2660
abalakrishnan@aclu.org

4

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| MAKE THE ROAD NEW YORK, *et al.*, | ) ) ) |  |
| *Plaintiffs*, | ) ) ) | No. 1:25-cv-00190-JMC |
| v. | ) |  |
| KRISTI NOEM, Secretary of the U.S. Department of Homeland Security, in her official capacity, *et al.*, | ) ) ) |  |
| *Defendants.* | ) ) ) |  |

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION TO POSTPONE EFFECTIVE DATE OF AGENCY ACTION

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

FACTS ............................................................................................................................... 2

  A.  The Expedited Removal Process. ............................................................................. 2

  B.  Prior Limited Expansions of Expedited Removal. ................................................... 5

  C.  Decades of Evidence of Widespread Flaws in the Expedited Removal Process. .............. 6

  D.  The Trump Administration Dramatically Expanded Expedited Removal Without
Addressing the Flaws of the Existing System. .................................................................. 7

  E.  Defendants Are Now Aggressively Pursuing Expedited Removal Pursuant to the Rule
and Guidance. ....................................................................................................................... 8

LEGAL STANDARD ........................................................................................................ 13

ARGUMENT .................................................................................................................... 13

  I.  Plaintiff Is Likely To Succeed On The Merits. ........................................................ 13

    A.  Plaintiff Is Likely To Prevail On Its Due Process Claim. ..................................... 13

      1.  The Private Interests At Stake Are Of The Utmost Importance. ............................. 16

      2.  The Risk Of Error Is High. ...................................................................................... 18

      3.  The Probable Value Of Additional Safeguards Is High And The Government's
Interests Do Not Outweigh The Need For Them. .................................................... 26

    B.  Plaintiff Is Likely To Prevail On Its Claim That The Rule and Guidance Violate The
Expedited Removal Statute As Interpreted To Require Adequate Procedures. ............. 29

    C.  Plaintiff Is Likely To Prevail On Its Claim That Expedited Removal Cannot Lawfully
Be Applied To Noncitizens In The Interior Based Solely On Lack Of Valid Entry
Documents. ........................................................................................................................ 34

    D.  Plaintiff Is Likely To Prevail On Its Claim That Expedited Removal Cannot Lawfully
Be Applied To Affirmative Asylum Applicants. .............................................................. 37

  II.  Absent Postponement, Plaintiff's Members Will Suffer Irreparable Harm. ..................... 41

  III.  The Balance of Equities and the Public Interest Strongly Favor Postponement of
Defendants' Actions. ........................................................................................................ 42

CONCLUSION ................................................................................................................. 44

**JA-106**

## INTRODUCTION

The Supreme Court has "long held"—and recently reaffirmed—that "[t]he Fifth Amendment entitles aliens to due process of law in the context of removal proceedings," such that "*no person* shall be removed from the United States" without due process, including reasonable notice and a meaningful opportunity to be heard. *A.A.R.P. v. Trump*, 145 S. Ct. 1364, 1367 (2025) (emphasis added) (cleaned up). Defendants' Rule expanding expedited removal and related Guidance violate due process because they permit immigration enforcement officers to summarily remove noncitizens who have already entered the United States with no advance notice, no opportunity to meaningfully contest removal, and no hearing before a neutral adjudicator.

Plaintiffs filed this action to challenge the Trump Administration's expansion of expedited removal into the interior of the United States, warning of the severe due process violations that will result from the wholesale application of a process designed for apprehensions and removal at the border to people who have already entered and been living in the United States for up to two years. Recent events necessitate emergency relief: In the past weeks, the Trump Administration has utilized the Rule and Guidance on an unprecedented, national scale to sweep into expedited removal people who were already undergoing regular removal proceedings before an immigration judge ("IJ"). With no advance notice to the noncitizens, Defendants are moving for IJs to dismiss people's removal proceedings; arresting and detaining people who have appeared for their court hearings as directed; and placing them in expedited removal proceedings, thereby denying them any meaningful opportunity to be heard before quickly removing them. This aggressive new implementation of the Rule and Guidance has sown fear in immigrant communities, as noncitizens who have been complying with their legal obligations now face the risk of arrest and summary deportation at their next court dates.

1

**JA-107**

Plaintiff Make the Road New York ("Plaintiff" or "Make the Road New York") files this motion to prevent the irreparable harm that its members, their families, and the public will suffer absent postponement of the Rule and Guidance.[1] Defendants' actions place Plaintiff's members at imminent risk of deportation and separation from their families and communities without due process. If the Rule and Guidance are not stayed, Plaintiff's members and thousands of noncitizens like them will be removed in violation of their constitutional and statutory rights. Indeed, even in its prior and far more limited application at the border, expedited removal already was rife with errors, resulting in the swift and wrongful deportation of U.S. citizens, lawful permanent residents, and bona fide asylum seekers, often to countries where they faced persecution, torture, or death.

Because Plaintiff faces irreparable harm absent a stay, is likely to succeed on the merits of its claims, and satisfies the other criteria for preliminary relief, this Court should postpone the effective date of the Rule and Guidance pending final adjudication of this case.

## FACTS

### A.    The Expedited Removal Process.

Before 1996, all noncitizens were entitled to full hearings in immigration court before immigration authorities could deport or exclude them, whether they sought admission at the border or had already entered the country. They were provided with the opportunity to investigate and prepare their cases, to retain and rely on the assistance of counsel, and to present and confront evidence before IJs. They also were entitled to two layers of review: an administrative appeal and subsequent federal court review. *See* 8 U.S.C. §§ 1105a, 1252 (1995); 8 C.F.R. § 242.16(a) (1995).

---

[1] Plaintiffs Mary and John, who were already unlawfully removed under the Rule and Guidance, do not seek interim relief through this motion.

In 1996, Congress enacted the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"), which retained full removal hearings as the standard procedure, while also creating a highly truncated process called "expedited removal." 8 U.S.C. § 1225(b)(1). IIRIRA authorized the use of expedited removal for noncitizens seeking admission at ports of entry and provided for possible future expansion of the procedure to the interior by administrative action, within certain limits.

Expedited removal can consist of two stages, although it often concludes after just one: first, inspection by an immigration officer, including questioning to determine whether a noncitizen fears removal and, if so, referral for a credible fear interview by an asylum officer; and second, where applicable, that credible fear interview and an opportunity for IJ review thereof. When a person applies for admission at a port of entry, the immigration officer must first determine if they are inadmissible either because they have engaged in fraud or lack a valid entry document (such as a visa). 8 U.S.C. § 1225(b)(1)(A)(i), (ii) (citing *id.* § 1182(a)(6)(C), (a)(7)). Someone who claims to be a U.S. citizen, lawful permanent resident, or refugee, or to have been granted asylum is entitled to limited additional review. *Id.* § 1225(b)(1)(C); 8 C.F.R. § 235.3(b)(5). Otherwise, if the officer concludes that the individual is inadmissible due to fraud or lack of valid entry documents, the officer "shall" order them removed "without further hearing or review unless the alien indicates either an intention to apply for asylum . . . or a fear of persecution." 8 U.S.C. § 1225(b)(1)(A)(i).

During the inspection stage, the individual is detained and denied the ability to contact or rely on the assistance of counsel. "Because the person is detained, he or she generally has no way to gather evidence." Declaration of Kara Hartzler ("Hartzler Decl.") ¶ 13. The inspection stage can, and generally does, begin and conclude in a matter of hours. *See* Declaration of Timothy Warden-

3

Hertz ("Warden-Hertz Decl.") ¶ 8 ("People who do not have legal representation can be shuffled through the process very quickly and may be deported without ever talking to an attorney."). The immigration officer's decision is subject only to a paper review by a supervisor. 8 C.F.R. § 235.3(b)(2)(i), (7). There is no administrative appeal. *Id.* § 235.3(b)(2)(ii).[2]

For many people, the inspection stage is the beginning and the end of the expedited removal process. Asylum seekers may gain access to the second stage, which is also flawed and does not remotely approach the process afforded in regular immigration proceedings. During inspection, the immigration officer must, in theory, ask the noncitizen whether they fear returning to their country and intend to apply for asylum. If the answer to either question is yes, the officer must, in theory, refer the individual for a credible fear interview with an asylum officer. *See* 8 U.S.C. § 1225(b)(1)(A)(ii), (B); 8 C.F.R. §§ 208.30, 235.3(b)(4). At that interview, the applicant must show "a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, that the alien could establish eligibility for asylum." 8 U.S.C. § 1225(b)(1)(B)(v). Asylum seekers are generally detained during credible fear interviews, 8 C.F.R. § 235.3(b)(4)(ii), and asylum officers normally conduct the interviews by phone, Declaration of Hannah Steinberg ("Steinberg Decl."), Ex. 6 (USCIRF 2025) at 7—even though the officer must evaluate the asylum seeker's credibility, 8 U.S.C. § 1225(b)(1)(B)(v).

If the asylum officer determines that a noncitizen meets the credible fear standard, the individual is placed in regular removal proceedings. Someone who does not pass the credible fear

---

[2] Federal court review is available only on a petition for habeas corpus where the issues are limited to whether the petitioner is a citizen; whether he was ordered removed under the statute; or whether he can prove that he is a lawful permanent resident, has been admitted as a refugee, or has been granted asylum. 8 U.S.C. § 1252(a)(2)(A), (e)(2).

interview may request review by an IJ, but receives only a limited hearing and has no right to further administrative or judicial review. 8 U.S.C. §§ 1225(b)(1)(B)(iii)(II)-(III), 1252(a)(2)(A)(iii).

>    **B.    Prior Limited Expansions of Expedited Removal.**

Congress authorized the Attorney General to expand the application of expedited removal beyond its initial scope. At its maximum, the congressional authorization encompasses certain noncitizens who were not lawfully admitted or paroled into the country and not continuously physically present for at least two years. 8 U.S.C. § 1225(b)(1)(A)(iii)(II). But Congress specified that the Attorney General (or, now, the Secretary of the Department of Homeland Security ("DHS")) must affirmatively designate the scope of any expansion of expedited removal before she can subject new groups of noncitizens to these truncated procedures. *Id.* § 1225(b)(1)(A)(iii)(I). For twenty years, the government chose not to expand expedited removal to its statutory limits, and at least one prior administration rejected such an extreme expansion because of concerns it would be illegal. *See* Steinberg Decl., Ex. 11 (USA Today, Feb. 24, 2017).

Instead, the government made only two much more modest expansions. In 2002, it authorized expedited removal to be used on a narrow group of people within the United States who had arrived by sea and were not continuously present for two years. 67 Fed. Reg. 68,924, 68,925-26 (Nov. 13, 2002). In 2004, it permitted the use of expedited removal on people apprehended within 100 air miles of a land border who could not show that they had been physically present in the United States for 14 days. 69 Fed. Reg. 48,877, 48,880-81 (Aug. 11, 2004). With only minor exceptions, the government has largely used expedited removal at and near the border.

**C.    Decades of Evidence of Widespread Flaws in the Expedited Removal Process.**

Nearly three decades of expedited removal have shown the process to be profoundly flawed, even when restricted to the border. Since 2005, a series of studies undertaken at Congress's direction by the statutorily-established U.S. Commission on International Religious Freedom ("Commission" or "USCIRF")[3] has repeatedly documented "serious problems" in the expedited removal process. Steinberg Decl., Ex. 4 (USCIRF 2005) at 4-5, 10; *see id.*, Ex. 5 (USCIRF 2016) at 2 (finding "continuing and new concerns" with immigration officers' "interviewing practices and the reliability of the records they create" as well as "inadequate quality assurance procedures"); *id.*, Ex. 6 (USCIRF 2025) at 3 (concluding that "many of the problems [the Commission] has repeatedly documented," "including flawed screening and documentation practices, [and] a lack of training and quality control," still "remain unaddressed"); *see also* Declaration of Yael Schacher ("Schacher Decl.") ¶ 5.

As set forth in detail below, each stage of expedited removal is rife with errors that are left unaddressed due to the lack of a meaningful opportunity to consult with an attorney, the lack of review by a neutral adjudicator, and other procedural deficiencies. *See infra*, Argument Section I.A. At the inspection stage, immigration enforcement officers routinely make factual errors that result in erroneous expedited removal orders. This has included repeated mistakes even in applying the much narrower 14-day continuous presence requirement. Immigration officers have also repeatedly applied expedited removal to U.S. citizens and others not lawfully subject to the process. Legal service providers report systemic interpretation and translation failures throughout the process. Immigration officers routinely ignore or fail to record noncitizens' expressions of fear of

---

[3] *See* 22 U.S.C. § 6474 (authorizing study); *see also* H.R. Rep. No. 105-480, pt. 3, at 17 (1998) (recognizing that immigration officers "may not always be following [agency] procedures designed to ensure that potential asylum claimants are properly referred" for interviews).

6

removal, denying them the opportunity for credible fear interviews. And the credible fear interview process itself is often rushed and unfair. *See id*.

**D.    The Trump Administration Dramatically Expanded Expedited Removal Without Addressing the Flaws of the Existing System.**

The expedited removal system was flawed when applied to the more limited class of noncitizens apprehended near the border. Nonetheless, in July 2019, at the direction of President Trump, DHS authorized the application of expedited removal to certain noncitizens arrested anywhere in the country who could not show that they had been continuously present in the United States for at least two years. 84 Fed. Reg. 35,409 ("2019 Rule"). Then-Judge Jackson preliminarily enjoined the 2019 Rule on the grounds that the Secretary failed to follow the notice-and-comment and reasoned-decisionmaking requirements of the Administrative Procedure Act ("APA"). *Make the Rd. N.Y. v. McAleenan*, 405 F. Supp. 3d 1, 11 (D.D.C. 2019). The D.C. Circuit reversed the district court's grant of the preliminary injunction on appeal and remanded the case so that the district court could consider other grounds on which the 2019 Rule had been challenged. *Make the Rd. N.Y. v. Wolf*, 962 F.3d 612, 618 (D.C. Cir. 2020).

On February 2, 2021, President Biden issued an Executive Order that directed the DHS Secretary to review the 2019 Rule and consider, *inter alia*, due process principles and humanitarian obligations. Exec. Order 14010, 86 Fed. Reg. 8,267 (Feb. 5, 2021).[4] On March 21, 2022, DHS rescinded the 2019 Rule. 87 Fed. Reg. 16,022 (Mar. 21, 2022). During the period the 2019 Rule was in effect, the government used it in an "exceedingly small number of cases." Steinberg Decl., Ex. 13 (Buzzfeed News, Oct. 14, 2021).

---

[4] In light of the Executive Order, the district court stayed its consideration of a renewed motion for preliminary injunction challenging the 2019 Rule on grounds not addressed by the vacated preliminary injunction decision. Minute Order, *Make the Rd. N.Y. v. McAleenan*, 1:19-cv-2369-KBJ (D.D.C. Feb. 8, 2021).

On January 20, 2025, President Trump issued Executive Order 14159. 90 Fed. Reg. 8,443. Consistent with the President's goal of rapidly deporting millions of immigrants, the Executive Order directed the DHS Secretary to "take all appropriate action" to apply expedited removal procedures "to the aliens designated under" 8 U.S.C. § 1225(b)(1)(A)(iii)(II). 90 Fed. Reg. at 8,445.

On January 21, 2025, DHS issued a notice, effective immediately, that authorizes application of expedited removal to certain noncitizens arrested anywhere in the country who cannot show "to the satisfaction of an immigration officer" that they have been continuously present in the United States for at least two years. 90 Fed. Reg. 8,139 ("Rule").[5]

On January 23, 2025, the Acting DHS Secretary issued a memorandum entitled "Guidance Regarding How to Exercise Enforcement Discretion" to implement the Rule. Steinberg Decl., Ex. 2 ("Guidance"). The Guidance directs DHS officers to consider "whether to apply expedited removal" to "any alien DHS is aware of who is amenable to expedited removal but to whom expedited removal has not been applied." *Id.* at 2. The Guidance authorizes officers to place individuals with pending asylum applications into expedited removal. *See id*. The Guidance further directs that applying expedited removal "may include steps to terminate any ongoing [regular] removal proceeding." *Id*.

Neither the Rule nor the Guidance, nor any other policies Defendants have instituted, address the existing flaws in the expedited removal system.

### E.    Defendants Are Now Aggressively Pursuing Expedited Removal Pursuant to the Rule and Guidance.

For the first three months after the expansion of expedited removal into the interior, Defendants appear to have been slow to implement their new authority, and Plaintiffs learned of

---

[5] The Rule is also attached as Exhibit 1 to the Steinberg Declaration.

only a handful of applications of expedited removal in the interior. That has now dramatically changed: Defendants are aggressively placing people in expedited removal pursuant to the Rule and Guidance.

In the past weeks, Defendants have undertaken an aggressive new enforcement initiative at immigration courts in New York and nationwide. This initiative specifically targets people who are in regular removal proceedings in immigration court, many of whom are pursuing asylum and other relief. *See generally* Steinberg Decl., Ex. 16 (N.Y. Times, May 30, 2025); *id.*, Ex. 17 (Wash. Post, May 23, 2025). The initiative has three basic components. First, DHS is orally moving to dismiss noncitizens' removal proceedings, with no advance notice, when people appear in immigration court for master calendar hearings (the equivalent of arraignments or pretrial conferences in criminal court), on the grounds that such proceedings are no longer in the best interests of the government under 8 C.F.R § 239.2(a)(7).[6] DHS is doing so even though the government's own Immigration Court Practice Manual requires that "filings must be submitted at least fifteen (15) days in advance of the master calendar hearing if requesting a ruling at or prior to the hearing." Steinberg Decl., Ex. 38 (Exec. Off. For Immigr. Review 2025); *see also* Koop Decl. ¶ 8. Despite that requirement, the Department of Justice issued written instructions to immigration judges stating that they may allow the government to move to dismiss orally, in court, without a written motion, and to decide that motion without allowing the noncitizen an opportunity to file a response. Dojaquez-Torres Decl. ¶ 9 & Ex. A.

---

[6] *See* Declaration of Vanessa Dojaquez-Torres ("Dojaquez-Torres Decl.") ¶ 3 (nationwide); Declaration of Gillian Rowland-Kain ("Rowland-Kain Decl.") ¶¶ 5, 8 (Varick Street and Broadway Immigration Courts in New York City and Buffalo Immigration Court); Declaration of Rosanna Eugenio ("Eugenio Decl.") ¶¶ 7, 10 (Federal Plaza Immigration Court in New York City); Declaration of Lisa Koop ("Koop Decl.") ¶¶ 6-7 (Chicago Immigration Court); Declaration of Audrey Gilliam ("Gilliam Decl.") ¶ 4 (Seattle Immigration Court); Declaration of Edna Yang ("Yang Decl.") ¶ 15 (San Antonio Immigration Court).

Second, ICE officers, in coordination with DHS trial attorneys, are stationing themselves in immigration courts—in the hallways or even in courtrooms—so that they can ambush noncitizens, immediately arresting and detaining them upon the conclusion of their court hearings.[7]

Finally, in cases where IJs have granted the government's motions to dismiss, the government has placed individuals in expedited removal—and, in some cases, deported people within a matter of days. *See, e.g.*, Declaration of Sienna Fontaine ("Fontaine Decl.") ¶¶ 35, 38 (explaining how noncitizens detained in immigration court were quickly moved out of New York City and toward deportation, such that, for example, "an individual detained in a New York City court on May 21 . . . had already been deported when a paralegal at [Make the Road New York] attempted to locate him . . . [on] May 27"); Declaration of William Botsch ("Botsch Decl.") ¶ 4 (explaining how, following their recent courthouse arrests, multiple noncitizens no longer appeared on the detainee locator system, indicating that they had most likely been removed, and one man's family confirmed that he had already been removed to Venezuela just days after being detained and placed in expedited removal).

This initiative is unprecedented. *See, e.g.*, Declaration of Rachel Levenson ("Levenson Decl.") ¶ 5 (in seven years of practice in immigration court, attorney had only once heard of an arrest there). This new initiative appears to be driven by the Trump administration's imposition of a new daily quota of 3,000 ICE arrests. *See* Steinberg Decl., Ex. 19 (Fox News, May 29, 2025);

---

[7] *See* Steinberg Decl., Ex. 16 (N.Y. Times, May 30, 2025) (describing coordination policy); Eugenio Decl. ¶ 12 (describing how plainclothes ICE officers "swarmed" noncitizens near courthouse elevator); Rowland-Kain Decl. ¶ 16 (arrests in the elevator of New York immigration court); Koop Decl. ¶¶ 7, 10 (arrests in hallway of Chicago Immigration Court); Gilliam Decl. ¶ 4 (arrests in hallway of Seattle Immigration Court); Yang Decl. ¶ 16 (arrests in hallway, lobby, and parking lot of San Antonio Immigration Court).

*see also id.*, Ex. 20 (Axios, May 28, 2025). Moreover, DHS has confirmed publicly that they are targeting people they believe are subject to the Rule and Guidance in order to move them from regular removal proceedings to expedited removal. *See id.*, Ex. 18 (Bill Melugin, May 22, 2025).

Despite their stated intentions, Defendants are nonetheless sweeping up people who are statutorily ineligible for expedited removal because they have been present in the U.S. for over two years. *See, e.g.*, Levenson Decl. ¶¶ 23-24 (detention of noncitizen who had been present for over two years); Pet. for Writ of Habeas Corpus, ECF No. 1, *Castillo Lachapel v. Joyce*, No. 25-cv-4693 (S.D.N.Y. June 4, 2025) (same); Pet. for Writ of Habeas Corpus, ECF No. 1, *Rojas Figuera v. Larocco*, No. 25-cv-3095 (E.D.N.Y. June 4, 2025) (same).

Defendants are even targeting people who have pending applications for relief, including for asylum. *See* Levenson Decl. ¶¶ 7, 18-24, 32-33 (detention of man whose partner was 8 months pregnant and who had applied for asylum, gay couple who feared persecution, asylum seeker married to a U.S. citizen, and 19-year-old who appears eligible for Special Immigrant Juvenile Status ("SIJS") and asylum due to fear of persecution); Declaration of Andres Cortes ("Cortes Decl.") ¶ 8 (motion to dismiss and detention of noncitizens who had asylum applications pending and expressed fear of return); Declaration of Siomara Umana ("Umana Decl.") ¶ 8 (same); Eugenio Decl. ¶¶ 9, 13 (same, as well as detention of a 20-year-old noncitizen eligible for SIJS).

The government's new policy has already deterred people from attending their removal proceedings. *See* Koop Decl. ¶ 16 ("The ICE arrests—as well as the noticeable presence of ICE agents near the entrance to and in the hallways outside of the Immigration Court—appear to have already caused people to miss their Immigration Court hearings"); Rowland-Kain Decl. ¶ 17 ("[I]n prior months . . . between forty to sixty pro se individuals [would appear each day at] Master Calendar Hearings; however, on May 29th, there were merely seven individuals and family units

who appeared."); Gilliam Decl. ¶¶ 24-26 ("unusually large number of *in absentia* removal orders" in days following courthouse arrests). Practitioners "have never witnessed this level of fear among immigrant clients in [their] years practicing immigration law." Rowland-Kain Decl. ¶ 17; Gilliam Decl. ¶ 26 ("The level of fear and distress expressed by immigrant community members . . . is unlike anything that I have seen in more than ten years of practicing immigration law.").

The government is systematically pursuing its new initiative in New York. *See* Rowland-Kain Decl. ¶ 8; Eugenio Decl. ¶¶ 7, 10. As a result—absent this Court's intervention—Plaintiff Make the Road New York's members with scheduled court dates in New York's immigration courts face the imminent risk of being placed in expedited removal and deported from the United States without due process. *See* Fontaine Decl. ¶¶ 19-26, 29 ("[T]he campaign to target individuals attending their immigration court proceedings for placement into expedited removal and detention by ICE has sent shock waves through Make the Road New York's members and the communities that we serve"); *see also* Fontaine Decl., Ex. A (Declaration of MRNY-John Doe 4 ("John Doe 4 Decl.")) ¶ 4 (member whose case DHS attempted to dismiss); *id.*, Ex. B (Declaration of MRNY-Jane Doe 2 ("Jane Doe 2 Decl.")) ¶ 4 (member in removal proceedings who fears placement into expedited removal).

In the first week of June, Defendants also launched a series of workplace raids reflecting yet another "new phase of the Trump administration's immigration crackdown." Steinberg Decl., Ex. 37 (N.Y. Times, June 7, 2025). White House "border czar" Thomas D. Homan told reporters: "You're going to see more work site enforcement than you've ever seen in the history of this nation." *Id.* A DHS spokesperson stated that "2,000 immigrants per day were arrested" during the first week in June. *Id.* It is therefore a near-certainty that even more people will be placed in expedited removal pursuant to the Rule and Guidance.

## LEGAL STANDARD

The APA authorizes district courts to "postpone" agency actions "to the extent necessary to prevent irreparable injury." 5 U.S.C. § 705. "Courts—including the Supreme Court—routinely stay already-effective agency action under Section 705." *Texas v. Biden*, 646 F. Supp. 3d 753, 770 (N.D. Tex. 2022) (citing, *inter alia*, *West Virginia v. EPA*, 577 U.S. 1126 (2016) (mem. op.)). To obtain relief under § 705, Plaintiff must show that (1) it will likely succeed on the merits, (2) it will likely suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in its favor, and (4) postponement is in the public interest. *Cath. Legal Immigr. Network, Inc. v. EOIR*, 513 F. Supp. 3d 154, 166 (D.D.C. 2021).

## ARGUMENT

### I.    Plaintiff Is Likely To Succeed On The Merits.

Plaintiff is likely to succeed on the merits of the four claims on which it bases this motion. First, the Rule and Guidance likely violate the due process rights of the noncitizens they newly subject to expedited removal. Second, the policies likely violate the expedited removal statute because they fail to provide the minimally adequate procedures the statute requires, as properly interpreted to avoid that serious constitutional question. Third, the Rule and Guidance likely violate the statute in a second respect, because the statute does not authorize the expedited removal of noncitizens who have already entered the United States on the basis that they lack valid entry documents. Fourth, the Guidance likely violates the regulations implementing the asylum statute, which do not permit the application of expedited removal to affirmative asylum applicants.

**A.      Plaintiff Is Likely To Prevail On Its Due Process Claim.**

"Procedural due process rules are meant to protect against the mistaken or unjustified deprivation of life, liberty, or property." *A.A.R.P.*, 145 S. Ct. at 1367 (cleaned up). Indeed, the Supreme Court has "long held that 'no person shall be' removed from the United States 'without opportunity, at some time, to be heard.'" *Id.* (quoting *Yamataya v. Fisher*, 189 U.S. 86, 101 (1903)).

The Rule and Guidance violate the fundamental due process rights—to meaningful notice and the opportunity to a fair hearing before a neutral decisionmaker—of people who have already entered the United States and therefore have a strong liberty interest in avoiding removal from the country. The Rule expands expedited removal far beyond its previous limits—individuals who, like the petitioner in *DHS v. Thuraissigiam*, were apprehended soon after crossing the border and thus could not "be said to have 'effected an entry.'" 591 U.S. 103, 140 (2020). The expansion challenged here applies to people who have effected physical entry and have been present in the United States for up to two years.

The due process rights of the people to whom the Rule and the Guidance applies require far more than the Rule provides. There is no advance notice of the charges or of the government's evidence. *See* 8 C.F.R. § 235.3(b)(2)(1)(ii) (notice of charges are issued at the same time and on the same form as expedited removal order); Steinberg Decl., Ex. 40 (Sample DHS Form I-860). But due process requires that "notice must be afforded within a reasonable time and in such manner as will allow [noncitizens] to actually seek . . . relief." *Trump v. J.G.G.*, 145 S. Ct. 1003, 1006 (2025); *see also Mullane v. Central Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950) (notice must "apprise interested parties of the pendency of the action and afford them an opportunity to present their objections" and "must be of such nature as reasonably to convey the required information").

14

The process places the burden on the noncitizen rather than the government, 8 U.S.C. § 1225(b)(1)(A)(iii)(II); 8 C.F.R. § 235.3(b)(1)(ii), (6)—an inversion of the burden required when stakes are so high. *Cf. Santosky v. Kramer*, 455 U.S. 745, 763 (1982) (holding that state should bear heightened proof burden in parental neglect proceedings because, *inter alia*, its "ability to assemble its case almost inevitably dwarfs the parents' ability to mount a defense").

The government is not required to permit noncitizens time to hire a lawyer or seek the assistance of any third party. *Cf. Ardestani v. I.N.S.*, 502 U.S. 129, 138 (1991) (explaining that "the complexity of immigration procedures, and the enormity of the interests at stake, make legal representation in deportation proceedings especially important").

Finally, there is no neutral adjudicator, but rather only a determination by an immigration enforcement officer who serves as both prosecutor and judge. *See* 8 C.F.R. § 235.3(b)(2)(ii); *see also Statewide Bonding, Inc. v. DHS*, 980 F.3d 109, 119 (D.C. Cir. 2020) ("The Due Process Clause entitles a person to an impartial and disinterested adjudicator.") (cleaned up). And while claims to certain lawful status and negative credible fear determinations can be reviewed by IJs, other key issues—including removability, continuous presence, and whether a noncitizen fears removal at all—are conclusively determined by enforcement officers with no possibility for IJ review.

Each of these deficits, on its own, would render application of the expedited removal process to people already within the United States unconstitutional. Together, they amount to a complete deprivation of the fundamental right to a full and fair hearing. The need for these procedural protections is demonstrated by the expedited removal system's track record in its past use at and near the border. *See infra*, Argument, Section I.A.2. But even without the ample

evidence of those errors, the system is unconstitutional as applied to people in the interior of the United States.[8]

Courts weigh three factors when determining what process is due: the private interests at stake; the risk of erroneous deprivation and probable value of additional safeguards; and the government's countervailing interests. *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). Each of these factors points in the same direction: The expansion of expedited removal to people who have already entered the United States and been in the country for up to two years violates due process.

### 1. The Private Interests At Stake Are Of The Utmost Importance.

The private liberty interests of Make the Road New York's members and others newly subject to expedited removal are of paramount importance. The Supreme Court has repeatedly held that the removal of people from within the United States implicates a "weighty" liberty interest. *Landon v. Plasencia*, 459 U.S. 21, 34 (1982); *see Bridges v. Wixon*, 326 U.S. 135, 164 (1945) (Murphy, J., concurring) ("[D]eportation . . . may result in poverty, persecution, and even death."); *Ng Fung Ho v. White*, 259 U.S. 276, 284 (1922) (Deportation "may result . . . in loss of both property and life, or of all that makes life worth living"); *see also Ardestani*, 502 U.S. at 138

---

[8] Plaintiff relies on declarations and other evidence to support its constitutional and statutory claims. In APA cases, "when a constitutional challenge to agency action requires evaluating the substance of an agency's decision made on an administrative record, that challenge must be judged on the record before the agency." *Bellion Spirits, LLC v. United States*, 335 F. Supp. 3d 32, 43 (D.D.C. 2018), *aff'd*, 7 F.4th 1201 (D.C. Cir. 2021). However, the record rule does *not* apply where a challenge does not require such an evaluation. *See id.*; *see also McKoy v. Spencer*, No. 16-cv-1313 (CKK), 2019 WL 400615, at *11 (D.D.C. Jan. 31, 2019). Here, Plaintiff seeks interim relief on the grounds that the Rule and Guidance violate its members' due process and statutory rights and subject them to expedited removal in violation of the INA and its implementing regulations. These claims do not ask the Court to evaluate the substance of the Secretary's decision to expand expedited removal based on an administrative record (if any such record exists). Nor could Plaintiff seek relief based on such a record-based challenge, which the D.C. Circuit has held is unavailable. *See Make the Rd. N.Y.*, 962 F.3d at 631-34 (holding that prior expansion could not be challenged as arbitrary and capricious).

16

(acknowledging "the enormity of the interests at stake" in immigration proceedings). The stakes are even higher for people who fear persecution, torture, or death if removed. *See INS v. Cardoza-Fonseca*, 480 U.S. 421, 449 (1987) ("Deportation is always a harsh measure; it is all the more replete with danger when the [noncitizen] makes a claim that he or she will be subject to death or persecution if forced to return to his or her home country."); *accord, e.g.*, *Kaweesa v. Gonzales*, 450 F.3d 62, 69 (1st Cir. 2006) (a noncitizen "seeking asylum or protection under the Convention Against Torture . . . clearly has a weighty interest in avoiding deportation").

People being subjected to the Rule and Guidance—including in courthouses across the nation—illustrate these weighty liberty interests. For example, many people subjected to courthouse arrests have pending asylum applications and a fear of persecution; others have U.S. citizen children and spouses. *See, e.g.*, Levenson Decl. ¶¶ 18-24 (courthouse arrests of asylum seeker married to a U.S. citizen who had been present for three years, asylum seeker whose partner was 8 months pregnant, and gay couple who feared persecution); Cortes Decl. ¶ 8 (courthouse arrests of noncitizens who had asylum applications pending and expressed fear of return); Umana Decl. ¶ 8 (same); Eugenio Decl. ¶ 9 (same); Dojaquez-Torres Decl. ¶ 11 (detainees include families with children as young as two and three years old, and ICE attempted to detain a mother with a nursing infant); Yang Decl. ¶ 16 (detention of "whole family units, including adults and their minor children").

Make the Road New York's members are no exception; they include John Does 1, 2, 3, and 4, and Jane Does 1 and 2, all of whom had been living in the United States for between 15 and 20 months when the amended complaint was filed, and some of whom have asylum applications pending. *See* Fontaine Decl. ¶¶ 19-26; *id.*, Ex. A (John Doe 4 Decl.) ¶¶ 2-3; *id.*, Ex. B (Jane Doe 2 Decl.) ¶ 2. Make the Road New York "also has numerous members" who have lived in the

17

country for longer than two years, but "would have difficulty affirmatively demonstrating two years of physical presence, particularly if suddenly detained or given only a short period of time to do so." *Id.* ¶ 41.

Plaintiffs Mary and John further illustrate the grave liberty interests at stake. They lived in the United States for ten years before being erroneously subjected to expedited removal under the Rule and Guidance. *See* Declaration of Mary ("Mary Decl.") ¶¶ 3, 8-11. Mary also has two U.S.-citizen children who remain in the United States. *Id.* ¶ 7. Already, therefore, the Rule has deprived Mary and John of residing with other members of their "immediate family, a right that ranks high among the interests of the individual." *Landon*, 459 U.S. at 34.

## 2. The Risk Of Error Is High.

The procedural deficiencies inherent in the expedited removal system make the risk of erroneous deprivation unacceptably high. The "troubling reality" is that expedited removal is "fraught with risk of arbitrary, mistaken, or discriminatory behavior" and can occur "without any check on whether the person understood the proceedings, had an interpreter, or enjoyed any other safeguards." *Khan v. Holder*, 608 F.3d 325, 329 (7th Cir. 2010). Indeed, the risk of error is already high when expedited removal is applied to people at the border or to people accused by immigration officers of having very recently crossed it, but at least in those situations, the factual predicates of expedited removal are typically straightforward. By contrast, by applying expedited removal to people who have entered and are living in this country, and for whom the answers to key questions like length of residence are far from obvious, the Rule and Guidance create a constitutionally intolerable removal system.

First, there is an unacceptable risk of error in the threshold determination concerning continuous presence in the United States. A person placed in expedited removal receives no

18

advance notice of either the government's charges or its evidence. *See* 8 C.F.R. § 235.3(b)(2)(1)(ii)

(notice of charges are issued at the same time and on the same form as expedited removal order);

Steinberg Decl., Ex. 40 (Sample DHS Form I-860). At the same time, that person "bears the

affirmative burden to show to the satisfaction of an immigration officer that [they have] been

present in the United States continuously for" two years or more. 90 Fed. Reg. at 8,140. DHS

officers therefore can presume, *without evidence*, that any individual they arrest is properly subject

to expedited removal. However, the "vast majority" of undocumented immigrants in this country

have been living here for longer than two years. Steinberg Decl., Ex. 30 (DHS 2024) (estimating

that 79 percent of the undocumented population as of 2022 "entered before 2010"); *see also id.*,

Ex. 14 (Ctr. for Migration Studies 2022) (estimating that, as of 2022, less than 12.4% of the

undocumented population present for less than two years had entered without inspection).

There is no requirement that noncitizens be permitted an opportunity to gather and present

evidence bearing on their continuous presence. *See* 8 C.F.R. § 235.3(b)(1)(ii); *cf. id.* § 235.3(b)(6)

(providing that the noncitizen "will be allowed to present evidence or provide sufficient

information to support" a claim of prior admission or parole). The Rule and Guidance do not even

require that noncitizens be provided an opportunity to make a phone call to a friend or family

member who can help them, or reasonable time to gather evidence. *Cf. Khan*, 608 F.3d at 326

(neither petitioner's counsel nor family "had been permitted to speak to him" while he was in

expedited removal proceedings). Moreover, the government's practices effectively preclude a

meaningful opportunity to gather such evidence, to prepare for the inspection by the immigration

officer, or any right or time to obtain counsel. *See, e.g.*, Schacher Decl. ¶ 15 (describing a

noncitizen denied an opportunity to rebut discrepancies and adverse facts caused by translation in

the wrong dialect). Nor is there any opportunity for a neutral adjudicator, such as an IJ, to review the question of continuous presence. *Id.* § 235.3(b)(2)(ii).

These procedural deficiencies, combined with the Rule's scope, make the risk of error unacceptable. Even in applying the prior 14-day continuous presence requirement, egregious errors occurred. *See, e.g.*, Steinberg Decl., Ex. 7 (ACLU 2014) at 63 (describing erroneous expedited removal of Mexican citizen who had lived in the United States for 14 years); Koop Decl. ¶¶ 27-29 (describing erroneous expedited removal of Honduran citizen who had lived in the United States for more than a decade); Declaration of Joanna Delfunt ("Delfunt Decl.") ¶¶ 7-10 (describing expedited removal order against individual who previously had not left the United States for three years).

Proving at least two years of continuous physical presence, while detained, alone, and without any opportunity to gather evidence, would be challenging for a U.S. citizen or lawful permanent resident, let alone for an undocumented person who may lack credit cards in their name or an identification document with a sufficiently early issue date. *See, e.g.*, Fontaine Decl. ¶¶ 41-43; Steinberg Decl., Ex. 15 (United States Citizenship and Immigration Services (USCIS) Form I-821D, Jan. 2025) (listing school records, employment records, bills, and military records as examples of documents to show continuous presence). For example, young people who came to this country as children may not have proof of physical presence easily accessible to them, or that evidence may be held by family members, whom they cannot contact while detained pending expedited removal proceedings. Fontaine Decl. ¶ 42. Even those who can locate such documents often will not physically have them at the time of apprehension. *Id.* ¶¶ 18, 41-43; *see also* Declaration of Holly Cooper ¶¶ 6-7 (explaining that detention centers do not provide confidential emails, fax, or other means of receiving documents other than mail, which takes 5-10 days to reach

20

detained clients). In addition, Make the Road New York has transgender members who recently changed their legal names, meaning that much of their proof of presence may be in a different name. Fontaine Decl. ¶ 41. In the absence of any meaningful, neutral review, there is no requirement that officers even document that contrary evidence was received, consider such evidence, or accurately weigh it in consideration of duration of continuous presence.

Without adequate due process protections, people who should not be subject to expedited removal at all—people like Plaintiffs Mary and John, who have lived in the United States for years—have already been and will continue to be erroneously removed. *See, e.g.*, Mary Decl. ¶¶ 2-12; Pet. for Writ of Habeas Corpus, ECF No. 1, *Castillo Lachapel v. Joyce*, No. 25-cv-4693 (S.D.N.Y. June 4, 2025) (person present for more than two years issued expedited removal order); Pet. for Writ of Habeas Corpus, ECF No. 1, *Rojas Figuera v. Larocco*, No. 25-cv-3095 (E.D.N.Y. June 4, 2025) (same); *Domingo-Ros v. Archambeault*, No. 25-cv-1208-DMS-DEB, 2025 WL 1425558, at *3 (S.D. Cal. May 18, 2025) (same); Delfunt Decl. ¶¶ 7-10 (noncitizens who had been present for over two years challenged expedited removal order on grounds they were not afforded an adequate process or representation by an attorney); *see also* Steinberg Decl., Ex. 7 (ACLU 2014) at 63 (noncitizen who had been living in United States continuously for 14 years wrongly subjected to expedited removal and denied a hearing).

Second, the same procedural deficiencies in the expedited removal process create a high risk of error in making the other threshold determinations about whether people are subject to expedited removal at all: whether someone has previously been admitted or paroled; whether they are inadmissible on grounds that make them subject to expedited removal; and whether they are ineligible for expedited removal because they are a U.S. citizen, lawful permanent resident, a refugee, or an asylee. Low-level officers decide these issues based on cursory interviews and

21

records checks. 90 Fed. Reg. at 8,139; 8 U.S.C. §§ 1225(b)(1)(A)(i), (iii); 8 C.F.R. §§ 235.3(b)(1)(i)-(ii), (b)(5). And officers have made recurring errors in these determinations even in the much more limited application of expedited removal at the border. Perhaps most egregiously, officers have even made errors in determining U.S. citizenship. *See Lyttle v. United States*, 867 F. Supp. 2d 1256, 1272-73 (M.D. Ga. 2012) (U.S. citizen erroneously issued expedited removal order without counsel); Steinberg Decl., Ex. 10 (Habeas Petition, *De la Paz v. Johnson*, No. 1:14-cv-16 (S.D. Tex., Jan. 24, 2014) (U.S. citizen erroneously subjected to expedited removal); *Matter of Lujan-Quintana*, 25 I. & N. Dec. 53, 54 (BIA 2009) (expedited removal order issued against U.S. citizen); Steinberg Decl., Ex. 8 (L.A. Times, Sept. 3, 2000) (expedited removal of U.S. citizen who was questioned by herself without counsel). Inspecting officers also routinely make errors in identifying unaccompanied minors, who by statute cannot be placed in expedited removal. 8 U.S.C. § 1232(a)(2)(B), (5)(D); *see* Hartzler Decl. ¶ 12 ("officers are often unable or unwilling to identify people who are juveniles").

Someone claiming U.S. citizenship, lawful permanent residence, or status as a refugee or asylee can in theory seek IJ review of those claims after an immigration enforcement officer issues an expedited removal order. *See* 8 U.S.C. § 1225(b)(1)(C). But unrepresented and detained people may have difficulty proving their status, as claims of lawful status can be complex and difficult to articulate. And, as noted above, the government is not required to provide noncitizens facing expedited removal with time or an opportunity to obtain counsel or the assistance of a third party. *See United States v. Ochoa-Oregel,* 904 F.3d 682, 685-86 (9th Cir. 2018) (addressing noncitizen subjected to expedited removal, despite claim that prior deportation did not extinguish his lawful permanent resident status). As the Supreme Court recently emphasized, the theoretical ability to

22

access review does not alone satisfy due process; the access must be real. *A.A.R.P.*, 145 S. Ct. at 1368; *J.G.G.*, 145 S. Ct. at 1006.

Third, due to the lack of procedural protections there is a well-documented risk of error in immigration enforcement officers' interviewing and documentation practices throughout the inspection process. This risk underscores the importance of review by a neutral adjudicator. USCIRF's 2005 study of the expedited removal system concluded that the statements officers take from noncitizens are "often inaccurate." Steinberg Decl., Ex. 4 (USCIRF 2005) at 74; *see also id.* at 53 (same, with respect to forms). The Commission's 2016 study "revealed continuing and new concerns" with immigration officers' "interviewing practices and the reliability of the records they create." *Id.*, Ex. 5 (USCIRF 2016) at 2. And its 2025 study found that "many of the problems it has repeatedly documented," "including flawed screening and documentation practices," "remain unaddressed." *Id.*, Ex. 6 (USCIRF 2025) at 3; Schacher Decl. ¶ 5. Often immigration officers do not even permit noncitizens to review their sworn statements;[9] they consistently fail to give noncitizens an opportunity to review and respond to the statements in the required paperwork;[10] and, even worse, they routinely pressure or coerce noncitizens into signing documents.[11] These

---

[9] *See, e.g.*, *United States v. Ochoa-Quinones*, 489 F. Supp. 3d 1184, 1187-88 (E.D. Wash. 2020) (concluding that failure to allow noncitizen to review statement violated due process); *United States v. Guzman-Hernandez*, 487 F. Supp. 3d 985 (E.D. Wash. 2020) (similar); *United States v. Caldera-Lazo*, 535 F. Supp. 3d 1037 (E.D. Wash. 2011) (similar); *United States v. Gonzales-Lopez*, No. CR-18-00213, 2020 WL 5210923 (N.D. Cal. Sep. 1, 2020) (similar); *United States v. Alvarez-Garcia*, No. 4:19-cr-6033-SMJ, 2020 WL 3445026 (E.D. Wash. June 9, 2020) (similar); Steinberg Decl., Ex. 9 (Slip Op., *United States v. Sanchez-Figueroa,* No. 3:19-cr-25 (D. Nev. July 25, 2019)) at 2, 9 (similar).

[10] Steinberg Decl. Ex. 4 (USCIRF 2016) at 21-22 (documenting that asylum seekers' statements were not read back to them, and that some were pressured to sign documents); *see also* Hartzler Decl. ¶¶ 5-10.

[11] *See* Warden-Hertz Decl. ¶¶ 5, 7; Yang Decl. ¶ 8; Hartzler Decl. ¶¶ 5-6, 10.

errors and abuses underscore the inherent dangers of a system in which enforcement officers serve as final adjudicators of most issues, with no review by a neutral decisionmaker.

Fourth, there is a persistent lack of adequate interpretation and translation. Once again, these errors can have devastating consequences in a process with no right to counsel or assistance and no neutral review over most key questions. Providers report systemic interpretation failures, leaving noncitizens unable to understand or communicate with government officials. *See* Declaration of Gracie Willis ("Willis Decl.") ¶¶ 7-8 ("numerous Mayan language speakers with fear-based claims . . . had little to no understanding of what was happening in their case" due to officers interviewing them in Spanish); Warden-Hertz Decl. ¶ 5 (150 Haitian men who, after being detained for a month, had yet to have any immigration official communicate with them in Creole).[12] Similarly, immigration officers have forced non-English speaking individuals to sign expedited removal forms without providing translations.[13]

Fifth, the existing system does not provide for any review of the decision to refer—or not refer—someone to an asylum officer for a credible fear interview. Multiple reports by the Commission and others have documented systemic flaws in this phase of the process, with asylum seekers who fear removal frequently denied credible fear interviews. *See* Steinberg Decl., Ex. 4 (USCIRF 2005) at 6, 53-55; *id.*, Ex. 5 (USCIRF 2016) at 2 (noting some "officers' outright skepticism, if not hostility, toward asylum claims"); *id.* at 18-23; *id.*, Ex. 6 (USCIRF 2025) at 11.

---

[12] *See also* Yang Decl. ¶ 9 (many people "received inadequate interpretation services during expedited removal interviews"); Declaration of Laura Lunn ("Lunn Decl.") ¶ 7 (same); Hartzler Decl. ¶¶ 7-8 (same); Steinberg Decl., Ex. 5 (USCIRF 2016) at 28 (same); Schacher Decl. ¶¶ 8, 12-13 (same); *see also* Steinberg Decl., Ex. 36 (DHS Advisory Comm. on Family Residential Ctrs. 2016) at 96-100 (discussing inadequate or nonexistent interpretation services during credible fear interviews and IJ reviews).

[13] *See* Hartzler Decl. ¶¶ 7-8; Yang Decl. ¶ 8; Steinberg Decl., Ex. 7 (ACLU 2014) at 35-36; *id.*, Ex. 33 (Borderland Immigr. Council 2017) at 13.

Indeed, one Commission study found that in *15 percent* of observed expedited removal cases, when a noncitizen expressed a fear of return to an immigration officer during the inspections process, the officer failed to refer the person to an asylum officer for a credible fear interview. *See* Steinberg Decl., Ex. 4 (USCIRF 2005) (emphasis added). A separate study similarly found that DHS erroneously failed to refer people who expressed fear of removal for credible fear interviews "[i]n 12% of cases." Steinberg Decl., Ex. 33 (Borderland Immigr. Council, 2017) at 12; *see also* Steinberg Decl., Ex. 34 (Human Rights Watch 2014) at 6 (fewer than half of noncitizens interviewed who expressed fear referred for credible fear interviews).

Practitioners report the same persistent problem.[14] Officers frequently record apparently "boilerplate language stating that individuals did not have a fear of return to their country of origin or that they were coming to the United States to work." Willis Decl. ¶ 5; *see also* Warden-Hertz Decl. ¶ 6 (same); Yang Decl. ¶ 7 (same); Hartzler Decl. ¶ 11 (same).[15] In other cases, officers actively interfere with noncitizens' efforts to express fear of return. *See* Koop Decl. ¶ 30 ("[Nonprofit] has spoken to people who were reluctant to express a fear of return because they experienced or witnessed violence and intimidation from CBP officers during the credible fear process."); Lunn Decl. ¶ 26 (officers told clients that "they are worthless, [that] they should give

---

[14] *See* Koop Decl. ¶ 22; Hartzler Decl. ¶ 14; Willis Decl. ¶ 9; Yang Decl. ¶¶ 4-6; Lunn Decl. ¶¶ 5-6; *see also* Steinberg Decl., Ex. 35 (Nat'l Immigr. Justice Ctr., Nov. 13, 2014) at 12-22 (reporting numerous instances in which "officials fail[ed] to capture [noncitizens' fear of removal] in the required documentation or include[d] mistaken information").

[15] Immigration officers' routine disregard of fear claims has increased in recent years under policies that eliminated the normal requirement that officers ask noncitizens if they fear removal, and instead required noncitizens to spontaneously "manifest" fear without being asked. *See* Koop Decl. ¶ 25; *see also* Steinberg Decl., Ex. 6 (USCIRF 2025) at 3; *id.*, Ex. 32 (Human Rights First, Aug. 2024) at 4-5; *id.*, Ex. 31 (Ctr. for Gender & Refugee Studies, Jan. 2024) at 1-2; Schacher Decl. ¶¶ 6, 17. The latest imposition of this "manifestation of fear" requirement was recently vacated as arbitrary and capricious. *Las Americas Immigr. Advoc. Ctr. v. DHS*, No. 24-cv-1702 (RC), 2025 WL 1403811, at *15-17, 21 (D.D.C. May 9, 2025).

up, or [that] they have no chance of staying in the United States"); Yang Decl. ¶ 6 (officer told

client that "asylum does not exist [] anymore" and other clients were told that they could not apply

for asylum).

Sixth, this risk of error extends to the credible fear interview stage. With no guarantee that

counsel can meaningfully participate, interviews are often truncated and unfair. *See* Steinberg

Decl., Ex. 12 (Congr. Testimony of Eleanor Acer, Human Rights First, Feb. 11, 2015) at 5

("interviews are sometimes rushed, essential information is not identified due to lack of follow up

questions, and/or other mistakes are made that block genuine asylum seekers from even applying

for asylum and having a real chance to submit evidence and have their case fully considered");

Schacher Decl. ¶ 7 (describing accelerated timeline that interferes with preparation and access to

counsel); *id.*, Ex. 3 (Am. Immigr. Lawyers Ass'n, Dec. 24, 2015) ("USCIS' negative fear

determinations are often flawed, with numerous substantive problems evident in the transcripts of

initial fear interviews."); Willis Decl. ¶ 12 (describing numerous issues related to interviews);

Lunn Decl. ¶ 18 (interviews lacked safeguards); *see also*, *e.g.*, Warden-Hertz Decl. ¶ 9 (describing

improper denial of credible fear and IJ review corrected only due to attorney intervention).

Again, these flaws were already egregious in the border context. But applying expedited

removal to the interior will amplify these problems. At the border, in the mine run of cases, there

is little question whether a person is arriving in the United States, and whether they lack a visa or

other document as required to be subject to expedited removal. But under the Rule and Guidance,

people will be arrested at courthouses or off the street and subject to these summary procedures,

even though they may have lived in this country for years or may even be U.S. citizens. The

endemic flaws in expedited removal will mean that people like Plaintiffs Mary and John will be

summarily removed despite not being legally subject to expedited removal at all.

26

### 3. The Probable Value Of Additional Safeguards Is High And The Government's Interests Do Not Outweigh The Need For Them.

Straightforward safeguards would mitigate the risk of error. Indeed, just last month, the Supreme Court held that noncitizens facing removal under the Alien Enemies Act were entitled to real, meaningful notice and an opportunity to be heard before they could be removed. *See A.A.R.P.*, 145 S. Ct. at 1367-68; *J.G.G.*, 145 S. Ct. at 1006. The same is true of noncitizens facing removal under the expedited removal statute. As explained *supra*, four basic safeguards would significantly reduce the risk of error.

First, noncitizens should be given greater notice of and an opportunity to rebut the government's charges against them and its adverse evidence. The Supreme Court held that noncitizens facing removal under the Alien Enemies Act "must receive notice that they are subject to removal under the Act within a reasonable time and in such a manner as will allow them to actually seek habeas relief before removal." *A.A.R.P.*, 145 S. Ct. at 1368 (cleaned up). Those noncitizens "must have sufficient time and information to reasonably be able to contact counsel, file a petition, and pursue appropriate relief"; "notice roughly 24 hours before removal . . . surely does not pass muster." *Id.* The same is true here: Noncitizens facing expedited removal must be given a reasonable opportunity to contest whether they are actually subject to expedited removal.[16]

---

[16] Indeed, the government recognizes that other kinds of removal orders should not be immediately executed, in order to give the noncitizen a chance to challenge them. *Accord* Deportation of Aliens in the United States; Expulsion, 51 Fed. Reg. 23,041 (June 25, 1986) (recognizing that noncitizens subject to deportation "will be held a minimum of 72 hours prior to removal by the Service, to ensure that due process is accorded the detainee"); 8 C.F.R. § 241.33(b) (preventing execution of removal order sooner than 72 hours after service of decision absent noncitizen's waiver); 8 C.F.R. § 241.22 (same); 8 U.S.C. § 1228(b)(3) (automatically staying execution of administrative removal order against noncitizens with aggravated felony convictions for 14 days unless waived by the noncitizen).

Second, immigration officers should also bear the burden of showing that the noncitizen is not admitted or paroled, and of establishing removability. In light of the government's superior access to evidence, the potential speed of the process, and the fundamental rights at stake, it is unfair to put this onus on the noncitizen. *Cf. Santosky*, 455 U.S. at 763.

Third, the simple opportunity to engage in consultation—with family, friends, or counsel—will also help ensure that noncitizens have a meaningful opportunity to gather evidence to demonstrate that they are not properly subject to expedited removal, and to respond to the government's evidence. *See Ardestani*, 502 U.S. at 138 (explaining that "the complexity of immigration procedures, and the enormity of the interests at stake, make legal representation in deportation proceedings especially important"); *Yiu Fong Cheung v. INS*, 418 F.2d 460, 463 (D.C. Cir. 1969) (discussing the importance of giving noncitizens in deportation proceedings the "opportunity to consult with friends").

Finally, and most importantly, a neutral adjudicator such as an IJ should review the questions of removability and applicability of expedited removal (including length of presence) and whether the noncitizen has a fear of removal, as opposed to a low-level immigration enforcement officer who acts as both prosecutor and judge. *See Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*, 508 U.S. 602, 618 (1993) (where "an initial determination" is "made by a party acting in an enforcement capacity," due process requires the right for "a neutral adjudicator to conduct a *de novo* review of all factual and legal issues" (cleaned up)); *Propert v. District of Columbia*, 948 F.2d 1327, 1333-34 (D.C. Cir. 1991) ("requirement of an unbiased decisionmaker" violated where "[t]he officer to whom appeal may be made is the same officer who decides that the vehicle is 'junk' in the first place").

The government's interest in removing people as quickly as possible cannot justify denying these basic safeguards. Indeed, that is the fundamental lesson of the recent Supreme Court decisions in the Alien Enemies Act cases. There, the government emphasized national security interests in effectuating rapid removals, but the Court was clear that due process requires real procedural protections—not meaningless procedures that do not afford an actual opportunity to contest key questions. *See A.A.R.P.*, 145 S. Ct. at 1368 ("We recognize the significance of the Government's national security interests as well as the necessity that such interests be pursued in a manner consistent with the Constitution . . . . [But] notice roughly 24 hours before removal, devoid of information about how to exercise due process rights to contest that removal, surely does not pass muster."). Indeed, the government too has an interest in the lawful and fair administration of the immigration laws. *Cf. Nken v. Holder*, 556 U.S. 418, 436 (2009) ("Of course there is a public interest in preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm.").

**B.    Plaintiff Is Likely To Prevail On Its Claim That The Rule and Guidance Violate The Expedited Removal Statute As Interpreted To Require Adequate Procedures.**

Although the expansion of expedited removal is unconstitutional, this Court need not rule on constitutional grounds. Instead, the Court can and should postpone the Rule and Guidance on statutory grounds. Plaintiff is likely to prevail on its claim that the Rule and Guidance violate the expedited removal statute which, as properly construed to avoid constitutional defects, requires procedurally fair determinations. The constitutional avoidance canon "is a tool for choosing between competing plausible interpretations of a statutory text, resting on the reasonable presumption that Congress did not intend the alternative which raises serious constitutional doubts." *Clark v. Martinez*, 543 U.S. 371, 381 (2005). The "rule is particularly applicable to cases involving

29

due process challenges" because courts "assume a Congressional solicitude for fair procedure, absent explicit statutory language to the contrary." *Gray Panthers v. Schweiker*, 652 F.2d 146, 152 n.15 (D.C. Cir. 1980) (cleaned up).

Courts have long construed removal statutes to require due process protections, even where the statute does not expressly provide such safeguards. The very concept of a deportation hearing arose when the Supreme Court read an early immigration statute to require a hearing in order to avoid serious due process concerns. *See Yamataya*, 189 U.S. at 100-01. The statutes at issue in *Yamataya* provided that immigration officers should "inspect" certain noncitizens arriving by sea to determine their excludability; that those determinations "shall be final" absent administrative appeal; and that the government could, "within one year after an alien of the excluded class entered the country, . . . cause him to be taken into custody and returned to the country whence he came." *Id.* at 95, 99. The Court rejected a "rigid construction" of those statutes and held that they "do no[t] necessarily exclude opportunity to the immigrant to be heard, when such opportunity is of right." *Id.* at 100; *accord id.* at 101 (statutory text did "not require an interpretation that would invest executive or administrative officers with the absolute, arbitrary power" to deport noncitizens without process); *see also Wong Yang Sung v. McGrath*, 339 U.S. 33, 49 (1950) ("It was under compulsion of the Constitution that this Court long ago held that an antecedent deportation statute must provide a hearing").

Since *Yamataya*, the Supreme Court has applied the constitutional avoidance canon to "read significant limitations into other immigration statutes." *Zadvydas v. Davis*, 533 U.S. 678, 689 (2001) (citing *United States v. Witkovich*, 353 U.S. 194, 195, 202 (1957)). For instance, *Witkovich* addressed "a legislative scheme designed to govern and to expedite . . . deportation" and, in particular, a provision requiring noncitizens awaiting deportation to provide the

government such information "as the Attorney General may deem fit and proper." 353 U.S. at 195,

202. Applying the avoidance canon, the Court read that language to "limit the statute to authorizing"

only "questions reasonably calculated to keep the Attorney General advised regarding

[noncitizens'] continued availability for departure." *Id.* at 202. Similarly, *Zadvydas* considered a

statute providing that a noncitizen "may be detained beyond the removal period." 533 U.S. at 689

(internal quotation marks omitted). The Court explained that "the word 'may' is ambiguous," *id.*

at 697, and applied the avoidance canon to "read an implicit limitation" into the statute that permits

"post-removal-period detention" only for a "reasonably necessary" period and prohibits "indefinite

detention," *id.* at 689; *accord Clark*, 543 U.S. at 377; *see also R.I.L-R v. Johnson*, 80 F. Supp. 3d

164, 186-88, 190 (D.D.C. 2015) (applying canon to read due process limits into similar language

in immigration detention statute).[17]

Courts have read other essential due process safeguards into other immigration statutes.

The statutory requirement that noncitizens "shall have a reasonable opportunity to examine" and

"present evidence" in regular removal proceedings under 8 U.S.C. § 1229a(b)(4)(B) and its

precursors has long been interpreted to require protections such as interpretation at hearings,

*Matter of Tomas*, 19 I. & N. Dec. 464, 465-66 (BIA 1987), the "timely production of" adverse

evidence, *Bondarenko v. Holder*, 733 F.3d 899, 907 (9th Cir. 2013), and a neutral adjudicator, *Tun*

*v. Gonzales*, 485 F.3d 1014, 1025 (8th Cir. 2007).

---

[17] The Supreme Court and D.C. Circuit have applied the same principle to read basic due process guardrails into statutes outside the immigration context. *E.g.*, *Greene v. McElroy*, 360 U.S. 474, 507 (1959) ("Where administrative action has raised serious constitutional problems, the Court has assumed that Congress or the President intended to afford those affected by the action the traditional safeguards of due process."); *Gonzalez v. Freeman*, 334 F.2d 570, 579 (D.C. Cir. 1964) ("[W]e cannot agree that Congress intended to authorize [the penalty of debarment] without regulations establishing standards and procedures and without notice . . . , hearings, and findings pursuant thereto.").

This Court should apply the same principle to interpret the expedited removal statute as applied by the Rule to require fair determinations of whether, *inter alia*, the factual criteria for expedited removal are met and a noncitizen is inadmissible based on the specified grounds, and to ensure that there is an adequate opportunity to express fear of removal. The expedited removal statute contains numerous ambiguous terms that make application of the constitutional avoidance canon appropriate. *See Gray Panthers*, 652 F.2d at 152 & n.15 (applying avoidance canon where statute did not "explicitly detail what process is due"); *R.I.L-R*, 80 F. Supp. 3d at 186 ("Although the statute is silent as to what factors may be considered in making such determinations, the Court must construe it with an eye toward avoiding 'serious constitutional doubts.'").

For example, the statute provides that "[i]f an immigration officer *determines* that an alien . . . who is arriving in the United States or is described in [§ 1225(b)(1)(A)](iii) is inadmissible under section 1182(a)(6)(C) or 1182(a)(7) of this title, the officer shall order the alien removed." 8 U.S.C. § 1225(b)(1)(A)(i) (emphasis added). But the statutory text is ambiguous as to the *process* by which immigration officers are to "determine" inadmissibility. Similarly, the statute provides that a noncitizen "described in clause (iii)," *id.*, is one "who has not been admitted or paroled into the United States, and who *has not affirmatively shown, to the satisfaction of an immigration officer*, that the alien has been physically present in the United States continuously for [a] 2-year period," *id.* § 1225(b)(1)(A)(iii)(II) (emphasis added). Again, the statute is ambiguous on the procedures for making this showing "to the satisfaction of an immigration officer." *Id.* The statute is equally ambiguous as to the process for providing noncitizens an opportunity to "indicate[] either an intention to apply for asylum under section 1158 of this title or a fear of persecution." *Id.* § 1225(b)(1)(A)(i).

The government has acknowledged that the language of these provisions is ambiguous. *See* 89 Fed. Reg. 48,710, 48,740 (June 7, 2024) ("8 U.S.C. 1225(b)(1)(A) [] does not specify the relevant aspects of the procedures that immigration officers must follow to determine whether a noncitizen who is subject to expedited removal can be ordered removed or whether the noncitizen must be referred to an [asylum officer] for a credible fear interview."); *id.* ("Congress has not provided a particular definition of the phrase 'indicates . . . an intention.'"). In the government's view, this ambiguity "gives DHS discretion to employ the procedures it reasonably concludes are appropriate." *Id.* But "[t]he APA . . . specifies that courts, not agencies, will decide *'all* relevant questions of law' arising on review of agency action—even those involving ambiguous laws." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 391-92 (2024) (internal citation omitted).

Interpreting these provisions to permit expedited removal of people who have entered the United States and lived here for up to two years using the same error-plagued procedures described above raises grave constitutional questions. *See supra* Argument, Section I.A. It is "fairly possible" to avoid those constitutional doubts by construing these ambiguous provisions to require more robust safeguards. *United States v. Hansen*, 599 U.S. 762, 781 (2023) (quotation marks omitted). And because the Court can construe the expedited removal statute's ambiguous language to guard against the kind of "absolute, arbitrary power" that the Rule and Guidance permit—and which Defendants' recent actions illustrate—it has a duty to do so. *Yamataya*, 189 U.S. at 101; *see also, e.g.*, *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 78 (1994) (it is "incumbent upon us to read the statute to eliminate [constitutional] doubts so long as such a reading is not plainly contrary to the intent of Congress").

33

**C.    Plaintiff Is Likely To Prevail On Its Claim That Expedited Removal Cannot Lawfully Be Applied To Noncitizens In The Interior Based Solely On Lack Of Valid Entry Documents.**

Plaintiff is also likely to succeed in showing that the Rule violates the INA in a second respect: the Rule is likely unlawful because it subjects people who have already entered the United States to expedited removal under 8 U.S.C. § 1182(a)(7).

By statute, expedited removal can only be applied to noncitizens who are inadmissible on one of two grounds: 8 U.S.C. § 1182(a)(6)(C) or § 1182(a)(7). 8 U.S.C. § 1225(b)(1)(A)(i). Section 1182(a)(6)(C) concerns noncitizens seeking to procure immigration status via fraud or who falsely claim U.S. citizenship. Section 1182(a)(7), entitled "Documentation Requirements," applies to noncitizens who, "at the time of application for admission," lack a valid visa, "border crossing identification card, or other valid entry document." The Rule explicitly "enables" DHS to subject noncitizens who have already entered the United States, including those who entered up to two years earlier, to expedited removal if they are "determined to be inadmissible" under either provision. 90 Fed. Reg. at 8,139. But § 1182(a)(7) does not apply to those who have already entered the United States because it applies only at "the time when a noncitizen seeks permission to physically enter United States territory." *Torres v. Barr*, 976 F.3d 918, 924 (9th Cir. 2020) (en banc).[18]

This is made clear by both the statute's plain language and context. By its plain terms, § 1182(a)(7) applies only to a noncitizen who lacks a valid entry document at a specific moment:

---

[18] Subsequently, in *United States v. Gambino-Ruiz*, the Ninth Circuit held that a noncitizen who was "detained near the border shortly after he crossed it," under the 14-day limitation in place prior to the Rule, could be subjected to expedited removal under § 1182(a)(7). 91 F.4th 981, 990 (9th Cir. 2024). *Gambino-Ruiz* is not persuasive for the reasons set forth in Plaintiff's Response to Defendants' Motion to Dismiss. *See* ECF 44 at 34. Moreover, the court in *Gambino-Ruiz* reaffirmed its holding in *Torres* that "'stretching the phrase 'at the time of application for admission' to refer to a period of years would push the statutory text beyond its breaking point.'" *Gambino-Ruiz*, 91 F.4th at 990 (quoting *Torres*, 976 F.3d at 926).

34

**JA-140**

"*at the time of* application for admission." 8 U.S.C. § 1182(a)(7)(A)(i) (emphasis added).[19] Section

1182(a)(7) uses the phrase "at the time of application for admission" in connection with requiring

a valid "*entry* document" to lawfully cross the border: the noncitizen must possess "a valid

unexpired immigrant visa, reentry permit, border crossing identification card,[20] or other valid entry

document." *Id*. § 1182(a)(7)(A)(i)(I) (emphasis added). It has a similar requirement for a valid

"*travel* document": the noncitizen must possess a "valid unexpired passport, or other suitable travel

document, or document of identity and nationality if such document is required under the

regulations issued . . . under section 1181(a)." *Id.* (emphasis added). Section 1181(a) likewise

concerns documents used to cross into the United States. *See* 8 U.S.C. § 1181(a). Thus, "the most

logical reading of [the] phrase ['at the time of application for admission'] is that it refers to the

moment of applying for entry into the country." *Torres*, 976 F.3d at 925.[21]

　　　　Statutory context confirms § 1182(a)(7)'s temporal focus on the moment of entry into the

United States. In contrast, a neighboring ground of inadmissibility, § 1182(a)(6)(A), renders

inadmissible a noncitizen who is "*present* in the United States without being admitted or paroled."

8 U.S.C. § 1182(a)(6)(A)(i) (emphasis added). Congress chose *not* to make mere presence a basis

---

[19] Several of the INA's inadmissibility provisions use the phrase "at the time of," each referring to a specific time when a noncitizen must meet a certain condition. *See, e.g.*, 8 U.S.C. § 1182(a)(4)(A) (inadmissible if "at the time of" his application for a visa, admission, or adjustment of status, person "is likely . . . to become a public charge"); *id.* § 1182(a)(5)(A)(i)(I) (inadmissible if noncitizen seeks to work without certification that there were insufficient workers to fill the same job "at the time of [the noncitizen]'s application for a visa and admission"); *id.* § 1182(a)(6)(C)(ii)(II) (inadmissible if noncitizen falsely claimed citizenship unless she "reasonably believed at the time of making such representation" that she was citizen).

[20] A "border crossing identification card" is a document issued for the "purpose of crossing over the borders between the United States and foreign contiguous territory." 8 U.S.C. § 1101(a)(6).

[21] This interpretation is consistent with how the INA elsewhere uses the term "application for admission." *See* 8 U.S.C. § 1361 (placing burden of demonstrating admissibility on noncitizen who "makes application for a visa or any other document required for entry, or makes application for admission, or otherwise attempts to enter the United States").

for inadmissibility under § 1182(a)(7), focusing instead on the moment when the person applies to enter the country. Congress's choice makes clear that it did not intend for expedited removal to apply to people who are present in the United States without valid entry documents. Had Congress wanted to do so, it had a straightforward option: listing the neighboring provision at § 1182(a)(6)(A) as a basis for expedited removal. *Cf. Kucana v. Holder*, 558 U.S. 233, 248 (2010) ("If Congress wanted the jurisdictional bar to encompass decisions specified as discretionary by regulation along with those made discretionary by statute . . . Congress could easily have said so.").

Under this correct construction of the statute, Defendants remain free to charge noncitizens with inadmissibility under § 1182(a)(7) if they are apprehended at the border without valid entry documents. And as to noncitizens in the interior who have been here for less than two years, the statute still allows the government to apply expedited removal to those who are inadmissible for fraud under § 1182(a)(6)(C), which is not limited to fraud at entry. But Defendants cannot do what the Rule explicitly purports to "enable": They cannot "place in expedited removal" noncitizens "determined to be inadmissible under" § 1182(a)(7) who have already entered the United States and have been present for up to two years. *See* 90 Fed. Reg. at 8,139.

Finally, the canon of constitutional avoidance resolves any remaining doubt that Plaintiff's construction must be adopted. An interpretation of the phrase "at the time of application for admission" in § 1182(a)(7) that would permit noncitizens who have already entered and been present in the United States for up to two years based solely on their lack of valid *entry* documents raise serious due process problems. *See supra* Argument, Section I.A. Because Plaintiff's reading of the statute is "fairly possible" and avoids the constitutional question as to this group of people, the Court should adopt it. *See Hansen*, 599 U.S. at 781 (internal quotation marks omitted).

36

**D.    Plaintiff Is Likely To Prevail On Its Claim That Expedited Removal Cannot Lawfully Be Applied To Affirmative Asylum Applicants.**

Plaintiff is also likely to succeed in showing that the Guidance is contrary to the asylum regulations because it applies expedited removal to affirmative asylum applicants. The regulations implementing the asylum statute, 8 U.S.C. § 1158, grant jurisdiction over affirmative asylum applications to USCIS. Those regulations permit placing affirmative asylum applicants in expedited removal in only one specific circumstance. Yet the Guidance applies expedited removal to *all* persons covered by the Rule's designation—even if they have filed an affirmative asylum application. *See* Steinberg Dec., Ex. 2 (Guidance) at 2 (stating that an "alien who has applied for asylum" will be considered for expedited removal). The Guidance thus violates the *Accardi* doctrine, which "requires federal agencies to follow their own rules." *Steenholdt v. Fed. Aviation Admin.*, 314 F.3d 633, 639 (D.C. Cir. 2003) (citing *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954)).

The asylum regulations exempt most affirmative asylum seekers from expedited removal. The regulations provide that "USCIS shall have initial jurisdiction over" any "asylum application filed by an alien physically present in the United States." 8 C.F.R. § 208.2(a)(1). The regulations further provide that "USCIS *shall adjudicate* the claim of each asylum applicant whose application is complete," *id.* § 208.9(a) (emphasis added), by means of an interview by an asylum officer, *id.* § 208.9(b). After that interview, the asylum seeker generally receives one of two outcomes. First, the asylum officer may grant the application. *Id.* § 208.14(b). Second, where the officer does not grant asylum and concludes that the asylum seeker "appears to be inadmissible or deportable under [8 U.S.C. § 1182(a) or § 1227(a)], the officer "*shall refer* the application to an [IJ], together with the appropriate charging document, for adjudication in [regular] removal proceedings." 8 C.F.R.

37

§ 208.14(c)(1) (emphasis added). Thus, for most affirmative applicants, the regulations never provide that they can be placed into expedited removal.

The regulations permit an affirmative applicant to be placed in expedited removal in only one situation: where the asylum seeker was previously paroled into the United States and their parole has expired or been terminated. *Id.* § 208.14(c)(4)(ii).[22] For such asylum seekers, where the asylum officer does not grant asylum and finds that the asylum seeker is inadmissible under 8 U.S.C. § 1182(a)(6) or § 1182(a)(7), the officer will "proceed in accordance with" the expedited removal regulations. 8 C.F.R. § 208.14(c)(4)(ii)(A) (citing *id.* § 235.3(b)).[23] By applying expedited removal to people outside this specific class, the Guidance is contrary to the regulations. *See Nasdaq Stock Market LLC v. SEC*, 38 F.4th 1126, 1137 (D.C. Cir. 2022) ("[m]ention of one thing" "implies exclusion of another thing"); *see also Doe v. SEC*, 28 F.4th 1306, 1314 (D.C. Cir. 2022) (applying this canon to a regulation).

This understanding of the regulations is consistent with the statutory scheme. 8 U.S.C. § 1158 provides that a noncitizen may apply for asylum "in accordance with this section [§ 1158] *or*, where applicable, section 1225(b) of this title." *Id.* § 1158(a)(1) (emphasis added). Section 1158 further provides that "[t]he Attorney General shall establish a procedure for the consideration of asylum applications filed under [this section]," *id.* § 1158(d)(1), and that such applications are

---

[22] *See* 8 U.S.C. § 1182(d)(5)(A) (authorizing the DHS Secretary to "parole into the United States temporarily . . . only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission"). The regulation does not apply to noncitizens who were granted "advance parole"—i.e., a form of authorization to travel from and return lawfully to the United States. *See* 8 C.F.R. § 208.14(c)(4)(ii).

[23] In *Doe v. Noem*, a class action challenging DHS's termination of certain parole programs, the court held that individuals whose parole has been terminated or expired are not subject to expedited removal under 8 U.S.C. § 1225(b)(1)(A)(iii)(II). --- F. Supp. 3d ----, 2025 WL 1099602, at *16 (D. Mass. Apr. 14, 2025), *order stayed pending appeal sub nom. Noem v. Doe*, 605 U.S. ---, 2025 WL 1534782 (U.S. May 30, 2025). This Court need not address this issue in this case as Plaintiff asks only that the Court find the Guidance in violation of the asylum regulations.

to receive "final administrative adjudication" following an "interview" or "hearing," *id.* § 1158(d)(5)(A)(ii)-(v). The regulations implement these adjudications by assigning them, respectively, to asylum officers and IJs in regular removal proceedings. *See* 8 C.F.R. § 208.2(a)(1), (b). By contrast, the expedited removal statute, 8 U.S.C. § 1225(b)(1), provides a distinct procedure—the credible fear process—by which noncitizens may apply for asylum, "where applicable, [under] section 1225(b)." 8 U.S.C. § 1158(a)(1).

Because affirmative applicants have already applied in accordance with § 1158, they are *not* applying under § 1225(b). *See In re Espy*, 80 F.3d 501, 505 (D.C. Cir. 1996) ("[A] statute written in the disjunctive is generally construed as setting out separate and distinct alternatives.") (cleaned up). This reading also makes sense: the credible fear process was designed as an initial screening process meant primarily for "newly-arrived" asylum seekers at or near the border. *See Grace v. Barr*, 965 F.3d 883, 887 (D.C. Cir. 2021). Nothing in the statutory scheme suggests Congress sought to apply that screening process to people who already have applied for asylum affirmatively.

Re-routing affirmative asylum applicants into expedited removal has significant consequences. The credible fear process provides far fewer protections than the affirmative one. An affirmative applicant may file an asylum application directly with USCIS. 8 C.F.R. § 208.2(a)(1). The applicant receives 21 days' notice of a non-adversarial interview, where they may have counsel present and may present witnesses and affidavits or other evidence, *id.* § 208.9(b), and may be granted asylum thereafter, *id.* § 208.14(b). By contrast, in the credible fear process, the asylum seeker must raise their asylum claim as a defense against expedited removal. *See* 8 U.S.C. § 1225(b)(1)(A)(ii). The applicant is generally detained, *see* 8 C.F.R. § 235.3(b)(4)(ii), limiting their access to counsel and ability to prepare their case, particularly since the interview

39

can occur as little as 24 hours after the noncitizen is given notice of it—even if they do not yet "have access to a phone," and even though "a significant share of the 24-hour period occurs overnight, when fewer people [will] likely be available to take calls." 89 Fed. Reg. at 81,197.[24] Asylum seekers generally participate in credible fear interviews by phone, Steinberg Decl. Ex. 6 (USCIRF 2025) at 7, even though asylum officers must evaluate their credibility, 8 U.S.C. § 1225(b)(1)(B)(v). And even when the asylum seeker passes the credible fear interview, they are merely placed into regular removal proceedings before an IJ, where they must continue to litigate their application. *See* 8 U.S.C. § 1225(b)(1)(B)(ii); 8 C.F.R. § 235.3(c).

Finally, even assuming the regulations could be read to allow for the general placement of affirmative applicants into expedited removal, the Guidance would still be arbitrary and capricious for three reasons. First, the Guidance "failed to consider . . . important aspects of the problem." *See Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 25 (2020) (cleaned up). Apart from a vague and conclusory statement in the Guidance [25] Defendants never even acknowledge, much less explain, that placing affirmative applicants into expedited removal is a significant change in policy, or that, at a minimum, there is significant tension between doing so and the regulations governing the adjudication of affirmative asylum claims. *See FCC v. Fox Television Stations, Inc*., 556 U.S. 502, 515 (2009) (holding that the agency must "display awareness that it is changing position" and "may not . . . depart from a prior policy *sub silentio* or simply disregard rules that are still on the books"); *accord Grace*, 965 F.3d at 900. Second,

---

[24] DHS's attempt to shorten the consultation window even further, to as little as four hours, was recently vacated as arbitrary and capricious. *Las Americas Immigr. Advoc. Ctr.*, 2025 WL 1403811, at *19-21.

[25] *See* Steinberg Dec., Ex. 2 (Guidance) at 2 ("Further, the expedited removal process includes asylum screening, which is sufficient to protect the reliance interests of any alien who has applied for asylum or planned to do so in a timely manner.").

Defendants failed to account for the reliance interests that asylum seekers have in the greater procedural protections provided by the affirmative asylum system. *See Regents*, 591 U.S. at 30-33. And third, Defendants failed to consider alternatives within the ambit of existing policy—namely, exempting affirmative asylum applicants from expedited removal, as the regulations contemplate. *See id*. at 32-33.

## II.    Absent Postponement, Plaintiff's Members Will Suffer Irreparable Harm.

The new Rule and Guidance make far-reaching changes that will cause Plaintiff Make the Road New York's members irreparable harm. Plaintiff's members face the prospect of summary removal pursuant to flawed and illegal expedited removal procedures. Plaintiff is a membership-based organization that has thousands of noncitizen members, many of whom have been subject to enforcement activities by DHS. Fontaine Decl. ¶¶ 13, 15. Plaintiff has identified at least six members who could be placed in expedited removal proceedings pursuant to the Rule, because they entered without inspection, and have been continuously present in the United States for less than two years. *Id*. ¶¶ 17-25, 40-42. Plaintiff also has other members who have been living in the United States for longer than two years and who could be erroneously subject to expedited removal because they do not have or know what documents they could use to show their legal status or their continuous presence, and do not know when and how they would be able to access this crucial information if they encounter an immigration officer at work, on the street, or at a courthouse. *See id*. ¶¶ 18, 41-43.

Furthermore, Plaintiff has members with upcoming immigration court dates whose cases DHS is likely to try to dismiss, and whom ICE may try to arrest and swiftly deport. *See id*. ¶¶ 19-26, 29 (discussing these members and explaining that "the campaign to target individuals attending their immigration court proceedings for placement into expedited removal and detention by ICE

has sent shock waves through [Make the Road New York's] members and the communities that we serve"). In fact, even in the early days of Defendants' new practice, DHS has already tried to dismiss the cases of Plaintiff's members. *See id.*, Ex. A (John Doe 4 Decl.) ¶ 4 (member recounting that at his May 30, 2025 immigration court hearing, "the attorney for the government wanted to end [his] case" but the IJ instead reset the hearing to August). Other members—even those who are not susceptible to dismissal, arrest, and deportation under the new policy—are scared to show up to court, which could result in an *in absentia* removal order. *See id.*, Ex. B (Jane Doe 2 Decl.) ¶ 6; *see generally* Rowland-Kain Decl. ¶ 17; Gilliam Decl. ¶¶ 24-26. Thus, absent a stay, the Rule and Guidance will cause irreparable harm to Make the Road New York.

### III.    The Balance of Equities and the Public Interest Strongly Favor Postponement of Defendants' Actions.

The remaining factors decisively favor Plaintiff. The public interest strongly favors postponement, as countless people living in the United States with their families, including U.S. citizen spouses and young children, are being swiftly detained and deported pursuant to a procedure that flouts core due process guarantees and denies them any opportunity to pursue immigration relief, including asylum. *See* Fontaine Decl. ¶ 29 (describing recent detention of a "19-year old," "a couple who . . .  had children at home," "a man . . . [who] did not have vital medication with him; and a same-sex couple pulled from each others' arms"); Levenson Decl. ¶¶ 18-24 (describing detention of asylum seeker whose partner was eight months pregnant, gay couple who feared persecution, and asylum seeker married to a U.S. citizen); Dojaquez-Torres Decl. ¶ 11 (detainees include families with children as young as two and three years old, and ICE attempted to detain a mother with a nursing infant); Yang Decl. ¶ 16 (detention of "whole family units, including adults and their minor children"). These sudden arrests, detentions, and deportations cause immeasurable harm to noncitizens, who are suddenly detained, separated from

JA-148

their families, and deported. *See* Fontaine Decl. ¶¶ 31("[m]any people have begun shaking or crying" upon their arrest); Levenson Decl. ¶ 15 (describing "true panic and horror on . . . faces" of noncitizens, one of whom "appeared to have a panic attack"); Eugenio Decl. ¶ 15 (describing noncitizens who were suddenly detained and had "a physical and emotional defeat in their body language that I will never unsee"); Cortes Decl. ¶¶ 4-5 ("people were in tears and shaking" and a family member "broke down in tears and expressed concern because [a detained individual] had not brought important prescription medication for his eyes."); Botsch Decl. ¶ 5 (describing the case of a Cuban man who was arrested and who started strangling himself and yelling that he would rather kill himself than be sent back to Cuba); *see also* Fontaine Decl. ¶ 33 (explaining how "[t]he experience of seeing individuals . . . some of whom had children at home or had not brought vital medication with them—being surrounded, handcuffed, and detained without warning or explanation has been deeply disturbing to [Make the Road New York] attorneys," "[s]everal of [whom have] broke[n] down in tears" and "have suffered difficulty sleeping"). And these sudden arrests and deportations are especially harmful to asylum seekers, who face removal to countries where they fear persecution. *See* Fontaine Decl. ¶¶ 30, 32 (arrest and detention of asylum seekers; Levenson Decl. ¶¶ 18-24 (same); Cortes Decl. ¶ 9 (same); Umana Decl. ¶ 9 (same). Defendants' practices are harmful not only to those detained and deported, but also to many more noncitizens who are not showing up to immigration court for fear that they will be detained, and who are consequently being ordered removed *in absentia*, even where they may have immigration relief available to them. *See* Rowland-Kain Decl. ¶ 17 (significant decrease in noncitizens who came to court in days following courthouse arrests); Gilliam Decl. ¶¶ 24-26 ("unusually large number of in absentia removal orders" following courthouse arrests).

Defendants cannot point to any harm that could outweigh that experienced by noncitizens who are detained and swiftly deported in violation of their due process rights. Indeed, as explained *supra*, Argument, Section I.A.3, the government *shares* Plaintiff's interest in the effective and fair administration of the immigration laws and in preventing erroneous removals. *Cf. Nken*, 556 U.S. at 436. Moreover, the government already provides safeguards similar to, and even beyond, those described above to all noncitizens in regular removal proceedings. *See generally* 8 U.S.C. § 1229a. Conversely, while the Rule and Guidance remain in effect, countless people living in the United States with their families could be deported pursuant to a procedure that flouts core due process guarantees. Finally, the public interest strongly favors postponement under § 705, as "[t]he public interest is served when administrative agencies comply with their obligations under the APA." *N. Mariana Islands v. United States*, 686 F. Supp. 2d 7, 21 (D.D.C. 2009).

## CONCLUSION

For the foregoing reasons, this Court should grant Plaintiff's motion to postpone the effective dates of the Rule and Guidance pending adjudication of this case on the merits.

Dated: June 10, 2025                    Respectfully submitted,

                                        */s/ Anand Balakrishnan*

Cody Wofsy (D.D.C. Bar No. CA00103)     Anand Balakrishnan
Stephen B. Kang (D.D.C. Bar No. CA00090) Lee Gelernt (D.D.C. Bar No. NY0408)
Morgan Russell                          Omar C. Jadwat
Hannah Steinberg                        Michael K.T. Tan (D.D.C. Bar No. NY0636)
American Civil Liberties Union Foundation Sidra Mahfooz
Immigrants' Rights Project              Grace Choi
425 California Street, Suite 700        American Civil Liberties Union Foundation
San Francisco, CA 94104                 Immigrants' Rights Project
T: (415) 343-0770                       125 Broad Street, 18th Floor
F: (332) 220-1702                       New York, NY 10004
*cwofsy@aclu.org*                       T: (212) 549-2660
*skang@aclu.org*                        F: (332) 220-1702
*mrussell@aclu.org*                     *abalakrishnan@aclu.org*
*hsteinberg@aclu.org*                   *lgelernt@aclu.org*

44

Amy Belsher
Robert Hodgson
New York Civil Liberties Union Foundation
125 Broad St., 19th Floor
New York, NY 10004
(212) 607-3300
*abelsher@nyclu.org*
*rhodgson@nyclu.org*

*ojadwat@aclu.org*
*m.tan@aclu.org*
*smahfooz@aclu.org*
*gchoi@aclu.org*

Arthur B. Spitzer (D.C. Bar No. 235960)
Aditi Shah (D.C. Bar No. 90033136)
American Civil Liberties Union Foundation of
the District of Columbia
529 14th Street, NW, Suite 722
Washington, D.C. 20045
(202) 457-0800
*aspitzer@acludc.org*
*ashah@acludc.org*

*Attorneys for Plaintiffs*

45

**CERTIFICATE OF SERVICE**

I hereby certify that on June 10, 2025, I electronically filed the foregoing with the Clerk

of the Court for the United States District Court for the District of Columbia by using the

CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that

service will be accomplished by the CM/ECF system.

<div align="right">

*/s/ Anand Balakrishnan*

Anand Balakrishnan
American Civil Liberties Union Foundation
Immigrants' Rights Project
125 Broad Street, 18th Floor
New York, NY 10004
T: (212) 549-2660
F: (332) 220-1702
*abalakrishnan@aclu.org*

</div>

## DECLARATION OF SIENNA FONTAINE, CO-EXECUTIVE DIRECTOR, MAKE THE ROAD NEW YORK

I, Sienna Fontaine, pursuant to 28 U.S.C. § 1746, declare as follows:

1.  I am a co-Executive Director at Make The Road New York (MRNY). I previously served as General Counsel and before that as Legal Director at MRNY. As part of MRNY's Executive Leadership Team, I am responsible for shaping many of MRNY's organizational priorities; overseeing our staff; and fundraising. I have worked at MRNY since 2015.

2.  MRNY is a nonprofit, membership-based community organization that integrates adult and youth education, legal and survival services, and community and civic engagement, in a holistic approach to help low-income New Yorkers improve their lives and neighborhoods. MRNY has five offices in the New York area, located in Brooklyn, Queens, Staten Island, and in Suffolk and Westchester Counties.

### MRNY's structure, mission, and activities

3.  MRNY's mission is to build the power of immigrant and working-class communities to achieve dignity and justice.

4.  MRNY currently has over 200 staff members who provide services to thousands of individuals a year. To fulfill our mission, MRNY engages in four key strategies: Legal and Survival Services, Transformative Education, Community Organizing, and Policy Innovation.

5.  At the core of our mission, MRNY and its members advocate on behalf of immigrant communities on issues that impact their lives to effect policy changes. MRNY's organizing team leads our advocacy work and campaigns. Each year, MRNY participates in dozens of actions around the state to advocate for policy and legislative changes that would impact our members and the communities we serve. The organization engages in a deliberative process with our staff and

members to create an annual platform comprised of our legislative and policy priorities for the year and then dedicates significant resources to educating and mobilizing our members to support those priorities. In the past, we have helped secure important legislative victories and reforms from expansion of eligibility for drivers' licenses in New York State to creation of a groundbreaking Excluded Workers Fund for workers unable to access unemployment and pandemic benefits because of their immigration status. MRNY also regularly submits comments on proposed federal regulations. For instance, MRNY previously submitted a comment on DHS's proposed public charge inadmissibility ground, DHS Docket No. USCIS-2010-0012, and assisted approximately 300 of its members in submitting individual comments.

6. MRNY's organizing team facilitates standing committees in many areas of importance to our members. Some of our committees include the Civil Rights and Immigrant Power Project ("CRIPP"), which works on campaigns for immigration reforms at the state and federal level; the Youth Power Project (YPP), which works on issues affecting youth including access to education and police reform; and its TrIP or Trans Immigrant Project, which focuses on the rights of TGNCIQ New Yorkers.

7. MRNY's services teams, which include legal, health, and adult education, are on the front line with immigrant communities in New York and serve thousands of immigrants each year.

8. MRNY has a robust legal department. MRNY's legal department is staffed by attorneys and advocates who provide a broad range of civil legal services to members. MRNY's immigration team provides individualized assistance to thousands of immigrant members annually including both individuals in removal proceedings and individuals filing affirmative applications for immigration benefits. Our immigration legal team covers a range of cases, including affirmative applications such as adjustment of status, naturalization, DACA, TPS, and visas for

2

survivors of violence, as well as removal defense before the immigration courts and motions to reopen. We represent both detained and nondetained individuals. The legal team assists other departments in advocacy, planning, and training related to pending laws or regulations and engages in impact litigation. Our housing legal team, which represents many MRNY members, assists hundreds of families in housing court cases involving evictions, hazardous conditions, and housing discrimination. Finally, our workers rights team helps individuals combat wage theft and other workplace-related violations.

9.  MRNY's health team promotes the health and well-being of our community members, by providing health services to community members and advocating for improved access to healthcare for immigrants. The health team assists eligible individuals and families with applying for health insurance, including both Medicaid and New York State's Child Health First program, and other benefits including the Supplemental Nutrition Assistance Program ("SNAP") and provides information and referrals to community members, particularly individuals who do not qualify for health insurance through the New York State of Health program or who are facing food insecurity.

10. Lastly, MRNY's adult education team provides English-language classes for hundreds of individuals for whom English is not their first language and assists immigrants with civics, adult basic education, and citizenship classes.

11. The majority of MRNY's Board of Directors is composed of community members who are elected from our grassroots membership. Every three years, each of our member-led organizing committees (with the exception of our Youth Power Project committee) elects one representative from their committee to serve on the board. All elected board members are given extensive support and training to enable their full participation. All board meetings are interpreted

3

to accommodate members who are not bilingual. MRNY's Board of Directors meets quarterly to review the budget and fundraising goals, discuss organizational direction and strategy, and give feedback to the executive directors.

12. Members who serve on our Board of Directors provide oversight to our executive directors and determine the strategic direction of the organization. They take leadership in our organizing committees, determining the direction of our organizing work and leading organizing campaigns. Members also have come to serve in staff roles across the organization, including in senior leadership positions. Through our leadership pipeline we have trained and supported countless members in transitioning to staff roles including Community Health Workers, Health "Promotoras," Organizers, Communications Staff, Paralegals, Department Directors, Chief of Staff, and even Executive Director.

**MRNY's membership**

13. MRNY is a membership-based organization with over 28,000 members residing in New York City, Westchester County, and Long Island, and primarily in the boroughs of Queens, Brooklyn and Staten Island

14. MRNY maintains a database of its members. However, we do not have current contact information or a means of reaching all of our members, as individuals change phone numbers and addresses frequently. The frequency of these changes reflects the composition of our membership, which is drawn from low-income and working communities who often face financial hardship. While we strive to remain in contact with our members, these realities mean we cannot reliably reach all our members in a timely way.

15. Although we do not collect immigration status information for our members, our long history engaging our members in the fight for immigration reforms and supporting them in sharing

4

their personal stories with elected officials and others has shown that many of our members are neither U.S. citizens nor Lawful Permanent Residents.

16. Because of concerns for our members' privacy and the importance of their trust in MRNY as crucial to our mission and work, MRNY does not share our membership information with third parties including governmental agencies.

**MRNY's members are subject to the new expedited removal policy**

17. MRNY's members include noncitizens who have not been admitted to the United States by an immigration officer and who have not been continuously present for at least two years. These members may be subjected to expedited removal, per the government's January 2025 rule expanding expedited removal (the "Rule"). As a result, they may be removed from the United States without sufficient opportunity to show that they have the right to remain in the United States or to assert claims for immigration relief for which they are eligible.

18. MRNY members also include members who are noncitizens who have not been admitted to the United States by an immigration officer and have been continuously present for longer than two years. These members may be erroneously placed into expanded expedited removal either because they do not have, or do not carry, documentation of their continuous length of residence or would not be able to present that documentation on the short timeline envisioned by the Rule, especially if they are detained by immigration authorities.

19. Examples of members who have been subjected to the Rule or who could be subject to the new Rule include:

20. MRNY-John Doe 1 is a member of MRNY and a noncitizen. He entered the United States without inspection in July 2023, and has been in the country since then. He is not in removal proceedings and does not have a final order of removal.

21. MRNY-John Doe 2 is a member of MRNY and a noncitizen. He entered the United States without inspection in December 2023, and has been in the country since then. He is not in removal proceedings and does not have a final order of removal. He filed a timely application for affirmative asylum with USCIS, which remains pending.

22. MRNY-John Doe 3 is a member of MRNY and a noncitizen. He entered the United States without inspection in October 2023, and has been in the country since then. He is in removal proceedings and does not have a final order of removal.

23. MRNY-John Doe 4 is a member of MRNY who arrived in the U.S. in October 2023. He filed an application for asylum with the immigration court. At a hearing in his case in May 2025, DHS made an oral motion to dismiss his proceedings based on changed circumstances. The motion remains pending. His next hearing date was initially set for August 2025 but a week later was advanced to June 2025. Public reporting, and the first-hand account of our staff, indicates that such dismissal motions are a precursor, and part of a concerted effort by Immigration & Customs Enforcement (ICE), to initiate expedited removal proceedings pursuant to the Rule.

24. MRNY-Jane Doe 1 is a member of MRNY and a noncitizen. She entered the United States without inspection in August 2023 and has been in the country since then. An Immigration Judge dismissed her removal proceedings in January 2025. She is not in removal proceedings and does not have a removal order.

25. MRNY-Jane Doe 2 is a member of MRNY     who arrived in the U.S. in March 2024. She and her family have filed an application for asylum with the immigration court date and their next hearing date is in December 2025.

26. As these individuals demonstrate, the communities MRNY serves will be harmed by the EO.

6

27. Attached are pseudonymous declarations from two members, John Doe 4 and Jane Doe 2, one of whom fears placement into expedited removal and the other of whom DHS has already moved to dismiss proceedings for, and both of whom fear retaliation if their identities and participation in this case is revealed.  Both original non pseudonymous versions are held by our organization as well as other case documents.  We are willing to provide a copy to the court for in camera review if necessary, or subject to an appropriate protective order in the course of discovery.

28. Every day, large numbers of people come to MRNY's five community-based offices or directly contact a member of our staff seeking information and assistance on a range of issues, particularly in the aforementioned areas including immigration, housing, and healthcare. Our staff regularly hold committee meetings, community-education sessions, and one-on-one meetings with our members and the communities we serve. We also regularly receive requests for help from families or individuals subject to ICE enforcement actions and our staff assists clients in ICE detention. Because of this, we experience firsthand the very harmful impact of policy changes targeting immigrants, including through this Rule.

29. The expansion of expedited removal and more recently the campaign to target individuals attending their immigration court proceedings for placement into expedited removal and detention by ICE has sent shock waves through MRNY's members and the communities that we serve. Our staff members have begun to receive panicked requests for help from individuals calling or walking into our offices because they have future court dates and     are now scared to attend court and do not know what is happening, what their rights are, or what to do. Our  staff has also received calls and referrals for people detained at New York City immigration courts in the past two weeks; we have had people walk into our offices seeking help; and our attorneys have obtained the information for people detained in court due to being present there and offering

7

assistance. To meet this tremendous need, we created an internal tracker of cases of people detained at immigration court appearances in that period and/or for whom DHS moved to dismiss proceedings, and who are in need of legal assistance. As of midday Friday, June 6, that list included over 60 individuals. Of these, the vast majority have a removability charge that indicates entry without inspection rather than entry with parole.

30. Beginning on May 29 and on several dates thereafter, MRNY sent legal-team members to Manhattan immigration courts to assist pro se individuals facing motions to dismiss. Our staff provided information to dozens of individuals about their rights and the nature of ICE's ongoing operation and also witnessed a high volume of detentions by ICE agents present inside the courthouses. Among those our staff witnessed be detained were a 19-year-old; a couple who told our staff they had children at home; a man whose U.S.-citizen sister pleaded with ICE officers he did not have vital medication with him; and a same-sex couple pulled from each others' arms. Staff witnessed detentions both after dismissal of cases and for individuals whose cases were *not* dismissed, despite ICE moving for the immigration judges to dismiss, either because the immigration judge denied the motion or because the judge set the case over to a future date for further consideration of the motion.

31. Our staff consistently witnessed ICE attorneys explain to immigration judges that they were seeking dismissal of the removal proceedings because of the expedited removal Rule. In some cases, our staff saw immigration judges ask pro se noncitizens whether they wanted their removal proceedings dismissed—without explaining that dismissal would facilitate ICE's strategy of then detaining and placing that person in expedited removal proceedings. Our staff has also spoken with individuals who had no understanding of the nature of DHS's motion; indeed, one woman whose proceedings were dismissed and who was then detained told an MRNY attorney

8

that DHS's motion was not even translated to her, and the judge did not ask her any questions before granting the motion and dismissing.

32. When MRNY staff have explained to pro se individuals what is happening, either before or after court, it is almost uniformly the first and only time the nature of this ongoing campaign by DHS is explained to them. Many people have begun shaking or crying and attempted to make a final call to a loved one.

33. In addition to explaining their rights to impacted individuals, MRNY attorneys have spoken directly with ICE officers. In almost every case, our attempts to intervene or explain why detention is inappropriate, including because the person's case was not dismissed or they have a future court date, have been ignored.

34. The experience of seeing individuals who are complying with their court obligations— some of whom had children at home or had not brought vital medication with them—being surrounded, handcuffed, and detained without warning or explanation has been deeply disturbing to MRNY attorneys, including experienced immigration practitioners and attorneys who regularly work with detained clients. Several of our attorneys broke down in tears; attorneys have also shared that they have suffered difficulty sleeping after observing in court.

35. On May 29, we learned that an MRNY member, John Doe 4, had court the next day. An MRNY attorney was able to accompany him to his court date at the New York - Broadway Immigration Court where ICE moved to dismiss his proceedings in order to pursue expedited removal. The case was continued without a decision and the MRNY member was able to leave the courthouse.

36. MRNY's legal team has struggled to respond to this onslaught. Exacerbating that difficulty, most detained individuals are quickly transferred out of the New York City area and are

9

not accessible to family members or to legal representatives for calls. We typically do not even

learn their location through the ICE locator for several days, if at all. Despite the detention

campaign beginning on May 21 in New York City, and MRNY attorneys beginning to observe in

court on May 27, it was not until a week later that we secured our first legal calls with individuals

detained. Absent or incorrect ICE locator information or delays in updates to the locator have

prevented attorneys from locating or speaking with many people. For instance, on May 29, two

attorneys from MRNY went to the Elizabeth Detention Center, where four individuals referred to

the organization due to recent detentions, three in New York City-area courthouses, were detained

according to the online ICE locator. But staff at the facility informed our team that none of the

four were there anymore, even though for days afterwards several continued to show as detained

at that facility on the ICE locator. Similarly, on June 5, we requested legal calls with multiple

individuals whom the ICE locator showed to be at Nassau County Correctional Center only to be

told by the facility they were not there. Family members of detained individuals have also told us

they have not heard from their loved ones for days. On information and belief, many individuals

detained in New York are initially held at the Nassau County Correctional Center which does not

provide any call capabilities to ICE detainees.

37. In addition, the venue for removal cases which are not dismissed is extremely hard to

track. Venue in some cases is moved; in others it has remained in New York for weeks. However,

the publicly available information is unreliable and indeed some cases appear not to be venued

anywhere for a significant period of time. For instance, on June 3, one of our attorneys attempted

to file an opposition to dismissal for an individual detained at the Varick Immigration Court the

day before. The case continued to show venue at Varick on the public EOIR portal, but the court

staff informed our attorney they would not accept a motion because DHS had filed a notice of new

10

address. However, as of June 6 (three days later), the venue still showed at Varick. This effectively means our attorneys are not able to file an opposition because there is nowhere to file it.

38. Our member, John Doe 4, also faced significant barriers to responding to the motion. First, he was directed to respond by his next court date, which was set for August. However, the following week, an MRNY attorney checked the EOIR portal and saw the date had been moved up two months, to June 2025. This is consistent with action we are seeing in many cases where individuals were permitted to leave court and not detained: their hearing dates are now being advanced, which not only puts them *back* at risk for detention but also curtails their time to oppose dismissal with little notice. MRNY assisted John Doe 4 in preparing a pro se opposition to DHS's motion to dismiss. However, when an MRNY staff member attempted to file it at the immigration-court window, the clerk refused to accept it saying the system did not reflect a motion to dismiss, although one had been made orally and John Doe 4 had been directed to respond before his next court date. Because she insisted that the court staff review the digital audio recording (DAR), the MRNY staff member waited an hour for multiple individuals from the clerk's office to review the case, confirming the motion to dismiss was made orally, before the filing was finally accepted.

39. All of these barriers to effective response are extremely alarming because removal— or placement into expedited removal, even before the removal case is dismissed—can happen very quickly. In one case referred to RRLC on May 24, an individual detained in a New York City court on May 21 following the dismissal of his removal proceeding had already been deported when a paralegal at MRNY attempted to locate him the following business day, May 27.

40. Even MRNY members without upcoming immigration court hearings are at risk of enforcement through expanded expedited removal. Our members live in areas where encounters with ICE officers are common. Just in 2025, MRNY has assisted over 70 individuals or families

11

**JA-163**

in the New York City area who have been detained by ICE or had a loved one detained by ICE. In the past decade, we have assisted hundreds of detained individuals who were targeted for enforcement in and around New York City. Since January, immigration enforcement has expanded from targeted raids and occasional detentions at ICE check-ins to include collateral detentions, worksite enforcement, and frequent detentions at check-ins with ICE or with ISAP.

41. MRNY has numerous members who have not been present in the United States for two years or more. These members are now at risk of placement into expanded expedited removal. Moreover, we have many members who have been present for *greater* than two years but could be subject to racial profiling and detention if they exercise their right to remain silent if they come into contact with an ICE officer.

42. Because of the communities we serve, MRNY has numerous members who would have difficulty affirmatively demonstrating two years of physical presence, particularly if suddenly detained or given only a short period of time to do so. Two of MRNY's most active committees are its Youth Power Project (YPP) and its Trans Immigrant Project (TrIP). TrIP has many transgender members, and in particular transgender women who are non-citizens, who have obtained legal name changes, which are available in New York regardless of immigration status. Some of these members may have a mix of documents with their prior and current name, and also face significant barriers in accessing documentation with their prior name.

43. Members of MRNY's Youth Power Project and other young members also face challenges in documenting presence. MRNY has assisted thousands of its members and clients apply for Deferred Action for Childhood Arrivals (DACA); many of these young people required significant time to gather documentation of physical presence in the U.S. and in some cases were

never able to do so because presence documents were never obtained in the young person's name, are with family members, or otherwise unavailable.

44. In addition, MRNY's members are drawn from the five boroughs of New York City, Long Island, and Westchester, where an expensive and dense housing environment means that many of our members are renters cohabitating with numerous other individuals or occupying single rooms within multi-family dwellings and do not have lease agreements or bills in their name. These members' inability to prove their addresses can make it difficult to open bank accounts or take other steps that would yield alternative documentation of presence. Undocumented members on Long Island are also unable to access any form of municipal identification.

45. MRNY members are at risk of facing significant harm as a result of the Rule. Community members we serve have expressed fear, confusion and anxiety about loss of access to their essential rights as a result of the Rule.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

_____
Sienna Fontaine

Executed this  9th day of June, 2025

13

# EXHIBIT A

## DECLARATION OF MRNY-JOHN DOE 4,
## MEMBER OF MAKE THE ROAD NEW YORK

I, MRNY-John Doe 4, pursuant to 28 U.S.C. § 1746, declare as follows:

1.   I am a member of Make the Road New York. I used to live near to the organization's Queens office; I passed by and I went inside to learn more. I have gotten a lot of help and services from the organization and I appreciate the support it offers for the immigrant community. I participate to help address the huge needs in our community, especially now.

2.   I am from Ecuador. I came to the United States in October 2023. I came escaping for my life; it was not from a desire to leave my country or my family. I entered without inspection and was released on my own recognizance. My removal case was docketed and I have kept my address updated with the court. I filed an asylum application with the court in September 2024.

3.   On May 30, 2025, I had a master calendar hearing at the Broadway Immigration Court in New York City. I was extremely fearful and anxious of what would happen because I saw on the news and heard from friends that people were being detained in court. Some friends told me it is better not to go but I am very respectful of the law. I called an organizer with Make the Road the night before. He connected me with an attorney who met me at the court the next morning.

4.   At my court hearing, I went to the front and from what I understood, the attorney for the government wanted to end my case. The immigration judge asked me if I wanted more time and I said yes. The judge gave me a new date in August 2025. I saw three other people this happened to as well.

5.   I am extremely scared of being detained and losing my chance to apply for asylum. I have tried to do everything correctly here. If the law has changed, I do not understand why it is retroactive to me because when I came here I was put into removal proceedings before the immigration court; I was not put into expedited removal. It is causing me immense anxiety.

6.   I want to remain anonymous because I am terrified that I may be targeted for expedited

removal or detention.

I hereby declare under penalty of perjury that the foregoing is true and correct.


_/s/ MRNY-John Doe 4_
MRNY-John Doe 4


Executed on June 2, 2025 in Queens, NY

# EXHIBIT B

JA-169

**DECLARATION OF MRNY-JANE DOE 2,**
**MEMBER OF MAKE THE ROAD NEW YORK**

I, MRNY-Jane Doe 2, pursuant to 28 U.S.C. § 1746, declare as follows:

1.   I am a member of Make the Road New York (MRNY). I joined MRNY because the organization has helped my family a lot and I appreciate their work and support for the rights of immigrants in this country. I have come to MRNY's office in Queens several times and I have talked with different staff members from the organization.

2.   I am from Venezuela. I came to the U.S. with my partner and our children, fleeing for safety because of the persecution and threats we faced from government-aligned gangs. We entered the United States in March  2024 through El Paso, Texas. My family and I entered without inspection and were released on our own recognizance the next day.

3.   Our removal case was docketed with the immigration court and we are still in removal proceedings now. My next court date is scheduled for later this year in New York City.

4.   I am extremely fearful of being placed into expedited removal proceedings. I have two children. After we entered the U.S., my husband was detained by ICE and he currently remains in ICE custody. I am extremely scared of being detained and separated from my children, who would have no one to care for them. I am also scared of losing my opportunity to apply for asylum and to include my children as derivatives on my asylum application and of not having the opportunity to testify and share my story with an immigration judge. I am very fearful of returning to Venezuela and do not want to lose those rights.

5.   My family and I have tried to do everything correctly. We applied for asylum within our first year here; we got employment authorization; and we attended our appointments with ICE. My 10-year-old daughter is extremely traumatized by her father's detention. Her school has begun offering her therapy because of how upset she is.

6.   I want to remain anonymous because I am terrified that I may be targeted for expedited removal or detention and separated from my children.

I hereby declare under penalty of perjury that the foregoing is true and correct.

*/s/ MRNY-Jane Doe 2*
MRNY-Jane Doe 2

Executed on May 30, 2025 in Queens, NY

## DECLARATION OF RACHEL LEVENSON

1.      My name is Rachel Levenson and I am a lead immigration attorney at Make the Road New York. I am based in our Brooklyn office, located at 301 Grove Street, Brooklyn, NY 11237. I specialize in immigration cases including representation of noncitizen clients before the immigration courts and USCIS. I am admitted as an attorney in New York State. I am fluent in Spanish.

2.      On May 29, 2025, I was present in the New York-Federal Plaza Immigration Court for much of the day and on May 30, 2025, I was present at the 290 Broadway Immigration Court, also for much of the day. I also was present at 290 Broadway Immigration Court for much of the day on June 4, 2025 and at New York – Federal Plaza Immigration Court for much of the day on June 5, 2025.

3.      Each day, I observed proceedings in several different courtrooms and provided assistance to numerous pro se individuals attending their master calendar hearings for whom DHS moved to dismiss their removal proceedings. I also provided information, advice and assistance to individuals at risk of dismissal of their proceedings and detention.

4.      My experience in the courts was unusual and shocking. Dozens of ICE agents were present throughout the courts including in the hallways immediately outside the door where the hearings were taking place as well as by the elevator banks including freight elevators.

5.      In my nearly 7 years practicing as an immigration lawyer, I have only once heard of an arrest at Immigration Court. But this week and last week, I witnessed multiple arrests and swarms of ICE agents preparing to perform even more arrests.

6.      This experience was extremely intimidating for the immigrants appearing at their scheduled court hearings as well as for me.

7.      On Thursday, May 29, 2025, I stepped out of the elevator on the 12th floor of 26 Federal Plaza, and I immediately observed ICE detain two people. I tried to get the contact information of the people detained but one did not speak any English. The other was only 19 years old. He spoke enough English to give me his A number (his DHS-assigned registration number) but the ICE officers would not let me talk to him to collect more information. He was alone and looked absolutely terrified as they whisked him into the elevator. I later looked up his A number and

1

**JA-172**

learned that he is charged under INA 212(a)(6)(A)(i), 8 USC 1182(a)(6)(A)(i), indicating entry without inspection, and that his case had been dismissed in Immigration Court by IJ Tiesha Peal that day. I saw him being detained right outside the courtroom and it is my understanding he was detained as soon the hearing ended.

8.      Observing proceedings in Immigration Judge Peal's courtroom that morning, I heard the attorney for DHS move to dismiss several cases. Initially when DHS moved to dismiss, the attorney gave no reasoning for the motion besides stating that DHS was moving to dismiss. Only after I attempted to speak up and intervene did the DHS attorney cite to the dismissal regulation. But even then, the DHS attorney did not give any individualized reason why DHS was moving to dismiss the proceedings of that particular respondent. I then heard the IJ explain to that and other pro se respondents that DHS was moving to dismiss their asylum applications which would mean they would not have an asylum application pending before the court anymore but they could affirmatively file for asylum with USCIS if they wanted. Obviously, since DHS's intent in seeking dismissal was to place people into expedited removal, that was incorrect.

9.      At no point did I hear IJ Peal explain to the pro se respondents that ICE would place people into expedited removal proceedings or that after dismissal ICE agents would detain them in the hallway, as ICE had done for the 19 year old and the other man I observed outside her courtroom by the elevators when I had arrived.

10.     I observed two more motions to dismiss and collected information for both respondents. Both are charged under INA 212(a)(6), 8 USC 1182(a)(6), indicating entry without inspection. The judge set both cases over without a decision and neither respondent was detained. However I understand that colleagues of mine were in the courthouse that day and ICE detained other people for whom motions to dismiss were made, even when the IJ did not grant the DHS's motions to dismiss.

11.     On Friday, May 30, 2025, I went to the Broadway Immigration Court at 290 Broadway to accompany a member of Make the Road New York who had a court appearance and who has been in the U.S. for under 2 years. He entered the country without inspection and had applied for asylum. I was present when DHS made a motion to dismiss his case on the basis of changed circumstances. The judge did not make a decision but set a new hearing in August 2025 and instructed him to respond by then. The following week, the hearing date was suddenly advanced to June 2025, less than two weeks away.

2

**JA-173**

12.     On the same date that I accompanied the MRNY member, I learned while in court that ICE had been waiting for people in the lobby and detaining them as they exited the elevator to leave the building. As there was only one exit to the building, people were trapped when the elevator doors opened. I later learned that ICE was also using a freight elevator to transport people. On the day I was at 290 Broadway Immigration Court, I saw ICE on the same floor as the courtrooms and detaining people there.

13.     Everyone I observed in the waiting room for a master calendar hearing was unrepresented. None appeared to have any information about expedited removal or their rights should DHS seek to dismiss their proceedings.

14.     In the next courtroom I entered, that of IJ Fayaz Habib, DHS identified a total of 6 individuals by A number for whom it would seek dismissal, out of around 20 people total in the courtroom. There were approximately four to six ICE agents in the hallway outside the courtroom waiting for the end of the court proceedings.

15.     With the IJ's permission, in small groups, I spoke with the individuals that DHS was seeking to dismiss their cases. The first groups were Spanish speaking. I explained the situation to a group of men, the youngest of whom was 19 years old. When I told them that the government was seeking to detain and put them into rapid deportation proceedings, I witnessed true panic and horror on their faces. One man appeared to have a panic attack in front of me. I took photos of their documents and asked for emergency contact information. The 19-year-old took out his phone and I saw that his emergency contact was listed in his phone as Mi Vida ("My Life" in Spanish). Several of them quickly texted loved ones or made brief calls to say goodbye. In total, over these first two days observing in court, I collected names and A numbers for 14 individuals whose proceedings DHS moved to dismiss. Later that afternoon, I assisted several more individuals for whom DHS moved to dismiss their cases. Using publicly available EOIR information, I confirmed that 11 of those individuals were charged with removability under INA 212(a)(6)(A)(i), which is the charge for entry without inspection or presence in the U.S. without authorization. That is not a charge used against individuals who entered the country through an appointment with CBP One and were released on parole.

16.     Many noncitizens and even immigration judges did not understand what was happening, what their rights were, or the possibility of opposing DHS's motions to dismiss. One individual for whom I witnessed DHS file a motion to dismiss on Thursday May 29, whom the IJ gave time

3

to oppose the motion, left the court and came to an MRNY office the next day (May 30) for assistance. Although he had an interpreter present in court, it was evident when he came to our office that he did not understand what had occurred, as he informed my colleague that he believed his case was going to be closed due to inadequacies in his asylum claim. Only because I was present in court and witnessed DHS's oral motion was I able to confirm that in fact DHS had moved to dismiss proceedings to seek expedited removal. He otherwise would not have known or understood that nor been able to respond.

17.     On June 4, 2025, I returned to immigration court to observe and provide assistance. I went to 290 Broadway Immigration Court to the 15th floor to the courtroom of Immigration Judge ("IJ") Anna Diao. I saw that ICE officers were waiting outside IJ Diao's courtroom. I soon witnessed a pro se person exit the courtroom behind me. As soon as he stepped out, ICE agents surrounded him and whisked him into a freight elevator. It happened quickly and silently.

18.     I spoke with several unrepresented individuals outside the courtroom. The first people I spoke with were a couple from Ecuador. They each had already filed for asylum and the woman in the couple was over 8 months pregnant. I identified that they had arrived within the last two years, explained the risk of expedited removal to them and encouraged them to ask for more time if the government made a motion. After the couple was called into the courtroom, I asked the ICE officers directly if they planned on detaining the pregnant couple and asked what their plans were for family units. The officer told me that they would not be detaining the pregnant woman but did not answer when I asked about her boyfriend.

19.     I went back into the courtroom and as I walked in, I saw a written decision from the IJ ordering the pregnant woman's boyfriend's case dismissed. I reviewed the paperwork which noted that he has opposed dismissal but the IJ had granted it anyways. I approached the bench and addressed the court, explaining that the couple was pregnant and sought reconsideration of the dismissal order. The IJ looked to the attorney for DHS for its position and when the DHS attorney objected, the IJ denied my request for sua sponte reconsideration. I asked if I could enter a limited appearance and make a motion. The IJ said she would take the motion but would not adjudicate it that day. I stated that ICE was waiting outside the courtroom to detain him based on the dismissed case but the IJ did not change her position.

20.     I informed the couple that the fact that the case was dismissed meant that the man would be detained by ICE. They sat in the courtroom, crying. Tears streamed down the woman's face

and they both expressed confusion about how this could be happening given that they had filed for asylum and were about to have their first child. I approached a law enforcement officer working with ICE in the courtroom and the ICE officers outside and pleaded with them to not separate this young family.

21.     When the expectant mother's case was called, she pled with the IJ to help her husband. I also approached the ICE attorney to show that the husband had a valid parole document and thus was not lawfully subject to expedited removal but the ICE attorney did not change her position. The IJ dismissed the case on DHS's motion.

22.     The IJ continued with her docket and continued to grant the DHS attorney's oral motions to dismiss based only on the DHS attorney citing to the dismissal regulation and the January 21, 2025 notice in the federal register regarding expedited removal. At no point did I hear the lawyers for DHS state any reason specific to any respondent as to why they dismissed the case.

23.     Another couple that I met who were subject to these motions were a gay couple, each of different nationality, and had been together for over seven years and feared persecution. They had only arrived several months ago and had not yet filed for asylum but intended to do so. I also spoke with a person who stated to the Immigration Judge that he has a U.S. citizen wife, they had been married for two years, he had applied for asylum and that he wanted more time on his case. He told the judge that if he were detained and deported, his wife would be left alone as a single mother.  I spoke with this man after his case was called and he told me that he had been in the U.S. for three years and had entered at the border without inspection. He explained that he first had contact with immigration when pulled over while driving in Maine in January 2025. He presented to me a copy of his driver's license which confirmed his narrative as it was issued in September 2022. He also explained that he and his wife were marking their two-year wedding anniversary the next day.

24.     With a copy of the man's license in hand, I approached the ACC and asked her to reconsider her position. I also addressed the IJ and explained the man could not be subject to expedited removal given his long residence. The IJ asked the ACC what her position was and she told me that the I-213 (arrest record) on file showed a different date and indicated she would oppose if the IJ sua sponte reconsidered her decision. The IJ did not reconsider her decision. That individual was subsequently detained by ICE agents and, 48 hours later, there was still no location for him listed on the ICE locator.

**JA-176**

25.     My colleague, attorney James Lopez Olvera was also present and spoke to another respondent who was unrepresented and whose case was dismissed. This man stated he also was married to a U.S. citizen and that he had mailed his asylum application days before his hearing and had a copy with him. My colleague went to try to file his application at the clerk's office to make sure it was on file but the clerk told him he could not file because the system already showed that his proceedings were dismissed.

26.     Once the judge finished her docket, she ordered everyone to clear her courtroom. Once outside in the hallway, ICE officers conducted four arrests, separating the gay couple who were in tears as they were pulled apart. Given the fact that they are nationals of different countries, they are likely to face a lengthy separation. As noted above, the spouse of a U.S. citizen who has been present in the U.S. for three years was also detained.

27.     On June 5, 2025, I returned to court to observe and assist when permitted. On this day, I primarily went to 26 Federal Plaza to the 12th and 14th floors where hearings are being held. When I went to one courtroom's waiting room, I immediately observed a plainclothes ICE officer sitting among the people present. I also saw approximately five ICE officers in the hallway.

28.     I went to several different courtrooms to offer my assistance to unrepresented persons. I also spoke with other lawyers and advocates there that day who observed that the hallways were teeming with ICE agents. I went to IJ Amiena Khan's courtroom where I observed DHS move to dismiss one case and observed IJ Jonathan Reingold's courtroom where the DHS attorney informed me that she had moved to dismiss several cases earlier that day but had not moved to dismiss other cases.

29.     The aftermath of these detentions has been extremely disturbing. As I noted above, many people do not have a detention location identified on the ICE locator for several days. I understand that many people may be detained for days at 26 Federal Plaza, in crowded conditions unsuitable for prolonged detention. Attorneys are not provided access to speak with detained persons at 26 Federal Plaza. Other people are detained at Nassau County Correctional Center, which does not provide for visits or phone access for ICE detainees.

30.     In the case of the 19-year-old I saw detained on May 29, I tried to track him via the ICE Detainee Locator for several days so that I could try to schedule a legal call with him; make sure he knew he has a right to request a credible fear interview; and see if he wanted me to assist him

JA-177

in moving the IJ to reconsider their decision. I had no way of locating or contacting him. It took over 72 hours after his detention for him to appear on the ICE Detainee Locator. I also entered a Form G-28 Notice of Appearance with ICE but was not provided a location or any contact information for him for the first 72 hours. After several days, his location appeared on the ICE Detainee Locator and showed he was in Louisiana. I promptly requested a phone conference with him, but the earliest time given to me was June 6, 2025, over a week after his detention.

31.    On June 6, 2025, I finally spoke with him. He told me he was abandoned by both of his parents in his home county of Guinea where he is part of an ethnic minority called the Fulani people. He told me that he fears return to his home country where he received death threats from police officers and experienced other mistreatment.

32.    I asked him if he understood what happened to him in court. He stated he believed he had a court date in August. I explained that this was incorrect and that his case had been dismissed by a judge. I also asked if an officer had asked him if he has a fear of return to his home country. He said he was only asked if he was willing to sign for his deportation and was not once asked about any fear of return.

33.    Based on the facts he told me, it is my assessment that in addition to his prime facie eligibility for asylum, he also is eligible for Special Immigrant Juvenile Status.

34.    In the case of the MRNY member for whom I witnessed DHS make a motion to dismiss on May 30 and whom I heard the IJ instruct to respond before his next court date, a colleague of mine went to file a written opposition to the motion to dismiss in person at the immigration court a week later. But the court would not accept the filing because it had no indication of a pending motion to dismiss. My colleague remained at the court for over an hour after repeatedly requesting that the clerk's office review of the Digital Audio Recording; only after multiple clerks reviewed the recording was the opposition finally accepted. Obviously, that type of advocacy would not be possible for most pro se respondents.

35.    My colleague had the same experience attempting to file an opposition for another individual at 26 Federal Plaza the same day: the clerk at the window would not accept the filing, despite the Immigration Judge's instruction that an opposition be filed before the next court date, and it was only after my colleague insisted on review of the audio that the opposition was accepted.

I declare under penalty of perjury that the foregoing is true and accurate to the best of my knowledge.

    Signed:                                        June 9, 2025

Rachel Levenson, Esq.
Lead Immigration Attorney – Brooklyn
Make the Road New York

JA-179

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MAKE THE ROAD NEW YORK, et al., | ) |
| | ) |
| *Plaintiffs*, | ) |
| v. | )    No. 1:25-cv-00190- |
| | )    JMC |
| KRISTI NOEM, Secretary of the U.S. | ) |
| Department of Homeland Security, in her | ) |
| official capacity, et al., | ) |
| | ) |
| *Defendants*. | ) |
| | ) |

**Declaration of Mary**

I certify under penalty of perjury that the following statement is true and correct pursuant to 28 U.S.C. § 1746.

1. I am a citizen of Mexico.

2. I am the mother of John, who is 18 years old.  He was born in Mexico.

3. My son, John, and I were issued expedited removal orders on January 28, 2025 at Del Rio, Texas.  A copy of those orders are attached to this Declaration as Exhibit A.

4. The order states that "on or about, Thursday, February 5, 2015, you illegally entered the United States at or near EL PASO, TX and were not inspected by an Immigration Officer."

5. I have never entered the United States illegally.  John has never entered the United States illegally.

6. We have both resided in the United States for over ten years.

7. In addition to John, I have four other children.  Two of them who are U.S. citizens, aged 8 and 6, and two are non-U.S. citizens who are 15 and 11.  My U.S. citizen children lived with me in the United States.

8.  I was issued a ten-year visa to visit to the United States on December 9, 2014. John was issued a similar visa on the same date. My visa expired on December 8, 2024 and John's expired on October 9, 2021.

9.  I first entered the U.S. on my visa on January 5, 2015 for a day trip. I then re-entered on my visa on February 2, 2015 until February 8, 2015. I returned to the U.S. on my visa later the same day, February 8, 2015. I then did not leave the U.S. again after that prior to my removal.

10. Every time I entered the United States was at a port of entry at the United States-Mexico border pursuant to that visa. Before I was deported in January 2025, I had been in the United States continuously since February 8, 2015.

11. John had a 10-year visa and never entered the country illegally.

12. On January 27, 2025 I was driving in Kerr County, Texas when I was stopped by police while driving with my son, John. They asked everyone in the car for ID. I did not have a driver's license, so gave them my and John's Mexican passports. The officers told me we had overstayed our permission to stay.

13. The police held me and my son where we were arrested for an hour to wait for immigration officers to arrive.

14. They did not arrive, and so John and I were taken to Kerr County Jail. I do not believe we were booked into the jail, but we were made to wear prisoner's clothing and wait for three to four hours.

15. I asked to contact a lawyer, but I was not allowed to do so. I was not able to make any phone calls at the jail.

16. Border Patrol took me and John from the Kerr County Jail to another facility in Rocksprings, Texas where we were placed in a cell.  We were not allowed to make calls or contact an attorney despite our requests.

17. Border Patrol officers then took me and John to a facility in Eagle Pass, Texas.  I believe it was around 2 A.M. at that time.  I was not allowed to make a phone call there.

18. A few hours later, at around 5 A.M., we were transferred to a detention center in Del Rio, Texas.  I requested again to talk a lawyer, but they ignored me.

19. After about 4 hours, at around 9 A.M., officers gave me and John documents and said we were going to be deported.

20. My son and I were never asked or given the option to sign our deportation orders.

21. We were then taken to a border bridge in a car and told to walk across.

22. We have been living in Mexico ever since.


I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 9, 2025, in <u>Ciudad Juárez</u>, Chihuahua, Mexico

# EXHIBIT A

U.S. DEPARTMENT OF HOMELAND SECURITY

# NOTICE TO ALIEN ORDERED REMOVED/DEPARTURE VERIFICATION

A-File No: ███████████

Date: 01/28/2025

Alien's name: ██████████████████████

You have been found to be inadmissible to the United States under the provisions of section 212(a) of the Immigration and Nationality Act (Act) or deportable under the provisions of section 237 of the Act as a Visa Waiver Pilot Program violator. In accordance with the provisions of section 212(a)(9) of the Act, you are prohibited from entering, attempting to enter, or being in the United States

☒ For a period of 5 years from the date of your departure from the United States as a consequence of your having been found inadmissible as an arriving alien in proceedings under section 235(b)(1) or 240 of the Act.

☐ For a period of 10 years from the date of your departure from the United States as a consequence of your having been ordered removed in proceedings under any section of the Act other than section 235(b)(1) or 240, or of being ordered excluded under section 236 of the Act in proceedings commenced prior to April 1, 1997.

☐ For a period of 20 years from the date of your departure from the United States as a consequence of being found inadmissible and being previously excluded, deported, or removed from the United States.

☐ At any time because in addition to being found inadmissible, you have been convicted of a crime designated as an aggravated felony.

After your removal has been effected, you must request and obtain permission from the Secretary of Homeland Security to reapply for admission to the United States during the period indicated. You must obtain such permission before commencing your travel to the United States. Application forms for requesting permission to reapply for admission may be obtained by contacting any United States Consulate or U.S. Department of Homeland Security office. Refer to the above file number when requesting forms or information.

**WARNING FOR ALL REMOVED ALIENS:** It is a crime under Title 8 United States Code, Section 1326, for an alien who has been removed from the United States to enter, attempt to enter, or be found in the United States without the Secretary of Homeland Security's express consent. Depending on the circumstances of the removal, conviction for this crime can result in imprisonment of a period of from 2 to 20 years and/or a fine up to $250,000.

**SPECIAL NOTICE TO SEX OFFENDERS:** Federal Law requires a convicted sex offender, including an alien who has been removed from or otherwise departed the United States and subsequently returns, to register in each jurisdiction in the United States in which he or she resides, is employed, or is a student. Violation of this requirement can result in prosecution and imprisonment for up to 10 years under Title 18 United States Code, Section 2250.

HECTOR A BRUNO
Date: 2025.03.28
ev92084 1494.KP
(Signature of officer serving warning)

Border Patrol Agent
(Title of officer)

DEL RIO, TX
(Location of DHS Office)

## Verification of Removal
(Complete this section for file copy only)

| Departure Date | Port of Departure | | Manner of Departure |
|---|---|---|---|
| Signature of Verifying Officer | | Title of Officer | |


Photograph of Alien

**Refused to Sign**
(Signature of alien whose fingerprint and photograph appear above)


Right Index Finger

HECTOR A BRUNO
Date: 2025.03.28
ev92084 1-16.GBP
(Signature of official taking fingerprint)

Page 1 of 1

DHS Form I-296 (1/12)

**JA-184**

Notice and Order of Expedited Removal

U. S. Department of Homeland Security

## DETERMINATION OF INADMISSIBILITY

Event No: ███████████

File No: ███████████

Date: January 29, 2025

In the Matter of: ███████████

Pursuant to section 235(b)(1) of the Immigration and Nationality Act (Act), (8 U.S.C. 1225(b)(1)), the Department of Homeland Security has determined that you are inadmissible to the United States under section(s) 212(a) ☐ (6)(C)(i); ☐ (6)(C)(ii); ☒ (7)(A)(i)(I); ☐ (7)(A)(i)(II); ☐ (7)(B)(i)(I); and/or ☐ (7)(B)(i)(II) of the Act, as amended, and therefore are subject to removal, in that:

1. You are not a citizen or national of the United States;

2. You are a native of Mexico and a citizen of Mexico ;

3. You are an immigrant not in possession of a valid unexpired immigrant visa, reentry permit, border crossing card, or other valid entry document required by the Immigration and Nationality Act;

4. to wit, on or about Thursday, February 5, 2015, you illegally entered the United States at or near EL PASO, TX and were not inspected by an Immigration Officer.

Border Patrol Agent
Name and title of immigration officer (Print)

HECTOR A BRUNO
Date: 2025.01.28
0992086146 CBP ███████████
Signature of immigration officer

---

## ORDER OF REMOVAL
## UNDER SECTION 235(b)(1) OF THE ACT

Based upon the determination set forth above and evidence presented during inspection or examination pursuant to section 235 of the Act, and by the authority contained in section 235(b)(1) of the Act, you are found to be inadmissible as charged and ordered removed from the United States.

Border Patrol Agent
Name and title of immigration officer (Print)

HECTOR A BRUNO
Date: 2025.01.28
0992086146 CBP ███████████
Signature of immigration officer

ACTING/PATROL AGENT IN CHARGE
Name and title of supervisor (Print)

JUAN A GUARDIOLA JR
Date: 2025.01.28
0661965396 CBP ███████████
Signature of supervisor, if available

☐ Check here if supervisory concurrence was obtained by telephone or other means (no supervisor on duty).

---

## CERTIFICATE OF SERVICE

I personally served the original of this notice upon the above-named person on     01/28/2025
                                                                                        (Date)

HECTOR A BRUNO
Date: 2025.01.28
0992086146 CBP ███████████
Signature of immigration officer

Border Patrol Agent

Form I-860 (Rev. 08/01/07)

**JA-185**

**Notice and Order of Expedited Removal**

Department of Homeland Security

**ACKNOWLEDGEMENT**

I acknowledge receipt of this notification Refused to Sign

Signature of alien

Form I-860 (Reverse)

U.S. DEPARTMENT OF HOMELAND SECURITY

## NOTICE TO ALIEN ORDERED REMOVED/DEPARTURE VERIFICATION

A-File No. ███████

Date: 01/28/2025

Alien's name: ███████

You have been found to be inadmissible to the United States under the provisions of section 212(a) of the Immigration and Nationality Act (Act) or deportable under the provisions of section 237 of the Act as a Visa Waiver Pilot Program violator. In accordance with the provisions of section 212(a)(9) of the Act, you are prohibited from entering, attempting to enter, or being in the United States

☒ For a period of 5 years from the date of your departure from the United States as a consequence of your having been found inadmissible as an arriving alien in proceedings under section 235(b)(1) or 240 of the Act.

☐ For a period of 10 years from the date of your departure from the United States as a consequence of your having been ordered removed in proceedings under any section of the Act other than section 235(b)(1) or 240, or of being ordered excluded under section 236 of the Act in proceedings commenced prior to April 1, 1997.

☐ For a period of 20 years from the date of your departure from the United States as a consequence of being found inadmissible and being previously excluded, deported, or removed from the United States.

☐ At any time because in addition to being found inadmissible, you have been convicted of a crime designated as an aggravated felony.

After your removal has been effected, you must request and obtain permission from the Secretary of Homeland Security to reapply for admission to the United States during the period indicated. You must obtain such permission before commencing your travel to the United States. Application forms for requesting permission to reapply for admission may be obtained by contacting any United States Consulate or U.S. Department of Homeland Security office. Refer to the above file number when requesting forms or information.

---

WARNING FOR ALL REMOVED ALIENS: It is a crime under Title 8 United States Code, Section 1326, for an alien who has been removed from the United States to enter, attempt to enter, or be found in the United States without the Secretary of Homeland Security's express consent. Depending on the circumstances of the removal, conviction for this crime can result in imprisonment of a period of from 2 to 20 years and/or a fine up to $250,000.

---

SPECIAL NOTICE TO SEX OFFENDERS: Federal Law requires a convicted sex offender, including an alien who has been removed from or otherwise departed the United States and subsequently returns, to register in each jurisdiction in the United States in which he or she resides, is employed, or is a student. Violation of this requirement can result in prosecution and imprisonment for up to 10 years under Title 18 United States Code, Section 2250.

---

HECTOR A BARILLAS
Date: 2025.01.28
09586014 ICBP
███████

(Signature of officer serving warning)

**Border Patrol Agent**
(Title of officer)

DEL RIO, TX
(Location of DHS Office)

---

## Verification of Removal
(Complete this section for file copy only)

| Departure Date | Port of Departure | Manner of Departure |
|---|---|---|
| | | |

| Signature of Verifying Officer | Title of Officer |
|---|---|
| | |

Photograph of Alien

## Refused to Sign

(Signature of alien whose fingerprint and photograph appear above)

Right Index Finger

HECTOR A BARILLAS
Date: 2025.01.28
09586014 CBP

(Signature of official taking fingerprint)

DHS Form I-296 (1/12)

Page 1 of 1

**JA-187**

U.S. Department of Homeland Security

## Notice and Order of Expedited Removal

## DETERMINATION OF INADMISSIBILITY

Event No: ███████████

File No: ███████

Date: January 28, 2025

In the Matter of: ███████████

Pursuant to section 235(b)(1) of the Immigration and Nationality Act (Act), (8 U.S.C. 1225(b)(1)), the Department of Homeland Security has determined that you are inadmissible to the United States under section(s) 212(a) ☐ (6)(C)(i); ☐ (6)(C)(ii); ☒ (7)(A)(i)(I); ☐ (7)(A)(i)(II); ☐ (7)(B)(i)(I); and/or ☐ (7)(B)(i)(II) of the Act, as amended, and therefore are subject to removal, in that:

1. You are not a citizen or national of the United States;

2. You are a native of Mexico and a citizen of Mexico ;

3. You are an immigrant not in possession of a valid unexpired immigrant visa, reentry permit, border crossing card, or other valid entry document required by the Immigration and Nationality Act;

4. to wit, on or about Thursday, February 5, 2015, you illegally entered the United States at or near EL PASO, TX and were not inspected by an Immigration Officer.

Border Patrol Agent
_____
Name and title of immigration officer (Print)

HECTOR A BRUNO
Date: 2025.01.28 ████████
0602046146 CBP
_____
Signature of immigration officer

---

## ORDER OF REMOVAL
## UNDER SECTION 235(b)(1) OF THE ACT

Based upon the determination set forth above and evidence presented during inspection or examination pursuant to section 235 of the Act, and by the authority contained in section 235(b)(1) of the Act, you are found to be inadmissible as charged and ordered removed from the United States.

Border Patrol Agent
_____
Name and title of immigration officer (Print)

HECTOR A BRUNO
Date: 2025.01.28 ██████████
0992046146 CBP
_____
Signature of immigration officer

ACTING/PATROL AGENT IN CHARGE
_____
Name and title of supervisor (Print)

JUAN A GUARDIOLA JR
Date: 2025.01.28 █████████
0061963196 CBP
_____
Signature of supervisor, if available

☐ Check here if supervisory concurrence was obtained by telephone or other means (no supervisor on duty).

---

## CERTIFICATE OF SERVICE

I personally served the original of this notice upon the above-named person on    01/28/2025
HECTOR A BRUNO
Date: 2025.01.28 ████████
0992046146 CBP
_____                _____
Signature of immigration officer                    (Date)
Border Patrol Agent

JA-188

Form I-860 (Rev. 08/01/07)

.nt of Homeland Security

**Notice and Order of Expedited Removal**

ACKNOWLEDGEMENT

I acknowledge receipt of this notification _____ **Refused to Sign**

Signature of alien

Form I-860 (Re

## DEPARTMENT OF HOMELAND SECURITY

### Office of the Secretary

### Designating Aliens for Expedited Removal

**AGENCY:** Office of the Secretary, Department of Homeland Security.

**ACTION:** Notice.

**SUMMARY:** This Notice rescinds the March 21, 2022 Notice, *Rescission of the Notice of July 23, 2019, Designation for Expedited Removal*. This Notice also restores the scope of expedited removal to the fullest extent authorized by Congress.

**DATES:** This designation is effective on 6:00 p.m. EST on Tuesday January 21, 2025.

**FOR FURTHER INFORMATION CONTACT:** Joseph Mazzara, Office of the General Counsel, Department of Homeland Security, 202–282–9256.

**SUPPLEMENTARY INFORMATION:**

### I. Background

This Notice rescinds the March 21, 2022 Notice, *Rescission of the Notice of July 23, 2019, Designating Aliens for Expedited Removal*,[1] which limited the application of expedited removal procedures to certain aliens under the Immigration and Nationality Act (INA), to the extent the March 21, 2022 Notice is inconsistent with this Notice. This Notice enables the U.S. Department of Homeland Security (DHS) to exercise the full scope of its statutory authority to place in expedited removal, with limited exceptions, aliens[2] determined to be inadmissible under sections 212(a)(6)(C) or (a)(7) of the INA who have not been admitted or paroled into the United States and who have not affirmatively shown, to the satisfaction of an immigration officer, that they have been physically present in the United States continuously for the two-year period immediately preceding the date of the determination of inadmissibility. Presently, immigration officers may apply expedited removal to aliens apprehended anywhere in the United States for up to two years after the alien arrived in the United States, provided that the alien arrived by sea and the other conditions for expedited removal were satisfied. For aliens who entered the United States by crossing a land

border other than at a port of entry, with the March 21, 2022 Notice, the Secretary of DHS effectively exercised his discretion under the INA to limit the use of expedited removal to aliens apprehended by an immigration officer within 100 air miles of the United States international land border and who were continuously present in the United States for less than 14 days immediately prior to the date of encounter.

The INA grants the Secretary of Homeland Security the "sole and unreviewable discretion" to modify at any time the discretionary limits on the scope of the expedited removal designation. The Secretary is exercising his statutory authority through this Notice to designate for expedited removal the following categories of aliens not currently designated: (1) Aliens who did not arrive by sea, who are encountered anywhere in the United States more than 100 air miles from a U.S. international land border, and who have been continuously present in the United States for less than two years; and (2) aliens who did not arrive by sea, who are encountered within 100 air miles from a U.S. international land border, and who have been continuously present in the United States for at least 14 days but for less than two years. Therefore, the designation in this Notice restores the scope of expedited removal to the fullest extent authorized by Congress, as was previously established in the July 23, 2019 Notice, *Designating Aliens for Expedited Removal*. To the extent there is an ambiguity in this Notice, the intended effect of this notice is to apply expedited removal to the fullest extent authorized by statute.

The effect of this change will be to enhance national security and public safety—while reducing government costs—by facilitating prompt immigration determinations. In particular, the full application of expedited removal authority will enable DHS to address more effectively and efficiently the large volume of aliens who are present in the United States unlawfully, without having been admitted or paroled into the United States, and ensure the prompt removal from the United States of those not entitled to enter, remain, or be provided relief or protection from removal.

### II. This Notice Is Immediately Effective

In keeping with the practice followed in announcing the previous designations, and consistent with implementing regulations at 8 CFR

235.3(b)(1)(ii),[3] this designation is effective without prior notice and comment or a delayed effective date. *See, e.g.,* 67 FR 68923, 68925 (2002 Notice); 69 FR 48877, 48880 (2004 Notice); 82 FR 4769, 4769 (2017 elimination of exception for Cuban nationals arriving by air); 82 FR 4902, 4902 (2017 elimination of exception for Cuban nationals encountered in the United States or arriving by sea); 84 FR 35409, 35413 (2019 Notice); 87 FR 16022, 16024 (2022 Notice).

Congress explicitly authorized the Secretary to designate categories of aliens to whom expedited removal procedures may be applied. It also made clear that "[s]uch designation shall be in the sole and unreviewable discretion of the [Secretary] and may be modified at any time." *See* INA 235(b)(1)(A)(iii)(I), 8 U.S.C. 1225(b)(1)(A)(iii)(I)(emphasis added). Therefore, the Secretary's designation, within statutory bounds, is "committed to agency discretion by law and . . . there is no cause of action to evaluate the merits of the Secretary's judgment under APA standards." *Make the Road N.Y.* v. *Wolf*, 962 F.3d 612, 633–634 (D.C. Cir. 2020). Furthermore, as the D.C. Circuit held, based on the statutory language allowing for modification of the designation "at any time" and in his "sole and unreviewable discretion," the Department does not have to undertake the notice-and-comment rulemaking process. *Id.* at 635. As discussed above, the rulemaking procedures of the APA do not apply to this Notice and the expansion or contraction of a designation may be made "at any time." *Id.* at 634–635 (internal quotation marks omitted).

### III. Notice of Designation of Aliens Subject to Expedited Removal

Pursuant to INA 235(b)(1)(A)(iii), 8 U.S.C. 1225(b)(1)(A)(iii), and 8 CFR 253.3(b)(1)(ii), I order, in my sole and unreviewable discretion, as follows:

(A) The Notice titled *Designating for Expedited Removal*, 87 FR 16022 (March 21, 2022), is hereby rescinded, effective immediately.

(B) I designate for expedited removal the following categories of aliens not

---

[1] The 2022 notice was published at 87 FR 16022. The 2019 notice was published at 84 FR 35409.

[2] The term "alien" is defined in statute as "any person not a citizen or national of the United States." 8 U.S.C. 1101(a)(3). Going forward, DHS will adhere to statutory language and use the proper terminology.

[3] 8 CFR 235.3(b)(1)(ii) (providing that "[t]he Commissioner shall have the sole discretion to apply the provisions of section 235(b)(1) of the Act, *at any time*, to any class of aliens described in this section" and that this "designation shall become effective upon publication of a notice in the **Federal Register**" as well as that, "if the Commissioner determines, in the exercise of discretion, that the delay caused by publication would adversely affect the interests of the United States or the effective enforcement of the immigration laws, the Commissioner's designation shall become effective immediately upon issuance, and shall be published in the **Federal Register** as soon as practicable thereafter" (emphasis added)).

**JA-190**

currently designated: (1) Aliens who did not arrive by sea, who are apprehended anywhere in the United States more than 100 air miles from a U.S. international land border, and who have been continuously present in the United States for less than two years; and (2) aliens who did not arrive by sea, who are apprehended within 100 air miles from a U.S. international land border, and who have been continuously present in the United States for at least 14 days but for less than two years. Each alien placed in expedited removal under this designation bears the affirmative burden to show to the satisfaction of an immigration officer that the alien has been present in the United States continuously for the relevant period. This designation does not apply to aliens who arrive at U.S. ports of entry, because those aliens are already subject to expedited removal. Nor does this designation apply to or otherwise affect aliens who satisfy the expedited removal criteria set forth in any of the previous designations. *See* 82 FR 4902, 69 FR 48877; 67 FR 68923.

(C) With the exception of the March 21, 2022 Notice rescinded above, this Notice does not supersede, abrogate, or amend or modify any of the Pre-2019 Designations,[4] which shall remain in full force and effect in accordance with their respective terms.

Signed at Washington, DC.

**Benjamine C. Huffman,**

*Acting Secretary of Homeland Security.*

[FR Doc. 2025–01720 Filed 1–21–25; 4:45 pm]

**BILLING CODE 9110–9M–P**

---

**INTERNATIONAL TRADE COMMISSION**

**[Investigation Nos. 701–TA–606 and 731–TA–1416 (Review)]**

**Quartz Surface Products From China**

**Determinations**

On the basis of the record [1] developed in the subject five-year reviews, the United States International Trade Commission ("Commission") determines, pursuant to the Tariff Act of 1930 ("the Act"), that revocation of the countervailing duty and antidumping duty orders on quartz surface products from China would be likely to lead to continuation or recurrence of material injury to an industry in the United

States within a reasonably foreseeable time.

**Background**

The Commission instituted these reviews on June 3, 2024 (89 FR 47614) and determined on September 6, 2024 that it would conduct expedited reviews (89 FR 97653, December 9, 2024).

The Commission made these determinations pursuant to section 751(c) of the Act (19 U.S.C. 1675(c)). It completed and filed its determinations in these reviews on January 17, 2025. The views of the Commission are contained in USITC Publication 5578 (January 2025), entitled *Quartz Surface Products from China: Investigation Nos. 701–TA–606 and 731–TA–1416 (Review).*

By order of the Commission.

Issued: January 17, 2025.

**Lisa Barton,**

*Secretary to the Commission.*

[FR Doc. 2025–01632 Filed 1–23–25; 8:45 am]

**BILLING CODE 7020–02–P**

---

**INTERNATIONAL TRADE COMMISSION**

**[Investigation No. 337–TA–1433]**

**Certain Glass Substrates for Liquid Crystal Displays, Products Containing the Same, and Methods for Manufacturing the Same; Notice of Institution of Investigation**

**AGENCY:** U.S. International Trade Commission.

**ACTION:** Notice.

**SUMMARY:** Notice is hereby given that a complaint was filed with the U.S. International Trade Commission on December 18, 2024, under section 337 of the Tariff Act of 1930, as amended, on behalf of Corning Incorporated, Corning, New York. A supplement to the Complaint was filed on January 7, 2025. The complaint, as supplemented, alleges violations of section 337 based upon the importation into the United States, the sale for importation, and the sale within the United States after importation of certain glass substrates for liquid crystal displays, products containing the same, and methods for manufacturing the same by reason of the infringement of certain claims of U.S. Patent No. 7,851,394 ("the '394 patent"); U.S. Patent No. 8,627,684 ("the '684 patent"); and U.S. Patent No. 9,512,025 ("the '025 patent"). The complainant, as supplemented, also alleges violations of section 337 based upon the importation and sale of certain glass substrates for liquid crystal displays, products

containing the same, and methods for manufacturing the same by reason of misappropriation of trade secrets the threat or effect of which is to destroy or substantially injure a domestic industry. The complaint, as supplemented, further alleges that an industry in the United States exists as required by the applicable Federal Statute. The complainant requests that the Commission institute an investigation and, after the investigation, issue a general exclusion order, or in the alternative a limited exclusion order, and cease and desist orders.

**ADDRESSES:** The complaint, except for any confidential information contained therein, may be viewed on the Commission's electronic docket (EDIS) at *https://edis.usitc.gov.* For help accessing EDIS, please email *EDIS3Help@usitc.gov.* Hearing impaired individuals are advised that information on this matter can be obtained by contacting the Commission's TDD terminal on (202) 205–1810. Persons with mobility impairments who will need special assistance in gaining access to the Commission should contact the Office of the Secretary at (202) 205–2000. General information concerning the Commission may also be obtained by accessing its internet server at *https://www.usitc.gov.*

**FOR FURTHER INFORMATION CONTACT:** Pathenia M. Proctor, The Office of Unfair Import Investigations, U.S. International Trade Commission, telephone (202) 205–2560.

**SUPPLEMENTARY INFORMATION:**

*Authority:* The authority for institution of this investigation is contained in section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. 1337, and in section 210.10 of the Commission's Rules of Practice and Procedure, 19 CFR 210.10 (2024).

*Scope of Investigation:* Having considered the complaint, the U.S. International Trade Commission, on January 17, 2025, *ordered that*—

(1) Pursuant to subsection (b) of section 337 of the Tariff Act of 1930, as amended, an investigation be instituted to determine:

(a) whether there is a violation of subsection (a)(1)(B) of section 337 in the importation into the United States, the sale for importation, or the sale within the United States after importation of certain products identified in paragraph (2) by reason of infringement of one or more of claims 1, 5, 6, and 8–10 of '394 patent; claims 1, 2, 4, 7, and 10–12 of the '684 patent; and claims 15–20 of the '025 patent, and whether an industry in the United States exists as required by subsection (a)(2) of section 337;

---

[4] *See, e.g.,* 82 FR 4902 (Jan. 17, 2017); 69 FR 48877 (Aug. 11, 2004); 67 FR 68924 (Nov. 13, 2002).

[1] The record is defined in § 207.2(f) of the Commission's Rules of Practice and Procedure (19 CFR 207.2(f)).



Secretary
U.S. Department of Homeland Security
Washington, DC 20528

January 23, 2025

MEMORANDUM FOR:    Caleb Vitello
Acting Director
U.S. Immigration and Customs Enforcement

Pete R. Flores
Senior Official Performing the Duties of the Commissioner
U.S. Customs and Border Protection

Jennifer B. Higgins
Acting Director
U.S. Citizenship and Immigration Services

FROM:    Benjamine C. Huffman
Acting Secretary

SUBJECT:    Guidance Regarding How to Exercise Enforcement Discretion

On January 20, 2025, I signed a memorandum entitled *Exercising Appropriate Discretion Under Parole Authority*. That memorandum clarifies DHS's position regarding the scope of the parole statute, 8 U.S.C. § 1182(d)(5), and directs a variety of actions to implement the memorandum. The memorandum also authorizes DHS components to pause, modify, or terminate, effective immediately, any parole program that is inconsistent with the memorandum—subject to certain conditions designed to ensure any such actions are lawful.

On January 21, 2025, I signed and transmitted to the Federal Register a notice entitled *Designating Aliens for Expedited Removal*. That notice expands the scope of expedited removal to the statutory maximum under 8 U.S.C. § 1225(b)(1) which, as further explained in the notice, includes certain aliens who have not been continuously present in the United States for two years.

This memorandum provides guidance regarding how to exercise enforcement discretion in implementing these policies.

"[T]he Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case." *United States v. Nixon*, 418 U. S. 683, 693 (1974). That principle applies with equal force to immigration enforcement. *United States v. Texas*, 599 U.S. 670, 679 (2023); *see*

1

*also Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 484 (1999) (Scalia, J.) (describing the Executive Branch's broad discretion to initiate or abandon removal proceedings).

To effectively implement these two new policies, consistent with the principles of enforcement discretion discussed above, I am directing you to take the following actions.

(1) For any alien DHS is aware of who is amenable to expedited removal but to whom expedited removal has not been applied:
    a. Take all steps necessary to review the alien's case and consider, in exercising your enforcement discretion, whether to apply expedited removal. This may include steps to terminate any ongoing removal proceeding and/or any active parole status.
(2) For any alien DHS is aware of who does not meet the conditions described in (1) but has been granted parole under a policy that may be paused, modified, or terminated immediately under the January 20 memorandum:
    a. Take all steps necessary to review the alien's case and consider, in exercising your enforcement discretion, whether any such alien should be placed in removal proceedings; and
    b. Review the alien's parole status to determine, in exercising your enforcement discretion, whether parole remains appropriate in light of any changed legal or factual circumstances.

The actions contemplated by this memorandum shall be taken in a manner consistent with applicable statutes, regulations, and court orders. They shall also be taken in a manner that takes account of legitimate reliance interests. It should be noted, however, that parole is a positive exercise of enforcement discretion to which no alien is entitled and that parole "shall not be regarded as an admission of the alien." 8 U.S.C. § 1182(d)(5)(A). Further, the expedited removal process includes asylum screening, which is sufficient to protect the reliance interests of any alien who has applied for asylum or planned to do so in a timely manner. *See* 8 U.S.C. § 1225(b)(1). To maximize efficiency in the short term, DHS components may wish to prioritize aliens eligible for expedited removal who failed to apply for asylum within the statutory deadline. *See* 8 U.S.C. § 1158(a)(2)(B) (setting a one-year deadline); *but see id.* § 1158(a)(2)(D) (discussing a very narrow exception to that deadline).

JA-193



## UNITED STATES COMMISSION ON
## INTERNATIONAL RELIGIOUS FREEDOM

# Report on Asylum Seekers
# in Expedited Removal

## VOLUME I: FINDINGS & RECOMMENDATIONS

*As authorized by Section 605 of the International Religious Freedom Act of 1998*



# Report on
# Asylum Seekers
# in
# Expedited Removal

## February 2005

U.S. Commission on International Religious Freedom
800 North Capitol Street, NW
Suite 790
Washington, DC 20002
202-523-3240
202-523-5020 (fax)

*www.uscirf.gov*

# United States Commission on International Religious Freedom

Preeta D. Bansal

*Chair*

Felice D. Gaer

Nina Shea[*]

*Vice Chairs*

Archbishop Charles J. Chaput

Michael Cromartie

Khaled Abou El Fadl

Elizabeth H. Prodromou

Bishop Ricardo Ramirez

Michael K. Young

Ambassador John V. Hanford, III, *ex officio*

Joseph R. Crapa
*Executive Director*

Tad Stahnke                    Mark Hetfield
*Deputy Director of Policy*    *Immigration Counsel*

*Asylum Seekers in Expedited Removal Subcommittee*

Preeta D. Bansal

Michael Cromartie

Bishor Ricardo Ramirez

Michael K. Young

Felice D. Gaer*, ex officio*

---

[*] Due to personal demands on her time, Commissioner Shea did not review or participate in the Study.

STUDY ON ASYLUM SEEKERS IN EXPEDITED REMOVAL

AUTHORS

REFUGEE AND ASYLUM EXPERTS

Mark Hetfield, *Editor and Director of Study*
*(U.S. Commission on International Religious Freedom)*

Kate Jastram
*(University of California at Berkeley, Boalt Hall School of Law)*

Allen S. Keller, M.D.
*(NYU School of Medicine, Bellevue-NYU Program for Survivors of Torture)*

Charles H. Kuck[*]
*(Weathersby, Howard, and Kuck, LLC, Atlanta)*

DETENTION ADVISOR

Craig Haney, Ph.D.
*(University of California at Santa Cruz)*

CHIEF METHODOLOGIST

Fritz Scheuren, Ph.D.
*(National Opinion Research Center, University of Chicago)*

LEADING RESEARCH STAFF

Patrick Baier, *Statistician*
*(National Opinion Research Center)*

Cory Fleming, *Statistician*
*(National Opinion Research Center)*

Tala Hartsough, *Research Coordinator*
*(University of California at Berkeley, Boalt Hall School of Law)*

Susan Kyle, *Research Coordinator*
*(U.S. Commission on International Religious Freedom)*

Andrew Rasmussen, Ph.D., *Research Director*
*(Bellevue-NYU Program for Survivors of Torture)*

Kim Reeves, *Research Coordinator*
*(Bellevue-NYU Program for Survivors of Torture)*

Barry Rosenfeld, Ph.D., *Port of Entry Study Methodologist*
*(Fordham University)*

---

[*] Replaced Robert C. Divine, who resigned on June 30, 2004 to accept an appointment at the Department of Homeland Security as the Chief Counsel to U.S. Citizenship and Immigration Services.

## RESEARCHERS

U.S. COMMISSION ON INTERNATIONAL RELIGIOUS FREEDOM
Claire Morris Clark
Robin Gary
Anne Marie Harkins
Karen Luong


NATIONAL OPINION RESEARCH CENTER
Ali Mushtaq


UNIVERSITY OF CALIFORNIA AT BERKELEY BOALT HALL SCHOOL OF LAW
Michael Burstein
Shelley Cavalieri
Carol Chacon
Amy Cucinella
Allison Davenport
Kathleen Glynn
Steven Herman
Olivia Horgan
Tara Lundstrom
Lauri Owen
Kyra Sanin
Rani Singh
Rebecca Tanner
Kaja Tretjak
Kristie Whitehorse


BELLEVUE-NYU PROGRAM FOR SURVIVORS OF TORTURE

| | |
|---|---|
| Monica Aguirre | Jonathan Hill |
| Christopher Barrett | Jessica Hood |
| Pamela Blair | Marissa Huang |
| Rona Carter | Allison Korn |
| Charlotte Labys | Charlotte Labys |
| Tracy Chu | Christina Luna |
| Adam Cohen | Jane Marshall |
| R. Meghan Davis | Christina Mathieson |
| Nirva Delva | Melody Moezzi |
| Mariel Diaz | Valentina Nikulina |
| Tia Dole | Lorelei Prevost |
| Darlene Dowling | Claudia Rincón |
| Cristina Fernandez | Jamie Rosenman |
| Lara Gamble | Evan Silverman |
| Sanida Halebic | Sylvia Sullivan |

**TABLE OF CONTENTS**
**REPORT ON ASYLUM SEEKERS IN EXPEDITED REMOVAL**
**VOLUME I: FINDINGS & RECOMMENDATIONS**

ACKNOWLEDGEMENTS…………………………………………………………………… vii

EXECUTIVE SUMMARY………………………………………………………………………1

INTRODUCTION…………………………………………………………………………10

STUDY EXPERT BIOGRAPHIES……………………………………………………………17

BACKGROUND BRIEF AND GLOSSARY ON EXPEDITED REMOVAL……………………………..20

EXPEDITED REMOVAL FLOW CHART……………………………………………………… 29

ORGANIZATIONAL CHART FOR DEPARTMENT OF HOMELAND SECURITY……………………..31

QUICK STATISTICS……………………………………………………………………… 32

HIGHLIGHTS OF THE STUDY METHODOLOGY…………………………………………… 36

U.S. AND INTERNATIONAL ASYLUM STANDARDS…………………………………………40

STUDY FINDINGS………………………………………………...…………………………50

STUDY RECOMMENDATIONS……………………………………………………………63

**JA-201**

JA-202

## Summary Table of Contents
## Report on Asylum Seekers in Expedited Removal
## Volume II: Expert Reports

Evaluation of Credible Fear Referral in Expedited Removal at Ports
of Entry in the United States
Allen Keller, Andrew Rasmussen, Kim Reeves, and Barry Rosenfeld……………………..   1

A-File and Record of Proceeding Analysis of Expedited Removal
Kate Jastram and Tala Hartsough………………………………………………………   44

Report on Credible Fear Determinations
Mark Hetfield………………………………………………………………………………165

Conditions of Confinement for Detained Asylum Seekers Subject to
Expedited Removal
Craig Haney…………………………………………………………………………   178

Legal Assistance for Asylum Seekers in Expedited Removal: A
Survey of Alternative Practices
Charles Kuck…………………………………………………………………………..232

Statistical Report on Expedited Removal, Credible Fear, and
Withdrawal,
FY 2000-2003
Cory Fleming and Fritz Scheuren…………………………………………………..281

Statistical Report on Detention, FY 2000-2003
Cory Fleming and Fritz Scheuren…………………………………………………..323

Statistical Report on Immigration Court Proceedings, FY 2000-2004

Susan Kyle, Cory Fleming, and Fritz Scheuren…………………………………………….383

Selected Statistical Analyses of Immigration Judge Rulings on
Asylum Applications, FY 2000-2003
Patrick Baier………………………………………………………………………...674

JA-204

ACKNOWLEDGEMENTS

   The authors of this Study would like to express our appreciation to the following individuals and organizations who were of great assistance during our research. We would especially like to thank the Commissioners on the Expedited Removal Subcommittee for their tireless support, their counsel, and for accompanying us to numerous detention centers and ports of entry. We would also like to express our gratitude to the many men and women around the country at the Department of Homeland Security and the Executive Office for Immigration Review who provided us with their time and insights on the Expedited Removal Process.

DEPARTMENT OF HOMELAND SECURITY
**Customs and Border Protection (CBP)** – especially our primary liaison, Linda Loveless, as well as Salvador Flores and Dana Graydon;
**Immigration and Customs Enforcement (ICE)** – especially our primary liaison, Elizabeth Herskovitz, as well as John Bjerke and Teresa Logue;
**Office of Immigration Statistics** – especially our primary liaison, Michael Hoefer, and Jim Fitzsimmons; and
**U.S. Citizenship and Immigration Services (USCIS)** – especially our primary liaison, Georgia Papas, as well as Karen Fitzgerald and Marc Sanderson.

DEPARTMENT OF JUSTICE
**Executive Office for Immigration Review (EOIR)** – especially our primary liaison, Marta Rothwarf, as well as Isabelle Chewning, Steven Lang, Scott Rosen, Brett Endres and Pamela Calvert.

GOVERNMENT ACCOUNTABILITY OFFICE (GAO) – especially Richard Stana and Jim Blume, who interrupted his retirement to discuss the GAO Study with us.

UNITED NATIONS HIGH COMMISSIONER FOR REFUGEES (UNHCR) – especially Larry Katzman, Dianne Curran, Elizabeth Dallam, Jane Kochman, Janice Marshall and Andrew Painter.

NON-GOVERNMENTAL ORGANIZATIONS AND ACADEMIC INSTITUTIONS
**American Bar Association, Washington, D.C.** – especially Andrea Siemens for her invaluable guidance on the detention standards;
**Center for Gender and Refugee Studies, UC Hastings College of the Law, San Francisco** – especially Karen Musalo for sharing her extensive expertise and groundbreaking efforts;
**Florida Immigrant Advocacy Center (FIAC), Miami** – especially Cheryl Little for facilitating meetings with clients to hear about their experiences in Expedited Removal;
**Georgetown University, Washington, D.C.** – especially Dean T. Alexander Aleinikoff of the Law Center, and Andrew Schoenholtz at the Institute for the Study of International Migration, for hosting a roundtable on the Study;
**Hebrew Immigrant Aid Society (HIAS), New York** – especially Frank Lipiner, Reena Arya and Simon Wettenhall for facilitating meetings to hear about their clients' experiences;
**Human Rights First, New York** – especially Eleanor Acer, Archi Pyati, Erin Corcoran and Anwen Hughes for facilitating meetings to hear about their clients' experiences; and
**Migration Policy Institute (MPI), Washington, D.C.** – especially Kathleen Newland for hosting a roundtable marking the beginning, and a briefing marking the end, of the Study.

***And the many other NGOs around the country who met with us on Expedited Removal.***

**JA-205**

## ASYLUM SEEKERS IN EXPEDITED REMOVAL

*A Study Authorized by Section 605 of the International Religious Freedom Act of 1998*
(The entire study is available at www.uscirf.gov)

## EXECUTIVE SUMMARY

### THE UNITED STATES COMMISSION ON INTERNATIONAL RELIGIOUS FREEDOM

The U.S. Commission on International Religious Freedom (USCIRF) was established by the International Religious Freedom Act of 1998 (IRFA). USCIRF is an independent and bipartisan federal agency created to monitor religious freedom in other countries and advise the President, Secretary of State and Congress on how best to promote it.

IRFA also authorized the Commission to appoint experts to conduct a study to advise whether certain legislative changes to asylum, enacted in 1996, were impairing America's obligation – and founding tradition – of offering refuge to those suffering persecution.

The Study examined how the new immigration procedure – known as "Expedited Removal" – was affecting asylum seekers, regardless of whether or not the claim was based on religion, race, nationality, membership in a particular social group, or political opinion.

### EXPEDITED REMOVAL

In 1996, President Bill Clinton signed the Illegal Immigration and Immigrant Responsibility Act (IIRAIRA), the most comprehensive immigration reform legislation in over 30 years. Among other reforms, the legislation established Expedited Removal, which was intended to strengthen the security of America's borders, without closing them to those fleeing persecution.

Specifically, prior to IIRAIRA, immigration inspectors could not compel an improperly documented alien to depart the United States. The inspector had the discretion to offer the alien the opportunity to withdraw his application for admission, or to refer the alien to an immigration judge for a hearing. If the inspector did refer the alien to an immigration judge, the alien could be detained until the hearing, but would generally be released due to bed-space shortages.

Under IIRAIRA, immigration inspectors were authorized to summarily remove aliens who lacked appropriate travel documents, or who obtained their travel documents through fraud or misrepresentation. Concerned, however, that *bona fide* asylum seekers not be removed to countries where they may be persecuted, Congress also included provisions to prevent the Expedited Removal of refugees fleeing persecution.[1] Specifically, an alien who indicates an

---

[1] Under the 1967 Protocol to the 1951 Convention relating to the Status of Refugees, which the United States has ratified, as implemented by the Refugee Act of 1980 and other amendments to the Immigration and Nationality Act, the United States may not return any individual to a country where that individual may face persecution on the basis of race, religion, nationality, membership in a particular social group or political opinion. In addition, the United

intention to apply for asylum or a fear of return is entitled to a "credible fear interview" by an asylum officer.  If the asylum officer determines that an alien has a "significant possibility" of establishing eligibility for asylum, he is entitled to ask the immigration judge for relief from removal.[2]  If credible fear is not found, the asylum officer orders the alien removed (although this decision is subject to review by an immigration judge).

Congress also required that aliens, including asylum seekers, subject to Expedited Removal be detained until the United States physically removes them, after which they may not return to the United States for five years.  If an asylum officer determines that an alien has credible fear, however, the alien may be considered for release while waiting for an asylum hearing.  While decisions of release ("parole") are discretionary, agency memoranda instruct that "parole is a viable option and should be considered for aliens who meet the credible fear standard, can establish identity and community ties, and are not subject to any possible bars to asylum involving violence or misconduct."[3]

On March 1, 2003, the Immigration and Naturalization Service (INS), the lead agency on Expedited Removal, was abolished by the Homeland Security Act of 2002.  The functions of the former INS were dispersed to various components within the newly created Department of Homeland Security.  The immigration judges, however, remained in the Executive Office for Immigration Review (EOIR) within the Department of Justice. [4]

Expedited Removal is mandatory for aliens arriving at ports of entry.  Congress, however, also authorized the Attorney General to exercise discretion in applying Expedited Removal in the interior of the United States to undocumented aliens apprehended within two years after entry.  On November 13, 2002, Expedited Removal was expanded by the INS to apply to undocumented non-Cubans who entered the United States by sea within the prior two years.

On August 11, 2004, the Department of Homeland Security announced that, effective immediately, it was exercising its discretion to further expand Expedited Removal authority to the Border Patrol for undocumented aliens apprehended within 14 days after entry and within 100 miles of the border, in the Tucson and Laredo Border Patrol sectors.[5]

---

States has ratified and implemented regulations to execute the Convention Against Torture (CAT), and may not remove anyone to a country where (s)he is in danger of being tortured.

[2] "Credible fear" is defined in section 235(b)(1)(B)(v) of the Immigration and Nationality Act, 8 USC 1225(b)(1)(B)(5) (2004).

[3] INS Memorandum, *Expedited Removal: Additional Policy Guidance* (Dec. 30, 1997) from Michael A. Pearson, Executive Associate Commissioner for Field Operations, Office of Field Operations, to Regional Directors, District Directors, Asylum Office Directors, reproduced in 75 *Interpreter Releases* 270 (Feb. 23, 1998).

[4] EOIR oversees the Immigration Judges who review negative credible fear determinations made by asylum officers and who hear asylum claims from aliens placed in Expedited Removal. It also houses the Immigration Judges' appellate review unit, the Board of Immigration Appeals (BIA).

[5] Designating Aliens for Expedited Removal, 69 Fed. Reg. 48,877 (2004).

2

***THE STUDY***

In the International Religious Freedom Act of 1998 (IRFA), Congress authorized the USCIRF to appoint experts to examine whether immigration officers, in exercising Expedited Removal authority over aliens who may be eligible for asylum, were:

(1)  Improperly encouraging withdrawals of applications for admission;
(2)  Incorrectly failing to refer such aliens for credible fear determinations;
(3)  Incorrectly removing such aliens to countries where such aliens may face persecution; or
(4)  Improperly detaining such aliens, or detaining them under inappropriate conditions.

Congress authorized the USCIRF-appointed experts to have virtually unrestricted access to Expedited Removal proceedings.

IRFA also required the Government Accountability Office (GAO) to complete its own study on asylum seekers in Expedited Removal, which was released in September 2000.   That study found that, in spite of some deficiencies in the process, INS was generally in compliance with its own Expedited Removal procedures.  GAO, however, relied primarily on the review of INS records, statistical analyses, and whether INS was following its own procedures.  GAO chose not to critically review legal determinations made by INS or the Executive Office for Immigration Review.

The Commission began its effort in the Fall of 2003, after the absorption of most Expedited Removal operations into the Department of Homeland Security (DHS).  Like the GAO, USCIRF appointed experts chose to avoid reviewing legal analyses performed by the Departments of Homeland Security and Justice, focusing instead on building on the file review and statistical analyses gathered by GAO.  The USCIRF Study, however, also differed from the GAO effort in several respects.  Specifically, the USCIRF-appointed experts chose to:

- Observe inspections at seven major ports of entry (GAO did not collect data from observations of Expedited Removal proceedings);
- Compare the detention standards to correctional standards, and ascertain whether correctional standards where "appropriate" for a non-criminal asylum seeker population (GAO instead accepted the INS detention standards, and measured INS compliance with some of those standards);
- Review the use of documents created during the Expedited Removal process are used as evidence during asylum hearings; and
- Examine the impact of representation on asylum claimants subject to Expedited Removal.

In collecting data for the Study, under the guidance of a chief methodologist and other experts in research methods, the experts:

- Observed, and collected data from, 404 secondary inspections and interviewed 194 aliens in Expedited Removal proceedings (with 155 of those aliens being both interviewed and observed);

3

**JA-209**

- Reviewed randomly selected subsamples of an additional 339 files from the Ports of Entry; 32 files of aliens who dissolved their asylum claims; 163 records of proceeding from the Board of Immigration Appeals; and 321 Alien Files of Asylum Seekers who were referred for credible fear;
- Surveyed all eight asylum offices and 19 detention facilities;
- Interviewed, and collected data from, 39 asylum seekers who were dissolving their asylum claim;
- Reviewed 50 files provided by DHS of negative credible fear determinations; and
- Compiled nation-wide statistics with the assistance of EOIR and DHS.

### *OVERVIEW OF FINDINGS AND RECOMMENDATIONS OF THE USCIRF STUDY*

The Study found mandatory procedures in place to ensure that asylum seekers are protected under Expedited Removal.  Some procedures were applied with reasonable consistency, but compliance with others varied significantly, depending upon where the alien arrived, and which immigration judges or inspectors addressed the alien's claim.  Most procedures lacked effective quality assurance measures to ensure that they were consistently followed.   Consequently, the outcome of an asylum claim appears to depend not only on the strength of the claim, but also on which officials consider the claim, and whether or not the alien has an attorney.   Similarly, while DHS has developed criteria relating to the release of detained asylum seekers, the implementation of these criteria also varies widely from place to place.

There are a few areas, however, where the Study identified problems other than inconsistent practices.  For example, with regard to detention, the Study found that asylum seekers are consistently detained in jails or jail-like facilities, which the experts found inappropriate for non-criminal asylum seekers.  There were, however, a small number of exceptions to this rule, the most prominent being a contract facility in Broward Country, Florida, which represents a secure, but appropriate and non-correctional, environment for non-criminal asylum seekers.

The Study also found that asylum seekers without a lawyer had a much lower chance of being granted asylum (2 percent) than those with an attorney (25 percent).  This difference was consistent whether the alien resided – or was detained – in an area with a high rate of representation, or a low rate of representation.  The Study does, however, identify a number of locations where public-private initiatives involving DHS, the Executive Office for Immigration Review, and non-governmental organizations, have put legal assistance within reach of more detained asylum seekers.  These programs, however, are limited to only a few select locations.

With regard to credible fear determinations, the Study found that  asylum officers screened-in more than 90 percent of credible fear applicants, and made a negative credible fear finding in only 1 percent of cases.  Quality assurance procedures – requiring much more extensive documentation and review of negative claims than of positive ones, may have created a built-in bias in the credible fear screening, undermining the objectivity of the process.

Each stage of the Expedited Removal Process relies upon the information collected in previous stages:

(1) The alien is referred by Customs and Border Protection (CBP) for a credible fear interview, or removed; then

(2) Referred by an asylum officer at U.S. Citizenship and Immigration Services (USCIS) for an asylum hearing, or ordered removed (subject to immigration judge review of the negative credible fear determination); then

(3) Detained or paroled by Immigration and Customs Enforcement (ICE); and then

(4) With the participation in the courtroom by an ICE Trial Attorney, granted or denied asylum, withholding, or Convention Against Torture (CAT) relief by the immigration judge (in the Department of Justice Executive Office for Immigration Review – EOIR).

The impediments to communication and information sharing within DHS, however, are serious. By the end of the process – the asylum hearing – unreliable and/or incomplete documentation from CBP and USCIS is susceptible to being misinterpreted by the ICE Trial attorney, misapplied by the Immigration Judge, and may ultimately result in the denial of the asylum-seeker's claim.  The Study did not seek to determine whether asylum claims were incorrectly denied, but did determine that immigration judges, even within the same court, had significantly different rates of granting or denying asylum claims.  Furthermore, in denying asylum applications on the basis of credibility, immigration judges frequently cited documents which the Study found to be unreliable and incomplete records.  The unreliability of the documentation was documented by the Port of Entry study (Keller, et al), and its incompleteness and its use in immigration proceedings were documented by the File Review (Jastram, et al).

The Study also noted that Expedited Removal has been expanded twice in recent years, without first addressing the flaws in the system which undermine the protections for asylum seekers.

The Study urges the incoming Secretary of Homeland Security to ensure that it is no longer he – but a high ranking official who reports to him – who is responsible for coordinating refugee and asylum matters among the various bureaus.  Without day-to-day oversight of asylum policy and its implementation department-wide, the flaws in the system identified in this Study cannot be effectively addressed, leaving asylum seekers in Expedited Removal at risk of being returned to countries where they may face persecution.

## SPECIFIC FINDINGS AND RECOMMENDATIONS

### *FINDINGS*

### Question One

*ARE IMMIGRATION OFFICERS, EXERCISING EXPEDITED REMOVAL AUTHORITY, IMPROPERLY ENCOURAGING ASYLUM SEEKERS TO WITHDRAW APPLICATIONS FOR ADMISSION?*

*Department of Homeland Security (DHS) regulations, and Customs and Border Protection (CBP) procedures and training materials make it clear to CBP inspectors that the withdrawal of an application for admission is "strictly voluntary" and "must not be coerced in*

JA-211

*any way." While most officers observed complied with these procedures, in one port of entry the Study observed a few instances in which immigration officers improperly encouraged asylum seekers to withdraw their applications for admission.*

## Question Two

*ARE IMMIGRATION OFFICERS, EXERCISING EXPEDITED REMOVAL AUTHORITY, INCORRECTLY FAILING TO REFER ASYLUM SEEKERS FOR A CREDIBLE FEAR INTERVIEW?*

*DHS regulations state that an immigration inspector must refer an alien for a credible fear determination if that alien indicates "an intention to apply for asylum, a fear of torture, or a fear of return to his or her country." In accordance with these regulations, nearly 85 percent (67/79) of arriving aliens observed by the Study expressing a fear of return were referred for a credible fear interview. CBP Guidelines, however, provide the inspector with more discretion than the regulations, allowing the inspector to decline referral in cases where the fear claimed by the applicant is unrelated to the criteria for asylum. Indeed, in 15 percent (12/79) of observed cases when an arriving alien expressed a fear of return to the inspector, the alien was not referred. Moreover, among these twelve cases were several aliens who expressed fear of political, religious, or ethnic persecution, which are clearly related to the grounds for asylum. Of particular concern, in seven of these twelve cases, the inspector incorrectly indicated on the sworn statement that the applicant claimed he had no fear of return.*

*DHS regulations require immigration inspectors to follow a standard script informing each alien that (s)he may ask for protection if (s)he has a fear of returning home. In approximately half of inspections observed, inspectors failed to inform the alien of the information in that part of the script. Aliens who did receive this information were seven times more likely to be referred for a credible fear determination than those who were not.*

*While DHS guidance requires that asylum seekers at land ports of entry be placed in Expedited Removal and referred for a credible fear interview, the Study interviewed two groups of aliens (one from the Middle East, the other from East Africa) who requested the opportunity to apply for asylum but were refused and "pushed back" at primary inspection. We became aware of these cases only because, in each case, the asylum seekers tried again on a different day and were referred into Expedited Removal as well as for a credible fear interview. CBP has stated that it is "very concerned and dismayed that this is happening contrary to policy, and is taking steps to address this."[6]*

## Question Three

*ARE IMMIGRATION OFFICERS, EXERCISING AUTHORITY UNDER EXPEDITED REMOVAL, INCORRECTLY REMOVING ASYLUM SEEKERS TO COUNTRIES WHERE THEY MAY FACE PERSECUTION?*

---

[6] Letter from Michael J. Hrinyak, Acting Executive Director , Immigration Policy and Programs, Office of Field Operations, to Mark Hetfield, USCIRF (February 2, 2005). *See also* "Aliens Seeking Asylum at Land Border Ports of Entry," Memorandum from Michael A. Pearson, Executive Associate Commissioner, Office of Field Operations, Immigration and Naturalization Service, to Regional Directors (2/6/2002).

JA-212

The second Study question concerned bona fide asylum seekers who are improperly denied a referral for a credible fear determination. While such asylum seekers may be removed to a country where they may face persecution, those findings are not repeated here. Rather, to respond to this question, the focus is on asylum seekers who are removed after the credible fear interview. In addressing this question, it is also appropriate to examine asylum seekers ordered removed by the immigration judge at the conclusion of their asylum hearing, focusing on the characteristics of the proceeding which are unique to cases that originate in Expedited Removal.

Asylum officers reach a negative credible fear determination in only one percent of cases referred. Moreover, a negative credible fear determination is subject to strict quality assurance procedures by Asylum headquarters, and may then be reviewed by an immigration judge, who vacates negative credible fear findings reached by asylum officers more than ten percent of the time.

Under the current system, immigration judges – not asylum officers – determine eligibility for asylum for aliens in Expedited Removal proceedings. We found very significant variations in the asylum approval rates of individual judges  Furthermore, in nearly 40% of the immigration judge decisions examined where relief was denied, the judge cited that the applicant's testimony was inconsistent with his or her initial asylum claim, as expressed to the immigration inspector or the asylum officer at the time of the credible fear interview. In nearly one-fourth of these cases, the Judge found that the asylum-seeker's testimony was not credible because the alien "added detail" to the prior statements. Such negative credibility findings fail to take into account that the records of these prior statements are, according to the findings of the Study, often unreliable and incomplete. Finally, immigration judges granted relief to 25 percent of represented asylum applicants but only two percent of unrepresented asylum seekers.

After being denied asylum, an alien who continues to claim a fear of persecution or torture may appeal a negative immigration judge decision to the Board of Immigration Appeals (BIA). While the BIA sustained 23 percent of Expedited Removal asylum appeals in FY2001, only two to four percent of such appeals have been granted since 2002, when the court began allowing the issuance of "summary affirmances" rather than detailed decisions. Statistically, it is highly unlikely that any asylum seeker denied by an immigration judge will find protection by appealing to the BIA.

## Question Four

ARE IMMIGRATION OFFICERS, EXERCISING AUTHORITY UNDER EXPEDITED REMOVAL, DETAINING ASYLUM SEEKERS IMPROPERLY OR UNDER INAPPROPRIATE CONDITIONS?

Asylum seekers subject to Expedited Removal must, by law, be detained until an asylum officer has determined that they have a credible fear of persecution or torture, unless release (parole) is necessary to meet a medical emergency need or legitimate law enforcement objective. The Study found that most asylum seekers are detained in jails and in jail-like facilities, often with criminal inmates as well as aliens with criminal convictions. While DHS has established detention standards, these detention facilities closely resemble, and are based on, standards for correctional institutions.

JA-213

In one particularly innovative Immigration and Customs Enforcement (ICE) contract facility, located in Broward County, Florida, asylum seekers are detained in a secure facility which does not closely resemble a jail.  While Broward could be the model in the United States for the detention of asylum seekers, it is instead the exception among the network of 185 jails, prisons and "processing facilities" utilized by DHS to detain asylum seekers in Expedited Removal.

DHS policy favors the release of asylum seekers who have established credible fear, identity, community ties, and no likelihood of posing a security risk.  However, there was little documentation in the files to allow a determination of how these criteria were actually being applied by ICE.

In FY2003, only 0.5 percent of asylum seekers subject to Expedited Removal in the New Orleans district were released prior to a decision in their case.  In Harlingen, Texas, however, nearly 98 percent of asylum seekers were released.  Release rates in other parts of the country varied widely between those two figures.

## RECOMMENDATIONS

### Recommendation One

IN ORDER TO MORE EFFECTIVELY PROTECT BOTH HOMELAND SECURITY AND BONA FIDE ASYLUM SEEKERS, THE DEPARTMENT OF HOMELAND SECURITY SHOULD CREATE AN OFFICE- HEADED BY A HIGH-LEVEL OFFICIAL- AUTHORIZED TO ADDRESS CROSS CUTTING ISSUES RELATING TO ASYLUM AND EXPEDITED REMOVAL.

### Recommendation Two

THE BURDEN ON THE DETENTION SYSTEM, THE IMMIGRATION COURTS, AND BONA FIDE ASYLUM SEEKERS IN EXPEDITED REMOVAL THEMSELVES SHOULD BE EASED BY ALLOWING ASYLUM OFFICERS TO GRANT ASYLUM IN APPROVABLE CASES AT THE TIME OF THE CREDIBLE FEAR INTERVIEW, JUST AS THEY ARE ALREADY TRAINED AND AUTHORIZED TO DO FOR OTHER ASYLUM SEEKERS.  ALIENS WHO ESTABLISH CREDIBLE FEAR BUT, FOR WHATEVER REASON, HAVE NOT YET ESTABLISHED AN APPROVABLE ASYLUM CLAIM, SHOULD CONTINUE TO BE REFERRED TO AN IMMIGRATION JUDGE.

### Recommendation Three

DHS SHOULD ESTABLISH DETENTION STANDARDS AND CONDITIONS APPROPRIATE FOR ASYLUM SEEKERS. THE AGENCY SHOULD ALSO PROMULGATE REGULATIONS TO PROMOTE MORE CONSISTENT IMPLEMENTATION OF EXISTING PAROLE CRITERIA, TO ENSURE THAT ASYLUM SEEKERS WITH A CREDIBLE FEAR OF PERSECUTION- WHO ESTABLISH IDENTITY AND THAT THEY POSE NEITHER A FLIGHT NOR A SECURITY RISK- ARE RELEASED FROM DETENTION.

### Recommendation Four

EXPAND EXISTING PRIVATE-PUBLIC PARTNERSHIPS TO FACILITATE LEGAL ASSISTANCE FOR ASYLUM SEEKERS SUBJECT TO EXPEDITED REMOVAL, AND IMPROVE ADMINISTRATIVE REVIEW AND QUALITY

JA-214

ASSURANCE PROCEDURES TO IMPROVE CONSISTENCY IN ASYLUM DETERMINATIONS BY IMMIGRATION JUDGES.

## Recommendation Five

THE DEPARTMENT OF HOMELAND SECURITY SHOULD IMPLEMENT AND MONITOR QUALITY ASSURANCE PROCEDURES TO ENSURE MORE RELIABLE INFORMATION FOR HOMELAND SECURITY PURPOSES, AND TO ENSURE THAT ASYLUM SEEKERS ARE NOT TURNED AWAY IN ERROR.

SPECIFICALLY, IT SHOULD:

- CREATE A RELIABLE INTER-BUREAU SYSTEM THAT TRACKS REAL-TIME DATA OF ALIENS IN EXPEDITED REMOVAL PROCEEDINGS.
- RECONCILE CONFLICTING FIELD GUIDANCE TO REQUIRE THAT ANY EXPRESSION OF FEAR AT THE PORT OF ENTRY MUST RESULT IN EITHER A REFERRAL FOR A CREDIBLE FEAR DETERMINATION OR, IN CASES WHERE THE INSPECTOR OR BORDER PATROL AGENT BELIEVES THE ALIEN WOULD "CLEARLY NOT QUALIFY" FOR ASYLUM OR CAT RELIEF, CONTACT WITH AN ASYLUM OFFICER TO SPEAK TO THE ALIEN VIA A TELEPHONIC INTERPRETATION SERVICE TO DETERMINE WHETHER OR NOT THE ALIEN NEEDS TO BE REFERRED.
- IMPROVE QUALITY ASSURANCE BY EXPANDING AND ENHANCING THE VIDEOTAPE SYSTEMS CURRENTLY USED AT HOUSTON AND ATLANTA TO ALL MAJOR PORTS OF ENTRY AND BORDER PATROL STATIONS TO UNINTRUSIVELY RECORD ALL SECONDARY INTERVIEWS, AND CONSIDER EMPLOYING THE USE OF UNDERCOVER "TESTERS" TO VERIFY THAT EXPEDITED REMOVAL PROCEDURES ARE BEING PROPERLY FOLLOWED.
- INCLUDE, ON SWORN STATEMENT FORM I-867B, AN EXPLANATION OF THE SPECIFIC PURPOSE FOR WHICH THE DOCUMENT IS DESIGNED TO SERVE, AND ITS LIMITATIONS.
- ENHANCE THE EFFICIENCY OF THE EXPEDITED REMOVAL PROCESS BY AMENDING DHS QUALITY ASSURANCE PROCEDURES FOR THE CREDIBLE FEAR INTERVIEW TO SUBJECT NEGATIVE AND POSITIVE DETERINATIONS TO SIMILAR QUALITY ASSURANCE PROCEDURES.

## Recommendation Summary

*THIS STUDY HAS PROVIDED TEMPORARY TRANSPARENCY TO EXPEDITED REMOVAL – A PROCESS WHICH IS OPAQUE NOT ONLY TO THE OUTSIDE WORLD, BUT EVEN WITHIN THE DEPARTMENT OF HOMELAND SECURITY. AS A RESULT OF THIS TRANSPARENCY, SERIOUS – BUT NOT INSURMOUNTABLE – PROBLEMS WITH EXPEDITED REMOVAL HAVE BEEN IDENTIFIED. THE STUDY'S RECOMMENDATIONS CONCERNING BETTER DATA SYSTEMS, QUALITY ASSURANCE MEASURES, ACCESS TO REPRESENTATION, AND A DHS REFUGEE COORDINATOR WOULD ALL CONTRIBUTE TO A MORE TRANSPARENT AND EFFECTIVE EXPEDITED REMOVAL PROCESS. WE ALSO RECOMMEND THAT CONGRESS REQUIRE THE DEPARTMENTS OF JUSTICE AND HOMELAND SECURITY TO PREPARE AND SUBMIT REPORTS, WITHIN 12 MONTHS OF THE RELEASE OF THIS STUDY, DESCRIBING AGENCY ACTIONS TO ADDRESS THE FINDINGS AND RECOMMENDATIONS OF THIS STUDY.*

JA-215

**ASYLUM SEEKERS IN EXPEDITED REMOVAL:**

*A Study Authorized by Section 605 of the International Religious Freedom Act of 1998*

**FINDINGS**

QUESTION ONE

*(1) ARE IMMIGRATION OFFICERS, EXERCISING EXPEDITED REMOVAL AUTHORITY, IMPROPERLY ENCOURAGING ASYLUM SEEKERS TO WITHDRAW APPLICATIONS FOR ADMISSION?*

*Department of Homeland Security (DHS) regulations, and Customs and Border Protection (CBP) procedures and training materials make it clear to CBP inspectors that the withdrawal of an application for admission is "strictly voluntary" and "must not be coerced in any way." While most officers observed complied with these procedures, in one port of entry the Study observed a few instances in which immigration officers improperly encouraged asylum seekers to withdraw their applications for admission.*

**Specific Findings**

**A. Department of Homeland Security (DHS) policy and training aims to prevent immigration inspectors from encouraging asylum seekers to withdraw their applications for admission.**

DHS procedures make it clear to inspectors that a withdrawal of an application for admission "is strictly voluntary, and should not be coerced in any way." Moreover, the training materials instruct that "if an alien is (subject to Expedited Removal but offered withdrawal), a sworn statement should be taken whenever possible, using Form I-867A and B. This ensures that all the facts of the case are recorded, especially in potentially controversial cases, and protects against accusations of coercing the alien into withdrawing, especially when there may have been an issue of fear of persecution."

**B. In only one port of entry (Houston) did the Study observe inspectors pressuring individuals to retract their fear claims (4/4 cases in which fear was expressed).**

In two of these four cases, the aliens actually withdrew their applications for admission. However, in the other two instances, the asylum seekers persisted with their credible fear claims and were referred to an asylum officer. In these four cases the officers used strong language to coerce applicants into withdrawing.

There were, however, cases in other ports of entry in which CBP officers told aliens about other consequences of pursuing asylum claims "off script." Two were told that because they entered illegally they might not have a chance to present their cases. Five were told they would be held in detention for three weeks or more, three of these for over a month. Because it was sometimes difficult to differentiate between appropriate factual responses to alien questions and deliberate attempts to discourage fear claims, the Study did not consider these disclosures to

**JA-216**

reflect deliberate coercion; nevertheless they could arguably be construed as encouraging asylum seekers to withdraw their claims.

**C. Customs and Border Protection (CBP) quality assurance mechanisms are inadequate to ensure that all officers comply with the policy that all withdrawals be "strictly voluntary."**

As described above, even when being monitored, a few inspectors engaged in conduct encouraging asylum seekers to withdraw their applications for admission. While a handful of ports of entry use video cameras to help protect inspectors from allegations of coercive behavior, most ports rely primarily on supervisory review of paper files to determine whether inspectors are following procedures. Paper files created by an unobserved inspector are not sufficient to monitor whether that inspector engaged in improper coercive conduct. The Study was not made aware of any other quality assurance mechanisms in place, such as direct observations of interviews by supervisors.

While the regulations require that Forms I-876A and B must be used for any alien who is ordered expeditiously removed, the regulations do not *require* that they be used for withdrawals. Rather, CBP training materials instruct immigration inspectors to use those forms "whenever possible." According to the CBP Inspector Training Materials on Expedited Removal, the forms should be used to prevent allegations that immigration inspectors improperly encouraging asylum seekers to withdraw their applications for admission. Form I-867A contains a script that informs the applicant that, if ordered removed, (s)he will be barred from re-entry for "a period of 5 years or longer." (This is in contrast to a withdrawal, which does not carry with it any such bar.)

The script also requires the CBP inspector to inform the alien that if (s)he has any reason to fear persecution, torture, or other harm upon being returned to his or her home country, (s)he should inform the inspector during the interview and may seek protection from return under U.S. law.

The inspector is not required to inform the alien of the possibility of withdrawing his or her application for admission, which does not carry the penalties associated with Expedited Removal. This is because withdrawal is offered only at the discretion of the inspector. The alien does not have the "right" to request a withdrawal of his or her application for admission.

The Study found that, when Form I-867A is used, aliens are frequently informed of the penalties of Expedited Removal but not of the availability of protection if they fear being returned. When subject to Expedited Removal, a potential asylum seeker who is offered withdrawal may be led to believe (s)he has only two choices: (1) to withdraw his or her application for admission, without penalty or (2) to be expeditiously removed with a five year bar from admission. Even in cases which resulted in the issuance of an order of Expedited Removal, the Study found that a significant percentage of aliens are not informed of a third choice: the right to apply for protection from return. Inspectors observed using Form I-867A and B during the Study failed to convey the protection information to the applicant approximately half of the time, even though that information was on the I-867A script.

**D. The role of asylum officers in the "dissolve" process reduces the risk that asylum seekers will be improperly encouraged to withdraw their applications for admission.**

The Study examined whether aliens might be "improperly encouraged" to withdraw their applications for admission by DHS detention officers after they have been referred for credible fear.  We interviewed 45 aliens who were dissolving (i.e. abandoning) their asylum claims while in detention, and asked each of them whether any DHS official had encouraged them to withdraw their applications for admission.  While a substantial number reported that the conditions of their detention influenced their decision to withdraw their application for admission, no one in this sample indicated that any detention official had improperly encouraged him or her to withdraw his or her application for asylum.

DHS has procedures in place at detention facilities to ensure against improper withdrawals of applications for admission.  Specifically, before a detention officer can permit an alien to withdraw his or her application for admission or otherwise abandon his or her credible fear claim, an asylum officer "must speak to the alien to ensure that (s)he is aware of the consequences of dissolving an asylum claim, and to ascertain why the alien no longer wishes to remain in the credible fear process…(The asylum officer) must also read and explain the contents of the (form) *Request for Dissolution of Credible Fear* to the alien.[1]  If, after the (asylum officer) explains the contents of the form, the alien changes his or her mind and wants to remain in the credible fear process, the (officer) continues processing the alien through the credible fear process."[2]

The role of asylum officers (who belong to U.S. Citizenship and Immigration Services (USCIS), a different agency than Immigration and Customs Enforcement, Office of Detention and Removal Operations (ICE-DRO), whose detention officials would authorize the withdrawal) in the dissolution process leaves detained asylum seekers less vulnerable to improperly encouraged withdrawals than aliens at ports of entry.  ICE cannot authorize an applicant to withdraw his application for admission until an asylum officer has had the opportunity to talk to the alien and document the voluntary nature of his decision to dissolve the credible fear claim and, if applicable, withdraw the application for admission.  This is different than the withdrawal of applications for admission at ports of entry, as the decision to authorize withdrawals is solely at the discretion of CBP inspectors.

---

[1] The dissolution form confirms that an asylum officer explained to the applicant that (s)he has "freely and voluntarily" decided to stop pursuing protection from removal, that (s)he understands that DHS will either permit him or her to withdraw his or her application for admission or issue an order of removal which would bar him or her from seeking readmission to the US for five years or more.  The form also reiterates that, if the alien changes his or her mind again any time prior to departure from the United States, (s)he may again ask for protection from removal through the credible fear process.  Finally, the alien is required to state the reason (s)he has decided not to ask for protection at this time.

[2] USCIS Credible Fear Procedures Manual, p. 35.

JA-218

QUESTION TWO

*(2) ARE IMMIGRATION OFFICERS, EXERCISING EXPEDITED REMOVAL AUTHORITY, INCORRECTLY*
*FAILING TO REFER ASYLUM SEEKERS FOR A CREDIBLE FEAR INTERVIEW?*

*DHS regulations state that an immigration inspector must refer an alien for a credible*
*fear determination if that alien indicates "an intention to apply for asylum, a fear of torture, or a*
*fear of return to his or her country." In accordance with these regulations, nearly 85 percent*
*(67/79) of arriving aliens observed by the Study expressing a fear of return were referred for a*
*credible fear interview. CBP Guidelines, however, provide the inspector with more discretion*
*than the regulations, allowing the inspector to decline referral in cases where the fear claimed*
*by the applicant is unrelated to the criteria for asylum. Indeed, in 15 percent (12/79) of observed*
*cases when an arriving alien expressed a fear of return to the inspector, the alien was not*
*referred. Moreover, among these twelve cases were several aliens who expressed fear of*
*political, religious, or ethnic persecution, which are clearly related to the grounds for asylum.*
*Of particular concern, in seven of these twelve cases, the inspector incorrectly indicated on the*
*sworn statement that the applicant stated he had no fear of return.*

*While DHS guidance requires that asylum seekers at land ports of entry be placed in*
*Expedited Removal and referred for a credible fear interview, the Study interviewed two groups*
*of aliens (one from the Middle East, the other from East Africa) who requested the opportunity to*
*apply for asylum but were refused and "pushed back" at primary inspection. We became aware*
*of these cases only because in each case, the asylum seekers tried again on a different day and*
*were referred into Expedited Removal as well as for a credible fear interview. CBP has stated*
*that it is "very concerned and dismayed that this is happening contrary to policy, and is taking*
*steps to address this."[3]*

**Specific Findings**

   **A. DHS policy does not clearly define whether all expressions of fear by an alien in**
   **Expedited Removal proceedings should result in a referral for a credible fear**
   **determination.**

DHS policy requires that immigration inspectors ask scripted questions from the Form I-867B to determine whether the alien should be referred for a credible fear interview on the basis of a fear of return.[4] DHS instructs its inspectors that for any alien who responds to these questions by expressing a fear of return, verbally or otherwise, a CBP inspector must refer the alien for a credible fear determination. Section 17.15 of the Inspector Field Manual, however, is not entirely consistent with DHS regulations. The Manual states that an inspector may choose

---

[3] Letter from Michael J. Hrinyak, Acting Executive Director , Immigration Policy and Programs, Office of Field Operations, to Mark Hetfield, USCIRF (February 2, 2005). *See also* "Aliens Seeking Asylum at Land Border Ports of Entry," Memorandum from Michael A. Pearson, Executive Associate Commissioner, Office of Field Operations, Immigration and Naturalization Service, to Regional Directors (2/6/2002).

[4] Those four questions are: (1) "Why did you leave your home country or country of last residence"; (2) Do you have any fear or concern about being returned to your home country or being removed from the United States"; (3) "Would you be harmed if you returned to your home country or country of last residence"; and (4) "Do you have any questions or is there anything else you would like to add."

JA-219

not to refer a case when the alien's expression of fear "would clearly not qualify that individual for asylum." We observed examples of failures to refer aliens who expressed a fear of return that may have ensued from this unclear guidance.

**B. DHS regulations require immigration inspectors to follow a standard script informing each alien that (s)he may ask for protection if (s)he has a fear of returning home. In approximately half of inspections observed, inspectors failed to inform the alien of the information in that part of the script. Aliens who did receive this information were seven times more likely to be referred for a credible fear determination than those who were not.**

**C. DHS inspectors observed by Study researchers asked, "Do you have any fear or concern about being returned to your home country or being removed from the United States?" 94 percent of the time; DHS inspectors observed by Study researchers asked, "Would you be harmed if you were returned to your home country or country of last residence?" 87 percent of the time. At least one of these questions was asked 95 percent of the time.**

**D. Approximately 85 percent (67/79) of arriving aliens whom the Study observed expressing a fear of return were referred for a credible fear interview, in accordance with DHS regulations. However, in 15 percent of observed cases (12/79) where an arriving alien expressed a fear of return to the inspector, that alien was not referred.**

The 12 cases that were not referred included expressions of economic fear but also fear related to political, religious, or ethnic persecution, as well as unspecified fear, fear of spouse abuse, and fear of smugglers. Under DHS regulations, all of these aliens should have been referred for a credible fear interview.

**E. While monitoring the San Ysidro land border port of entry, researchers interviewed two groups of aliens who were previously refused a referral to secondary inspection, despite expressing an intention to apply for asylum. Aliens at busy land ports of entry are particularly vulnerable to improper denials of credible fear referrals, even though this is contrary to DHS policy.**

While monitoring the San Ysidro port of entry, the Study became aware of two instances in which primary inspectors improperly refused entry to the United States for applicants lacking proper documentation and "pushed back" those applicants without referring them to secondary inspection or creating a record of the primary inspection. In contrast, at airports, aliens cannot simply be put on a return flight without an inspector documenting the interaction. Moreover, primary inspections at any busy port of entry are difficult for observers or supervisors to monitor. This is particularly true in San Ysidro, where primary inspectors inspect an average of 25,000 pedestrians per day and 50,000 automobile passengers, with 24 lanes of traffic. Nevertheless, while in San Ysidro, Study researchers encountered two small groups of aliens who reported asking for asylum at primary inspection, but were nevertheless refused a referral to secondary

**JA-220**

inspection or a credible fear determination in clear violation of DHS procedures.[5]  These aliens came to the attention of the Study after they made a subsequent, successful request for a credible fear referral the following day.

**F. Files of cases resulting in Expedited Removal generally included the required documents used to screen aliens to determine whether the alien had a fear of return, and whether he or she should be referred for a credible fear interview.   The reliance of Customs and Border Protection (CBP) on file reviews for quality assurance, however, is insufficient to ensure that aliens who express a fear of return are referred for a credible fear determination.**

CBP does not have sufficient controls in place to ensure that inspectors are referring all aliens who express a fear of return for a credible fear determination.  While a handful of ports of entry use video cameras to help protect inspectors from allegations of improper conduct during secondary inspections, most ports rely heavily on paper files to determine whether inspectors are following procedures.  While the paper files generally appear to be complete, Study observations indicate that paper files created by the inspector are not always reliable indicators of whether that inspector should have referred an alien for a credible fear determination.   Study researchers found that the file often indicated that all four fear questions were asked of the alien, even when they were not.  Conversely, when the questions were asked, the file occasionally indicated they had not been.  Of special concern in the 12 cases mentioned above where the alien responded to the fear question by asserting that (s)he had a fear of return, seven of the files memorializing those inspections incorrectly indicated that the alien responded that (s)he had no fear of return.

---

[5] While field guidance was distributed on February 6, 2002 instructing INS Inspectors on these procedures for referring asylum seekers at land ports of entry, it appears that the Inspectors Field Manual has not yet been updated to reflect those instructions, in spite of an indication in the memorandum that it would be.

JA-221

QUESTION THREE

*(3) ARE IMMIGRATION OFFICERS, EXERCISING AUTHORITY UNDER EXPEDITED REMOVAL, INCORRECTLY REMOVING ASYLUM SEEKERS TO COUNTRIES WHERE THEY MAY FACE PERSECUTION?*

*The second Study question concerned bona fide asylum seekers who are improperly denied a referral for a credible fear determination.  While such asylum seekers may be removed to a country where they may face persecution, those findings are not repeated here.  Rather, to respond to this question, the focus is on asylum seekers who are removed after the credible fear interview.  In addressing this question, it is also appropriate to examine asylum seekers ordered removed by the immigration judge at the conclusion of their asylum hearing, focusing on the characteristics of the proceeding which are unique to cases that originate in Expedited Removal.*

*Asylum officers reach a negative credible fear determination in only one percent of cases referred.  Moreover, a negative credible fear determination is subject to strict quality assurance procedures by Asylum headquarters, and may then be reviewed by an immigration judge, who vacates negative credible fear findings reached by asylum officers more than ten percent of the time.*

*Under the current system, immigration judges – not asylum officers – determine eligibility for asylum for aliens in Expedited Removal proceedings.  We found very significant variations in the asylum approval rates of individual judges  Furthermore, in nearly 40% of the immigration judge decisions examined where relief was denied, the judge cited that the applicant's testimony was inconsistent with his or her initial asylum claim, as expressed to the immigration inspector or the asylum officer at the time of the credible fear interview.  In nearly one-fourth of these cases, the Judge found that the asylum-seeker's testimony was not credible because the alien "added detail" to the prior statements.  Such negative credibility findings fail to take into account that the records of these prior statements are, according to the findings of the Study, often unreliable and incomplete.  Finally, immigration judges granted relief to 25 percent of represented asylum applicants but only two percent of unrepresented asylum seekers.*

*After being denied asylum, an alien who continues to claim a fear of persecution or torture may appeal a negative immigration judge decision to the Board of Immigration Appeals (BIA).  While the BIA sustained 23 percent of Expedited Removal asylum appeals in FY2001, only two – four percent of such appeals have been granted since 2002, when the court began allowing the issuance of "summary affirmances" rather than detailed decisions.  Statistically, it is highly unlikely that any asylum seeker denied by an immigration judge will find protection by appealing to the BIA.*

**Specific Findings**

**A. DHS and the Executive Office for Immigration Review (EOIR) have implemented a screening standard and procedures which ensure that asylum officers conducting the credible fear screening do not incorrectly remove asylum seekers subject to Expedited Removal to countries where they may face persecution.**

JA-222

According to statistics compiled for the Study, in FY2003 90 percent of aliens referred were found to have a credible fear of persecution, nine percent withdrew their credible fear claims, and only one percent were found by the asylum officer not to have a credible fear. Furthermore, among those aliens who requested that an immigration judge review the negative credible fear determination, ten percent were ultimately found to have a credible fear.  In addition to the right of review by an immigration judge, USCIS requires that the Asylum office at USCIS headquarters review every negative credible fear determination.

The Form I-870 documents that an alien has a credible fear of persecution due to "a significant possibility" that during a full asylum hearing, (1) "the applicant would be found to be credible"; and (2) the applicant has a fear of torture or would establish a fear of return which could have a nexus to one of the grounds for asylum.  Nevertheless, because USCIS imposes much more labor intensive quality assurance procedures for negative credible fear findings than for positive ones, the agency may be inadvertently encouraging its asylum officers to find "credible fear" even in cases where it may not be warranted.

**B.** **The "Record of Sworn Statement" (Form I-867A and B) records created at ports of entry during the Expedited Removal process are often incomplete and less than reliable.  Reliance on these records by immigration judges for purposes of assessing the credibility of an asylum applicant's testimony in court could, therefore, lead to the incorrect removal of asylum seekers to countries where they may face persecution.  In 31 percent (43/137) of transcripts reviewed, immigration judges denying asylum cited the asylum seeker's statement made to the immigration inspector at the port of entry, as recorded on Form I-867A and B.**

The Form I-867A and B is written in question and answer format, implying that it is a verbatim transcript.  Moreover, it includes a paragraph informing the applicant that (s)he may apply for protection if (s)he has a fear of return.  The Study observed that this paragraph, which is part of the sworn statement "verbatim" script, is in fact read to the applicant only 44 percent of the time (164/354).  In addition, while each of the required questions relating to the applicant's fear of return was asked approximately 95 percent of the time, in 32 of the 37 cases when a particular fear question was not asked, the sworn statement in the file inaccurately indicated that it had been asked – and answered.  Finally, the form indicates that the information on the sworn statement was read back to and verified by the alien. However, the statement was not, in fact, reviewed by the alien, interpreter, or interviewing officer in 72 percent of the cases observed (268/373).

The Inspector Field Manual instructs immigration inspectors taking the sworn statement: "Do **not** go into detail on the nature of the alien's fear of persecution or torture (emphasis in original)."  Nevertheless, in 23.3 percent of cases (10/43) reviewed in which the judge cited the sworn statement as a basis for denying asylum, the judge found that the applicant was not credible because the alien's testimony in court reflected additional detail not in the original document from the port of entry.

Finally, with the exception of Houston and Atlanta airports, the ports of entry observed did not create an audio or videotape of the secondary inspection interview, but relied entirely on

**JA-223**

an unwitnessed statement as transcribed by the interviewing officer.  Even in Atlanta and Houston, where secondary inspections are videotaped, the videos are taped over within a few months.  They are, therefore, seldom available to the government or the alien during consideration of the alien's asylum application before the immigration judge.

**C.  The asylum officer's notes from the asylum seeker's credible fear interview, as recorded on the Form I-870, are generally incomplete summaries of the asylum seeker's claim and not a verbatim transcript of the credible fear interview itself.  Nevertheless, in 29 percent (40/137) of transcripts reviewed, immigration judges denying asylum on credibility grounds cited these notes.**

In a survey conducted at all eight regional asylum offices, the offices unanimously affirmed the Study's characterization that the statement taken at the time of the credible fear interview is used "to record just the basics of a positive determination, to show whether the alien has met the threshold for credible fear.  The credible fear statement does not generally represent a complete description of the alien's asylum claim."  Nonetheless, in 25 percent (10/40) of the cases in which the credible fear notes were cited as a basis to find that the applicant lacked credibility, the immigration judge specified that the applicant was not credible because at the immigration hearing, (s)he added detail to the claim originally expressed during the credible fear interview.

After a revision of the Form I-870 (November 21, 2003), the form indicated that:  "The following notes are not a verbatim transcript of this interview…There may be areas of the individual's claim that were not explored or documented for purposes of this threshold screening."  While this language on the form I-870 was not in effect until after the period covered by the Study, it nevertheless confirms the limitations of the evidentiary value of the form.

**D.  The outcomes of asylum claims for asylum seekers who were placed in Expedited Removal vary significantly across courts and judges.**

The Study identified wide statistical variations of grant rates of individual immigration judges for asylum seekers in Expedited Removal proceedings, even among aliens of the same nationality or among judges with the same caseload sitting in the same court.

**E.  In recent years, there has been a substantial decrease in the granting of alien appeals by the Board of Immigration Appeals (BIA).**

Moreover, statistics gathered in the Study demonstrate that since the BIA decision to permit "affirmances without opinion" (rather than opinions specifying the reasons for the decision) for asylum, withholding, and relief under the Convention Against Torture (CAT), the BIA, in deciding appeals filed by asylum seekers subject to Expedited Removal, has gone from reversing 23 percent of immigration judge decisions to reversing only two to four percent of such decisions.  With wide variations in asylum approval rates among judges (discussed above), and only two to four percent of those decisions now being overturned on appeal, the BIA may now offer little protection from the possibility of erroneous immigration judge decisions.

**F. Asylum seekers subject to Expedited Removal who are represented by an attorney are granted relief 25 percent of the time; this contrasts with asylum seekers representing themselves, who are granted relief two percent of the time.**

Asylum hearings before an immigration judge are adversarial proceedings, where an asylum applicant faces not only the immigration judge but also a DHS trial attorney who almost without exception argues that the alien should be removed. Asylum applicants in Expedited Removal proceedings are entitled to counsel, but only at no expense to the government. The Executive Office for Immigration Review (EOIR), the Arlington Asylum Office (in cooperation with the Capital Area Immigrants' Rights Coalition), and numerous non-profit organizations have developed various programs which assist detained asylum seekers in receiving legal advice and finding legal counsel. Most of these, however, are largely dependent on the local supply of legal representation. However, many of the approximately 185 detention facilities used by DHS to house asylum seekers subject to Expedited Removal are in areas, which are served by neither of these programs nor by private asylum attorneys.

QUESTION FOUR

*(4) ARE IMMIGRATION OFFICERS, EXERCISING AUTHORITY UNDER EXPEDITED REMOVAL, DETAINING ASYLUM SEEKERS IMPROPERLY OR UNDER INAPPROPRIATE CONDITIONS?*

*Asylum seekers subject to Expedited Removal must, by law, be detained until an asylum officer has determined that they have a credible fear of persecution or torture, unless release (parole) is necessary to meet a medical emergency need or legitimate law enforcement objective. The Study found that most asylum seekers are detained in jails and in jail-like facilities, often with criminal inmates as well as aliens with criminal convictions. While DHS has established detention standards, these detention facilities closely resemble, and are based on, standards for correctional institutions.*

*In one particularly innovative Immigration and Customs Enforcement (ICE) contract facility, located in Broward County, Florida, asylum seekers are detained in a secure facility which does not closely resemble a jail. While Broward could be the model in the United States for the detention of asylum seekers, it is instead the exception among the network of 185 jails, prisons and "processing facilities" utilized by DHS to detain asylum seekers in Expedited Removal.*

*DHS policy favors the release of asylum seekers who have established credible fear, identity, community ties, and no likelihood of posing a security risk. However, there was little documentation in the files to allow a determination of how these criteria were actually being applied by ICE.*

*In FY2003, only 0.5 percent of asylum seekers subject to Expedited Removal in the New Orleans district were released prior to a decision in their case. In Harlingen, Texas, however, nearly 98 percent of asylum seekers were released. Release rates in other parts of the country varied widely between those two figures.*

**Specific Findings**

    A.  **The law and regulations require that aliens in Expedited Removal be detained until it is determined that they have a credible fear of return unless parole is necessary to meet a medical emergency or legitimate law enforcement objective.**

    B.  **The overwhelming majority of asylum seekers in Expedited Removal are detained in jails and jail-like facilities, often with criminal inmates and aliens with criminal convictions.**

The standards applied by ICE for all of their detention facilities are identical to, and modeled after, correctional standards for criminal populations. In some facilities with "correctional dormitory" set-ups, there are large numbers of detainees sleeping, eating, going to the bathroom and showering out in the open in one brightly lit, windowless and locked room. Recreation in ICE facilities often consists of unstructured activity of no more than one hour per day in a small outdoor space surrounded by high concrete walls or a chain link fence. All

**JA-226**

detainees must wear prison uniforms, and a guard is posted in each dormitory room all day and night. Conditions do vary from facility to facility, but nearly all are prisons or prison like. In contrast, the Executive Committee of the United Nations High Commissioner for Refugees, of which the United States is a member, has recommended that national legislation and administrative practice make the necessary distinction between criminals, refugees and asylum seekers, and other aliens.[6]

**C. DHS detains some asylum seekers in Expedited Removal in a secure facility which does not resemble a conventional jail and at a cost comparable to that of other DHS detention centers.[7] The facility, located in Broward County, Florida, has the potential to be copied in other locations, but has not yet been.**

The Broward County facility allows detainees to walk outside in a secure grassy courtyard during all daylight hours, use the toilet and the shower without anyone else watching, wear civilian clothing, and freely walk to class or other programmed activities without an armed escort.

**D. DHS Policy Guidance, while not set in regulation, favors the release of asylum seekers who establish credible fear, identity, community ties, and who do not pose a security or flight risk.**

**E. The decision-making criteria applied by Immigration and Customs Enforcement (ICE) in considering parole are not readily discernible from the information contained in the file.**

ICE has not developed a form that documents the decision-making process for parole. Thus, it cannot be easily ascertained from ICE records whether the criteria are being appropriately applied to asylum seekers subject to Expedited Removal.

**F. The USCIS (U.S. Citizenship and Immigration Services) Form I-870, completed by an asylum officer during the credible fear interview, collects information relating to some of the criteria which DHS guidance indicates should be applied to parole decisions. The asylum officer, however, does not make a recommendation to ICE concerning release. ICE and USCIS, however, seem to have different interpretations of key definitions relevant to the release criteria. For example, while**

---

[6] UNHCR Executive Committee Conclusion No. 44 (1986) on Detention of Refugees and Asylum Seekers, paragraphs (a), (d) and (f). In that conclusion, the Executive Committee "(a) *Noted* with deep concern that large numbers of refugees and asylum seekers in different areas of the world are currently the subject of detention or similar restrictive measures by reason of their illegal entry or presence in search of asylum, pending resolution of their situation; …(d) *Stressed* the importance for national legislation and/or administrative practice to make the necessary distinction between the situation of refugees and asylum seekers, and that of other aliens; and (f) *Stressed* that conditions of detention of refugees and asylum seekers must be humane. In particular, refugees and asylum seekers shall, whenever possible, not be accommodated with persons detained as common criminals, and shall not be located in areas where their physical safety is endangered…"

[7] The Broward County facility costs DHS approximately $83 per bed per night, compared to a national average cost of $85.

**JA-227**

**ICE does not define its interpretation of release criteria, USCIS determines identity on the basis of "a reasonable degree of certainty."**

According to the file review, 20 percent of asylum seekers whom USCIS determined identity with a reasonable degree of certainty and collected community ties information were not released from detention by ICE prior to their asylum hearing. From most of these files, the Study could not ascertain the basis for ICE's decision whether or not to release the alien.

**G. The Study found no evidence that ICE is consistently applying release criteria.**

Statistical review also revealed that while the average ICE district releases 63 percent of asylum seekers prior to their asylum hearing, release rates varied in major districts from .5 percent (New Orleans) to 97.6 percent (Harlingen). With such variations, the Study concludes that the formal release criteria are not being consistently applied. Moreover, the Study's statistical review found that variations in parole rates from ICE facilities across the country are associated with factors other than the established parole criteria, including port of entry and country of origin.

**H. DHS regularly places aliens with facially valid documents in Expedited Removal and mandatory detention, for the sole reason that they expressed an intention to apply for asylum.**

According to the review of 353 files, 18 asylum seekers with facially valid documents were placed in Expedited Removal proceedings and were subject to mandatory detention, solely because they informed the inspector of an intention to apply for asylum. Six of these asylum seekers volunteered their intention to apply for asylum at primary inspection. According to CBP, such asylum seekers "in most cases" are subject to Expedited Removal because, while they hold a temporary visa, their intention to apply for asylum indicates that they intend to reside in the United States permanently.[8]

---

[8] In its policy memorandum on the topic, DHS (then INS) does not define "most cases." *See* "Aliens Seeking Asylum at Land Border Ports of Entry," Memorandum from Michael A. Pearson, Executive Associate Commissioner, Office of Field Operations, Immigration and Naturalization Service, to Regional Directors (2/6/2002).

**JA-228**

ASYLUM SEEKERS IN EXPEDITED REMOVAL:
*A Study Authorized by Section 605 of the International Religious Freedom Act of 1998*

## RECOMMENDATIONS

### OVERVIEW

In establishing Expedited Removal, Congress included a number of safeguards and mandated that the Attorney General ensure that legitimate asylum seekers fleeing persecution or torture would not be "expeditiously removed" to the countries they had fled. The Immigration and Naturalization Service (INS), indeed, implemented procedures intended to protect bona fide asylum seekers from involuntary return, and those procedures remain in effect today. INS (now Department of Homeland Security) officers were, and continue to be, trained in these procedures.[1] With some exceptions, however, such procedures have not been enforced through effective quality assurance measures. The Study observed several failures to comply with a number of required procedures. It also observed some aliens who expressed a fear but were nevertheless returned without being referred to an asylum officer, as the CBP inspector is required to do by law.

### DHS detention practices are ill-suited to the non-criminal asylum seeking population

Prior to the establishment of Expedited Removal, criminal aliens generally took priority over arriving asylum seekers in the allocation of INS detention bed space. With the establishment of Expedited Removal, however, INS was required to detain nearly all arriving asylum seekers. In spite of this, INS did not create any program to oversee the new challenges posed by its growing population of non-criminal asylum seekers in detention. No new procedures or trainings were created within INS to address challenges posed by its mandate to detain non-criminal asylum seekers at least until their credible fear hearing. The Study found that asylum seekers subject to Expedited Removal are detained under the same conditions as criminal inmates, and that standardized procedures have not been implemented to determine whether – or not – an asylum seeker should be released.

### Agency Coordination

On March 1, 2003, INS was abolished and its components separated into different lines of reporting within the newly created Department of Homeland Security (DHS). Four different components of DHS are now involved in Expedited Removal. Under the current structure of DHS, any differences among these agencies must be resolved by the Secretary or Deputy Secretary of Homeland Security. This makes it exceedingly difficult to address inter-bureau issues regarding Expedited Removal, as those officials already oversee an amalgamation of 22 former federal agencies, including INS. As a practical matter, procedural difficulties regarding credible fear, parole, and conditions of detention cannot compete with the myriad of demands on the Secretary's time and attention and indeed should be resolved at lower levels. In addition, the prominent role in asylum matters retained by the Executive Office for Immigration Review

---

[1] INS, an agency within the Department of Justice, was abolished by the Homeland Security Act of 2002 and its functions were folded into the Department of Homeland Security (DHS) in March 2003.

**JA-229**

(EOIR), which remained in the Department of Justice, further complicates the capability of DHS to address cross-cutting issues of Expedited Removal policy, implementation and quality assurance.

While the refugee and asylum programs are housed within U.S. Citizenship and Immigration Services (USCIS) at DHS, neither USCIS nor any other office has been given the authority to resolve, or even to act as a forum on, inter-bureau issues relating to the impact of Expedited Removal on asylum seekers and refugees. Rather, DHS has relied on ad hoc "working groups," such as the recently formed working group on credible fear determinations, to address particular issues after they arise.

## Expansion of a System with Serious Flaws

Congress mandated that Expedited Removal be applied to improperly documented aliens at ports of entry. It also permitted Expedited Removal to apply, at Departmental discretion, to aliens apprehended within 24 months after an entry without inspection. In November 2003, the Commissioner of the INS exercised his discretion to expand Expedited Removal to aliens who entered without inspection by sea within 24 months prior to apprehension. In August 2004, the Secretary of Homeland Security further expanded Expedited Removal to aliens who enter without inspection by land and are apprehended within 100 miles of the border within 14 days after their last entry. Both of these expansions of Expedited Removal occurred at a time when coordination among the different actors in Expedited Removal was particularly difficult, i.e. as the INS was being disassembled and its components placed in different sections of DHS.

The Study has cited several ways in which asylum seekers who express a fear of return are nevertheless at some risk of being returned without being permitted to speak to an asylum officer. If referred, they are almost certain to be detained in jail or under jail-like conditions.

We are concerned that Expedited Removal has been expanded several times without an official mechanism – such as a Refugee Coordinator - to resolve the problems which arise in its implementation, particularly those requiring inter-bureau or inter-agency cooperation. We are also concerned that the following recommendations would be difficult to implement without such a mechanism.

## RECOMMENDATION ONE

IN ORDER TO MORE EFFECTIVELY PROTECT BOTH HOMELAND SECURITY AND BONA FIDE ASYLUM SEEKERS, THE DEPARTMENT OF HOMELAND SECURITY SHOULD CREATE AN OFFICE- HEADED BY A HIGH-LEVEL OFFICIAL- AUTHORIZED TO ADDRESS CROSS CUTTING ISSUES RELATING TO ASYLUM AND EXPEDITED REMOVAL.

**1.1** ***The Department of Homeland Security should create an office headed by a high-level Refugee Coordinator, with authority to coordinate DHS policy and regulations, and to monitor the implementation of procedures affecting refugees or asylum seekers, particularly those in the Expedited Removal process.***

JA-230

The Study found that responsibilities for the treatment of asylum seekers in Expedited Removal are divided among several entities within DHS; therefore, resolving policy or procedural issues in this area currently requires the involvement of the Secretary or Deputy Secretary.[2]

The Study also found that there was no effort or program at DHS to assess on an agency-wide basis the treatment of asylum seekers in Expedited Removal.  Nor were there adequate quality control measures in place to assess the impact on asylum seekers of the individual pieces of the process.

The Study also identifies significant problems in implementing and maintaining the safeguards for asylum seekers that Congress established.  In order for these problems to be addressed, and given the current structure and lines of authority at DHS, a coordinating office is necessary to (a) ensure consistent asylum policy and legal interpretations Department-wide; (b) coordinate implementation of necessary changes set forth in the Study's recommendations; and (c) monitor the system on an agency-wide basis to see that changes take hold and that emerging problems are addressed as they arise.  For example, the office would address problems identified in this Study concerning credible fear referrals at ports of entry; credible fear determinations; decisions concerning withdrawals of applications for admission; dissolutions of credible fear claims; the development of detention standards and facilities specific to asylum seekers; and information relating to parole criteria and conditions of detention specific to asylum seekers.  Addressing these problems would require a consistent DHS-wide asylum and refugee policy, as well as inter-bureau discussions of how the various pieces of the process function and relate to one another.[3]

With the expansion of Expedited Removal authority, there are now four entities within DHS that can enter an Expedited Removal order:  CBP Inspectors at ports of entry (for arriving aliens); Border Patrol (for aliens apprehended in the interior pursuant to the inland Expedited Removal procedures promulgated on August 11, 2004); the Office of Asylum (for aliens who fail to establish a credible fear of persecution); and Immigration and Customs Enforcement (ICE).  It is critical to have these four entities treating asylum seekers by the same rules and procedures,

---

[2] Although overall DHS was cooperative, difficulties in liaising with the agency during this study re-enforced the conclusion concerning the need for an individual with coordinating authority across bureaus.  Specifically, DHS was unable to name any individual in a position to act as the primary liaison between the Department and Commission experts.  While DHS assigned USCIS as the nominal primary contact, conducting the Study required establishing separate working relationships with Detention and Removal Operations within the Bureau of Immigration and Customs Enforcement (ICE-DRO), Inspections, Border Patrol, USCIS, the Office of Immigration Statistics, as well as the Executive Office for Immigration Review (EOIR), in the Department of Justice.  While the Study was being conducted, the experts were unable to discern who at DHS had responsibility for inter-bureau policy or DHS-wide operational asylum issues.  Nevertheless, all agencies with whom we worked were cooperative in working with the Study.  A number of agency officials confirmed that inter-bureau differences in approach are currently difficult to resolve.

[3] We recognize, however, that such an office need not be focused exclusively on Expedited Removal issues, but other inter-bureau refugee and asylum issues as well; e.g. refugee issues arising from interdictions of aliens at sea; asylum issues arising from the Memorandum of Understanding on Asylum with Canada; the detention of asylum seekers other than those in Expedited Removal proceedings; linkages between overseas enforcement programs and the refugee resettlement program, etc.

JA-231

and to ensure that information is being adequately shared.  At this point, such coordination is only possible if done by the Office of the Secretary.  The Secretary should delegate this responsibility to an individual who is authorized to coordinate the various entities' work relating to the protection of refugees and asylum seekers. Otherwise, with the recent expansions of Expedited Removal, and its serious flaws, the United States' tradition of protecting asylum seekers – not to mention those asylum seekers' lives – continues to be at risk.

## RECOMMENDATION TWO

DECREASE THE BURDENS ON IMMIGRATION COURTS, THE DETENTION SYSTEM, AND THE APPLICANTS BY PERMITTING ASYLUM OFFICERS TO GRANT ASYLUM CLAIMS DURING THE CREDIBLE FEAR INTERVIEW.

**2.1** ***The burden on the detention system, the immigration courts, and bona fide asylum seekers in Expedited Removal themselves should be eased by allowing asylum officers to grant asylum in approvable cases at the time of the credible fear interview, just as they are already trained and authorized to do for other asylum seekers.***

With some amendments to the regulations, the credible fear interview could further expedite both the removal of aliens without bona fide asylum claims and the adjudication of asylum claims.  These changes would reduce the time spent in, and government funds spent on, detention.

Asylum officers are already trained and authorized to adjudicate asylum claims; therefore, they should be permitted to grant asylum at the time of the credible fear interview for those asylum seekers in Expedited Removal who are able to establish that they meet the criteria at that early juncture.  This is precisely what asylum officers do for asylum seekers whose claims are addressed in the "affirmative asylum" process.  In that process, asylum officers are already trained in, and accustomed to, adjudicating full asylum applications from applicants who entered without inspection, or who successfully passed through the inspection process in spite of a lack of proper documentation.

Under this proposal, at the time of the credible fear interview, asylum officers would either (1) order the alien removed if (s)he fails to meet the credible fear standard (subject to review by an immigration judge); (2) grant the applicant asylum if (s)he establishes a well-founded fear of persecution; or (3) refer the alien to an immigration judge for a *de novo* proceedings if the alien's fear is credible but the case requires further consideration or corroboration to warrant a grant of asylum.  Allowing asylum officers to grant asylum at this stage would reduce demands on detention beds, EOIR resources, trial attorney time, and reduce the time the bona fide asylum seeker spends in detention.

Moreover, in informal interviews with asylum seekers in Expedited Removal, it became evident that the high screen-in rate at the credible fear stage may give aliens a false sense of confidence about their eligibility for asylum. By allowing for an asylum determination at the time of the credible fear interview, an asylum seeker who is merely referred to an immigration judge rather than granted asylum may be in a position to better understand whether or not (s)he is

**JA-232**

eligible for asylum.  Therefore, this reform may lead to more aliens dissolving their asylum claims and spending less time in detention.

However, such reform would require an understanding among attorneys and aliens that continuances could not be granted by an asylum officer to delay the credible fear interview and that asylum seekers who needed more time would still have the benefit of a referral to an immigration judge.  This reform would not require a change in the Immigration and Nationality Act, as the statute does not specify who shall make the asylum determination in the case of an asylum seeker with a credible fear of persecution.

INS had once endorsed this idea in the early years of Expedited Removal.  One argument against the proposal was that an asylum officer's decision not to approve an asylum claim at the time of the credible fear interview could prejudice the immigration judge's consideration of the asylum claim.  However, this concern is not supported by statistics made available to the Study by EOIR.  As seen in EOIR Table V, each year immigration judges grant asylum to approximately 20 percent of affirmative cases referred to them by asylum officers.  This compares with an approval rate of approximately 25 percent for credible fear cases referred to immigration judges by asylum officers.  By granting relief in 20 percent of cases where asylum officers have declined to, immigration judges do not appear to be prejudiced by asylum officer determinations in the affirmative process.  With proper training and an understanding that compressed time frames may make it difficult for asylum seekers in Expedited Removal to establish eligibility at the time of the credible fear interview, immigration judges would not likely be prejudiced by asylum officer decisions not to grant asylum at the credible fear stage.

## RECOMMENDATION THREE

ESTABLISH DETENTION STANDARDS AND CONDITIONS APPROPRIATE FOR ASYLUM SEEKERS. DHS SHOULD ALSO PROMULGATE REGULATIONS TO PROMOTE MORE CONSISTENT IMPLEMENTATION OF EXISTING PAROLE CRITERIA, TO ENSURE THAT ASYLUM SEEKERS WITH A CREDIBLE FEAR OF PERSECUTION- AND WHO POSE NEITHER A FLIGHT NOR A SECURITY RISK- ARE RELEASED FROM DETENTION.

### 3.1 *DHS should address the inconsistent application of its parole criteria by codifying the criteria into formal regulations.*

The INS established criteria for the release of asylum seekers (i.e. credible fear, community ties, establishment of identity, and not a suspected security risk) and these criteria continue, in theory, to be in effect at DHS. The Study, however, found that rates of release vary dramatically in different parts of the country and there is no evidence that these criteria are being applied consistently.  Codification of the parole criteria into regulations will help ensure that DHS consistently detains those aliens who do not meet the criteria and releases those who do.

### 3.2 *DHS should develop standardized forms and national review procedures to ensure that its parole criteria are more consistently applied nation-wide.*

In addition to codifying its criteria in formal regulations, DHS should create standardized forms and review procedures to address inconsistent application of its release criteria for asylum

**JA-233**

seekers.  In trying to understand the wide variations in release rates, the Study found no evidence of quality assurance procedures to ensure that these criteria are being followed.  Nor do DHS files usually include the information or forms necessary to ascertain whether or not the criteria are being applied. Detention and Removal Operations (ICE-DRO) should develop a form, perhaps modeled after the USCIS Form I-870, as well as associated national review procedures, to assess consistent application of the parole criteria.  This will help ensure that asylum seekers who do not pose a security risk and who establish a credible fear of persecution, community ties, and identity are not improperly detained.  The form would require DHS to document its assessment of each of the parole criteria.

**3.3** ***When non-criminal asylum seekers in Expedited Removal are detained, they should not be held in prison-like facilities, with the exception of those specific cases in which DHS has reason to believe that the alien may pose a danger to others.  Rather, non-criminal asylum seekers should be detained in "non-jail-like" facilities such as the model developed by DHS and INS in Broward County, Florida.  DHS should formulate and implement nationwide detention standards created specifically for asylum seekers. The standards should be developed under the supervision of the proposed Office of the Refugee Coordinator, and should be implemented by an office dedicated to the detention of non-criminal asylum seekers, developing a small number of centrally managed facilities specific to and appropriate for, asylum seekers.  The current DHS standards – based entirely on a penal model -- are inappropriate.***

U.S. law and DHS regulations are silent on whether asylum seekers should have detention standards that are different from those applied to other aliens.  The Executive Committee of the United Nations High Commissioner on Refugees (UNHCR) has, however, spoken on the subject.  Specifically, in UNHCR Executive Committee Conclusion No. 44 (1986) on Detention of Refugees and Asylum Seekers, the Executive Committee noted "deep concern" that large numbers of asylum seekers are the "subject of detention" and "stressed the importance for national legislation or administrative practice to make the necessary distinction between the situation of refugees and asylum seekers, and that of other aliens" and "stressed that conditions of detention of refugees and asylum seekers must be humane and that, in particular, refugees and asylum seekers shall, whenever possible, not be accommodated with persons detained as common criminals…."

We have found that detained asylum seekers in Expedited Removal are subjected to conditions of confinement that are virtually identical to those in prisons or jails.  These conditions create a serious risk of institutionalization and other forms of psychological harm. They are inappropriate, particularly for an already traumatized population of asylum seekers, and unnecessary.  ICE's own "non-jail-like detention" model in Broward County, Florida has demonstrated that asylum seekers may be securely detained in an environment which does not resemble a jail and which is no more expensive than more secure facilities.  Broward is, however, the only such non-jail-like detention facility among the 185 jails, prisons, and detention centers where ICE detains asylum seekers.

The Study concurs with the UNHCR Executive Committee that asylum seekers have different issues and needs than those faced by prisoners or even other aliens, and standards should be developed in recognition of this important distinction.   While DHS has its own

JA-234

"Detention Standards" to ensure that aliens are detained under acceptable conditions, these standards are virtually identical to, and indeed are based on, correctional standards. Asylum seekers who are not criminals should not be treated like criminals.

We recommend that the proposed Office of the Refugee Coordinator oversee the development and implementation of those standards, and that an office be established to oversee the centralized development and management of non-jail-like asylee detention facilities. Standards appropriate for asylum seekers cannot be implemented in the existing decentralized network of 185 detention facilities, nearly all of which are either jails or jail-like detention centers.

**3.4** ***DHS should ensure that personnel in institutions where asylum seekers are detained are given specialized training to better understand and work with a population of asylum seekers, many of whom may be psychologically vulnerable due to the conditions from which they are fleeing.***

In the Study's survey of approximately 20 detention facilities that house more than 70 percent of the population of asylum seekers subject to Expedited Removal, only one facility indicated that line officers or guards were explicitly told which detainees were asylum seekers. In addition, staff at very few facilities were given any specific training designed to inform them of the special needs or concerns of asylum seekers, and in only one facility did the staff receive any training to enable them to recognize or address any of the special problems which victims of torture or other victims of trauma may have experienced. As noted above, asylum seekers have different needs than, and should be distinguished from, other aliens. Indeed, unlike other migrants, bona fide asylum seekers have a well-founded fear of persecution, and may also have special needs and problems stemming from that fear. This distinction underscores the need for specialized training for guards and other detention center employees.

**3.5** ***DHS should exercise discretion and not place a properly documented alien in Expedited Removal – and mandatory detention – when the sole basis for doing so is the alien's expression of a desire to apply for asylum at the port of entry***.

Under DHS policy, when an alien at a port of entry indicates a desire to seek asylum, that alien is placed in Expedited Removal after being charged with inadmissibility as an intending immigrant under section 212(a)(7)(A)(i)(l) of the Immigration and Nationality Act for having misrepresented the purpose of obtaining a visa to the United States. According to DHS, the intention to apply for asylum is not permissible with a visa for a temporary stay in the United States. The Study reviewed 353 files of aliens referred for credible fear from FY2002 to FY2003, and found 18 asylum seekers who had valid documents and were placed in Expedited Removal proceedings after expressing an intention to apply for asylum.[4]

---

[4] Recently, this practice was the subject of press attention, when the 81 year old Reverend Joseph M. Dantica, a frequent visitor to the United States in possession of a valid visitor visa from Haiti, was placed in Expedited Removal proceedings. Rev. Dantica was placed in Expedited Removal because, when asked by the inspector how long he intended to remain, the Reverend responded that he intended to apply for "temporary asylum." Dantica was sent to the Krome detention center in Florida, where he collapsed during his credible fear interview and died shortly thereafter.

**JA-235**

The Study questions whether it is necessary or desirable to place such aliens with facially valid documents and whose identity is not in doubt in Expedited Removal and mandatory detention solely because the alien expresses an intention to apply for asylum. We urge DHS to revisit its presumption that an intention to apply for asylum is tantamount to an intention to "immigrate" to the United States. Asylee status is not "immigrant" status. In fact, asylees may not apply for "immigration" status (i.e. lawful permanent residence) until twelve months after they receive asylum. Even then, asylees can only become lawful permanent residents after an "asylum adjustment" number becomes available, which now takes more than a decade.

## RECOMMENDATION FOUR

EXPAND EXISTING PRIVATE-PUBLIC PARTNERSHIPS TO FACILITATE LEGAL ASSISTANCE FOR ASYLUM SEEKERS SUBJECT TO EXPEDITED REMOVAL, AND IMPROVE ADMINISTRATIVE REVIEW AND QUALITY ASSURANCE PROCEDURES TO IMPROVE CONSISTENCY IN ASYLUM DETERMINATIONS BY IMMIGRATION JUDGES.

**4.1** *Statistics specific to Expedited Removal establish that asylum seekers without legal representation are at a significant disadvantage in presenting their asylum claim to the immigration judge. At the same time, other studies have shown that legal assistance actually improves the efficiency of the removal hearing process. Two programs in particular should be expanded:*

4.1.a *The Legal Orientation Program (LOP), administered by the Executive Office for Immigration Review (EOIR) in partnership with non-governmental organizations (NGO's), should be expanded beyond the seven facilities in which it is currently administered.*

With approval rates of 25 percent for represented asylum seekers in Expedited Removal and 2 percent for those who are unrepresented, the findings of the Study clearly underscore that unrepresented applicants have serious difficulties presenting their claim for asylum in an adversarial asylum proceeding. The LOP, directed by EOIR in partnership with numerous NGOs, has proven to be an effective and efficient model of facilitating representation for asylum seekers and other detainees at seven facilities. EOIR and a major study by the Department of Justice have demonstrated that such programs not only assist aliens with meritorious claims, but assist the government as well. Because they provide aliens without a realistic possibility of relief a better understanding of their prospects, legal orientation programs result in more efficient use of court and detention resources.

Regrettably, while Congress instructed that INS (now ICE) transfer $1 million in appropriated funds to EOIR for the LOP program each year from FY2002-2004, the funds for FY2003 have yet to be transferred. ICE did, however, agree to transfer $1 million in FY2005 funding on February 1, 2005. LOP funding should continue and, to the extent possible, be expanded system-wide.

4.1.b *Each of the local eight asylum offices should form partnerships with service providers in their area to ensure that asylum seekers have an attorney to consult with during the credible fear process. Such a collaborative project between the Arlington,*

**JA-236**

*Virginia Asylum Office and the Capital Area Immigrants Rights Coalition has already demonstrated that it can enhance the efficiency of the asylum process.*

The partnership developed between the Arlington asylum office (DHS-USCIS) and the Capital Area Immigrants' Rights Coalition, which endeavors to facilitate legal assistance for asylum seekers awaiting a credible fear interview, serves as another efficiency model. Specifically, since the launch of the program, the frequency of asylum seekers dissolving their claims in Arlington has increased by 50 percent, and it now has the highest dissolve rate of any asylum office in the country. After receiving legal counseling, an alien with no available relief is more likely to retract his or her claim and ask to be returned home, saving the government detention and immigration court costs and the alien wasted time in detention. Moreover, in many cases, legal assistance facilitated for purposes of the credible fear interview extends to representation at the time of the asylum hearing and helps ensure that asylum seekers with valid claims will not be returned to countries where they may face persecution.

Both of these public-private partnerships should be expanded for asylum seekers subject to Expedited Removal on a national basis to supplement other effective, but under-resourced, models of pro bono representation in various parts of the United States. Facilitating asylum seekers' access to legal assistance, however, will remain logistically difficult until DHS implements the Study's recommendation that detained asylum seekers be concentrated in a limited number of detention centers appropriate to asylum seekers.

*4.1.c  ICE and EOIR should also collaborate with local service providers to ensure that NGO's, particularly those that conduct "Know Your Rights Presentations" at DHS detention facilities in LOP, should have access to aliens in Expedited Removal proceedings, including those aliens who have not been referred for a credible fear determination, so long as such interviews do not delay the Expedited Removal process.*

The LOP model, and similar programs such as the "Know Your Rights Presentations" conducted by the Florence Immigrant and Refugee Rights Project (FIRRP), may also be useful in helping DHS identify cases which should be referred for a credible fear interview. When Commissioners and Study Experts visited Arizona in August 2004 in order to learn about the implementation by the Border Patrol of Expedited Removal, Border Patrol officials erroneously assured the delegation that all aliens in Expedited Removal would, while detained, be able to attend "Know Your Rights" presentations at the detention facility in Florence. According to subsequent conversations with other DHS officials and the FIRRP, which conducts such presentations, the only aliens who are able to meet with FIRRP are those scheduled for a hearing with an immigration judge. By definition, this limitation means that the only aliens in Expedited Removal who may meet with FIRRP are those whom Border Patrol has referred for a credible fear determination *and* who have then been found to have a credible fear of persecution by an asylum officer. By facilitating meetings with all aliens in Expedited Removal, DHS could both instill confidence that the Expedited Removal process is properly referring asylum seekers for a credible fear determination, and also allow organizations to bring to DHS' attention aliens who should *not* be returned without first seeing an asylum officer.

EOIR has already taken steps in this direction by allowing its contractors in the Legal Orientation Program to provide "self-help" training workshops when needed for unrepresented

**JA-237**

aliens interested in pursuing relief from removal or subject to special procedures.  The Study hopes that EOIR will be given the necessary resources to help ensure that aliens have the information they need to make the system both more efficient, and more just as well.

**4.2 The Study found significant variations in immigration judge grant rates for asylum claims referred through the Expedited Removal process.  This is true not only from court to court, but also from judge to judge within individual courts.  The Study also found that many immigration judges are relying heavily on Expedited Removal documents, which the Study found to be incomplete and less than reliable.  We recommend that these quality assurance and administrative review issues be addressed in the following ways:**

4.2.a  *The Board of Immigration Appeals (BIA) should revisit its recently adopted practice of allowing summary affirmances for asylum, withholding, and Convention Against Torture (CAT) relief since there are indications that this practice may be undermining the Board's effectiveness as the primary review mechanism for decisions by immigration judges.*

The BIA is the primary means for reviewing immigration judge decisions and correcting judicial error.  Three years ago, in order to "increase efficiency," the BIA authorized the use of one-sentence summary affirmances of immigration judge decisions.   Since that time, the sustain rate for appeals filed by asylum seekers subject to Expedited Removal has fallen from 23 percent to 4 percent.  This difference has not been adequately explained by EOIR and should be thoroughly investigated.  By making it significantly easier to affirm - rather than vacate - an immigration judge decision, the BIA may be inadvertently undermining its effectiveness as a quality assurance mechanism.  The application of summary affirmances to cases involving asylum, withholding and CAT relief should be revisited to ensure that the review process is equitable.

4.2.b  *EOIR should reinstate funding for immigration judge training and consider additional quality assurance procedures (i.e. peer review) to address the significant variations in approval and denial rates among immigration judges.  In particular, immigration judges should be provided training specific to issues related to the reliability of DHS forms that they use to ascertain the credibility of testimony; e.g. the Forms I-867 and I-870 analyzed by this study.*

The Study's statistical findings on the variability of immigration judge decisions on relief for asylum seekers in Expedited Removal highlight the need for these differences to be examined and explained in order to develop and implement appropriate training and quality assurance mechanisms.  Moreover, immigration judges should be trained and otherwise advised on the mechanics of the Expedited Removal process (i.e. the extremely limited probative value of the I-867 and I-870 forms).  Other methods of quality assurance, e.g. peer review panels, should be considered as well.  Yet, due to budget shortfalls, the immigration judges have not held a training conference for several years.  Such trainings are necessary, and should be re-established.

JA-238

RECOMMENDATION FIVE

IMPLEMENT AND MONITOR QUALITY ASSURANCE PROCEDURES TO ENSURE MORE RELIABLE
INFORMATION FOR HOMELAND SECURITY PURPOSES, AND TO ENSURE THAT ASYLUM SEEKERS ARE
NOT TURNED AWAY IN ERROR.

**System Wide**

**5.1 *Create a reliable inter-bureau system that tracks real-time data of aliens in Expedited
Removal proceedings.***

The Office of Immigration Statistics within DHS is currently dependent on each of the
organizational components (USCIS, ICE, CBP) spread across this vast agency – and beyond
(with the EOIR in the Department of Justice) – in order to obtain statistics on immigration
activities in general, and Expedited Removal/Asylum activities in particular.  There is currently
no capability to track statistics of aliens from the beginning of the Expedited Removal process –
at the port of entry, through detention, and up until the completion of the hearing before the
immigration judge at the Department of Justice.  Most of the statistics in this Study had to be
cobbled together from different non-interactive systems with different data.  Other statistics
sought – such as breakdowns by nationality of aliens permitted to withdraw their applications for
admission – were simply not being tracked by DHS databases.  Quality assurance and integrated
operations cannot be done until DHS develops an agency-wide (and beyond) system that tracks
real time data of aliens in Expedited Removal proceedings.  The lack of reliable real time data
shared among the bureaus in the DHS raises concerns about its ability to protect not only asylum
seekers, but homeland security as well.

Simply put, DHS should have an information system that will allow it to readily monitor
the types of issues which were examined during the Study.

**Inspections and Border Patrol**

**5.2 *Reconcile conflicting field guidance to require that any expression of fear at the port of
entry must result in either a referral for a credible fear determination or, in cases
where the inspector or Border Patrol agent believes the alien would "clearly not
qualify" for asylum or CAT relief, contact with an asylum officer to speak to the alien
via a telephonic interpretation service to determine whether or not the alien needs to be
referred.***

CBP regulations and guidance provide conflicting instructions to CBP officers on
whether all expressions of fear by the alien during inspection should result in a referral to an
asylum officer.  We recommend that the conflicting guidance be clarified.  When an inspector
has a question about whether the fear is related to the grounds for asylum, the regulations do not
provide him or her with discretion to make that determination, and the alien should be referred to
an asylum officer.  The Field Manual, however, authorizes inspectors not to refer aliens whose
expression of fear "would clearly not qualify that individual for asylum."  DHS guidance also
instructs immigration inspectors to contact the asylum office point(s) of contact "when necessary

**JA-239**

to obtain guidance on questionable cases involving an expression of fear or a potential asylum claim."

Immigration inspectors and Border Patrol agents are not trained in asylum law and should not make determinations about whether a fear is related to the grounds of asylum or CAT relief. On the other hand, if an alien's expression of fear has no relationship to the grounds for asylum or CAT relief, there is no benefit to subjecting the alien to detention for several days at government expense.

DHS should require that, when an alien expresses a fear of return, the immigration inspector or Border Patrol agent must either (1) refer the alien for a credible fear determination or (2) when the inspector believes the alien's expression of fear is not related to grounds for relief, initiate an interview, with appropriate privacy, between the alien and an asylum officer via a telephonic interpretation service. The asylum officer would then determine whether the alien should be referred for a credible fear determination and provide a short form documenting the consultation for the file.

**5.3 *DHS should improve quality assurance by expanding and enhancing the videotape systems currently used at Houston and Atlanta to all major ports of entry and Border patrol stations to unintrusively record all secondary interviews, and consider employing the use of undercover "testers" to verify that Expedited Removal procedures are being properly followed.***

The Study found current CBP quality assurance procedures to be inadequate and to rely entirely on "self-reporting" by immigration inspectors. The Study has shown that sworn statements taken at ports of entry are often inaccurate and are almost always unverifiable. The unintrusive video-taping systems currently in place in Houston and Atlanta should be expanded to all major ports of entry and the tapes should be reviewed and retained for a sufficient period of time to be useful for quality assurance purposes. The Study found the tapes to be useful because they may be used to protect aliens from improper conduct by inspectors, and to protect inspectors from specious allegations of improper conduct. In addition, video should also be used by CBP to monitor the accuracy of sworn statements and the proper implementation of all CBP procedures. As a quality assurance measure, CBP should also consider utilizing "testers" (undercover actors) who could verify that aliens with fraudulent documents are placed in Expedited Removal and that asylum seekers are properly referred for a credible fear determination. A "tester" would have the benefit of verifying compliance with procedures without the intrusiveness of a third-party monitor in the room, which would likely have an effect on the conduct of the officer.[5] In the meantime, however, CBP should monitor ports of entry on a periodic basis much in the way this Study has done.

Primary inspection at land ports of entry, however, is much more difficult to monitor due to the volume of inspections performed. While monitoring San Ysidro, the Study became aware of two separate incidents in which religious asylum seekers from Africa and the Middle East were turned away at primary inspection instead of being referred to Expedited Removal

---

[5] Testers are already routinely used by DHS at the Transportation Security Administration (TSA), which employs them to test the effectiveness of airport passenger and baggage screening procedures.

**JA-240**

proceedings and a credible fear interview as required. In both cases, the asylum seekers were eventually referred to secondary inspection, but only after returning on a subsequent day and describing their difficulties to the secondary inspector. When a secondary inspector or an asylum officer becomes aware of such incidents, employees should be reminded of their responsibility to refer such cases for secondary inspection and the incident should be reported to both CBP and Asylum Headquarters.

**5.4** *Sworn Statement Form I-867B should include an explanation of the specific purpose for which the document is designed to serve, and its limitations.*

The Study found that immigration judges frequently deny asylum claims on the basis of aliens "adding detail" to claims originally expressed in the sworn statement taken by CBP officers at the secondary inspection. The Study also found that such forms are often incomplete and less than reliable. CBP should amend its sworn statement forms (I-867B) in the same way that USCIS recently amended its credible fear assessment form (I-870), with a prominently displayed notation that the form is not a transcript and, echoing the language in the Inspector Field Manual, is "not intended to go into detail about any fear of persecution or torture."

**5.5** *Current DHS procedures concerning the administration of the Form I-867A and B should be maintained, but should be more vigorously monitored.*

Current CBP procedures are designed to protect bona fide asylum seekers from being removed without a hearing. They already require that immigration inspectors (1) explain the Expedited Removal process to the alien by reading the script on the Form I-867A; (2) ask the alien all four of the "fear questions," as written on Form I-867B; (3) review the alien's Sworn Statement, as recorded on the Form I-867A and B, by reading it back to the alien (with the assistance of an interpreter, if necessary); (4) inquire whether the alien understood what was read back to him; and (5) correct any inaccuracies pointed out by the alien and ask him or her sign the statement to confirm its accuracy.

The Study, however, found lapses in compliance with these procedures. Implementation of the procedures, could be maintained and enforced through more effective quality assurance efforts including the use of videotapes, testers, as well as ongoing training.

Finally, while the use of language specific videotape presentations to explain the Expedited Removal and credible fear process to the alien could be a useful tool to help ensure that the alien better understands the process, at least one port of entry sometimes plays a video tape in lieu of the officer reading the script to the alien. This practice falls short of the Inspector Field Manual guidance that an immigration inspector must be "absolutely certain that all required procedures have been adhered to and that the alien has understood the proceedings against him or her." A videotape presentation is a good addition to, but should not substitute for, the required steps mentioned above.

**Asylum**

**5.6 *The efficiency of the Expedited Removal process should be enhanced by amending DHS quality assurance procedures for the credible fear interview.***

The credible fear determination by an asylum officer, which – by law – is reviewable by an immigration judge, has proven successful at ensuring that bona fide asylum seekers referred from the port of entry will not be removed without a full asylum hearing. The credible fear process fails, however, at making asylum more efficient by failing to screen out invalid claims and thus putting more strain on detention and immigration court resources. With a screen-in rate consistently exceeding 90 percent, and a negative determination rate of approximately 1 percent, some view the credible fear process itself as somewhat lacking in credibility. The Asylum Division subjects negative determinations to a much more intensive quality assurance process than positive determinations. This lopsided treatment may be resulting in lopsided credible fear determinations. We would suggest that this bias in favor of positive credible fear determinations be addressed by subjecting them to similar quality assurance procedures as negative determinations, and that immigration judges continue to review negative determinations, unless the asylum seeker indicates he does not wish for the decision to be reviewed.

RECOMMENDATION SUMMARY

THIS STUDY HAS PROVIDED TEMPORARY TRANSPARENCY TO EXPEDITED REMOVAL – A PROCESS WHICH IS OPAQUE NOT ONLY TO THE OUTSIDE WORLD, BUT EVEN WITHIN THE DEPARTMENT OF HOMELAND SECURITY. AS A RESULT OF THIS TRANSPARENCY, SERIOUS – BUT NOT INSURMOUNTABLE – PROBLEMS WITH EXPEDITED REMOVAL HAVE BEEN IDENTIFIED. THE STUDY'S RECOMMENDATIONS CONCERNING BETTER DATA SYSTEMS, QUALITY ASSURANCE MEASURES, ACCESS TO REPRESENTATION, AND A DHS REFUGEE COORDINATOR WOULD ALL CONTRIBUTE TO A MORE TRANSPARENT AND EFFECTIVE EXPEDITED REMOVAL PROCESS. WE ALSO RECOMMEND THAT CONGRESS REQUIRE THE DEPARTMENTS OF JUSTICE AND HOMELAND SECURITY TO PREPARE AND SUBMIT REPORTS, WITHIN 12 MONTHS OF THE RELEASE OF THIS STUDY, DESCRIBING AGENCY ACTIONS TO ADDRESS THE FINDINGS AND RECOMMENDATIONS OF THIS STUDY.

JA-242



# BARRIERS TO PROTECTION

**THE TREATMENT OF ASYLUM SEEKERS IN EXPEDITED REMOVAL**



**U . S . C o m m i s s i o n   o n   I n t e r n a t i o n a l   R e l i g i o u s   F r e e d o m**

JA-243

Barbed wire is seen at Casa del Migrante in Reynosa, Mexico. Casa del Migrante provides housing, food, clothing and medical care to people who are planning to cross the border and to those have have been deported from the United States (Reuters/Eric Thayer).

U. S. COMMISSION ON INTERNATIONAL RELIGIOUS FREEDOM

# BARRIERS TO PROTECTION

## THE TREATMENT OF ASYLUM SEEKERS IN EXPEDITED REMOVAL

## COMMISSIONERS

Thomas J. Reese, S.J.
*Chair*

Daniel Mark
James J. Zogby
*Vice Chairs*

Kristina Arriaga de Bucholz
Sandra Jolley
John Ruskay
Jackie Wolcott
Ambassador David N. Saperstein, *ex officio,* non-voting member

## AUTHORS OF THIS REPORT

Elizabeth Cassidy
*Co-Director for Policy and Research*

Tiffany Lynch
*Senior Policy Analyst*

JA-248

# TABLE OF CONTENTS

Acronyms . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vi

Expedited Removal Process Flow Chart . . . . . . . . . . . . . . . . . . . . . . . . vii

Executive Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Methodology . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

The Expedited Removal Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

The Expansion of Expedited Removal . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Findings and Recommendations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    Management and Coordination . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    Initial Processing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

    Credible Fear Screening . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

    Detention . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

    Access to Information and Counsel . . . . . . . . . . . . . . . . . . . . . . . . . 50

    Adjudication of Asylum Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

    Prosecution of Asylum Seekers . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

    The 2014 Surge . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

Glossary of Terms . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

Appendices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

## ACRONYMS

| | |
|---|---|
| **ABA** | American Bar Association |
| **ATD** | Alternatives to Detention |
| **BIA** | Board of Immigration Appeals |
| **BP** | U.S. Border Patrol |
| **CBP** | U.S. Customs and Border Protection |
| **DHS** | Department of Homeland Security |
| **DOJ** | Department of Justice |
| **EOIR** | Executive Office for Immigration Review |
| **HPI/GPI** | Honduran and Guatemalan Pilot Initiatives |
| **ICE** | U.S. Immigration and Customs Enforcement |
| **IIRIRA** | 1996 Illegal Immigration Reform and Immigrant Responsibility Act |
| **INA** | Immigration and Nationality Act |
| **ISAP** | Intensive Supervision Appearance Program |
| **LOP** | Legal Orientation Program |
| **OFO** | U.S. Customs and Border Protection Office of Field Operations |
| **OIG** | Department of Homeland Security Office of Inspector General |
| **ORR** | Department of Health and Human Services Office of Refugee Resettlement |
| **PBNDS** | 2011 Performance Based National Detention Standards |
| **RCA** | Risk Classification Assessment |
| **UAC** | Unaccompanied non-citizen children |
| **USCIRF** | U.S. Commission on International Religious Freedom |
| **USCIS** | U.S. Citizenship and Immigration Services |
| **VTC** | video teleconference |

# EXPEDITED REMOVAL PROCESS FLOW CHART



**JA-252**

# EXECUTIVE SUMMARY

Unprecedented numbers of individuals worldwide are forcibly displaced by conflict or persecution or migrating in search of improved economic opportunities. For example, in 2015, more than one million refugees and migrants undertook treacherous journeys across the Mediterranean Sea to reach Europe. In fiscal year 2014, 52,000 unaccompanied non-citizen children and 68,000 family units from Central America crossed into the United States from Mexico.

These large, mixed flows of people require that nations have credible, effective immigration laws and processes to identify and protect *bona fide* refugees and asylum seekers. In the United States, one such system is the Expedited Removal process. Under Expedited Removal, foreign nationals arriving in the United States without proper documentation or with fraudulent documentation can be returned to their countries of origin without delay, and without the immigration court removal hearings, unless they establish a credible fear of persecution or torture. This report examines the U.S. government's treatment of asylum seekers in Expedited Removal.

Expedited Removal is a complicated administrative process carried out by multiple agencies of the U.S. Department of Homeland Security (DHS), including U.S. Customs and Border Protection (CBP) and U.S. Immigration and Customs Enforcement (ICE). For asylum seekers, DHS's U.S. Citizenship and Immigration Services (USCIS) and the Executive Office for Immigration Review (EOIR) of the U.S. Department of Justice (DOJ) also are involved.

CBP first encounters non-citizens when they apply for admission to the United States at U.S. ports of entry, or after they cross the U.S. border, and identifies those subject to Expedited Removal and, from that group, those seeking asylum. During this initial processing, CBP officials are required to explain Expedited Removal and its consequences, advise non-citizens to ask for protection without delay if they have any fear or concern about being returned home, and ask four questions related to fear of return. CBP then turns non-citizens subject to Expedited Removal over to ICE for detention and removal. While in ICE detention, those who claimed fear of return are screened by USCIS asylum officers to determine if their fear is credible, defined as "a significant possibility" of establishing eligibility for protection. If USCIS finds a credible fear of persecution or torture, the asylum officer places the non-citizen in removal proceedings before an EOIR immigration judge, in which he or she may apply for asylum or other relief or protection from removal, and ICE may release the asylum seeker from detention while the immigration court proceeding is pending. If USCIS does not find credible fear, the non-citizen may request a review by an immigration judge, but if credible fear is again denied the person is removed promptly thereafter.

*These large, mixed flows of people require that nations have credible, effective immigration laws and processes to identify and protect bona fide refugees and asylum seekers.*

The International Religious Freedom Act of 1998 authorized the U.S. Commission on International Religious Freedom (USCIRF) to designate experts to conduct a study to assess the situation of asylum seekers in Expedited Removal. USCIRF released its first assessment in the 2005 *Report on Asylum Seekers in Expedited Removal*, which documented serious flaws placing asylum seekers at risk of return to countries where they could face persecution and inappropriate, prison-like detention conditions. To address these problems, USCIRF made a series of recommendations designed both to help protect U.S. borders and ensure the fair and humane treatment of *bona fide* asylum seekers.

This follow-up report, based on field research and a review of public information conducted by USCIRF between 2012 and 2015, evaluates the current situation of asylum seekers in Expedited Removal and the implementation of USCIRF's 2005 recommendations. The research revealed that, although DHS had taken some measures in response to the 2005 study, there were continuing and new concerns about the processing and detention of asylum seekers in Expedited Removal, and most of USCIRF's 2005 recommendations had not been implemented. Furthermore, since USCIRF's original research, both the U.S. government's use of Expedited Removal and the number of individuals in Expedited Removal seeking asylum have grown significantly. As a result, flaws in the system now potentially affect even more asylum seekers.

**Key findings include:**

- There continues to be a need for a high-ranking DHS official to coordinate refugee and asylum issues among the various agencies involved in Expedited Removal.

- USCIRF's observations and research revealed continuing and new concerns about CBP officers' interviewing practices and the reliability of the records they create, including: flawed Border Patrol internal guidance that conflates CBP's role with that of USCIS; certain CBP officers' outright skepticism, if not hostility, toward asylum claims; and inadequate quality assurance procedures.

- CBP's and USCIS' reliance on technology to process and interview increased numbers of border crossers has improved efficiency, but the impersonal nature of the interviews raises concerns that this may be at the expense of identifying and protecting asylum seekers.

- USCIS' 2014 revised lesson plan for asylum officers on credible fear and a new detailed interview checklist may have moved what should be a screening interview closer to a full asylum adjudication.

- ICE continues to detain asylum seekers before their credible fear interviews, and, in some cases even after being found by USCIS to have credible fear, under inappropriate penal conditions.

- ICE's 2009 directive on parole, and its increased use of Alternatives to Detention, have improved opportunities for release of asylum seekers found to have a credible fear, in line with USCIRF's 2005 recommendations.

- ICE's failure to develop uniform procedures to determine bond amounts and its extensive use of ankle bracelets over other alternatives, without individually assessing each asylum seeker's non-appearance risk, raise serious concerns.

- Detained asylum seekers with whom USCIRF met lack any real understanding of their rights, responsibilities, and, if relevant, the next steps in their asylum cases.

- The prioritization of funding for the agencies involved in the enforcement aspects of Expedited Removal has resulted in adjudication delays and backlogs at both USCIS and EOIR.

- CBP's referral of non-citizens who claim fear to DOJ for prosecution for illegal entry or illegal re-entry without first allowing USCIS to assess their fear claim is problematic and may violate the United States' international obligations.

- The U.S. government's detention of mothers and children in Expedited Removal who expressed fear of return is inherently problematic and several courts have found that the facilities used do not comply with the U.S. government's own standards for child detention as defined in a 1997 legal settlement, the *Flores* Agreement.

- CBP's and ICE's implementation of the Honduran and Guatemalan Pilot Initiatives to detain separately and remove speedily adults from these two countries who do not claim fear has the negative effect of limiting these non-citizens' opportunities to learn about their legal rights.

## KEY RECOMMENDATIONS INCLUDE

### To the Secretary of Homeland Security

- Appoint a high-ranking official with sufficient authority and resources to make the reforms necessary to ensure the protection of asylum seekers in Expedited Removal and to oversee implementation.

- Reiterate to all agencies and officers implementing Expedited Removal that their law enforcement mandate includes fully implementing U.S. laws and regulations governing the protection of individuals seeking refuge from return to persecution or torture.

- Request that the DHS Office of Inspector General audit the Expedited Removal process for compliance with laws and policies regarding the protection of asylum seekers.

### To CBP

- Video record all Expedited Removal processing interviews and require supervisory and headquarters review of the recordings of a sampling of interviews for quality assurance purposes.

- Retrain all officers and agents on their role in the Expedited Removal process, the proper procedures for interviewing non-citizens, and the special needs and concerns of asylum seekers and other vulnerable populations.

- Establish a dedicated corps of specially-trained, non-uniformed inter-viewers to interview women and children to identify fear claims, and ensure that female interviewers are included.

- Track the results of interviews conducted by virtual processing against those conducted in person to determine if the two methods are produc-ing materially different outcomes.

- Develop a document that briefly and clearly explains the Expedited Removal process, its consequences, the right to seek protection for those who fear return, and the right to request a private interview, and provide this document to all individuals, in a language they understand, as soon as possible when they come into CBP custody.

### To USCIS

- Track whether credible fear interview referrals are coming from CBP or ICE to better understand when in the process most fear claims are being raised.

- Reaffirm in the asylum officers' lesson plan that the credible fear standard is a screening standard requiring a showing of a "significant possibility" of eligibility for asylum, not a full assessment of the merits of the case.

- Continue to track the results of credible fear interviews conducted telephonically and those conducted in person to determine if the two methods are producing materially different outcomes.

- Allow asylum officers to convert and adjudicate appropriate Expedited Removal cases in which credible fear is found as affirmative asylum cases.

### To ICE

- Detain all adult asylum seekers who must be detained, whether before or after a credible fear determination, in civil facilities only.

- Require an individualized re-assessment of the need for custody for all detainees with a positive credible fear finding, and apply a presumption

## KEY RECOMMENDATIONS INCLUDE (CONTINUED)

of bond for detainees with credible fear who do not fall under the 2009 parole directive.

- Increase the use of Alternatives to Detention, such as monitored release, for asylum seekers, beyond bond and parole opportunities.
- Expand the Know Your Rights presentations that provide detainees with basic legal information to all facilities that house asylum seekers.
- If families are placed in Expedited Removal, detain them only in facilities that meet the standards of the *Flores* Agreement and individually re-assess the need for custody after credible fear is found, with a presumption of release.
- Ensure that programs that detain nationals of particular countries separately do not have the effect of preventing them from learning about the right to seek asylum.

### To EOIR

- Retrain immigration judges that the interview record created by CBP is not a verbatim transcript of the interview and does not document the individual's entire asylum claim in detail, and should be weighed accordingly.
- Expand the Legal Orientation Program available in some facilities to all detention facilities housing asylum seekers, and provide it to detainees before their credible fear interviews.

### To CBP, USCIS, and DOJ

- Work together to develop procedures to allow USCIS to conduct credible fear interviews for non-citizens being referred for prosecution who express fear before DOJ pursues their criminal cases.

### To Congress

- Authorize and fund another independent, comprehensive study of the treatment of asylum seekers in Expedited Removal at all stages of the process.
- Request the Government Accountability Office to conduct a study to assess whether non-citizens removed to their home countries under Expedited Removal have faced persecution or torture after their return.
- Increase funding for the adjudicatory aspects of Expedited Removal to enable USCIS and EOIR to address backlogs, conduct timely adjudications, and provide due process.
- Increase funding to EOIR to expand the Legal Orientation Program to all facilities housing asylum seekers and to enable it to be provided to detained asylum seekers before their credible fear interviews.

JA-257

# FINDINGS AND RECOMMENDATIONS

## MANAGEMENT AND COORDINATION

The 2005 Study found extensive problems with DHS's overall management and coordination of the Expedited Removal process, including poor communication among the responsible agencies, insufficient quality assurance and data management practices, and no mechanism to address system-wide issues. USCIRF's main recommendation to address these flaws was that the Secretary of Homeland Security appoint a high-ranking official to coordinate refugee and asylum matters among the various agencies and implement reforms.

Although then-Secretary Michael Chertoff appointed a Senior Advisor for Refugee and Asylum Policy in 2006, that position was never at the level, nor had the authority and resources, necessary to address USCIRF's findings. The position did not report to the Secretary or Deputy Secretary, but rather was within the DHS Office of Policy. The position was filled from 2006 to 2011, but since then has been vacant.

USCIRF's current research revealed continuing and new concerns about the treatment of asylum seekers in Expedited Removal and confirmed that most recommendations from the 2005 Study remain unimplemented. A high-ranking official, with the Secretary's clear support and sufficient authority and resources, is still needed to implement the required reforms, ensure consistent asylum policy and practice, manage the Expedited Removal system, and address issues as they arise.

*USCIRF's current research revealed continuing and new concerns about the treatment of asylum seekers in Expedited Removal and confirmed that most recommendations from the 2005 Study remain unimplemented. A high-ranking official, with the Secretary's clear support and sufficient authority and resources, is still needed to implement the required reforms, ensure consistent asylum policy and practice, manage the Expedited Removal system, and address issues as they arise.*

### RECOMMENDATIONS

#### To the Secretary of Homeland Security

- As recommended in 2005, appoint a high-ranking official with sufficient authority and resources to make the reforms necessary to ensure the protection of asylum seekers in Expedited Removal and to oversee implementation, including by chairing a regular interagency working group of all agencies involved in the Expedited Removal process.
- Reiterate to all agencies and officers implementing Expedited Removal that their law enforcement mandate includes fully implementing U.S. laws and regulations governing the protection of individuals seeking refuge from return to persecution or torture.
- Request that the DHS Office of Inspector General audit the Expedited Removal process for compliance with laws and policies regarding the protection of asylum seekers.

#### To Congress

- Authorize and fund another independent, comprehensive study of the treatment of asylum seekers in Expedited Removal at all stages of the process.
- Request the Government Accountability Office to conduct a study to assess whether non-citizens removed to their home countries under Expedited Removal have faced persecution or torture after their return.

## INITIAL PROCESSING

As discussed above, CBP first encounters non-citizens at ports of entry or after they cross the border and identifies those subject to Expedited Removal and from that group, those seeking asylum. OFO officers process non-citizens arriving at ports of entry and BP agents process non-citizens apprehended along the border through interviews taken as sworn statements on Form I-867. Form I-867 seeks to ensure that non-citizens who fear return are identified and not erroneously returned to countries where they may face persecution. The form has two parts: (1) side A (see Appendix A) includes a required script explaining the Expedited Removal process and its consequences and advising non-citizens to ask for protection without delay if they have any reason to fear being returned home;[20] and (2) side B (see Appendix B) includes four required questions relating to fear of return.[21]

*Why did you leave your home country or country of last residence?*

*Do you have any fear or concern about being returned to your home country or being removed from the United States?*

*Would you be harmed if you are returned to your home country or country of last residence?*

*Do you have any questions or is there anything else you would like to add?*

---

[20] Form I-867 Side A reads as follows:

> I am an officer of the United States Department of Homeland Security. I am authorized to administer the immigration laws and to take sworn statements. I want to take your sworn statement regarding your application for admission to the United States. Before I take you statement, I also want to explain your rights, and the purpose and consequences of this interview.

> You do not appear to be admissible or to have the required legal papers authorizing your admission to the United States. This may result in your being denied admission and immediately returned to your home country without a hearing. If a decision is made to refuse your admission into the United States, you may be immediately removed from this country, and if so, you may be barred from reentry for a period of 5 years or longer.

> This may be your only opportunity to present information to me and the Department of Homeland Security to make a decision. It is very important that you tell me the truth. If you lie or give misinformation, you may be subject to criminal or civil penalties, or barred from receiving immigration benefits or relief now or in the future.

> Except as I will explain to you, you are not entitled to a hearing or review.

>> U.S. Law provides protection to certain persons who face persecution, harm or torture upon return to their home country. If you fear or have a concern about being removed from the United States or about being sent home, you should tell me so during this interview because you may not have another chance. You will have the opportunity to speak privately and confidentially to another officer about your fear or concern. That officer will determine if you should remain in the United States and not be removed because of that fear.

> Until a decision is reached in your case, you will remain in the custody of the Department of Homeland Security.

> Any statement you make may be used against you in this or any subsequent administrative proceeding.

[21] The four questions on Form I-867 Side B are:

> Why did you leave your home country or country of last residence?

> Do you have any fear or concern about being returned to your home country or being removed from the United States?

> Would you be harmed if you are returned to your home country or country of last residence?

> Do you have any questions or is there anything else you would like to add?

At the time of the research for the 2005 Study, Expedited Removal applied at OFO ports of entry only. More than two dozen trained researchers and several expert supervisors observed more than 400 secondary inspection interviews at seven ports of entry, spending from two to six weeks at each site. They also reviewed case files and spoke with interviewees.

Their findings were alarming. In more than half of the interviews observed in the research for the 2005 Study, OFO officers failed to read the required information advising the non-citizen to ask for protection without delay if s/he feared return. At least one of the four required fear questions was asked approximately 95 percent of the time, but in 86.5 percent of the cases where a fear question was not asked, the record inaccurately indicated that it had been asked, and answered. And in 72 percent of the cases, asylum seekers were not allowed to review and correct the form before signing, as required. Thus, USCIRF found that, although they resemble verbatim transcripts, the I-867 sworn statements were neither verbatim nor reliable, often indicating that information was conveyed when in fact it was not and sometimes including answers to questions that never were asked. Yet immigration judges often used these unreliable documents against asylum seekers when adjudicating their cases.[22]

Additionally, in nearly 15 percent of the cases observed in the research for the 2005 Study, asylum seekers who expressed a fear of return were removed without referral to a USCIS asylum officer for a credible fear determination. Moreover, in nearly half of those cases, the files indicated that the asylum seeker had not expressed any fear. Some of these non-referrals may have been because of problematic language in the CBP Field Manual in use at the time stating that an officer may decline referral where the fear claimed by the applicant "would clearly not qualify that individual for asylum," but several involved expressions of fear of political, religious, or ethnic persecution. Finally, at one port of entry, the researchers found a few instances when CBP officers improperly pressured asylum seekers to retract their fear claims and withdraw their applications for admission.

To address these interviewing and recordkeeping flaws, USCIRF recommended that CBP: (1) videotape all Expedited Removal processing interviews for quality assurance review purposes, and use undercover "testers" to further verify that correct procedures are being followed; (2) revise field guidance to make clear that any expression of fear must result in a referral for a credible fear determination; and (3) amend Form

---

[22] As the 2005 Study noted, the records created by CBP during initial interviews or by USCIS asylum officers during credible fear interviews are often used by ICE trial attorneys to impeach asylum seekers' credibility and/or cited by immigration judges in denying relief. USCIS has since amended the Form I-870, on which it documents credible fear interviews, to include a statement that "[t]he following notes are not a verbatim transcript of this interview . . . There may be areas of the individual's claim that were not explored or documented for purposes of this threshold screening." CBP has not similarly modified the I-867.

I-867 to include a prominently displayed notation that it is not a verbatim transcript and is not intended to document the applicant's entire asylum claim in detail.

For the current research, one or two USCIRF staff visited five OFO ports of entry and four BP stations on a series of trips during 2014 and 2015, touring the facilities, meeting with officers, and observing a few in-person interviews.[23] At three ports of entry (Los Angeles International Airport, John F. Kennedy International Airport, and Otay Mesa Port of Entry) and one BP station (McAllen Station), USCIRF observed a total of five partial, in-person interviews. During four of these interviews, USCIRF observed the taking of the I-867 sworn statement but not the interviewee's review and signing (see Appendix C and Appendix D); for the fifth, the reverse was observed.[24] At McAllen and El Paso Border Patrol stations, USCIRF observed both sides of the virtual processing that is now used for most Expedited Removal cases involving border-crossers in the Rio Grande Valley CBP sector.

### Interviewing and Record Keeping Practices

Despite the small sample of CBP interviews observed, USCIRF found several examples of non-compliance with required procedures, including: failure to read back the answers to the interviewee and allow him to correct errors before signing, as required;[25] interviewing individuals together instead of separately and in private; failure to read the required script from the I-867A; and failure to record an answer correctly. For example, in one case, a BP agent did not read the I-867A script until the end of the interview, after he had already asked and filled out answers to the four fear questions on the I-867B. In another case, in response to the last of the four I-867B questions ("[d]o you have any questions or is there anything else you would like to add?"), the interviewee asked how long the process would take, and the agent answered that he did not know and could not say. On the sworn statement, however, the interviewer indicated "no" to question four.

*Despite the small sample of CBP interviews observed, USCIRF found several examples of non-compliance with required procedures*

---

[23] The ports of entry were: John F. Kennedy International Airport, Los Angeles International Airport, Hidalgo Port of Entry, Otay Mesa Port of Entry, and San Ysidro Port of Entry. The Border Patrol sites were: Chula Vista Station, El Paso Station, McAllen Station (twice), and Ramey Station. The time spent at each facility ranged from a half-day to two days.

[24] The other OFO ports and BP stations were not conducting any Expedited Removal interviews when USCIRF was there. All observations were done with the consent of the interviewee. The observations were partial because the full interview process took longer than the amount of time USCIRF was at the sites.

[25] Asked why, the OFO officer told USCIRF that he only reads back the contents if the interviewee requests it because it takes too long, and that the interviewee's initialing each page simply indicates that s/he received a copy of that page. A supervisor later confirmed that reading back the form is required and initialing signifies approval of the contents, and said he would remind all interviewing officers.

The credible fear interviews USCIRF observed at USCIS asylum offices[26] further raised concerns about CBP's interviewing and record-keeping practices. In three of the five observed credible fear interviews, asylum seekers' I-867 forms indicated "no" answers to the fear questions in his or her BP interview, but the asylum seeker said that s/he had articulated a fear or was not asked. These individuals were referred for credible fear interviews when they raised a fear of return to ICE while detained awaiting removal. For example, in one credible fear interview, the asylum seeker's form indicated he did not express a fear of return, but he told the asylum officer that the agents had not asked him if he was afraid, they only asked for his identifying information. He also said he had a letter from a helpful police officer in El Salvador saying he had been threatened by gang members, which he said the agent told him he would have to present to the asylum officer but then took and kept. In another, a woman's form also showed no expression of fear, but said she was coming to the United States to work; however, the asylum seeker stated in the credible fear interview that she remembers saying to BP that she was afraid to return to Guatemala and that she did not say she was coming to the United States to seek employment. She said "I had a good job in Guatemala but had to leave it because I needed protection."

Asylum officers reported to USCIRF that this was a common occurrence. They also said that they were seeing many forms with identical answers,[27] and others with clearly erroneous ones (*i.e.* the form said that the individual was asked, and answered, whether she was pregnant when the person is a man).[28]

While many asylum seekers in ICE detention centers reported that CBP officers did ask them about fear of return, others reported that CBP officers did not ask them the fear questions, asked them incorrectly, recorded "no" when interviewees answered "yes," inquired into their fear claims in detail, and/or dismissed assertions of fear. Some said their statement was not read back to them and/or that they were pressured to sign documents. For example, a detained asylum seeker from Nepal, apprehended at the southern border in Texas, reported that the BP agents asked her questions and she gave answers, but they did not write down what she said, they wrote down that she was coming to the United States to work. Another detained Nepali asylum seeker who crossed the border told

---

[26] USCIRF visited the Los Angeles, Houston, New Jersey, New York, and Miami asylum offices. The credible fear interviews were observed at the New Jersey and New York offices.

[27] This could be explained by the use of the interviewing templates discussed in the *Introduction of Virtual Processing* section.

[28] Similarly, a *pro bono* attorney with whom USCIRF met on one of our trips told us of a case where a 4-year-old child's file indicated that he said that he came to the United States to work.

USCIRF that the BP agents only asked him questions about his identity and did not ask him about fear. A detained asylum seeker from Somalia, who entered through an OFO port of entry and announced his intent to apply for asylum on arrival, said that the interviewing officer asked him the fear questions and told him that he would need proof of his story. However, at the end of the interview, he was asked to sign his statement and did so, but it was not translated back to him before signing.

Of particular concern are reports of CBP officials denying non-citizens in Expedited Removal the opportunity to claim fear. For example, a Guatemalan asylum seeker in ICE custody who had previously been deported told USCIRF that on her first apprehension by BP, she "was not given the opportunity to talk;" instead, she said that when she tried to explain why she had fled to the United States, the agent forced her to sign papers instead. One Central American man said he was told "whether you sign or not, we are going to deport you." Others said BP agents told them that "it's better if you just ask to be deported" or "we're going to throw you out." USCIRF heard an especially troubling account from a detained Bangladeshi asylum seeker. He recounted that he and two other Bangladeshis arrived at an OFO land port of entry and immediately asked the first officer they encountered for asylum. He said that officer turned them away, telling them to seek asylum in Mexico. They returned an hour later and the same officer again told them to go back to Mexico. However, he said that this time they refused and were taken inside, interviewed by a different officer, processed, and sent to ICE detention.

*These reports are consistent with information from USCIS, which told USCIRF anecdotally that the majority of their credible fear interview referrals come from ICE, not CBP.*

These reports are consistent with information from USCIS, which told USCIRF anecdotally that the majority of their credible fear interview referrals come from ICE, not CBP. In the credible fear interviews USCIRF observed, the asylum officers proactively asked each asylum seeker during the interview if CBP asked him or her about fear of return. Under the circumstances, USCIRF considers this to be a good practice.

In another troubling finding, USCIRF observed fear claims being examined beyond the four required questions, such as OFO officers and BP agents asking detailed questions about why the individual left his or her country or asking what an individual knows about the asylum process. When USCIRF asked one interviewing officer how he documents the raising of a fear claim, he responded that he asks "how it all started" and then asks about each arrest or incident in order. He further explained that he is "looking for the little details," which he records on the I-867.

Detainees in ICE custody reported similar experiences. For example, an ICE detainee from Ethiopia, who came to a port of entry and said he stated immediately that he was a refugee, told USCIRF that the interviewing officer asked him about the situation in his country and asked "a lot of follow-up questions" about his problems. Another detained Somali, also a

port of entry arrival, said that he was asked twice if he feared returning to his country and then was asked in detail about why he could not go back.

U.S. law requires that CBP simply document that a person in Expedited Removal expressed fear and then notify and send that person's file to USCIS, which is responsible for examining and assessing the fear claim. Positively, supervising OFO and BP officers interviewed by USCIRF stated, correctly, that interviewing officers are not supposed to ask too many questions regarding the situation that the individual fled and fears.

Additionally, a conversation with two interviewing BP agents revealed both a lack of knowledge of, and non-compliance with, DHS policy on withdrawals of fear claims. One agent said that interviewees who claim fear often ask what will happen next, and he tells them that the process may take a long time and that, in his experience, many people get sent back in the end, especially in gang-related cases. He said that after hearing this some people say that they do have a fear of return but do not want to wait and ask to be sent home. He felt, and the other agent agreed, that this required him to adjust the answers on Form I-867 to reflect that the individual does not want to seek asylum and should not be referred for a credible fear determination.

*U.S. law requires that CBP simply document that a person in Expedited Removal expressed fear and then notify and send that person's file to USCIS, which is responsible for examining and assessing the fear claim.*

## Quality Assurance

CBP has not implemented USCIRF's 2005 recommendations to videotape interviews for quality assurance purpose and use testers. CBP does subject all secondary inspection decisions to two levels of supervisory review, but this consists of reviews of the file and conversations with the officer, not observing the interview. In addition, beginning four years ago, OFO started a quarterly headquarters review of information submitted by its field offices on all port of entry Expedited Removal cases, but this also does not include interview observations.[29] BP does not conduct such a headquarters review.

---

[29] As described to USCIRF by OFO, every quarter each field office collects and reports to headquarters information on five aspects of such cases: (1) was the question and answer sufficient?; (2) was the narrative done correctly?; (3) was there supervisory concurrence?; (4) were the fear questions addressed?; and (5) was the correct charge under INA section 212 used? OFO headquarters reviews the information and reports back to the field offices and to the Assistant Commissioner. OFO stated that, in the year between April 2014 and April 2015, the ports of entry handled around 220,000 adverse actions, of which about 29,000 were Expedited Removals. Of those 29,000, the headquarters review found errors in only 15, according to OFO. Most of these were what OFO described as procedural errors, such as using the wrong form, failing to use a translator, or interviewing a mother on behalf of a child. Only one involved an error where a person who claimed fear was removed; OFO stated that they worked with the State Department to bring the individual back to the United States for a credible fear interview with USCIS. In addition, OFO officials told USCIRF that they recently developed and started offering a new eight-hour refresher course on five core categories of adverse actions, including Expedited Removal, based on information learned through the headquarters review process. As of October 2015, this training reportedly had been provided to supervisors and officers at 10 locations.

### The Introduction of Virtual Processing

Since 2013, BP's central processing facility for non-citizens apprehended in the Rio Grande Valley sector, McAllen Station, has used virtual processing for interviews of most first-time apprehensions who speak English or Spanish.[30] Agents in McAllen do the initial collection and checks of identifying information, and then assign the cases to a BP agent at the El Paso, Texas, or El Centro, California, stations, who complete the Form I-867. The non-citizen sits at a bank of computers in McAllen, in front of a monitor and, using a phone handset, is interviewed by an El Paso or El Centro BP agent through Skype and an internet-based communicator. As with in-person interviews, supervisory review is only of the paper files. USCIRF visited the El Paso Station and observed the interviewing agents, work in a room that looks like a computer lab, with a dozen terminals. Supervisors at McAllen and El Paso stations said the virtual processing improves processing efficiencies and allows agents in sectors other than the Rio Grande Valley, who otherwise do not do much processing, to refresh and maintain their skills.

*In February 2015, agents in McAllen told USCIRF that 100,000 people had been processed this way since virtual processing started in mid-2013. However, USCIRF is concerned that processing efficiency is coming at the expense of identifying and protecting asylum seekers.*

BP reports that virtual processing has allowed McAllen Station to double its processing output with half the manpower. In February 2015, agents in McAllen told USCIRF that 100,000 people had been processed this way since virtual processing started in mid-2013.[31] Indeed, USCIRF observed the efficiencies of virtual processing – as an individual was being video interviewed, USCIRF saw McAllen BP agents pulling together that individual's paper file while other agents prepared other individuals for their interviews.

However, USCIRF is concerned that processing efficiency is coming at the expense of identifying and protecting asylum seekers. Agents are given incentives for speedy processing. BP agents at Mc Allen told USCIRF that fewer than 10 percent of the applicants processed there claim fear and this low rate had been consistent over the past several years. This seems inconsistent with the dramatic increase in fear claims assessed by USCIS, especially from individuals apprehended in the Rio Grande Valley sector, since FY2013.

USCIRF is particularly concerned by the use of interviewing "templates" observed during the virtual processing. As they conducted the virtual interviews, the El Paso agents relied on Microsoft Word documents with standardized questions and responses, from which they copied and pasted text into the E3 software that BP uses for processing. In another

---

[30] Virtual processing is not used for unaccompanied minors under the age of 14 or non-citizens who may be referred to prosecution, even if they speak English or Spanish.

[31] BP began the virtual processing then because their projections were predicting an increase in arrivals, although the surge in 2014 exceeded even those projections.

effort to improve efficiency, McAllen Station created the templates, which are organized by county and case type (Expedited Removal, family Expedited Removal, etc.) and cover the narrative and sworn statement sections of the interview process. USCIRF observed that when a BP agent opened the templates to begin the interview, answers were already included and would require deletion by the agent. While using a standard list of questions on its own could be a good practice, having prepared answers seemed to prompt the interviewers to use leading questions in important areas. This risks suggesting to the interviewee that what the agent said is the correct answer, as opposed to eliciting an independent response. For example, instead of asking "why did you come to the United States?," USCIRF observed an interviewer ask "why did you come to the United States – to live and work and provide a better life for your children?" USCIRF also observed one agent cutting and pasting the answers from the template into the sworn statement even before the interviewee had finished giving his answers.

*While using a standard list of questions on its own could be a good practice, having prepared answers seemed to prompt the interviewers to use leading questions in important areas.*

The impersonal nature of the virtual interviews also is problematic. Facial expressions and other non-verbal cues are important ways for BP agents to tell if an interviewee is uncomfortable articulating a fear claim at the counter and needs a private interview. The director of virtual processing in El Paso recognized this, and admitted that it is harder to read these signals in a virtual interview. Furthermore, during USCIRF observations, the interviewing agents rarely looked into the camera to make eye contact with the interviewees, focusing instead on their own computer screen or keyboard. This makes it even less likely that they would detect any non-verbal cues.

Finally, occasional malfunctioning of technology presents concerns. BP agents at both McAllen and El Paso said they feel that the virtual processing generally runs smoothly, technology permitting. Unfortunately, USCIRF observed several technical problems that interrupted interviews, including Microsoft Word or computers crashing and cameras freezing. One interviewer who experienced multiple crashes did not give any explanation to the interviewee for the interruptions.

## Privacy

At the various OFO and BP facilities USCIRF visited, interviews are conducted in settings that range from private or semi-private offices to large rooms where multiple interviews are done simultaneously. All four of the partial, in-person interviews USCIRF observed at OFO ports of entry were conducted in private rooms, but in one case, a mother was interviewed with her young daughter present. Because telephonic interpretation was required, the partial, in-person interview observed at a BP station was conducted in a semi-private room set up for two officers but being used at the time by one. However, three individuals from the same country were interviewed together. They had been apprehended as a group and,

according to the supervisor, interviewing them as a group "helps us get through the process."

At BP facilities, there typically is a counter with around eight agents at computers processing different individuals or groups at the same time, with other interviewees waiting nearby. At one such facility, USCIRF noted that asylum seekers might be afraid to express fear with others around them, but the agents said they did not view this as a problem and placed the burden on the interviewee to ask for a private room. BP officials said that most BP facilities do not have the space to permit private interview spaces. A positive exception was BP's Ramey Station, which, after a recent renovation, has private interview rooms with acoustic padding to stop sound from carrying. The supervisor reported that the renovation "has been a big asset," further stating that "Before, the people would be frightened to express fear. The private rooms also help with intelligence gathering because people are more forthcoming."

The experience of a detained Somali asylum seeker with whom USCIRF spoke at an ICE facility underlines the need for private interviews. He arrived with a group of Somalis at an OFO port of entry and was interviewed at the windows in the waiting room, where "everyone could hear each other." He said that when asked why he had come to the United States, he whispered his answer because he feared the other Somalis would hear him answer that he is from a persecuted minority tribe. When the officer could not hear what he was saying, he had to write it down.

An open, counter set-up is used for the virtual interviews at McAllen Station. The agents there stated that they believe virtual processing provides more privacy than speaking to an agent in-person at a counter, since it is harder to overhear someone who is speaking into a telephone handset. One agent said "the subjects open up more over videoconferencing because it's more confidential." USCIRF observed groups of people clustered together to be interviewed virtually, with one person speaking on the phone handset and others crowded around him or her, sitting on the same fixed stool or immediately adjacent stools. BP agents said that this seating arrangement was to keep the virtual processing moving along, since groups that travel together have the same route information, and also so that agents "don't have to wait [between interviews] for the next body to be brought out." Asked what would happen if an interviewee who had a fear felt uncomfortable talking about it in front of others, the agents said that the interviewer would notice that and would ask the person if s/he wanted a private interview. However, as discussed above, such non-verbal cues may not be easy to detect in virtual interviews.

McAllen Station is planning to move its processing to a new facility nearby, the Ursula facility. When USCIRF asked if the new facility would have partitions between the computer stations to improve privacy, the agents said CBP had deemed this impossible for security and staffing

reasons. However, in an improvement, they did say that at the new facility, groups will not have to sit clustered together in front of the screen; rather, one person at a time will be at the computer station and the others will wait on benches placed farther away from the counter.

### Interpretation

OFO uses other officers as interpreters whenever possible, rather than telephonic interpretation.[32] In two of the interviews USCIRF observed at ports of entry, the OFO officer who was supposed to be serving as the interpreter instead acted as a second interviewer. In one of these cases, the interpreting officer questioned the applicant more aggressively than the interviewing officer did. In the other, in addition to asking questions, the interpreting officer had difficulty translating and a supervisor who spoke the language had to step in.

OFO occasionally uses airline employees as interpreters at airport ports of entry. Although supervisors said they do not use state airline employees to interpret if they believe the individual is an asylum seeker from that country, this still is potentially problematic. Airline employees are not professional interpreters, and an airline can be fined if a passenger is denied admission to the United States and returned. USCIRF observed a preliminary interview, not an I-867 sworn statement interview, where the airline employee clearly was answering the officer's questions herself instead of interpreting. Positively, the officer stopped the interview, dismissed the airline employee, and used a different interpreter.

All BP agents are required to speak Spanish as a condition of their employment. They conduct interviews in Spanish themselves, although some lawyers and NGOs with whom USCIRF met expressed concerns about their ability to do so adequately, particularly for interviewees who speak local dialects. For languages other than Spanish, BP agents are supposed to use professional telephonic interpretation, but this does not always occur. A supervisory BP agent complained about the need to use telephonic interpretation, because it slows down processing and the interviewing agent cannot tell if the interpretation is accurate or not.

USCIRF heard from BP, as well as USCIS, about ongoing difficulties in finding telephonic interpreters for Central American indigenous languages. BP agents at McAllen said that indigenous language speakers usually speak some Spanish, but get to a point in the interview where their Spanish is insufficient. The agent then switches from virtual processing to an in-person interview, using another "subject" (meaning another non-citizen being processed) to interpret. The agents also reported that sometimes they reach

---

[32] To serve as interpreters, OFO officers must be certified as proficient in the language by the State Department and must renew that certification every year.

out to the relevant consulate, which they said usually can provide interpreters relatively quickly. Both of these approaches are inappropriate ways to secure interpretation for a person who might be an asylum seeker.

Detainees at ICE facilities interviewed by USCIRF reported instances where interpretation was not used for Expedited Removal processing interviews. For example, a detained Ethiopian asylum seeker who arrived at an OFO port of entry said that he was a Somali speaker but there was no Somali interpretation available; instead, another Somali non-citizen in custody interpreted. However, he stated that this person did not go over with him in detail what was written down on the forms, he just told him where to sign. Another detained Somali who arrived at a port of entry said that no Somali interpreter was available for his interview so he spoke as best he could in English.

### Interviewer Training and Guidance

The interviewing problems USCIRF observed raise questions about the adequacy of CBP's training and guidance on Expedited Removal processing. In response to USCIRF inquiries on these topics, OFO and BP provided some general information about their training, but USCIRF was not allowed to review the content and therefore cannot assess its substance. The relevant training was described as follows: As part of their 89-day basic training course, new OFO officers receive a two-hour lecture on Expedited Removal processing and two hours of practical exercises. After the academy, new officers are assigned to a port of entry, where they observe processing for 11 weeks, then have three more weeks of classroom training that includes a module on all adverse actions, including Expedited Removal. After this, they begin conducting processing themselves, initially with a more experienced officer observing. BP agents' 19 weeks of basic training includes a two-hour lecture on Expedited Removal processing, plus 30 minutes of practical exercises. Following this, they are assigned to a station, where they are paired with mentors. After about three weeks at a station, the new agents receive a one to one-and-a-half hour review lesson on Expedited Removal, which reiterates what was covered in basic training. Despite the foregoing, neither OFO nor BP agents in the field interviewed by USCIRF said they received any specific training on interviewing or on working with victims of persecution or torture.

USCIRF was, however, permitted to see the current internal guidance on Expedited Removal fear claims. The OFO guidance accurately describes the process, but the BP guidance does not. On a positive note, as of 2012, OFO no longer uses the Field Manual with the problematic language noted in the 2005 Study that suggested that CBP inspectors can assess an applicant's fear. The current OFO guidance on processing

*The interviewing problems USCIRF observed raise questions about the adequacy of CBP's training and guidance on Expedited Removal processing*

Expedited Removal cases, contained in an October 2014 memo/muster,[33] is an improvement, and accurately describes the steps OFO officers are required to follow to give a non-citizen in Expedited Removal the opportunity to express fear. Unfortunately, it is not clear what guidance was used between 2012 and 2014.

The October 2014 document consists of a one-page cover memo and a three-page muster.[34] The cover memo cites a 1997 statement of the then-INS Commissioner about the importance of protecting the rights of aliens in Expedited Removal, particularly those who fear persecution. The muster states that when an alien expresses fear, it is against DHS policy to encourage withdrawal, fail to refer to USCIS, improperly remove, or detain in inappropriate conditions; that OFO officers should not estimate the time the alien will spend in detention; and that if an alien answers yes to a fear question or asks for asylum and then asks to be sent home, the OFO officer must consult with the USCIS asylum office. If a supervising asylum officer cannot be reached, the case must be referred. It reminds OFO officers that aliens who express fear cannot be removed until an asylum officer has interviewed them to determine if they have credible fear. Finally, it states that it is CBP's responsibility to protect the alien's identity and not reveal to any foreign national or government that the alien might have sought refuge in the United States.

By contrast, the BP guidance erroneously conflates the roles of BP agents and USCIS asylum officers. This guidance is contained in a "Muster Module about Credible Fear Determination," (see Appendix E) which consists of a one-page cover memo from BP headquarters dated November 2014 and two one-page musters dated September 2014.[35] Both musters are titled "Credible Fear Determination," with one addressing Expedited Removal and the second on unaccompanied non-citizen children's cases. Although the documents correctly state that BP agents must ask the four required fear questions and record the responses, they conflate this questioning with the credible fear process and instruct BP agents on how to determine credible fear. The text provides the legal standard for credible fear of persecution twice, and also includes the legal standard for credible fear of torture. It includes a text box that

*The [OFO] muster states that when an alien expresses fear, it is against DHS policy to encourage withdrawal, fail to refer to USCIS, improperly remove, or detain in inappropriate conditions. It reminds OFO officers that aliens who express fear cannot be removed until an asylum officer has interviewed them to determine if they have credible fear. By contrast, the BP guidance erroneously conflates the roles of BP agents and USCIS asylum officers.*

---

[33] According to OFO, memo/musters are sent to each field office, and, when circulated, are read and distributed to officers at the muster at the beginning of each of that day's shifts. They also are available in OFO's electronic library. OFO is working on a replacement to the Field Manual, the Officer's Reference Tool, but it is not yet complete. Chapter 11 was made available on the OFO intranet in July 2015; it contains the existing memo/musters on admissibility.

[34] OFO would not provide the 2014 document but permitted USCIRF to read it at their offices and take notes.

[35] Border Patrol headquarters told USCIRF that the previous guidance was a March 2009 policy memo, which USCIRF did not review.

reads as follows: "An individual will be found to have a credible fear of persecution if he/she establishes that there is a 'significant possibility' that he/she could establish in a full hearing before an Immigration Judge that he/she has been persecuted or has a well-founded fear of persecution or harm on account of his/her race, religion, nationality, membership in a particular social group, or political opinion if returned to his/her country." Further, the BP muster suggests agents should go beyond the four required fear questions to have a "dialogue" with the interviewee in order to assess if s/he has credible fear. For example, the muster on UAC cases states that "agents are not limited to asking only [the four required] questions. . . . The provided questions are intended to establish a dialogue with the UAC that may allow agents to gather additional information to assist in their determination." This is not the role of BP agents, but rather of USCIS asylum officers. USCIS, however, is not mentioned anywhere in the documents.

### Processing of Women and Children

CBP encounters large numbers of largely Central American women and children, many of whom could have protection needs,[36] but it does not have enough female agents or officers to have women interviewing women and children. This is particularly true at BP, which is only 4.5 to five percent female, although it has been trying to recruit more women. As a result, the officers and agents who interview women and children to identify those with fear claims are overwhelmingly men who receive no specific training on working with children and families. Asked about their interactions with children, BP agents at McAllen Station admitted that many children do not want to talk to a male agent in uniform.

Another concern relates to CBP's approach to processing family units with children under the age of 14. The agency's policy is to interview children over 14 individually. If a child is under that age, the mother or parent answers the questions for the child, and this is indicated on the form. This is potentially problematic, as a child could have a fear claim independent of his or her parents, or because of them. Asked about these scenarios, BP agents responded to USCIRF that they had never seen that come up and moreover, that they were confident that, since the child had made it to the safety of the United States, s/he would voice any concerns s/he had.

> *CBP encounters large numbers of largely Central American women and children, many of whom could have protection needs, but it does not have enough female agents or officers to have women interviewing women and children.*

---

[36] *See, e.g.,* UNHCR, *Children on the Run* (2014) (finding that, of 404 unaccompanied children from El Salvador, Guatemala, Honduras, and Mexico who arrived in the United States in or after October 2011, no less than 58 percent had actual or potential international protection needs); UNHCR, *Women on the Run* (2015) (finding that, in El Salvador, Guatemala, Honduras, and some parts of Mexico, women face a startling degree of violence in their daily lives and receive no protection).

## Attitudes toward Asylum

CBP has two vital roles in Expedited Removal: first, to ensure that inadmissible non-citizens are not permitted to enter the United States and second, to ensure that non-citizens who fear persecution or torture have the opportunity to seek asylum, even if they otherwise would be inadmissible. These dual roles are not easy to balance, especially in the post-9/11 era and under the strain of large numbers of arrivals. OFO officers and BP agents must be able to alternate between examining non-citizens who arrive without proper documents and identifying and providing protection to those who need it. Given these requirements, USCIRF was concerned by the skepticism some CBP officials openly expressed of asylum claims, either generally or from certain nationalities. Moreover, these officers and agents appeared to have little recognition of the potential negative implications their skepticism might have for case processing.

For example, two different OFO officers told USCIRF that migrants, especially Mexicans, believe they will be let into the country if they say they are afraid or want political asylum, and then try to retract those claims when they learn they will be detained. One stated that "political asylum is putting the smugglers out of business." Another OFO officer told USCIRF that he believes that many individuals who claim fear on arrival are not really afraid, because "those with real fear can apply overseas and bring their family."[37] However, he also said that if a person claims fear "I would never try to talk anybody out of it." USCIRF observed this officer conduct a confrontational interview, where he and another officer (who was supposed to be interpreting but instead acted as a second interviewer) aggressively questioned a non-citizen and responded to his answers with obvious distrust based on their skepticism of his intentions for entry and his supposed fear claim. The individual in fact was not claiming fear of return, but the officers assumed that he was going to because another citizen of the same country who arrived on the same flight had sought asylum earlier that day.[38]

A BP agent at one station drew a distinction between "legitimate" asylum seekers who present themselves at ports of entry, as opposed to those apprehended along the border. USCIRF also heard this view from a BP headquarters official, who said that asylum seekers show up at ports of entry, they do not get apprehended by BP.

Another BP agent stated that Mexican asylum seekers all tell the same stories about fleeing the cartels, which he viewed as indicating coaching,

*CBP has two vital roles in Expedited Removal: first, to ensure that inadmissible non-citizens are not permitted to enter the United States and second, to ensure that non-citizens who fear persecution or torture have the opportunity to seek asylum, even if they otherwise would be inadmissible.*

---

[37] This seems to be a reference to applying for resettlement as a refugee through the U.S. Refugee Admissions Program, a different legal process than asylum. A person cannot apply for asylum from overseas under U.S. law.

[38] USCIRF also observed part of the interview of the asylum seeker from the same country by a different officer/interpreter team, and it was conducted respectfully and calmly.

JA-272

if not fraud. A second agent at the same station said that hearing the same stories over and over made the agents "jaded" and that he believed the vast majority of those claiming fear did not meet the definition for asylum, although he did recognize that this was not BP's job to determine.

One BP agent implied that all fear claims made to ICE are invalid, stating that they result from individuals talking to other detainees and receiving the Know Your Rights orientation.[39] He also drew a distinction between Central Americans and other asylum seekers, saying that Central Americans almost always have family in the United States, "unlike Somalis, for example, who are coming here because they really want to get away" from their country. A supervisor at this station expressed skepticism about Chinese claims of religious persecution, telling USCIRF that Chinese individuals often say they are Christian but cannot even name the church they attend; when USCIRF informed him that many Chinese Christians worship in homes, not churches, he seemed surprised.

To be sure, not all claims of fear are credible or warrant asylum under U.S. law, and persecution is more common in some countries than others. Nevertheless, it is not CBP's role to assess the credibility or merits of fear claims, but rather to ask if a person is afraid of return, record the answer, and, if it is yes, refer the person to USCIS. The agency must do so fairly and accurately for all individuals it encounters. The comments described above may indicate that this may not always be happening, especially when considered in light of BP's flawed internal guidance (discussed above) and evidence of discrepancies between CBP's referrals and USCIS' credible and reasonable fear caseloads for certain populations.[40]

---

[39] See *Information Provided in ICE Custody* section.

[40] Human Rights Watch, *"You Don't Have Rights Here:" U.S. Border Screening and Returns of Central Americans to Risk of Serious Harm*, pg. 21-24 (2014). Human Rights Watch analyzed CBP data on apprehensions and dispositions between October 2010 and September 2012, and found that only 0.1 of Mexicans, 0.8 percent of Guatemalans 1.9 percent of Hondurans, and 5.5 percent of Salvadorans in Expedited Removal or Reinstatement of Removal were referred to USCIS for credible or reasonable fear screening, as compared to 21 percent of migrants from other countries in the same proceedings in the same years. *Id.* at 21-22. Meanwhile, however, both the number and proportion of the three Central American nationalities in USCIS's caseload increased, with most referrals coming from other agencies, like ICE, that are not required to ask systematically about fear. *Id.* at 24. For example, USCIS' credible and reasonable fear caseload of Hondurans increased from 1,108 individuals in 2006 to 8,539 in 2013. Id. In 2012, USCIS did 2,405 credible fear interviews of Hondurans, but CBP referred only 615 of these. *Id.*

## RECOMMENDATIONS

### To CBP

- As recommended in 2005, amend Form I-867 to include a prominently displayed notation that it is not a verbatim transcript of the interview and is not intended to document the individual's entire asylum claim in detail.

- As recommended in 2005, videorecord all Expedited Removal processing interviews at all OFO ports of entry and BP stations, including virtual processing interviews, and require supervisory and headquarters review of the recordings of a sampling of interviews for quality assurance purposes. Until videorecording is established, require supervisors to sit in on and observe a sampling of interviews, and use testers to further verify that proper interviewing procedures are being followed.

- Retrain all OFO officers and BP agents on their role in the Expedited Removal process, the proper procedures for interviewing non-citizens, and the special needs and concerns of asylum seekers and other vulnerable populations.

- Remove any and all language in internal guidance that suggests that OFO officers or BP agents have the authority to reject or assess claims of fear or eligibility for asylum.

- Establish a dedicated corps of specially-trained, non-uniformed interviewers to interview women and children to identify fear claims, and ensure that female interviewers are included. Until such a corps is established, use female OFO officers and BP agents to interview women and children whenever possible, and continue to work to increase the number of women in these positions.

- Track the results of interviews conducted by virtual processing against those conducted in person, to determine if the two methods are producing materially different outcomes.

- Ensure that all interviewees have access to completely private interviews and that parents are not interviewed with their children present.

- Use only professional interpreters, not officers, agents, or any other individual, during the I-867 interviews, and do not use airline employees as interpreters at any point in the inspection process.

### To USCIS

- Continue the good practice of asking asylum seekers during credible fear interviews about discrepancies in their fear claims documented in the I-867 forms and fear claims raised with ICE authorities in detention.

- Track whether credible fear interview referrals are coming from CBP or ICE to better understand when in the Expedited Removal process most fear claims are being raised.

### To EOIR

- Retrain immigration judges about the fact that Form I-867 it is not a verbatim transcript of the interview and is not intended to document the individual's entire asylum claim in detail, and instruct them that it should be weighed accordingly.

## CREDIBLE FEAR SCREENING

Within DHS, the USCIS Asylum Division is responsible for screening for credible fear persons who express to CBP or ICE a fear of persecution or torture if returned to their countries of origin. Under IIRIRA, the credible fear screening is to determine if the person has "a significant possibility" of establishing eligibility for asylum or eligibility for protection under the Convention Against Torture through withholding of removal or deferral of removal and therefore is entitled to a full hearing before an immigration judge. The credible fear screening is not a full adjudication; rather it is an initial review meant to quickly identify potentially meritorious claims and screen out frivolous ones.

Credible fear screenings are done by asylum officers, who have received training on relevant U.S. and international legal standards and non-adversarial interview techniques. Asylum officers are required by law to have access to information about the conditions in asylum seekers' countries of origin to make well-informed credible fear determinations.[41]

The 2005 Study found that USCIS had developed procedures and protections to help ensure that *bona fide* asylum seekers in Expedited Removal were not returned to countries erroneously where they could face persecution.

Since the release of the 2005 Study, the number of persons in Expedited Removal claiming fear has grown from 9,465 in FY2005 to 51,001 in FY2014.[42] Wait times for credible fear interviews also increased. In order to address increased workloads, USCIS increased its authorized staffing levels by 100 asylum officers in FY2014 and began to hire and train new officers; redeployed staff to conduct the increased volume of credible fear interviews;[43] and increased the use of telephonic interviews.

In addition, as fear claims in Expedited Removal increased, so too did the rate of positive credible fear findings. To address what USCIS headquarters felt were potentially inflated credible fear determination rates, USCIS in 2014 issued a revised credible fear lesson plan for asylum officer training to reinforce and remind officers of the legal requirements of the credible fear screening process and updated their quality assurance procedures.

> *The credible fear screening is to determine if the person has "a significant possibility" of establishing eligibility for asylum or eligibility for protection under the Convention Against Torture through withholding of removal or deferral of removal and therefore is entitled to a full hearing before an immigration judge.*

---

[41] The use of country of origin information is required in the INA, section 208(b)(1)(B)(iii).

[42] Referrals to USCIS for credible fear screenings in FY2015 fell to 48,052.

[43] USCIS' movement of asylum officers from the affirmative asylum process to address credible fear and reasonable fear delays has led to a growing backlog of affirmative asylum filings, which have also risen during this time period. As of the end of 2014, USCIS had over 73,000 affirmative asylum cases pending.

## New Lesson Plan

When the U.S. Congress considered the enactment of Expedited Removal, Senator Orrin Hatch of the Senate Judiciary Committee affirmed that "[T]he (credible fear) standard . . . is intended to be a low screening standard for admission into the usual full asylum process."[44]

In February 2014, USCIS issued a revised lesson plan to train asylum officers on evaluating asylum seekers' fear (see Appendix F). USCIS headquarters told USCIRF that the purpose of the revised lesson plan was to re-emphasize the requirement that asylum seekers must show a nexus between their personal fear claims and a protected ground.[45] Namely, each asylum seeker must demonstrate that s/he personally experienced, or if returned would personally experience, persecution as a member of a group that is persecuted based on a protected ground; a positive credible fear determination cannot be made simply because an asylum seeker belongs to such a group. DHS further reported to USCIRF that the change in the lesson plan clarified the standard of proof and that the lesson plan makes it clear that "[e]ssentially, the asylum officer is applying a threshold screening standard . . ."[46]

Nevertheless, the lesson plan's language raised concerns among some stakeholders that the credible fear standard had been raised to require an in-depth assessment more like a full adjudication of asylum claims. For example, the new lesson plan eliminated the above statement from Senator Hatch about the low screening standard, but bolded language declaring that a claim that has no possibility, or only a minimal or mere possibility, of success would not meet the "significant possibility" standard.[47] Positively, the revised lesson plan does reiterate that the purpose of the credible fear interview is to "quickly identify potentially meritorious claims to protection and to resolve frivolous ones with dispatch"[48] and to allow immigration judges to further examine the former. It also reminds asylum officers that asylum seekers are not required to show that the chances of success are more likely than not.[49]

To assist this determination, asylum officers now are required to use a standard checklist for the credible fear interview. The checklist initially

*When the U.S. Congress considered the enactment of Expedited Removal, Senator Orrin Hatch of the Senate Judiciary Committee affirmed that "[T]he (credible fear) standard . . . is intended to be a low screening standard for admission into the usual full asylum process."*

---

[44] Senate, "Proceedings and Debates of the 104th Congress, Second Session," *Congressional Record*, Vol. 142 No. 136, September 27, 1996.

[45] International and U.S. refugee law recognize five protected grounds: race, religion, nationality, membership in a particular social group and political opinion.

[46] U.S. Citizenship and Immigration Services, *Lesson Plan Overview,* February 28, 2014, pg. 12

[47] *Id.* pg. 14

[48] *Id.,* pg. 11.

[49] *Id.,* pg. 14.

was piloted by the Houston Asylum Office in April 2013. USCIS found it to be an efficient tool and with the surge of credible fear referrals in 2014, began using it nationwide. The checklist replaced the previous format of the written analysis for credible fear determinations. At the end of the interview, asylum officers continue to be required to write a short summary of relevant facts (see Appendix G).

Asylum officers interviewed by USCIRF provided mixed assessments of the revised lesson plan and checklist. They noted that they are helpful to increase the specifics and knowledge of an asylum seeker's claim. At the same time, they said the credible fear interview is intended to be a screening but the checklist leads them to develop a fuller analysis and record of the claim, bringing it close to the point of a full adjudication on the merits. They said interviews under the new lesson plan are more detailed and take longer. Asylum officers estimated that most credible fear interviews are now around 1 hour and 15 minutes.

*Following the deployment of the new lesson plan, credible fear grant rates fell from 81.4 percent in February 2014 to 70.2 percent for FY2015 and 77.15 percent for FY2016 through February 2016.*

Following the deployment of the new lesson plan, credible fear grant rates fell from 81.4 percent in February 2014 to 70.2 percent for FY2015 and 77.15 percent for FY2016 through February 2016.

## Telephonic Interviews

USCIS also has expanded significantly its reliance on telephonic interviews for credible fear screenings. Only two percent of all 5,369 credible fear interviews were conducted by phone in 2009. By contrast, 59 percent of the 51,001 interviews were done that way in FY2014, according to the USCIS Ombudsman.[50] The greatest use of telephonic interviews is for asylum seekers in Expedited Removal who crossed the southern border. This is due to the high numbers of that population, the lack of space in detention facilities for asylum officers to conduct in-person interviews, and the remote locations of the detention facilities.

The move toward telephonic credible fear interviews has raised concerns. Asylum seekers interviewed by telephone may find it more difficult to recount fully to the asylum officer, through an interpreter, the details of violent and traumatic events. Some legal service providers reported to USCIRF that telephonic credible fear interviews are shorter, less accurate, and more confusing than in-person interviews. Additionally, telephonic interviews limit asylum officers' ability to assess asylum seekers' credibility. Indeed, the USCIS 2014 credible fear lesson plan recognizes this limitation, stating that telephonic interviews "further limits the reliability of and ability to evaluate [demeanor, candor, and responsiveness]

---

[50] U.S. Citizenship and Immigration Services Ombudsman, *Annual Report 2015*, June 29, 2015, pg. 62.

in the credible fear context."[51] USCIS told USCIRF it has attempted to use videoconferencing for credible fear interviews, but connectivity and other technical issues prevented the expansion of this option. Despite these concerns, USCIS headquarters reported to USCIRF that positive fear determination rates are slightly higher for telephonic interviews than for in-person interviews.

When USCIS started using telephonic credible fear interviews, it instituted quality assurance mechanisms to take into account some of the concerns discussed above. Initially, asylum officers were required to conduct a follow-up interview with persons determined not to have a credible fear either in person or by videoconference. However, that requirement ended in June 2013; follow-up interviews are now left to the discretion of asylum office directors.

## Quality Assurance

In the 2005 Study, USCIRF drew attention to an imbalance in USCIS' review and quality assurance procedure: negative credible fear determinations required 100 percent headquarters review and extra documentation, whereas positive determinations did not. USCIRF cautioned that this discrepancy could create a bias in favor of positive credible fear determinations. In June 2014, USCIS headquarters implemented a new procedure to review randomly 10 percent of all pre-decisional positive and negative credible fear determinations. This was a return to a quality assurance policy that USCIS first implemented in 2006 following the release of USCIRF's 2005 Study, but ceased for unknown reasons.

### RECOMMENDATIONS

#### To USCIS

- Reaffirm in the Asylum Officers' Lesson Plan that the credible fear standard is a screening standard requiring a showing of a "significant possibility" of eligibility for asylum, not a full assessment of the merits of the case.

- Continue to track the results of credible fear interviews conducted telephonically and those conducted in person to determine if the two methods are producing materially different outcomes, and in the meantime reinstate in-person re-interviews, when requested by the non-citizen, of negative credible fear findings from telephonic interviews.

- Continue the good practice of headquarters' review of a statistical sampling of both positive and negative credible fear determinations for quality assurance purposes, as recommended in 2005.

---

[51] U.S. Citizenship and Immigration Services, *Lesson Plan Overview*, February 28, 2014, pg. 18.

# Barriers to Protection as of 2024

## UPDATED RECOMMENDATIONS ON ASYLUM SEEKERS IN EXPEDITED REMOVAL



# USCIRF'S MISSION

*To advance international freedom of religion or belief, by independently assessing and unflinchingly confronting threats to this fundamental right.*

| | |
|---|---|
| CHAIR | Stephen Schneck |
| VICE CHAIR | Meir Soloveichik |
| COMMISSIONERS | Ariela Dubler |
| | Mohamed Elsanousi |
| | Maureen Ferguson |
| | Susie Gelman |
| | Vicky Hartzler |
| | Asif Mahmood |
| EXECUTIVE DIRECTOR | Erin D. Singshinsuk |

This report is based on research conducted in 2023–24 into policies and practices in place at that time. Policies and practices implemented in 2025 are not covered.

February 2025



UNITED STATES COMMISSION ON INTERNATIONAL RELIGIOUS FREEDOM

JA 2910

# CONTENTS

1    About The United States Commission on International Religious Freedom

2    Executive Summary

4    Introduction

5    The Expedited Removal Process

    7    Scope of Application
    7    Initial Screenings by CBP Officers
    8    Credible Fear Interviews

10    Research Methodology and Findings

    10    Methodology
    10    Findings

16    Analysis of USCIRF's 2016 Recommendations

19    Updated Policy Recommendations

    19    To the Secretary of Homeland Security
    19    To CBP
    19    To USCIS
    20    To ICE
    20    To EOIR
    20    To Congress

21    Glossary of Acronyms

22    About the Authors

*This page intentionally left blank.*

# ABOUT THE UNITED STATES COMMISSION ON INTERNATIONAL RELIGIOUS FREEDOM

## WHO WE ARE

The U.S. Commission on International Religious Freedom (USCIRF) is an independent, bipartisan U.S. federal government commission created by the 1998 International Religious Freedom Act (IRFA). USCIRF uses international standards to monitor violations of freedom of religion or belief abroad and makes policy recommendations to the president, the secretary of state, and Congress. USCIRF Commissioners are appointed by the president and congressional leaders of both political parties. The Commission's work is supported by a professional, nonpartisan staff of regional and subject matter experts. USCIRF is separate from the U.S. Department of State, although the department's ambassador-at-large for international religious freedom is a nonvoting, ex officio Commissioner.

## WHAT RELIGIOUS FREEDOM IS

Inherent in religious freedom is the right to believe or not believe as one's conscience leads and to live out one's beliefs openly, peacefully, and without fear. Freedom of religion or belief is an expansive right that includes the freedoms of thought, conscience, expression, association, and assembly. While religious freedom is America's first freedom, it also is a core human right that international law and treaty recognize; a necessary component of U.S. foreign policy and America's commitment to defending democracy and freedom globally; and a vital element of national security, critical to ensuring a more peaceful, prosperous, and stable world.

# EXECUTIVE SUMMARY

When Congress enacted the expedited removal process in 1996 to establish stronger controls at the border and ports of entry (POEs), it included safeguards to protect bona fide asylum seekers. In 1998, Congress enacted the International Religious Freedom Act (IRFA), which authorized the U.S. Commission on International Religious Freedom (USCIRF) to conduct a study to examine the treatment of asylum seekers in expedited removal. This study aimed to ensure immigration officials implemented expedited removal in a manner consistent with the United States' obligations to protect noncitizens fleeing persecution.

In 2005, USCIRF released its *study*, which revealed serious flaws in the processing and detention of asylum seekers in expedited removal and made recommendations to address them. Since then, USCIRF has periodically assessed whether the 2005 study's recommendations have been implemented and, if not, whether they remain relevant or need to be revised. Specifically, USCIRF released a 2007 *report card*, a 2013 *assessment* of the implications of detention reforms, and a 2016 *report* on the effects of changes in the expedited removal process overall. Since USCIRF's last report in 2016, there have been several significant policy changes that altered the legal and procedural standards for asylum seekers in expedited removal. Altogether, the passage of time and these policy changes led USCIRF to commission this report to reevaluate the status and relevance of USCIRF's 2016 recommendations. The research took place in 2023 and 2024 and looked at policies and implementation practices in effect during that period.

## THE EXPEDITED REMOVAL PROCESS

Expedited removal is a streamlined process to screen and swiftly remove certain noncitizens. Although quick, the expedited removal process is complex, involving numerous agencies within both the Department of Homeland Security (DHS) and the Department of Justice (DOJ). These include DHS's Customs and Border Protection (CBP), Immigration and Customs Enforcement (ICE), and U.S. Citizenship and Immigration Service (USCIS), and DOJ's Executive Office for Immigration Review (EOIR) and Board of Immigration Appeals (BIA). (A glossary of these and other relevant acronyms can be found at the end of the report.)

If CBP decides to subject a noncitizen to expedited removal, they can be deported without an immigration court hearing unless they express an intention to apply for asylum or a fear of persecution, torture, or return to their home country. If they express such intention or fear, they are typically referred to USCIS for a credible fear interview (CFI), which is a screening interview conducted while they are detained to determine whether there is a *significant possibility* that they would later be able to show that they qualify for asylum or other protections in an immigration court. If a USCIS asylum officer determines they have a credible fear, an EOIR immigration judge (IJ) then decides whether they are eligible for asylum or other protection and can remain in the United States. If the asylum officer determines they do not have a credible fear, the noncitizen can either ask for an IJ to review the CFI decision or they are swiftly removed from the country.

The expedited removal process has changed significantly over the past few years. At the time of the research, there had been several recent policy changes that:

- Fast-tracked the process further and allowed for processing, detention, and CFIs (as well as IJ reviews of CFI decisions) to take place in CBP facilities;

- Changed the legal standard and procedure for deciding these asylum claims;

- Applied a different process to families in expedited removal allowing their conditional release from detention; and

- Prevented certain noncitizens, whom an asylum officer determined to have a credible or reasonable fear of return, from being released from detention on bond while an IJ considers their asylum or protection claim.

## METHODOLOGY

The findings in this report are based on a literature review conducted from December 2023 to February 2024 and primary research conducted from May to August 2024. The primary research consisted of interviews, survey responses, observations, site visits, and consultations with DHS officials. The research was less extensive in time and scope than USCIRF's prior research on expedited removal but did allow for an assessment, in light of conditions during the research period, of the status and relevance of USCIRF's 2016 recommendations and the development of new recommendations.

JA-284

## KEY FINDINGS

Based on primary and secondary research, it was determined that some of USCIRF's 2016 recommendations were implemented, several were not and are still relevant, and several are no longer relevant due to recent policy changes. The research also revealed several important new concerns raised by expedited removal policies in place in 2024. Most notably:

- **The "shout test" that CBP is using under the Securing the Border policy to identify whether a noncitizen fears return may prevent bona fide asylum seekers from receiving a chance to access legal protection.** Under policies in force during periods of high encounters, noncitizens are not asked about fear during CBP screenings, as they were in the past. Instead, noncitizens must express fear on their own volition to be referred for a CFI. Previously, CBP officers were required to ask four questions about fear of return set forth on Forms I-867, although USCIRF's past research revealed inconsistent compliance with this requirement. The research for this report found that: CBP and ICE officers did not receive additional training on how to recognize a noncitizen's manifestation of fear; CBP and ICE facilities did not provide adequate notice to noncitizens about this new requirement; CBP officers may be improperly assessing the credibility of fear claims (an issue also identified in USCIRF's previous research); and intake procedures using contractors, virtual processing, and artificial intelligence could hinder a noncitizen from manifesting fear while in CBP custody.

- **Coupled with the fast-tracked processes, detention in CBP facilities makes it difficult for asylum seekers to prepare for and undergo their CFIs and for lawyers to advise and represent them.** Since 2023, many steps of the expedited removal process have taken place in CBP processing facilities, including overnight multi-day holding, CFIs, and IJ reviews. Previously, CBP handled intake and CFI referrals in its facilities and then transferred detainees to ICE detention centers, which are better equipped for multi-day stays, access to counsel, and CFIs. The research found that CBP facilities are designed for short-term processing; that legal representatives are not allowed inside and have difficulty contacting detained noncitizens and obtaining notice of appearance forms; that phone access for detainees is rushed and sporadic; that lawyers do not receive adequate notice of their clients' CFIs and IJ reviews; and that CFIs, which are telephonic, are held at odd hours, including on weekends and holidays, and can be lengthy given the exceptions and additional issues that are now considered.

## RECOMMENDATIONS

Finally, this report includes reiterated and updated policy recommendations from the 2016 report as well as new ones reflecting changes in policies. Like USCIRF's prior recommendations in this area, these recommendations seek to further Congress's intent that the expedited removal process both protect U.S. borders and ensure the fair and humane treatment of bona fide asylum seekers. USCIRF is troubled that many of the problems it has repeatedly documented since 2005 in the U.S. government's treatment of asylum seekers in expedited removal—including flawed screening and documentation practices, a lack of training and quality control, inadequate information for noncitizens in the process, inappropriate detention conditions, and insufficient coordination and oversight—remain unaddressed 20 years later. These flaws raise serious concerns that the United States is erroneously returning asylum seekers to countries where they could face persecution or torture in violation of both U.S. and international law.

For the full list of detailed recommendations to DHS, DOJ, and Congress, see pages 19 to 20. While the specific policies in place at the time of the research for this report are Biden administration policies, the first Trump administration put in place a similar fast-tracked process for CFIs in CBP detention and used expedited removal to the fullest extent allowed under the law. Given that the second Trump administration is also expected to vigorously implement expedited removal, the recommendations in this report on how to better protect asylum seekers in this process while also securing U.S. borders remain relevant.

**JA-285**

# INTRODUCTION

When Congress enacted the expedited removal process in 1996 to establish stronger controls at the border and POEs, it included safeguards to protect bona fide asylum seekers.[1] Congress purposely set a low screening standard to ensure that asylum seekers were not returned to countries of persecution.[2] In 1998, Congress enacted IRFA, which authorized USCIRF to conduct a study to determine whether U.S. immigration officials, in exercising expedited removal authority over noncitizens who may be eligible for asylum, were (1) improperly encouraging withdrawals of applications for admission; (2) incorrectly failing to refer such noncitizens for credible fear determinations; (3) incorrectly removing such noncitizens to countries where they may face persecution; or (4) improperly detaining such noncitizens or detaining them under inappropriate conditions.[3]

In 2005, USCIRF released a comprehensive study[4] that documented serious implementation flaws that placed asylum seekers at risk of being returned to countries where they could face persecution and prison-like detention conditions. USCIRF made a series of recommendations to various federal agencies to address these flaws, ensure fair and humane treatment of asylum seekers in expedited removal, and help protect U.S. borders. Since then, USCIRF has periodically assessed whether the 2005 study's recommendations were

implemented and, if not, whether they remain relevant or need revision. Specifically, USCIRF released a 2007 report card, a 2013 assessment of the implications of detention reforms, and a 2016 report on the effects of changes in the expedited removal process overall.[5] The most recent report, which was titled *Barriers to Protection*, found that even though some of the 2005 recommendations were implemented by 2016, there were continuing and new concerns about the processing and detention of asylum seekers. Between 2016 and 2023, the circumstances and policies surrounding the expedited removal process had changed considerably and required reevaluation, which led USCIRF to commission this report.

This follow-up report is divided into four sections. First, it explains the expedited removal process as implemented when the research was conducted. Second, it provides key findings from primary research gathered through a survey, interviews, site visits to DHS facilities, observations of CFIs, and consultations with DHS HQ officials. Third, the report reevaluates the recommendations made in the 2016 report to determine whether they were implemented and, if not, whether they remain relevant. Finally, it provides reiterated, updated, and new recommendations that reflect this research and the expedited removal process as of 2024.

---

[1]   Illegal Immigration Reform and Immigrant Responsibility Act, INA § 235(b)(1), 8 U.S.C. § 1252 (1996). https://www.govinfo.gov/content/pkg/COMPS-13677/pdf/COMPS-13677.pdf.

[2]   *See* 142 Cong. Rec. S11491-92 (September 27, 1996). See statement of Senator Orrin Hatch, former Chair of the Senate Judiciary Committee: "The (credible fear) standard ... is intended to be a low screening standard for admission into the usual full asylum process."

[3]   International Religious Freedom Act of 1998, Pub. L. 105-292 § 605 (1998), 112 Stat. 2787 § 6474.

[4]   U.S. Commission on International Religious Freedom (USCIRF). 2005. *Asylum Seekers in Expedited Removal: A Study Authorized by Section 605 of the International Religious Freedom Act of 1998*. Washington, DC: USCIRF. https://www.uscirf.gov/publications/report-asylum-seekers-expedited-removal.

[5]   U.S. Commission on International Religious Freedom (USCIRF). 2007. "Expedited Removal Study Report Card: 2 Years Later." https://www.uscirf.gov/sites/default/files/Reportcard%20Scorecard_0.pdf. *See also* U.S. Commission on International Religious Freedom (USCIRF). 2007. "Expedited Removal Study Recommendations Report Card." https://www.uscirf.gov/sites/default/files/Score%20Card%20Grades_0.pdf; U.S. Commission on International Religious Freedom (USCIRF). February 8, 2007. "USCIRF Finds Disappointing Response from Departments of Justice and Homeland Security to Its Recommendations on Expedited Removal Process." Press Release. https://www.uscirf.gov/news-room/releases-statements/uscirf-finds-disappointing-response-departments-justice-and-homeland; U.S. Commission on International Religious Freedom (USCIRF). 2013. *Assessing the U.S. Government's Detention of Asylum Seekers: Further Action Needed to Fully Implement Reforms*. Special Report. Washington, DC: USCIRF. https://www.uscirf.gov/sites/default/files/resources/ERS-detention-reforms-report-April-2013.pdf; U.S. Commission on International Religious Freedom (USCIRF). 2016. *Barriers to Protection: The Treatment of Asylum Seekers in Expedited Removal*. Washington, DC: USCIRF. https://www.uscirf.gov/sites/default/files/Barriers%20To%20Protection.pdf.

JA-286

# THE EXPEDITED REMOVAL PROCESS

Expedited removal is a streamlined removal process utilized to screen and swiftly remove certain noncitizens.[6] If DHS decides to subject a noncitizen to expedited removal, they can be deported without an immigration court hearing unless they express an intention to apply for asylum or fear of persecution, torture, or return to their home country. If they do, they are typically referred for a CFI, which is a screening interview to determine whether there is a *significant possibility* that they would later be able to show they qualify for asylum or other protections in immigration court. If an asylum officer determines they have a credible fear, an IJ then decides whether they are eligible for asylum or other protection.

Noncitizens subject to expedited removal, who are not referred for a CFI, do not have a right to counsel[7] or a hearing,[8] and there is little opportunity for them to challenge an expedited removal order.[9] Those who receive an expedited removal order are rapidly deported from the United States without a full hearing before an IJ and are typically barred from reentering the country for five years.[10]

Although quick, the expedited removal process is complex and involves several steps and multiple federal agencies, including DHS and its component agencies CBP, ICE, and USCIS as well as DOJ's EOIR and BIA.

From 2023 to 2024, there were several significant policy changes that altered the way these agencies implement expedited removal:

- The Enhanced Expedited Removal (EER) policy fast-tracked the process, providing noncitizens 24 hours to speak to a legal representative and prepare for their CFIs.[11] It also allowed noncitizens to be processed and detained and to undergo their CFIs, as well as IJ reviews of CFI decisions, in CBP processing facilities. Previously, noncitizens were detained and had their CFIs in ICE detention centers.

- The Circumvention of Lawful Pathways (CLP) rule presumes that noncitizens are ineligible for asylum if they do not enter the United States in specific ways and did not seek protection or asylum in a country they traveled through, unless they meet certain exceptions.[12] They can still seek other forms of protection but are held to a higher legal standard (*reasonable possibility*) to receive them. Whether a noncitizen meets the exceptions to this rule or the higher standard for protection is now considered during their CFI.

- The Securing the Border (STB) policy (including a presidential proclamation and final rule) prevents noncitizens from entering the United States at the southern border during periods of high encounters, unless they meet

---

6   8 U.S.C. § 1225, I.N.A. § 235. https://uscode.house.gov/view.xhtml?req=granuleid:USC-prelim-title8-section1225&num=0&edition=prelim.

7   The statutory right to consult does not attach until a noncitizen is referred for a CFI, and the noncitizen must pay for representation or access pro bono services. INA 235(b)(1)(B)(iv), 8 U.S.C. 1225(b)(1)(B)(iv). These consultations are also made available under the policies and procedures of the detention facility where they are detained. See 8 CFR 235.3(b)(4)(ii).

8   8 U.S.C. § 1225, I.N.A. § 235. https://uscode.house.gov/view.xhtml?req=granuleid:USC-prelim-title8-section1225&num=0&edition=prelim. See also 8 C.F.R. § 235.3(b)(2)(ii).

9   *Id. See also* U.S. Department of Homeland Security v. Thuraissigiam, 591 U.S. (2020). https://supreme.justia.com/cases/federal/us/591/19-161/. (The Supreme Court held that IIRIRA 8 U.S.C. § 1252(e)(2) limits on judicial review of expedited removal orders (preventing habeas corpus challenges in federal court), and this does not violate the Suspension or Due Process clauses of the Constitution.)

10  8 U.S.C. § 1182(a)(9)(A)(i), I.N.A. § 212(a)(9)(A)(i). https://uscode.house.gov/view.xhtml?req=granuleid%3AUSC-prelim-title8-section1182&num=0&edition=prelim.

11  U.S. Department of Homeland Security. 2023. "Fact Sheet: U.S. Government Announces Sweeping New Actions to Manage Regional Migration." https://www.dhs.gov/news/2023/04/27/fact-sheet-us-government-announces-sweeping-new-actions-manage-regional-migration. EER was not the first time the CFI process has been fast-tracked. In 2019, under the first Trump administration, DHS began implementing two pilot programs, the Prompt Asylum Claim Review (PACR) and Humanitarian Asylum Review Process (HARP). Noncitizens in the CFI process were given 24 to 72 hours to prepare for their CFI, and they were detained in CBP custody (instead of ICE custody) until they were either removed or their case was decided by an IJ. The programs were implemented until March 2020, when Title 42 blocked asylum seekers from entering the country for public health reasons, which remained in force until May 2023. In 2021, the Biden administration issued an executive order directing DHS to stop the PACR and HARP programs. Creating a Comprehensive Regional Framework to Address the Causes of Migration, to Manage Migration Throughout North and Central America, and to Provide Safe and Orderly Processing of Asylum Seekers at the United States Border, E.O. 14010, 86 F.R. 8267 (February 2, 2021). https://www.federalregister.gov/documents/2021/02/05/2021-02561/creating-a-comprehensive-regional-framework-to-address-the-causes-of-migration-to-manage-migration.

12  Under the CLP policy, noncitizens entering the United States at its borders are presumed ineligible for asylum if they (1) approach U.S. POEs without an appointment through the CBP One app (or without using other existing lawful pathways) or cross the border irregularly between POEs and (2) did not seek protection or asylum in a third country they traveled through on their way to the United States. If noncitizens cannot meet these requirements, they can only seek asylum if they can prove they meet one of the following exceptions: they are facing imminent threats to their lives; they are victims of severe forms of trafficking; they cannot access the CBP One app to make an appointment due to technical or other accessibility issues; they face an acute medical emergency; or they face other exceptionally compelling circumstances that immigration officers determine to be sufficient to provide an exception on a case-by-case basis. See Circumvention of Lawful Pathways 88 F.R. 11704, 8 C.F.R. 208 (May 11, 2023). https://www.federalregister.gov/documents/2023/05/16/2023-10146/circumvention-of-lawful-pathways; U.S. Department of Homeland Security. May 11, 2023. "Fact Sheet: Circumvention of Lawful Pathways Final Rule." https://www.dhs.gov/news/2023/05/11/fact-sheet-circumvention-lawful-pathways-final-rule.

**JA-287**

certain exceptions.[13] While this policy is in effect, CBP officers are no longer required to ask noncitizens specific questions about whether they fear persecution or return as part of the initial screening process; instead, noncitizens must express this fear on their own volition to be referred for a CFI. The STB policy also further fast-tracked the process, providing noncitizens four hours to prepare for their CFIs, which are conducted in CBP custody. Like the CLP rule, the STB policy presumes noncitizens are ineligible for asylum if they do not enter the country a certain way or meet exceptions, and those not within the exceptions must meet an even higher legal standard (*reasonable probability*) to receive other forms of protection. This policy also allows families to be detained in CBP facilities and undergo their CFIs there.

- DHS started requiring asylum officers to consider whether noncitizens are subject to statutory bars to asylum during CFIs.[14] These were previously considered later in the process by IJs.

- DHS and DOJ created a dedicated Recent Arrivals docket for certain cases of those who crossed the southwest border, without inspection, between POEs (which may arise from positive CFI determinations).[15] This is intended for IJs to decide these cases as fast as possible.

- The Family Expedited Removal Management (FERM) program allows certain families in expedited removal to be conditionally released from detention while they go through their CFIs.[16]

- DHS policies, which are being challenged in the ongoing *Padilla v. ICE* lawsuit, prevent certain noncitizens, whom an asylum officer determined to have a credible fear during a CFI, from being released from detention on bond while an IJ considers and decides their asylum or protection claim.[17]

Table 1 describes the roles of the various agencies in the process, as implemented during the research period.

---

[13] Under the STB policy, most noncitizens are barred from entering the United States at the southern border until daily encounters fall below a certain level. There are exceptions for certain noncitizens who approach POEs, including: unaccompanied minors; victims of severe forms of trafficking; those with CBP One appointments; those whom CBP officers permit to enter based on the totality of the circumstances, including consideration of law enforcement, officer and public safety, and urgent humanitarian and public health interests; and those permitted to enter due to operational consideration at the time of entry or encounter. While the STB policy is in force, noncitizens who approach a POE or are encountered at or near the border are deemed ineligible for asylum unless they meet one of the foregoing exceptions or show exceptionally compelling circumstances. This includes cases where the noncitizen or their family member: faced an acute medical emergency; faced an imminent and extreme threat to life or safety; or meet the definition of a victim of a severe form of trafficking under federal regulations. *See* Securing the Border Proclamation 10773, 89 F.R. 48487 (June 3, 2024). https://www.federalregister.gov/documents/2024/06/07/2024-12647/securing-the-border; Securing the Border Interim Final Rule (IFR) 89 F.R. 48710 (June 5, 2024). https://www.federalregister.gov/documents/2024/06/07/2024-12435/securing-the-border; A Proclamation Amending Proclamation 10773, 89 F.R. 80351 (September 27, 2024). https://www.federalregister.gov/documents/2024/10/02/2024-22942/amending-proclamation-10773; Securing the Border Final Rule, 89 F.R. 81156 (October 7, 2024). https://www.federalregister.gov/documents/2024/10/07/2024-22602/securing-the-border.

[14] Application of Certain Mandatory Bars in Fear Screenings, 89 F.R. 41347, 8 C.F.R. 208 (May 13, 2024). https://www.federalregister.gov/documents/2024/05/13/2024-10390/application-of-certain-mandatory-bars-in-fear-screenings.

[15] Efficient Case and Docket Management in Immigration Proceedings, 89 F.R. 46742 (May 29, 2024). https://www.federalregister.gov/documents/2024/05/29/2024-11121/efficient-case-and-docket-management-in-immigration-proceedings; U.S. Department of Homeland Security. May 16, 2024. "DHS and DOJ Announce 'Recent Arrivals' Docket Process for More Efficient Immigration Hearings." https://www.dhs.gov/news/2024/05/16/dhs-and-doj-announce-recent-arrivals-docket-process-more-efficient-immigration.

[16] U.S. Immigration and Customs Enforcement. May 10, 2023. "ICE Announces New Process for Placing Family Units in Expedited Removal." Press Release. https://www.ice.gov/news/releases/ice-announces-new-process-placing-family-units-expedited-removal.

[17] U.S. Department of Justice. March 20, 2019. Matter of M-S-, 27 I&N Dec. 509 (A.G. 2019); National Immigration Litigation Alliance (NILA), Northwest Immigrant Rights Project (NIRP), and American Immigration Council (AIC). 2024. "Padilla v. ICE and Delays in Credible Fear Interviews." Practice Alert. https://www.americanimmigrationcouncil.org/sites/default/files/practice_advisory/padilla_practice_alert_-_032224.pdf.

JA-288

## Table 1: Roles of Federal Agencies in the Expedited Removal Process

| Federal Agency | Sub-Agency | Role |
| --- | --- | --- |
| U.S. Department of Homeland Security (DHS) | U.S. Customs and Border Protection (CBP) | CBP conducts initial screenings to determine whether certain noncitizens should be subject to expedited removal at POEs and along the border. Office of Field Operations (OFO) officers screen noncitizens at POEs, and Border Patrol agents screen those apprehended at or near the border. If a noncitizen expresses an intention to apply for asylum or a fear of persecution, torture, or return to their home country, CBP refers them to USCIS for a CFI (or a reasonable fear interview [RFI] if they were previously ordered removed or their deportation, exclusion, or removal order was reinstated). Since 2023, most noncitizens stay in CBP custody until they receive an order of expedited removal or a USCIS decision on their CFI. |
|  | U.S. Immigration and Customs Enforcement (ICE) | Previously, noncitizens referred for CFIs were transferred to ICE custody until their CFIs and sometimes their immigration court hearings, but since 2023 most remain in CBP custody at least until their CFI is completed. Some are still transferred to ICE facilities under certain circumstances, including a lack of space in CBP facilities. ICE Enforcement and Removal Operations (ERO) works with CBP to facilitate removals. ICE also conducts check-ins and provides ankle monitors and other alternatives to detention (ATD) aspects of the FERM program. |
|  | U.S. Citizenship and Immigration Services (USCIS) | USCIS conducts CFIs or RFIs for noncitizens who express to CBP or ICE officers an intent to apply for asylum or a fear of persecution, torture, or return to their home country. These interviews are done over the phone by a USCIS asylum officer (who could be anywhere in the country) within 24 hours (under the EER process) or four hours (if the STB policy is in effect) from the time the detained noncitizen is given an opportunity to consult with a legal representative or other consultant. These timeframes usually begin when the noncitizen is provided access to phones or given information about the expedited removal and CFI process. During the interview, the asylum officer determines whether there is a significant or reasonable possibility (or probability under the STB policy) that the noncitizen would later show that they qualify for asylum, withholding of removal, or Convention Against Torture (CAT) protection in immigration court. |
| U.S. Department of Justice (DOJ) | Executive Office of Immigration Review (EOIR) | If an asylum officer determines that the noncitizen has a credible or reasonable fear, they are placed in removal proceedings before an EOIR IJ who determines whether to grant them legal protection. If the asylum officer determines that the noncitizen does not have a credible or reasonable fear, the noncitizen can request that an IJ review this determination. If the IJ reverses the asylum officer's determination, they will be placed in removal proceedings before an IJ to seek asylum and other legal protections. |
|  | Board of Immigration Appeals (BIA) | The BIA decides appeals of the decisions made by EOIR IJs. |

## SCOPE OF APPLICATION

DHS is authorized, but not required, to apply expedited removal to any noncitizen who enters the United States without inspection or with fraudulent or misrepresented documents who cannot demonstrate that they have been physically present in the country for at least two years.[18] It typically applies to noncitizens who do not have proper documentation to enter the country at U.S. POEs,[19] entered the United States by sea without inspection,[20] or entered the United States by land without inspection and are encountered within 100 miles of a U.S. land border within 14 days of their unauthorized entry into the country.[21]

## INITIAL SCREENINGS BY CBP OFFICERS

CBP conducts initial screenings to determine whether certain noncitizens should be subject to expedited removal and referred for a CFI at POEs and the border. Typically, CBP OFO officers screen these noncitizens at POEs, and Border Patrol agents screen those who are apprehended at or near the border.

---

[18]  8 U.S.C. § 1225(b)(1)(A)(iii)(II), I.N.A. § 235(b)(1)(A)(iii)(II). https://uscode.house.gov/view.xhtml?req=granuleid:USC-prelim-title8-section1225&num=0&edition=prelim.

[19]  When expedited removal was first implemented in 1997, it only applied to these noncitizens. Illegal Immigration Reform and Immigrant Responsibility Act, I.N.A. § 235(b)(1), 8 U.S.C. § 1252 (1996). https://www.govinfo.gov/content/pkg/COMPS-13677/pdf/COMPS-13677.pdf.

[20]  In 2002, the Immigration and Naturalization Service (INS) expanded expedited removal to apply it to these noncitizens. Notice Designating Aliens Subject to Expedited Removal I.N.A. § 235(b)(1)(A)(iii), 67 F.R. 68924 (November 13, 2002). https://www.federalregister.gov/documents/2002/11/13/02-29038/notice-designating-aliens-subject-to-expedited-removal-under-section-235b1aiii-of-the-immigration.

[21]  In 2004, DHS—which succeeded the INS—expanded its use of the expedited removal process again and began to also apply it to these noncitizens. Designating Aliens for Expedited Removal, 69 F.R. 48877 (August 11, 2004). https://www.federalregister.gov/documents/2004/08/11/04-18469/designating-aliens-for-expedited-removal. In 2019, the Trump administration expanded its use of expedited removal again to the fullest extent possible under the Illegal Immigration Reform and Immigrant Responsibility Act, applying it to these noncitizens encountered anywhere in the United States who have been in the country for less than two years, removing the 100-mile encounter location and 14-day limits. See Designating Aliens for Expedited Removal, 84 F.R. 35409 (July 23, 2019). https://www.federalregister.gov/documents/2019/07/23/2019-15710/designating-aliens-for-expedited-removal). In 2022, the Biden administration rescinded that rule, reverting to the above application of the expedited removal process. See Recission of the Notice of July 23, 2019, Designating Aliens for Expedited Removal, 87 F.R. 16022 (March 21, 2022). https://www.federalregister.gov/documents/2022/03/21/2022-05961/rescission-of-the-notice-of-july-23-2019-designating-aliens-for-expedited-removal.

JA-289

During these initial screenings, CBP officers were previously required to ask mandatory questions and take a sworn statement documenting the noncitizen's fears and intentions using Forms I-867A and B before issuing a notice and order of expedited removal (Form I-860).[22] This included four carefully designed questions about fear of persecution or return to ensure that no refugee or asylee was returned to a country of persecution, as required by the Refugee Act of 1980 and the Refugee Protocol.[23] However, under the STB policy, this standard has changed since June 2024.[24]

While the STB policy is in effect, CBP officers neither ask the required questions nor take a sworn statement using I-867 forms. They will only refer noncitizens for CFIs if the noncitizens manifest fear on their own volition. This fear can be expressed in several ways (i.e., verbally, in written form, through bodily signals, etc.) during screenings or while they are in CBP or ICE custody, but whether fear is manifested is open to interpretation and up to the discretion of the officer. Under the STB policy, instead of using I-867 forms to record how and whether a noncitizen manifested fear, DHS uses a Form I-213 with a "credible fear" stamp to record the details of the person's apprehension and immigration history.

The overall number of southern border credible fear screening referrals and decisions over the past decade shows that 2023 registered a peak with 148,480 referrals. This figure is 29.5 percent higher than the number recorded in 2019, prior to the COVID-19 pandemic.[25] However, after the STB policy was implemented in June 2024, there was a drastic decrease in the number of credible fear referrals and decisions.[26] Between May and August 2024, the total monthly CFI referrals plummeted from 20,010 to 1,382, an approximately 93 percent drop. CFI decisions also decreased by approximately 87 percent (from a total of 18,515 decisions in May to 2,390 in August 2024).

Previously, CBP officers usually turned over noncitizens referred for CFIs to ICE custody, and CFIs were not done in CBP facilities.[27] However, since 2023 many remain in CBP custody while they await their CFI and before they receive an order of expedited removal or a hearing with an IJ.[28]

## CREDIBLE FEAR INTERVIEWS

If a noncitizen expresses an intention to seek asylum or a fear of persecution, torture, or return to their home country during CBP's initial screenings or while they are in CBP or ICE custody, they are typically referred to USCIS for a CFI. During this screening interview, a USCIS asylum officer determines whether there is a *significant possibility* that they would later show they qualify for asylum or other legal protection in immigration court.[29] If a noncitizen was previously ordered removed or their deportation, exclusion, or removal order was reinstated, they are referred to USCIS for an RFI instead of a CFI.[30] In this case they would not be eligible for asylum and would only receive withholding of removal or CAT protection if the asylum officer determines there is a *reasonable possibility* (which is a higher legal standard) that they can later show they qualify for these protections in court. DHS cannot remove those who are referred for CFIs and RFIs until their claim is evaluated.

When noncitizens are referred for CFIs, CBP (or ICE) officers must provide them with a written explanation of the CFI process (Form M-444 or a form titled "Information About the Credible Fear Interview Sheet," which is a modified version of Form M-444) to explain the circumstances under the STB policy. This includes information about the purpose of the referral and a description of the CFI process; the right to consult with an attorney or accredited representative (who will not be provided or paid for by the U.S. government) prior to and after their interview; what happens after they receive a positive or negative credible fear determination; and the right to request a review by an IJ of the asylum officer's fear determination.[31]

The CFI process was fast-tracked twice: in May 2023 by the EER policy and again in June 2024 by the STB policy. Under these policies, CFIs shall occur within 24 hours (under

22    8 C.F.R. § 235.3(b)(2)(i). https://www.ecfr.gov/current/title-8/chapter-I/subchapter-B/part-235.

23    Refugee Act of 1980, S. 643 P.L. 96-212 96th Cong. (March 17, 1980). https://www.congress.gov/bill/96th-congress/senate-bill/643/text; Protocol Relating to the Status of Refugees, G.A. Res. 2198 (XXI) (January 31, 1967).

24    *See* Securing the Border, 89 C.F.R. 48710 *supra* note 13; and U.S. Department of Homeland Security, Immigration and Customs Enforcement. (June 4, 2024). "Memorandum for Daniel A. Bible, Executive Associate Director Enforcement and Removal Operations, 'Implementation Guidance for Noncitizens Described in Presidential Proclamation of June 3, 2024, *Securing the Border*,' and 'Interim Final Rule, *Securing the Border*.'" https://drive.google.com/file/d/1jedC-2TzM0wzDaKWy4F_y7niS1fFkbhj/view.

25    U.S. Office of Homeland Security Statistics. March 2024. "Immigration Enforcement and Legal Processes Monthly Tables." https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables.

26    U.S. Office of Homeland Security Statistics. "Semi-Monthly Credible Fear and Reasonable Fear Receipts and Decisions. Data July 1, 2023–August 31, 2024." https://www.uscis.gov/tools/reports-and-studies/semi-monthly-credible-fear-and-reasonable-fear-receipts-and-decisions.

27    Hillel Smith. October 8, 2019. "Expedited Removal of Aliens: Legal Framework." Congressional Research Service. https://crsreports.congress.gov/product/pdf/R/R45314.

28    *See* DHS 2023 *supra* note 11 and Securing the Border 89 CFR 48710 *supra* note 13. This practice was also applied under previous programs the Trump administration implemented in 2019 that were rescinded in 2021. These pilot programs were the Prompt Asylum Claim Review (PACR) and Humanitarian Asylum Review Process (HARP).

29    8 C.F.R. § 235.3(b)(4). https://www.ecfr.gov/current/title-8/chapter-I/subchapter-B/part-235.

30    8 C.F.R. 208.31. https://www.ecfr.gov/current/title-8/chapter-I/subchapter-B/part-208/subpart-B/section-208.31.

31    Information about Credible Fear Interview Form M-444 (Rev. 5-31-2022).

JA-290

EER) or four hours (if apprehensions reach certain levels and the STB policy is implemented) from the time the noncitizen is given information about the CFI process and phone access to consult with a legal representative or other consultant. Previously, USCIS's policy was to wait at least 48 hours from the noncitizen's arrival in ICE custody to conduct a CFI. Asylum officers completed most CFIs in 20 days or less between 2014 and 2019.[32]

During CFIs, USCIS asylum officers typically determine whether noncitizens may qualify for asylum or other protections under the *significant possibility* legal standard, explained above. However, under the CLP rule (since May 2023) and the STB policy (since June 2024), certain noncitizens who do not enter the country in certain ways are presumed ineligible for asylum. Unless they meet certain exceptions, they can only seek withholding of removal and CAT protections and are subject to different legal standards. If they do not meet exceptions, an asylum officer determines whether there is a *reasonable possibility* (under the CLP rule—a higher standard than *significant possibility*) or a *reasonable probability* (under the STB policy—an even higher standard than *reasonable possibility*) that they can later show they qualify for these legal protections in court. USCIS HQ confirmed that asylum officers received training on the new legal standards under the CLP and STB policies.

Although noncitizens can still receive withholding of removal or CAT protection if they do not meet an exception to the CLP and STB rules, these protections are not substitutes for asylum. Unlike asylum, withholding of removal and CAT protection do not provide permanent residence or a pathway to citizenship. In addition, the noncitizen can still be deported to a third country, and spouses and unmarried children under 21 cannot receive derivative protection as family members of the noncitizen.[33]

If the asylum officer determines through the CFI or RFI that a noncitizen has a credible or reasonable fear, the noncitizen receives a notice to appear (NTA) before an IJ, is placed in removal proceedings, and can seek legal protection in immigration court. The noncitizen must file an application with the court, and an IJ eventually decides whether to grant them asylum, withholding, or CAT protection.

If an asylum officer determines that the noncitizen does not have a credible or reasonable fear, the noncitizen may request that an IJ review this determination.[34] If the noncitizen does not make this request, they may be swiftly deported. The IJ review happens quickly, usually at most seven days after the noncitizen receives the negative determination. An IJ review is not a full hearing on the merits of the case; it only reviews the asylum officer's CFI determination. If the IJ agrees with that determination, the noncitizen will receive a removal order and be deported shortly thereafter. If the IJ does not agree, the noncitizen receives an NTA and is placed in removal proceedings to apply for asylum or other protection and have a full hearing.

Most noncitizens subject to expedited removal are detained (whether they wind up receiving an order of expedited removal or a referral for a CFI).[35] If an asylum officer determines that a noncitizen has a credible fear, they are typically granted parole and released from CBP or ICE custody, unless they pose certain security risks.[36] Those who do not qualify for parole are kept in detention until their case is decided by an IJ and they are transferred from CBP to ICE custody.[37]

---

[32]  Government Accountability Office (GAO). February 19, 2020. *Immigration: Actions Needed to Strengthen USCIS's Oversight and Data Quality of Credible and Reasonable Fear Screenings.* GAO-20-250, Washington, DC: GAO. https://www.gao.gov/products/gao-20-250. USCIS did not require CFIs to be completed within a certain timeframe and used timeliness goals to monitor their CFI workload.

[33]  *See* U.S. Department of Justice. 2021. "Model Hearing Program Substantive Law Lecture: Asylum, Withholding of Removal, and Protection under the U.N. Convention Against Torture." https://icor.eoir.justice.gov/substantive_law_lecture_asylum_withholding_cat_accessible.pdf.

[34]  8 U.S.C. § 1225(b)(1)(B)(iii)(III). https://uscode.house.gov/view.xhtml?req=granuleid:USC-prelim-title8-section1225&num=0&edition=prelim. *See also* 8 C.F.R. 280.30(g)(1).

[35]  8 C.F.R. § 235.3(b)(4)(ii). https://www.ecfr.gov/current/title-8/chapter-I/subchapter-B/part-235.

[36]  ICE HQ confirmed this during consultations. *See* "Parole of Arriving Aliens Found to Have a 'Credible Fear' of Persecution or Torture," ICE Policy Directive No. 11002.1, December 8, 2009. (In 2009, ICE issued a directive to automatically consider these noncitizens for parole if they entered at POEs.) https://www.ice.gov/doclib/dro/pdf/11002.1-hd-parole_of_arriving_aliens_found_credible_fear.pdf. *See also* ICE. 2023. "Parole of Arriving Aliens Found to Have Credible Fear of Persecution or Torture." https://www.ice.gov/factsheets/credible-fear.

[37]  8 U.S.C. § 1225(b)(1)(B)(ii), and (iii)(V). https://uscode.house.gov/view.xhtml?req=granuleid:USC-prelim-title8-section1225&num=0&edition=prelim. *See also* 8 C.F.R. § 212.5(b). https://www.ecfr.gov/current/title-8/chapter-I/subchapter-B/part-212/section-212.5.

# RESEARCH METHODOLOGY AND FINDINGS

## METHODOLOGY

The findings in this report are based on a literature review conducted from December 2023 to February 2024 and primary research conducted from May to August 2024. The primary research consisted of interviews, survey responses, observations, site visits, and consultations with DHS officials. The research was less extensive in time and scope than USCIRF's prior research on expedited removal but did allow for an assessment—in light of conditions during the research period—of the status and relevance of USCIRF's 2016 recommendations and the development of new recommendations.

The primary research involved the following: First, the research team conducted 14 interviews and circulated a survey that received 18 responses from a total of 26 legal representatives from 15 different organizations and four private law firms that work with asylum seekers in expedited removal. As of the research period, few legal representatives and organizations represent asylum seekers in expedited removal. When this research was conducted in the summer of 2024, only five organizations provided pro bono legal services to noncitizens in CBP custody; five provided these services to those enrolled in the FERM program; 16 organizations provided these services in the eight ICE detention centers that held asylum seekers in expedited removal; and few private attorneys took on these noncitizens as clients. In addition, the research team interviewed policy experts about border and expedited removal policy as well as representatives of shelters and other service providers near the southwest border.

Second, the research team conducted several site visits to DHS facilities in Texas and Arizona in July and August 2024. This included in-person site visits to four CBP processing facilities in Donna, McAllen, and El Paso, TX, and Tucson, AZ, and a virtual visit and briefing at the Brownsville, TX, POE. In-person site visits were also conducted in August 2024 to the IAH Polk and Eloy ICE Detention Centers (two of the eight detention centers holding asylum seekers in expedited removal at that time) in Livingston, TX, and Eloy, AZ. These visits allowed the research team to observe the conditions of these facilities and speak with CBP and ICE officers. However, the team was not able to observe screening and intake procedures or to formally interview noncitizens in CBP and ICE custody.

Third, the research team observed six CFIs, randomly chosen by USCIS, at asylum offices in Newark, NJ, Arlington, VA, and Houston, TX, in August 2024. Four of the observed interviews were conducted virtually (with asylum seekers who were in CBP and ICE custody) and two were in person (with families enrolled in the FERM program). The observed CFIs involved noncitizens from several countries who spoke different languages, including one who identified as indigenous and another who spoke a rare language.

Finally, the research team consulted with officials from DHS HQ, including its component agencies CBP, ICE, and USCIS, to gather information about their new protocols and procedures and understand whether some of the 2016 report's recommendations were implemented and still relevant. The research team sent written questions to DHS HQ and component agencies and received their responses in August 2024. They also reached out to EOIR several times to do the same but did not receive a response.

## FINDINGS

The research identified several barriers that bona fide asylum seekers face in accessing asylum or other forms of legal protection under policies in place in 2024. As discussed further in this section:

- Many asylum seekers may not be aware of the new "shout test" requirement or may not be able to affirmatively manifest fear to be referred for a CFI.

- The conditions in CBP custody are not suitable for multi-day stays, the detention of families, access to counsel, or preparing for and undergoing CFIs.

- Legal representatives face so many obstacles representing noncitizens in CBP custody that many have decided to stop doing so. ICE facilities, by contrast, provide more appropriate detention conditions and better access to counsel and other legal resources.

- CFIs are lengthy, are conducted telephonically, and take place at odd hours and on short notice. Lack of availability of interpreters for CFIs, especially for rare languages, can be an issue.

- Families enrolled in the FERM program and released from CBP custody experience unique challenges.

JA-292

- Joint Processing Centers, where CBP, ICE, and USCIS operate under the same roof, could help these agencies better manage the expedited removal process.

## The Shout Test

As discussed above, under the STB policy, to be referred for a CFI, noncitizens must manifest fear on their own volition either during CBP's initial screenings or while they are in CBP or ICE custody. This new requirement—coupled with issues identified by the research team, including a lack of training, signage, or opportunities to manifest fear during intake—increases the risk that bona fide asylum seekers are not receiving the opportunity to seek legal protection. This concern is heightened by DHS data showing that CFI referrals and decisions plummeted after the STB policy was implemented in June 2024.

During consultations with DHS HQ and site visits, the research team confirmed that CBP and ICE officers did not receive additional training on how to identify manifestations of fear. They were only given guidance memorandums providing some examples of verbal, nonverbal, and physical ways noncitizens may show fear.[38] During site visits, CBP officers told the researchers that if a detainee claims fear, officers follow up with questions to verify that fear and, depending on their view of the adequacy of the response, do not necessarily refer the detainee for a CFI. This practice exceeds CBP's role in the process, which does not include assessing the credibility of fear claims.

The research team also observed a lack of visible, easily understandable signs in the CBP and ICE facilities they visited to inform detainees of the need to express fear on their own and the significance of this requirement. Some CBP facilities had posted standard-size pieces of paper that explained the new requirements in dense paragraphs in four languages (English, Spanish, Chinese, and Hindi), but they were not easily noticeable and did not convey that they contained important information. The Eloy ICE Detention Center had the same signs, but they were available in at least 10 additional languages, and it also had videos about manifesting fear playing in the intake area. At the IAH Polk ICE Detention Center and El Paso CBP facility, the research team did not observe any signage or videos on manifestation of fear or the new requirements.

Because the fear questions are no longer asked during screenings, the brief intake period presents the only opportunity for a noncitizen to manifest fear before CBP takes the next step on their case (whether that is a CFI referral, release, or deportation). In some CBP facilities that the research team visited, CBP officers or staff conducted this intake. Others used contractors (who may not have the training and experience to recognize manifestations of fear),[39] virtual processing (by video conference with CBP officers located elsewhere), and/or artificial intelligence software (to pull data from biographical documents and fill in intake forms). These forms of intake may prevent noncitizens from manifesting fear or affect whether it is recognized, potentially making it less likely that a bona fide asylum seeker will be referred for a CFI.

## Detention Conditions in CBP Facilities

CBP facilities are designed for short-term processing. However, since the EER policy was implemented in May 2023, CBP is handling additional aspects of the expedited removal process, including longer-term stays, on top of their other preexisting duties. Detention conditions in CBP facilities are inadequate for such stays, especially when they exceed their capacity during periods of high apprehensions. For example, CBP officers at the El Paso facility told the research team it has capacity to hold 2,500 individuals, but during surges in apprehensions it held up to 7,000 individuals. During site visits, the research team observed that the pods where single adult detainees were held were crowded and uncomfortable, and this was during periods of low apprehensions.[40] The holding pods were empty rooms without beds or other basics for overnight stays. Officers indicated that they try to keep an average of about 15–16 people in each pod but exceed this during times of high volume of encounters. In the pods, the research team observed detainees sleeping on the floor with foil blankets, side by side, with the lights on when they arrived early in the morning.

When the researchers spoke to CBP officers about their experiences adapting to the fast-tracked approach and their additional responsibilities under the EER and STB policies, they said that initially, the new CFI process sometimes took longer than intended but had become more efficient over time. For example, they reported that at the Donna facility,

---

[38]  U.S. Department of Homeland Security, Immigration and Customs Enforcement. June 4, 2024. "Memorandum for Daniel A. Bible, Executive Associate Director Enforcement and Removal Operations, 'Implementation Guidance for Noncitizens Described in Presidential Proclamation of June 3, 2024,' *Securing the Border*, and 'Interim Final Rule, *Securing the Border*.'" https://drive.google.com/file/d/1jedC-2TzM0wzDaKWy4F_y7niS1fFkbhj/view.

[39]  According to CBP HQ, CBP staff trains the contractors to assist with parts of the intake process, while CBP officers oversee and compete immigration processing, and if a contractor identifies something that seems to be a manifestation of fear, the contractor must bring that information to a CBP officer. However, CBP HQ did not confirm whether these contractors were trained or received memoranda or guidance to understand different ways fear could be manifested.

[40]  For example, at the CBP facilities in Donna and McAllen, TX, CBP officers said they were receiving about 150–300 people per day when the team visited in July 2024, but in the past, they had experienced 2,000–4,000 people per day. This decrease was also reflected in CBP southwest border encounter statistics overall. Comparing the percentage change in total encounters at the southwest border from July 2023 to July 2024, encounters were down by 57.5 percent, from 132,642 to 56,399. *See* U.S. Customs and Border Protection. 2024. "Southwest Land Border Encounters (By Component)." https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters-by-component.

noncitizens referred for CFIs were held for 15–16 days, and in El Paso 11–20 days, when apprehensions were high. But CBP officers in El Paso indicated that the holding period was down to five days when the research team visited in July 2024.

The facilities holding women and children had separate pods for unaccompanied children and families and a designated area for children under six years old. More space was provided, and phones were available so these detainees could call family members without limitations. Children under six years old were held in separate areas that had toys, blankets, and televisions, with contractors who took care of the children. CBP officers told the research team that there were time limits on detaining children and families (72 hours for unaccompanied minors and 120 hours for families), but at least one legal representative interviewed was aware of families and children being held in CBP custody for periods of five to 15 days.

### Access to Counsel and CFI Preparation in CBP Facilities

CBP facilities are also not designed to facilitate access to counsel or CFI preparation. The research revealed that: phone access for detainees can be rushed, sporadic, and granted at unusual hours; legal representatives are not allowed inside the facilities and have difficulty contacting detained noncitizens and obtaining signed notice of appearance forms; detainees typically only have a few hours and at most one phone call with counsel to prepare for their CFIs; and lawyers do not receive adequate notice of their clients' CFIs and IJ reviews, which may be held at odd hours, on weekends, or on holidays, limiting their ability to attend. Among the legal representatives surveyed, almost all of them (94.1 percent) indicated it was easier to work with clients in ICE custody than in CBP custody. Seven out of 18 legal representatives interviewed said that they have drastically reduced, or entirely ceased, working with clients in CBP custody because it was too difficult to represent them in good faith. Several more indicated in the survey that they, or their organization, only work with FERM or ICE custody clients.

During site visits to CBP facilities, the research team asked about detainee phone access. The officers explained that it is provided "when operationally feasible." Legal representatives interviewed reported that CBP sometimes provides this access outside of normal business hours, such as during the night or very early in the morning, when they are not available to answer these calls. They also indicated that they had trouble communicating with CBP officers and the DHS Office of

Chief Counsel (OCC) to facilitate contact with or call back detainees. DHS and DOJ do provide a list of points of contact for CFIs in CBP custody with emails and phone numbers for CBP, USCIS, and EOIR in various Border Patrol sectors in Texas, Arizona, and California.[41] DHS HQ said that these points of contact were established in 2023. However, legal representatives interviewed and surveyed reported that their calls and emails frequently go unanswered, and some only learned about this list in August 2024.

When detainees and their counsel do manage to talk by phone, the call is usually rushed, complicated information needs to be covered very quickly, and detainees do not have access to pens and paper. The four- and 24-hour consultation periods under the STB and EER policies and limited phone access mean that detainees in CBP custody typically are given one phone call before their CFIs, and if they manage to reach a lawyer, that call is their only opportunity to prepare for this highly consequential interview.

Legal representatives interviewed and surveyed also reported that their clients in CBP custody, especially families, are not in any condition to prepare themselves for CFIs. Detainees are traumatized from their journey to the border, are sleeping on the floor and sometimes sick from the cold conditions or the food, do not have freedom of movement, and have difficulty concentrating on their cases while taking care of their children. Family units are unable to prepare for their CFI together; they are typically detained separately, with women and young children placed in a different facility than their male family members, and they only reunite for the CFI.

### Detention Conditions and Access to Counsel in ICE Facilities

ICE facilities are better suited for multi-day stays, with beds and other basic necessities, and they provide better access to counsel and legal resources than CBP facilities. As of August 2024, only eight ICE detention centers held asylum seekers in expedited removal. The research team was able to visit two: the Eloy Center in Arizona and IAH Polk Center in Texas. Although only 16 organizations provided pro bono legal services to these eight facilities, that is more than triple the amount that served CBP facilities nationwide at that time. The ICE detention centers the team visited provided multiple mechanisms to contact legal representatives. For example, at Eloy, detainees had access to tablets with an app to chat with and send messages to legal representatives[42] and to virtual attorney visitation (VAV)[43] video conferencing systems. In addition, representatives could visit the facilities

---

41    American Immigration Lawyers Association. August 12, 2024. "Points of Contact for Credible Fear Interviews in CBP Custody."

42    U.S. Immigration and Customs Enforcement. 2024. "Tablet Legal Orientation Program Initiative." https://www.ice.gov/doclib/detention/tabletLOPinitiative.pdf.

43    U.S. Immigration and Customs Enforcement. 2024. "Virtual Attorney Visitation Program." https://www.ice.gov/detain/detention-facilities/vav.

JA-294

in person and make appointments for calls to detained clients. Some ICE detainees also have access to law libraries, Legal Orientation Program (LOP) group and individual orientations, pro se workshops, referrals to pro bono services, and Know Your Rights (KYR) materials and presentations.

ICE HQ confirmed during consultations that these resources vary depending on location. For example, the research team observed differences between Eloy and IAH Polk. IAH Polk was also set up for VAV, but detainees there had less access to tablets, the facility could accommodate fewer attorney visits, there was insufficient indoor space for in-person group LOP presentations, and detainees usually needed to contact the LOP provider by phone if they wanted to talk to legal representatives.

## CFIs and IJ Reviews

Many legal representatives interviewed or surveyed said they were unable to attend CFIs or IJ reviews for clients in CBP custody because they were scheduled so rapidly and with little or no notice. By contrast, those representing clients in ICE custody indicated they received notice some or most of the time. According to USCIS HQ, if a notice of appearance is on file at the time of scheduling or received before the CFI, the asylum officer must notify the legal representative—via email, phone, or voicemail—of the date and time at least one business day beforehand, if operationally feasible. If this is not operationally feasible, the asylum officer must notify the legal representative at the time of the interview.[44] Several legal representatives indicated they received notice this way, and if they did not answer the phone or were unavailable at the time, they could not attend.

CFIs may be scheduled at odd hours, on weekends, or on holidays, and are done telephonically. The asylum officer, noncitizen, and legal representative may be in different time zones. According to USCIS HQ, they schedule CFIs based on the length of time the case has been pending and the number of asylum officers available in a variety of locations nationwide. CFIs are conducted by telephone seven days a week and on federal holidays, beginning at 7:30 a.m. until about 8:00 p.m. local time at the CBP or ICE detention facility where the noncitizen is held.

The CFIs observed by the research team took about two to five hours to complete. Asylum officers confirmed that these interviews take longer than they did before the 2023–24 policies were implemented. During site visits, ICE officers told the team that CFIs can even take up to eight hours. With additional factors to adjudicate, including exceptions and statutory bars to

asylum, a CFI must cover extensive ground. This is particularly true for CFIs with FERM families, where each family member's claim must be considered, including children.

Undergoing a lengthy telephone interview with a stranger about traumatic events can be difficult and exhausting, especially when done from a small phone booth while in detention. A phone interview also does not allow the asylum officer to see the interviewee's face, expressions, and body language. The phone booths used for CFIs at the IAH Polk ICE Detention Center are small closets with all-black walls and floor. The CBP facilities the research team visited had new phone booths for CFIs and IJ reviews that seemed to be more private and soundproof but are not large enough to fit a family of more than two people. Each had a landline phone and a Teams phone to connect to Microsoft applications but no video conference capability. Incorporating video conferencing by adding webcams, computers, or tablets could help improve conditions for conducting CFIs and IJ reviews from CBP and ICE detention.

None of the noncitizens in the observed CFIs had legal representatives, which may also have contributed to the length of the interview. Noncitizens who meet with counsel beforehand or have representation during CFIs are more likely to understand the protection they are applying for and to be better prepared to answer complicated questions, making interviews more efficient. The research team noted that the noncitizens in the observed interviews did not seem to understand how important some questions were to meet the legal requirements to receive asylum or other protection. The research team also observed that some asylum officers were sensitive and accommodating to the noncitizens and their children and spent time making sure they were comfortable and understood certain requirements, while one was impatient, cut off the noncitizens' answers, and may have intimidated them from sharing critical details.

Some legal representatives interviewed or surveyed noted that IJ reviews, which are usually a noncitizen's one chance to appeal a negative CFI decision, are cursory and short. They also explained that IJs often treat CFI transcripts as verbatim records and afford them significant weight, when in fact these documents are only the asylum officer's notes from the interview and not a comprehensive recounting of the interviewee's entire claim.

---

[44]    *See also* U.S. Citizenship and Immigration Service. 2023. "Credible Fear Procedures Manual." Last updated October 5, 2023. https://www.uscis.gov/sites/default/files/document/guides/CredibleFearProceduresManual.pdf (which highlights similar protocols).

**JA-295**

## Interpretation Issues

Due to the rapid nature of the expedited removal process, noncitizens who speak rare or indigenous languages do not always receive adequate interpretation. According to legal representatives interviewed and surveyed, these noncitizens may receive interpreters who speak a different dialect of their language that they cannot understand, or they feel pressured to go forward with the CFI or IJ review in more common languages like English, Spanish, or French to get out of detention faster. In these situations, the noncitizen may be unable to provide a clear story or may get confused, potentially leading to misinterpretations or misunderstandings that negatively impact their ability to receive legal protection.

The research team observed one CFI with a rare language speaker. The asylum officer tried but was unable to find a USCIS-certified interpreter in the noncitizen's language. The asylum officer asked the noncitizen if he wanted to proceed in another language or reschedule; the noncitizen agreed to go forward but mentioned he may not be able to express himself well. The officer told the research team that the asylum office he worked in was seeing rare language speakers every other day. During consultations with DHS HQ, the research team asked USCIS about the procedure for providing interpreters to rare or indigenous language speakers. USCIS explained that if a noncitizen's preferred language is not serviced and they do not agree to proceed with their CFI in another language, they will be issued an NTA. If their preferred language is serviced

but an interpreter cannot be scheduled or secured within three business days, then USCIS also may issue them an NTA.

## FERM Program

DHS has been applying a different CFI process to certain families in expedited removal through the FERM program since May 2023.[45] This program seeks to keep some families in expedited removal out of CBP custody and move them through the CFI process quickly. The program aims to issue decisions on their cases within 30 days of their CFI referral. Initially, it was implemented in four cities but expanded to 45 during its first year.[46]

At the time of the research, only certain FERM families that reside near nine cities can receive an asylum merits interview after a positive CFI determination, instead of an NTA.[47] In these cases, an asylum officer would later decide whether to grant them asylum, withholding, or CAT protection instead of an IJ. These families are subject to a different CFI process that was previously applied to noncitizens in expedited removal from June 2022 to April 2023.[48] Under this process, their positive CFI determination is treated as a full application for asylum, withholding, or CAT protection, and they do not need to file a separate one.[49] If the asylum officer decides to grant them protection, they do not need to go to immigration court afterward. If the asylum officer decides not to grant them asylum, they would then be placed in removal proceedings before an IJ where they would need to file a new application with the court.

45  U.S. Immigration and Customs Enforcement. May 10, 2023. "ICE Announces New Process for Placing Family Units in Expedited Removal." Press Release. https://www.ice.gov/news/releases/ice-announces-new-process-placing-family-units-expedited-removal. *See also* U.S. Citizenship and Immigration Service. 2023. "Implementation of the Credible Fear and Asylum Processing Interim Final Rule." Fact Sheet. https://www.uscis.gov/humanitarian/refugees-and-asylum/asylum/fact-sheet-implementation-of-the-credible-fear-and-asylum-processing-interim-final-rule; and Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 87 F.R. 18078 (2023). https://www.federalregister.gov/documents/2022/03/29/2022-06148/procedures-for-credible-fear-screening-and-consideration-of-asylum-withholding-of-removal-and-cat. Families are selected for enrollment based on factors including whether they are nationals of countries to which ICE has regular removal flights, whether they intend to live within 75 miles of one of the designated cities, and whether the head of household is eligible for ICE's Alternatives to Detention (ATD) program.

46  These cities are in the following states: Indiana, Ohio, Maryland, District of Columbia, Massachusetts, New Jersey, Rhode Island, Florida, Georgia, Kentucky, Louisiana, North Carolina, Tennessee, Virginia, Missouri, Minnesota, Colorado, California, Nevada, Oregon, Utah, Washington, Arizona, and Texas. *See* ICE 2023 *supra* note 16.

47  *See* U.S. Immigration and Customs Enforcement. 2023. "Implementation of the Credible Fear and Asylum Processing Interim Final Rule." Fact Sheet. https://www.uscis.gov/humanitarian/refugees-and-asylum/asylum/fact-sheet-implementation-of-the-credible-fear-and-asylum-processing-interim-final-rule.

48  Even though the CFI process is different for families enrolled in the FERM program, they are still subject to the CLP rule and the STB policy and are held to the legal standards described above. *See* Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 87 F.R. 18078 (2023). https://www.federalregister.gov/documents/2022/03/29/2022-06148/procedures-for-credible-fear-screening-and-consideration-of-asylum-withholding-of-removal-and-cat.

49  *Id.*

JA-296

The research found that families enrolled in the FERM program face unique difficulties, even though they are released from detention. All five legal representatives interviewed who worked with FERM families reported that the required check-ins with ICE or the program's contractor, which are weekly and in person, were so frequent and time-consuming they did not have sufficient time to prepare their clients for their CFIs and IJ reviews. They also reported that the use of ankle monitors, GPS tracking, and curfews feels punitive to the families. In addition, the legal representatives interviewed noted the length of the CFIs of FERM families. One recounted a CFI that lasted for six hours (three hours for CLP exceptions and three hours for asylum screening standards). Another said they tell FERM families to be prepared to be at the USCIS asylum office all day.

The research team observed two CFIs of FERM families. Both took between three and four hours. It can be difficult for a parent to talk about trauma, persecution, or torture they faced in front of their children during a CFI, as well as for an asylum officer to ask children similar questions about their experiences. Some asylum officers may be sensitive to these difficulties, and some may not. For example, during one observed CFI, the asylum officer asked a nonverbal baby about their asylum claim, expecting answers, and did not let the parent testify on the baby's behalf.

## Joint Processing Centers

CBP officers at the facilities that the research team visited expressed interest in and support for more Joint Processing Centers (JPCs). These centers are a new concept and allow all component agencies involved in the expedited removal process (including CBP, ICE, and USCIS) to operate under one roof. CBP HQ confirmed that construction of the first JPC in Laredo, TX, started in 2024, and Congress set aside $200 million to build two JPCs along the border in FY 2022.[50] CBP officers explained that JPCs would make it easier for them to coordinate with USCIS (to schedule CFIs and handle issues during and after the interview) and ICE (to handle deportation, ATD aspects of the FERM program, and release of detainees), making the expedited removal process more efficient. These JPCs are also designed to provide healthcare, childcare, legal support, adjudication of cases, and border security. DHS HQ did not provide the research team with much detail on how JPCs would be managed, but if they incorporate better conditions for multi-day stays and better coordination throughout the process, they could improve circumstances both for DHS and for asylum seekers in expedited removal.

---

[50]   Consolidated Appropriations Act, 2022, H.R. 2471 P.L. 117–103 117th Cong. (March 15, 2022). https://www.congress.gov/117/plaws/publ103/PLAW-117publ103.pdf.

# ANALYSIS OF USCIRF'S 2016 RECOMMENDATIONS

This section analyzes the recommendations made in USCIRF's 2016 expedited removal report.[51] It lists the 2016 recommendations, organized by agency, and provides an assessment of whether they have been implemented and, if not, whether they remain relevant.

## TO THE SECRETARY OF HOMELAND SECURITY

In 2016, USCIRF made three recommendations to the Secretary of Homeland Security:

1. Appoint a high-ranking official with authority to make reforms and oversee implementation to ensure protection of asylum seekers going through the expedited removal process. *Finding: Not Implemented.*

2. Request that the DHS Office of Inspector General (OIG) audit the expedited removal process for compliance with laws and policies regarding the protection of asylum seekers. *Finding: Partially Implemented.* There have been several DHS OIG audits of specific operations along the U.S. southern border that incorporate evaluation of the treatment of asylum seekers in expedited removal.[52] But there have been no broad audits of the expedited removal process, and DHS HQ confirmed that it has not made a specific request to OIG for this type of audit.

3. Reiterate to all agencies and officers implementing expedited removal that their law enforcement mandate includes fully implementing U.S. laws and regulations governing the protection of individuals seeking refuge from return to persecution or torture. *Finding: Fully Implemented* and is part of training for all component agencies.

## TO CBP

The 2016 report made five recommendations to CBP, *none of which were implemented:*

1. Videorecord all expedited removal processing interviews and require supervisory and headquarters review of the recordings of a sampling of interviews for quality assurance purposes. *Finding: Not Implemented.* CBP HQ confirmed that it does not videorecord all expedited removal processing because it is not operationally feasible, but it noted that portions of the process may be captured via CCTVs in CBP facilities and body cameras worn by Border Patrol officers. CBP did not comment on whether any of this video is reviewed in the manner recommended in 2016.

2. Retrain officers and agents on their role in the expedited removal process, procedures for screening noncitizens, and special needs of asylum seekers and other vulnerable populations. *Finding: Not Implemented.* CBP provides officers in the field with policy guidance and memorandums when there are changes in the process but does not retrain them.

3. Establish a dedicated corps of specially trained, nonuniformed officers, including female interviewers, to interview women and children to identify fear claims. *Finding: Not Implemented.* CBP HQ confirmed that it did not establish a dedicated corps of this sort.

4. Track the results of interviews conducted by virtual processing against those conducted in person to determine if the two methods are producing materially different outcomes. *Finding: Not Implemented.* CBP HQ confirmed that the fourth recommendation was not implemented and that it does not track the results of virtual vs. in-person processing interviews.

5. Develop a document that briefly and clearly explains the expedited removal process, its consequences, the right to

---

51    U.S. Commission on International Religious Freedom (USCIRF). 2016. *Barriers to Protection: The Treatment of Asylum Seekers in Expedited Removal.* Washington, DC: USCIRF. https://www.uscirf.gov/sites/default/files/Barriers%20To%20Protection.pdf.

52    *See, e.g.,* OIG. September 25, 2023. *CBP Needs to Improve Its Video and Audio Coverage at Land Ports of Entry.* Report OIG-23-54. Washington, DC: OIG. https://www.oig.dhs.gov/sites/default/files/assets/2023-09/OIG-23-54-Sep23.pdf; OIG. 2023. *Results of Unannounced Inspections of CBP Holding Facilities in the San Diego Area.* OIG-24-07. Washington, DC: OIG. https://www.oig.dhs.gov/sites/default/files/assets/2023-11/OIG-24-07-Nov23.pdf; OIG. January 25, 2021. *Prompt Asylum Claim Review: DHS Has Not Effectively Implemented the Prompt Asylum Pilot Programs.* OIG-21-16. Washington, DC: OIG. https://www.oig.dhs.gov/taxonomy/term/2622; OIG. 2020. *CBP Has Taken Steps to Limit Processing of Undocumented Aliens at Ports of Entry.* OIG-21-02. Washington, DC: OIG. https://www.oig.dhs.gov/sites/default/files/assets/2020-11/OIG-21-02-Oct20.pdf; and OIG. 2020. *CBP Separated More Asylum-Seeking Families at Ports of Entry than Reported and for Reasons Other than Those Outlined in Public Statements.* OIG-20-35. Washington, DC: OIG. https://www.oig.dhs.gov/sites/default/files/assets/2020-06/OIG-20-35-May20.pdf.

JA-298

seek protection for those who fear return, and the right to request a private interview, and provide this document to all individuals, in a language they understand, as soon as possible when they come into CBP custody. **Finding: Not Implemented.** Such a document was not developed. The 2016 report recommended the creation of this document to incorporate information present in I-867 forms to provide noncitizens with an overview of the expedited removal process. This was originally recommended to ensure that bona fide asylum seekers were not summarily removed because they did not understand the information provided by CBP officers from this form during initial screenings, or because the officer did not provide it. Now that I-867 forms are no longer being used during initial screenings under the STB policy, this recommendation is even more relevant.

### TO USCIS

In the 2016 report, USCIRF made four recommendations to USCIS:

1. Track whether CFI referrals are coming from CBP or ICE to better understand when in the process most fear claims are being raised. **Finding: Not Implemented.** USCIS confirmed that it does not track when in the process most fear claims are being raised.

2. Reaffirm in the asylum officers' lesson plan that the credible fear standard is a screening standard that requires showing a **significant possibility** of eligibility for asylum, not a full assessment of the merits of the case. **Finding: No Longer Relevant** as the Biden administration changed the standards applied during credible fear interviews.

3. Continue to track the results of CFIs conducted telephonically and those conducted in person to determine if the two methods are producing materially different outcomes. **Finding: No Longer Relevant.** Nearly all CFIs are now performed telephonically, aside from those done under the FERM program. USCIS HQ also indicated that when it tracked and compared the results of telephonic and in-person CFIs, there were no significant differences in outcomes. However, the researchers did not receive or analyze this data.

4. Allow asylum officers to convert and adjudicate appropriate expedited removal cases in which credible fear is found as affirmative asylum cases (decided by an asylum officer instead of an IJ). **Finding: Partially Implemented.** Through the FERM program, in some cities, asylum officers are conducting asylum merits interviews to adjudicate cases with

positive CFI determinations. However, this is being done in a limited fashion and does not apply to anyone outside the FERM program.

### TO ICE

In the 2016 report, USCIRF made six recommendations to ICE:

1. Require an individualized reassessment of the need for custody for all detainees with a positive credible fear finding and apply a presumption of bond for detainees with credible fear who do not fall under the 2009 parole directive. **Finding: No Longer Relevant** because noncitizens who receive positive CFI determinations do not have access to bond hearings under DHS policy at the time of the research.

2. Ensure that programs that detain nationals of particular countries separately do not have the effect of preventing them from learning about the right to seek asylum. **Finding: No Longer Relevant.** ICE HQ confirmed that they are not detaining nationals of particular countries separately.

3. Increase the use of Alternatives to Detention, such as monitored release, for asylum seekers, beyond bond and parole opportunities. **Finding: Partially Implemented.** The recommendation was implemented for families in the FERM program but not for other noncitizens in expedited removal.

4. If families are placed in expedited removal and detained, detain them only in facilities that meet the standards of the Flores Agreement and individually reassess the need for custody after credible fear is found, with a presumption of release. **Finding: Partially Implemented.** ICE HQ confirmed that it stopped holding families in ICE detention centers by FY 2022 and only holds single adults there as of the time of the research. Families are also being released from detention through the FERM program. However, some families are still being held in CBP facilities under the STB policy while they wait to undergo their CFI. It is unclear how long and under what conditions they are being held and whether their detention complies with the Flores Agreement.[53]

5. Detain all adult asylum seekers who must be detained, whether before or after a credible fear determination, in civil facilities only. **Finding: Unclear.** From a review of the eight ICE facilities that held asylum seekers in expedited removal at the time of the research, most seem to be civil facilities. However, at least two, the Torrance County Detention Facility in New Mexico and IAH Polk, hold other prisoners charged with crimes, in addition to ICE detainees.[54] ICE HQ also

---

[53] Santamaria, Kelsey Y. 2021. "Child Migrants at the Border: The *Flores* Settlement Agreement and Other Legal Developments." Congressional Research Service. https://crsreports.congress.gov/product/pdf/IF/IF11799.

[54] TRAC Immigration. "Detention Facilities Average Daily Population." https://tracreports.org/immigration/detentionstats/facilities.html.

**JA-299**

did not confirm whether penal facilities held asylum seekers in the past, and it is unclear whether this will be done in the future.

6. Expand the KYR presentations that provide detainees with basic legal information to all facilities that house asylum seekers. *Finding: Unclear.* ICE HQ confirmed that the location of KYR presentations is dependent on capacity and EOIR and other local funding and can change at any time.

## TO EOIR

In the 2016 report, USCIRF made two recommendations to EOIR:

1. Retrain IJs that the interview record created by CBP is not a verbatim transcript of the interview and does not document the individual's entire asylum claim in detail and should be weighed accordingly. *Finding: Unclear.* The research team asked EOIR about the implementation of these recommendations and did not receive any response. They were also unable to confirm the information independently. Training materials for IJs are not publicly available.

2. Expand the LOP available in some facilities to all detention facilities housing asylum seekers and provide it to detainees before their CFIs. *Finding: Partially Implemented.* As of fall 2024, the LOP was available in all ICE detention centers that house asylum seekers in expedited removal, except for the Torrance County Detention Facility.[55] However, LOP services vary between ICE detention centers and are not available to all detainees before their CFIs. The LOP also has not been expanded overall. Historically, EOIR has managed the LOP through contracts with nonprofit organizations. Until 2022, EOIR's contracting partner was the Vera Institute of Justice. According to the Vera Institute of Justice's website,[56] the program was operational in 40 facilities. As of 2024, the LOP is managed by another organization, Acacia Center for Justice. According to Acacia's website, LOP services are available in 35 ICE facilities.[57]

## TO CONGRESS

In the 2016 report, USCIRF made four recommendations to Congress:

1. Authorize and fund another independent, comprehensive study of the treatment of asylum seekers in expedited removal at all stages of the process. *Finding: Not Implemented.*

2. Request the Government Accountability Office (GAO) to conduct a study to assess whether noncitizens removed to their home countries under expedited removal have faced persecution or torture after their return. *Finding: Not Implemented.*

3. Increase funding for the adjudicatory aspects of expedited removal to enable USCIS and EOIR to address backlogs, conduct timely adjudications, and provide due process. *Finding: Partially Implemented.* EOIR and USCIS received more funding since 2016, and some of it was specific to addressing the backlogs, increasing legal representation, and adding staff.[58] Despite these efforts and modest increases in budgets, the immigration court backlog has continued to grow tenfold and USCIS still struggles with an overwhelming number of asylum and credible and reasonable fear cases.[59]

4. Increase funding to EOIR to expand the LOP to all facilities housing asylum seekers and to enable it to be provided to detained asylum seekers before their CFIs. *Finding: Unclear.* Although recent EOIR congressional budgets included efforts to increase access to LOP resources, these efforts are grouped with Legal Access initiatives in the most recent budget, which was allotted a small portion of the budget and included multiple programs.[60]

---

55    Acacia Center for Justice. "Legal Orientation Program (LOP)." https://acaciajustice.org/what-we-do/legal-orientation-program-lop/ (Accessed on Sept. 23, 2024).

56    Vera Institute of Justice. "Legal Orientation Program." https://www.vera.org/projects/legal-orientation-program/legal-orientation-program-lop-facilities (accessed on September 23, 2024).

57    Acacia Center for Justice. "Legal Orientation Program (LOP)." https://acaciajustice.org/what-we-do/legal-orientation-program-lop/. (Accessed on Sept. 23, 2024).

58    EOIR. 2016. "Executive Office for Immigration Review (EOIR) FY 2017 Budget Request at a Glance." https://www.justice.gov/jmd/file/821961/download. EOIR. 2023. "Executive Office for Immigration Review (EOIR) FY 2024 Budget Request at a Glance." DHS. 2023. "United States Citizenship and Immigration Services Budget Overview Fiscal Year 2023." https://www.dhs.gov/sites/default/files/2022-03/U.S.%20Citizenship%20and%20Immigration%20Services_Remediated.pdf. USCIS. 2022. "USCIS Announces New Actions to Reduce Backlogs, Expand Premium Processing, and Provide Relief to Work Permit Holders." https://www.uscis.gov/newsroom/news-releases/uscis-announces-new-actions-to-reduce-backlogs-expand-premium-processing-and-provide-relief-to-work. USCIS. 2024. "Completing an Unprecedented 10 Million Immigration Cases in Fiscal Year 2023, USCIS Reduced Its Backlog for the First Time in Over a Decade." https://www.uscis.gov/EOY2023.

59    TRAC (Transactional Records Access Clearinghouse) Immigration. December 18, 2023. "Immigration Court Backlog Tops 3 Million; Each Judge Assigned 4,500 Cases." https://tracreports.org/reports/734/ (the immigration court backlog also increased drastically from approximately 516,000 cases in 2016 to over three million cases at the start of 2024). DHS and USCIS. 2023. "Asylum Application Processing Fiscal Year 2022." https://www.dhs.gov/sites/default/files/2023-08/23_0717_uscis_asylum_application_processing.pdf. (The amount of affirmative asylum and credible and reasonable fear cases that USCIS asylum officers had to tackle increased by 166 percent between 2021 and 2022, a huge jump compared to previous years.)

60    DOJ. 2022. *United States Department of Justice Executive Office for Immigration Review FY 2023 Performance Budget Congressional Budget Submission.* Washington, DC: DOJ. 2021. *United States Department of Justice Executive Office for Immigration Review FY 2022 Congressional Budget Submission.* Washington, DC: DOJ. https://www.justice.gov/jmd/page/file/1398381/download; and DOJ. 2020. *United States Department of Justice Executive Office for Immigration Review FY 2021 Congressional Budget Submission.* Washington, DC: DOJ. https://www.justice.gov/doj/page/file/1246381/download.

JA-300

# UPDATED POLICY RECOMMENDATIONS

Considering recent policy changes, the research findings, and the analysis of the 2016 recommendations, updated policy recommendations are necessary to address new and evolving concerns and circumstances. Below are reiterated and updated policy recommendations from the 2016 report and new ones that reflect the expedited removal process as implemented during the research period.

## TO THE SECRETARY OF HOMELAND SECURITY

### Reiterated and Updated 2016 Recommendations:

- Appoint a high-ranking official with authority to make reforms and oversee implementation to ensure protection of asylum seekers going through the expedited removal process.
- Request that the DHS OIG audit the expedited removal process and all relevant recent policy changes for compliance with laws and policies regarding the protection of asylum seekers and their due process rights.

### New Recommendation:

- Expand the use of JPCs to improve coordination among the component agencies involved in expedited removal, enhance the efficiency of the process, and provide better conditions for multi-day detention and access to legal support.

## TO CBP

### Reiterated and Updated 2016 Recommendations:

- Develop a document that provides information that was previously read to noncitizens from the I-867 forms during the screening process. The document should explain the expedited removal process, its consequences, the right to seek protection for those who fear return, and the right to request a private interview. It should be provided to all individuals, in a language they understand, as soon as possible when they come into CBP custody.
- Videorecord all expedited removal screening and intake procedures (conducted by CBP OFO and Border Patrol) and require supervisory and headquarters review (overseen by the high-ranking official referenced above) of a sampling of recordings of these procedures for quality assurance purposes.

- Provide CBP officers with regular training to understand new and updated policies, their role in the expedited removal process, procedures for screening noncitizens, and the special needs of asylum seekers and other vulnerable populations.
- Establish a dedicated corps of specially trained, nonuniformed officers, including female interviewers, to interview women and children to identify fear claims.
- If families are placed in expedited removal and detained, detain them only in facilities that meet the standards of the Flores Agreement (which governs the duration and conditions of family detention) and individually reassess the need for custody after credible fear is found, with a presumption of release. (This recommendation was made to ICE in 2016 but is now more appropriate for CBP because ICE HQ confirmed it stopped detaining families in its facilities in 2022.)

### New Recommendations:

- Display prominent signage and informational videos on manifestation of fear requirements under the new "shout test" in CBP facilities and train CBP officers on how to identify manifestation of fear.
- Make conditions in CBP facilities more hospitable for overnight stays and access to counsel, including by allowing detainees to meet with legal representatives (in person or via tele- or videoconferencing), making available KYR presentations, and creating a central email and phone number that lawyers can use to reach their clients.

## TO USCIS

### Reiterated and Updated 2016 Recommendations:

- Track whether CFI referrals are coming from CBP or ICE to better understand when in the process most fear claims are being raised.
- Allow asylum officers to convert and adjudicate appropriate expedited removal cases, in which credible fear is found, as affirmative asylum cases through asylum merits interviews instead of having them adjudicated by an IJ. (As of the research period, this is only done for some cases in the FERM program.)

**New Recommendations:**

- Video and/or audiorecord CFIs so that there is an accurate record and transcript of the interview for IJ reviews and hearings in case any details need to be further evaluated.

- Conduct CFIs with noncitizens in CBP and ICE custody via video conferencing instead of voice calls to allow the asylum officer to observe the noncitizen's body language, physical features, and emotional reactions and make the noncitizen more comfortable to express necessary details about their case.

- If there is a notice of appearance (Form G-28) on file for a noncitizen, provide the legal representative with timely notice of the date, time, and location (in person or virtual) of the CFI. If a noncitizen indicates they have or want a legal representative during a CFI, provide a continuance and reschedule the interview to make sure the representative can prepare for and attend it.

**TO ICE**

**Reiterated and Updated 2016 Recommendations:**

- Require an individualized reassessment of the need for custody for all detainees with a positive CFI determination.

- Increase the use of Alternatives to Detention, such as monitored release, for asylum seekers (aside from those in the FERM program) beyond parole opportunities.

- Detain all adult asylum seekers who must be detained, whether before or after a credible fear determination, in civil facilities only.

- Expand the KYR presentations that provide detainees with basic legal information to all facilities that house asylum seekers.

**TO EOIR**

**Reiterated and Updated 2016 Recommendations:**

- Retrain IJs that the record created by CBP during screenings and CFI transcripts (consisting of notes written by asylum officers during CFIs) are not verbatim transcripts, do not document the noncitizen's entire asylum claim in detail, and should be weighed accordingly.

- Expand LOP resources at all CBP and ICE facilities housing asylum seekers and provide these resources to detainees before their CFIs and IJ reviews.

**New Recommendation:**

- If there is a notice of appearance (Form EOIR-28) on file for a noncitizen, provide the legal representative with timely notice of the date, time, and location (in person or virtual) of the IJ review. If a noncitizen indicates they have or want a legal representative during an IJ review, provide a continuance and reschedule the IJ review to make sure their representative can prepare for and attend it.

**TO CONGRESS**

**Reiterated and Updated 2016 Recommendations:**

- Authorize and fund another independent, comprehensive study of the treatment of asylum seekers in expedited removal at all stages of the process.

- Request the GAO to conduct a study to assess whether noncitizens removed to their home countries under expedited removal faced persecution or torture after their return.

- Increase funding for the adjudicatory aspects of expedited removal to enable USCIS and EOIR to address backlogs, conduct timely adjudications, and provide due process.

- Increase funding to EOIR to expand the LOP to all CBP and ICE facilities housing asylum seekers and enable it to be provided to detained asylum seekers before their CFIs.

**New Recommendation:**

- Appropriate resources and direct DHS and EOIR to develop and activate a "reserve corps" of officers and IJs to provide surge capacity to support expedited removal proceedings when there are significant increases in arrivals at or between POEs.

# GLOSSARY OF ACRONYMS

## GOVERNMENT AGENCIES

**USCIRF:** U.S. Commission on International Religious Freedom

**DHS:** Department of Homeland Security

**CBP:** Customs and Border Protection

**OFO:** CBP Office of Field Operations

**ICE:** Immigration and Customs Enforcement

**ERO:** ICE Enforcement and Removal Operations

**USCIS:** U.S. Citizenship and Immigration Services

**OCC:** DHS Office of Chief Counsel

**OIG:** DHS Office of Inspector General

**GAO:** Government Accountability Office

**DOJ:** Department of Justice

**EOIR:** Executive Office for Immigration Review

**BIA:** Board of Immigration Appeals

## LEGAL AND PRACTICAL TERMS

**CFI:** Credible Fear Interview

**RFI:** Reasonable Fear Interview

**IJ:** Immigration Judge

**IRFA:** International Religious Freedom Act

**NTA:** Notice to Appear

**CAT:** Convention Against Torture

**LOP:** Legal Orientation Program

**KYR:** Know Your Rights

**ATD:** Alternatives to Detention

**POE:** Port of Entry

## POLICY ACRONYMS

**CLP:** Circumvention of Lawful Pathways Rule

**EER:** Enhanced Expedited Removal

**FERM:** Family Expedited Removal Management Program

**STB:** Securing the Border Policy

# ABOUT THE AUTHORS

This research was conducted by HIAS. The report was made possible by the contributions of several authors, contributors, technical advisors, and reviewers. **Melissa Katsoris** authored the report and directed phase two (primary research component) of this project. She also conducted secondary and primary research by providing legal and policy analysis, collecting data, and leading outreach, interviews, site visits, observations, information gathering, and consultations. **Vanessa Dojaquez-Torres** and **Yael Schacher** contributed to this report by conducting and facilitating outreach, interviews, site visits, observations, and real-time analysis of the evolving laws and policies governing expedited removal (which were changing as this project was underway). **Bonnie Ip** guided the conceptualization of the survey and interview structure, conducted qualitative analysis to derive findings from the research team's interviews and survey, and analyzed publicly available data for this report.

**Mark Hetfield** provided technical guidance throughout the project to develop an overall research plan, facilitate outreach, and provide his expertise and in-depth review based on his experience directing and authoring USCIRF's 2005 expedited removal study. **Andy Schoenholtz** provided research guidance and legal expertise and conducted an in-depth review of the report to ensure quality and accuracy of the legal analysis and research. **Rachel Levitan** reviewed the report and provided practical support to the authors and contributors throughout the project.

**Guillermo Cantor** led the conceptualization and development of the research plan, directed the first phase of this project (secondary research) and coauthored the interim report, which provided the conceptual foundation for this report. **Ingrid Eagly** provided technical guidance and review during the first phase of the project.

The authors and contributors would like to thank all the legal representatives, shelters, service providers, policy experts, congressional staff, and current and former government officials who participated in this research and provided their knowledge, interviews, and survey responses. They would like to thank the government officials from the Department of Homeland Security who facilitated site visits, observations, consultations, and information sharing. This was crucial to the research team's understanding of the expedited removal process and the development of primary research findings and policy recommendations.

## PROFESSIONAL STAFF

| | |
|---|---|
| SENIOR STRATEGIC ADVISOR | Elizabeth K. Cassidy |
| DIRECTOR OF RESEARCH AND POLICY | Guillermo Cantor |
| DEPUTY DIRECTOR OF RESEARCH AND POLICY | Kurt Werthmuller |
| | |
| SUPERVISORY POLICY ADVISOR | Mingzhi Chen |
| CHIEF ADMINISTRATIVE OFFICER | Thomas Kraemer |
| SUPERVISORY POLICY ANALYST | Scott Weiner |
| CHIEF OF PUBLIC AFFAIRS | Nathan Wineinger |
| | |
| POLICY ANALYST | Michael Ardovino |
| SENIOR POLICY ANALYST | Susan Bishai |
| POLICY ANALYST | Mollie Blum |
| SENIOR POLICY ANALYST | Sema Hasan |
| PUBLIC AFFAIRS SPECIALIST | Veronica McCarthy |
| POLICY ANALYST | Hilary Miller |
| OPERATIONS SPECIALIST | Nora Morton |
| POLICY ANALYST | Dylan Schexnaydre |
| POLICY ANALYST | Katie Todd |
| POLICY ANALYST | Jean Wu |



UNITED STATES COMMISSION ON INTERNATIONAL RELIGIOUS FREEDOM

# DISCRETION TO DENY

**FAMILY SEPARATION, PROLONGED DETENTION, AND DETERRENCE OF ASYLUM SEEKERS AT THE HANDS OF IMMIGRATION AUTHORITIES ALONG THE US-MEXICO BORDER**



COVER PHOTO: Getintoit/ flickr.com

**JA-308**

# DISCRETION TO DENY

FAMILY SEPARATION, PROLONGED DETENTION, AND DETERRENCE OF ASYLUM SEEKERS
AT THE HANDS OF IMMIGRATION AUTHORITIES ALONG THE US-MEXICO BORDER

*Borderland Immigration Council*
*February 2017*



JA-309

## THE BORDERLAND IMMIGRATION COUNCIL

The Borderland Immigration Council (BIC) is an El Paso-Las Cruces based coalition of immigration attorneys and service providers, advocacy organizations and concerned community members. BIC is addressing serious concerns with the treatment of migrants and their attorneys by local immigration authorities. This report is a direct response to the need to document trends of due process violations and barriers asylum-seekers face vis-a-vis the Department of Homeland Security (DHS), particularly with ICE and CBP in the El Paso Sector.

## THE HOPE BORDER INSTITUTE

Hope Border Institute (HBI) is an independent grassroots community organization working in the El Paso-Ciudad Juárez-Las Cruces region, that seeks to bring the perspective of Catholic social teaching to bear on the social realities unique to our region. Through a robust program of research, reflection, leadership development, advocacy and action, HBI develops and aligns the border's community leaders engaged in the work of justice from across the Mexico-US border to deepen solidarity across borders and transform our region.

## AUTHORS

This report was researched and written by Theodora Simon, Associate Director for Advocacy and Leadership Development; Edith Tapia, Policy Research Analyst; and Dylan Corbett, Executive Director, all of the Hope Border Institute. Interviews were conducted by Theodora Simon, Edith Tapia, and Anai Ramirez, Communications Manager of the Hope Border Institute.

## ACKNOWLEDGMENTS

We would like to thank the following organizations and individuals for dedicating their time and experiences towards the creation of this report: Las Americas Immigrant Advocacy Center; Diocesan Migrant & Refugee Services (DMRS); the Texas Civil Rights Project; The Law Offices of Carlos Spector; Noble & Vapri, P.A., El Paso; Beckett Law Firm; Catholic Charities of Southern New Mexico; Frontera Immigration Law; The Law Office of Daniel Caudillo; Janos Zavala & Villalpando, LC; the Southwest Asylum & Migration Institute;  the Law Office of David Haro Jr.; the Law Office of Antonio Williams; Texas RioGrande Legal Aid, El Paso; the Law Offices of Armendariz & Holguin; Mexicanos en Exilio; the members of the Detained Migrant Solidarity Committee; CIVIC Las Cruces; and all the other legal service providers and community members who were interviewed in this process.

We express our gratitude to those who provided invaluable expertise to this project in other ways, including reviewing drafts, offering guidance, and providing inspiration for this project: the ACLU Regional Center for Border Rights, the University of Texas at El Paso's Center for Inter-American and Border Studies, the Programa de Defensa e Incidencia Binacional, the Detention Watch Network, the Southern Poverty Law Center, the KINO Border Initiative, the University of Dayton's Human Rights Center, and the Southern Border Communities Coalition.

Finally, the Hope Border Institute and this report's authors are exceptionally grateful to Linda Rivas, Melissa Lopez, Jessie Miles, Carlos Spector, Gloria Amesquita, Eddie Beckett, Alan Dicker, Nellie Alvarado, and Brian Jacobi for their leadership, solidarity, and commitment to advocating for the rights and dignity of all people. This report would not have been possible without them.

We dedicate this report to the people whose experiences motivate its writing, and those whose testimonies appear herein.

# TABLE OF CONTENTS

- Executive Summary .................................................... 1
- Introduction ............................................................. 4
- Methodology ........................................................... 6
- Enforcement & Family Separation ......................... 7
- Systematic Deterrence of Asylum Seekers ........... 11
- Unaccountable, Arbitrary Denial of Stays of Removal ......... 16
- Unaccountable, Arbitrary Denial of Parole .......... 19
- Violations of Due Process & Barriers to Effective Representation . 22
- Recommendations.................................................... 25
- Conclusion .............................................................. 28
- Appendix ................................................................. 29
- Endnotes ................................................................. 37

JA-311

# EXECUTIVE SUMMARY

This report identifies failures of immigration agencies and officials in the El Paso Sector to respect fundamental human rights and dignity. These systemic failures are indicative of an intricate border security complex -- an overlapping web of individuals and agencies, detention centers and courts, and enforcement priorities and mechanisms -- that denies justice at the cost of the most vulnerable: immigrant and mixed-status families, children, and those who come to the U.S. fleeing violence, persecution and insecurity.

In the border enforcement region commonly known as the El Paso Sector, encompassing counties in West Texas and all of New Mexico, immigrants and asylum-seekers routinely face situations in which Department of Homeland Security (DHS) agencies use a broad and unaccountable mechanism of "discretion" to separate families, remove asylum seekers and keep people in situations of prolonged detention. El Paso Sector U.S. Customs and Border Protection (CBP) and U.S. Immigration and Customs Enforcement (ICE) officials make fateful decisions regarding use of discretion, ones which fail to advance DHS enforcement priorities or humanitarian claims and at times contravene stated DHS policy. Far from serving our community and national interests, these decisions undermine the values of justice, fairness and democracy.

In the summer of 2016, private attorneys, legal service providers and advocacy organizations in the El Paso area formed the Borderland Immigration Council to address growing abuses in the immigration enforcement system. Between September 2016 and January 2017, the Hope Border Institute conducted in-depth research on enforcement and detention policies and practices in the El Paso Sector. An analysis of over 100 documented cases revealed the following troubling trends:

JA-312

1. **ENFORCEMENT & FAMILY SEPARATION**
   CBP and ICE routinely separate families at ports of entry and through detention and enforcement. Minors are torn from parents and caregivers, forcing children into state custody or foster care. Adult male caregivers and other male family members are systematically isolated from family units through detention and deportation. This family separation results in detrimental impacts on legitimate asylum claims as well as the mental, material and physical well-being of children and other family members.

2. **SYSTEMATIC DETERRENCE OF ASYLUM SEEKERS**
   CBP and ICE practices deter and dissuade asylum seekers at all points of the asylum process, from intimidation and harassment of individuals arriving at ports of entry and agents' failure to screen for credible fear, to the use of prolonged detention and the abuse of asylum seekers while in custody. These practices, intended to break the spirits of asylum seekers, lead to the deportation of people seeking refuge, often to situations of extreme danger.

3. **UNACCOUNTABLE, ARBITRARY DENIAL OF STAYS OF REMOVAL**
   ICE increasingly denies even the most urgent humanitarian requests for stays of removal with little to no explanation, even to attorneys. This results in the deportation of individuals with longstanding ties to communities, parents of minor children dependent on their care, and individuals whose prior requests for stays of removal were approved. This new practice has serious negative effects not only on those deported, but also on the communities and lives and livelihoods of family members they leave behind.

4. **UNACCOUNTABLE, ARBITRARY DENIAL OF PAROLE**
   The arbitrary nature of parole denials in the El Paso Sector represents a distinct deviation from previous leadership. Parole denials include those with established family ties and community sponsors, those responsible for family members with urgent medical situations, and parents of minor children. ICE provides minimal or no justification for these denials, holding immigrants and asylum seekers in detention, hindering their cases and causing mental and physical strain.

5. **VIOLATIONS OF DUE PROCESS AND BARRIERS TO COUNSEL FOR DETAINED MIGRANTS**
   Numerous obstacles to effective legal representation, including access to legal representatives, amount to a serious crisis of due process for individuals in immigration proceedings. Patterns identified in the El Paso sector include impediments to attorney-client meetings and confidentiality, the execution of deportation orders without notification to legal counsel; and other practices that inhibit due process.

These findings are not isolated events, but represent systematic and pervasive practices which deter asylum seekers and criminalize immigrants in the El Paso Sector. Furthermore, these documented cases, most dating from after December 2015, are representative of broader trends in immigrant detention and the treatment of asylum seekers across the United States. We reference reports and documentation presented by human rights, advocacy and faith-based organizations identifying many of these same patterns and practices throughout the country.

JA-313

We join the many advocates in the United States and around the world in the call to end private immigrant detention and to treat asylum seekers with respect and dignity. Given the devastating human consequences this report depicts, we recommend the following:

1. **EFFECTIVE TRANSPARENCY AND ACCOUNTABILITY**
CBP and ICE should implement effective vehicles of transparency and accountability in the areas of asylum, detention and prosecutorial discretion.

2. **LIMIT USE AND DURATION OF IMMIGRANT DETENTION**
Detention should not be used as a punitive measure and only as necessary to ensure public safety and appearance in court. ICE and EOIR should prioritize alternatives to detention and utilize prosecutorial discretion to release detainees in accordance with DHS memos, to prioritize humane enforcement and detention that respects dignity and rights.

3. **END DETERRENCE & MASS DETENTION OF ASYLUM SEEKERS**
CBP and ICE must offer asylum seekers the protections afforded to them by US and international law. Asylum seekers should not be processed as border crossers and detention should not be used as a deterrence for those who seek protection and refuge in the United States.

4. **HUMANE ENFORCEMENT OF REMOVAL**
ICE should utilize prosecutorial discretion to grant stays of removal to prioritize humane enforcement in a way that respects basic dignity and rights and should ensure that legal counsel and deportees are advised of impending deportation.

5. **END FAMILY SEPARATION**
DHS agencies tasked with immigration enforcement should prioritize child wellbeing and family unity in all decision making, including in asylum, detention and enforcement processes.

6. **GUARANTEE ACCESS TO COUNSEL AND RESPECT DUE PROCESS**
ICE and private detention contractors should implement measures to improve and ensure detainees' access to counsel and due process.

*This report illustrates policies, practices, patterns and a culture of abuse particular to the El Paso Sector, in which local officials exploit the opaque domain of discretion and in so doing deny fundamental human rights. This situation has become more acute since the arrival of ICE Field Office Director Corey Price. El Paso-based CBP and ICE leadership, along with EOIR, have the power to address these systematic abuses. In doing so, they can protect the most fundamental rights of migrants and asylum-seekers while upholding the law, promoting justice and preserving the integrity of the immigration system in the El Paso sector.*

JA-314

# INTRODUCTION

This report details the effects of an increasingly harsh border enforcement paradigm in the area known to immigration officials as the El Paso Sector, encompassing counties in West Texas and all of New Mexico. It provides a snapshot of the human impacts of the metastasizing systems of border enforcement at the twilight of the Obama Administration and the beginning of the Trump Administration. The testimonies and findings presented here illustrate how local immigration officials have repurposed a sprawling complex of border security and immigration control and made of it a means to separate families, dissuade and discourage asylum seekers, block humanitarian claims, deport an ever-increasing number of immigrants, and detain more persons for longer periods of time.

The progressive militarization of the southern border and criminalization of the migrant have deep roots in the history of our country and the region.1 In recent times, following the implementation of the North American Free Trade Agreement (NAFTA) and in the aftermath of the 9/11 terrorist attacks, a relatively fluid border was significantly hardened. The state apparatus of border and immigration enforcement mushroomed, often under the pretext of national security. This meant an exponential growth in immigration enforcement agents, checkpoints, walls, surveillance technology, immigrant detention centers, and punitive policies criminalizing migrants through programs like Operation Streamline.

IN 2014, IN AN ATTEMPT TO SHUT DOWN OUR BORDERS TO THE THOUSANDS OF MIGRANTS AND REFUGEES ESCAPING EXTREME POVERTY, POLITICAL INSTABILITY AND DANGEROUS SITUATIONS OF CRIME IN CENTRAL AMERICA, THE OBAMA ADMINISTRATION PUBLICLY COMMITTED ITSELF TO AN AGGRESSIVE "STRATEGY OF DETERRENCE."

This deterrence strategy included a massive expansion of immigrant detention, including the detention of mothers and children, and the priority deportation of "border crossers" through expedited removal. The Obama Administration's deterrence strategy marked an inflection point. Harsh measures of enforcement, expressly intended to "send a message" to those who would undertake the treacherous journey to the United States in order to escape economic and political collapse in countries of origin, were no longer just the actions of a renegade few. These measures became official policy.

Following the implementation of this deterrence strategy, attorneys and advocates in the border communities of El Paso, TX and neighboring Las Cruces, NM began to encounter an increasing number of obstacles to effective representation of immigrant clients. Attorneys noticed growing patterns of harsh and abusive treatment among clients at the hands of immigration enforcement agents, in immigration courts and in immigrant detention centers. Asylum seekers were detained in greater numbers, separated from family members. Stays of deportation and grants of humanitarian parole were on the decline. Expedited removal and prolonged detention were on the rise.

These troubling patterns grew more acute with the arrival of U.S. Immigration and Customs Enforcement (ICE) Field Office Director Corey Price in December 2015.

The deported and detained are made invisible by the immigration enforcement system. In the El Paso Sector, an estimated 4,000 immigrants are held in detention on any given night. ICE and U.S. Customs and Border Protection (CBP) are notorious for providing incomplete information regarding their operations and decision making and often assume a defensive posture when confronted with the claims of advocates and attorneys.

***Discretion to Deny*** aims to shine a light on processes, practices and agencies urgently in need of transparency and accountability. We hope to lift up the people whose lives are impacted by this broken system and illustrate the moral impacts of an ever harsher system of border enforcement.

This report is not intended to demonize the men and women that work for ICE or CBP. It is agency leadership who is responsible for instilling and perpetuating an institutional culture that prioritizes accountability, transparency and human dignity. Practices that dehumanize and demoralize asylum seekers and migrants also dehumanize and demoralize agents and officials.

> THE REPORT PRESENTS FIVE KEY FINDINGS: FAMILY SEPARATION, DETERRENCE OF ASYLUM SEEKERS, ARBITRARY DENIALS OF STAY OF REMOVAL, ARBITRARY DENIALS OF HUMANITARIAN PAROLE, AND BARRIERS TO DUE PROCESS.

The findings are illustrated by case studies, demonstrating the multiple dimensions of an increasingly punitive system of border enforcement. We follow these findings with a series of broad recommendations for ICE, CBP, and immigration courts in the El Paso sector.

It is our assertion that these abuses of authority are not isolated incidents. The cases on which this report is based represent systematic and pervasive practices which further militarize the border and criminalize immigrants. This report demonstrates not the scattershot anecdotes of a few, but documents trends and patterns of abuse in the El Paso Sector based on the experiences of dozens of legal experts and more than 100 clients. These practices represent a crisis in human rights on the U.S.-Mexico border and a significant challenge to constitutionality and the rule of law.

JA-316

# METHODOLOGY

This report is based on in-depth, one-on-one interviews conducted between September 2016 and January 2017 with 25 legal experts in the El Paso and Las Cruces area. Our goal was to collect evidence to document increased restrictions on due process and access to counsel, in detention centers and during legal proceedings, as well as increased use of detention as a deterrence for asylum-seekers and undocumented immigrants.

A survey instrument for interviews was developed by researchers at the Hope Border Institute (HBI), focusing on the experiences of legal representatives in detention centers and immigration courts as well as in interactions with ICE and CBP officials and agents. Interviews took place at attorney and community organization offices and ranged in duration from 60 minutes to two hours or more. HBI researchers transcribed and coded the interviews and identified major thematic areas.

Detailed information on over 120 cases of asylum seekers, persons requesting humanitarian parole or relief, and individuals detained was collected, coded, analyzed and classified. Additional documentation collected included attorney testimony, redacted affidavits and redacted court documents. Supplemental interviews were conducted with a number of local migration advocates in order to supplement the data. These interviews further corroborated concerns expressed by the legal community regarding growing restrictions pertaining to prosecutorial discretion and the treatment of asylum seekers. While this report is primarily based in the testimonies of legal experts and the content of legal documents, when accessible, testimonies from asylum seekers were also incorporated into the analysis.

## LIMITATIONS
This report reflects attorney cases from 2014 to 2016, with the vast majority taking place after December 2015. Being the first study of its kind to be carried out in the El Paso Sector, it documents a discreet but meaningful sample of cases. Research findings are consistent with a wider body of academic and policy literature on the experience of migrants in the US-Mexico borderlands in the context of their interactions with immigration enforcement and control actors.

The findings in this report are based primarily on attorney interviews. While these representatives have access to a great deal of information about their clients and immigration proceedings, this method does present some limitations. Analysis was limited to information which attorneys could provide. Data is primarily qualitative, as the present study constitutes the first of its kind and no systematic tool for data collection has been implemented or used by local organizations to document or report incidents of abuse of prosecutorial discretion. Furthermore, collecting data on victims of intimidation and harassment at the hands of state actors is difficult to obtain. Additionally, there are numerous barriers to obtaining official statistics from ICE and CBP. Given this lack of official statistics, our ability to compare government data on the practices prior to and after the arrival of ICE Field Director Corey Price is limited.

Attorneys were the focus of interviews for this report precisely because of the consequences of trends and practices identified herein. This report describes a system that makes migrants, asylum seekers and those in detention invisible. Many of the clients whose cases are documented have been deported and are thus difficult to contact - either due to unknown whereabouts or because they are in hiding.

This report does not reflect the experiences of migrants or asylum seekers who acted *pro se* or who did not have the assistance of an attorney. This unrepresented population makes up the vast majority of those caught up in the immigration system.[2] As migrants and asylum seekers with legal counsel have greater access to avenues for relief and prosecutorial discretion, it is our contention that the patterns and practices identified in this report affect a much broader population than is represented here.

# ENFORCEMENT & FAMILY SEPARATION

In the El Paso Sector, although immigration enforcement officers have the ability to exercise discretion to preserve family unity and protect the most fundamental rights of children, ICE and CBP demonstrate callous indifference towards family unity.[3] Officers routinely make decisions about detention, prosecution and deportation that tear families apart. Minors are separated from parents and caregivers, forcing children into state custody or foster care. Adult male caregivers and other male family members are systematically isolated from family units through detention and deportation. The consequences of family separation are clear and well-documented: detrimental impacts on legitimate asylum claims and harm to the mental, material, and physical well-being of children and other family members. The overarching pattern of total disregard for family unity throughout the immigration enforcement system has been detailed by countless organizations over many years.

*"Children seeking asylum are separated from their parents and forced into state custody."*

Arbitrary family separation occurs routinely in the El Paso Sector: nearly one-third of the cases documented for this report involved the separation of families. Shockingly, in over one quarter of the cases, minor children were torn from one or both parents or caretakers.

Family separation occurs at every step in the migration process - while families are in transit, as they cross the border, at the time of apprehension, in or through detention, at the time of deportation, and long after deportation.[4] Given the scope of this study, our findings focus on decisions that separate nuclear families through apprehension, detention and deportation.

## SEPARATING CHILDREN FROM THEIR ONLY PARENT OR CAREGIVER

While the ICE Parental Interests Directive indicates that immigration enforcement activities should not "unnecessarily disrupt the parental rights of both alien parents or legal guardians of minor children" regardless of the dependent's citizenship, the cases and testimony documented for this report demonstrate that ICE and CBP in the El Paso Sector fail to respect this directive.[5]

The most egregious cases documented in our study were those in which ICE and CBP decisions separated minor children from their primary caretakers, forcing children - often asylum seekers - into state-sponsored shelters or foster care. One attorney interviewed indicated that, in nearly a decade of practice prior to December 2015, she saw children separated from single parents with whom they traveled only a handful of times. But, between January and July 2016, she recorded over 30 such incidents. In fact, a governmental advisory committee report in September 2016 found that "disconcertingly, recent evidence suggests that some families are separated and adults detained and placed in expedited removal or reinstatement proceedings while children are sent to the Office of Refugee Resettlement."[6]

### VERONICA[7]

*Veronica, a 24-year old Guatemalan woman with an asylum claim based on domestic violence and abuse, requested asylum at a port of entry in El Paso in mid August, 2016, along with her five year-old daughter, who had been witness of the violence experienced by her mother. Veronica was separated from her young daughter and detained, likely on the basis of an immigration record. Veronica passed a credible fear interview only two weeks after her initial request for asylum, but was kept in detention. There were no family members in the United States who were able to assume custody of the five-year old girl, and she was subsequently put into state care. During her initial period of detention, Veronica was unable to obtain information regarding the whereabouts or condition of her young daughter, and experienced stress-induced strokes. With the added trauma of separation from her mother, the little girl stopped eating.*

*Veronica requested parole in mid-November 2016, as the only parent and caretaker for her young daughter. Despite DHS guidance that responses to parole requests should be issued within a week's time, Veronica's request was met with silence. After nearly five months of detention, given her daughter's condition and the toll of the separation, Veronica requested removal. Although she wished to continue her asylum claim, Veronica simply could not stand to see her daughter placed into foster care.*

As *Veronica*'s experience evidences, once separated by detention decisions, it can be extremely difficult for families to locate one another, maintain communication, and reunite.[8] This only increases the stress and trauma of detention and separation.[9]

These practices cause trauma for children, families and communities, and stand in direct violation of the best interests of children, parental rights, and DHS's own directives. Legal experts interviewed for this report further argue that this practice is costly for the government; when children are separated from primary caregivers and forced into government custody or foster care, they become a financial responsibility for taxpayers.[10]

### ERICA

ICE called Erica, a Mexican woman in her mid-forties, to come in to discuss her request for a stay of removal. Erica has six U.S. citizen children, between the ages of 7 and 18. Her husband, a U.S. citizen, is disabled and has a serious medical condition, which prevents him from working and leaves him dependent on Erica's daily care and assistance.[11] Erica had been granted two prior stays of removal. As the only caregiver and income-earner, Erica's family is entirely dependent on her.

The interview was not about her request for a stay; it was to place Erica in removal proceedings. While Erica was held in detention, her attorney fought her case. A month after her apprehension, Erica's husband underwent heart surgery. Despite her role as her family's main caregiver and breadwinner, and the precarious health of her husband, Erica was deported without notice. Neither her family nor her attorney on record received notification of her deportation until after she had been deported.

## SEPARATION OF FAMILIES THROUGH APPREHENSION, DETENTION AND DEPORTATION

Another practice uncovered by this study is that of separating families at the time of apprehension or when they request asylum at ports of entry. "We have seen hundreds of cases like this. They [CBP officers] began granting parole at the border to asylum seekers, but only to women and children; they would hold the men. This became standard practice; men would be detained and often deported."[12]

This trend has been identified in other border regions; numerous reports point to the arbitrary and unjustified practice of releasing mothers with children, while separating adult males from their families through detention. This extends to single fathers, who are often separated from their minor children upon contact with immigration officials.[13]

### MIGUEL

Three generations of a Mexican family were subject to violent persecution in their hometown. The elderly grandfather was shot and wounded, and the rest of the family witnessed the attack. The grandfather requested asylum in the U.S. and was granted humanitarian parole because of his injury.

The man's son, Miguel, a young man in his 20's with a partner and children, requested asylum in December 2015. Although Miguel's partner and their children were released into the

JA-320

*U.S., and sent to live with the grandfather to continue their asylum application, Miguel was detained and placed into removal proceedings.*

*A stay of removal was filed in March 2016, based on humanitarian circumstances; Miguel was seeking asylum, his elderly father been shot and needed care during recovery, and Miguel was the primary caregiver of his two children, as their mother was ill and unable to adequately care for them. Despite the shared asylum claim, and the rest of the family's positive credible fear, Miguel's request for a stay of removal was denied. Torn from his family, Miguel was detained for six months and then deported.*

As Miguel's case evidences, family units requesting asylum under the same asylum claim are routinely separated, not only creating additional burdens on the immigration adjudication system and attorneys who represent asylum seekers by duplicating caseloads, but leading to divergent outcomes for family units seeking asylum.[14] Long-term separation compounds the trauma children and families fleeing violence face and, for the family members deported, may lead to continued persecution, violence and even death.

Agency practices that separate families have impacts beyond recent arrivals and asylum seekers. Family unity is impacted by immigration enforcement decisions to reinstate orders of removal and deny stays of removal. Our research found that both ICE and CBP fail to utilize discretion in maintaining family unity by denying humanitarian parole and holding family members in detention despite compelling humanitarian concerns, including serious illness of immediate family members.[15] These findings are discussed in greater detail in further sections.

Systematic practices resulting in family separation are on the rise and have devastating, long-term impacts on all those involved: "deportation of noncitizens with U.S. family ties affects the economic, emotional and physical well being of children and spouses who remain in the United States."[16] Extensive research has been conducted into the devastating impacts that parental deportation has on minor children, which include poverty, diminished access to food and health care, mental health and behavioral problems and limited educational opportunities.[17] In No Safe Haven Here, researchers find that the practice of family separation "piles on additional trauma and creates additional risk for depression, anxiety, and post-traumatic stress."

While immigration officers can favorably utilize prosecutorial discretion to preserve family unity, our study reveals a pattern of detaining and deporting parents of minor children - legal permanent residents and U.S. citizens, as well as undocumented children - despite the guidelines of the parental directive. These decisions, which have a significant impact on children's welfare and family unity, are arbitrary, in El Paso and beyond.[18] As deportations rise, so, too, do family separation and its devastating consequences.[19]

The inexplicable and inhumane pattern of arbitrary family separation in the El Paso Sector is traumatic for children, has far-reaching impacts on affected families and communities, and puts asylum seekers at risk.

# SYSTEMATIC DETERRENCE OF ASYLUM SEEKERS

CBP and ICE practices deter and dissuade asylum seekers at all points of the asylum process, from intimidation and harassment of individuals arriving at ports of entry and agents' failure to screen for credible fear, to the use of prolonged detention and the abuse of asylum seekers while in custody. While asylum seekers, fleeing extreme violence and persecution, should be treated with respect and dignity, they encounter practices intended to compel them to abandon their claims. This is deeply concerning not only because it violates DHS policy and international norms, but leads to the deportation of people to situations of extreme danger.

JA-322

*"You'll just be detained for six months and then deported anyway."*

· · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · ·

**T**he United States has moral and legal obligations to respect and protect those seeking asylum who arrive at our borders. U.S. and international law require that authorities offer protection to those facing persecution in their home countries. Because of their vulnerability, asylum seekers are to be treated in a manner decidedly distinct from other non-citizen border crossers and offered protections to ensure *non-refoulement.*[20]

Since 2014, the number of Central Americans - unaccompanied minors, family units and individuals - arriving to the U.S. has remained at historic highs. Tens of thousands of Central Americans, hailing from one of the most violent regions in the world, have since requested asylum.  The El Paso Sector has seen influxes of asylum seekers from other regions of the world in recent years, including Haitians, Bangladeshis, Chinese, Cubans and families and individuals from other countries, as well as many people seeking asylum from governmental and drug-cartel related persecution in Ciudad Juarez and throughout Mexico.

Every legal expert and community advocate interviewed for this report stated that CBP and ICE practices intended to deter asylum seekers were common. Over one-third of the cases documented include verbal dissuasion from requesting asylum during apprehension; intimidation and inhumane treatment of asylum seekers in CBP and ICE custody; the use of prolonged detention to pressure asylum-seekers to abandon their claims; and language barriers that prolong the asylum process and create obstacles for asylum seekers. The extent and prevalence of these deterrence practices demonstrate a culture of disregard for the rights and lives of asylum seekers.

These systematic trends of deterring asylum seekers at all points in the asylum process are not unique to the El Paso Sector. These practices have been widely documented across the borderlands and throughout the U.S., signaling the uniform practice of an unwritten rule rooted in DHS culture.[21]

## INTIMIDATION AND HARASSMENT AT PORTS OF ENTRY AND FAILURE TO SCREEN FOR CREDIBLE FEAR

Deterrence efforts intended to force asylum seekers to give up their claims begin during initial contact with CBP and Border Patrol officers in the El Paso Sector. CBP officers and Border Patrol agents are not asylum officers; they are required to ask why an individual left his or her home country and if they fear persecution, and refer immigrants who may qualify for asylum on to immigration courts for asylum determination.[22] However, our research indicates that CBP and Border Patrol officers in the El Paso Sector routinely and intentionally discourage people from seeking asylum. In 12% of the cases documented for this report, individuals expressing fear of violence upon return to their country of origin were not processed for credible fear screenings and instead, were placed into removal proceedings.[23] Attorneys interviewed for this report maintain that it is commonplace for asylum seekers to be placed in expedited removal proceedings and summarily deported without appearing before a judge or having had an opportunity to present their asylum claim, despite expressing fear.[24]

**PEDRO**

*Pedro, a young Honduran, requested asylum, having faced persecution because of his sexual orientation. Although he told CBP officers he feared for his life, Pedro was put into expedited removal proceedings, because, according to the CBP officers who detained him, sexual orientation is not a basis for asylum. Pedro's family was able to retain an attorney, who immediately tracked down Pedro's whereabouts and sent documentation to notify ICE that Pedro was seeking asylum. Pedro was transferred overnight to a facility in Louisiana for immediate deportation. Following days of persistent efforts from Pedro's attorney, Pedro was finally returned to the West Texas Detention Facility where he faced constant, ongoing harassment from the detentions guards because of his sexual orientation.*

This is not an isolated event; Pedro's attorney asserts that many LGBTQ asylum seekers have been denied access to the asylum process by CBP officers and face harassment and abuse while in detention.

According to legal experts interviewed for this report, immigrants are subjected to hours-long "interviews" during CBP screening, which more closely resemble interrogations, with intending asylum seekers being badgered by authorities until they provide the answers DHS officials seek - that an individual has come to the United States to work or reunite with family, not seeking safety.

Our findings are supported by research identifying numerous flaws at this initial stage in the asylum process, including lack of knowledge of the asylum process among would-be asylum seekers, screenings conducted by uniformed and armed government agents, and the conditions in which screenings are conducted.[25] The U.S. Commission on International Religious Freedom recently observed significant inconsistencies and non-compliance during CBP interviews, in El Paso and nationwide, including a vast majority of screenings in which individuals were not asked if they feared return to their home country, as is required.[26]

## LANGUAGE BARRIERS

In sixteen documented cases, asylum seekers faced language barriers that nearly prevented them from seeking asylum and prolonged their claims. In the El Paso Sector, one of the most prevalent language-related findings was related to indigenous asylum seekers, who often do not speak English or Spanish well enough to fully comprehend what immigration authorities ask or tell them or to express their fears in a meaningful way.[27]

**SANDRA**

*Sandra, a 23 year old indigenous woman from Guatemala, was apprehended crossing into the US in early 2016. Sandra spoke an indigenous language, and her understanding of Spanish was very limited; when asked in Spanish by CBP is she was afraid to return to Guatemala, she said no. Sandra had been gang raped in Guatemala and received no protection or support from local police. She was, indeed, afraid to return, but signed a sworn affidavit - in English - that she was not afraid and was placed in removal proceedings.*

*Sandra was later able to communicate her fears, and passed a credible fear interview. However, during a bond hearing, an immigration judge questioned Sandra's credibility due to the discrepancies between her sworn affidavit and her asylum claim. Sandra received no mental health support while in detention, and quickly became demoralized and disheartened. Facing indefinite detention, Sandra gave up and requested voluntary departure to Guatemala, where she faces violence and danger.*

Half of the attorneys interviewed for this report stated that CBP affidavits are often inconsistent with asylum-seekers' own accounts. Individuals are forced to sign legal documents in English without translation. For those that are able to proceed with their asylum claims, these inconsistencies lead to an asylum seeker's "credibility" being questioned by government attorneys and immigration judges. This not only leads to prolonged detention but also jeopardizes the asylum claim.[28]

## PROLONGED DETENTION UNDER CRIMINALIZED, ABUSIVE CONDITIONS

Asylum seekers face verbal, physical and mental harassment at the hands of CBP, ICE, and security contractors throughout the apprehension, detention and asylum processes.[29] Twenty-eight such cases were documented for this report.

Criminalized, punitive immigrant detention is a deterrent in itself[30] and other reports of abuse and maltreatment of detainees in the El Paso Sector and across the country have been made public.[31] Verbal harassment to deter asylum seekers includes comments such as: "You'll just be detained for six months and then deported anyway." These abusive practices compound the trauma asylum seekers have experienced.

### SILVIA

*Silvia, a Mexican woman in her 50s, asked for political asylum after being raped and persecuted by drug cartels. She was initially told by a CBP officer that "Mexicans don't get asylum," and was denied entry to the U.S. She tried to ask for asylum a second time but was detained and charged with illegal re-entry. Her mental health issues and posttraumatic stress disorder caused Silvia to have a nervous breakdown during her credible fear interview and she was unable to complete it. An immigration judge refused to declare her incompetent and would not grant her a second credible fear interview. Meanwhile, Silvia remained in detention while her physical and mental health deteriorated.*

In a dozen cases documented for this report, asylum seekers held in detention needed mental health care, not available to them in detention. Conditions of detention aggravated the mental health situation of many of these individuals. Asylum seekers have been through traumatizing events, and detention comes to represent yet another traumatic event in their lives.

### JULIA

*Julia, a Brazilian woman in her mid-30s, traveled to the US southern border with her six year old daughter to request asylum. Although Julia presented proof of parental relationship, she and her daughter were separated - Julia was detained and her daughter was sent first to a child crisis center, then transferred to two distinct foster homes, then sent back to the child crisis center.*

*The little girl is a U.S. citizen and was a witness to the domestic abuse that is the basis for Julia's asylum claim. Already traumatized, she is now facing separation from her mother and the instability of bouncing around between foster homes and child crisis centers. They have scarcely been able to see each other, as visitation is only permitted on certain days of the week and depends on the policies of child crisis centers and the wishes of foster families.*

*Julia did not appear before a judge until after having been detained for two months and, as no interpreter was present, her hearing was postponed another month. Despite having a community sponsor, Julia's request for parole was denied because she was deemed a flight risk, based on a prior order of deportation issued in absentia of which Julia was unaware.*

Nearly one-quarter of the cases documented involved prolonged detention, in which asylum seekers are held for over six months, and sometimes up to two years, in criminalized detention facilities. Despite having authority to release asylum seekers,[32] failure to utilize discretion leaves many asylum seekers languishing in detention for unjustifiably long periods of time. Furthermore, when separated from their families, prolonged detention impacts the children and life partners of those detained. When physical, verbal and mental abuse and harassment occur in prolonged detention, asylum seekers are compelled to drop their claims to end confinement. As one attorney interviewed stated: "People are having to choose between their lives and their freedom."

**ARUN**

*Arun, a Bangladeshi asylum seeker, was detained at the El Paso Processing Center for almost two years. His case was delayed for a multitude of reasons, including a hearing scheduled for insufficient time and a hearing rescheduled because an interpreter was not present.*

*Arun requested parole, stays of removal, and two custody redeterminations. These requests were all denied, citing Arun as a flight risk and a terrorist bar - based on his affiliation to a political party, which was the basis for his asylum claim. Arun strongly believed that he was denied parole because of his religion. His health severely suffered in detention; a petite man, Arun lost over 20 pounds and his diabetes - previously under control through diet alone - worsened.*

Prolonged detention is impacted by numerous decisions and decision makers, including ICE decisions on parole and EOIR practices regarding bond (see appendix for further discussion of bond). The practice of prolonged detention has legal consequences for asylum seekers; there is an enormous difference in outcomes for immigrants held in detention as compared to their non-detained counterparts.[34] The reason for this disparity is clear: it is much more difficult to prepare an asylum case from inside an immigration detention center because of limited ability to gather evidence, contact witnesses, and even use a phone, along with the numerous barriers to due process imposed by detention facilities.[35]

As a global leader, it is the United States' responsibility to protect asylum seekers in accordance with national laws and international norms. Far from offering refuge and protection to the vulnerable, this section has described how immigration authorities in the El Paso Sector engage in deterrence practices at all points in the asylum process, from the moment asylum seekers come into contact with agents and officials through prolonged detention. The patterns and practices identified in this section are deeply woven into the immigration enforcement system and seem designed to induce suffering for a highly vulnerable population: asylum seekers, a population who has already endured violence and persecution before arriving at the US's southern border. This forces families and individuals to relinquish their requests for protection opting instead to return to danger. In short, it is a system designed to "break the spirit" of asylum seekers, as one seasoned attorney described. Such deterrence undercuts the integrity of the immigration system, puts asylum seekers' lives at risk, and is in violation of U.S. and international law.

**RONALDO**

*As of January 2017, Ronaldo had been detained for 11 months. This young man fled Honduras because he was persecuted by a gang who killed his brother. He appeared with his mother at the El Paso port of entry and together, they requested asylum. Ronaldo was taken into custody and separated from his mother, who was paroled and reunited with a legal resident daughter. ICE reported that he had "eluded inspection" and was charged with illegal entry. His request for parole was denied in August 2016, indicating he was a flight risk. Ronaldo has no criminal record and did not elude inspection - he asked for asylum at a port of entry. Despite efforts from his attorney and advocates, at the time of publication of this report, Rolando was still in detention and his final determination hearing had yet to take place.[33]*

JA-326

# UNACCOUNTABLE, ARBITRARY DENIAL OF STAYS OF REMOVAL

ICE El Paso systematically and with increasing frequency denies even the most urgent humanitarian requests for stays of removal with little to no explanation, even to attorneys. A stay of removal allows a person with a compelling humanitarian claim to temporarily postpone his or her deportation, one way in which a broken immigration system allows for justice and fairness. These denials result in the deportation of individuals with longstanding ties to communities, parents of minor children dependent on their care, and individuals whose prior requests for stays of removal had been approved. This practice, not previously employed in the El Paso Sector, has serious negative effects not only on those deported - the parent of a seriously ill child, the primary caregiver for an infirm elderly person, the primary caregiver of a U.S. citizen minor child - but on the communities and lives and livelihoods of family members they leave behind.

# "This is something new. People who are here on stays [of removal] now know that they are in jeopardy."

ICE officials have the power to grant temporary relief from deportation to individuals with compelling humanitarian arguments, including individuals with "family or community ties in the United States … or compelling humanitarian factors such as poor health, age, pregnancy, a young child, or a seriously ill relative" who do not otherwise represent "a threat to national security, border security, or public safety."[36] This stay of removal does not grant an individual any kind of legal status, but allows the person to remain in the United States for a predetermined period of time.

Attorneys interviewed for this report insist that, prior to December 2015, ICE El Paso leadership utilized discretion to grant requests for stays of removal for compelling cases. Since that time, even exceptional requests for stays of removal are routinely denied. Fourteen percent of the cases documented in this report involved denials of stays of removal.

## ROSA MANI

*Rosa Mani is the mother of three children, including Emily, an 11-year-old US citizen suffering from a rare form of Systemic Juvenile Idiopathic Arthritis, with epilepsy and depression. Emily's family could not afford the treatment available to her in Mexico, and so the children's father travelled with them to Chicago.  Rosa requested a visa to join her family through legal means, and when denied, sought to cross the border. She was apprehended, detained for two months, and deported. In desperation, Rosa re-attempted to cross the border only to be apprehended again  in August 2016. Despite clear, compelling humanitarian exceptions - a very ill US citizen daughter who needed her mother's care - Rosa's request for a stay of removal was denied, and she was deported to Ciudad Juarez late at night, in violation of the Local Repatriation Arrangement. Emily's mental health has worsened without the presence of her mom.*

SEE APPENDIX FOR DOCUMENTS DETAILING ROSA'S CASE.

Denials of stays of removal provided by ICE El Paso are often one-page boilerplate forms, making little or no reference to the details of the case and providing limited, if any, explanation of the grounds for denial. Little attention or weight is given to supporting evidence presented as a part of a request for a stay of removal, and exceptional cases do not receive due attention by ICE officials.[37] This suggests that ICE El Paso is electing not to review requests for stays in any meaningful sense and echoes the findings of a 2015 report on prosecutorial discretion nationwide: "Prosecutorial discretion requests receive a truncated review, if they are reviewed at all."[38] Lack of meaningful response in denying requests for stays of removal further impedes attorneys' ability to present more complete or favorable petitions for stays of removal in the future or to determine with their clients whether that effort has a chance at success. Finally, with absolutely no detail provided in denials, it is impossible to provide oversight or monitoring of ICE El Paso's inconsistent, arbitrary decisions.[39]

According to one attorney interviewed: "This is something new. People who are here on stays [of removal] now know that they are in jeopardy."

## RICARDO

*Ricardo, a 35-year old father of a three-year old U.S. citizen child and married to a U.S. citizen, entered the U.S. without documents as a teenager. In the fall of 2016, he was apprehended by immigration authorities and placed in detention. While his attorney presented a request for a stay of removal, Ricardo's mental health quickly deteriorated and he suffered from severe insomnia and anxiety. He attempted suicide and was transferred to an area hospital; Ricardo was in the hospital under surveillance when ICE denied his request for a stay and immediately deported him. Neither Ricardo's family nor his attorney were informed that he was to be deported, but instead, found out when Ricardo called them from Mexico.*

Individuals whose requests for stays of removal have been arbitrarily denied in the El Paso sector in recent years do not pose any threat to public safety or national security. As their petitions demonstrate, use of discretion would clearly and demonstrably serve the public interest by allowing them to stay. ICE El Paso's practice of failing to favorably utilize its discretionary powers for individuals clearly worthy of such discretion not only causes serious, detrimental effects on the person who is deported, but on lives and livelihoods of their family members and communities.

In three of the cases documented, previous requests for stays of removal had been granted; the only change was ICE leadership in El Paso.

These cases demonstrate an increasing trend not only of arbitrarily denying even the most compelling humanitarian stays of removal, but a concerning practice of misleading petitioners in order to get them to report to ICE for deportation, alongside ICE's failure to inform attorneys of record about impending deportations.

**GUILLERMO**

*Guillermo is a 45-year-old Mexican national and resident of the U.S. for over 20 years. He is a father of four U.S. citizen children - aged 20, 17, 15 and 10 - and a 24-year-old DACA recipient and has substantial ties to the community. Guillermo applied for a fourth stay of removal as the primary caregiver of his three minor children.40 Despite having an attorney of record, Guillermo received a call directly from ICE officers asking him to report in person. He did so, and was detained based on a prior removal order.41 Guillermo's family called his attorney, who filed a request for a stay of removal. The stay was denied, and Guillermo was deported just before Christmas. The same stay of removal request was granted three years in a row to allow this father of five to remain in the U.S. to care for his children.*

# UNACCOUNTABLE, ARBITRARY DENIAL OF PAROLE

The arbitrary nature of parole denials in the El Paso Sector represents a distinct deviation from previous leadership. Parole denials include those with established family ties and community sponsors, those responsible for family members with urgent medical situations, and parents of minor children. ICE provides minimal or no justification for these denials, holding immigrants and asylum seekers in detention, hindering their cases and causing mental and physical strain.

JA-330

*Asylum seekers and individuals with urgent humanitarian claims are held in criminalized detention facilities, face barriers to their constitutional rights to due process, and are separated from families and communities.*

P arole is not a final determination of admissibility or an asylum claim; it is a way to ensure that individuals are not needlessly detained at great cost to themselves and the immigrant detention system. U.S. law states that noncitizens in removal proceedings must not be detained or required to pay bond unless they pose a demonstrated public-safety or flight risk.[42] The 2009 "Parole of Arriving Aliens Found to Have Credible Fear of Persecution or Torture" directive grants Field Office Directors the express authority to utilize discretion to parole "arriving aliens" in the asylum process for "urgent humanitarian reasons" or "significant public benefit," including for "aliens whose continued detention is not in the public interest."[43] The directive instructs appropriate ICE officers to parole asylum seekers who have been found to have credible fear, who establish their identity, and who are neither flight risks nor dangers to the community. Still, many such individuals continue to be detained in the El Paso Sector.

The overwhelming majority of lawyers and advocates interviewed for this report maintain that discretion has become nearly non-existent in the El Paso Sector as of late 2015. ICE routinely elects to deny parole for even the most urgent, humanitarian and exceedingly reasonable requests. One attorney estimated that in one year, less than ten percent of her organization's parole requests were granted, a significant decrease over previous years.[44]

One fifth of the cases documented for this report involved arbitrary, unexplained, and unjustified denials of parole. This trend is echoed by reports from across the country of asylum seekers routinely denied parole and bond,[45] even after meeting appropriate criteria.[46] Furthermore, parole denials are communicated on a rote form where a box is ticked but frequently, no additional details are provided. As is the case with denials of stays of removal, this leads us to question the extent to which parole requests are reviewed on a case-

**RENE**

*Rene is a Mexican national in his 30s. Rene, his twin brother, and a cousin were detained and tortured by members of the Mexican federal police in 2013; Rene's brother was killed and his cousin was disappeared. Rene laid next to his brother's lifeless body for hours in the back of a truck until he was let go. He came to an El Paso point of entry and requested asylum, and was detained based on a prior misdemeanor charge. Despite the harrowing basis for Rene's asylum claim, several parole requests were denied, and he was held in detention for two years.*

by-case basis, as is required in the directive. Finally, ICE is exceedingly slow in responding to parole requests, during which time individuals are deprived of freedom and held in detention.

ICE El Paso elects not to publicize numbers of parole requests or denials; as such, it is difficult to hold ICE leadership accountable in their lack of compliance with internal directives. ICE's 2009 directive explicitly calls on ICE Detention and Removal Operations (DRO) to monitor parole statistics and implement a quality assurance processes.

**MARIANA**

*A young Mexican mother fleeing violence and subjugation at the hands of a powerful cartel leader in Ciudad Juarez, Mariana was separated from her infant child, who was still breastfeeding, after the family requested asylum in El Paso in February 2016. Mariana was originally released on parole with her infant in order to pursue their*

*asylum claim. She was later called to report to the ICE office and left her baby with an aunt with whom they were staying. After a few hours, when Mariana hadn't come home, the family called to ask after her. They were told that she had been detained.*

*Mariana's attorney requested parole the following week; what they received in response was a simple, rote form, indicating without further explanation that Mariana was a flight risk. Mariana and her sister, Laura, together with their mother, Cristina, were denied parole even though the U.S. Citizenship and Immigration Services (USCIS) deemed the family to have a viable, credible asylum claim. ICE disregarded agency humanitarian policies even as Mariana remained separated from her six-month old baby.*

*Mariana was finally released from detention in late October, 2016, under the terms of the Convention Against Torture, but placed on restrictive conditions, including ankle bracelet monitoring, home visits, and telephone check-ins. Her mother, inexplicably, was held in detention for another month before being released.*

## DETENTION AND PHYSICAL & MENTAL HEALTH

Detention has a detrimental impact on the physical and mental health of detainees, aggravating previously existing conditions and triggering mental health episodes. Twenty cases of serious health concerns were documented for this report, consistent with allegations of medical neglect at the El Paso Processing Center and other detention facilities nationwide.[47]

**SUSAN**

*In January 2016, Susan came to the southern U.S. border seeking asylum, facing persecution and threats from the government in her home country government because of her activism. Susan passed her credible fear interview, but failed to disclose her engagement to a U.S. citizen. Despite having no criminal record, no immigration violations and strong ties to the community, she was denied parole three times and labeled a flight risk. As of January 2017, Susan remains in detention, under threat of deportation. Susan is suffering from depression and has shown suicidal ideations. Susan's parole denials offered no explanation as to why ICE considered her a flight risk.*

This report sheds light on a pattern of arbitrary decision making by ICE leadership in the El Paso Sector; a process that is wholly unaccountable and offers little by way of explanation, but one that has devastating consequences. Asylum seekers and individuals with urgent humanitarian claims are held in criminalized detention facilities, face barriers to their constitutional rights to due process, and are separated from families and communities.

# VIOLATIONS OF DUE PROCESS & BARRIERS TO EFFECTIVE REPRESENTATION

Numerous obstacles to effective legal representation amount to a serious crisis of due process for individuals in immigration proceedings. Patterns identified in the El Paso Sector include obstacles to access to legal representatives, impediments to attorney-client meetings and confidentiality, the execution of deportation orders without notification to legal counsel, and other practices that inhibit the fundamental constitutional right to due process.

JA-333

..............................................................

**A**lthough representation at government expense is not a right in civil proceedings like immigration, detainees do have a right to counsel in immigration proceedings and due process rights.[48] Policies and practices in the El Paso Sector clearly infringe on this most basic right, at times at the expense of a legitimate asylum claim or family separation.

A recent study by the American Immigration Council found that access to counsel is scarce and uneven across the United States, with rates of representation far worse for immigrants held in detention than non-detained immigrants, and that immigrants with representation fare better at every stage of the court process, from custody hearings to outcomes of relief decisions.[49] Although representation of detained immigrants at the El Paso Processing Center (EPC) is higher than the national average, attorneys who attempt to provide representation at EPC report a wide variety of challenges and barriers in accessing clients and in preparing and presenting cases.

Concerns regarding access to counsel and violations of due process in the El Paso Sector were described in detail in an open letter sent to ICE Field Office Director Corey Price and other local leadership of the Department of Homeland Security and Department of Justice in January 2017. These concerns include:

## 1. UNREASONABLE RESTRICTIONS AND IMPEDIMENTS TO CONFIDENTIAL ATTORNEY-CLIENT MEETINGS

Because of lack of access to adequate facilities, attorney-client meetings at EPC are not confidential. Detention center guards, other detainees and other attorneys are privy to private and sensitive information. This presents a serious burden to asylum cases, as asylum seekers are afraid to share information in a non-confidential environment.

Attorneys are routinely denied access to contact rooms and are forced to utilize malfunctioning phone booth for meetings. On rare occasions when representatives are granted access to contact rooms, these do not have even minimally appropriate furnishing for case preparation, including lack of writing surfaces.[50]

> "YOU CAN HEAR GUARDS YELLING TO EACH OTHER OR AT DETAINEES, YOU CAN HEAR GUARDS TALKING TO ONE ANOTHER, LAUGHING. IF YOU CAN HEAR THEM, THEY CAN HEAR YOU."

## 2. EXECUTION OF DEPORTATION ORDERS WITHOUT ATTORNEY NOTIFICATION

Prior to December 2015, interviewees report that clients and attorneys would receive advance notification of deportation. Since that time, attorneys increasingly receive written notices only after a client has been deported. Failure to notify attorneys of impending deportation dates not only prevents attorneys from filing appeals, but in numerous cases has put the lives of asylum-seekers and migrants at risk.

> "I HAVE NEVER BEEN ADVISED AHEAD OF TIME THAT OUR CLIENT IS GOING TO BE REMOVED. WE GET [A NOTIFICATION] IN THE MAIL DAYS LATER, BUT WE GET A CALL FROM THE CLIENT FROM MEXICO BEFORE THEN. WE HAVE NEVER, EVER BEEN ADVISED AHEAD OF TIME."

## 3. DIRECT AND INDIRECT BARRIERS TO ACCESSING EXPERTS AND INTERPRETERS FOR CASE PREPARATION

Barriers for experts, including lengthy wait times for background checks, to access individuals in detention make use of such experts prohibitive. These issues have led to clients abandoning valid asylum claims or having stays of removal denied -- not based on the facts of their cases, but because of an inability to access expert witnesses and effective representation. Additionally, accredited representatives and clergy with pre-clearance have been denied access to detainees at EPC. Lastly, many detainees in the El Paso Sector are non-English and non-Spanish speaking, but interpreters are not provided during hearings and detention centers impede access to interpretation services.[51]

> "YOU NEED TO BE ABLE TO COLLECT EVIDENCE AND CORROBORATE CLAIMS. YOU HAVE TO DO RESEARCH, PULL POLICE RECORDS, LOOK FOR NEWS ARTICLES TO BACK UP ASYLUM CASES; YOU CAN'T DO THIS WITHOUT NAMES AND IDENTITIES."

## 4. BURDENSOME AND INEXPLICABLE WAIT TIMES FOR ATTORNEY-CLIENT MEETINGS

Legal representatives face unduly burdensome wait times - often up to two hours - to meet with clients at EPC. This forces representatives to plan entire schedules around the detention facility and increases the cost of legal representation.

## 5. LACK OF ACCESS TO NECESSARY CLIENT DOCUMENTATION PRIOR TO HEARINGS

Attorneys are often prevented from obtaining necessary case files and documents to prepare and present cases. Clients cannot present a defense if they do not have access to their own immigration records.

## 6. INEXPLICABLE RESTRICTIONS ON ACCESS TO COURTROOMS

Attorneys depend on detention center guards to allow them into the courtroom for hearings; guards routinely fail to do so in a timely manner. Presiding judges admonish attorneys for their tardiness and this has led to rescheduling of hearings, thereby prolonging detention. Immigration attorneys also lack access to computers, printers and internet in the context of court, equipment widely available to government attorneys. This places migrants' counsel in serious disadvantage, being unable to access files, statutes, and precedents while in court.

> "WE DON'T HAVE INTERNET ... ALL THE CODES, LAWS, POLICIES YOU NEED TO HAVE THEM, AND THE ONLY ALTERNATIVE IS TO HAUL IN A STACK OF BOOKS WITH YOU. THIS IS INHERENTLY UNFAIR WHEN GOVERNMENT ATTORNEYS DO HAVE INTERNET ACCESS."

## 7. RESTRICTION ON ACCESS TO AND LACK OF CLEAR GUIDELINES ON TECHNOLOGY IN DETENTION CENTERS

There are no clear regulations regarding use of technology during attorney-client meetings, and legal teams report frequent and arbitrary denial of cell phone use upon arrival at the EPC. Attorneys need access to telephonic interpreters to interview their clients and prepare cases. Attorneys seek various mechanisms to use personal cell phones for interpretation, including emailing ICE for written permission, however private security guards allow or deny cell phones seemingly at their whim.

## 8. ARBITRARY PRACTICES THAT NEGATIVELY AFFECT ATTORNEY ABILITY TO REPRESENT CLIENTS

In addition to the serious systematic impediments to due process detailed above, the legal community reports many more subtle ways in which agencies, officers and private security contractors denigrate them and make daily work more difficult. These include the denial of water, sexual harassment by guards and a general lack of written policies and rules.

Individually and as a whole, these barriers to basic due process serve to  deter those seeking asylum,[52] by prolonging detention and also by contributing to a general environment of mistreatment at immigrant detention and processing centers in the sector.[53]

# RECOMMENDATIONS

The findings in this report reveal an entrenched culture of disregard for human dignity within the immigration enforcement system in the El Paso Sector. Far from isolated incidents, these cases demonstrate systemic abuses obscured by opaque decision making processes and unaccountable leadership, which result in long-term, devastating impacts on the lives of asylum-seekers and migrants.

Immigration enforcement officials in the El Paso Sector should treat every individual humanely and respectfully while guaranteeing their legal rights. This includes the treatment of asylum-seekers at ports of entry and upon apprehension and extends to decisions and processes to remove individuals from the United States. Detention should not be used as a mechanism to deter asylum claims and should not be the default strategy of immigration authorities. The decisions made by ICE, CBP, and Executive Office for Immigration Review in El Paso are not without consequence. These decisions often have irreparable ramifications on the families and communities affected by them. In the case of asylum-seekers, these practices may mean life or death.

While immigration law and enforcement policies are complex and local actors must inevitably balance a complicated nexus of national priorities, memorandums and legislative actions, local authorities still exercise significant power and discretion in enforcing immigration law. The following broad recommendations are aimed at rectifying the unaccountable and inhumane nature of decision making in the  El Paso Sector and injecting rationality, fairness and coherence into this system. We call on the responsible Department of Homeland Security and Department of Justice authorities in the El Paso Sector to:

1. **Increase and Promote Transparency and Accountability**
2. **Limit Use and Duration of Immigrant Detention**
3. **End Deterrence & Mass Detention of Asylum Seekers**
4. **Enforce Removal in a Humane Manner**
5. **End Family Separation**
6. **Guarantee Access to Counsel & Respect for Due Process**

## INCREASE AND PROMOTE TRANSPARENCY AND ACCOUNTABILITY

CBP and ICE should implement effective vehicles of transparency and accountability in the areas of asylum, detention and prosecutorial discretion.

In addition to improving training for ICE and CBP agents, creating mechanisms for accountability, and improving communication regarding decision making, CBP and ICE should publish statistics related to asylum, detention and prosecutorial discretion. The 2009 ICE parole directive clearly states that DRO Field Offices shall maintain national and local statistics on parole determinations and establish a quality assurance process.[54] Implementation of this directive is critical. As an important first step towards increasing transparency, EOIR and ICE El Paso should publish information on a wide range of relevant data, including, but not limited to:

- **Length of detention of asylum seekers for FY 2015 & 2016.**
- **Children and family separation**
- **Issuance of parole to arriving aliens with credible fear determinations for FY 2015 & 2016**
- **Issuance of bond for FY 2015 & 2016**
- **Detention and alternatives to detention for FY 2015 & 2016**
- **Applications for stays of deportation for FY 2015 & 2016**

A complete list of the information under each of these areas is detailed in the appendix.

We refer local authorities to additional reports, which present specific mechanisms and implementation steps to promote accountability, including community engagement and relationship-building between immigration authorities and civil society.[55]

## LIMIT USE AND DURATION OF IMMIGRANT DETENTION

Immigration detention should only be utilized when necessary to ensure public safety and appearance in court. Immigrant detention should not be the default decision. ICE should make individualized detention decisions, especially for those seeking asylum and long-term residents of the U.S. with family ties (including legal permanent resident or citizen spouses and children).[56] The burden of proof should lie with agencies to justify holding individuals in detention facilities.

ICE and EOIR should also prioritize the use of alternatives to detention for asylum seekers, migrants with mental and physical health problems, and migrants with immediate family in the United States. Alternatives to detention are not only a moral imperative, they are effective.[57]

Additionally, ICE should utilize prosecutorial discretion to release asylum seekers and immigrants from detention in accordance with existing DHS memos, in a way that prioritizes humane enforcement and detention practices that respect human dignity. When ICE elects to deny requests for parole, it should provide detailed and case-specific reasons, demonstrating a serious assessment of both positive factors and risk factors. The current denial form, often vague or nearly blank, suggests arbitrariness and lacks meaningful specifics.[58]

EOIR should follow the lead of the U.S. Court of Appeals for the 9th Circuit and establish automatic detention determination hearings at the six-month mark, as required by the U.S. Constitution.[59]

Finally, detention facilities should be decriminalized and should reflect the civil nature of proceedings. Such steps should include expanded visitation for family, clergy and friends; greater freedom of movement; and humane treatment and conditions.[60]

## END DETERRENCE & MASS DETENTION OF ASYLUM SEEKERS

Agencies should take every step necessary to ensure that asylum seekers are offered the protections afforded to them by U.S. and international law, including the ability to request asylum at ports of entry and upon apprehension and the ability to

present asylum claims before an immigration judge.

Asylum seekers should not be miscategorized as border crossers for purposes of removal and detention and detention should not be used as deterrence for those who seek protection and refuge in the United States. Given the undue burden detention places on asylum seekers - on legal claims and wellbeing - asylum seekers should not be detained unless the state can demonstrate that detention is in the interest of the community.

The burden should lie with the state to prove that an individual is a public security or flight risk. Agency officials and federal prosecutors should decline to prosecute those who express fear of persecution with illegal entry/re-entry, so as to avoid detention and a higher bar for processing what are otherwise legitimate asylum claims.[61]

Furthermore, CBP and ICE officials should cease all practices that intimidate, abuse, harass or otherwise dissuade asylum seekers. Extensive recommendations for improved training, accountability mechanisms, and oversight have been set forth by non-governmental organizations with expertise in these areas, and we refer agency leadership to these reports.[62] Implementation plans should be expanded to include all those who come into contact with asylum seekers, including private security contractors.

## ENFORCE REMOVAL IN A HUMANE MANNER

ICE should utilize prosecutorial discretion and grant stays of removal to prioritize humane enforcement in a way that respects human dignity and rights. Greater weight should be placed on humanitarian concerns of those requesting relief, and these considerations should be made on a case-by-case basis.

Furthermore, ICE should desist from misrepresenting the purpose of in-person meetings and all communication regarding case-related issues should be conducted only through the attorney of record, in the case of individuals with representation. No one should be pressured to sign final deportation orders or other documents. Individuals should be provided these documents in their primary language and should not be denied access to their attorney or the ability to consult with an attorney.

Legal counsel and deportees should be advised in a timely manner before deportation orders are executed to ensure that all legal measures have been exhausted and so that a deportee and her family can make necessary preparations for safe removal. Finally, deportation should always respect Local Repatriation Agreements.

## END FAMILY SEPARATION

DHS agencies tasked with immigration enforcement should prioritize child wellbeing and family unity in all decision-making, including in asylum, detention and enforcement processes.

Families should not be separated at any point in enforcement processes by CBP or ICE, including the detention of parents and caregivers of minor children, or those with mental or physical health concerns. Furthermore, ICE and CBP should take positive steps to reunify families when they have been separated through failure to utilize prosecutorial discretion and decisions regarding detention and parole.

Numerous reports with recommendations for DHS agencies regarding family separation, parental rights and reunification have published in recent years. We refer agency leadership to these reports for additional guidance on implementation steps to respect and guarantee family unity within the immigration enforcement system.[63]

## ACCESS TO COUNSEL & RESPECT FOR DUE PROCESS

Given the extent, gravity and systemic nature of barriers to access to counsel and violations of due process, ICE, EOIR and the Office of the Chief Counsel should implement corrective measures throughout the El Paso Sector to improve and guarantee detainee access to counsel. These recommendations have been detailed and presented to DHS and DOJ leadership through an official complaint letter.[64]

- Detention facilities should permit legal counsel maximum access and flexibility in meeting and speaking with, advising and representing clients, and authorities should ensure confidentiality of attorney-client communications.
- Detention facilities should ensure timely access to experts (including psychological experts and others).
- EOIR and OCC should implement policies and procedures that eliminate investigative disparity between immigration attorneys/respondents and the government.
- Detention facilities and EOIR should establish clear, consistent policies regarding use of technology in client meetings and the courtroom.
- Government and private attorneys should be treated equally as officers of the court.
- Detention facilities and EOIR should ensure that respondents are able to participate meaningfully in proceedings by facilitating language access during communication with attorneys and other officers of the court.

# CONCLUSION

On November 8th, Donald J. Trump was elected President of the United States on a wave of rhetoric and campaign promises demonizing migrants, border communities, Mexicans and many others. Since that time, advocates and immigrants have experienced a further emboldened CBP and ICE, manifested in the deepening of a culture of inhumane treatment that violates the basic human dignity of those encountering the immigration system in El Paso.

Since his inauguration, President Trump has signed a number of highly controversial executive orders. Through these orders, predicated on a "surge of illegal immigration" and a "significant increase in violent crime and United States deaths," the President directs government agencies to "construct a physical wall along the southern border;" increase immigrant detention and expedited removal proceedings; expand the size of CBP and ICE forces; engage local law enforcement "to perform the functions of an immigration officer;" prioritize the prosecution of "offenses *having a nexus* to the southern border;" and placing substantial restrictions on refugee and asylum programs.

While it is, as yet, unclear how many of these executive orders will be carried out to the letter and under what timeline, advocates along the US-Mexico border see a new stage in an already long process -- one that has led to the hyper-criminalization of the migrant and the militarization of the southern border. There is well-founded fear that these executive orders, along with new departmental leadership and the policies and memoranda they may implement,

will further reduce the use of prosecutorial discretion, allow for increasingly arbitrary decisions with less oversight, and erect further obstacles to due process and fundamental human rights through an expanded immigrant enforcement and detention system. In short, advocates fear that the egregious violations of human dignity depicted in this report will worsen.

By shedding light on the human and moral consequences of a broken border enforcement paradigm, we hope to begin to repair the institutional culture embedded in immigration enforcement agencies. Today, this culture rejects engagement with local communities and advocates, shies away from transparency and accountability, and is enabled by racist rhetoric, xenophobia and general disregard for human rights. The efforts of the many advocates, grassroots leaders, and members of the legal community in El Paso, TX and Las Cruces, NM who work to build a more just border renew our hope in the power of local communities to overcome systems of oppression by working together. Their efforts are the inspiration for this report.

# APPENDIX

## CASE SUMMARY TABLE

Detailed information on over 120 cases of asylum seekers, individuals requesting humanitarian parole or relief, and detained and deported people was collected, coded, analyzed and classified in the creation of this report. The following chart presents the raw number and percentage of cases in which people were subjected to ICE and CBP practices and decisions:

| FINDING | TOTAL | % |
|---|---|---|
| Families separated by immigration enforcement decisions | 36 | 30 |
| Minor children separated from parents and/or caregivers | 31 | 25 |
| Immigrants and asylum seekers deported as a result of deterrence practices and or abuse of prosecutorial discretion | 25 | 20 |
| CBP & ICE practices intended to deter and dissuade asylum seekers | 44 | 36 |
| Deterrence practice: failure to process credible fear interviews | 14 | 11 |
| Deterrence practice: Language barriers during initial interviews | 16 | 13 |
| Deterrence practice: Verbal, physical, and mental harassment and abuse while in detention | 28 | 23 |
| Inconsistencies between sworn affidavits written by CBP & Border Patrol and client's testimonies | 9 | 7 |
| Detention exceeding six month period | 27 | 22 |
| Untreated physical and mental health problems in detention | 26 | 21 |
| Unaccountable, arbitrary denial of parole | 23 | 19 |
| Unaccountable, arbitrary denial of stays of removal | 18 | 15 |

JA-340

**BOND**

In addition to the findings presented in the report, researchers identified bond as another major issue in the immigration system in the El Paso Sector.  Numerous attorneys reported that bond hearings are treated, by many EOIR judges, as preliminary asylum hearings, and if significant evidence and documentation of the asylum claim are not presented, Judges do not consider bond. The merits of a full asylum claim have nothing to do with whether the individual in detention represents a flight risk or security risk. Furthermore, asylum seekers have the highest court appearance rates in the immigration system, an indication that releasing asylum seekers from punitive detention does not create a high risk of failure to appear. Finally, given the many challenges to preparing an asylum claim from detention, forcing counsel and asylum seekers to argue the asylum claim while detained presents a serious burden. In addition to treating bond hearings as preliminary asylum hearings, attorneys report that when granted, bond amounts are exorbitant -- well above $10,000 and up to $30,000.

The issue of bond - how hearings are treated as well as denial rates - is an important concern, but one that went beyond the scope of this report. Researchers believe this is an important area for future study.

**INCREASE AND PROMOTE TRANSPARENCY AND ACCOUNTABILITY: DETAILED INFORMATION**

The following information should be made available to attorneys and advocates through the Borderland Immigration Council, as well as published by ICE on a biannual basis:

■ **Length of Detention of immigrants claiming fear of return to home country ("Asylum Seekers") in El Paso sector for FY 2015 & 2016.**
  • How many immigrants claimed fear of return in the El Paso sector for FY 2015 & 2016?
  • What was the average length of detention for asylum seekers in the El Paso Sector for FY 2015 & 2016?
  • How many asylum seekers withdrew their claim of fear in the FY 2015 & 2016 (i.e. took a removal order or voluntary departure in lieu of pursuing asylum claim)?
  • How many of those who withdrew or abandoned their applications for asylum were in detention for more than 6 months?

■ **Children and Family Separation**
  • How many immigrant children arrived or were encountered in the El Paso Sector for FY 2015 & 2016?
    ■ How many of these children were asylum seekers?

JA-341

**INCREASE AND PROMOTE TRANSPARENCY AND ACCOUNTABILITY: DETAILED INFORMATION**

- How many immigrant children who arrived or were encountered in the El Paso Sector were unaccompanied by an adult relative (UACs) for FY 2015 & 2016?
- How many children who arrived with or were encountered in the El Paso Sector <u>with an adult relative</u> in 2015 & 2016 were separated from their adult relative?
- How many <u>adult asylum seekers</u> arrived or were encountered in the El Paso Sector with a child in the FY 2015 & 2016?
- Of these adult asylum seekers, how many were been separated from the child?
- How many of these adult asylum seekers who arrived with a child were detained by ICE for at least 48 hours?
- How many of these adult asylum seekers who were detained were sent to a family detention center with the child they arrived with (i.e. Dilley, Karnes, Artesia), and how many were detained without the child at another ICE location?

■ **Issuance of Parole to Arriving Aliens with Credible Fear Determinations for FY 2015 & 2016**
- Please clarify that ICE is responsible for determining whether an arriving alien who claims fear will be detained or paroled.
- How many people were designated as "arriving aliens" in the El Paso Sector for 2015 & 2016?
- How many arriving aliens were granted parole by ICE in El Paso Sector in the FY 2015 & 2016?
  - How many of those granted parole were adults who arrived with children, were pregnant, or had medical issues which served as the basis of parole?
  - How many of those granted parole were children?
- How many arriving aliens were denied parole by ICE in El Paso Sector for FY 2015 & 2016?
  - How many of those denials were based on danger to the community?
  - How many of those denials were based on flight risk or "overriding militating factors"?

■ **Issuance of bond by ICE for FY 2015 & 2016**
- Please clarify whether the the Risk Classification Assessment Tool ("RCA") is being utilized in each office for every bond eligible alien.
- Please provide numbers of how many people were run through the RCA system in the El Paso Sector for FY 2015 & 2016, by the field office where the RCA was administered (i.e. Albuquerque Field Office, Midland/Odessa Field Office, El Paso Field Office, etc).
- How many people (total) were granted bond or Release on Recognizance (RoR) by ICE in the El Paso Sector for FY 2015 & 2016, broken down by field office)?
- How many asylum seekers were run through the RCA in the El Paso sector for FY 2015 & 2016 by field office, and how many were issued bond or RoR?

JA-342

**INCREASE AND PROMOTE TRANSPARENCY AND ACCOUNTABILITY: DETAILED INFORMATION**

■ **Detention and Alternatives to Detention for FY 2015 & 2016**
- How many people were detained in the El Paso Sector each month in 2015 & 2016?
- How many people were enrolled in an Alternative to Detention ("ATD") program, (such as GPS monitoring or telephone check-ins) each month in the El Paso Sector for FY 2015 & 2016?
- How many people were under orders of supervision administered by the El Paso Sector for FY 2015 & 2016?
  - How many of those under an order of supervision were asylum seekers?
  - How many of those under an order of supervision were children?

■ **Applications for Stays of Deportation for the El Paso Sector for FY 2015 & 2016**
- How many applications for Stays of Deportation were filed in El Paso Sector in FY 2015 & 2016?
- How many were approved?
  - How many of these approvals were based on eligibility for some of relief (ex. U visa, DACA, etc.)?
  - How many of these approvals were based on compelling humanitarian factors alone?
- How many applications for stay of deportation were denied (by month if possible) in 2015 and 2016?
- Of the applications that were denied, how many claimed eligibility for a U visa or other form of relief?



*Office of Enforcement and Removal Operations*

**U.S. Department of Homeland Security**
11541 Montana Avenue, Suite E
El Paso, Texas 79936

U.S. Immigration
and Customs
Enforcement

1 2 OCT 2016

Carlos Spector, Esq.
Law Offices of Carlos Spector
1430 E. Yandell
El Paso, TX 79902

Re: ███████████ A ██████████

Dear Mr. Spector:

This letter is in response to your client's Application for a Stay of Deportation or Removal filed with U.S. Immigration and Customs Enforcement (ICE), Enforcement and Removal Operations (ERO) on September 15, 2016.

This office has thoroughly reviewed the information and documentation provided with your request, taking into consideration the individual circumstances of your client's case. I have determined that your client's removal from the United States is a priority under The Department's civil immigration enforcement priorities and as such he does not warrant a favorable exercise of prosecutorial discretion. Please see the Department's Civil Immigration Enforcement Priorities 2014 and 2015. This case was also reviewed under the terms of the August 23, 2013 ICE Directive, *Facilitating Parental Interests in the Course of Civil Immigration Enforcement Activities*, also referred to as the Parental Interests Directive.

Upon review of the evidence submitted, I determined that your client does not warrant a favorable exercise of prosecutorial discretion under the Directive. Your client's application for a stay of removal is hereby denied. You may not appeal this decision; however, it does not prohibit your client from seeking any other form(s) of relief available. If you have any questions regarding this matter, please contact Deportation Officer Patricia Noga at ████████████

Sincerely,

Corey A. Price
Field Office Director

RECEIVED OCT 1 5 2016



*Office of Enforcement and Removal Operations*

**U.S. Department of Homeland Security**
11541 Montana Avenue Suite E
El Paso, TX 79936

**U.S. Immigration
and Customs
Enforcement**

August 18, 2016

████████████████████████████
C/O El Paso Processing Center
8915 Montana Avenue
El Paso, Texas 79925

In Reference to: ████████████████████

## NOTIFICATION DECLINING TO GRANT PAROLE

Dear ████████████████

This letter is to inform you that U.S. Immigration and Customs Enforcement (ICE) has decided not to parole you from detention at this time. Under ICE policy, arriving aliens determined by an Asylum Officer to have a credible fear of persecution or torture are initially considered for parole. While the decision whether to grant parole is discretionary, ICE policy is generally to grant parole to aliens determined to have a credible fear if they establish their identity and that they pose neither a flight risk nor danger to the community.

As part of its determination whether to parole you, on <u>04/06/2016</u>, ICE conducted an initial interview with you. Your immigration files and any supplemental documentation that you provided were reviewed at that time. After reviewing all available information, ICE has determined that parole is not appropriate in your case at this time based on the following reason(s):

☐ You have not established your identity to the satisfaction of ICE.
    ☐ You did not present valid, government-issued documentation of identity, or any documents you submitted did not, to ICE's satisfaction, establish your identity.
    ☐ You did not provide third-party verification of your identity, or any third-party information you provided did not, to ICE's satisfaction, establish your identity.
    ☐ You did not, to ICE's satisfaction; establish your identity through credible statements.

☒ You have not established to ICE's satisfaction that you are not a flight risk.
    ☐ You failed to provide, to ICE's satisfaction, a valid U.S. address where you will reside while your immigration case is pending.
    ☐ You did not establish, to ICE's satisfaction, substantial ties to the community.
    ☒ Imposition of a bond or other conditions of parole would not ensure, to ICE's satisfaction, your appearance at required immigration hearings pending the outcome of your case.

☐ You have not established to ICE's satisfaction that you are not a danger to the community or U.S. security. In making this determination, ICE has taken into account any evidence of past criminal activity, activity contrary to U.S. national security interests, activity giving rise to concerns of public safety or danger to the community, disciplinary infractions or incidents, or other criminal or detention history that shows you have harmed or would likely harm yourself or others.

☐ Additional exceptional, overriding factors (e.g., law enforcement interests or potential foreign policy consequences) in your case militate against parole, as follows:

Subject is a recent entrant and a flight risk. Subject only has a LPR sister who resides in the United States.

☐ ICE previously provided you with a written decision declining to grant parole, and you have failed to provide additional documentation or to demonstrate any significant changed circumstances which would alter ICE's previous determination.

You may request a redetermination of this decision in writing, based upon changed circumstances in your case or additional documentation you would like ICE to consider. Such changed circumstances or documentation should relate to the reason(s) indicated above why ICE is not paroling you from custody at this time. For example, if you have not established your identity to ICE's satisfaction, you may wish to consider providing previously unfurnished government-issued documents such as passports, birth certificates, or identity cards. Identity can also be established through written statements prepared by individuals whom you know in the United States and whose identity ICE can verify to its satisfaction. These statements should include the address of the person you know in the United States and evidence of his or her identity. Finally, if there are multiple grounds checked above, you should try to provide further evidence addressing each of them.

If you request redetermination of this decision, please direct your written request to the address above, include a copy of this letter and any other prior ICE written decision(s) declining to grant you parole, and clearly explain what changed circumstances or additional documents you would like considered. Failure to provide satisfactory documentation and explanation may result in a denial of your request for redetermination.

Sincerely,

Alfredo Fierro
Deputy Field Office Director
El Paso Field Office

(x) cc: Attorney of Record or Designated Representative
( ) cc: A-File

**35** | DISCRETION TO DENY

9400 Viscount Blvd, Suite 100
El Paso, TX 79925



**U.S. Customs and
Border Protection**

December 9, 2016

Robert Reed
Sonoma Springs Covenant Church
3940 Sonoma Springs Avenue
Las Cruces, New Mexico 88011

Dear Mr. Reed,

Thank you for your correspondence received on December 6, 2016 on behalf of Rosa ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ regarding her request for parole and subsequent denial on October 28, 2016 at the Port of El Paso.

First, please allow me to express regret for her situation. CBP is tasked with protecting our Nation's borders as well as enforcing numerous laws at our Nation's ports of entry on behalf of a variety of other Government agencies, including state and local law enforcement. All international travelers attempting to enter the United States, including all U.S. citizens, are subject to examination upon each arrival into this country.

CBP does not have the authority to admit an inadmissible alien. Certain discretionary mechanisms, such as parole or waiver of the requirement to present certain documents during the inspection/admission process, may be applied in appropriate situations. The exercise of discretion to grant parole into the United States is an extraordinary measure, sparingly used only for urgent or emergency circumstances or for significant public benefit. Parole is not to be used to circumvent normal passport and visa requirements. Moreover, discretion cannot be exercised favorably for a person that poses a substantial risk to contributing to the illegal population of the U.S. nor any potential threat of committing criminal acts. After careful review, it has been determined that the denial of Ms. ▮▮▮▮▮▮▮'s parole request at the Port of El Paso on October 28, 2016 was appropriate.

CBP is greatly committed to maintaining the physical integrity of all individuals under our custody, and as such, we regret that Ms. ▮▮▮▮▮▮'s repatriation during the early hours of September 3, 2016 was not in accordance with our established practices. We have already addressed this issue with the Mexican consulate, by providing a written explanation of the timeline and events that occurred during the early hours of September 3, 2016, and have taken steps to ensure that our officers will comply with the terms of the repatriation agreement. Additional information regarding U.S. Customs and Border Protection may be found at www.CBP.gov.

Sincerely,

Hector A. Mancha
Director, Field Operations
Office of Field Operations

# ENDNOTES

1       For more on the historical context of the El Paso area, see: Staudt, Kathleen and Josiah Heyman.  "Immigrants Organize Against Everyday Life Victimization" in *The  Immigrant Other: Lived Experiences in a Transnational World, ed.*  Furman, Rich et al. (Columbia University Press 2016), 75-89.

2       Early, Ingrid and Steven Shafer. "Access to Counsel in Immigration Court." American Immigration Council Special Report. September 2016.

3       While we support calls to expand the definition of "family" to extended family units in order to protect asylum seekers and reduce vulnerability of migrants upon deportation, for the purposes of this report, we focus on separation of immediate family members (spouses and minor children) at the moment of apprehension and through detention and deportation.

4       This report focuses on family separation through decisions regarding detention and deportation. For background on the practices and consequences of separation prior to apprehension and post-deportation, see:
        Danielson, Michael S. *Documented Failures: the Consequences of Immigration Policy on the U.S./Mexico Border.* Nogales, AZ and Sonora, Nogales, Mexico: Jesuit Refugee Service/USA, Jesuit Conference of the United States, and Kino Border Initiative. 2013.

5       U.S. Immigration and Customs Enforcement. *Facilitating parental interests in the course of civil immigration enforcement activities.* Washington, DC: US Department of Homeland Security Immigration and Customs Enforcement. 2013.

6       DHS Advisory Committee on Family Residential Centers, ACFRC Consolidated Draft Subcommittees' Recommendation Report, "Report of the DHS Advisory Committee on Family Residential Centers. September 2016. Available at: https://www.ice.gov/sites/default/files/documents/Report/2016/ACFRC-sc-16093.pdf (accessed 31 January 2017)

7       In order to ensure the privacy and protection of the individuals whose cases and testimonies appear in this report, we use pseudonyms for the vast majority of these cases.

8       The KINO Report, *Our Values on the Line,* details many of these barriers, and the challenges faced by individuals separated from their families and held in detention who are seeking to relocate their family members: "In most cases separation is attributable to predictable consequences of an increased criminalization of unauthorized migration or an administrative failure of U.S. immigration authorities to determine familial relationships and keep track of the whereabouts of family members through the process of detention and deportation." (Page 1.)
        *See also,* Lutheran Immigration and Refugee Services. *Separation of Immigrant Families in U.S. Immigration Custody.* March 2016. "When families are detained in different federal facilities, there is no way to regularly monitor this or inform the detainee where their family member is located, making it nearly impossible to reunite or pursue a joint asylum claim without counsel." (Page 2)

9       *See,* Family Detention: Still Happening, Still Damaging. Human Rights First. October 2015.
        For documentation of other traumatic cases of family separation through detention, see: O'Connor, Kathleen; et al. *No Safe Haven Here: Mental Health Assessment of Women and Children Held in U.S. Immigration Detention.* Unitarian Universalist Service Committee, October 2015.
        "ICE separates families as a matter of course and in a way that risks family members losing each other permanently. One of the women interviewed had been separated from her 10-˜year old son as well as from her husband. The husband, interned on the East Coast somewhere, was desolate at losing his family and tried to commit suicide. The mother and her young daughter were released on the last day of the team's field trip but are stuck in the shelter waiting for her son to be released. The woman reported experiencing migraines and not being able to sleep or eat since she could not stop thinking about her son. Her two youngest children would hear their mother cry at night and would also start crying, wondering why their brother and father were not with them." (Page 8)

10      *No Safe Haven Here* authors state that "if the human cost of family separation is not sufficient to warrant ending the practice, the government should consider taxpayer burden when spending tax dollars on foster care subsidies that would be unnecessary if families were kept intact." (8-9)

11      Due to a prior unauthorized re-entry charge, Erica is ineligible to apply for legal status despite being married to a U.S. citizen.

12       Interview. Transcript on record at Hope Border Institute.

13      Women's Refugee Commission. *Backgrounder: Separation of Immigrant Families in U.S. Immigration Custody.* March 2016. Available at https://www.womensrefugeecommission.org/rights/gbv/resources/document/download/1384 (accessed on January 31, 2017).

JA-348

## ENDNOTES

........................................................................................................................................................................

"Decisions to prosecute immigrants and asylum seekers for illegal re-entry have increased the number of minor children separated from family members with whom they are traveling, resulting in these children being classified as unaccompanied minors and referred to ORR custody." (2)

See also, *Report of the DHS Advisory Committee:* "Currently, the criteria and conditions for admissions and releases of mothers with minor children and fathers with minor children appear to be different and arbitrary, with insufficient justification." (12)

14    Barrick, Leigh. *Divided By Detention: Asylum Seeking Families' Experience of Separation.* American Immigration Council. August 2016.

"Far from preserving family unity, DHS custody and release decisions for family members that have fled violence together are inconsistent and result in the separation of asylum seekers from their loved ones, especially when they fall outside of the ICE definition of a family unit as parents with children, or its de facto definition as mothers with children … By separating asylum-seeking families, DHS throws new hurdles into what is already an arduous legal process. It jeopardizes families' well-being and access to humanitarian protection, while multiplying the government resources required to adjudicate the same asylum claim…" (22)

See also, *Backgrounder: Separation of Immigrant Families in U.S. Immigration Custody*, 2016:

"Family separation can impede the ability of families to access asylum and other protection mechanisms because individual family members may be unable to apply for the same benefit they are legally entitled to apply for as a family unit." (1)

"[ICE custody determination]has widespread negative consequences: loss in immigration relief determinations (e.g. asylum) because of separate claims … or result in removal of some family members while others continue to pursue relief." (3)

*See also,* Campos, Sara, Esq. and Joan Friedland, Esq. *Mexican and Central American Asylum and Credible Fear Claims: Background and Context.* Washington, DC: American Immigration Council, 2014.

15    United Nations Commissioner of Refugees. Working Group on Arbitrary Detention: Preliminary Findings from its visit to the Unites States of America. October 11-24, 2016. Available at: http://www.ohchr.org/EN/NewsEvents/Pages/DisplayNews.aspx?NewsID=20746&LangID=E Accessed January 31, 2017.

16    Srikantiah, Jayashri, Charles Abbott, Lisa Weissman-Ward, and Francisco Quintana. "Report on Prosecutorial Discretion and Family Unity: US Government Officials' Failure to Consider the Impact of Deportation on Families." In support of the Request for Public Thematic Hearing Concerning U.S. Deportation Policy and the Rights of Migrants before the Inter-American Commission on Human Rights. 149th Period of Sessions. Mills Legal Clinic, Stanford Law School and CEJIL. 2016.

*See also,* Wessler, Seth Freed et al. *Shattered Families: The Perilous Intersection of Immigration Enforcement and the Child Welfare System.* Applied Research Center. November 2011.

"In fiscal year 2011, the United States deported a record-breaking 397,000 people and detained nearly that many. According to federal data … a growing number and proportion of deportees are parents … These deportations shatter families and endanger the children left behind." (5)

*See also,* Amnesty International USA. *In Hostile Terrain: Human Rights Violations in Immigration Enforcement in the US Southwest.* March 2012.

17    Satinsky, Sara, et. al; *Family Unity, Family Health: How Family-Focused Immigration Reform Will Mean Better Health for Children and Families.* Human Impact Partners. June 2013.

*See also:* Shattered Families 2011.

18    Women's Refugee Commission. *Torn Apart by Immigration Enforcement: Parental Rights and Immigration Detention.* New York: December 2010.

19    *Our Values on the Line* (2015) found that mothers, fathers, and guardians deported by ICE in Arizona are often separated from their citizen children; of their sample, three-fifths of adults deported were torn from a child remaining in the U.S.

For numbers on the increase in deportation of parents of minor children, see Satinsky, Sara, et. al; *Family Unity, Family Health: How Family-Focused Immigration Reform Will Mean Better Health for Children and Families.* Human Impact Partners. June 2013.

See also, *Shattered Families.*

20    The U.S. has ratified the International Covenant on Civil and Political Rights (ICCPR), the Convention Against Torture (CAT), and the Refugee Protocol. Available at: https://www.state.gov/j/drl/reports/treaties/index.htm#ftn2. Accessed on January 29, 2017.

21    *See,* Human Rights First. *Lifeline on Lockdown: Increased U.S. Detention of Asylum Seekers.* July 2016.

*And,* Amnesty International. *Home Sweet Home? Honduras, Guatemala and El Salvador's Role in a Deepening Refugee Crisis.* London: 2016.

Hiskey, Jonathan T.; et, al. *Understanding the Central American Crisis: Why They Are Fleeing and How U.S. Policies are*

## ENDNOTES

·······················································································································································

*Failing to Deter Them.* American Immigration Council. February 2016.
Wolgin,  Philip E.  *A Short-Term Plan to Address the Central American Refugee Situation.* Center for American Progress.
May 2016.

22    U.S. Citizenship and Services website. *Credible Fear FAQs.* DOI (https://www.uscis.gov/faq-page/credible-fear-faq#t12831n40132) Accessed on December 13, 2016.

23    More egregious still, there are many reports of CBP agents turning asylum seekers away at ports of entry. The American
Immigration Council recently presented a complaint addressing this very issue. *See,* "U.S. Customs and Border Protection's
Systemic Denial of Entry to Asylum Seekers at Ports of Entry on U.S.-Mexico Border." American Immigration Council. 13
January 2017.

24    *See,* U.S. Customs and Border Protection's Systemic Denial of Entry to Asylum Seekers at Ports of Entry on U.S.-Mexico
Border. The American Immigration Council. January 13, 2017. Available at: https://www.americanimmigrationcouncil.org/
content/us-customs-and-border-protections-systemic-denial-entry-asylum-seekers-ports-entry-us.
*And,* Martinez, Daniel, Guillermo Cantor, and Walter Ewing.  "No Action Taken: Lack of CBP Accountability in Responding to
Complaints of Abuse." American Immigration Council Special Report. May 2014.
*And,* Human Rights First. "How to Protect Refugees and Prevent Abuse at the Border: A Blueprint for US Government
Policy." June 2014.

25    See, Rosenblum, Marc R., et.al. *The Deportation Dilemma: Reconciling Tough and Humane Enforcement.* Migration Policy
Institute. April 2014.
*See also,* Dominguez, Lara et al. "U.S. Detention and Removal of Asylum Seekers: An International Human Rights Law
Analysis," prepared at the request of Human Rights First. June 20, 2016.

26    Cassidy, Elizabeth and Lynch, Tiffany. *Barriers to Protection: The Treatment of Asylum Seekers in Expedited Removal.* The
U.S. Commission on International Religious Freedom. November 2016.

27    For further analysis, see: Gentry, Blake. *Exclusion of Indigenous Language Speaking Immigrants in the U.S. immigration
System, a technical review.* Ama Consultants. June 2015.

28    The USCIRF report *Barriers to Protection* (2016) found that sworn statements "were neither verbatim nor reliable, and often
indicating that information was conveyed when in fact it was not and sometimes including answers to questions that never
were asked," and in 72 percent of the cases, asylum seekers are not allowed to review the document before signing it. (19)

29    This is happening in El Paso as well as nationally. The USCIRF report "found that asylum seekers continue to be detained
under inappropriate penal conditions before their credible fear interviews, and in some cases, even after being found to
have a credible fear." (40).

30    See, *Report of the DHS Advisory Committee.*

31    *See,* Detained Migrant Solidarity Committee "'*I was treated like a dog instead of a human being:' Degradation, negligence,
and abuse in ICE's El Paso Processing Center.*" El Paso: November 2016.
Also see, *Shadow Prisons: Immigrant Detention in the South.* Southern Poverty Law Center, National Immigration Project of
the National Lawyers Guild, Adelante Alabama Worker Center. November 2016.
*U.S. Detention of Asylum Seekers: Seeking Protection, Finding Prison.* Human Rights First. June 2009.

32    U.S. Immigration and Customs Enforcement. *Parole of Arriving Aliens Found to Have a Credible Fear of Persecution or
Torture.* December 2009.

33    The letter denying Rolando's parole application can be found in the Appendix.

34    Steering Committee of the New York Immigrant Representation Study Report, "Accessing Justice I: The Availability and
Adequacy of Counsel in Removal Proceedings," Cardozo Law Review, (2011) Vol. 33:2, p. 364 and seriatim, available at
http://www.cardozolawreview.com/Joomla1.5/content/33-2/NYIRS%20Report.33-2.pdf

35    *U.S. Detention of Asylum Seekers, 2009.*

36    Johnson, Jeh Charles, Secretary of U.S. Department of Homeland Security, Memorandum for Thomas S. Winkowski et al. re:
Policies for the Apprehension, Detention and Removal of Undocumented Immigrants. November 2014.

## ENDNOTES

.........................................................................................................................................................................

37    These issues are not limited to the El Paso sector, or any specific national or ethnic group. For example, *see:* Automatic Injustice: A Report on Prosecutorial Discretion in the Southeast Asian American Community.  October 2016.
"Even SEAAs whose stories are indeed "compelling and exceptional," who indeed are valued family members (mothers, fathers, aunts and uncles), and who have demonstrated rehabilitation and pose no threat to those around them continue to be deported." (4)
And, Letter from Congress Calling for DHS Accountability on Immigration Enforcement Priorities. **AILA Doc. No. 15051208**. 11 May 2015. Available at: http://www.aila.org/advo-media/whats-happening-in-congress/congressional-updates/congress-calling-dhs-accountability-on-enforcement
"[I]n many instances, ICE summarily denies a request for prosecutorial discretion with little or no review of a request." (2)

38    Canizales, Carolina; Shah, Paromita. *Prosecutorial Discretion DENIED*. United We Dream.  April 2015.

39    For further discussion of the inconsistency in DHS decision making regarding stays, see:
Hing, Bill Ong. The Failure of Prosecutorial Discretion and the Deportation of Oscar Martinez (2013).
*And*, The Scholar: St. Mary's Law Review on Race and Social Justice, Vol. 15, 2013; Univ. of San Francisco Law Research Paper No. 2013-10. Available at SSRN: https://ssrn.com/abstract=2215989

40    This stay of removal would have been Guillermo's last petition; he was going to be able to adjust his status in the coming year.

41    While ICE officers insisted they had notified Guillermo's attorney of the removal order, the attorney on record had not received any such notice.

42    In Human Right First (June 2016) from Matter of Patel, 15 I&N. Dec. 666, 666 (B.I.A. 1976).

43    *Parole of Arriving Aliens Found to Have a Credible Fear of Persecution or Torture.*

44    As a non-profit service provider with limited resources and many clients, this attorney further maintained that her organization is selective about the parole requests it submits.

45    See appendix for further discussion of bond in the El Paso Sector.

46    Human Rights First. *Reducing the Immigration Court Backlog and Delays*. Fact Sheet. July 2016. Available at: http://www.humanrightsfirst.org/resource/reducing-immigration-court-backlog-and-delays

47    See, *"I Was Treated Like A Dog Instead of a Human Being."*
And, Amnesty International. *Jailed Without Justice: Immigrant Detention in the USA.* March 2009.

48    *Dakane v. U.S. Attorney General,* 371 F.3d 771 (11th Cir. 2004).

49    Early, Ingrid and Steven Shafer. "Access to Counsel in Immigration Court." American Immigration Council Special Report. September 2016.

50    *See also, See also,* Penn State Law and Legal Action Center of the American Immigration Council, "Behind Closed Doors: An Overview of DHS Restrictions on Access to Counsel," May 2012, as cited in, Human Rights Watch. *You Don't Have Rights Here: US Border Screening and Returns of Central Americans to Risk of Serious Harm.* October 2014.
"ICE fails to provide or facilitate access to counsel when questioning represented individuals, restricts attorney-client communications in detention facilities, and has also discouraged noncitizens from seeking legal counsel." (30)
And, *Lifeline on Lockdown:* "individual facility operators, which in effect set their own rules regulating attorney access to facilities, sometimes impede access to counsel." (33)

51    See, American Immigration Lawyers Association. *Due Process Denied: Central Americans Seeking Asylum and Legal Protection in the United States.* AILA Doc. No. 16061461. June 2016.

52    *See also, Report of the DHS Advisory Committee on Family Residential Centers.*

53    For documentation of human rights abuses and inhumane treatment at the El Paso Processing Center s*ee,*
*"'I was treated like a dog instead of a human being."*

54    *Parole of Arriving Aliens Found to Have a Credible Fear of Persecution or Torture.*

55    *See:*

## ENDNOTES

......................................................................................................................................................................

*Barriers to Protection,* 2016.
*Lifeline on Lockdown,* 2016.
*Letter from Congress,* 2015.
Government Accountability Office. *Immigration Detention-Additional Actions Needed to Strengthen DHS Management of Short-Term Holding Facilities.* May 2016.
*Fatal Neglect: How ICE Ignores Deaths in Detention.* American Civil Liberties Union, Detention Watch Network, and Heartland Alliance's National Immigrant Justice Center. February 2016.
*ICE's Failed Monitoring of Immigration Detention Contracts: A Policy Brief from Heartland Alliance's National Immigrant Justice Center.* Heartland Alliance's National Immigrant Justice Center. September 2016.

56   *See:* Jennings v. Rodriguez oral arguments. November 30, 2016. Available at (https://www.supremecourt.gov/oral_arguments/argument_transcripts/2016/15-1204_k536.pdf. Accessed on January 20, 2017.

57   Please refer to the following reports for in-depth recommendations on the use of alternatives to detention:
Danielson, Michael S. *Our Values on the Lines: Migrant Abuse and Family Separation at the Border.* Kino Border Initiative. Study prepared for the Jesuit Conference of Canada and the United States. September 2015.
*Locking Up Family Values, Again.* Lutheran Immigration & Refugee Service and the Women's Refugee Commission. 2014.
*Punishment Before Justice: Indefinite Detention in the US.* Physicians for Human Rights. 2011. Available at: https://s3.amazonaws.com/PHR_Reports/indefinite-detention-june2011.pdf.
*Barriers to Protection* 2016.

58   *Automatic Injustice* 2016. SEARAC states that parole denial forms should include a detailed analysis outlining the decision making process, including the weighing of positive factors against information the government has against a request for parole.

59   Letter to Secretary Johnson from former Immigration Jurists. October 31, 2016. Available at: http://www.immigrantjustice.org/sites/default/files/content-type/press-release/documents/2016-11/ImmJudges_IncreasedDetention_Letter_October2016.pdf

60   See: *"I was treated like a dog instead of a human being."* 2016.
*Jailed Without Justice* 2008.

61   This recommendation is echoed by numerous human rights organizations; see:
*Barriers to Protection* 2016.
*Lifeline on Lockdown* 2016.
*Fatal Neglect 2*016.
*Jailed Without Justice*  2009.
United Nations Commissioner of Refugees 2016.

62   See, United States Commission on International Religious Freedom. *Report of Asylum Seekers in Expedited Removal.* February 2005.
*And,* Amnesty International USA. *In Hostile Terrain: Human Rights Violations in Immigration Enforcement in the US Southwest.* March 2012.
*You Don't Have Rights Here* 2014.

63   *See:*
*Divided by Detention,* 2016.
*Locking up Family Values, Again: A Report on the Renewed Practice of Family Immigration Detention.* Lutheran Immigration & Refugee Service and the Women's Refugee Commission. October 2014.
*Torn Apart by Immigration Enforcement,* 2010.
*DHS Advisory Committee,* 2016.
*Backgrounder: Separation of Immigrant Families in U.S. Immigration Custody,* 2016.
Family Detention: Still Happening, Still Damaging, 2015.

64   Available on request; contact the Hope Border Institute.

JA-353



borderlandimmigrationcouncil.org

BORDERLAND
IMMIGRATION COUNCIL

U .S. Department of Homeland Security

## Notice and Order of Expedited Removal

## DETERMINATION OF INADMISSIBILITY

Event Number: _____

File No: _____

Date: _____

In the Matter of: _____

Pursuant to section 235(b)(1) of the Immigration and Nationality Act (Act), (8 U.S.C. 1225(b)(1)), the Department of Homeland Security has determined that you are inadmissible to the United States under section(s) 212(a) ☐ (6)(C)(i); ☐ (6)(C)(ii); ☐ (7)(A)(i)(I); ☐ (7)(A)(i)(II); ☐ (7)(B)(i)(I); and/or ☐ (7)(B)(i)(II) of the Act, as amended, and therefore are subject to removal, in that:

_____    _____
Name and title of immigration officer (Print)                           Signature of immigration officer

## ORDER OF REMOVAL
## UNDER SECTION 235(b)(1) OF THE ACT

Based upon the determination set forth above and evidence presented during inspection or examination pursuant to section 235 of the Act, and by the authority contained in section 235(b)(1) of the Act, you are found to be inadmissible as charged and ordered removed from the United States.

_____    _____
Name and title of immigration officer (Print)                           Signature of immigration officer

_____    _____
Name and title of supervisor (Print)                                        Signature of supervisor, if available

☐ Check here if supervisory concurrence was obtained by telephone or other means (no supervisor on duty).

---

### CERTIFICATE OF SERVICE

I personally served the original of this notice upon the above-named person on _____
                                                                                                              (Date)

_____
Signature of immigration officer

Form I-860 (Rev. 08/01/07)

JA-355

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MAKE THE ROAD NEW YORK, 301 Grove Street, Brooklyn, NY 11237; | ) ) ) |
| MARY, and her son, JOHN, care of American Civil Liberties Union, 125 Broad Street, New York, NY 10004; | ) ) ) ) ) |
| *Plaintiffs*, | ) No. 1:25-cv-00190-JMC ) |
| v. | ) ) |
| KRISTI NOEM, Secretary of the U.S. Department of Homeland Security, in her official capacity, 245 Murray Lane, SW Washington, DC 20528; | ) ) ) ) |
| TODD LYONS, Acting Director of the U.S. Immigration and Customs Enforcement, in his official capacity, 500 12th St., SW, Washington, D.C. 20536; | ) ) ) ) |
| JENNIFER B. HIGGINS, Acting Director of U.S. Citizenship and Immigration Services, in her official capacity, 5900 Capital Gateway Drive Camp Springs, MD 20746; | ) ) ) ) ) |
| PETE R. FLORES, Senior Official Performing the Duties of the Commissioner for U.S. Customs and Border Protection, in his official capacity, 1300 Pennsylvania Avenue, NW, Washington, DC 20229; | ) ) ) ) ) |
| PAM BONDI, Acting Attorney General of the United States, in her official capacity, 950 Pennsylvania Avenue, NW, Washington, DC 20530; | ) ) ) ) |
| *Defendants*. | ) ) ) ) ) ) |

**JA-356**

## FIRST AMENDED COMPLAINT[1]

(Violation of Immigration and Nationality Act, Administrative Procedure Act, and Due Process)

## INTRODUCTION

1.    This case concerns the Trump Administration's decision to dramatically expand "expedited removal," under which low-level Department of Homeland Security ("DHS") immigration officers summarily deport individuals from the United States without any meaningful review, much less court review.  DHS deports individuals subject to expedited removal soon after apprehension, without any opportunity to speak with an attorney; to gather evidence or call witnesses; or to present a claim for relief from removal, other than a truncated process for those who express fear of persecution.

2.    Expanding the expedited removal process to the interior of the country is a major departure from a century-long norm of providing all noncitizens within the United States with notice, access to counsel, an opportunity to prepare, and a contested hearing when they face removal.  Since it was created nearly three decades ago, federal immigration authorities have focused the use of expedited removal in limited circumstances: to noncitizens who are seeking admission at a port of entry, who have been apprehended near the border shortly after they entered the country, or who arrive in the United States by sea.

3.    On January 21, 2025, the Administration issued, and made immediately effective, a new rule that dramatically expands the reach of expedited removal to individuals located anywhere in the country who cannot prove they have been continuously present in the United

---

[1] Plaintiff has sought leave to amend by consent, ECF. 25,  However, Plaintif is also hereby amending by right, pursuant to FRCP 15(a)(1), as no responsive pleading has been filed to the initial complaint, ECF. 1.  See Committee Note to 2023 Amendment (explaining that "right to amend continues without interruption until the 21 days after the earlier of the events described in Rule 15(a)(1)(B).")

States for more than two years.  *See* U.S. Dep't of Homeland Sec., Designating Aliens for Expedited Removal (Jan. 21, 2025), https://public-inspection.federalregister.gov/2025-01720.pdf ("Rule").

4.      The Administration's decision to expand expedited removal to a vast group of noncitizens living anywhere in the United States disregards nearly three decades of experience showing that the expedited removal process, even when used at the border for new arrivals, is rife with errors and results in widespread violations of individuals' legal rights.  That experience shows that the government has erroneously deported numerous individuals through expedited removal, including U.S. citizens and individuals with bona fide fears of persecution in their countries of origin.  Numerous reports, including a comprehensive study commissioned by Congress, have extensively documented the widespread abuse and serious flaws in the expedited removal process at the border.

5.      The expansion means that low-level DHS officers can now immediately and without process subject individuals in the interior of the United States to expedited removal, without any consideration of their family ties—including ties to U.S. citizen or lawful permanent resident family members—or their ties to their communities.  Moreover, current procedures place the burden of proof on the individual to show that he or she is not subject to expedited removal, yet fail to provide time or a meaningful opportunity for the individual to do so. As a result, countless noncitizens will likely have expedited removal erroneously applied to them.

6.      The Rule is illegal.  Without relief from this Court, individuals living anywhere in this country are at risk of being separated from their families and expelled from the country without any meaningful process.

## JURISDICTION AND VENUE

7.     This case arises under the United States Constitution; the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq*.; the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq*. and its implementing regulations; and the Convention Against Torture ("CAT"), the Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), Pub. L. No. 105-277, div. G, Title XXII, § 2242, 112 Stat. 2681, 2681-822 (1998) (codified as Note to 8 U.S.C. § 1231).

8.     The Court has jurisdiction under 8 U.S.C. § 1252(e)(3).  Section 1252(e)(3) is a provision of the INA that provides jurisdiction in the United States District Court for the District of Columbia over "[c]hallenges [to the] validity of the system," including regulations and "written" policies regarding expedited removal.  The Court also has jurisdiction under 28 U.S.C. § 1331.

9.     Venue is proper in this District because 8 U.S.C. § 1252(e)(3)(A) requires that all § 1252(e)(3) actions be brought in the United States District Court for the District of Columbia. In addition, venue is proper under 28 U.S.C. § 1391(e)(1) because a substantial part of the events or omissions giving rise to this action occurred in this District and Defendants are officers of the United States being sued in their official capacity and reside in the District.

## PARTIES

10.     Plaintiff Make the Road New York ("MRNY") is a nonprofit, membership-based community organization with five offices in the New York area, located in Brooklyn, Queens, Staten Island, and in Suffolk and Westchester Counties.

11.     MRNY's mission is to build the power of immigrant and working-class communities to achieve dignity and justice.

3

JA-359

12.     MRNY's members are subject to the Rule's expansion of expedited removal. Mary is a Mexican national who resided in the United States for over 10 years, living with her family, which includes two U.S.-citizen children.  After her arrest and detention in the interior of the United States, she was illegally placed into expedited removal proceedings and issued an expedited removal order on January 28, 2025, and deported to Mexico.

13.     John is Mary's son.  He is 18 years old, and—like his mother—lived in the U.S. for more than two years when he was illegally placed into expedited removal proceedings and issued an expedited removal order and then deported to Mexico on January 28, 2025.

14.     Defendant Kristi Noem is sued in her official capacity as the Secretary of DHS. In this capacity, she directs each of the component agencies within DHS, including United States Immigration and Customs Enforcement ("ICE"), United States Citizenship and Immigration Services ("USCIS"), and United States Customs and Border Protection ("CBP").  In her official capacity, Defendant Noem is responsible for the administration of the immigration laws pursuant to 8 U.S.C. § 1103 and is empowered to designate categories of noncitizens subject to expedited removal and to grant asylum or other relief.

15.     Defendant Todd Lyons is sued in his official capacity as Acting Director of ICE.

16.     Defendant Pete R. Flores is sued in his official capacity as the Senior Official Performing the Duties of the Commissioner for CBP.

17.     Defendant Jennifer B. Higgins is sued in her official capacity as the Acting Director of USCIS.

18.     Defendant Pam Bondi is sued in her official capacity as the Acting Attorney General of the United States.  In this capacity, she is responsible for the administration of the immigration laws pursuant to 8 U.S.C. § 1103, oversees the Executive Office for Immigration

Review ("EOIR") (the administrative immigration court system), and is empowered to grant asylum or other relief.

<div align="center">

**FACTS**

</div>

**A.      The Trump Administration's Decision to Expand Expedited Removal.**

19.      On January 20, 2025, President Trump signed an Executive Order titled "Protecting the American People Against Invasion."  In relevant part, the Executive Order emphasizes that "[i]t is the policy of the United States to faithfully execute the immigration laws against all inadmissible and removable aliens" and "achieve the total and efficient enforcement of those laws." *See* Executive Order, § 2.

20.      Consistent with the President's goal of deporting millions of immigrants from the United States, section 9 of the Executive Order directs the DHS Secretary to "take all appropriate action, pursuant to section 235(b)(1)(A)(iii)(I) of the INA (8 U.S.C. 1225(b)(1)(A)(iii)(I)), to apply, in her sole and unreviewable discretion, the provisions of section 235(b)(1)(A)(i) and (ii) of the INA to the aliens designated under section 235(b)(1)(A)(iii)(II)."

21.      On January 21, 2025, DHS issued a Federal Register Notice, to be published in the Federal Register on January 24, 2025, that authorizes the application of expedited removal to certain noncitizens arrested anywhere in the country who cannot show "to the satisfaction of an immigration officer" that they have been continuously present in the United States for longer than two years.  The effective date of the Rule was January 21.

22.      As a result, noncitizens who have resided in the country for less than two years continuously are at imminent risk of deportation without any hearing or meaningful review, regardless of their ties to the United States, or the availability of claims for relief from and defenses to removal.  Even individuals who are not properly subject to expedited removal (for

<div align="center">5</div>

**JA-361**

example, U.S. citizens or individuals who have been continuously present for more than two years)—or to removal at all—can be summarily removed if they are unable to affirmatively prove those facts to the satisfaction of an immigration officer.

23.    On January 23, 2025, Benjamine C. Huffman, then-Acting Director of DHS, issued a Memorandum entitled "Guidance Regarding How to Exercise Enforcement Discretion" to implement both the January 21, 2025 Rule and January 20, 2025 Memorandum entitled "Exercising Appropriate Discretion Under Parole Authority." Benjamine C. Huffman, Guidance Regarding How to Exercise Enforcement Discretion (Jan. 23, 2025) ("January 23 Guidance"), https://www.dhs.gov/sites/default/files/2025-01/25_0123_er-and-parole-guidance.pdf. The January 23, 2025 Guidance directs that for "any alien DHS is aware of who is amenable to expedited removal but to whom expedited removal has not been applied," officers should "[t]ake all steps necessary to review the alien's case and consider, in exercising your enforcement discretion, whether to apply expedited removal. This may include steps to terminate any ongoing removal proceeding." The January 23 Guidance additionally states:

> Further, the expedited removal process includes asylum screening, which is sufficient to protect the reliance interests of any alien who has applied for asylum or planned to do so in a timely manner. See 8 U.S.C. § 1225(b)(l). To maximize efficiency in the short term, DHS components may wish to prioritize aliens eligible for expedited removal who failed to apply for asylum within the statutory deadline. See 8 U.S.C. § 1158(a)(2)(B) (setting a one-year deadline); *but see id.* § 1158(a)(2)(D) (discussing a very narrow exception to that deadline).

*Id*. at 2. Thus, the January 23 Guidance contemplates placement of individuals whose applications for asylum are pending into expedited removal under the Rule.

### B.    History of Expedited Removal.

24.    Prior to 1996, noncitizens generally were entitled to a full hearing in immigration court before they could be removed, whether they were seeking entry at the border or had

JA-362

already entered the country.  They also were entitled to administrative appellate review before

the Board of Immigration Appeals ("BIA" or "Board") and judicial review in federal court.

25.     In 1996, Congress enacted the Illegal Immigration Reform and Immigrant

Responsibility Act ("IIRIRA").  The Act generally retained the procedures for removal hearings

for all noncitizens—i.e., full immigration court hearings, appellate review before the BIA, and

federal court review.  8 U.S.C. § 1229a; 8 U.S.C. § 1252(a) *et seq.*  In these regular removal

proceedings (commonly referred to as "Section 240" proceedings), the noncitizen has a number

of procedural rights, including the right to an adversarial hearing before an Immigration Judge

("IJ"), and the right to retain and be represented by counsel.  Noncitizens can contest the factual

and legal allegations against them and apply for relief from removal, including asylum.

Noncitizens also can move to terminate the proceedings or suppress evidence based on an

unlawful arrest.  Moreover, noncitizens in Section 240 proceedings are entitled to an

administrative appeal to the BIA along with an automatic stay of deportation while the appeal is

pending, and to seek judicial review of an adverse administrative decision by filing a petition for

review in the court of appeals.

26.     IIRIRA also created a highly truncated removal process called "expedited

removal" for certain individuals coming to the United States who are inadmissible because they

engaged in fraud or misrepresentation to procure admission or other immigration benefits, 8

U.S.C. § 1182(a)(6)(C), or they lack the requisite documents for admission, § 1182(a)(7).  *See* 8

U.S.C. § 1225(b)(1). Expedited removal applies only to noncitizens charged under those specific

grounds of inadmissibility and does not apply to noncitizens removable for other reasons. *See* 8

C.F.R. § 235.3(b)(1), (b)(3).

JA-363

27.    Noncitizens subjected to expedited removal are ordered removed by an immigration officer "without further hearing or review."  8 U.S.C. § 1225(b)(1)(A)(i).

28.    Individuals who express a fear of persecution or an intention to apply for asylum are entitled to an additional truncated screening process, *see* 8 U.S.C. § 1225(b)(1), but nothing remotely approaching a full immigration court hearing unless they pass the screening.  If they pass the screening, the expedited removal order is cancelled and they are permitted to apply for asylum and any other form of relief or protection for which they are eligible in full Section 240 proceedings.  *See* 8 U.S.C. § 1225(b)(1)(B); 8 C.F.R. § 208.30(f).

29.    IIRIRA authorized the use of expedited removal for individuals who were applying for admission at a port of entry.  *See* 8 U.S.C. § 1225(b)(1).

30.    IIRIRA also included a provision allowing the Attorney General to apply expedited removal to individuals who had entered the country but had never been officially admitted—i.e., individuals who had crossed the border without presenting themselves for inspection.  *See* 8 U.S.C. § 1225(b)(1).  Under that provision, the Attorney General could apply expedited removal to noncitizens residing anywhere in the United States who cannot prove to an immigration officer's "satisfaction" that they have been continuously physically present for two years and were lawfully admitted or paroled into the country.  *See* 8 U.S.C. § 1225(b)(1)(A)(iii)(II), 8 C.F.R. § 235.3(b)(6).

31.    However, IIRIRA provided that, before the Attorney General could apply expedited removal to noncitizens apprehended inside the country, the Attorney General would

8

have to affirmatively designate which noncitizens would be included.  *See* 8 U.S.C. § 1225(b)(1)

(A)(iii)(I).[2]

32.    From the time the expedited removal provisions took effect in 1997 until 2002,

the government did not apply expedited removal to individuals who had entered the country.

Instead, it applied expedited removal only to inadmissible noncitizens arriving at ports of entry.

*See* Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of

Removal Proceedings; Asylum Procedures; Final Rule, 62 Fed. Reg. 10312 (Mar. 6, 1997).

33.    In 2002, the government first invoked its authority to apply expedited removal to

persons already inside the country, but limited application to a narrow group of individuals who

arrived by *sea* without being admitted or paroled and who were apprehended within two years of

entry.  *See* Notice Designating Aliens Subject to Expedited Removal Under Section

235(b)(1)(A)(iii) of the Immigration and Nationality Act, 67 Fed. Reg. 68924 (Nov. 13, 2002).

34.    Beginning in 2004, the government authorized the application of expedited

removal to individuals who entered by means other than sea, but only if they were apprehended

within 100 miles of a land border and were unable to demonstrate that they had been

continuously physically present in the United States for 14 days.  *See* Designating Aliens for

Expedited Removal, 69 Fed. Reg. 48877, 48879 (Aug. 11, 2004).

35.    Thus, between 1997 and 2019, with the limited exception of noncitizens who

arrived by sea, immigration authorities never sought to apply expedited removal to noncitizens

---

[2] Under the Homeland Security Act of 2002, the Immigration and Naturalization Service ("INS"), under the direction of the Attorney General, ceased to exist and its functions were transferred to DHS, effective March 1, 2003.  *See* Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135 (Nov. 25, 2002).  As a result, statutory references to the INS or its officers are deemed to have been replaced by reference to DHS or the applicable DHS official. *See* 6 U.S.C. § 557.

apprehended far from the border, or individuals anywhere in the United States (including near the border) who had been residing in the country for more than fourteen days.

36.    On July 23, 2019, at the direction of President Trump, DHS published a Federal Register Notice that authorized the application of expedited removal to certain noncitizens arrested anywhere in the country who cannot show they have been continuously present in the United States for longer than two years.  *See* 84 Fed. Reg. at 35409.  The District Court for the District of Columbia preliminary enjoined the Rule. *Make the Rd. New York v. McAleenan*, 405 F. Supp. 3d 1, 11 (D.D.C. 2019).  The D.C. Circuit vacated the preliminary injunction in a published decision. *See Make the Rd. New York v. Wolf*, 962 F.3d 612, 618 (D.C. Cir. 2020).

37.    On February 2, 2021, President Biden issued an Executive Order on Creating a Comprehensive Regional Framework to Address the Causes of Migration, to Manage Migration Throughout North and Central America, and to Provide Safe and Orderly Processing of Asylum Seekers at the United States Border ("E.O. on Migration"). *See* E.O. 14010, 86 FR 8267 (Feb. 5, 2021). The E.O. on Migration directed the Secretary of Homeland Security to review the July 2019 Notice and consider, *inter alia*, legal and humanitarian obligations, and constitutional principles of due process and other applicable law.

38.    In light of the E.O. on Migration, this Court stayed its consideration of a renewed motion for preliminary injunction challenging the 2019 Rule.  Minute Order, *Make the Road v. McAleenan*, 1:19-cv-02369-JMC (D.D.C. Feb. 8, 2021).

39.    On March 21, 2022, the Department of Homeland Security (DHS) rescinded the 2019 Rule.  See Rescission of the Notice of July 23, 2019, Designating Aliens for Expedited Removal, 87 Fed. Reg. 16022 (March 21, 2022).  In the period the 2019 expansion was in effect, the Rule was used in an exceedingly small number of cases.

**C.      The Expedited Removal Process.**

40.     The expedited removal statute provides that the process begins—and often effectively concludes—with an inspection by an immigration officer.

41.     That officer must determine whether the individual has been continuously present in the United States for less than two years; is a noncitizen; and is inadmissible because he or she has engaged in certain kinds of fraud or lacks valid entry documents "at the time of . . . application for admission."  *See* 8 U.S.C. § 1225(b)(1)(A)(i), (iii) (citing 8 U.S.C. § 1182(a)(6)(C), (a)(7)).

42.     If an individual claims to be a U.S. citizen, to have been admitted as a lawful permanent resident or refugee, or to have been granted asylum (in which case the individual cannot be subject to expedited removal), then the individual is entitled to limited additional review.  *See* 8 U.S.C. § 1225(b)(1)(C); 8 C.F.R. § 235.3(b)(5).

43.     Otherwise, if the officer concludes that the individual is inadmissible under an applicable ground, the officer "shall," with simply the concurrence of a supervisor, 8 C.F.R. § 235.3(b)(7), order the individual removed "without further hearing or review unless the alien indicates either an intention to apply for asylum . . . or a fear of persecution."  8 U.S.C. § 1225(b)(1)(A)(i).

44.     Thus, a low-level DHS officer can order the removal of an individual who has been living in the United States with virtually no administrative process—just completion of cursory paperwork—based only on the officer's own conclusions that the individual has not been admitted or paroled, that the individual has not adequately shown the requisite continuous physical presence, and that the individual is inadmissible on one of the two specified grounds.

Once a determination on inadmissibility is made, removal can occur rapidly, within twenty-four hours.

45.    For those who fear return to their countries of origin, the expedited removal statute provides a limited additional screening.  But the additional screening, to the extent it occurs, does not remotely approach the type of process that asylum seekers receive in regular Section 240 immigration proceedings.

46.    During the inspection process, if an individual indicates an intention to apply for asylum or expresses fear of return to his or her country of origin, the immigration officer must refer the individual for a rudimentary screening interview with an asylum officer, referred to as a "credible fear" interview, to determine whether the individual should be able to apply for asylum and related humanitarian relief.  8 U.S.C. § 1225(b)(1)(A)(ii), (B); 8 C.F.R. § 235.3(b)(4); 8 C.F.R. § 208.30(d)-(e).

47.    To prevail at the credible fear interview, the applicant must show "a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, that the alien could establish eligibility for asylum."  8 U.S.C. § 1225(b)(1)(B)(v).

48.    Applicants who satisfy the credible fear standard have their expedited removal orders cancelled by operation of law and are placed into Section 240 removal proceedings, where they have the opportunity to apply for asylum and other relief from removal, present and cross-examine evidence before an Immigration Judge, preserve objections, and appeal any adverse decision to the BIA and court of appeals.  8 C.F.R. § 208.30(f); *see also* 8 U.S.C. § 1225(b)(1)(B)(ii).

49.    Applicants who do not pass the credible fear interview may request review of the decision by an Immigration Judge, but do not receive a full hearing or any subsequent administrative appellate review.  8 U.S.C. § 1225(b)(1)(B)(iii)(II)-(III); *see also* 8 C.F.R. § 208.30(g)(1).  During the inspection and credible fear stages of expedited removal, DHS generally detains the noncitizen.  8 C.F.R. §§ 235.3(b)(2)(iii), (b)(4)(ii).

50.    An expedited removal order comes with significant consequences beyond removal itself.  Noncitizens who are issued expedited removal orders are subject to a five-year bar on admission to the United States unless they qualify for a discretionary waiver.  8 U.S.C. § 1182(a)(9)(A)(i); 8 C.F.R. § 212.2.  Similarly, noncitizens issued expedited removal orders after having been found inadmissible based on misrepresentation are subject to a lifetime bar on admission to the United States unless they are granted a discretionary exception or waiver.  8 U.S.C. § 1182(a)(6)(C).

**D.    Widespread Flaws in the Government's Expedited Removal Policies.**

51.    The government's expedited removal policies suffer from numerous serious deficiencies.  The 2025 Rule will only result in more erroneous removals and rights violations.  Any individual may be apprehended by immigration authorities in any location and summarily removed without a meaningful process to test whether that individual is properly subject to arrest, to expedited removal, or even to removal at all.

*Flaws in the Procedures for Inspection by Immigration Officers*

52.    Under expedited removal, an individual who seeks to contest many of the critical factual or legal requisites for expedited removal—admission or parole, inadmissibility, or the requisite continuous physical presence in the country—receives no meaningful opportunity to do so.  The individual bears the burden of proving certain critical facts.  *See*

13

JA-369

8 U.S.C. § 1225(b)(1)(A)(iii)(II) (noncitizen must show continuous presence to "satisfaction of" immigration officer); 8 C.F.R §§ 253.3(b)(1)(ii) (burden on noncitizen to show continuous presence), (b)(6) (same as to parole or admission). The individual is not provided with any guaranteed minimal time to prepare or means by which to gather evidence, present witnesses, or review or cross-examine DHS' evidence; nor any right to counsel recognized by the government or time to obtain counsel—all in sharp contrast to regular removal proceedings, where individuals are entitled to such safeguards.

53.    For individuals who have been residing in the country for an extended period or who are apprehended far from the border, the risk of error in the expedited removal process is particularly high.

54.    For example, the burden is on the individual to "affirmatively show[], to the satisfaction of an immigration officer" that the length of the individual's continuous presence makes the individual ineligible for expedited removal. *See* 8 U.S.C. § 1225(b)(1)(A)(iii)(II); 8 C.F.R 253.3(b)(1)(ii). Thus, there is a default presumption that, in the absence of this affirmative showing, any individual arrested anywhere in the country is a noncitizen who has not been continuously present for two years or more.

55.    That presumption creates numerous difficulties when applied to individuals apprehended in the interior of the United States, all of whom would need to show not only that they have been here for two years but also that they have been here *continuously* during that period, in order to avoid summary removal.

56.    Moreover, under the government's policies, individuals faced with proving that they have been continuously physically present in the United States for two years are not guaranteed any time or opportunity to gather evidence that would establish that fact. That is so

14

even though individuals who are arrested while going about their daily lives—attending religious services, taking their children to school, attending community events, or even simply grocery shopping—are extremely unlikely to be carrying the necessary documentary evidence on their person.

57.    The government's policies and interpretations of the statute and regulations fail to guarantee these individuals, who are detained during the inspection process, with time or any opportunity to gather the necessary evidence, nor even the ability to make a telephone call to someone who could help.  The inspecting officer is not required to make any independent effort to corroborate or verify any information, unless the individual makes a claim of U.S. citizenship; lawful permanent resident, refugee, or asylee status; or having been admitted or paroled.

58.    In addition, the government's expedited removal policies fail to require that the immigration officer assess individuals to ensure that they are mentally competent or otherwise have the capacity to participate in the inspections process, and they fail to require additional safeguards should an individual be found to have competency or capacity issues.

59.    And in the expedited removal process, a noncitizen's removability is determined by a low-level immigration enforcement officer who acts as both prosecutor and judge, rather than by a neutral adjudicator, as required in regular removal proceedings.  *See* 8 U.S.C. § 1225(b)(1)(A)(i).

60.    In addition, the expedited removal policies fail to provide any opportunity for a noncitizen to raise claims that his or her arrest violated a statutory or constitutional requirement.

61.    Over the last two decades, extensive studies have demonstrated that the expedited removal process deprives individuals of a meaningful opportunity to show that they are not subject to expedited removal, or to removal at all.  The government is well aware of the

15

widespread inadequacies and flaws in the expedited removal process and yet has failed to

adequately address the problem.  Expanding this process to alleged noncitizens apprehended in

the interior of the United States and who are alleged to have resided in the country for less two

years is certain to result in even more widespread erroneous removals.

62.      For example, a 2005 study commissioned by Congress documented numerous

"serious problems" in the expedited removal process "which put some asylum seekers at risk of

improper return."  U.S. Comm'n on Int'l Religious Freedom, *Report on Asylum Seekers in

Expedited Removal: Volume I: Findings & Recommendations* 4, 10 (2005), a*vailable at*

https://bit.ly/1GkjQfK ("2005 USCIRF Study").

63.       A 2016 follow-up study "revealed continuing and new concerns about CBP

officers' interviewing practices and the reliability of the records they create, including: flawed

Border Patrol internal guidance that conflates CBP's role with that of USCIS; certain CBP

officers' outright skepticism, if not hostility, toward asylum claims; and inadequate quality

assurance procedures."  *See* U.S. Comm'n on Int'l Religious Freedom, *Barriers to Protection:

The Treatment of Asylum Seekers in Expedited Removal* 2 (2016), *available at*

https://bit.ly/2uydMQ8 ("2016 USCIRF Study").

64.       A 2025 follow-up study concluded that "USCIRF is troubled that many of the

problems it has repeatedly documented since 2005 in the U.S. government's treatment of asylum

seekers in expedited removal—including flawed screening and documentation practices, a lack

of training and quality control, inadequate information for noncitizens in the process,

inappropriate detention conditions, and insufficient coordination and oversight—remain

unaddressed 20 years later. These flaws raise serious concerns that the United States is

erroneously returning asylum seekers to countries where they could face persecution or torture in

16

violation of both U.S. and international law." *See* U.S. Comm'n on Int'l Religious Freedom, *Barriers to Protection: The Treatment of Asylum Seekers in Expedited Removal* 3 (2025), *available at* http://bit.ly/4kZ3EYv.

65.    Specifically, multiple reports have documented that immigration enforcement officers routinely make factual errors in completing the forms required for expedited removal. Although the officers are required to take sworn statements from the individual, the sworn statements that are recorded in the forms are "often inaccurate and nearly always unverifiable." 2005 USCIRF Study, at 53, 55, 74; *see also* 2016 USCIRF Study, at 21.  The officer taking the sworn statement is often the person translating as well.  Asylum officers, who review expedited removal forms in the course of conducting credible fear interviews, have reported that the forms filled out by immigration enforcement officers commonly contain egregious inaccuracies.  *See, e.g.*, Borderland Immigration Council, *Discretion to Deny: Family Separation, Prolonged Detention, and Deterrence of Asylum Seekers at the Hands of Immigration Authorities Along the U.S.-Mexico Border* 13 (2017) ("Borderland Report"), https://bit.ly/2ZxInuV (describing evidence "that CBP affidavits are often inconsistent with asylum-seekers' own accounts").

66.    Asylum officers also have reported seeing many forms with identical answers, and others with clearly erroneous ones—such as forms indicating that a male noncitizen was asked and answered whether he was pregnant.  *See, e.g.*, 2016 USCIRF Study, at 20-22.

67.    Such factual errors are the natural consequence of a system that lacks procedural protections.  Furthermore, the government's expedited removal policies fail to provide any adequate check against immigration enforcement officers' failure to comply with required procedures, such as giving the individual an opportunity to review and respond to the statements in the requisite expedited removal forms.  For example, asylum seekers commonly report that

JA-373

immigration enforcement officers failed to read their statements back to them but nonetheless pressured them to sign documents.  *See, e.g.*, 2016 USCIRF Study, at 20-22.  As a result, individuals routinely are deprived of any opportunity to correct errors in their statements before signing.

68.    Reports have documented that immigration enforcement officers have routinely employed coercive tactics to force non-English speaking individuals to sign expedited removal forms in English, without any translation or interpretation.  *See, e.g.,* Borderland Report at 13.

69.    Multiple other reports have documented immigration enforcement officers engaging in flagrant intimidation to pressure asylum seekers not to express a fear of return.  For example, officers often accuse asylum seekers of lying, falsely tell asylum seekers that they have no right to seek asylum, inform asylum seekers that they will be jailed if they continue to assert a fear of return and refuse to sign the expedited removal order, or prematurely assert that the asylum seekers' claim will not succeed.

70.    The lack of any meaningful administrative review also contributes to errors.  For example, although current regulations technically require a supervisor to review the issuance of an expedited removal order, that requirement is limited to review of the paperwork—which, as described above, is often rife with errors and inaccuracies—and does not provide any independent review of the facts or corroboration of the immigration officer's representations.  *See* 8 C.F.R. § 235.3(b)(7).

71.    Among the most troubling problems is the widespread failure of immigration enforcement officers to refer noncitizens who express a fear of persecution for interviews with asylum officers, a problem for which the expedited review system offers no recourse.  As a

result, numerous asylum seekers have been erroneously removed without any opportunity to speak with an asylum officer or apply for asylum.

72.    A study commissioned by Congress found that in 15 percent of observed expedited removal cases, when a noncitizen expressed a fear of return to an immigration officer during the inspections process, the officer failed to refer the individual to an asylum officer for a credible fear interview.  2005 USCIRF Study, at 53-54.  Another study found that of the numerous individuals interviewed who reportedly told a CBP officer of their fear of return, fewer than half were referred for a credible fear interview before being summarily removed.  *See* Human Rights Watch, *You Don't Have Rights Here* (2014), https://bit.ly/1GocBhZ ("[S]ome said that US border officials ignored their expressions of fear and removed them with no opportunity to have their claims examined; others said border officials acknowledged hearing their expressions of fear but pressured them to abandon their claims.").

73.    Other reports have reached the same conclusion.  *See, e.g.*, Borderland Report, at 12 ("CBP and Border Patrol officers in the El Paso Sector routinely and intentionally discourage people from seeking asylum.  In 12% of the cases documented for this report, individuals expressing fear of violence upon return to their country of origin were not processed for credible fear screenings and instead, were placed into removal proceedings."); Letter from Nat'l Immigrant Justice Ctr. et al. to U.S. Dep't of Homeland Sec. Office of Civil Rights & Civil Liberties & Office of the Inspector Gen. at 12-22  (Nov. 13, 2014), https://bit.ly/1xfFsog (explaining that "[w]hen applicants express fears, CBP officials fail to capture those statements in the required documentation or include mistaken information," and providing numerous stories of asylum seekers affected by CBP's failures during the inspections stage of expedited removal).

   *Flaws in the Credible Fear Asylum Process*

74.    Even where asylum applicants are referred for a credible fear interview, there are serious flaws in the government's credible fear procedures.

75.    Although the credible fear procedures provide greater safeguards for asylum seekers than for other noncitizens placed into expedited removal, the procedures are inadequate given the complexity of asylum law and the fact that an overwhelming number of applicants are traumatized, do not speak English, and are afraid to be candid at their interviews, especially women and children.

76.    For example, the asylum officer need not create a transcript or audio recording of what occurred at the credible fear interview, a particularly glaring procedural deficiency given the translation problems and misunderstandings that routinely occur in asylum cases.  Instead, the asylum officer must create only a written summary of the "material facts," 8 C.F.R. § 208.30(d)(6), *see also* 8 USC § 1225(b)(1)(B)(iii)(II), and a written record of "the officer's analysis of why, in light of [the] facts, the alien has not established a credible fear of persecution."  8 U.S.C. § 1225(b)(1)(B)(iii)(II).

77.    And, although the asylum officer is required to "determine that the alien has an understanding of the credible fear determination process," 8 C.F.R. § 208.30(d)(2), the government's policies fail to require that the asylum officer or immigration judge assess individuals to ensure that they are mentally competent and have the capacity to meaningfully participate in the credible fear process; they also fail to require additional safeguards should an individual be found to have competency or capacity issues.

78.    Further, although the government recognizes that there is a right before and during the asylum officer interview to consult with a third party, 8 C.F.R. § 208.30(d)(4), the government's policies do not recognize a right to representation by counsel.  Nor do the

government's policies recognize a right to counsel prior to or during the IJ review hearing of a determination that credible fear has not been shown.  As a result, the government's policies do not guarantee an individual the right to be represented by her own counsel, who could help the individual identify and articulate the key facts relevant to a claim of persecution or torture, which is particularly important given the specialized nature of asylum and protection claims.

79.     Significantly, although the credible fear standard allows the decision maker to consider "such other facts as are known to the officer," 8 U.S.C. § 1225(b)(1)(B)(v), the government's policies do not impose any requirement that the asylum officer or IJ fully disclose to the individual all of the other facts that were considered, nor is there any requirement that the individual be given an opportunity to respond to those other facts.

80.     Although during the IJ review stage the judge "may receive into evidence any oral or written statement which is material and relevant to any issue in the review," 8 C.F.R. § 1003.42(c), at no point in the process do the government's credible fear policies provide an adequate opportunity to *gather* evidence, including articles or expert testimony which could address country conditions and other key factual questions, such as whether the noncitizen is a member of a particular social group that is being targeted for persecution, or whether the government in their country of origin is unable or unwilling to protect them.

81.     The procedures are further flawed because, for the many individuals who are forced to proceed *pro se*, there is no obligation for the asylum officer or immigration judge to fully develop the record or advise the individual about what he or she must prove to prevail.

82.     That the government's credible fear policies are inadequate is reinforced by the widespread evidence of failures in the credible fear process.  For example, advocates "regularly learn of reports of legitimate asylum seekers who are denied 'credible fear'—and the chance to

21

even file an application for asylum—even though they should meet the standard and may be eligible for asylum.  In some cases, interviews are sometimes rushed, essential information is not identified due to lack of follow up questions, and/or other mistakes are made that block genuine asylum seekers from even applying for asylum and having a real chance to submit evidence and have their case fully considered."  Hearing before the H. Judiciary Subcomm. on Immigration & Border Sec. at 5 (Feb. 11, 2015) (statement of Eleanor Acer, Dir., Refugee Protection, Human Rights First) ("Acer Statement"), http://bit.ly/4jjW0au; *see, e.g.*, Letter from Am. Immigration Lawyers Ass'n, et al. to Leon Rodríguez, Dir., U.S. Citizenship & Immigration Servs., and Sarah Saldaña, Dir., U.S. Immigration & Customs Enforcement 2-4 (Dec. 24, 2015) ("AILA Letter"), https://bit.ly/2Yr3DWF ("USCIS' negative fear determinations are often flawed, with numerous substantive problems evident in the transcripts of initial fear interviews.").  In some cases, mothers are called upon to reveal sensitive details of the persecution they faced—including physical or sexual violence or abuse at the hands of other family members—with their children present at their interviews; as a result, critical information is often omitted during these interviews.

83.    These flaws are compounded by the lack of access to counsel.  Few individuals in the credible fear process have the assistance of counsel or any other representative.  Those that do often cannot be effectively represented due to restrictions on attorney participation and lack of notice of key proceedings.  *See, e.g.*, AILA Letter at 3 (explaining that immigration judge review of credible fear determinations "seldom involves attorney participation" because attorneys receive notice of hearings either not at all, or with too little time to prepare and attend such hearings).

84.    There are well-documented systematic inadequacies in interpretation services during the expedited removal process.  *See, e.g.*, *Report of the DHS Advisory Committee on Family Residential Centers* 96-99 (2016), https://bit.ly/2yFluu0 (discussing inadequate or nonexistent interpretation services during credible fear interviews and immigration judge reviews of negative credible fear determinations); Borderland Report at 13; 2016 USCIRF Study, at 28 (describing denial of interpretation); Acer Statement at 6 (same).

### *Erroneous Expedited Removals*

85.    The result of the widespread flaws in the expedited removal process is that many individuals have been erroneously removed from the United States.

86.    DHS has removed multiple U.S. citizens pursuant to expedited removal orders. *See Lyttle v. United States*, 867 F. Supp. 2d 1256, 1272-73 (M.D. Ga. 2012) (U.S. citizen erroneously issued expedited removal order); *de la Paz v. Johnson*, No. 1:14-CV-016 (S.D. Tex.) (habeas petition filed Jan. 24, 2014) (U.S. citizen erroneously subjected to expedited removal); Ian James, *Wrongly Deported, American Citizen Sues INS for $8 Million*, L.A. Times (Sept. 3, 2000), https://tinyurl.com/y4uulrds (recounting expedited removal of U.S. citizen Sharon McKnight).

87.    DHS also has erroneously removed numerous asylum seekers pursuant to expedited removal orders.  *See Human Rights Watch*, You Don't Have Rights Here, https://bit.ly/1GocBhZ; Letter from Nat'l Immigrant Justice Ctr. et al. to U.S. Dep't of Homeland Sec. Office of Civil Rights & Civil Liberties & Office of the Inspector Gen. at 16-18  (Nov. 13, 2014), https://bit.ly/1xfFsog.

88.    Defendants are aware of the flaws in the expedited removal and credible fear processes, including the lack of procedural protections.  Nevertheless, Defendants have acted to

expand a systematically deficient process to an even larger category of individuals, without

taking steps to address these well-documented problems.

89.    Under the 2025 Rule's expansion of the expedited removal process, any

individual apprehended anywhere in the country could be erroneously subjected to these

truncated and flawed procedures and mistakenly deported without a meaningful hearing.  Indeed,

the application of expedited removal to the interior of the country—far from the border—

increases the likelihood that citizens, noncitizens with lawful status, and noncitizens who have

lived in the country for years or decades and are therefore eligible for relief from removal, will

be swept up in raids or other enforcement actions and mistakenly or arbitrarily subjected to

expedited removal.  Applying expedited removal to noncitizens who have significant ties to the

United States and have resided in communities across the country for extended periods will

exacerbate the existing widespread, systemic violations of constitutional, statutory, and

regulatory rights in the expedited removal process.

**E.    Overbroad Application of 8 U.S.C. § 1182(a)(7)**

90.    Expedited removal only applies to noncitizens who are inadmissible on one of

two specified grounds:  8 U S.C. § 1182(a)(6)(C), which applies to those who seek to procure

immigration status or citizenship via fraud or false representations, or § 1182(a)(7), which

applies to noncitizens who, "at the time of application for admission," fail to satisfy certain

documentation requirements.  8 U.S.C. § 1225(b)(1)(A)(1). If DHS seeks to remove noncitizens

based on other grounds, they must afford the noncitizen a full hearing before an immigration

judge. *See* 8 C.F.R. § 235.3(b)(1), (3).

91.    Defendants construe 8 U.S.C. § 1182(a)(7) to encompass *all* noncitizens present

in the United States without having been admitted. Under Defendants' view, therefore, they can

apply expedited removal to noncitizens apprehended in the interior of the country by charging them with inadmissibility under § 1182(a)(7), as long as the noncitizen cannot demonstrate two years of continuous physical presence.

92.    Defendants' construction of § 1182(a)(7) is incorrect.  The statute's text, context, and history demonstrate that § 1182(a)(7) applies only to those noncitizens who lack documentation at the moment of applying for entry at the border, and not to noncitizens already present inside the country.

93.    Defendants may only apply the expanded scope of expedited removal to those found inadmissible under § 1182(a)(6)(C).

**F.    Harm to Plaintiffs.**

94.    MRNY is a nonprofit membership-based organization whose mission includes providing immigration assistance and legal services to members and community members.

95.    MRNY is a nonprofit, membership-based community organization that integrates adult and youth education, legal and survival services, and community and civic engagement, in a holistic approach to help low-income New Yorkers improve their lives and neighborhoods. MRNY has five offices in the New York area, located in Brooklyn, Queens, Staten Island, and in Suffolk and Westchester Counties.

96.    MRNY has over 28,000 members residing in New York City, Westchester County, and Long Island.  Its members are overwhelmingly drawn from Spanish-speaking immigrant communities.

97.    Members include noncitizens who have not been admitted to the United States and who have been continuously present for between two weeks and two years, and are thus subject to the 2025 Rule expanding expedited removal.

25

98.    For example, MRNY-John Doe 1 is a member of MRNY and a noncitizen.  He entered the United States without inspection in July 2023, and has been in the country since then. He is not in removal proceedings and does not have a final order of removal.

99.    MRNY-John Doe 2 is a member of MRNY and a noncitizen.  He entered the United States without inspection in December 2023, and has been in the country since then. He is not in removal proceedings and does not have a final order of removal. He filed a timely application for affirmative asylum with USCIS, which remains pending.

100.    MRNY-John Doe 3 is a member of MRNY and a noncitizen. He entered the United States without inspection in October 2023, and has been in the country since then. He is in removal proceedings and does not have a final order of removal.

101.    MRNY-Jane Doe 1 is a member of MRNY and a noncitizen. She entered the United States without inspection in August 2023 and has been in the country since then. An Immigration Judge dismissed her removal proceedings. She is not in removal proceedings and does not have a removal order.

102.    MRNY also has numerous members who have lived in the country for longer than two years, but would have difficulty affirmatively demonstrating two years of physical presence, particularly if suddenly detained or given only a short period of time to do so, as is regularly the case when expedited removal orders are issued.

103.    Members of MRNY live in areas where encounters with ICE officers and detention by ICE are common. ICE officers actively detain noncitizen New Yorkers, including at check-in appointments with ICE and in the course of ICE enforcement actions, both as the targets of such actions and as collateral arrests.

104.     The Trump Administration has announced an intent to concentrate ICE enforcement activity in jurisdictions like New York, which have taken steps to protect noncitizen community members.  ICE engaged in widespread raids and detentions in and around New York City from 2017 to 2020.

105.     As a result of their expedited removal orders, Mary and her son, John, have been removed to Mexico and face a five-year bar on returning to the United States.

106.     All of the foregoing allegations are incorporated into each of the following claims for relief as if fully set forth therein.

## FIRST CLAIM FOR RELIEF

### (Violation of the Due Process Clause of the Fifth Amendment to the United States Constitution)

107.     The Due Process Clause of the Fifth Amendment provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law. . . ."

108.     Plaintiffs' members who are at risk of being subjected to expedited removal under the new Rule are entitled under the Due Process Clause to meaningful process before they can be removed from the country.

109.     The Rule and January 23 Guidance violate the Due Process Clause.

## SECOND CLAIM FOR RELIEF

### (Violation of the Immigration and Nationality Act, 8 U.S.C. § 1182(a)(7); Administrative Procedure Act, 5 U.S.C. § 706(2); 8 U.S.C. § 1252(e)(3))

110.     8 U.S.C. § 1225(b)(1)(A)(i) provides that a noncitizen who is "inadmissible under [8 U.S.C. §] 1182(a)(7)" may be issued an expedited removal order.

111.     8 U.S.C. § 1182(a)(7) renders inadmissible any noncitizen who "at the time of application for admission" is not in possession of a valid visa or other legal permission to enter.

27

112.    An individual present in the interior is not inadmissible under 8 U.S.C.

§ 1182(a)(7) because "at the time of application for admission" denotes the time when a

noncitizen seeks permission to enter United States territory.

113.    The Rule violates the INA and is "not in accordance with law" and "in excess of

statutory . . . authority" under the APA, 5 U.S.C. §§ 706(2)(A), (C), because it extends authority

to place into expedited removal individuals in the interior of the United States who have been

physically present for up to two years based on a determination that they are inadmissible under

8 U.S.C. § 1182(a)(7).  Such individuals may not be found inadmissible on this ground because

they have already entered the United States.

### THIRD CLAIM FOR RELIEF

**(Violation of the Immigration and Nationality Act, 8 U.S.C. § 1225(a), (b)(1);
Administrative Procedure Act, 5 U.S.C. § 706(2); 8 U.S.C. § 1252(e)(3))**

114.    The expansion of expedited removal denies people a meaningful process before

they are removed from the United States.  A meaningful process includes, *inter alia*, an

opportunity to gather evidence necessary to establish they are not inadmissible and have been

continuously present in the United States for more than two years, an opportunity to consult or

rely on the aid of others, including counsel, an opportunity to assert and present evidence that

they are not lawfully subject to expedited removal, and an opportunity to meaningfully contest

the termination or dismissal of removal proceedings.

115.    The Rule and January 23 Guidance violate the Immigration and Nationality Act, 8

U.S.C. §§ 1225(a), (b)(1) because the statute must be interpreted to provide minimal procedures

to persons faced with expedited removal, to ensure that the process is administered fairly and not

applied to persons who are not lawfully subject to expedited removal. The expedited removal

statute must be interpreted to provide this meaningful process, since otherwise it would violate the Constitution.

116.    Therefore, the Rule and January 23 Guidance violate the APA because they are, *inter alia*, "not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," and "without observance of procedure required by law . . . ." 5 U.S.C. § 706(2)(A), (C), (D).

## FOURTH CLAIM FOR RELIEF

### (Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A))

117.    The APA provides that courts "shall . . . hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

118.    Among other reasons, the Rule and January 23 Guidance are arbitrary and capricious because, in adopting it, Defendants have failed to articulate a reasoned explanation for their decision, which represents a change in the agency's longstanding policy; entirely failed to consider important aspects of the problem; and offered explanations for their decision that run counter to the evidence before the agency.

## FIFTH CLAIM FOR RELIEF

### (Violation of the Administrative Procedure Act, 5 U.S.C. § 553)

119.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

120.    The Administrative Procedure Act, 5 U.S.C. § 553, requires that agencies provide public notice of, and opportunity to comment on, legislative rules before their promulgation.  *See*

5 U.S.C. §§ 553(b), (c).  The APA also requires that any substantive rule must be published at least 30 days prior to its effective date.  *See* 5 U.S.C. § 553(d).

121.    Although styled as a "Notice," the Rule is a legislative rule within the meaning of the APA.

122.    DHS did not comply with the APA's procedural requirements when it made the Rule immediately effective upon publication.

123.    Defendants' failure to provide for notice and comment violates 5 U.S.C. §§ 553(b) and (c).

124.    Defendants' failure to publish the Rule 30 days before its effective date violates 5 U.S.C. § 553(d).

## SIXTH CLAIM FOR RELIEF

### (Violation of the Immigration and Nationality Act, 8 U.S.C. §§ 1158, 1225(b)(1); 8 C.F.R. § 208; Administrative Procedure Act, 5 U.S.C. § 706(2); 8 U.S.C. § 1252(e)(3))

125.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

126.    The INA, including 8 U.S.C. §§ 1158 and 1225(b)(1)(A), and its implementing regulations, 8 C.F.R. § 208.1, *et seq.*, grant noncitizens in the United States who are not in removal proceedings the right to file their asylum applications with USCIS. Such applications are known as "affirmative" applications, in contrast to "defensive" applications that are filed in removal proceedings. A noncitizen who properly files an affirmative application is entitled to present their claim before a USCIS officer in a non-adversarial setting, and to have that claim adjudicated. If the USCIS officer denies the asylum application, at that point the noncitizen may be referred to removal proceedings.

JA-386

127.    The INA and its implementing regulations do not permit the expedited removal of noncitizens who entered without inspection and have filed affirmative asylum applications with USCIS.

128.    By authorizing the expansion of expedited removal to such noncitizens who have filed affirmative applications for asylum, the Rule and January 23 Guidance are in excess of statutory and regulatory authority and contrary to law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully pray this Court to:

a.    Declare the Rule and January 23 Guidance unconstitutional and contrary to law;

b.    Enter an order vacating the Rule and January 23 Guidance;

c.    Enter an order enjoining and staying Defendants from continuing to apply expedited removal to noncitizens who have been present in this country for longer than 14 days, or who have been apprehended farther than 100 miles from the border;

d.    Declare Mary and John's expedited removal orders illegal, vacate the orders, and grant further relief allowing them to return to the United States;

e.    Award Plaintiffs' counsel reasonable attorneys' fees under the Equal Access to Justice Act, and any other applicable statute or regulation; and

f.    Grant such further relief as the Court deems just, equitable, and appropriate.

Dated: March 22, 2025            Respectfully submitted,

/s/ *Anand Balakrishnan*

Cody Wofsy (D.D.C. Bar No. CA00103)
Stephen B. Kang (D.D.C. Bar No. CA00090)        Anand Balakrishnan
Morgan Russell                                  Lee Gelernt (D.D.C. Bar No. NY0408)
Hannah Steinberg                                Omar C. Jadwat
American Civil Liberties Union Foundation        Sidra Mahfooz

31

JA-387

Immigrants' Rights Project
425 California Street, Suite 700
San Francisco, CA 94104
(415) 343-0770
*cwofsy@aclu.org*
*skang@aclu.org*
*mrussell@aclu.org*
*hsteinberg@aclu.org*

Amy Belsher
Robert Hodgson
New York Civil Liberties Union Foundation
125 Broad St., 19th Floor
New York, NY 10004
(212) 607-3300
*abelsher@nyclu.org*
*rhodgson@nyclu.org*

Grace Choi
American Civil Liberties Union Foundation
Immigrants' Rights Project
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2660
*abalakrishnan@aclu.org*
*lgelernt@aclu.org*
*ojadwat@aclu.org*
*smahfooz@aclu.org*
*gchoi@aclu.org*

Arthur B. Spitzer (D.C. Bar No. 235960)
Aditi Shah*
American Civil Liberties Union Foundation of
the District of Columbia
529 14th Street, NW, Suite 722
Washington, D.C. 20045
(202) 457-0800
*aspitzer@acludc.org*
*ashah@acludc.org*

*Attorneys for Plaintiffs*
* *Admitted to practice in the District of
Columbia; D.C. Bar No. pending*

32