ORAL ARGUMENT SCHEDULED FOR DECEMBER 9, 2025

No. 25-05320

# United States Court of Appeals
# for the
# District of Columbia Circuit

_____

MAKE THE ROAD NEW YORK, et al.,

*Plaintiffs-Appellees*

v.

KRISTI NOEM, et al.,

*Defendants-Appellants*

_____

Appeal From the United States District Court for the District of Columbia
Case No. 1:25-cv-190-JMC (Hon. Jia M. Cobb)

_____

**BRIEF FOR APPELLEE**

_____

Morgan Russell
Hannah Steinberg
Michael K.T. Tan
Cody Wofsy
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
425 California Street, Suite 700
San Francisco, CA 94104
(415) 343-0770
*mrussell@aclu.org*
*hsteinberg@aclu.org*
*m.tan@aclu.org*
*cwofsy@aclu.org*

Lucia Goin
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
915 15th Street NW
Washington, DC 20005
(212) 549-2500
*lgoin@aclu.org*

Amy Belsher
Robert Hodgson
NEW YORK CIVIL LIBERTIES UNION
FOUNDATION
125 Broad St., 19th Floor
New York, NY 10004
(212) 607-3300
*abelsher@nyclu.org*
*rhodgson@nyclu.org*

Anand Balakrishnan
*Counsel of Record*
Grace Choi
Sidra Mahfooz
Omar C. Jadwat
Lee Gelernt
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2660
*abalakrishnan@aclu.org*
*gchoi@aclu.org*
*smahfooz@aclu.org*
*ojadwat@aclu.org*
*lgelernt@aclu.org*

Arthur B. Spitzer
Aditi Shah
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF THE DISTRICT OF
COLUMBIA
529 14th Street, NW, Suite 722
Washington, D.C. 20045
(202) 457-0800
*aspitzer@acludc.org*
*ashah@acludc.org*

*Attorneys for Plaintiffs-Appellees*

## <u>CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES</u>

Pursuant to D.C. Circuit Rule 28(a)(1), counsel for Plaintiffs-Appellees certifies that all information concerning parties and intervenors appearing for purposes of the present appeal, the rulings under review, and related cases are included in the Emergency Motion for Stay Pending Appeal. *See* Doc. No. 2133998. Amicus Federation for American Immigration Reform has appeared in support of Defendants-Appellants.

<div style="margin-left:40%">

*/s/ Anand Balakrishnan*
Anand Balakrishnan
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2660
*abalakrishnan@aclu.org*

</div>

## **TABLE OF CONTENTS**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ..............i

GLOSSARY.................................................................................................... xiii

INTRODUCTION ................................................................................................1

JURISDICTIONAL STATEMENT ....................................................................3

BACKGROUND .................................................................................................3

I.      The Expedited Removal System.................................................................3

II.     The 2019 Designation and Its Rescission..................................................6

III.    Defendants' Current Expansion of Expedited Removal ................................8

IV.     Proceedings Below .....................................................................................8

SUMMARY OF ARGUMENT .........................................................................11

LEGAL STANDARD .......................................................................................13

ARGUMENT ....................................................................................................13

I.      The Designation and Huffman Memorandum Likely Violate Due Process. 13

        A.      A Weighty Liberty Interest Is At Stake..............................................14

        B.      *Mathews* Applies. ..............................................................................23

        C.      The Risk of Erroneous Deprivation Is Unacceptably High. ...............24

                1.      Inadequate Process to Evaluate Continuous Presence..............26

                2.      Unacceptable Risk of Removal to Persecution or Torture. ......32

        D.      The Government's Interests Do Not Outweigh the Strong Need for Additional Safeguards. ........................................................................34

        E.      Defendants' *Salerno* Argument Fails.................................................37

II.     The Action Was Timely. ..........................................................................39

III.   8 U.S.C. § 1252(f)(1) Does Not Bar Relief. ..................................................40

IV.   The Equities Favor Relief. ...........................................................................46

V.   The Scope of Relief Is Proper ......................................................................48

CONCLUSION ....................................................................................................56

# TABLE OF AUTHORITIES

**Cases**

*A.A.R.P. v. Trump*,
  605 U.S. 91 (2025)............................ 2, 14, 15, 16, 21, 22, 26, 29, 34, 36, 37, 48

*All. for Hippocratic Med. v. FDA*,
  78 F.4th 210 (5th Cir. 2023) ..................................................42, 50

*Am. Soc. for Prevention of Cruelty to Animals v. Feld Ent., Inc.*,
  659 F.3d 13 (D.C. Cir. 2011) .....................................................37, 38

*Ardestani v. INS*,
  502 U.S. 129 (1991)................................................................23, 35

*Awad v. Obama*,
  608 F.3d 1 (D.C. Cir. 2010) ..........................................................13

*Bennett v. Spear*,
  520 U.S. 154 (1997)......................................................................37

*Biden v. Texas*,
  597 U.S. 785 (2022)................................................................40, 41

*Boumediene v. Bush*,
  553 U.S. 723 (2008)......................................................................22

*Bowen v. Massachusetts*,
  487 U.S. 879 (1988)......................................................................50

*Bridges v. Wixon*,
  326 U.S. 135 (1945)......................................................................22

*Cabrera v. U.S. Dep't of Labor*,
  No. 25-cv-1909, 2025 WL 2092026 (D.D.C. July 25, 2025)............................51

*California v. Arizona*,
  452 U.S. 431 (1981)......................................................................44

*Career Colls. & Schs. of Tx. v. U.S. Dep't of Educ.*,
  98 F.4th 220 (5th Cir. 2024) ......................................................51, 52

*Carey v. Piphus*,
  435 U.S. 247 (1978)................................................................16

*Castillo Lachapel v. Joyce*,
  No. 25-cv-4693, 2025 WL 1685576 (S.D.N.Y. June 16, 2025).......................25

*Chogllo Chafla v. Scott*,
  No. 2:25-cv-437, 2025 WL 2531027 (D. Me. Sept. 2, 2025) .........................25

*City of Chicago v. Morales*,
  527 U.S. 41 (1999)................................................................37

*Co Tupul v. Noem*,
  No. 25-cv-2748, 2025 WL 2426787 (D. Ariz. Aug. 4, 2025) ..........................25

*Coal. for Humane Immigrant Rts. v. Noem*,
  No. 25-5289 (docketed Aug. 11, 2025) ............................................21

*Coal. for Humane Immigrant Rts. v. Noem*,
  No. 25-cv-872, 2025 WL 2192986 (D.D.C. Aug. 1, 2025).............20, 42, 51, 55

*Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr.*
  *for S. Cal.*,
  508 U.S. 602 (1993)................................................................36

*Corner Post, Inc. v. Bd. of Governors of Fed. Reserve Sys.*,
  603 U.S. 799 (2024)..........................................................49, 50, 51

*Cuomo v. NRC*,
  772 F.2d 972 (D.C. Cir. 1985)....................................................13

*Darby v. Cisneros*,
  509 U.S. 137 (1993)................................................................53

*Dep't of State v. Munoz*,
  602 U.S. 899 (2024)................................................................15

*DHS v. Thuraissigiam*,
  591 U.S. 103 (2020)..............................................17, 18, 19, 21, 22

*In re Directives Pursuant to Section 105B of Foreign Intel.*
  *Surveillance Act*,
  551 F.3d 1004 (Foreign Int. Surv. Ct. Rev. 2008)................................38

*District of Columbia v. U.S. Dep't of Agric.*,
   444 F. Supp. 3d 1 (D.D.C. 2020).......................................................51

*Domingo-Ros v. Archambeault*,
   2025 WL 1425558 (S.D. Cal. May 18, 2025) ...................................25

*Dunlap v. Presidential Advisory Comm'n on Election Integrity*,
   944 F.3d 945 (D.C. Cir. 2019).............................................................3

*Dusenbery v. United States*,
   534 U.S. 161 (2002).............................................................................23

*Garland v. Aleman Gonzalez*,
   596 U.S. 543 (2022).....................................................................41, 43

*Gordon v. Holder*,
   632 F.3d 722 (D.C. Cir. 2011).............................................................46

*Grace v. Barr*,
   965 F.3d 883 (D.C. Cir. 2020).............................................................38

*Griffin v. HM Florida-ORL, LLC*,
   144 S. Ct. 1 (2023).............................................................................51

*In re GTE Serv. Corp.*,
   762 F.2d 1024 (D.C. Cir. 1985).........................................................50

*Hernandez Torrealba v. DHS*,
   No. 1:25-cv-1621, 2025 WL 2444114 (N.D. Ohio Aug. 25, 2025) .................25

*I.A.M. Nat'l Pension Fund Benefit Plan A v. Cooper Indus., Inc.*,
   789 F.2d 21 (D.C. Cir. 1986).................................................................3

*Immigrant Defs. L. Ctr. v. Noem*,
   145 F.4th 972 (9th Cir. 2025) ........................................................3, 42

*INS v. Cardoza-Fonseca*,
   480 U.S. 421 (1987).............................................................................23

*Jarkesy v. S.E.C.*,
   803 F.3d 9 (D.C. Cir. 2015).................................................................39

*Jazz Pharms., Inc. v. Kennedy*,
    141 F.4th 254 (D.C. Cir. 2025)............................................................23

*Kaplan v. Tod*,
    267 U.S. 228 (1925)............................................................20

*Kaweesa v. Gonzales*,
    450 F.3d 62 (1st Cir. 2006)............................................................23

*Khan v. Holder*,
    608 F.3d 325 (7th Cir. 2010) ....................................................24, 27

*Landon v. Plasencia*,
    459 U.S. 21 (1982)............................................................21, 22

*Leng May Ma v. Barber*,
    357 U.S. 185 (1958)............................................................20

*Lewis v. Casey*,
    518 U.S. 343 (1996)............................................................31

*Matter of Lujan-Quintana*,
    25 I&N Dec. 53 (BIA 2009) ..................................................7

*Lyttle v. United States*,
    867 F. Supp. 2d 1256 (M.D. Ga. 2012) ............................................7

*Make the Rd. N.Y. v. Wolf*,
    962 F.3d 612 (D.C. Cir. 2020)..................................................7, 39

*Mathews v. Eldridge*,
    424 U.S. 319 (1976)............................................................10, 36

*Mexichem Specialty Resins, Inc. v. EPA*,
    787 F.3d 544 (D.C. Cir. 2015)..................................................50

*Mullane v. Central Hanover Bank & Trust Co.*,
    339 U.S. 306 (1950)............................................................16, 23

*NAACP v. Alabama ex rel. Patterson*,
    357 U.S. 449 (1958)............................................................55

*Nat'l Insts. of Health v. Am. Pub. Health Ass'n*,
  145 S. Ct. 2658 (2025) .................................................................49

*Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*,
  145 F.3d 1399 (D.C. Cir. 1998) .................................................50

*In re Navy Chaplaincy*,
  697 F.3d 1171 (D.C. Cir. 2012) .................................................31

*Ng Fung Ho v. White*,
  259 U.S. 276 (1922) ...................................................................23

*Nishimura Ekiu v. United States*,
  142 U.S. 651 (1892) .......................................................17, 18, 20

*Nken v. Holder*,
  556 U.S. 418 (2009) .............................................3, 13, 37, 43, 44, 45

*Orellana Juarez v. Moniz*,
  788 F. Supp. 3d 61 (D. Mass. 2025) ..........................................25

*Potter v. District of Columbia*,
  558 F.3d 542 (D.C. Cir. 2009) ..................................................30

*Propert v. District of Columbia*,
  948 F.2d 1327 (D.C. Cir. 1991) ...........................................24, 36

*Reno v. American-Arab Anti-Discrimination Comm.*,
  525 U.S. 471 (1999) ...................................................................41

*Reno v. Flores*,
  507 U.S. 292 (1993) ...................................................................15

*Shaughnessy v. U.S. ex rel. Mezei*,
  345 U.S. 206 (1953) .............................................................14, 20

*Shawnee Tribe v. Mnuchin*,
  984 F.3d 94 (D.C. Cir. 2021) ....................................................48

*Tamay v. Scott*,
  No. 2:25-cv-438, 2025 WL 2507011 (D. Me. Sept. 2, 2025) ............25

*Texas v. United States*,
    40 F.4th 205 (5th Cir. 2022) ...............................................42

*Town of Chester, N.Y. v. Laroe Ests., Inc.*,
    581 U.S. 433 (2017)...............................................................31

*Trump v. CASA, Inc.*,
    606 U.S. 831 (2025)...................................................48, 49, 52

*Trump v. J.G.G.*,
    604 U.S. 670 (2025)...................................................15, 16, 26

*United States ex rel. Turner v. Williams*,
    194 U.S. 279 (1904)...............................................................19

*United States v. Bronstein*,
    849 F.3d 1101 (D.C. Cir. 2017)............................................43

*United States v. Ochoa-Oregel*,
    904 F.3d 682 (9th Cir. 2018) ..................................................7

*United States v. Salerno*,
    481 U.S. 739 (1987)...............................................................37

*Wash. State Grange v. Wash. State Republican Party*,
    552 U.S. 442 (2008)...............................................................37

*West Virginia v. EPA*,
    577 U.S. 1126 (2016).............................................................51

*Yamataya v. Fisher*,
    189 U.S. 86 (1903).................................................2, 14, 15, 20

*Yiu Fong Cheung v. INS*,
    418 F.2d 460 (D.C. Cir. 1969)..............................................35

*Zadvydas v. Davis*,
    533 U.S. 678 (2001).................................................17, 20, 22

**Statutes**

5 U.S.C. § 702 ...............................................................................53

5 U.S.C. § 705 .................................................................................10, 12, 40, 50

5 U.S.C. § 706 .................................................................................12, 42

5 U.S.C. § 706(2) .............................................................................50

8 U.S.C. § 1105a ..............................................................................4

8 U.S.C. § 1182(a)(6)(C) ..................................................................4

8 U.S.C. § 1182(a)(7) .......................................................................4

8 U.S.C. § 1225(b)(1) .......................................................................4

8 U.S.C. § 1225(b)(1)(A)(i) ..............................................................4

8 U.S.C. § 1225(b)(1)(A)(ii) .............................................................4

8 U.S.C. § 1225(b)(1)(A)(iii)(I) .......................................................6

8 U.S.C. § 1225(b)(1)(A)(iii)(II) ......................................................6

8 U.S.C. § 1225(b)(1)(B)(ii) .............................................................5

8 U.S.C. § 1225(b)(1)(B)(iii)(II) .......................................................5

8 U.S.C. § 1225(b)(1)(B)(iii)(III) .....................................................5, 6

8 U.S.C. § 1225(b)(1)(B)(iv) .............................................................32

8 U.S.C. § 1225(b)(1)(B)(v) ..............................................................5

8 U.S.C. § 1225(b)(1)(C) ..................................................................4

8 U.S.C. § 1252 ................................................................................4

8 U.S.C. § 1252(a)(2)(A) ..................................................................38

8 U.S.C. § 1252(e)(1)(A) ..................................................................45

8 U.S.C. § 1252(e)(3)........................................................12, 37, 38, 48, 53

8 U.S.C. § 1252(e)(3)(A)(ii) .............................................................40

8 U.S.C. § 1252(e)(3)(B) ..................................................................39

8 U.S.C. § 1252(f) ..................................................................... 3

8 U.S.C. § 1252(f)(1) ...............................................12, 40, 41, 42, 45

8 U.S.C. § 1252(f)(2) .............................................................. 44

28 U.S.C. § 1292(a)(1) ........................................................... 3

## Rules and Regulations

8 C.F.R. § 208.30(f) ............................................................... 5

8 C.F.R. § 242.16(a) .............................................................. 4

84 Fed. Reg. 35409 ............................................................... 7

87 Fed. Reg. 16022 ............................................................... 8

90 Fed. Reg. 8139 .............................................................8, 55

90 Fed. Reg. 13033 .............................................................. 17

Fed. R. Civ. P. 65 ...............................................................44

*Implementation Guidance for January 2025 Federal Register Notice,
   Designating Aliens for Expedited Removal* (Feb. 28, 2025), U.S.
   Immigr. & Customs Enf't, https://perma.cc/F32Y-NJ8R ...........................29, 30

## Other Authorities

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation
   of Legal Texts* 176-77 (2012) ...............................................43

Bryan A. Garner,
   *Garner's Dictionary of Legal Usage* 294-96 (3d ed. 2011) ...............................44

Camilo Montoya-Galvez, *Border Patrol Takes Lead Role in Trump
   Administration's Chicago Crackdown, Carrying Out More Arrests
   Than ICE*, CBS News (Oct. 30, 2025), https://perma.cc/KA3H-
   Y64J ........................................................................30

FOIA ICE Library, U.S. Immigr. & Customs Enf't,
https://perma.cc/R5U9-WFAE .............................................................29

Memorandum from Benjamine C. Huffman, Acting DHS Secretary, to
Caleb Vitello, Acting ICE Director, Guidance Regarding How to
Exercise Enforcement Discretion (Jan. 23, 2025),
https://perma.cc/W3CL-SNDN, JA-192-193 .......................................8

Mila Sohoni, *The Power to Vacate a Rule*, 88 Geo. Wash. L. Rev.
1121 (2020).......................................................................................50

Nicole Foy, *We Found That More Than 170 U.S. Citizens Have Been
Held by Immigration Agents*, ProPublica (Oct. 16, 2025),
https://perma.cc/MM9Z-XQ7W .........................................................25

Reuel E. Schiller, *Rulemaking's Promise: Administrative Law and
Legal Culture in the 1960s and 1970s*, 53 Admin. L. Rev. 1139,
1145 (2001).......................................................................................53

# **GLOSSARY**

| | |
|---|---|
| 2019 Designation | Designating Aliens for Expedited Removal, 84 Fed. Reg. 35409 (July 23, 2019) |
| APA | Administrative Procedure Act |
| Designation | Designating Aliens for Expedited Removal, 90 Fed. Reg. 8139 (Jan. 21, 2025), JA 190-91 |
| DHS | U.S. Department of Homeland Security |
| Guidance | *Implementation Guidance for January 2025 Federal Register Notice, Designating Aliens for Expedited Removal*, U.S. Immigr. & Customs Enf't (Feb. 28, 2025), https://perma.cc/F32Y-NJ8R |
| Huffman Memorandum | Memorandum from Benjamine C. Huffman, Acting DHS Secretary, to Caleb Vitello, Acting ICE Director, *Guidance Regarding How to Exercise Enforcement Discretion* (Jan. 23, 2025), https://perma.cc/W3CL-SNDN, JA-192-193 |
| ICE | U.S. Immigration and Customs Enforcement |
| INA | Immigration and Nationality Act |
| JA | Joint Appendix |
| MRNY | Plaintiff Make the Road New York |

# **INTRODUCTION**

Expedited removal places the power to deport noncitizens in the hands of low-level immigration enforcement officers. The process can occur within hours, with no opportunity for the noncitizen to contact anyone, let alone a lawyer; no opportunity to challenge the officer's determinations; and no advance notice of the charges of removal or the showings required to receive a full hearing.

Since its creation in 1996 as a limited alternative to full removal proceedings, expedited removal has been used at or near the border, and only for people present for less than fourteen days. Even there, the lack of process and oversight has resulted in recurring errors and erroneous removals.

Defendants' decision to expand expedited removal nationwide to noncitizens living in the United States for up to two years creates an intolerable risk of erroneous deportations. And as the district court found, it has already caused many such errors, inflicting grave harm on families and communities across the country. Defendants have detained noncitizens—including those who have dutifully appeared for their immigration court hearings—and summarily removed them without any meaningful opportunity to contest whether they are lawfully subject to expedited removal. As a result, two of the Plaintiffs below who lived in this country for a decade were unlawfully deported. Other noncitizens who have lived here for even longer have suffered the same harm.

1

In a careful opinion relying on extensive record evidence, the district court correctly issued a stay of the agency actions expanding the use of expedited removal. The district court made clear that it was not "barring the Government from subjecting [this new] group of people . . . to expedited removal." JA-41. Instead, Defendants "remain[] free to issue new rules or guidance implementing" even "modest procedural safeguards" to ensure that people are "subjected to expedited removal through constitutionally adequate procedures." JA-42.

Defendants resist even modest modifications, and nowhere address the extensive track record of errors in the expedited removal system. They instead insist that the identified members of Plaintiff Make the Road New York ("MRNY") and other noncitizens who have not been lawfully admitted to the United States have no protected liberty interest in remaining here. That defies over a century of precedent. The Supreme Court has "long held"—and reaffirmed this year—that "[t]he Fifth Amendment entitles [noncitizens] to due process of law in the context of removal proceedings," such that "'no person shall be' removed from the United States" without reasonable notice and a meaningful opportunity to be heard. *A.A.R.P. v. Trump*, 605 U.S. 91, 94 (2025) (cleaned up) (quoting *Yamataya v. Fisher*, 189 U.S. 86, 101 (1903)).

The district court's decision should be affirmed.

2

## JURISDICTIONAL STATEMENT

MRNY does not contest that the Court has appellate jurisdiction under 28 U.S.C. § 1292(a)(1). Under this Court's precedent, Section 1292(a)(1) allows for interlocutory appeals not just of injunctions but also orders that, though not injunctions themselves, have the "practical effect" of an injunction and go to the merits of the case. *Dunlap v. Presidential Advisory Comm'n on Election Integrity*, 944 F.3d 945, 948 n.2 (D.C. Cir. 2019); *I.A.M. Nat'l Pension Fund Benefit Plan A v. Cooper Indus., Inc.*, 789 F.2d 21, 24 n.3 (D.C. Cir. 1986). MRNY does not contest that the stay issued below addresses the merits and satisfies the "practical effect" standard for appealability insofar as it renders the Designation and the Huffman Memorandum temporarily unenforceable.[1]

## BACKGROUND

### I. The Expedited Removal System

Before 1996, all noncitizens facing deportation were entitled to full hearings before immigration judges. Such full removal proceedings provide noncitizens the opportunity to prepare their cases, retain and rely on the assistance of counsel, and present and confront evidence. Those in regular removal proceedings may apply for

---

[1] Unlike the Section 1292(a)(1) appealability analysis, the Supreme Court has explicitly rejected a "practical effect" test in interpreting the limits on injunctive relief set out in 8 U.S.C. § 1252(f). *Nken v. Holder*, 556 U.S. 418, 428-29 (2009); *see infra*, Argument Part III; *compare Immigrant Defs. L. Ctr. v. Noem*, 145 F.4th 972, 984-85 (9th Cir. 2025) (holding Section 705 stay appealable), *with id.* at 990 (relying on *Nken* to hold that Section 1252(f)(1) did not bar Section 705 stay).

an array of forms of relief from removal, including not just asylum, withholding of removal, and protection under the Convention Against Torture but also other relief including adjustment of status and cancellation of removal. And those in removal proceedings can seek both an administrative appeal and federal court review. *See* 8 U.S.C. §§ 1105a, 1252 (1995); 8 C.F.R. § 242.16(a) (1995).

Legislation in 1996 created alternative "expedited removal" proceedings. 8 U.S.C. § 1225(b)(1); JA-4-5. Expedited removal can consist of two stages, though it often concludes after just one: first, inspection by an immigration officer; and second, for people who fear removal, a credible fear interview by an asylum officer and the opportunity for immigration judge review thereof. JA-109.

When someone applies for admission at a port of entry, an immigration officer must first determine if they are inadmissible either because they have engaged in fraud or lack a valid visa or other entry document. 8 U.S.C. § 1225(b)(1)(A)(i), (ii); *id.* § 1182(a)(6)(C), (a)(7). Unless the person claims to be a U.S. citizen, lawful permanent resident, refugee, or asylee, *id.* § 1225(b)(1)(C), the officer "shall" order them removed "without further hearing or review" unless the noncitizen indicates fear of removal. *Id.* § 1225(b)(1)(A)(i). If a noncitizen does indicate fear, referral to a credible fear interview is mandatory. *Id.* § 1225(b)(1)(A)(ii).

During the inspection stage, the noncitizen is detained and denied the ability to contact or rely on the assistance of counsel. JA-6-7. The immigration officer's

4

decision is subject only to a paper review by a supervisor; there is no administrative appeal. JA-7, 35-36.

Asylum seekers may reach the second stage, which does not remotely approach the process afforded in regular immigration proceedings. JA-6-7. At the credible fear interview, the noncitizen must show "a significant possibility" that they "could establish eligibility for asylum." 8 U.S.C. § 1225(b)(1)(B)(v). Noncitizens in expedited removal proceedings are subject to mandatory detention, preventing them from seeking bond, JA-6-7, and asylum officers normally conduct the interviews by phone, JA-289, even though the officer must evaluate the noncitizen's "credibility," 8 U.S.C. § 1225(b)(1)(B)(v). Noncitizens who meet the screening standard are then transferred to regular removal proceedings. 8 U.S.C. § 1225(b)(1)(B)(ii); 8 C.F.R. § 208.30(f).

Someone who does not pass the credible fear interview may request review by an immigration judge, but receives only a limited hearing and has no right to further administrative or judicial review. 8 U.S.C. §§ 1225(b)(1)(B)(iii)(II)-(III), 1252(a)(2)(A)(iii). There is no mechanism within expedited removal for noncitizens to pursue relief other than asylum, withholding of removal, or Convention Against Torture protection. As a result, expedited removal forecloses people with valid claims from seeking other forms of relief.

Expedited removal operates on an "accelerated timeline": removal orders are

"usually issued within a few days" of apprehension, "if not hours," and removal can follow immediately thereafter. ECF 50-15 ¶ 7; ECF 50-16 ¶ 10, 13; *see also* ECF 50-10 ¶ 31 (credible fear interviews are conducted "as little as 24 hours" after a noncitizen's initial interview with an immigration officer); 8 U.S.C. § 1225(b)(1)(B)(iii)(III) (immigration judge review of asylum officers' negative credible fear determination shall occur to the "maximum extent practicable within 24 hours, but in no case later than 7 days after" any initial determination).[2] For example, Plaintiffs Mary and John Doe, a mother and son who had lived in the United States for ten years, were removed within a day of being detained. JA-180-82.

## II. The 2019 Designation and Its Rescission

Congress authorized the DHS Secretary to expand expedited removal to encompass, at maximum, certain noncitizens who were not lawfully admitted or paroled into the country and not continuously physically present for at least two years. 8 U.S.C. § 1225(b)(1)(A)(iii)(I)-(II). For twenty years, until the first Trump administration, the government chose not to expand expedited removal to its statutory limits. JA-10-11. At least one prior administration—that of President George W. Bush—rejected such an extreme expansion due to concerns it would be illegal. ECF 50-23 at 226. With just minor exceptions, the government has used

---

[2] ECF numbers refer to the district court docket.

expedited removal only at and near the border. Even at the border, the expedited removal system was deeply flawed. *See infra* at 32-33.

Perhaps most egregiously, officers have even made errors in determining U.S. citizenship. *See, e.g.*, *Lyttle v. United States*, 867 F. Supp. 2d 1256, 1272-73 (M.D. Ga. 2012) (U.S. citizen erroneously issued expedited removal order without counsel); *Matter of Lujan-Quintana*, 25 I&N Dec. 53, 54 (BIA 2009) (expedited removal order issued to U.S. citizen); ECF 50-23 at 197-99 (expedited removal of U.S. citizen who was questioned by herself without counsel); ECF 50-23 at 214-23 (U.S. citizen erroneously subjected to expedited removal); *see also United States v. Ochoa-Oregel*, 904 F.3d 682, 685-86 (9th Cir. 2018) (addressing noncitizen subjected to expedited removal, despite claim that prior deportation did not extinguish his lawful permanent resident status).

Nonetheless, in July 2019, DHS authorized the application of expedited removal to certain noncitizens arrested anywhere in the country who could not show that they had been continuously present in the United States for at least two years. Designating Aliens for Expedited Removal, 84 Fed. Reg. 35409 (July 23, 2019) ("2019 Designation"). Then-Judge Jackson preliminarily enjoined the 2019 Designation on arbitrary-and-capricious and notice-and-comment grounds. This Court reversed and remanded for consideration of other claims. *Make the Rd. N.Y. v. Wolf*, 962 F.3d 612, 618 (D.C. Cir. 2020).

On March 21, 2022, DHS rescinded the 2019 Designation. Recission of the Notice of July 23, 2019, Designating Aliens for Expedited Removal, 87 Fed. Reg. 16022 (Mar. 21, 2022). During the period the 2019 Designation was actually in effect, it was applied to only around 21 people. JA-11 n.8.

## III.    Defendants' Current Expansion of Expedited Removal

On January 21, 2025, the Acting DHS Secretary issued a notice authorizing the expedited removal of certain noncitizens arrested anywhere in the country who cannot show "to the satisfaction of an immigration officer" that they have been continuously present for at least two years. 90 Fed. Reg. 8139 ("Designation"). On January 23, 2025, the Acting Secretary issued a memorandum implementing the Designation that directs officers to consider applying expedited removal to any noncitizen "who is amenable to expedited removal." ECF 50-23 at 9-10 ("Huffman Memorandum").

## IV.    Proceedings Below

On March 22, 2025, Plaintiffs MRNY and Mary and John Doe filed the operative amended complaint challenging the Designation and Huffman Memorandum on due process and statutory grounds. MRNY is a membership organization with "over 28,000 members" in the greater New York City area, including "noncitizens who have been in the country for between 14 days and two years, and who are therefore subject to expedited removal under" the Designation.

JA-13-14. MRNY sued on behalf of its members. JA-14. Mary and John Doe are a mother and son who were subjected to expedited removal under the Designation and Huffman Memo after living in the United States for a decade—without ever being told that they could avoid expedited removal based on their length of presence or given any opportunity to show it. JA-15-16, 19, 37.

As with the 2019 Designation, Defendants did not immediately implement the current Designation at scale, but "enforcement efforts significantly ramped up" in May 2025. JA-12. Defendants aggressively targeted noncitizens in regular removal proceedings in immigration court in New York by moving to dismiss those regular proceedings, immediately arresting the noncitizens, and carrying out their expedited removal within days. JA-12, 115. This "initiative appear[ed] to be driven" by Defendants' daily quota of 3,000 immigration arrests. JA-116. Defendants filed one such motion to dismiss to pursue expedited removal in the proceedings of MRNY member John Doe 4. JA-158.

Defendants also "launched a series of workplace raids as part of a 'new phase of the Trump administration's immigration crackdown.'" JA-13. The White House "warned" that the country would "see more work site enforcement than [it had] ever seen in the history of this nation." *Id.* DHS confirmed that 2,000 noncitizens were arrested per day during the first week of June. *Id.*

On June 10, 2025, in response to this ramp-up and fearing irreparable harm to John Doe 4 and its many other members susceptible to expedited removal, MRNY moved the district court to stay the Designation and Huffman Memorandum pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 705.

The district court granted the Section 705 stay on August 29. Applying the procedural due process balancing test from *Mathews v. Eldridge*, 424 U.S. 319 (1976), the district court first concluded that MRNY's members and others at risk of expedited removal under the Designation and Huffman Memorandum have a weighty liberty interest in remaining in the United States. JA-22-29.

The district court then closely examined the procedures imposed by the Designation and Huffman Memorandum and concluded that the risk of erroneous deprivation in the generality of cases also heavily favored MRNY. JA-30-37. The court concluded that the Designation and Huffman Memorandum create an intolerable risk of error in: (1) "determining whether a noncitizen has been present for two years," due to Defendants' "woefully inadequate procedures" for making that determination, JA-34-37; (2) referring noncitizens who fear removal to the required credible fear screening interviews, JA-30-34; and (3) ensuring that noncitizens with credible fears of persecution or torture are placed in full removal proceedings, JA-32-33.

10

The district court next concluded that Defendants' interests in swift removals do not outweigh the value of modest procedural safeguards, such as adopting policies that "ensure that individuals are asked about, and have an opportunity to contest, their eligibility based on continuous presence grounds" or ensure a "meaningful opportunity to ask counsel or third parties for help in gathering evidence to prove either a credible fear or their continual presence." JA-37-40.

Finally, the district court found that the equitable factors favored MRNY and that a full stay of the challenged actions was necessary. JA-42-47. On September 9, the district court denied Defendants' motion to stay its order pending appeal. ECF 70.

## SUMMARY OF ARGUMENT

This Court should affirm the district court's stay of the Designation and Huffman Memorandum.

On the merits, Defendants' expansion of expedited removal likely violates due process. Under more than a century of precedent reaffirmed this year in *A.A.R.P.*, MRNY's members and other noncitizens who have already entered the United States, and are therefore subject to the Designation, have a liberty interest in remaining in the country. Defendants' contrary admission-based rule cannot be squared with those precedents and leads to an untenable result: that people who have lived in this country for years have no constitutionally protected liberty interest

regarding their removal. The district court also correctly concluded that the record demonstrates that the threadbare procedures imposed by the Designation and Huffman Memorandum present an unacceptable risk of erroneous removals that is not outweighed by the government's interests. MRNY has associational standing for its due process claim because it identified multiple members at risk under the policies—including John Doe 4, who Defendants already sought to place in expedited removal, and two others who have been in the United States for more than two years. And the equities strongly favor a stay of agency action.

The threshold and remedies arguments advanced by Defendants and their Amicus fail. First, the action was timely filed within 60 days of the issuance and first implementation of both challenged policies as required under 8 U.S.C. § 1252(e)(3).

Second, as every court to consider the question has concluded, 8 U.S.C. § 1252(f)(1)'s "Limit on injunctive relief" does not apply to the non-injunctive APA remedies of vacatur under 5 U.S.C. § 706 and stays under 5 U.S.C. § 705, which nullify the challenged agency action itself rather than directing government officials' conduct.

Finally, the scope of relief is proper. The Section 705 stay operates on the Designation and Memorandum themselves, and it would be nonsensical to postpone their effective dates only as to MRNY. This is particularly true here, where Congress has provided for prompt facial review of new written expedited removal policies in

12

this Circuit under 8 U.S.C. § 1252(e)(3). And, as the district court found, the facts here would warrant a full stay even if party-specific Section 705 stays were possible in some cases, since there is no viable way to limit relief just to MRNY's members.

## LEGAL STANDARD

A stay of agency action turns on "(1) the likelihood that the party seeking the stay will prevail on the merits of the appeal; (2) the likelihood that the moving party will be irreparably harmed absent a stay; (3) the prospect that others will be harmed if the court grants the stay; and (4) the public interest in granting the stay." *Cuomo v. NRC*, 772 F.2d 972, 974 (D.C. Cir. 1985); *accord Nken v. Holder*, 556 U.S. 418, 426 (2009). This Court reviews the district court's legal holdings de novo. *Awad v. Obama*, 608 F.3d 1, 10 (D.C. Cir. 2010). It "review[s] a district court's factual findings for clear error." *Id.* at 6-7. "[I]f the district court's account of the evidence is plausible in light of the record viewed in its entirety," this Court "may not reverse it." *Id.* at 7.

## ARGUMENT

## I.    The Designation and Huffman Memorandum Likely Violate Due Process.

The district court correctly concluded that the Designation and Huffman Memorandum fail to provide adequate safeguards under *Mathews*. Noncitizens subject to the policies have a weighty liberty interest in remaining in the United States. And the risk of erroneous deprivation of that interest and the probable value of additional safeguards far outweigh Defendants' countervailing interests.

13

### A.    A Weighty Liberty Interest Is At Stake.

The district court correctly relied on "more than a century of precedent holding that those who have entered the United States have a liberty interest in remaining—no matter how they entered." JA-24. Under Defendants' contrary rule, undocumented people could live in the United States not just for months but for decades and never acquire a liberty interest in remaining in the country, solely because they were never lawfully admitted. That defies the Supreme Court's precedents, and this Court should reject it.

1. *Yamataya v. Fisher*, 189 U.S. 86 (1903), held that a noncitizen who had entered the United States "surreptitiously, clandestinely, [and] unlawfully" could not be "deprived of [her] liberty" without receiving "due process of law." *Id.* at 87, 100-01. And just this past year, in *A.A.R.P.*, the Supreme Court reiterated that it has "long held that 'no person shall be' removed from the United States" without due process. 605 U.S. at 94 (quoting *Yamataya*, 189 U.S. at 101); *see also, e.g.*, *Shaughnessy v. U.S. ex rel. Mezei*, 345 U.S. 206, 212 (1953) (Noncitizens "who have once passed through our gates, even illegally, may be expelled only after proceedings conforming to traditional standards of fairness encompassed in due process of law.") (citing *Yamataya*, 189 U.S. at 100-01).

Defendants argue that *Yamataya* left the rule unsettled as to unlawful entrants, Br. 40, but the noncitizen there was arrested and charged with deportation four days

14

after the government asserted she had "surreptitiously, clandestinely, unlawfully, and without any authority come into the United States." 189 U.S. at 87; *see also* ECF 58-1 at 40, 46-47, 49, 51 (Br. for United States, *Yamataya v. Fisher*, 189 U.S. 86 (No. 171)) (stating noncitizen had entered "clandestinely" and "surreptitiously" through "evasion of inspection"). The Court nonetheless held that she could not be "deprived of [her] *liberty*" without receiving "due process of law." 189 U.S. at 100-01 (emphasis added); *see also id.* at 100 (stating that deportation "involv[es] the liberty of persons").

And the Supreme Court's opinion this year in *A.A.R.P.* refutes Defendants' reading of *Yamataya*. First, the Court stated that "[t]*he Fifth Amendment* entitles [noncitizens] to due process of law in the context of removal proceedings." *A.A.R.P.*, 605 U.S. at 94 (emphasis added) (quoting *Trump v. J.G.G.*, 604 U.S. 670, 673 (2025), in turn quoting *Reno v. Flores*, 507 U.S. 292, 306 (1993), in turn citing *Yamataya*, 189 U.S. at 100-01). Then, citing *Yamataya* directly, the Court reaffirmed that "'no person shall be' removed from the United States 'without opportunity, at some time, to be heard.'" *Id.* (quoting *Yamataya*, 189 U.S. at 101). Contrary to Defendants' assertion, Br. 42, the Supreme Court's recognition of a liberty interest in remaining in the United States under *Yamataya* and its progeny is just as "deeply rooted" as the nation's first immigration restrictions, which date to "the late 19th century." *See Dep't of State v. Munoz*, 602 U.S. 899, 912 (2024).

15

Defendants also fail in their attempt to sideline *A.A.R.P.* and *J.G.G.* as involving solely application of the Alien Enemies Act and not the Due Process Clause. *See* Br. 40-41. The Supreme Court's analysis in both decisions was explicitly based on application of "[t]he Fifth Amendment." *A.A.R.P.*, 605 U.S. at 94 (quoting *J.G.G.*, 604 U.S. at 673); *accord id*. at 95 (stating that the court of appeals on remand should address in the first "instance the precise process necessary to satisfy *the Constitution* in this case") (emphasis added); *id*. at 96 (stating that the government's "interests be pursued in a manner consistent with *the Constitution*) (emphasis added); *id.* at 97-98 (stating that the noncitizens "are entitled to *constitutionally* adequate notice prior to any removal") (emphasis added). And both decisions cited other precedent applying *constitutional* due process requirements. *A.A.R.P.*, 605 U.S. at 94-95 (citing, inter alia, *Carey v. Piphus*, 435 U.S. 247, 259 (1978), and *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950)); *J.G.G.*, 604 U.S. at 673 (citing *Mullane*, 339 U.S. at 313).

Moreover, the constitutional due process holding in *A.A.R.P.* cannot be squared with Defendants' position that due process rights attach only after lawful admission. As the district court observed, the Alien Enemies Act proclamation that served as the basis for removal there was directed at Venezuelan nationals the President claimed had "'unlawfully infiltrated the United States' and 'engage[d] in

16

mass illegal migration.'" JA-24 (quoting Proclamation No. 10903, 90 Fed. Reg. 13033, 13033 (Mar. 14, 2025)).

2. Defendants claim that *DHS v. Thuraissigiam*, 591 U.S. 103 (2020), abrogated this century-old line of precedent stretching back to *Yamataya* to hold that only noncitizens who have been "lawfully admitted" to the United States have due process rights in remaining here. Br. 33-38. Not so. *Thuraissigiam* held that a noncitizen apprehended "25 yards into U.S. territory" was entitled only to the process Congress provided because he had not "'effected an entry.'" 591 U.S. at 139-40 (quoting *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001)). Because that was the only situation *Thuraissigiam* addressed, it did not and could not overrule the Supreme Court's earlier holdings that noncitizens who *have* entered the United States, even if unlawfully, have due process rights. If the Court had rejected the due process claim in *Thuraissigiam* based solely on the fact that the noncitizen had not been lawfully admitted, it would have said as much. Instead, its holding turned on the fact that a "[noncitizen] like [the] respondent" in that case, who was "detained shortly after unlawful entry[,] cannot be said to have 'effected an entry.'" *Thuraissigiam*, 591 U.S. at 140.

Nor was that rule overturned by the statement in *Thuraissigiam* that statutory procedures constitute due process for "foreigners who have never . . . been admitted into the country pursuant to law." *Id.* at 138 (quoting *Nishimura Ekiu v. United*

*States*, 142 U.S. 651, 660 (1892)) (cited at Br. 36-37). Much as *Thuraissigiam* concerned a noncitizen still "on the threshold" along the physical border, *id.* at 140, *Nishimura Ekiu* concerned a noncitizen who was denied initial admission at a port of entry, and who therefore likewise had not effected physical entry, 142 U.S. at 662.

*Thuraissigiam* is therefore consistent with—and reaffirmed—the rule that noncitizens who have "effected an entry" have a liberty interest in remaining within the country and can be removed only through procedures that satisfy due process. Defendants ask the Court to simply ignore *A.A.R.P.* and more than a century of antecedents while expansively overreading *Thuraissigiam*.

Defendants' other citations for their admission-based test are likewise inapposite. They cite *Landon v. Plasencia*, 459 U.S. 21 (1982), for the assertion that a noncitizen acquires due process rights concerning removal only "once [the noncitizen] gains admission to our country and begins to develop the ties that go with permanent residence." Br. 35 (quoting 459 U.S. at 32). But the Court in *Landon* was explaining that the lawful permanent resident there possessed a liberty interest in *re-entering* the United States at a port of entry—at the physical threshold—due to her prior connection with the country, even though a noncitizen who had not previously entered the country would not have a liberty interest in "seeking initial admission." 459 U.S. at 32-33. The Court was *expanding* protections for certain

noncitizens seeking entry from abroad—lawful permanent residents with prior connections—not curtailing protections for those already within the country.

Meanwhile, contrary to Defendants' suggestion, Br. 35, the entry of the noncitizen in *United States ex rel. Turner v. Williams*, 194 U.S. 279 (1904), was "forbidden by law" because he was an anarchist—not because he had not been admitted. *Id*. at 280-84, 292. And the decision did not address procedural due process—the noncitizen had received an administrative hearing and appeal as well as federal court review, *id*. at 281-83—but instead whether the substantive immigration statute barring anarchists was constitutional, *id*. at 292-94.

3. Defendants also invoke the "entry fiction," whereby noncitizens whom the government permits onto U.S. soil without admission are "are treated for due process purposes as if stopped at the border." Br. 34 (quoting *Thuraissigiam*, 591 U.S. at 139). But the Supreme Court's "entry fiction" decisions concerning noncitizens detained or paroled at ports of entry—like its holding in *Thuraissigiam*—are not only consistent with but reaffirm the rule that noncitizens who have effected an entry do have a liberty interest in remaining in the country and can be removed only through procedures that satisfy due process.

The entry fiction provides a narrow exception to this general rule and has no application here. The fiction began as a way to accommodate "temporary arrangements" in which noncitizens arriving by ship were permitted to come ashore

for inspection without this convenience "bestow[ing] . . . additional rights." *Mezei*, 345 U.S. at 215; *see, e.g.*, *Nishimura Ekiu*, 142 U.S. at 661-62. The fiction has been extended to noncitizens detained on shore following inspection, *Kaplan v. Tod*, 267 U.S. 228, 230 (1925), and to those granted parole upon arrival in lieu of detention, *Leng May Ma v. Barber*, 357 U.S. 185, 188-90 (1958). But the Court's cases applying the entry fiction continued to recognize the rule from *Yamataya* that noncitizens "who have once passed through our gates, even illegally, may be expelled only after . . . due process." *Mezei*, 345 U.S. at 212 (citing, inter alia, *Yamataya*, 189 U.S. at 100-01); *accord Zadvydas*, 533 U.S. at 693 ("[O]nce [a noncitizen] enters the country, the legal circumstance changes, for the Due Process Clause applies to all 'persons' within the United States, including [noncitizens], whether their presence here is lawful, unlawful, temporary, or permanent.").

Like *Thuraissigiam*, therefore, the Supreme Court's "entry fiction" decisions reaffirmed the general rule that noncitizens who *have* effected an entry have a liberty interest in remaining in the country and can be removed only through procedures that satisfy due process. The Supreme Court has never applied the fiction so as to swallow the entry-based rule entirely, as Defendants urge this Court to do.

Defendants also raise a concern that noncitizens paroled at ports of entry could be treated worse than noncitizens who entered without inspection. Br. 4, 37-38. But that potential disparate treatment is a problem of Defendants' own making. Prior to

the current administration, expedited removal had "rarely, if ever, been applied at any scale to parolees." *Coal. for Humane Immigrant Rts. v. Noem*, No. 25-cv-872, 2025 WL 2192986, at *2, *16 (D.D.C. Aug. 1, 2025), *appeal pending*, D.C. Cir. No. 25-5289 (docketed Aug. 11, 2025). Accordingly, parolees have enjoyed the due process protections of regular removal proceedings in immigration court. And whether the statute permits the expedited removal of parolees is at issue in another case before this Court. *See Coal. for Humane Immigrant Rts. v. Noem*, No. 25-5289 (D.C. Cir.).

4. Defendants also appear to advance a different theory than their admission-based test: that due process rights depend on "[w]hether [a noncitizen] has 'established connections'" in the United States and that whether such connections exist "is a political judgment that falls to the political branches." Br. 38 (quoting *Thuraissigiam*, 591 U.S. at 107). As explained above, however, the Supreme Court has only actually applied such a requirement for established connections with respect to the due process rights of *returning* noncitizens seeking entry from abroad. *See supra* at 18 (discussing *Landon*, 459 U.S. at 32-33).

Nor does precedent support Defendants' apparent suggestion that assessing the due process rights of noncitizens presents a political question. *See* Br. 38. If that were correct, the Supreme Court would have rejected the due process claim in *A.A.R.P.*, instead of holding that the procedure there "surely does not pass muster."

21

605 U.S. at 95. Similarly, *Thuraissigiam* would have had no occasion to apply the entry-based rule and conclude that the noncitizen could not "be said to have 'effected an entry.'" 591 U.S. at 140. Congress cannot dictate whether someone has "effected an entry" and is therefore a person "within the United States" for due process purposes. *Zadvydas*, 533 U.S. at 693; *see also id.* at 695 ("Executive and Legislative Branch decisionmaking" concerning removal "is subject to important constitutional limitations."); *Landon*, 459 U.S. at 24-26, 32-34 (noncitizen apprehended at the border and therefore categorized by Congress as subject to streamlined "exclusion" proceedings rather than more robust "deportation" proceedings nonetheless had constitutional due process rights); *cf. Boumediene v. Bush*, 553 U.S. 723, 765 (2008) (rejecting the notion that "the political branches have the power to switch the Constitution on or off at will").

5. Accordingly, the district court correctly concluded that MRNY's members and other noncitizens newly subject to the Designation "have a liberty interest in remaining" in the United States because they "have long since crossed the 'threshold' and effected entry into the country." JA-22. And that liberty interest is of paramount importance. The Supreme Court has repeatedly held that the removal of people from within the United States implicates a "weighty" liberty interest. *Landon*, 459 U.S. at 34; *see Bridges v. Wixon*, 326 U.S. 135, 164 (1945) (Murphy, J., concurring) ("[D]eportation . . . may result in poverty, persecution, and even

22

death."); *Ng Fung Ho v. White*, 259 U.S. 276, 284 (1922) (Deportation "may result . . . in loss of both property and life, or of all that makes life worth living."); *see also Ardestani v. INS*, 502 U.S. 129, 138 (1991) (acknowledging "the enormity of the interests at stake" in immigration proceedings). The stakes are even higher for people who fear persecution, torture, or death if removed. *See INS v. Cardoza-Fonseca*, 480 U.S. 421, 449 (1987) ("Deportation is always a harsh measure; it is all the more replete with danger when the [noncitizen] makes a claim that he or she will be subject to death or persecution if forced to return to his or her home country."); *accord, e.g.*, *Kaweesa v. Gonzales*, 450 F.3d 62, 69 (1st Cir. 2006) (A noncitizen "seeking asylum or protection under the Convention Against Torture . . . clearly has a weighty interest in avoiding deportation.").

## B. *Mathews* Applies.

Defendants assert that the district court erred by applying the *Mathews* test rather than assessing the adequacy of notice under *Mullane*. Br. 41-42. But *Mullane* concerned *only* adequacy of notice. 339 U.S. at 308, 313-20; *see Dusenbery v. United States*, 534 U.S. 161, 168 (2002) (Supreme Court has "regularly turned to" *Mullane* on adequacy of notice). Here, by contrast, the district court identified both defective notice, JA-34-36, and other procedural defects, *id.* at 30-37. Defendants cite no case suggesting it is improper to apply *Mathews* in such circumstances. *Cf. Jazz Pharms., Inc. v. Kennedy*, 141 F.4th 254, 266 (D.C. Cir. 2025) (drawing

23

relevant due process principles from both *Mullane* and *Mathews*); *Propert v. District of Columbia*, 948 F.2d 1327, 1332 (D.C. Cir. 1991) (same).

Nor do Defendants explain why the outcome would change under *Mullane* alone. And there is no reason to believe it would, since a principal distinction of *Mathews* balancing is explicit consideration of the government's countervailing interests.

## C.    The Risk of Erroneous Deprivation Is Unacceptably High.

The district court correctly held that the procedures imposed by the Designation and the Huffman Memorandum create an unacceptably high risk of erroneous expedited removals.

The "troubling reality" is that even at the border, expedited removal is "fraught with risk of arbitrary, mistaken, or discriminatory behavior" that can occur "without any check on whether the person understood the proceedings, had an interpreter, or enjoyed any other safeguards." *Khan v. Holder*, 608 F.3d 325, 329 (7th Cir. 2010). But prior to the Designation, the factual predicates for expedited removal—including whether someone had recently arrived at or crossed the border—were typically straightforward. And, under *Thuraissigiam*, no protected liberty interest was typically at stake.

The Designation and Huffman Memorandum make the relevant determinations much more difficult. And by applying expedited removal to people

24

who have entered and are living in this country, and for whom the answers to key questions like length of residence are far from obvious, they create a constitutionally intolerable removal system. Indeed, these defects have already resulted in repeated errors, including the erroneous expedited removal of Plaintiffs Mary and John Doe, who had lived continuously in the United States for *ten years*, JA-180-82, and the issuance of an expedited removal to another noncitizen who had lived here for *thirty*, *Co Tupul v. Noem*, No. 25-cv-2748, 2025 WL 2426787, at *1 (D. Ariz. Aug. 4, 2025); *see also, e.g.*, *Tamay v. Scott*, No. 2:25-cv-438, 2025 WL 2507011, at *1 (D. Me. Sept. 2, 2025) (noncitizen present for more than two years); *Orellana Juarez v. Moniz*, 788 F. Supp. 3d 61 (D. Mass. 2025) (same); *Domingo-Ros v. Archambeault*, 2025 WL 1425558, at *3 (S.D. Cal. May 18, 2025) (same); *Chogllo Chafla v. Scott*, No. 2:25-cv-437, 2025 WL 2531027, at *1 (D. Me. Sept. 2, 2025) (same); *Hernandez Torrealba v. DHS*, No. 1:25-cv-1621, 2025 WL 2444114, at *1-2 (N.D. Ohio Aug. 25, 2025) (same); *Castillo Lachapel v. Joyce*, No. 25-cv-4693, 2025 WL 1685576, at *1-2 (S.D.N.Y. June 16, 2025) (same); ECF 50-4 ¶ 23-24 (noncitizen present for three years). Increasingly frequent erroneous arrests of U.S. citizens underscore the same grave risk of error. *See, e.g.*, Nicole Foy, *We Found That More Than 170 U.S. Citizens Have Been Held by Immigration Agents*, ProPublica (Oct. 16, 2025), https://perma.cc/MM9Z-XQ7W.

### 1.    Inadequate Process to Evaluate Continuous Presence.

As the district court correctly found, the "complete lack of process for an individual to demonstrate how long they have been present . . . creates a significant risk of erroneous removal" when "when expedited removal is applied to people in the interior of country." JA-36-37. And Defendants' reliance on a new guidance document, identified for the first time in their appeal brief, does not cure the procedural deficits identified by the district court.

First, the noncitizen receives no advance notice of the charges; rather, the "notice" and the removal order are issued on the same form at the same time. JA-6, 15-16, 35; *see* JA-355 (form). And while officers are supposed to ask about fear of removal, there is no requirement to even *ask* about length of continuous presence. JA-34-35. Therefore, noncitizens who have been in the country for at least two years get no advance notice that avoiding summary deportation without a hearing will depend on raising the issue. As the Supreme Court made clear in *A.A.R.P.*, summary removal without meaningful notice of how "to contest that removal" and receive a hearing "surely does not pass muster" under the Fifth Amendment. 605 U.S. at 95; *see also J.G.G.*, 604 U.S. at 673 ("[N]otice must be afforded within a reasonable time and in such a manner as will allow [noncitizens] to actually seek habeas relief.").

Second, despite the lack of notice, the burden is on the noncitizen to somehow

establish that they have been continuously present in the country for two years or more, an exceedingly difficult task for the population targeted by the Designation. JA-36-37. "Continuous presence is unlikely to be seriously contested when it comes to those apprehended in close temporal and spatial proximity to the border." JA-36. But that is not the case for the population subject to the Designation and Huffman Memorandum. Because "vast majority" of undocumented immigrants have been living in the United States for longer than two years, there is a "significant risk" that officers presuming without evidence that undocumented noncitizens they arrest are properly subject to expedited removal will lead to frequent erroneous expedited removals. *See* JA-34, 36; *see also* JA-34 (79 percent of the undocumented population as of 2022 "entered before 2010"); *id.* (less than 12.4 percent of the undocumented population present for less than two years as of 2022 had entered without inspection).

Third, there is no requirement that noncitizens be guaranteed an opportunity to gather and present evidence bearing on their continuous presence. JA-36. Nor do Defendants require that noncitizens be guaranteed an opportunity to seek the assistance of a lawyer or even make a phone call to a friend or family member who can help them. *Cf. Khan*, 608 F.3d at 326 (neither noncitizen's counsel nor family "had been permitted to speak to him" while he was in expedited removal proceedings).

Proving at least two years of continuous physical presence, while detained,

alone, and without any opportunity to gather evidence, would be challenging for U.S. citizens or lawful permanent residents, let alone for undocumented people who may lack credit cards or identification documents with sufficiently early issue dates. *See, e.g.*, JA-164. Even those who have other relevant documents often will not physically have them at the time of apprehension. JA-157, 164.

Fourth, there is no opportunity for a neutral review concerning continuous presence: The only determination is by an enforcement officer who serves as both prosecutor and judge. JA-35. This lack of review compounds the existing risk of error in immigration enforcement officers' interviewing and documentation practices. A congressionally commissioned 2005 study of the expedited removal system concluded that the statements officers take from noncitizens are "often inaccurate." JA-240. That commission's 2016 study "revealed continuing and new concerns" with immigration officers' "interviewing practices and the reliability of the records they create." JA-254. And its 2025 study found that "many of the problems it has repeatedly documented," "including flawed screening and documentation practices," "remain unaddressed." JA-285.

These endemic flaws will mean that people who should not be subject to expedited removal at all—people like Plaintiffs Mary and John—have already been and will continue to be erroneously removed. JA-37, 180-82.

Defendants' attempt to defend their deficient procedures fail. They admit that

there is no requirement that noncitizens be advised of the relevance of continuous presence or asked about the issue, stating only that the statute and regulations "allow such claims to be raised." Br. 50. That alone renders the process unconstitutional. *A.A.R.P.*, 605 U.S. at 95.

Defendants also assert that noncitizens "ha[ve] an opportunity to demonstrate continuous presence" using "banknotes, leases, . . . and the like." Br. 50. In support, they cite a guidance document that they never presented below despite multiple opportunities. *Id.* (citing *Implementation Guidance for January 2025 Federal Register Notice, Designating Aliens for Expedited Removal*, U.S. Immigr. & Customs Enf't (Feb. 28, 2025) ("Guidance"), *available at* https://perma.cc/F32Y-NJ8R). "When [the district court] asked at oral argument what would happen if . . . [a noncitizen] wants 'to demonstrate that they've been here for a period of two years but they don't have any paperwork on them,' the Government came up empty, offering only 'to take that back to the agency to give [the court] an answer.'" JA-40 (citation omitted). Defendants never cited or filed the Guidance, either in the month between the argument and the decision below, *id.*, or in their motion below for a stay pending appeal, ECF 67. Indeed, the Guidance was only posted online on October 20, 2025—the date Defendants filed their appeal brief. *See* FOIA ICE Library, U.S. Immigr. & Customs Enf't, https://perma.cc/R5U9-WFAE (Nov. 1, 2025).

Because the Guidance was not presented below and is not part of the record

on appeal, this Court should decline to consider it in the first instance. *See, e.g.*, *Potter v. District of Columbia,* 558 F.3d 542, 550 (D.C. Cir. 2009). Defendants may instead seek to raise this Guidance or any other purported procedures at the summary judgment stage in the district court.

In any case, the Guidance is insufficient. First, it is directed only to ICE, whereas Border Patrol officers—who are also authorized to apply expedited removal—are currently engaged in aggressive immigration enforcement operations around the country. *See, e.g.*, Camilo Montoya-Galvez, *Border Patrol Takes Lead Role in Trump Administration's Chicago Crackdown, Carrying Out More Arrests Than ICE*, CBS News (Oct. 30, 2025), https://perma.cc/KA3H-Y64J. And even though the Guidance nowhere requires that noncitizens be given actual notice of the continuous presence requirement, the purported "brief" period it authorizes for noncitizens to obtain relevant evidence is triggered only by a "claim[] to have access to such evidence." Guidance at 3.

Finally, Defendants assert that MRNY lacks standing to complain of this defect because it did not "assert that any [of its] members were placed or were likely to be placed in expedited removal after being in the United States for more than two years." Br. 49. But "only one plaintiff must have standing" to stay the Designation and Huffman Memorandum based on their due process claim, and Defendants do not question the standing of MRNY's members present for less than two years. *See*

*In re Navy Chaplaincy*, 697 F.3d 1171, 1178 (D.C. Cir. 2012); *see also Town of Chester, N.Y. v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017) (a party need only "demonstrate standing for each *claim* he seeks to press and for *each form of relief* that is sought" (emphasis added)). This is not a case, as in *Lewis v. Casey*, 518 U.S. 343, 358 (1996), where the plaintiffs sought injunctive relief extending beyond that necessary to redress their particular injuries. MRNY seeks unitary relief concerning the challenged agency actions—postponement now and ultimately vacatur—for which they have established standing.

In any event, MRNY has "many members who have been present for *greater* than two years," ECF 50-2 ¶ 41, and the district court properly found that "many of its 'members [] would have difficulty affirmatively demonstrating two years of physical presence, particularly if suddenly detained or given only a short period of time to do so.'" JA-38 (quoting ECF 50-2 ¶ 42).

Moreover, identified members previously on the verge of completing two years of presence have now done so. Member John Doe 1 "entered the United States without inspection in July 2023" and "has been in the country since then," JA-157, and so was present for two years when the district court ordered relief on August 8, 2025. And member Jane Doe 1 also completed two years of continuous presence in August 2025. JA-158. The district court found that both "are at risk of being placed in expedited removal pursuant to the 2025 Designation." JA-43.

Therefore, MRNY has standing on its due process claim, and the deficiencies in the process for assessing continuous presence violate due process.

### 2.    Unacceptable Risk of Removal to Persecution or Torture.

The district court correctly found that the uncontested record—including a series of congressionally authorized studies—demonstrates an unacceptably "high risk" of failing to refer individuals for a credible fear interview. JA-30. The court relied on record evidence establishing that immigration enforcement officers have already failed to refer *15 percent* of noncitizens who express fear of removal to credible fear screening interviews. JA-30-31 (citing ECF 50-23 at 46); *see also* JA-323 (separate study finding that DHS erroneously failed to refer 12 percent of people who expressed fear); ECF 50-23 at 148 (fewer than half of noncitizens interviewed who expressed fear referred for credible fear interviews). The same reports documented systemic flaws in this phase of the process, with asylum seekers who fear removal frequently denied credible fear interviews. *See* JA-212, 219-21, 254, 259-64, 293. And the district court found that uncontroverted evidence from immigration practitioners further documented the persistence of these errors. JA-31.

Defendants do not contest these facts, yet argue the district court erred by examining "rare exceptions," rather than the "generality of cases." Br. 46. But erroneously removing more than one out of ten people to danger without required screenings is hardly a "rare exception."

Defendants' reliance on immigration judge review of negative determinations by asylum officers, Br. 44, does nothing to address this root problem. Enforcement officers' "error[s] in [not] referring people for credible fear interviews" are "not reviewable" by immigration judges. JA-31. Similarly, the statutory right to "consult with a person" prior to a credible fear interview attaches only to someone found "eligible for such [an] interview," 8 U.S.C. § 1225(b)(1)(B)(iv), and so is of no aid to those erroneously denied interviews.

Unacceptable risks of error continue during the rushed credible fear interview and review process. "[N]oncitizens are not afforded a meaningful opportunity to prepare for or present evidence at their credible fear interviews, are stuck with the record they make during those interviews, and must appeal the adverse determinations coming out of those interviews [to an immigration judge] without knowing the basis for the negative findings." JA-33-34; *see also* JA-32 (existing policies often "leave[] noncitizens unable to obtain 'medical records' and other proof that would substantiate their claims of fear" (quoting ECF 50-11 ¶ 22)). And with no guarantee that counsel can meaningfully participate, interviews are often truncated and unfair. *See* ECF 50-23 at 13, 234; ECF 50-13 ¶ 7; ECF 50-23 at 13; ECF 50-19 ¶ 12; ECF 50-18 ¶ 18; 50-17 ¶ 9.

Particularly in addition to the grave problems concerning continuous presence, these further deficiencies in the procedures for preventing the removal of

noncitizens to persecution and torture create an intolerable risk of erroneous deprivations of liberty.

**D.    The Government's Interests Do Not Outweigh the Strong Need for Additional Safeguards.**

As the district court found, any of the additional safeguards MRNY proposed would "mitigate the risk that the Government erroneously removes people via expedited removal." JA-37-38.

First, noncitizens should be given reasonable notice of and an opportunity to rebut the government's charges against them and its adverse evidence. The Supreme Court held that noncitizens facing removal under the Alien Enemies Act "must receive notice that they are subject to removal under the Act within a reasonable time and in such a manner as will allow them to actually seek habeas relief before removal." *A.A.R.P.*, 605 U.S. 95 (cleaned up). Those noncitizens "must have sufficient time and information to reasonably be able to contact counsel, file a petition, and pursue appropriate relief"; "notice roughly 24 hours before removal . . . surely does not pass muster." *Id*. The same is true here: Noncitizens facing expedited removal must be given a reasonable opportunity to contest whether they are actually subject to expedited removal.

The simple opportunity to engage in consultation—with family, friends, or counsel—will also help ensure that noncitizens have a meaningful opportunity to gather evidence to demonstrate that they are not properly subject to expedited

removal, and to respond to the government's evidence. JA-38. Likewise, procedures that "afford individuals with a meaningful opportunity to ask counsel or third parties for help in gathering evidence to prove [a claim of] credible fear . . . would substantially improve the reliability of the proceedings." *Id*.; *see Ardestani*, 502 U.S. at 138 (explaining that "the complexity of immigration procedures, and the enormity of the interests at stake, make legal representation in deportation proceedings especially important"); *Yiu Fong Cheung v. INS*, 418 F.2d 460, 463 (D.C. Cir. 1969) (discussing the importance of giving noncitizens in deportation proceedings the "opportunity to consult with friends").

Defendants contend there is no right to counsel in removal proceedings, Br. 53-54, but Defendants miss the point. MRNY argued below, and reiterates again here, that the procedures attached to the expedited removal process cumulatively "have devastating consequences" for individuals subject to the Designation. JA-130; *see* JA-6. Without participation of counsel, credible fear interviews can be truncated and unfair, JA-132, 285, 294, and the accelerated expedited removal timeline makes gathering and presenting evidence demonstrating continuous residence difficult, even for those represented by counsel.

In addition, a neutral adjudicator such as an IJ should review the questions of removability and applicability of expedited removal (including length of presence) and whether the noncitizen has a fear of removal, as opposed to a low-level

immigration enforcement officer who acts as both prosecutor and judge. *See Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal*., 508 U.S. 602, 618 (1993) (where "an initial determination" is "made by a party acting in an enforcement capacity," due process requires the right for "a neutral adjudicator to conduct a de novo review of all factual and legal issues" (cleaned up)); *Propert*, 948 F.2d at 1333-34 ("requirement of an unbiased decisionmaker" violated where "[t]he officer to whom appeal may be made is the same officer who decides that the vehicle is 'junk' in the first place"). Defendants argue that the requirement that a neutral adjudicator review findings is an act of policy that is entrusted to Congress and not the court. Br. 52-53. But *Mathews* explicitly "requires consideration" of any "probable value . . . of additional or substitute procedural safeguards." 424 U.S. at 335.

Defendants note that the statute places the burden concerning continuous presence on the individual. Br. 53. But that only underscores the need to provide adequate notice to noncitizens that they can avoid expedited removal and receive full hearings if they can demonstrate the requisite continuous presence, and a meaningful opportunity to do so. JA-36.

Defendants' interest in removing people as quickly as possible, Br. 46, 58, cannot justify denying these basic safeguards. Indeed, that is the fundamental lesson of *J.G.G.* and *A.A.R.P.* There, the government emphasized national security interests

in effectuating rapid removals, but the Court was clear that "such interests [must] be pursued in a manner consistent with the Constitution," meaning *real* procedural protections—not meaningless procedures that do not afford an actual opportunity to contest key questions. *A.A.R.P.*, 605 U.S. at 96. And Defendants too have an interest in the lawful and fair administration of the immigration laws. *Cf. Nken*, 556 U.S. at 436 ("Of course there is a public interest in preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm.").

### E.    Defendants' *Salerno* Argument Fails.

Defendants further contend that, even if the Designation and Huffman Memorandum are unconstitutional as to the vast majority of those they subject to expedited removal, MRNY's claim fails because it must show there is "no set of circumstances" under which the policies would be permissible. Br. 54 (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). That is incorrect.

*Salerno* does not apply to facial, systemic challenges under 8 U.S.C. § 1252(e)(3). *Salerno* is not a jurisdictional rule but rather a "prudential doctrine," *City of Chicago v. Morales*, 527 U.S. 41, 55 n.22 (1999) (plurality opinion), reflecting courts' self-imposed inclination toward "judicial restraint," *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008). Such judicially "self-imposed limits . . . can be modified or abrogated by Congress." *Bennett v. Spear*, 520 U.S. 154, 162 (1997) (cleaned up); *see also Am. Soc. for Prevention of*

*Cruelty to Animals v. Feld Ent., Inc.*, 659 F.3d 13, 19 (D.C. Cir. 2011) (Congress had "eliminate[d] any prudential standing requirements" in particular statute); *In re Directives Pursuant to Section 105B of Foreign Intel. Surveillance Act*, 551 F.3d 1004, 1008 (Foreign Int. Surv. Ct. Rev. 2008) (Congress can eliminate prudential limits "expressly or by fair implication").

That is what Congress has done here. Section 1252(e)(3) was enacted "to authorize, as its title makes clear, '[c]hallenges on [the] validity of the [expedited-removal] system.'" *Grace v. Barr*, 965 F.3d 883, 895 (D.C. Cir. 2020) (quoting 8 U.S.C. § 1252(e)(3)). This unusual system specifically provides for "facial challenges to expedited removal policies" to be heard in this Circuit, *id.* at 896, if filed within 60 days of new policies' implementation. At the same time, Congress severely restricted subsequent as-applied challenges. *See id.* at 892 (finding statute "forbids review of individual aliens' credible fear determinations, not suits . . . that challenge credible fear policies on their face"); 8 U.S.C. § 1252(a)(2)(A), (e)(3). Congress thus not only permitted early facial reviews, but required that any claim be brought almost immediately, and correspondingly not only disfavored as-applied challenges, but outright barred them. That is the opposite scenario to the one that generally justifies application of the *Salerno* standard in other contexts.

Indeed, applying *Salerno* to Section 1252(e)(3) could eliminate all review—precisely the opposite of Congress's goal. *See Grace*, 965 F.3d at 893 (rejecting

interpretation that would eliminate all Section 1252(e)(3) review of policy). After all, in Defendants' view, even a rule that was unconstitutional 95 percent of the time could not be voided facially. Yet it also could not be challenged as applied in those 95 percent of cases, the vast majority of which would occur after the 60-day limitations period had ended. Because Congress specifically authorized constitutional review of expedited removal policies, applying a judge-made doctrine to effectively eliminate that review would represent the opposite of "respect for [Congress]." *Jarkesy v. S.E.C.*, 803 F.3d 9, 25 (D.C. Cir. 2015).

## II.    The Action Was Timely.

An amicus brief asserts that MRNY's suit was untimely under 8 U.S.C. § 1252(e)(3)(B), which provides that challenges to new written policies implementing the expedited-removal statute must be filed within 60 days of the writing's first implementation. *See* Corrected Amicus Br. of Federation for American Immigration Reform 3-13 ("FAIR Amicus"). Defendants wisely do not endorse that argument, which is incorrect.

As with the 2019 Designation and guidance, the current Designation and Memorandum are new written policies within the meaning of Section 1252(e)(3)(A) that subject a significant new population of noncitizens to expedited removal. *See Make the Road N.Y.*, 962 F.3d at 625. This action was timely filed on January 22, 2025, and timely amended on March 22, JA-357, within 60 days of the issuance—

and therefore also the first implementation—of the Designation on January 21 and the Memorandum on January 23.

Amicus argues that the action was nonetheless untimely on the theory that the Designation merely reinstates the prior 2019 Designation. *See* FAIR Amicus 10-13. That cannot be squared with the text of either the statute or the new Designation. The statute contemplates review of specific "written policy directive[s]"—i.e., specific documents—not of the substance of policies divorced from such writings. 8 U.S.C. § 1252(e)(3)(A)(ii); *cf. Biden v. Texas*, 597 U.S. 785, 809 (2022) (reiterating that the APA similarly does not contemplate review of "an abstract decision apart from specific agency action"). The 2019 Designation and the current Designation are clearly separate written directives under the statute. The Memorandum likewise plainly constitutes a new written policy directive or guideline. JA-192-93. To the extent Amicus also suggests that the relevant "first implement[ation]" occurred in 1997, FAIR Amicus 11-12, that argument fails for the same reason. The challenged policies are new written directives and could not have been first implemented before they were issued.

### III.    8 U.S.C. § 1252(f)(1) Does Not Bar Relief.

As every court to address the issue has concluded, 8 U.S.C. § 1252(f)(1) does not apply to stays of agency action under the APA, 5 U.S.C. § 705. Instead, the text,

title, and structure—and Supreme Court precedent interpreting all three—limit Section 1252(f)(1) to injunctive relief, i.e., to injunctions and restraining orders.

Section 1252(f)(1) bars classwide injunctive relief that would "enjoin or restrain the operation of" specified provisions of the INA. 8 U.S.C. § 1252(f)(1). Interpreting Section 1252(f)(1), the Supreme Court has observed that "enjoin" means "to 'require a person . . . to abstain or desist from[] some act,'" i.e., to "prohibit[] someone from doing some specified act." *Garland v. Aleman Gonzalez*, 596 U.S. 543, 548-49 (2022). Similarly, "restrain" means to "prevent [someone] from doing something" or "some course of action." *Id.* at 549. Like "enjoin," the term is therefore directed at some actor's "particular actions" or "acts." *Id.* Accordingly, Section 1252(f)(1) bars orders that require "officials *to take or to refrain from taking actions* to enforce, implement, or otherwise carry out the specified statutory provisions." *Id.* at 550 (emphasis added).

Section 1252(f)(1)'s "title—'Limit on injunctive relief'—makes clear the narrowness of its scope." *Texas*, 597 U.S. at 786. It "deprives courts of the power to issue a specific category of remedies." *Id.* The specified "category" is "injunctive relief." "By its plain terms, and even by its title, [the] provision is nothing more or less than a limit on injunctive relief." *Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 481 (1999).

41

Consistent with the statutory text and title, an unbroken line of cases has held that § 1252(f)(1)'s limit on injunctive relief does not apply to APA remedies—vacatur under 5 U.S.C. § 706 and stays under Section 705—that do not direct officials' conduct but instead eliminate or suspend the effectiveness of the challenged agency action. *See, e.g.*, *Immigrant Defs. L. Ctr.*, 145 F.4th at 990; *All. for Hippocratic Med. v. FDA*, 78 F.4th 210, 254 (5th Cir. 2023), *rev'd and remanded on other grounds*, 602 U.S. 367 (2024); *Texas v. United States*, 40 F.4th 205, 220 (5th Cir. 2022); *Coal. for Humane Immigrant Rts.*, 2025 WL 2192986, at *13 n.16 (collecting cases).

The critical distinction between injunctive relief and these forms of APA relief is that the latter do "not order the defendant to do anything" but instead "remove[] the source of the defendant's authority." *All. for Hippocratic Med.*, 78 F.4th at 254. A Section 705 "stay is the temporary form of vacatur": just as "vacatur effectively rescinds the unlawful agency action," the stay "temporarily voids the challenged authority." *Id.* Like vacatur—and unlike injunctive relief—stays do not "prohibit conduct." *Id.*

Defendants argue that although a Section 705 stay does not "enjoin" officers' conduct, it nonetheless "restrains" it. Br. 30-33. In doing so, they rightly admit that APA vacatur "is not a remedy that naturally 'enjoins or restrains' the use of a given power; instead, it *eliminates* that power in the first place." *Id.* at 32-33. In other

42

words, they agree that vacatur "removes the source of authority" to act, *id.* at 32, rather than "order[ing] federal officials to take or to refrain from taking actions," *Aleman Gonzalez*, 596 U.S. at 550.

But the Supreme Court has already held—in interpreting Section 1252(f) itself—that this same critical distinction also differentiates stays from injunctive relief. In *Nken*, Chief Justice Roberts explained that stays operate "by temporarily suspending the source of authority to act" and "not by directing an actor's conduct." 556 U.S. at 428-29. By contrast, injunctive relief "is directed at someone, and governs that party's conduct." *Id.* at 428. Based on this distinction, the Court held that the second "Limit on injunctive relief" in Section 1252(f)—that set out in Section 1252(f)(2)—does not bar stays. *Id.* at 428-32. This distinction means that stays do not "restrain" the conduct of agency officials any more than they "enjoin" it. *See Aleman Gonzalez*, 596 U.S. at 549 (stating that "restrain" means to "prevent [someone] from doing something").

Defendants nonetheless insist that "restrain" must be given a broad sweep so that it is not rendered "superfluous." Br. 31. But the surplusage "canon can be appropriately discounted" when statutes employ strings of "synonyms and near-synonyms" of the kind common in legal drafting. *United States v. Bronstein*, 849 F.3d 1101, 1110 (D.C. Cir. 2017) (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 176-77, 179 (2012)). The words

"restrain and enjoin" are a textbook example of these "common doublets in legal writing" and they are often used as "coupled synonyms." Bryan A. Garner, *Garner's Dictionary of Legal Usage* 294-96 (3d ed. 2011); *see also, e.g.*, *California v. Arizona*, 452 U.S. 431, 432 (1981) (using "enjoined and restrained" to refer to injunction).

To the extent that the relevant meanings of "enjoin" and "restrain" do not overlap, they most naturally refer to the two kinds of injunctive relief: injunctions and temporary restraining orders. *See generally* Fed. R. Civ. P. 65; *see also* Fed. R. Civ. P. 65(c) (referring to the party against whom an "injunction or temporary restraining order" will issue as the party to be "enjoined or restrained"). This reading is particularly natural in a section aimed at limiting "injunctive relief."

Defendants also seek to draw inferences from the fact that Congress did not use the same "enjoin or restrain" formulation from Section 1252(f)(1) in subsection (f)(2). Br. 31-32. But that difference is consistent with reading each subsection as solely a "Limit on injunctive relief." Section 1252(f)(2) provides that "no court shall enjoin the removal of any [noncitizen] . . . unless the [noncitizen] shows by clear and convincing evidence that the entry or execution of such order is prohibited as a matter of law." 8 U.S.C. § 1252(f)(2). As *Nken* explained, Section 1252(f)(2)'s "clear and convincing evidence" standard is incompatible with interim relief because it "requir[es] a definitive merits decision," "without regard to the prospect of

44

irreparable harm." 556 U.S. at 432. In other words, Section 1252(f)(2) permits only *final* injunctions (and only if its heightened standard is met); it does not contemplate the entry of temporary restraining orders (or preliminary injunctions) at all. Because Section 1252(f)(2)'s heightened standard is incompatible with temporary restraining orders, it would have been illogical for Congress to indicate that courts could "enjoin *or restrain*" removals if that standard is met.

Meanwhile, other provisions of Section 1252 enacted at the same time as Section 1252(f) demonstrate that when Congress intended to bar stays or other non-injunctive relief, it did so clearly. *See Nken*, 556 U.S. at 430. "[W]hen Congress wanted to refer to a stay" in Section 1252, "it used the term 'stay,'" as it did in Section 1252(b)(3)(B). *Id.* "By contrast, the language of subsection (f) says nothing about stays." *Id.* Similarly, Section 1252(e)(1)(A)—titled "Limitations on relief," rather than just on "injunctive relief"—prohibits the entry of "declaratory, injunctive, or other equitable relief" in specified circumstances. *See* 8 U.S.C. § 1252(e)(1)(A). Congress' contrary decision not to refer to either "stays" specifically or to "other relief" more generally in § 1252(f)(1) reinforces the conclusion that the provision—as its title states—is solely a "Limit on injunctive relief." *See Nken*, 556 U.S. at 430 (cleaned up).

45

## IV.    The Equities Favor Relief.

The district court concluded that MRNY demonstrated three categories of the ongoing or imminent harm to its members: (1) wrongful removal of individuals statutorily ineligible for expedited removal; (2) detention and family separation during expedited removal proceedings; and (3) risks of persecution and death if and when noncitizens subject to expedited removal are removed. JA-43-45.

Defendants claim that a supposed "delay" in seeking preliminary relief undermines MRNY's showing of irreparable harm. Br. 56. But the lone decision they cite involved "inexcusable delay," and the timing here is "neither unexplained nor unexcused." JA-45. Indeed, Defendants nowhere contest the evidence demonstrating that when Defendants began to "aggressively implement the 2025 Designation, in New York and nationwide," MRNY filed promptly to seek relief once *its members* faced *imminent* injury. As the district court found, these "new facts" justified MRNY's "sudden urgency." *Id.* (cleaned up). And any supposed delay is alone insufficient to undercut MRNY's showing of harm. *Cf. Gordon v. Holder*, 632 F.3d 722, 724 (D.C. Cir. 2011).

Defendants next contend that MRNY did not demonstrate its members were likely to face expedited removal. Br. 56-57. But the record is "replete with uncontested evidence" that, at the time MRNY sought relief, Defendants were "systematically targeting individuals attending their immigration court proceedings

46

for placement into expedited removal, in New York," where MRNY members reside and report to immigration court.  JA-43.

Moreover, MRNY identified multiple members at risk of being placed in expedited removal under the challenged policies, several of whom had impending immigration court dates. JA-43 (citing JA-157-58). Indeed, Defendants had *already* sought to dismiss member John Doe 4's regular removal proceedings in order to subject him to expedited removal. JA-158. As the district court found, because Defendants were "dismissing section 240 proceedings as a predicate to placing people in expedited removal proceedings, the foreseeable next step [was] that some of [MRNY's] members will be put into expedited removal." JA-44. The district court rightly concluded that this imminent danger would cause irreparable harm in the forms of detention, separation from family, and unconstitutional removal. JA-44.

Defendants additionally claim that MRNY's members seeking asylum face no harm because they can access the credible fear process. That ignores the significant limitations and risks of error in the expedited removal process that the district court identified; that members will be denied the procedural rights they have in full removal proceedings to present their asylum claims; and that they will be detained for the expedited removal process, isolated, and separated from their families and lawyers while attempting to present their claims. *See supra* Argument Part I.C.

Nor does the district court's order significantly harm the government or the public, as Defendants claim. *See* Br. 57-60. Defendants suggest that being required to process noncitizens through regular rather than expedited removal proceedings constitutes irreparable harm. But that was the status quo for decades, and those regular proceedings permit Defendants to continue to detain and remove noncitizens from the interior of the United States while also providing constitutionally adequate safeguards. Moreover, the district court made clear that it was not wholly barring Defendants from expanding expedited removal, only from doing so without "modest procedural safeguards." JA-42.

Finally, "[t]here is generally no public interest in the perpetuation of unlawful agency action." *Shawnee Tribe v. Mnuchin*, 984 F.3d 94, 102 (D.C. Cir. 2021). Indeed, in *A.A.R.P.*, even the government's purported "national security interests" in quickly removing supposed gang members did not outweigh "the necessity that such interests be pursued in a manner consistent with the Constitution." 605 U.S. at 96. Thus, the equities favor relief.

## V. The Scope of Relief Is Proper.

The district court properly ordered a full stay under Section 705. According to Defendants, the principle that equitable relief "should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs" counsels against a full stay. Br. 61 (quoting *Trump v. CASA, Inc.*, 606 U.S. 831, 852 (2025)).

48

However, even assuming the complete relief principle applies to the APA, complete relief under the APA requires postponement of the agency action itself, not just postponement as to the parties (if that were even possible). That is certainly the case in actions like this one pursuant to 8 U.S.C. § 1252(e)(3), in which Congress specifically provided for prompt review of the legality of new expedited removal policies in this Circuit. Additionally, Defendants fail to demonstrate error in the district court's findings that, under the facts here, the only way to provide complete relief to MRNY is to stay the agency action in full.

1. Relief under the APA means postponing or vacating the challenged agency actions, not barring their application just as to the parties. As Justice Kavanaugh explained, the APA "empower[s] the judiciary to act directly against the challenged agency action.'" *Corner Post, Inc. v. Bd. of Governors of Fed. Reserve Sys.*, 603 U.S. 799, 838 (2024) (Kavanaugh, J., concurring). Justice Kavanaugh therefore made clear in his *CASA* concurrence that full vacatur remains available. 606 U.S. at 869 (Kavanaugh, J., concurring). Five other justices have since indicated the same. *See Nat'l Insts. of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2662-63 (2025) (Roberts, C.J., joined by Sotomayor, Kagan, and Jackson, JJ., concurring in part and dissenting in part); *id.* at 2661 (Barrett, J., concurring).

Indeed, Sections 705 and 706 both explicitly empower courts to act directly against the agency action. Section 706 allows courts to "hold unlawful and set aside

49

*agency action.*" 5 U.S.C. § 706(2) (emphasis added). Because Section 706 relief involves vacating an agency action, relief is not limited to the parties. *See Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998); *accord Corner Post*, 603 U.S. at 831 (Kavanaugh, J., concurring); *see also* Mila Sohoni, *The Power to Vacate a Rule*, 88 Geo. Wash. L. Rev. 1121, 1173 (2020) ("The term 'set aside' means invalidation—and an invalid rule may not be applied to anyone"). "When a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed." *Nat'l Mining Ass'n*, 145 F.3d at 1409. The Supreme Court has also approved full vacatur of agency action under Section 706, describing it as "complete relief." *Bowen v. Massachusetts*, 487 U.S. 879, 911 (1988) (affirming district court order granting full vacatur).

Like Section 706, Section 705 empowers courts to act directly against agency action by "postpon[ing] the effective date of an agency action." 5 U.S.C. § 705. Defendants attempt to distinguish between Sections 705 and 706. Br. 65. But a Section 705 stay is simply "the temporary form of vacatur," which "temporarily voids the challenged authority" pending further review (and potential subsequent vacatur). *All. for Hippocratic Med.*, 78 F.4th at 254; *see also, e.g.*, *In re GTE Serv. Corp.*, 762 F.2d 1024, 1026 (D.C. Cir. 1985) (Section 705 provides "statutory authority to stay agency orders pending review in this court."); *Mexichem Specialty*

*Resins, Inc. v. EPA*, 787 F.3d 544, 549, 562 (D.C. Cir. 2015) (Kavanaugh, J., dissenting on other grounds) ("Section 705 of the APA authorizes courts to stay agency rules pending judicial review.").

Because a Section 705 stay postpones the agency action itself, the remedy is not limited to the parties. *See, e.g.*, *West Virginia v. EPA*, 577 U.S. 1126 (2016) (staying agency action in full); *Career Colls. & Schs. of Tx. v. U.S. Dep't of Educ.*, 98 F.4th 220, 255 (5th Cir. 2024), *cert. granted on other grounds*, 145 S. Ct. 1039 (2025) (explaining why relief is not limited to the parties); *Coal. for Humane Immigrant Rts.*, 2025 WL 2192986, at *37 (same); *Cabrera v. U.S. Dep't of Labor*, No. 25-cv-1909, 2025 WL 2092026, at *8 (D.D.C. July 25, 2025) (same); *District of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 48 (D.D.C. 2020) (same). Thus, complete relief under Section 705 requires postponement of the challenged agency actions themselves, not just as to MRNY.

Defendants argue that Section 705 incorporates traditional equitable principles. Br. 61-64. "But in the APA, Congress . . . depart[ed] from th[e] baseline" that "equitable relief is ordinarily limited to the parties" and "empower[ed] the judiciary to act directly against the challenged agency action." *Corner Post*, 603 U.S. at 838 (Kavanaugh, J., concurring); *Griffin v. HM Florida-ORL, LLC*, 144 S. Ct. 1, 2 & n.1 (2023) (APA relief is "distinct" from "enjoin[ing] the government from

51

enforcing [a] law against non-parties.") (Statement of Kavanaugh, J.). Defendants' cited cases, Br. 61-63, which involve injunctions, are thus inapposite.

Defendants' reliance on *CASA*, Br. 61-63, 66, is similarly misplaced. That case concerned whether the Judiciary Act of 1789 authorized universal injunctions and acknowledged that "whether the Administrative Procedure Act authorizes federal courts to vacate federal agency action" presents a "distinct question." 606 U.S. at 847 n.10; *see also id.* at 869 (Kavanaugh, J., concurring).

Defendants' attempts to tie their interpretation to the text of the APA, Br. 62-64, fail as well. Defendants argue that Section 705's text providing that a court may grant relief "to the extent necessary to prevent irreparable injury" "refers to irreparable injury to the plaintiff." Br. 62. As the district court observed, however, Section 705 "authorizes the reviewing court to postpone the effective date of an agency action or preserve status or rights full stop, not only as to plaintiffs before the court." JA-48 (cleaned up). Defendants' interpretation thus requires adding words found nowhere in the statute.

Defendants also note that Section 705 allows a court to issue "all necessary and appropriate process." Br. 60, 63. But this language simply means that "relief should only involve postponing the effective date of the portions of the [agency action] that [the plaintiff] actually challenges and for which it has shown a likelihood of success on the merits." *Career Colls.*, 98 F.4th at 255.

Defendants similarly read far too much into 5 U.S.C. § 702—the APA section providing a waiver of sovereign immunity—which states that "[n]othing herein . . . affects . . . the power or duty of the court to . . . deny relief." Br. 64. That language merely clarifies that the APA's elimination of sovereign immunity "did not affect any other limitation on judicial review that would otherwise apply under the APA." *Darby v. Cisneros*, 509 U.S. 137, 153 (1993). It has no bearing on the scope of relief awarded here.

Finally, Defendants cite a House Report, Br. 64, but that report repeats the language of "prevent[ing] irreparable injury" without specifying that such injury must be the plaintiff's alone. Additionally, Defendants never acknowledge the fact that, at the time of this Report, the majority of agency actions were adjudications that would impact just the litigant, not non-parties; rulemaking was less common. *See* Reuel E. Schiller, *Rulemaking's Promise: Administrative Law and Legal Culture in the 1960s and 1970s*, 53 Admin. L. Rev. 1139, 1145 (2001) ("Before the 1960s agencies acted mainly through case-by-case adjudications."). The Report's statement that relief would "normally, if not always, be limited to the parties complainant" is thus simply a descriptive claim about the relative frequency of party-specific relief in that era, where the "normal[]" challenge was a plaintiff challenging an order limited to that person alone, so the "normal[]" relief would be limited to that plaintiff.

2. Even assuming Section 705 stays could be limited to the plaintiffs, full stays (and vacatur) under the APA are certainly appropriate in actions like this one pursuant to 8 U.S.C. § 1252(e)(3). In that provision, Congress explicitly provided a short window for facial review of new, written expedited removal policies within this Circuit—while disallowing piecemeal as-applied challenges across the country. 8 U.S.C. § 1252(e)(3); *see also supra* Argument Part I.E. It therefore clearly intended for unitary relief as to the challenged agency actions themselves, dovetailing with the APA's provisions providing for interim relief in the form of stays of agency action and final relief in the form of vacatur.

3. Even assuming Section 705 stays could be limited to the plaintiffs in some cases, complete relief here requires staying the challenged actions in full. As the district court found, a full stay of the Designation and the challenged portions of the Memorandum is warranted for the independent reason that this relief is necessary to provide complete relief to MRNY. The district court correctly found that practical considerations make it impossible to limit the stay to MRNY's members while preventing irreparable injury. ECF 70 at 2-3.

Based on uncontested evidence, the district court found that this "narrower remedy" was "unworkable given the facts of this case" because of at least three "practical hurdles": (1) MRNY does not preemptively collect immigration status information from its members; (2) it is impossible for MRNY to ensure that it will

reach every affected member in any case because "its membership is drawn from 'low-income and working communities' where people often 'change phone numbers and addresses'"; and (3) requiring MRNY to disclose its members subject to the challenged policies would "put[] those members at risk of 'retaliation.'" *Id.* at 3.

Moreover, the "substantial evidence" of "recurring errors" throughout the expedited removal process, *see* JA-30-36, makes it implausible that Defendants would effectively screen out MRNY members—just as they fail to effectively identify people who have lived in the country for at least two years, asylum seekers, and even U.S. citizens. *See Coal. for Humane Immigrant Rts.*, 2025 WL 2192986, at *38 (explaining that because the "agencies struggle even to follow the limited procedures that exist," it would be difficult for them to "implement . . . additional procedures to determine whether individuals in expedited removal are members of one of the [p]laintiff organizations"). Defendants do not grapple with any of these findings.

Nor do Defendants address the district court's conclusion that limiting relief would "raise serious constitutional questions" because requiring disclosure of MRNY's membership list could infringe on its members' associational rights. ECF 70 at 3 (citing *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462 (1958)). Because Defendants' proposed "narrower remedy" is "unworkable given the facts of this case," the scope of relief is proper. *Id.*

Finally, Defendants suggest that this Court should allow the continued use of the Designation against noncitizens "who entered the country *lawfully*, *i.e.*, because they were granted humanitarian parole that was subsequently revoked." Br. 67. But the Designation is not divisible or severable in this respect, since its operative provisions never mention either parole or lawful or unlawful entry. 90 Fed. Reg. at 8140. Thus, the scope of relief is proper.

## CONCLUSION

The Court should affirm.

Dated: November 3, 2025

Respectfully submitted,

*/s/ Anand Balakrishnan*
Anand Balakrishnan
*Counsel of Record*

Morgan Russell
Hannah Steinberg
Michael K.T. Tan
Cody Wofsy
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
425 California Street, Suite 700
San Francisco, CA 94104
(415) 343-0770
*mrussell@aclu.org*
*hsteinberg@aclu.org*
*m.tan@aclu.org*
*cwofsy@aclu.org*

Lucia Goin
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
915 15th Street NW

Grace Choi
Sidra Mahfooz
Omar C. Jadwat
Lee Gelernt
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2660
*abalakrishnan@aclu.org*
*gchoi@aclu.org*
*smahfooz@aclu.org*
*ojadwat@aclu.org*
*lgelernt@aclu.org*

Arthur B. Spitzer
Aditi Shah

56

Washington, DC 20005
(212) 549-2500
*lgoin@aclu.org*

Amy Belsher
Robert Hodgson
NEW YORK CIVIL LIBERTIES UNION
FOUNDATION
125 Broad St., 19th Floor
New York, NY 10004
(212) 607-3300
*abelsher@nyclu.org*
*rhodgson@nyclu.org*

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF THE DISTRICT OF
COLUMBIA
529 14th Street, NW, Suite 722
Washington, D.C. 20045
(202) 457-0800
*aspitzer@acludc.org*
*ashah@acludc.org*

*Attorneys for Plaintiffs-Appellees*

## CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P 27(d)(2)(A)

Pursuant to Fed. R. App. P. 27(d)(2)(A), I hereby certify that the preceding document complies with the type-volume limitation of the Rules, containing 12, 977 words, excluding the parts of the document exempted by Federal Rules of Appellate Procedure 32(f). I further certify that the document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365, in 14-point Times New Roman font.

*/s/ Anand Balakrishnan*
Anand Balakrishnan
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2660
*abalakrishnan@aclu.org*

58

## CERTIFICATE OF SERVICE

I hereby certify that on November 3, 2025, I caused this document to be filed through the ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

> */s/ Anand Balakrishnan*
> Anand Balakrishnan
> AMERICAN CIVIL LIBERTIES UNION
> FOUNDATION
> IMMIGRANTS' RIGHTS PROJECT
> 125 Broad Street, 18th Floor
> New York, NY 10004
> (212) 549-2660
> *abalakrishnan@aclu.org*