# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued December 9, 2025                    Decided June 23, 2026

No. 25-5320

MAKE THE ROAD NEW YORK, ET AL.,
APPELLEES

v.

MARKWAYNE MULLIN, SECRETARY OF THE U.S. DEPARTMENT
OF HOMELAND SECURITY, IN HIS OFFICIAL CAPACITY, ET AL.,
APPELLANTS

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:25-cv-00190)

———

*Drew C. Ensign*, Deputy Assistant Attorney General, U.S. Department of Justice, argued the cause for appellants. With him on the briefs were *Brett A. Shumate*, Assistant Attorney General, *Tyler J. Becker*, Counsel to the Assistant Attorney General, and *Elissa Fudim*, *Joseph McCarter*, and *Caroline McGuire*, Attorneys.

*Christopher J. Hajec* and *Matt A. Crapo* were on the brief for *amicus curiae* Federation for American Immigration Reform in support of defendants-appellants.

2

*Anand Balakrishnan* argued the cause for appellees. With him on the brief were *Morgan Russell*, *Hannah Steinberg*, *Michael K.T. Tan*, *Cody Wofsy*, *Lucia Goin*, *Sidra Mahfooz*, *Omar C. Jadwat*, *Lee Gelernt*, *Arthur B. Spitzer*, and *Aditi Shah*.

*Rob Bonta*, Attorney General, Office of the Attorney General for the State of California, *Vilma Palma-Solana*, Supervising Deputy Attorney General, *Kristin K. Mayes*, Attorney General, Office of the Attorney General for the State of Arizona, *Kathleen Jennings*, Attorney General, Office of the Attorney General for the State of Delaware, *Anne E. Lopez*, Attorney General, Office of the Attorney General for the State of Hawai'i, *Aaron M. Frey*, Attorney General, Office of the Attorney General for the State of Maine, *Andrea Joy Campbell*, Attorney General, Office of the Attorney General for the Commonwealth of Massachusetts, *Keith Ellison*, Attorney General, Office of the Attorney General for the State of Minnesota, *Philip J. Weiser*, Attorney General, Office of the Attorney General for the State of Colorado, *William Tong*, Attorney General, Office of the Attorney General for the State of Connecticut, *Kwame Raoul*, Attorney General, Office of the Attorney General for the State of Illinois, *Anthony G. Brown*, Attorney General, Office of the Attorney General for the State of Maryland, *Dana Nessel*, Attorney General, Office of the Attorney General for the State of Michigan, *Aaron D. Ford*, Attorney General, Office of the Attorney General for the State of Nevada, *Matthew J. Platkin*, Attorney General, Office of the Attorney General for the State of New Jersey, *Letitia James*, Attorney General, Office of the Attorney General for the State of New York, *Charity R. Clark*, Attorney General, Office of the Attorney General for the State of Vermont, *Brian L. Schwalb*, Attorney General, Office of the Attorney General for the District of Columbia, *Raul Torrez*, Attorney General, Office of the Attorney General for the State of New Mexico,

3

*Dan Rayfield*, Attorney General, Office of the Attorney General for the State of Oregon, and *Nicholas W. Brown*, Attorney General, Office of the Attorney General for the State of Washington, were on the brief for *amici curiae* States of California, et al. in support of appellees.

Before: WILKINS, RAO and WALKER, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* WALKER, in which WILKINS, J., joins as to Parts I, II and IV, and in which RAO, J., joins as to Parts I–III, IV.B, and V.

Opinion concurring in the judgment by *Circuit Judge* RAO, in which WALKER, J., joins as to Part II.A.

Opinion concurring in part and dissenting in part by *Circuit Judge* WILKINS.

WALKER, *Circuit Judge*: Thirty years ago, Congress created a new process for deporting illegal aliens. It is called "expedited removal." Unlike other statutorily required procedures that can take years to complete, expedited removal often takes just a few days.

At issue here is the provision allowing the Secretary of Homeland Security to designate certain aliens already in the country for expedited removal. Congress excluded many people from that provision. Any aliens admitted or paroled are excluded, even if they are here illegally. So too is anyone who can prove he has lived here — legally or illegally — for at least two straight years.

As for whether to designate other aliens for expedited removal, Congress let the Executive decide. And for many years, while some were designated, others were not. But that

4

changed in January 2025 when the Executive expanded expedited removal to the maximum extent allowed by Congress.

The district court stayed the expansion, holding that it likely violated due process.

Because it does not, we vacate the stay.

## I. Background on Expedited Removal

### A. Statutory Scheme

As its name suggests, "expedited removal" authorizes the rapid removal of certain aliens.  Subject to various limitations, that generally includes two groups: first, those "arriving in the United States," 8 U.S.C. § 1225(b)(1)(A)(i); second, those already in the United States who were not admitted or paroled and who cannot show continuous physical presence for at least two years, if the Secretary of Homeland Security so designates. *Id.* § 1225(b)(1)(A)(iii).

The expedited-removal process begins with an inspection by an immigration officer.  If the officer finds the alien inadmissible and no exception applies, the officer must order removal without a hearing before an immigration judge and without ordinary administrative review. *Id.* § 1225(b)(1)(A)(i).  Before issuing a removal order, the officer must advise the alien of the charges and allow a response in a sworn statement.  8 C.F.R. § 235.3(b)(2)(i).  Interpretive assistance must be provided if needed. *Id.*  The removal order and related documents "must be reviewed and approved by [a] supervisor" before becoming final. *Id.* § 235.3(b)(7).

A person may claim that expedited removal does not apply to him.  For example, he may claim U.S. citizenship, lawful

5

permanent resident status, refugee or asylee status, admission or parole, or sufficient continuous physical presence. 8 U.S.C. § 1225(b)(1)(A)(iii)(II), (1)(C); 8 C.F.R. § 235.3(b)(5). The regulations allow the person to present evidence in support of these claims. 8 C.F.R. § 235.3(b)(6)–(7).

The parties agree that — at least when the executive has not exercised his discretion in a way that categorically bars asylum — the statute provides for the following regime. *See* Appellants' Brief at 8–12; Appellees' Brief at 4–6; *cf. Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 730–31 (D.C. Cir. 2022); *Refugee & Immigrant Center for Education & Legal Services v. Mullin*, 174 F.4th 81, 105–11 (D.C. Cir. 2026) (addressing whether executive action may foreclose the statutory opportunity to apply for asylum). If an alien expresses fear of persecution or torture, or an intent to apply for asylum, the alien is referred to a non-adversarial "credible fear" interview with an asylum officer who decides whether there is a significant possibility that the alien could establish eligibility for asylum or related protection. 8 C.F.R. §§ 208.30(e), 235.3(b)(4); 8 U.S.C. § 1225(b)(1)(A)(ii).

Under that system, if the asylum officer finds no credible fear, a supervisor reviews that decision. 8 C.F.R. § 235.3(b)(7). If the supervisor agrees, the alien may request review by an immigration judge. 8 U.S.C. § 1225(b)(1)(B)(iii)(III). The judge reviews the issue de novo. 8 C.F.R. § 1003.42(c). If the judge also finds no credible fear, the expedited removal order becomes final. *Id.* § 1003.42(f)(2).

If credible fear is found at any stage, the alien must be detained for further consideration of the asylum application. 8 U.S.C. § 1225(b)(1)(B)(ii). United States Citizenship and Immigration Services has "complete discretion" over how to

6

proceed. 8 C.F.R. § 208.30(f). It may place the alien into regular (non-expedited) removal proceedings before an immigration judge or instead retain jurisdiction over the asylum application. *Id.* If USCIS retains jurisdiction, it follows the procedures set out in 8 C.F.R. § 208.9 to assess the alien's eligibility for asylum, withholding of removal, or protection under the Convention Against Torture. *See* 8 U.S.C. §§ 1225(b)(1), 1158(a), 1231(b)(3); FARRA § 2242; 8 C.F.R. §§ 1208.16–18. Other forms of relief are available only in regular removal proceedings.

Judicial review of individual expedited-removal orders is narrow. *See id.* § 1252(a)(2)(A), (e). Through habeas corpus, a court may consider only whether the petitioner is an alien, whether an expedited-removal order was issued, and whether the petitioner has lawful-permanent-resident, refugee, or asylee status. *Id.* § 1252(e)(2); 28 U.S.C. § 2241(c) (conferring jurisdiction). Courts may not review the underlying determination of inadmissibility or the credible-fear determination. 8 U.S.C. § 1252(e)(5).

Congress has also provided limited judicial review of the expedited-removal system itself. Challenges to the lawfulness of the statute, regulations, or certain written policies must be brought in the United States District Court for the District of Columbia and within the time limits set by statute. *Id.* § 1252(e)(3).

Detention during expedited removal is generally mandatory. 8 U.S.C. § 1225(b)(1)(B)(iii)(IV); 8 C.F.R. § 235.3(b)(2)(iii). The process operates on a short timeline. Decisions and removals often occur within days, and sometimes sooner. Hartzler Dec. ¶ 13, *Make the Road New York v. Noem*, No. 1:25-cv-90 (D.D.C. June 10, 2025), ECF No. 50-13.

7

## B. History of Executive Branch Policies

Since the creation of expedited removal, the Executive has implemented it through a series of Federal Register designations. Those designations have defined which aliens may be placed in expedited removal and under what conditions.

A designation in 1997 applied expedited removal to aliens arriving at ports of entry and to those interdicted at sea. *Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures*, 62 Fed. Reg. 10,312 (Mar. 6, 1997). The Attorney General noted that the statute permitted future expansion and that any such expansion would depend on enforcement needs and available resources. *Id.* at 10,314.

A 2002 designation expanded expedited removal to certain aliens who arrived in the United States by sea, were not admitted or paroled, and could not show two years of continuous physical presence. *Notice Designating Aliens Subject to Expedited Removal Under Section 235(b)(1)(A)(iii) of the Immigration and Nationality Act*, 67 Fed. Reg. 68,924 (Nov. 13, 2002).

In 2004, the Secretary of Homeland Security expanded the application of expedited removal to all qualifying aliens encountered within 100 miles of the border and within fourteen days of entry. *Designating Aliens for Expedited Removal*, 69 Fed. Reg. 48,877 (Aug. 11, 2004). That designation did not limit its application to certain methods of arrival as the previous ones had. The Secretary explained that because he wanted to focus enforcement resources, he was not expanding the designation beyond those time and distance parameters. *Id.* at 48,879.

8

In 2017, the Secretary extended existing expedited-removal designations to Cuban nationals, who had previously been exempt. *Eliminating Exception To Expedited Removal Authority for Cuban Nationals Encountered in the United States or Arriving by Sea*, 82 Fed. Reg. 4,902 (Jan. 17, 2017).

In July 2019, DHS issued a new designation. It authorized expedited removal for certain aliens encountered *anywhere* in the United States — not just within 100 miles of the border — who had not been admitted or paroled and who did not show two years of continuous physical presence. *Designating Aliens for Expedited Removal*, 84 Fed. Reg. 35,409 (July 23, 2019). The 2019 designation was preliminarily enjoined about two months after it was issued. *See Make the Road N.Y. v. McAleenan*, 405 F. Supp. 3d 1, 72 (D.D.C. Sept. 27, 2019). This court reversed the preliminary injunction. *Make the Road N.Y. v. Wolf*, 962 F.3d 612, 618 (D.C. Cir. 2020).

In March 2022, DHS rescinded the 2019 designation. *Rescission of the Notice of July 23, 2019, Designating Aliens for Expedited Removal*, 87 Fed. Reg. 16,022 (Mar. 21, 2022). During the period it was in effect, it was reportedly applied to twenty-one aliens. Aleaziz, *The Biden Administration Has Suspended a Trump-Era Policy That Put Immigrants at Risk of Being Deported Without Due Process*, BuzzFeed News (Oct. 14, 2021), *reprinted in* Steinberg Decl. ¶ 13, *Make the Road N.Y. v. Noem*, No. 1:25-cv-90 (D.D.C. June 10, 2025), ECF No. 50-23, at 250–51.

All other prior expedited-removal designations remained in effect after the rescission.

9

## II. The Facts of This Case

### A. DHS's 2025 Expansion of Expedited Removal

On January 21, 2025, Acting Secretary of Homeland Security Benjamin Huffman issued a notice authorizing the use of expedited removal nationwide for certain aliens who cannot demonstrate continuous physical presence in the United States for at least two years. *Designating Aliens for Expedited Removal*, 90 Fed. Reg. 8,139 (Jan. 24, 2025).[1]

Under the 2025 Designation, DHS may place in expedited removal, with limited exceptions, aliens who are inadmissible because they lack valid documentation or entered via fraud or willful misrepresentation, have not been admitted or paroled, and have not affirmatively shown, to the satisfaction of an immigration officer, that they have been continuously present in the United States for the two years immediately preceding the determination of inadmissibility. *Id.*; 8 U.S.C. § 1182(a)(6)(C) (fraud or misrepresentation), (a)(7) (documentation requirement).

In practical terms, the Designation extended expedited removal to all aliens eligible for expedited removal under the statute who were not already covered by prior designations. DHS thereby exercised its discretion to apply its expedited-removal authority to the maximum extent allowed by law.

The notice stated that the Designation would "enhance national security and public safety — while reducing government costs — by facilitating prompt immigration determinations." *Designating Aliens for Expedited Removal*,

---

[1] The notice rescinded the 2022 rescission of the 2019 designation. *Designating Aliens for Expedited Removal*, 90 Fed. Reg. at 8,139.

10

90 Fed. Reg. at 8,139.  It also stated that the expanded use of expedited removal would allow DHS to address more effectively "the large volume of aliens who are present in the United States unlawfully" and to ensure their prompt removal. *Id.*

On January 23, 2025, Acting Secretary Huffman issued an internal memorandum providing guidance on how to implement the Designation.  The Huffman Memorandum directs immigration officers to take all steps necessary to review an alien's case and to evaluate whether the alien should be placed in expedited removal.  It instructs officers to consider applying expedited removal to any alien who is "amenable" to that process.  Department of Homeland Security, *Guidance Regarding How to Exercise Enforcement Discretion* (Jan. 23, 2025), perma.cc/X7EG-WKZ7.

In addition, the memorandum addresses how officers should exercise enforcement discretion in implementing the expanded authority.  It encourages them to consider a range of factors, including whether an individual is eligible for expedited removal and whether the individual failed to apply for asylum within the statutory deadline.

The memorandum thus functions as an operational directive.  It does not itself expand the statutory scope of expedited removal.  Instead, it guides officers in identifying cases in which expedited-removal procedures may be appropriate under the 2025 Designation and existing law.

## B. This Case's Procedural History

Make the Road New York filed this action challenging the 2025 Designation and the Huffman Memorandum.  The complaint asserted statutory and constitutional claims,

11

including a claim that the Designation and Huffman Memorandum violate the Due Process Clause.  It alleged standing on behalf of its members, asserting that some were subject to expedited removal under the 2025 Designation.[2]

In June 2025, Make the Road moved to postpone the effective date of the Designation and Huffman Memorandum under 5 U.S.C. § 705.[3]  The district court granted the § 705 stay in August 2025.  Applying the framework of *Mathews v. Eldridge*, it concluded that Make the Road was likely to succeed on its due process claim because aliens subject to expedited removal have a significant liberty interest in remaining in the United States and face a substantial risk of erroneous deprivation of this interest under the procedures established by the Designation and Huffman Memorandum.

The district court identified three principal areas of risk:

1. The procedures for referring individuals who fear removal for credible-fear interviews.

2. The credible-fear interviews themselves.

3. The procedures for determining whether an alien has been continuously present in the United States for two years.

The court concluded that the Government's interest in swift removals did not outweigh the value of additional

---

[2] The complaint also named two individual plaintiffs, Mary and John Doe.  They alleged that they were placed in expedited-removal proceedings and removed under the Designation and the Huffman Memorandum.

[3] The individual plaintiffs did not seek relief in that motion.

12

procedural safeguards.  It also determined that equitable factors favored relief.

By its terms, the order "postponed and stayed" without qualification "the effective dates of implementation and enforcement" of the 2025 Designation and the Huffman Memorandum.  Order, *Make the Road N.Y. v. Noem*, No. 1:25-cv-190 (D.D.C. Aug. 29, 2025), ECF No. 65.  The stay thus applied on a nationwide basis.  It was not limited to Make the Road or its members.

The Government filed an emergency motion in this court for an administrative stay and a stay pending appeal.  The court denied the motion for an administrative stay, granted in part the motion for a stay pending appeal, and denied it in part.  Order, *Make the Road N.Y. v. Noem*, No. 25-5320, 2025 WL 3563313 at *1 (D.C. Cir. Nov. 22, 2025).  Judge Rao dissented, stating that the district court lacked authority to enter the § 705 stay. *Id.* at *45 (Rao, J., dissenting).

### III. Standard of Review and Summary of Analysis

"The factors to be considered in determining whether a stay is warranted are: (1) the likelihood that the party seeking the stay will prevail on the merits of the appeal; (2) the likelihood that the moving party will be irreparably harmed absent a stay; (3) the prospect that others will be harmed if the court grants the stay; and (4) the public interest in granting the stay." *Cuomo v. NRC*, 772 F.2d 972, 974 (D.C. Cir. 1985).

In the nearly two decades since the Supreme Court decided *Winter v. NRDC*, 555 U.S. 7 (2008), and *Nken v. Holder*, 556 U.S. 418 (2009), our circuit has not had occasion to decide whether, as those opinions at least suggest, the party moving for a preliminary injunction (*Winter*) or a stay (*Nken*) needs to

13

show that the party is likely to succeed on the merits, *and* that the party is irreparably harmed, *and* that the balance of equities favors that party. In other words, we have not decided if the movant's failure to establish any one of the factors dooms the motion or if instead we can apply a sliding-scale approach (as we did before *Winter* and *Nken*).

Nor do we need to decide so today because Make the Road has not satisfied the more movant-friendly, sliding-scale standard. First, it is not likely to prevail on the merits. *See infra*, Part V. Second, lawful "removal alone cannot constitute the requisite irreparable injury." *Nken*, 556 U.S. at 435. Third, the Government is harmed by "an improper intrusion by a federal court into the workings of a coordinate branch of the Government." *INS v. Legalization Assistance Project*, 510 U.S. 1301, 1305-06 (1993) (O'Connor J., in chambers). And fourth, when removal is lawful, the public has an "interest in prompt execution of removal orders." *Nken*, 556 U.S. at 436.

Because the application of the second, third, and fourth factors are well established in the context of alien removals, the rest of this opinion focuses on the first factor — Make the Road's failure to show that it is likely to succeed on the merits.

## IV. Jurisdiction, Standing, Timeliness, and the District Court's Authority to Issue a Stay

Before turning to whether Make the Road has shown that the challenged agency actions likely violate due process, we discuss four threshold issues: (A) jurisdiction; (B) standing; (C) timeliness; and (D) the district court's authority to issue a stay. None of those issues blocked the district court from proceeding as it did.

14

## A. Jurisdiction

First, jurisdiction.  The district court had jurisdiction under 8 U.S.C. § 1252(e)(3).

Section 1252 tightly restricts judicial review of expedited removal.  It bars review of individual removal orders, subject to narrow exceptions not relevant here.  *See* 8 U.S.C. § 1252(a)(2)(A), (e)(2).   And it commits the Secretary's decision whether to designate classes of aliens for expedited removal to the Secretary's "sole and unreviewable discretion." *Id.* § 1225(b)(1)(A)(iii)(I); *see also id.* § 1252(a)(2)(A)(ii); *Make the Road New York v. Wolf*, 962 F.3d 612, 631–34 (D.C. Cir. 2020) ("*Make the Road I*") (holding that courts may not second-guess the Secretary's policy judgment).

But the statute does not eliminate all judicial review. Instead, § 1252(e)(3) channels to the District Court of the District of Columbia claims that the expedited-removal statute, its implementing regulations, or any "written policy directive, written policy guideline, or written procedure" is unconstitutional, inconsistent with the INA, or otherwise contrary to law.  8 U.S.C. § 1252(e)(3)(A).

Under *Make the Road I*, this suit falls within that preserved category.[4]   The Plaintiffs challenge two "written policy directive[s]": the January 21, 2025 Designation Notice and the January 23, 2025 Huffman Memorandum.  And they challenge

---

[4] Like Judge Rao, I am not persuaded by the court's analysis in *Make the Road I*, and I join Part II.A of her concurrence in the judgment. But because *Make the Road I* is a binding precedent, I apply its holding in today's case.

15

whether those directives comply with statutory and constitutional limits.  So the district court had jurisdiction.

That conclusion follows from the line this court has already drawn between unreviewable designation decisions and reviewable challenges to the written policies implementing expedited removal.

*Make the Road I* held that the District Court for the District of Columbia has jurisdiction over systemic challenges to designation decisions or their implementing directives.  As the court explained, "Section 1252 . . . route[s] . . . legal and constitutional challenges to two different fora": individual challenges to orders denying discretionary relief go to the courts of appeals, while "challenges pertaining to the expedited removal program must be filed in the District of Columbia district court."  962 F.3d at 630–31.  Since the plaintiffs brought their legal and constitutional challenges to the program in the D.C. district court, under *Make the Road I*, their challenges may proceed.[5]

---

[5] In an amicus brief, the Federation for American Immigration Reform suggests that *Make the Road I*'s jurisdictional analysis is undermined by this court's subsequent decision in *iTech U.S., Inc. v. Renaud*, 5 F.4th 59 (D.C. Cir. 2021).  But *iTech* addressed whether the jurisdictional  bar in § 1252(a)(2)(B)(ii) is limited to "[d]enials of discretionary relief," holding that it is not.  *Id.* at 63.  *Make the Road I*, by contrast, addressed the distinct question whether that generally worded jurisdictional bar blocks review of generally applicable implementing directives in light of the specific review scheme Congress established in § 1252(e)(3).  Because *iTech* neither involved expedited removal nor considered the interaction between § 1252(a)(2)(B) and § 1252(e)(3), it does not displace *Make the Road I*'s conclusion that Congress preserved judicial review of such directives.

16

To be sure, *Make the Road I* acknowledged that the Secretary's *policy choice* concerning "whether to expand expedited removal" is unreviewable. *Id.* at 618. But that is irrelevant. All *Make the Road I* meant is that no one may challenge the Secretary's decision if it "falls within statutory and constitutional bounds." *Id.* at 635. So, plaintiffs *cannot* challenge the designation decision, because that represents a policy choice to expand expedited removal. *Id.* at 631–34. But they *can* challenge the written directives effectuating that choice for constitutional and statutory defects — just as they have done here. *Id.* at 625–26.[6]

## B. Standing

To demonstrate associational standing, Make the Road must show, among other things, that at least one of its members has "standing to sue in [his] own right." *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 343 (1977). It has done so.[7]

---

[6] Nor does a written directive cease to be a "written policy directive" under § 1252(e)(3)(A) merely because it also announces a designation decision. It is both — and the former is subject to judicial review.

[7] The parties disagree about whether any member of Make the Road has standing to challenge DHS's continuous-presence requirements. So our discussion of standing focuses only on that. Make the Road satisfies the other requirements for associational standing to challenge DHS's continuous-presence procedures and has associational standing to challenge DHS's credible-fear procedures. *See Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 343 (1977) (association has standing when "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's

17

Make the Road challenges a unitary set of agency actions: the Designation and the Huffman Memorandum.  It claims that those DHS directives injure its members who have a credible fear of persecution abroad by denying them the adequate credible-fear interviews that due process requires.  It has therefore alleged (1) an injury (2) traceable to the directives and (3) redressable by vacatur of the directives.

DHS does not dispute Make the Road's standing on those grounds.  But it says Make the Road can *only* challenge the directives' alleged denial of adequate credible-fear interviews — not the directives' alleged denial of an adequate chance to show that the alien has lived in the country for two straight years.

But that confuses Make the Road's legal claim with its legal arguments.  After establishing standing to seek vacatur of the directives based on its members' credible-fear injuries, Make the Road may advance any legal argument to show that the directives are unlawful.  In this case, one of those arguments is that the directives violate due process by denying adequate credible-fear interviews.  Another of those arguments is that the directives violate due process by denying others an adequate opportunity to establish two years of continuous presence in the United States.

To be clear, Make the Road cannot ask the court for a *remedy* that would redress only other people's injuries.  Here, regardless of what due-process argument is made, Make the Road's requested remedy — vacatur of the directives — would redress the (alleged) injury to its members caused when those

purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit").

18

directives (allegedly) prevent their members from receiving adequate credible-fear interviews.

This court confirmed that principle in *Ascendium Education Solutions, Inc. v. Cardona*, 78 F.4th 470 (D.C. Cir. 2023). There, the plaintiffs challenged an agency rule and sought vacatur. *Id.* at 474. We held that when a plaintiff has standing to seek vacatur of a rule, it "has standing to bring any claims that could lead to the Rule's vacatur." *Id.* at 478. That is so "even if" some of the challenged provisions of that rule "are not directly linked to Petitioners' injuries." *Id.* (quoting *Mozilla Corp. v. FCC*, 940 F.3d 1, 46–47 (D.C. Cir. 2019)).

Because vacating the directives would redress its members' injuries, Make the Road may advance any legal theory that would justify vacating those directives.

## C. Timeliness

Next, timeliness. Because the suit was filed within 60 days of the challenged written directives, it is timely.

A challenge under § 1252(e)(3) "must be filed no later than 60 days after the date the challenged section, regulation, directive, guideline, or procedure . . . is first implemented." 8 U.S.C. § 1252(e)(3)(B). This requirement is jurisdictional. *M.M.V. v. Garland*, 1 F.4th 1100, 1109 (D.C. Cir. 2021). In calculating compliance with the time requirement, courts must look to when "the challenged" directive or procedure was "first implemented." *Id.* at 1108.

Here, the suit was timely. The Plaintiffs challenge two written directives: the Designation and the Huffman Memorandum. The Designation was implemented on January 21, 2025; the Huffman Memorandum was implemented on

19

January 23, 2025.  The Plaintiffs filed suit on January 22, 2025 and timely amended on March 22, 2025.  That is within 60 days of both directives.  So the suit was timely.

The Government and its amicus respond that the Plaintiffs' suit is untimely because the *procedures* invoked by the 2025 directives were first implemented years ago — in 2002 for aliens arriving by sea, in 2004 for aliens near land borders, and in 2019 for all other aliens eligible under the statute.  On that view, the January 2025 directives are not independently reviewable.  They are mere transmission devices for pre-existing procedures, and challenges to those procedures are time-barred.

That is wrong.  Section 1252(e)(3) contemplates review of a specific written instrument — "a regulation," "a written policy directive, written policy guideline, or written procedure."  8 U.S.C. § 1252(e)(3)(A)(ii).  Judicial review attaches to these discrete legal instruments, not to abstract policies divorced from particular documents.  *Cf. Biden v. Texas*, 597 U.S. 785, 809 (2022) (explaining that the APA does not contemplate review of "an abstract decision apart from specific agency action").  The January 2025 Designation Notice and Huffman Memorandum are specific written directives.  They are the legal instruments the Plaintiffs ask the court to set aside.  They are the objects of this lawsuit.  And they were first implemented in January 2025.

The Government's argument assumes that a written directive invoking pre-existing procedures is not itself a "written policy directive" subject to review — or that challenges to such a directive collapse into challenges to the underlying procedures.  But the statute draws no such distinction.  A directive does not cease to be a reviewable written instrument merely because it incorporates procedures

20

used elsewhere. Each written directive is a distinct legal instrument, and each is subject to its own 60-day window.

Moreover, the Government's contrary reading would gut § 1252(e)(3). If a directive invoking pre-existing procedures inherits those procedures' timeliness bar, then any expansion of expedited removal could be insulated from judicial review. The Government would need only to employ pre-existing procedures, regardless of their original scope or context. A procedure designed for and tested only on aliens arriving by sea could later be applied to millions of long-term residents in the interior. Yet, no court could hear a challenge. That would allow the Government to dodge the judicial review contemplated by Congress in § 1252(e)(3).[8]

Think about it from another angle. The January 2025 directives applied expedited removal to a new population under new circumstances. The question in this case is whether those new applications comport with due process — i.e., whether procedures adequate for arriving aliens are adequate for long-term interior residents. That question could not have even been raised until the directives existed. So it is hard to understand how we could hold that the Plaintiffs failed to raise in a timely

---

[8] Even setting aside the structural problem, the 2019 designation provides no barrier. That designation was formally rescinded in 2022. *See Rescission of the Notice of July 23, 2019, Designating Aliens for Expedited Removal*, 87 Fed. Reg. 16,022 (Mar. 21, 2022). Once rescinded, it had no continuing legal effect. The 2025 Designation Notice is a new written directive creating new legal obligations. Agencies cannot immunize directives from review by rescinding them when challenged and reinstating them later, outside the 60-day window.

21

fashion a challenge that was impossible to raise because the directive to be challenged did not exist.[9]

This reading is consistent with *M.M.V. v. Garland*, 1 F.4th 1100 (D.C. Cir. 2021). The plaintiffs there argued that the 60-day clock should run from when the challenged policy was applied to *them specifically* — i.e., when agents first took actions, authorized by the policy, at the particular facility where they were held. *Id.* at 1109. This court rejected that position as a misreading of 8 U.S.C. § 1252(e)(3)(B).

The court held that the limitations period runs from when "the agreement became effective" or "when CBP agents began conducting interviews" of anyone covered by the policy — not from when the policy was "first applied to specific facilities or [specific] aliens." *Id.*

Unlike the unsuccessful plaintiffs in *M.M.V.*, the Plaintiffs here do not rely on when the challenged policies were applied to them personally. Instead, they contend that the clock runs from when the written directives they challenge — the 2025

_____

[9] The Government suggests that the mode of arrival or length of presence is constitutionally irrelevant — that procedures adequate for aliens arriving by sea are equally adequate for long-term residents in the interior. Perhaps so. But that is an argument about whether the Plaintiffs' due-process claim succeeds, not about whether they may bring it. The timeliness question is whether the Plaintiffs challenged the directives within 60 days of their implementation. They did. *Cf. Corner Post, Inc. v. Board of Governors of Federal Reserve System*, 144 S. Ct. 2440, 2451 (2024) ("we have 'reject[ed]' the possibility that a 'limitations period commences at a time when the [plaintiff] could not yet file suit' as 'inconsistent with basic limitations principles'") (quoting *Bay Area Laundry and Dry Cleaning Pension Trust Fund v. Ferbar Corp. of California*, 522 U.S. 192, 200 (1997)).

22

Designation Notice and the Huffman Memorandum — first took legal effect. That is the implementation-based trigger *M.M.V.* identified.

### D. The District Court's Authority to Issue a Stay

We reach our final threshold issue: whether the district court had authority to issue a stay. It did. First, 5 U.S.C. § 705 authorized the district court to issue a stay. And second, the limit on injunctive relief in 8 U.S.C. § 1252(f)(1) did not stand in the way.

Start with the district court's authority to issue the stay in the first place.

The source of that authority came from the Administrative Procedure Act. The APA authorizes courts to "hold unlawful and set aside agency action" that is "contrary to constitutional right." 5 U.S.C. § 706(2)(B). Constitutional challenges to agency action are therefore resolved within the APA's judicial-review framework. *See Webster v. Doe*, 486 U.S. 592, 599, 602-04 (1988) (even when "committed to agency discretion," constitutional claims may proceed "under the APA" because the Constitution provides a "law to apply"); *id.* at 607 n.* (Scalia, J., dissenting) ("Chapter 7 (originally enacted as § 10 of the APA) is an umbrella statute governing judicial review of all federal agency action. While a right to judicial review of agency action may be created by a separate statutory or constitutional provision, once created it becomes subject to the judicial review provisions of the APA unless *specifically* excluded, see 5 U.S.C. § 559."). And 5 U.S.C. § 705 has been

23

understood to authorize courts to issue stays when they are engaged in judicial review under the APA.[10]

The due-process challenge sought vacatur of agency action as unconstitutional. So it was properly reviewed under the standard set forth in § 706(2)(B).

True, the district court claimed it did "not reach Make the Road's APA claims." *Make the Road New York v. Noem*, No. 25-cv-190, 2025 WL 2494908, at *9 n.14 (D.D.C. Aug. 29, 2025). But it meant only the Plaintiffs' claims that the agency actions were unreasonable, were unreasonably explained, or violated notice-and-comment requirements. The court went on to evaluate the due-process claim and to grant a § 705 stay based on its assessment of that claim's merits.

That said, the APA does not always supply the governing framework for judicial review of agency action. It provides the default structure for such review, including a general cause of action (§ 702), default forms of proceeding (§ 703), authority for interim relief pending review (§ 705), and standards of review (§ 706). Congress may displace that framework by creating a special statutory review scheme. When such a scheme exists, § 703 directs courts to use the specified form of proceeding rather than the APA's default route. But the APA's provisions remain applicable except to the extent a later statute "expressly" supersedes them. 5 U.S.C. § 559.

This Court applies that principle strictly. A statute displaces APA procedures only when Congress creates procedures "so clearly different from those required by the APA that it must have intended to displace the norm." *Citizens for Responsibility & Ethics in Washington v. FEC*, 993 F.3d

---

[10] *See, e.g.*, *West Virginia v. EPA*, 577 U.S. 1126, 1126 (2016).

24

880, 889–90 (D.C. Cir. 2021) (quoting *Asiana Airlines v. FAA*, 134 F.3d 393, 397 (D.C. Cir. 1998)).

Section 1252(e)(3) creates a special statutory review proceeding, but it does not displace the APA's procedural framework.  It designates a forum: the District Court for the District of Columbia.  It defines reviewable claims: constitutional and legal challenges to written implementing directives.  And it sets a limitations period: 60 days.  But it prescribes no special procedures for conducting that review, and it does not disable any provision of the APA.  So, under § 559 and § 703, the APA's procedural provisions apply.

Section 705 is one of the provisions that applies.  It authorizes a reviewing court to "postpone the effective date of an agency action" or "preserve status or rights pending conclusion of the review proceedings."  5 U.S.C. § 705.  Its trigger is not an APA cause of action.  Its trigger is judicial review of agency action.  Once a court is properly engaged in such review, § 705 is available unless Congress has expressly disabled it.

Congress knows how to disable § 705 when it wishes.  It has done so in other statutes.  *See, e.g.*, 16 U.S.C. § 1855(f)(1)(A) (Magnuson-Stevens Act) ("section 705 of [title 5] is not applicable").  Section 1252(e)(3) contains no comparable language.  Given the precision with which § 1252 elsewhere restricts judicial remedies, that omission is significant.

The district court therefore had statutory authority under § 705 to stay the effective dates of the challenged directives pending resolution of Plaintiffs' constitutional claim.

25

In response, the Government argues that 8 U.S.C. § 1252(f)(1) strips lower courts of authority to issue a § 705 stay.  That is wrong.

Section 1252(f)(1) provides:

Regardless of the nature of the action or claim . . . **no court** (other than the Supreme Court) **shall have jurisdiction or authority to enjoin or restrain the operation of [specified immigration provisions]** other than with respect to the application of such provisions to an individual alien against whom proceedings . . . have been initiated.[11]

Section 1252(f)(1) does not bar stays issued under § 705 because there is a difference between "stay" and "enjoin or restrain."  For starters, *Nken* held that "enjoin" does not mean "stay."  *Nken*, 556 U.S. at 428.  So the only question is whether "restrain" means "stay."

Neither "enjoin" nor "restrain" means "stay."  That's because an order enjoining or restraining is a judicial command that coerces a party's behavior — which a stay does not do.  To see why, consider each word in turn.

*First*, "enjoin."  To "enjoin" means to "command" or "positively direct" an action, or to "require a person to . . . abstain or desist from some act."  *Garland v. Aleman Gonzalez*, 596 U.S. 543, 548 (2022) (cleaned up).  Or as the Court put it in *Nken*, an injunction "directs the conduct of a party" and "does so with the backing of [the court's] full coercive powers."  *Nken*, 556 U.S. at 428.

---

[11] 8 U.S.C. § 1252(f)(1).

26

*Second*, "restrain." It is of a piece with "enjoin." To "restrain" means to "check, hold back, or prevent (a person or thing) from some course of action." *Aleman Gonzalez*, 596 U.S. at 549.

Reading "restrain" narrowly to cover only formally coercive relief makes sense of precedent both from the Supreme Court and our court. The Supreme Court's lead opinion in *Nielsen v. Preap* set aside concerns about § 1252(f)(1) as a potential bar to jurisdiction, reasoning that even if the provision were jurisdictional, it would not foreclose declaratory relief. 586 U.S. 392, 402 (2019). This court followed that understanding in *Make the Road I*, observing that § 1252(f)(1) "does not proscribe issuance of a declaratory judgment." 962 F.3d at 635.

If the term "restrain" could cover relief that does not *formally* coerce — but only *functionally* checks — government action, those holdings would make no sense. In a functional sense, a declaratory judgment blocks the Government from taking certain action. In fact, it may do so quite directly, since 28 U.S.C. § 2202 permits those who get a declaratory judgment to go to court to get an injunction to enforce it.[12] Thus, the most sensible principle to draw from the holdings of these cases is that § 1252(f)(1) doesn't bar remedies that might restrict government action in a functional sense; it restricts courts from issuing only those remedies that are formally coercive.

*Third* and finally, "stay." Unlike "enjoin" or "restrain," a "stay" does not order parties to do anything. Instead, it operates on the legal status of the challenged agency action. As the Court explained in *Nken*, a stay "achieves [its] result by

---

[12] *See* Samuel L. Bray, *The Myth of the Mild Declaratory Judgment*, 63 Duke L.J. 1091, 1111 (2014).

27

temporarily suspending the source of authority to act . . . not by directing an actor's conduct." *Nken*, 556 U.S. at 428–29.

The Government seems to accept that § 1252(f)(1) does not bar *vacatur* — the permanent elimination of an agency rule. But that makes the Government's § 1252(f)(1) argument all the more baffling. A stay is just the preliminary form of vacatur — much like a preliminary injunction is the preliminary form of a permanent injunction.[13] So if § 1252(f)(1) doesn't bar vacatur, § 1252(f)(1) doesn't bar a stay.

The statute's structure confirms that conclusion. Section 1252(e)(3) ensures judicial review of systemic expedited-removal implementation. If § 1252(f)(1) barred stays, agencies could implement challenged policies immediately and proceed with removals while litigation proceeds.[14] By the time review concluded, the challenged directive might be rescinded and replaced, beginning the cycle anew and frustrating the

---

[13] *See* Samuel L. Bray, *The Purpose of the Preliminary Injunction*, 78 Vand. L. Rev. 809, 816 (2025) (explaining that a preliminary injunction is "temporary" in the sense that "it does not persist after the judgment"); Christopher D. Moore, *So-Called "Administrative Stays" in Trump 2.0*, 104 Tex. L. Rev. Online 1, 9–10 (2025) (explaining the parallel between stays and vacatur). Justice Kavanaugh recently confirmed this understanding, explaining that "in cases under the Administrative Procedure Act, plaintiffs may ask a court to preliminarily 'set aside' a new agency rule," citing both § 706(2) and the Court's 2016 stay of the Clean Power Plan. *Trump v. CASA, Inc.*, 606 U.S. 831, 869 (2025) (Kavanaugh, J., concurring).

[14] Stays are the main candidate for preliminary relief because § 1252(f)(1) bars preliminary injunctions.

28

meaningful judicial review Congress authorized in § 1252(e)(3).[15]

---

[15] The Government argues that our reading fails to explain why § 1252(f)(1) — the provision that matters here — says "enjoin or restrain" when § 1252(f)(2) — the provision that follows it — says just "enjoin." But the phrase "enjoin or restrain" is a familiar legal doublet — a conventional pairing of terms for emphasis and breadth, not an invitation to parse each word for independent meaning. Federal Rule of Civil Procedure 65(c) uses the same language, referring to a party "enjoined or restrained" by preliminary injunction or temporary restraining order. And the Supreme Court has long employed the same formulation in its decrees. *See Missouri v. Iowa*, 48 U.S. 660, 679 (1849); *Nebraska v. Wyoming & Colorado*, 534 U.S. 40, 50 (2001). The effect of a doublet is why no one has invoked the surplusage canon to hold that the term "capricious" imposes some novel requirements not contained in the term "arbitrary." On the contrary, "arbitrary and capricious," like "aid and abet," or "enjoin or restrain," are all common legal doublets. As such, they are not vulnerable to surplusage arguments.

Even setting aside the doublet point, the terms are not obviously surplusage. "Restrain" may capture forms of coercive relief that "enjoin" might not — such as mandamus, which compels official action. Both terms describe coercive commands to parties, but they may reach slightly different forms of such commands. Section 1252(f)(2), which addresses individual removal orders, uses only "enjoin" rather than "enjoin or restrain." That difference is consistent with this reading. In the individual context, the relevant relief is prohibitory — stopping a particular removal — so "enjoin" alone suffices. In the systemic context of (f)(1), both terms cover the full range of coercive relief a challenger might seek. The variation confirms that Congress chose its terms with care, not that "restrain" in (f)(1) reaches non-coercive relief like § 705 stays.

And even to the extent that the two terms might yet be characterized as a "redundant surplusage," the Supreme Court has observed that "redundancies are common in statutory

29

In short, the statutory scheme fits together:

- Section 1252(e)(3) authorizes judicial review of systemic expedited-removal implementation.

- Sections 559 and 703 supply the APA's procedural framework for conducting that review.

- Section 705 provides authority to preserve the legal status quo while review proceeds, by temporarily suspending the operative force of the challenged action.

- Section 1252(f)(1) limits coercive relief — assuring that officials carrying out the statute's operation cannot be commanded or restrained by judicial decree.[16]

Under that structure, the district court acted within its authority. It exercised jurisdiction to review the legality of written directives and issued a stay under § 705 to suspend the directives' legal force pending review — all without formally coercing any party's behavior. Nothing in § 1252(f)(1)

_____

drafting — sometimes in a congressional effort to be doubly sure, sometimes because of congressional inadvertence or lack of foresight, or sometimes simply because of the shortcomings of human communication." *Barton v. Barr*, 590 U.S. 222, 239 (2020).

[16] The statute bars relief that would "enjoin or restrain the operation of" the specified provisions. 8 U.S.C. § 1252(f)(1). The Supreme Court has explained that laws ordinarily "work" or "function" "through the actions of officials or other persons who implement them." *Aleman Gonzalez*, 596 U.S. at 549. The statutory language thus contemplates restraint of officials' conduct — coercive commands directed at the persons implementing the law — not determinations about the legal status of agency directives.

30

prohibits that stay because § 1252(f)(1) bars only judicial commands that coerce a party's behavior — orders that "enjoin or restrain," not orders that "stay."

## V. Due Process

The 2025 Designation and Huffman Memorandum do not violate the Due Process Clause.

Here, we (A) explain the standard that governs Make the Road's due-process claim. Then, we (B) hold that under that standard, Make the Road is not likely to succeed on that claim.

### A. *Mullane* Sets the Standard for Due Process

The district court evaluated Make the Road's due-process claim under *Mathews v. Eldridge*, 424 U.S. 319 (1976). But even assuming for the sake of argument that the affected aliens have due-process rights, the due-process claim should be evaluated under the less demanding standard in *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306 (1950).

Recent Supreme Court precedent favors application of *Mullane* instead of *Mathews*. In *Trump v. J.G.G.*, 145 S. Ct. 1003 (2025), and *A.A.R.P. v. Trump*, 145 S. Ct. 1364 (2025), the Court applied *Mullane* to decide what process was due to aliens facing removal under the Alien Enemies Act. *J.G.G.*, 145 S. Ct. at 1006; *A.A.R.P.*, 145 S. Ct. at 1368. Neither case mentioned *Mathews*.

The distinction between *Mullane* and *Mathews* matters. *Mathews* invites courts to balance private interests against governmental interests and to prescribe "additional . . . procedural safeguards" when the balance tips toward the individual. 424 U.S. at 335. *Mullane*, by contrast, does not ask whether additional procedures might reduce the risk of error.

31

Rather, *Mullane* asks only whether notice was "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." 339 U.S. at 314; *see Dusenbery v. United States*, 534 U.S. 161, 167–68 (2002) (rejecting argument that due process requires the most effective notice practicable and holding that *Mullane* requires only notice "reasonably calculated" to inform).

The district court's opinion illustrates the difference. Applying *Mathews*, the court prescribed (1) revised forms, (2) expanded access to counsel, and (3) additional time. But *Mullane* does not ask what procedures would be better. It asks whether the provided procedures are adequate.

In the removal context, *A.A.R.P.* explained what adequacy requires: notice "reasonably calculated, under all the circumstances, to apprise interested parties" and "sufficient time and information to reasonably be able to contact counsel, file a petition, and pursue appropriate relief." 145 S. Ct. at 1367–68 (quoting *Mullane*, 339 U.S. at 314). The question in this case is whether the expedited-removal process satisfies that standard.

**B. Make the Road Has Not Shown a Due Process Violation**

Make the Road has not shown that the expedited-removal process denies its members notice and an opportunity to be heard.

Start with notice. The expedited-removal process provides notice that the individual is being placed in removal proceedings and is subject to removal for inadmissibility — specifically, for lacking valid entry documents or for fraud. *See* 8 U.S.C. § 1225(b)(1)(A)(i); 8

32

C.F.R. § 235.3(b)(2)(i).  The sample notice in the record reads in bold at the top "**Notice and Order of Expedited Removal**." It includes a section titled "**DETERMINATION OF INADMISSIBILITY**," which includes checkboxes for an immigration officer to record which provisions of 8 U.S.C. § 1182(a)(6)(C) and (7) the applicant failed.  A section below is titled "**ORDER OF REMOVAL UNDER SECTION 235(b)(1) OF THE ACT**."  That section informs the alien that he is "found to be inadmissible as charged and ordered removed from the United States."  So it provides notice.

The individual then has an "opportunity to respond." 8 C.F.R. § 235.3(b)(2)(i).  This "opportunity" includes "a reasonable time" for the alien to present his objections.[17]  *See A.A.R.P.*, 145 S. Ct. at 1367–68; *Mullane*, 339 U.S. at 314; *see also Kwong Hai Chew v. Colding*, 344 U.S. 590, 598–99 (1953) (interpreting a regulation governing exclusion proceedings as consistent with constitutional due process requirements).  He may raise any basis for contesting removal. The statute places the burden on the alien to "affirmatively show[]" continuous presence.  8 U.S.C. § 1225(b)(1)(A)(iii)(II).

There is no evidence that the Designation or Huffman Memorandum secretly restricts the right to notice and an opportunity to respond, that they command officers to withhold information, that they prohibit aliens from raising continuous presence or any other defense, or that they limit the time or opportunity afforded to aliens after a removal order issues.  If

---

[17] What counts as "reasonable" for due process purposes varies with the circumstances.  *A.A.R.P.*, 145 S. Ct. at 1367–68.  But unlike the as-applied challenge in *A.A.R.P.*, Make the Road's facial challenge to the Designation and Huffman Memorandum does not turn on the facts of a particular removal.

USCA Case #25-5320    Document #2179963    Filed: 06/23/2026    Page 33 of 60

33

any of those things are happening, they are not the result of the Designation or Huffman Memorandum. Those directives are silent on these matters — and a directive's silence cannot command, authorize, or structurally ensure a constitutional violation.

With its due-process claim, Make the Road challenges only the "written policy directive[s]" and the procedures they incorporate. Because Make the Road has not shown that those directives and procedures violate due process, its claim fails.

### 1. Make the Road's Continuous Presence Argument

What does Make the Road say in response?

It first argues that DHS has failed to provide proper notice and an opportunity to be heard because it thinks DHS must proactively tell aliens that they can defeat expedited removal if they prove two years of continuous presence. The district court and the motions panel majority shared that concern and faulted DHS for using forms that neither ask about continuous presence nor inform aliens why that information would be relevant.

We disagree. Make the Road has identified no authority — and we are aware of none — holding that due process requires the government to instruct individuals on available defenses or exemptions. The constitutional requirement is notice of the action the government is taking and the grounds for it, plus an opportunity to respond. *See Mullane*, 339 U.S. at 314; *Loudermill*, 470 U.S. at 546. It is not a requirement that the government explain how the individual might prevail.

34

The distinction is well established in the context of criminal law, where the stakes are even higher. In criminal proceedings, the government must provide notice of the charges, but it has no obligation to advise the defendant of available defenses. *See* Fed. R. Crim. P. 7(c)(1) (indictment must contain "a plain, concise, and definite written statement of the essential facts constituting the offense charged"). Prosecutors must not suppress *evidence* favorable to the accused, *see Brady v. Maryland*, 373 U.S. 83, 87–88 (1963), but they are not required to affirmatively instruct the defendant on favorable *law*. If due process imposes no such requirement in criminal proceedings, it follows a fortiori that it imposes no such requirement in the removal context, where fewer procedural protections apply. *See Bugajewitz v. Adams*, 228 U.S. 585, 591 (1913) (holding that deportation is not a punishment and does not trigger criminal procedural protections).

Make the Road argues that *A.A.R.P.* counsels otherwise. Again, we disagree. In *A.A.R.P.*, the detainees were not given constitutionally adequate notice that they were subject to removal under the Alien Enemies Act and lacked "sufficient time and information" to "actually seek habeas relief" before removal. 145 S. Ct. at 1367–68. The Court required notice of the Government's asserted authority and procedures sufficient to permit detainees to pursue habeas in a meaningful way. *Id.* at 1368. The Court did not hold that the government must provide the detainees with an objective on-the-one-hand-on-the-other-hand memo about whether Tren de Aragua was an arm of the Maduro regime, walk them through a corpus linguistics of "invasion" as it was understood in 1798, or explain the XYZ Affair and the Quasi-War with France to provide historical context for the Act. The holding was about notice of the action and a realistic opportunity to seek relief — not notice of every conceivable counterargument.

35

Make the Road's contrary reasoning would require immigration officers to provide what amounts to legal advice. If due process requires the government to inform individuals of the two-year continuous-presence rule, it presumably also requires informing them of every other basis for contesting expedited removal. Make the Road offers no limiting principle and identifies no authority for so expansive a requirement.

Make the Road's remaining arguments turn to procedures that precede the removal order. It argues that (1) its members must receive "advance notice" that expedited removal will be applied so they can "contest that removal" by establishing two years' presence, (2) they should not bear the burden of doing so, (3) a "requirement" must exist "guarantee[ing]" time to gather evidence and seek assistance, and (4) a neutral officer must review continuous presence.

Properly understood, these arguments simply restate Make the Road's broader premise that due process requires the Government to affirmatively facilitate the assertion of potential defenses to expedited removal. But even accepting Make the Road's factual criticisms at face value, they do not establish the kind of constitutional defect identified in *A.A.R.P.* — a regime that failed to provide notice of the Government's asserted authority and a realistic opportunity to seek relief. Here, aliens are informed that DHS is placing them in expedited removal. And they may contest their amenability to that process, including by asserting continuous presence. The Fifth Amendment does not require the government to provide advance legal instruction, to reallocate statutory burdens, or to guarantee optimal conditions for evidence-gathering before the threshold determination Congress authorized.

Finally, consider the relief Congress *has* made available. The district courts have federal habeas corpus jurisdiction

36

under 28 U.S.C. § 2241. *Cf. I.M. v. CBP*, 67 F.4th 436, 439 (D.C. Cir. 2023) (28 U.S.C. § 1252(e)(2) "requires an alien to rely on *another* jurisdiction-conferring statute to bring habeas proceedings," and "the only grant of habeas jurisdiction that we or the parties could identify is 28 U.S.C. § 2241"). With 8 U.S.C. § 1252, Congress put limits on habeas relief. And Make the Road has not shown that the challenged directives prevent aliens from pursuing the limited relief that Congress has allowed.

To be sure, the record contains evidence that some aliens have been erroneously subjected to expedited removal despite having been present for more than two years. Is that because they were denied an opportunity to prove continuous presence? If so, that's illegal. But the cause there would be individual officers' failure to follow the law — not defects in the *written directives* under review or the procedures they incorporate.

The distinction matters because of how Congress structured judicial review of expedited removal. Under 8 U.S.C. § 1252(e)(3), courts may review whether "a regulation, or a written policy directive, written policy guideline, or written procedure" is "not consistent with applicable provisions of this subchapter or is otherwise in violation of law." *Id.* § 1252(e)(3)(A)(ii). The object of review is the written instrument — not the conduct of individual officers who may fail to comply with it. And if there is any remedy for officer-level noncompliance, it is not invalidation of the directive itself. *Cf. Buchanan v. Barr*, 71 F.4th 1003, 1016 (D.C. Cir. 2023) (Walker, J., concurring).

37

### 2. Make the Road's Credible-Fear Argument

Make the Road has also failed to show that the credible-fear process denies adequate notice or a meaningful opportunity to pursue relief based on fear of persecution.

Make the Road does not dispute that this statutory structure, if followed, provides a meaningful opportunity to pursue asylum-based relief.  Its challenge is to implementation, not design.  The district court agreed that implementation is flawed, pointing to three problems: first, a 15% failure-to-refer rate for aliens expressing fear; second, insufficient time to consult counsel; and third, the absence of a neutral adjudicator at the initial screening.  None establishes that the *written directives* are unlawful.

*First*, the district court found that roughly 15% of aliens who expressed fear were not referred for credible-fear interviews.  That bears little weight.  The question is not whether some officials fail to implement a directive properly; it is whether the "written policy directive" itself is unlawful.  8 U.S.C. § 1252(e)(3)(A)(ii).

Here, the directives are not unlawful.  The statute commands referral: the officer "shall refer the alien for an interview."  8 U.S.C. § 1225(b)(1)(A)(ii).  The Designation does not override that command by, for example, instructing officers to skip referrals, or by authorizing departures from the statutory mandate.  And, again, the potential failure of some officials to implement the directives properly doesn't somehow mean the directives themselves are unlawful.  *Cf. Trump v. American Federation of Government Employees*, 145 S. Ct. 2635, 2635 (2025) (Sotomayor, J., concurring in the grant of stay) (explaining that an "Executive Order direct[ing] agencies to plan reorganizations and reductions in force 'consistent with

38

applicable law'" was not unlawful even though the plans to implement that Executive Order might not be "consistent with the constraints of law"); *Buchanan*, 71 F.4th at 1016 (D.C. Cir. 2023) (Walker, J., concurring).

*Second*, the district court thought that aliens have insufficient time to consult counsel before credible-fear interviews. But neither the Designation nor the Huffman Memorandum limits that time or restricts access to counsel. And Make the Road has identified nothing in them that takes away what the governing statute and regulations promise — an opportunity for consultation *if* it can occur "at no expense to the Government" and will not unreasonably delay the highly expedited process. 8 U.S.C. § 1225(b)(1)(B)(iv); *see also* 8 C.F.R. § 208.30(d); *cf. Make the Road New York v. Wolf*, 962 F.3d 612, 619 (D.C. Cir. 2020) ("Expedited removal lives up to its name.").

At most, the district court's findings show that Congress's expedited screening system operates quickly and with practical constraints — features the statute itself contemplates. They do not show that the challenged directives deprive aliens of a meaningful opportunity to be heard.

*Third*, the district court criticized the absence of a neutral adjudicator at the initial screening. But due process does not require a neutral adjudicator at every stage of a multi-step administrative process — as many regulated industries know all too well. What it requires is an opportunity to be heard "at a meaningful time and in a meaningful manner." *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965). When initial decisions are made by agency officers but subject to de novo review by neutral adjudicators, due process is satisfied. *Concrete Pipe & Products of California, Inc. v. Construction Laborers Pension Trust for Southern California*, 508 U.S. 602, 618 (1993).

39

Therefore, Make the Road has not shown a due-process violation. Congress assigned credible-fear interviews to asylum officers, and de novo review of negative determinations to immigration judges. 8 U.S.C. § 1225(b)(1)(B)(iii)(III); 8 C.F.R. § 1003.42(c). The availability of immigration-judge review provides the neutral check needed to satisfy due process.

The district court also erred to the extent it held that the lack of review of initial referral decisions violates due process. The statute already provides that an immigration officer "shall refer [an] alien for an interview by an asylum officer" if the alien "indicates either an intention to apply for asylum . . . or a fear of persecution." 8 U.S.C. § 1225(b)(1)(A)(ii). That is a ministerial duty that nothing in the Designation or Huffman Memorandum prevents the immigration officer from performing.

*    *    *

Although Make the Road clears the four threshold procedural hurdles, it falters when it reaches the merits. It has not shown that the written directives fail to comply with constitutional due process. And Make the Road's evidence of implementation problems — referral errors, rushed interviews, communication barriers — does not establish that the Designation and Huffman Memorandum are themselves "not consistent with applicable provisions of [the INA] or . . . otherwise in violation of law." 8 U.S.C. § 1252(e)(3)(A)(ii).

We therefore vacate the district court's § 705 stay.

*So ordered.*

RAO, *Circuit Judge*, concurring in the judgment: When reforming immigration law in 1996, Congress created a procedure for quickly removing certain unlawfully present aliens from the United States. Congress also gave the Executive "sole and unreviewable discretion" to decide which aliens would be subject to expedited removal and explicitly barred courts from reviewing those decisions. Make the Road challenged the Executive's policy decision to expand the reach of expedited removal. The district court concluded that it had jurisdiction and issued a universal stay of the expedited removal policy.

This lawsuit should have been dismissed at the threshold because Congress left expedited removal policies to the Executive's discretion, barred judicial review, and foreclosed universal remedies. While I respectfully disagree with my colleagues' decision to reach the merits, I agree with Judge Walker that the expedited removal policy is consistent with due process and that the district court's stay must be vacated. After over a year of litigation, the government finally may proceed with its expedited removal policy.

I.

The Secretary of Homeland Security may designate certain aliens for expedited removal from the United States.[1] 8 U.S.C. § 1225(b)(1)(A)(iii). This process "substantially shorten[s] and speed[s] up the removal" of aliens not lawfully admitted to this country. *Make the Rd. N.Y. v. Wolf* ("*Make the Road I*"), 962 F.3d 612, 618 (D.C. Cir. 2020). Two provisions of the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA") are central to this case. First, the Secretary's

---

[1] Federal law assigns expedited removal designation decisions to the Attorney General, but this authority has been transferred to the Secretary of Homeland Security. *See* 6 U.S.C. §§ 251(2), 557; 8 C.F.R. § 235.3(b)(1)(ii).

2

decision to designate eligible aliens for expedited removal is explicitly committed to the Secretary's "sole and unreviewable discretion." 8 U.S.C. § 1225(b)(1)(A)(iii)(I). Because designation decisions are committed to agency discretion by law, they cannot be reviewed under the APA. *See Make the Road I*, 962 F.3d at 631–34 (holding that designation decisions are "withdraw[n] … from APA review" under 5 U.S.C. § 701(a)(2)). Second, lower courts are stripped of "jurisdiction or authority to enjoin or restrain the operation of" the expedited removal provisions, except with respect to individual proceedings, which are not at issue here. 8 U.S.C. § 1252(f)(1).

In January 2025, the Secretary published a designation decision expanding expedited removal "to the fullest extent authorized by statute." Designating Aliens for Expedited Removal, 90 Fed. Reg. 8139, 8139 (Jan. 24, 2025) ("Designation"). Expedited removal previously applied to a relatively narrow category of aliens, but the Designation authorized expedited removal of all unlawfully present aliens who have not shown two years of continuous physical presence. *Id.*; *see* 8 U.S.C. § 1225(b)(1)(A)(iii) (authorizing the designation of such aliens). The Secretary also issued guidance directing immigration officers to implement the Designation. Department of Homeland Security, Guidance Regarding How to Exercise Enforcement Discretion (Jan. 23, 2025) ("Huffman Memorandum").

Make the Road challenged the Designation and Huffman Memorandum, asserting claims under the APA and the Due Process Clause of the Fifth Amendment. When Make the Road moved for interim relief, it did not seek a preliminary injunction, which all agree would be barred by section 1252(f)(1). *See Garland v. Aleman Gonzalez*, 142 S. Ct. 2057, 2063–65 (2022). Instead, Make the Road moved for a stay of agency action under the APA's interim relief provision, 5

3

U.S.C. § 705. The district court granted Make the Road's motion and "stayed" the "implementation and enforcement" of the Designation and Huffman Memorandum under section 705. J.A. 1 (order accompanying opinion). The court declined to address the government's argument that IIRIRA commits the Designation to the Secretary's discretion and therefore it is not reviewable under the APA. Instead, the district court characterized Make the Road's due process claim as an equitable claim brought directly under the Constitution, not under the APA. *Make the Rd. N.Y. v. Noem* ("*Make the Road II*"), 805 F. Supp. 3d 139, 158 n.14 (D.D.C. 2025).

A motions panel denied in substantial part the government's request for a stay, over my dissent. *See Make the Rd. N.Y. v. Noem* ("*Make the Road III*"), No. 25-5320, 2025 WL 3563313, at *37 (D.C. Cir. Nov. 22, 2025); *id.* at *37–45 (Rao, J., dissenting).

II.

I concur in the majority's due process analysis.[2] But IIRIRA forecloses this lawsuit at the jurisdictional threshold

---

[2] I also agree with the majority's conclusion that Make the Road's lawsuit is timely, but for a different reason. Make the Road's due process claim must "be filed no later than 60 days after the date the challenged … procedure … [was] first implemented." 8 U.S.C. § 1252(e)(3)(B). Under *M.M.V. v. Garland*, 1 F.4th 1100 (D.C. Cir. 2021), a due process challenge to longstanding expedited removal procedures would be time barred because those procedures are "first implemented" when first promulgated or applied anywhere, not when first applied to the particular aliens bringing a legal challenge after an expanded designation. *See Make the Road III*, 2025 WL 3563313, at *39–40 (Rao, J., dissenting). The government disclosed only in its merits briefing that it had implemented new procedures for expedited removal following the Designation. Because the new procedures pertain to Make the Road's due process claim, those

4

and prohibits the universal stay ordered by the district court. Moreover, the APA does not provide authority for the stay because designation decisions are committed to the Secretary's discretion by law and therefore are not reviewable under the APA. When Congress limits judicial review and remedies, courts must carefully heed those limits to avoid encroaching on the proper province of the political branches.

A.

Our circuit has held that district courts have jurisdiction over preenforcement challenges to designation decisions and expedited removal policies implementing those decisions. *Make the Road I*, 962 F.3d at 624–26; *see also* Majority Op. 14–15. This conclusion, however, is inconsistent with the text and structure of IIRIRA. I again highlight the lack of jurisdiction because this error lies at the inception of this and many other cases. *See Make the Road I*, 962 F.3d at 639–45 (Rao, J., dissenting) (explaining why courts lack jurisdiction over preenforcement suits challenging expedited removal designations).

Congress's power to limit federal court jurisdiction is one of the few checks on the Judiciary. Accordingly, a "statute affecting federal jurisdiction must be construed both with precision and with fidelity to [its] terms." *Kucana v. Holder*, 558 U.S. 233, 252 (2010) (cleaned up). That principle applies with particular force here given that "*many* provisions of IIRIRA are aimed at protecting the Executive's discretion from the courts—indeed, that can fairly be said to be the theme of

---

procedures started a new 60-day clock. Make the Road's due process challenge is timely because of the new procedures used to implement the Designation, not simply because the Designation expanded the class of aliens subject to expedited removal.

5

the legislation." *Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 486 (1999).

IIRIRA doubly strips jurisdiction to review the Designation. First, courts lack jurisdiction to review "any … decision or action … the authority for which is specified … to be in the [Secretary's] discretion." 8 U.S.C. § 1252(a)(2)(B)(ii). This covers expedited removal designations, which Congress expressly committed to the "sole and unreviewable discretion" of the Secretary. *Id.* § 1225(b)(1)(A)(iii)(I); *see Make the Road I*, 962 F.3d at 639–41 (Rao, J., dissenting).

Second, courts generally lack jurisdiction to review policies and procedures implementing expedited removal. *See* 8 U.S.C. § 1252(a)(2)(A)(iv). Congress conferred authority on the Secretary to set expedited removal policies and stripped courts of jurisdiction to consider challenges to those policies. *See id.* §§ 1225(b)(1)(A), 1252(a)(2)(A)(iv). By contrast, Congress preserved judicial review of challenges to written policies and procedures "solely in the context of individual 'determinations under section 1225(b).'"[3] *Make the Road I*, 962 F.3d at 642–43 & nn.10–11 (Rao, J., dissenting) (quoting 8 U.S.C. § 1252(e)(3)(A)). IIRIRA preserved judicial review

---

[3] This limitation on judicial review follows from reading sections 1252(a) and (e) together. Section 1252(a)(2)(A) bars judicial review of designation decisions, individual determinations related to removal eligibility, and the implementation of removal orders, except as provided by section 1252(e). Section 1252(e) does not mention designation decisions. Instead, it permits review of written policies only in the context of "determinations under section 1225(b) … and its implementation." 8 U.S.C. § 1252(e)(2), (e)(3)(A). Sections 1252(a) and (e) thus condition the availability of judicial review on an individual expedited removal "determination" and do not authorize review of designations.

6

for individuals vindicating their legal rights. But there are no individual determinations at issue in this case. Make the Road's lawsuit fails because the Secretary's Designation is an expedited removal policy that cannot be reviewed by the federal courts.

IIRIRA commits expedited removal policies to the Secretary's discretion and insulates that discretion from judicial review. Although circuit precedent forecloses this conclusion, the district court had no jurisdiction to consider Make the Road's preenforcement challenge to the Designation.

## B.

There are two additional and independent reasons why the district court lacked authority to issue a stay of the Designation and Huffman Memorandum. First, the stay is barred by section 1252(f)(1) because it "restrains the operation of" IIRIRA's expedited removal provisions and provides universal, rather than individual, relief. Second, the district court cannot grant a stay under the APA because designation decisions are committed to the Secretary's discretion by law and therefore APA review and APA remedies are unavailable.

## 1.

IIRIRA's text and structure, as well as Supreme Court precedent, compel the conclusion that section 1252(f)(1) strips the district court of authority to issue a universal stay of the Designation and Huffman Memorandum.

Section 1252(f)(1) states: "Regardless of the nature of the action or claim … no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of" certain provisions of the Immigration and Nationality Act ("INA"), including the expedited removal

7

provisions. 8 U.S.C. § 1252(f)(1). The one exception is that such relief is available when those provisions are applied "to an individual alien against whom proceedings … have been initiated." *Id.*

The phrase "enjoin *or restrain*" encompasses more than injunctions,[4] and the district court's stay "restrain[s] the operation of" the expedited removal provisions by halting implementation of the Designation as to all aliens. *Id.* (emphasis added). Accordingly, the stay exceeded the district court's remedial authority.

This straightforward reading of the statute is confirmed by *Aleman Gonzalez*, in which the Supreme Court explained that "to restrain" in section 1252(f)(1) means "to check, hold back, or prevent … some course of action." 142 S. Ct. at 2064 (cleaned up); *see also Restrain*, Black's Law Dictionary (6th ed. 1990) ("To limit, confine, abridge, narrow down, restrict, obstruct, impede, hinder, *stay*, destroy.") (emphasis added). A stay of the Designation "restrains" because it checks, holds back, and prevents the government from executing the expedited removal authority conferred by IIRIRA.[5]

---

[4] Both *Aleman Gonzalez* and *Biden v. Texas* expressly reserved the question of whether section 1252(f)(1) bars "any other form of relief that is practically similar to an injunction." *Aleman Gonzalez*, 142 S. Ct. at 2065 n.2 (cleaned up); *accord Biden v. Texas*, 142 S. Ct. 2528, 2540 n.4 (2022).

[5] The ordinary meaning of "restrain" in section 1252(f)(1) is reinforced by a related judicial review provision describing stays as relief that restrains agency action. Under the INA, the "filing of the petition for review does not of itself *stay* or suspend the operation of the order of the agency," but the court of appeals "may *restrain* or suspend … the operation of the order pending" judicial review. 28 U.S.C. § 2349(b) (emphasis added). We have long interpreted

8

This interpretation is also consistent with *Nken v. Holder*, which held that the term "enjoin," standing alone in section 1252(f)(2), does not include stays. 556 U.S. 418, 428–30 (2009). But the Supreme Court distinguished section 1252(f)(1), which strips courts of authority to "enjoin *or restrain*," and explained that stays "have the practical effect of *preventing*" agency action. *Id.* at 428 (emphasis added). Stays are thus squarely covered by "restrain," which has a meaning distinct from "enjoin." *Aleman Gonzalez*, 142 S. Ct. at 2064. *Contra* Majority Op. 28 n.15 (asserting that "enjoin or restrain" is a "legal doublet" in which the terms are overlapping and essentially redundant). Taking *Nken* and *Aleman Gonzalez* together, a stay is a judicial remedy that "restrain[s]" by preventing agency action. Stays therefore fall within the remedial limitations of section 1252(f)(1).

Moreover, it is well established that universal relief is not permitted under section 1252(f)(1). As the Court has explained, that provision allows injunctive relief only "on behalf of a particular alien …, but injunctive relief on behalf of an entire class of aliens is not allowed because it is not limited to remedying the unlawful 'application' of the relevant statutes to 'an individual alien.'" *Aleman Gonzalez*, 142 S. Ct. at 2065; *American-Arab Anti-Discrimination Comm.*, 525 U.S. at 481.

The district court stayed the implementation and enforcement of the Designation as to all aliens. There are no individual proceedings challenged in this lawsuit. Because the stay universally restrains the government's expedited removal

---

section 2349(b) to provide "statutory authority to stay agency orders," which further confirms that "restrain" captures stays. *In re GTE Serv. Corp.*, 762 F.2d 1024, 1026 (D.C. Cir. 1985).

9

authority, it is prohibited by section 1252(f)(1), and the district court had no jurisdiction or authority to enter it.[6]

The majority holds that universal stays against expedited removal policies are permitted, an interpretation of section 1252(f)(1) that substantially expands the authority of the district courts.[7] The majority asserts that "restrain" is limited to "formally coercive relief," which does not include stays. Majority Op. 26. But this gloss finds no support in the text of IIRIRA or Supreme Court precedent. As the majority recognizes, to "restrain" means to "check, hold back, or prevent" agency action. *Id.* (citing *Aleman Gonzalez*, 142 S. Ct. at 2064). And the district court's stay plainly checks, holds back, and prevents the government from implementing the Designation. Moreover, the majority does not account for the reach of section 1252(f)(1), which prohibits courts from restraining "*the operation of*" the expedited removal provisions, a phrase that encompasses "the [g]overnment's efforts to enforce or implement" those provisions. *Aleman*

---

[6] I need not address whether section 705 of the APA generally provides for universal stays of agency action because Congress explicitly barred such universal relief in the expedited removal context "[r]egardless of the nature of the action or claim." 8 U.S.C. § 1252(f)(1). In IIRIRA, Congress provided only for individual relief in individual proceedings, a limitation consistent with traditional equitable principles of party-specific relief. *See Trump v. CASA, Inc.*, 145 S. Ct. 2540, 2552 (2025) (recognizing that "party-specific principles … permeate our understanding of equity").

[7] Section 1252(f)(1) prohibits lower courts from enjoining or restraining the operation of "part IV of this subchapter," which includes expedited removal as well as provisions governing alien inspection, apprehension, detention, and other forms of removal. Under the majority's interpretation, a lower court may issue universal stays of government policies implementing any of these provisions. *See* 8 U.S.C. §§ 1221–32.

10

*Gonzalez*, 142 S. Ct. at 2064. Here, the district court stayed the "implementation and enforcement" of the Designation as to all aliens, which is precisely the kind of universal relief the Supreme Court held was prohibited by section 1252(f)(1).[8] Holding that the district court has authority to stay the Designation, the majority sanctions an end run around Congress's clear remedial limitations.

Section 1252(f)(1) "deprives courts of the power to issue a specific category of remedies: those that 'enjoin or restrain the operation of'" the expedited removal provisions. *Biden v. Texas*, 142 S. Ct. 2528, 2539 (2022). The district court had no authority to stay the Designation because that remedy restrains the government's efforts to implement its expedited removal policies.

2.

The district court also erred by issuing an APA stay when APA review is unavailable. Make the Road invokes section 705 of the APA as authority to stay the Designation.[9] But expedited

---

[8] The Supreme Court has declined to decide whether section 1252(f)(1) "extends to … declaratory relief." *Texas*, 142 S. Ct. at 2540 n.4. The majority assumes section 1252(f)(1) permits declaratory relief and on this assumption concludes that it must permit stays as well. Majority Op. 26. But whether or not declaratory judgments are permitted, stays are a distinct remedy. A declaratory judgment does not "enjoin or restrain." Instead, it requires a litigant "to go to court to get an injunction to enforce it," as the majority acknowledges. *Id.*

[9] Section 705 is titled "Relief pending review" and provides, "On such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court … may issue all necessary and appropriate process to postpone the effective date of

11

removal designations are committed to agency discretion by law and therefore are not reviewable under the APA. *Make the Road I*, 962 F.3d at 631–34.

Congress committed designation decisions to the Secretary's "sole and unreviewable discretion." 8 U.S.C. § 1225(b)(1)(A)(iii)(I). Section 701(a)(2) of the APA provides that "[t]his chapter"—which includes section 705—applies "*except to the extent that*" the challenged "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2) (emphasis added). When an action is committed to agency discretion by law, section 701(a)(2) "limits application of the entire APA." *Webster v. Doe*, 486 U.S. 592, 599 (1988); *accord Oryszak v. Sullivan*, 576 F.3d 522, 525 (D.C. Cir. 2009). Because designation decisions are committed to agency discretion by law, the APA does not apply.[10] When the APA does not apply, APA remedies are not available. The district court therefore could not rely on section 705 of the APA to issue a stay.

Attempting to avoid the reality that APA review is not available for challenges to expedited removal designations, the district court treated Make the Road's due process claim as an

_____

agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705 (cleaned up).

[10] APA review is also unavailable when "statutes preclude judicial review." 5 U.S.C. § 701(a)(1). As explained in Part II.A, IIRIRA strips courts of jurisdiction to review expedited removal designations and policies. The APA is therefore doubly disabled in this lawsuit. *See Chairez v. Mayorkas*, 168 F.4th 1227, 1231 (9th Cir. 2026) (holding that section 701(a)(1) precludes APA review "whenever the agency action at issue falls within the INA's jurisdictional bar in § 1252(a)(2)(B)(ii)"); *Shabaj v. Holder*, 718 F.3d 48, 52 (2d Cir. 2013) (per curiam) (similar).

12

equitable constitutional claim. *Make the Road II*, 805 F. Supp. 3d at 158 n.14. I agree with the district court that this characterization is supported by Make the Road's complaint and that equitable constitutional claims are generally available irrespective of whether APA review is available.

But even if we treat the due process claim as an equitable constitutional claim, that does not change the fact that Make the Road challenges the Secretary's designation expanding the aliens eligible for expedited removal—an action IIRIRA expressly commits to the Secretary's unreviewable discretion. The Designation may be reviewable in equity for constitutional defect, but because it is not reviewable *under the APA*, a stay under section 705 of the APA is not available.

The majority's approach runs into the same problem. The majority reframes Make the Road's due process claim as an APA claim that the Designation is "contrary to constitutional right." Majority Op. 22–23 (quoting 5 U.S.C. § 706(2)(B)). Of course, APA review may include a claim that agency action is unconstitutional. But parties may not raise constitutional challenges *under the APA* to actions that are committed to agency discretion by law.

To reiterate, IIRIRA commits expedited removal designations to agency discretion by law and thus "withdraw[s] the decision[s] from APA review." *Make the Road I*, 962 F.3d at 632. And where APA review is unavailable, the "entire APA," including its remedial provisions, is unavailable. *See Webster*, 486 U.S. at 599; *see also Doe v. Gates*, 981 F.2d 1316, 1319 (D.C. Cir. 1993) (explaining that section 701(a)(2) precludes "any judicial review under the APA" when the challenged action is committed to agency discretion). Make the Road's constitutional claim must proceed, to the extent it

13

proceeds at all, in equity with whatever equitable remedies are appropriate.

In the mine run of cases in which a party seeks to immediately halt unconstitutional agency action, there will be little practical consequence between seeking a preliminary injunction or a stay under section 705. In this case, however, Make the Road challenges the Designation, a challenge that implicates the restrictions of both IIRIRA and the APA. IIRIRA squarely prohibits the district court from entering a classwide injunction in this preenforcement challenge. *See* 8 U.S.C. § 1252(f)(1); *Aleman Gonzalez*, 142 S. Ct. at 2064–65. Because injunctive relief is not available, Make the Road sought an APA stay. But that relief is foreclosed because expedited removal designations are explicitly committed to agency discretion by law, and therefore an APA stay is unavailable.

Mixing and matching an equitable constitutional claim with an APA remedy does not work here. The district court's conclusion that Make the Road can secure a universal stay under the APA when APA review is not available is a novel holding that contravenes the limits of both IIRIRA and the APA. At bottom, it does not matter whether Make the Road's due process challenge is framed as an equitable constitutional claim or an APA claim. Make the Road challenges an expedited removal designation that is explicitly committed to agency discretion by law, and therefore the APA and its remedies are off the table.

\* \* \*

My colleagues conclude that Make the Road's challenge to the Designation is reviewable and that the district court had authority to issue a universal stay. Those conclusions, however, run into multiple roadblocks Congress erected in IIRIRA to

14

"protect[] the Executive's discretion from the courts" with respect to immigration policy. *American-Arab Anti-Discrimination Comm.*, 525 U.S. at 486. First, courts cannot review the Secretary's discretionary decisions, which include the designation of aliens for expedited removal. Second, courts cannot review the policies and procedures implementing expedited removal in preenforcement challenges. Third, courts cannot enter universal injunctions or stays in preenforcement challenges. Finally, APA review and APA remedies are not available for the Designation, which is an expedited removal policy that Congress committed to the "sole and unreviewable discretion" of the Secretary.

In sum, IIRIRA forecloses judicial review of Make the Road's preenforcement challenge to the Designation, and the APA does not provide a back door for the district court's universal stay. I concur in the judgment because I agree that the Secretary's expedited removal procedures are consistent with due process and that the district court's stay must be vacated. Nevertheless, the more fundamental error lies in the district court exceeding its lawful authority and halting an immigration policy that Congress left to the discretion of the Executive Branch.

WILKINS, *Circuit Judge*, concurring in part and dissenting in part: I agree with Judge Walker that Plaintiffs have standing, that the 2025 Designation and Huffman Memorandum are reviewable under the APA, and that the standard for notice set forth in *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306 (1950), and not the balancing test established in *Mathews v. Eldridge*, 424 U.S. 319 (1976), governs Plaintiffs' constitutional due process claim. I write separately, however, to express my view that Plaintiffs were entitled to a § 705 stay under the *Mullane* test, having shown a likelihood of success that the 2025 Designation and Huffman Memorandum violate due process. On that ground, I respectfully dissent.

## I.

"The INA authorizes the Executive to remove a foreign individual from the United States but confines that authority to only two specified methods: regular removal under 8 U.S.C. § 1229a or expedited removal under 8 U.S.C. § 1225(b)(1)." *Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Mullin*, 174 F.4th 81, 93 (D.C. Cir. 2026). This case is about expedited removal. The INA authorizes expedited removal for persons unable to "affirmatively show[], to the satisfaction of an immigration officer," that they have been continuously present in the United States for at least two years. 8 U.S.C. § 1225(b)(1)(iii)(II). The Department of Homeland Security ("DHS") thus has no authority to remove individuals from the United States using expedited removal procedures if that person has been continuously present in the United States for more than two years. *See La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986) ("an agency literally has no power to act . . . unless and until Congress confers power upon it.").

Notwithstanding this statutory requirement, the District Court found that while using expedited removal procedures mandated by the 2025 Designation and Huffman Memorandum, DHS has deported several noncitizens who had

2

been continuously present in the United States for more than two years. *See* J.A. 15–16. DHS has not contested this factual finding. This begs the question of how and why the agency is removing people from the country in a manner contrary to the federal statute. The answer to this question is pretty simple: DHS is using procedures that do not allow a meaningful opportunity for noncitizens to demonstrate that they have been continuously present in the United States for two years.

An immigration officer who follows the 2025 Designation and Huffman Memorandum will not apprise a noncitizen that demonstrating two-years of continuous presence in the United States exempts them from expedited removal. The District Court found that the forms mandated for reading to noncitizens do not ask these individuals how long they have been present in the country and do not inform them they are only subject to expedited removal if they have been present in the United States for less than two continuous years. *See* J.A. 34. The District Court also found that "there is nothing in the expedited removal interview process that would prompt an individual to put forward the 'affirmative[]' evidence of continuous two-year presence that is required under the statute." J.A. 35 (citing 8 U.S.C. § 1225(b)(1)(A)(iii)(II)).

Absent such knowledge, the noncitizen is simply left to hope that the immigration officer will conclude that they have met their burden of demonstrating two-years of continuous presence at the initial screening interview. That is because, as the District Court found, "once the [screening] interview is complete, the individual is not afforded any other opportunity to present evidence about their continual presence." J.A. 35. An immigration officer who "determines that [the noncitizen is] subject to expedited removal and receives supervisory sign off . . . serves the Form I-860, which combines both the notice of and order for expedited removal" thus leaving the noncitizen

3

"ordered removed 'without further hearing or review.'" *Id.* (citing 8 U.S.C. § 1225(b)(1)(A)(i)). And even if the noncitizen, by some slim chance, has the knowledge or foresight to assert two-years continuous presence in the United States, the District Court found that "the expedited removal process hardly affords individuals any opportunity, let alone a 'meaningful' one, to demonstrate that they have been present in the United States for two years." *See* J.A. 35–36; J.A. 40.[1]

A procedure that can result in persons being deported pursuant to the expedited removal statute without even being asked how long they have been in the country might satisfy due process for persons encountered at the border, but it is woefully inadequate for persons encountered in the interior of the country. Long ago, the Department of Justice "acknowledge[d] that application of the expedited removal provisions to aliens already in the United States will involve more complex determinations of fact" and will present the difficulty of "determining the exact time of the alien's arrival." *Inspection*

---

[1] For the first time on appeal, the Government asserts there is a guidance document that allows noncitizens a "brief but reasonable opportunity" to gather such evidence, Appellant Br. 10, but that document cannot be considered since it was not presented to the District Court. *See Ellipso, Inc. v. Mann*, 480 F.3d 1153, 1157 (D.C. Cir. 2007) (refusing to consider arguments made on appeal that were not presented to District Court in opposition to the motion for preliminary injunction). The District Court noted that "[w]hen asked at oral argument what would happen if, for example, an individual unexpectedly apprehended at a court hearing wants 'to demonstrate that they've been here for a period of two years but they don't have any paperwork on them,' the Government came up empty, offering only 'to take that back to the agency to give [the Court] an answer.'" J.A. 40 (quoting hearing transcript); *see also* J.A. 7 n.3 (District Court noting that the Government had not "put forward *any* evidence of its own about how the process works") (emphasis in original).

4

*and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures*, 62 Fed. Reg. 10312, 10313 (Mar. 6, 1997).  Under *Mullane*, the traditional hallmarks of due process are "notice and opportunity for hearing appropriate to the nature of the case," so procedures that may be constitutionally adequate when applied to aliens arriving at a port of entry are not necessarily adequate when applied to persons apprehended anywhere in the United States.[2]  339 U.S. at 313–14; *see also Walker v. City of Hutchinson*, 352 U.S. 112, 115 (1956) (reiterating "the impossibility of setting up a rigid formula as to the kind of notice that must be given; notice required will vary with circumstances and conditions.").  Removal and deportation proceedings employ the same flexibility.  *See A. A. R. P. v. Trump*, 605 U.S. 91, 94–95 (2025) (per curiam) (construing due process in light of the circumstances); *Trump v. J. G. G.*, 604 U.S. 670, 673 (2025) (per curiam) (same).

The fact that the procedures implementing the 2025 Designation and Huffman Memorandum do not require (1) DHS to ask the persons when they entered the country, or (2) DHS to advise persons that expedited removal applies only if the person has not been continuously present in the country for two years, violates due process.  As the Court held in *Mullane*, notice must "be of such nature as reasonably to convey the required information" and "afford a reasonable time for those interested to make their appearance."  339 U.S. at 314.  In *A. A. R. P. v. Trump*, the Court held that notice issued "roughly 24 hours before removal" and "devoid of information about

---

[2] Below and on appeal, the Government principally relies on the due process analysis of *American Immigration Lawyers Association v. Reno*, 18 F. Supp. 2d 38, 46–47 (D.D.C. 1998), *aff'd*, 199 F.3d 1352 (D.C. Cir. 2000), but the court in that case dismissed the due process claims based on the finding that arriving aliens stopped at or near the border had no due process rights, a premise that we reject for persons living in the interior of the United States.

5

how to exercise due process rights to contest that removal" is constitutionally inadequate.  605 U.S. at 95.  Similarly, in *Trump v. J. G. G.*, the Court explained that "notice must be afforded within a reasonable time and in such a manner *as will allow [the detainees] to actually seek* habeas relief in the proper venue before such removal occurs."  604 U.S. at 673 (emphasis added).  The thrust of these cases is that notice exacts more than mere ceremony; its content and timing must be sufficient to give the noncitizen an *actual opportunity to avail themselves of review prior to removal* (even if the only review available is that of a supervisory DHS official).

For many of the same reasons, the procedures implementing the 2025 Designation and Huffman Memorandum violate due process for persons "already in section 240 removal proceedings, many of whom are pursuing asylum and other collateral relief."  J.A. 12.  The District Court found as a factual matter that "[c]redible fear interviews are regularly conducted 'as little as 24 hours' after a noncitizen's initial interview with an immigration officer" and that "the Government's procedures prevent noncitizens from 'contact[ing] counsel or other support [to] gather information that they . . . need to . . . assert a credible fear' in their interview" since "[s]ome of the detention facilities where noncitizens are held charge cost-prohibitive rates for attorney-client phone calls and have long wait-times (more than 24 hours) for scheduling calls after they are requested."  J.A. 32 (citations omitted). A process of that kind that "leaves noncitizens unable to obtain 'medical records' and other proof that would substantiate their claims of fear" while also precluding them on appeal from "'explain[ing] discrepancies in their previous statements' during credible fear interviews 'or to provide additional evidence or information not detailed in the credible fear interview'" offers no one any opportunity to make their case.  *See* J.A. 32–33 (citations omitted).  The four

6

questions read aloud by an immigration officer to a noncitizen at the screening interview count for nothing if they cannot contact anyone who might help or gather the necessary documentation to substantiate their credible fear.  *See A. A. R. P.*, 605 U.S. at 95.

Nor can *A. A. R. P.* and *J. G. G.* be factually distinguished to support the Majority's position.  The Court in *J. G. G.* held that Alien Enemy Act ("AEA") "detainees must receive notice . . . that they are subject to removal under the Act" when reviewing two temporary restraining orders "preventing removal under the AEA of a provisionally certified class consisting of all noncitizens in U.S. custody who are subject to the Proclamation."  604 U.S. at 671, 673 (citation modified).  So too in *A. A. R. P.*  There, the named applicants asserted they were "at imminent risk of being classified as alien enemies and removed from the United States," even though "the record d[id] not indicate that they . . . received any formal notice of removal under the AEA."  *A. A. R. P.*, 605 U.S. at 97.  Even on that account, the Court held that "[t]he named applicants, along with putative class members" were "entitled to constitutionally adequate notice prior to any removal, in order to pursue appropriate relief."  *Id.* at 97–98.  The result should be no different here.  Plaintiffs consist of persons "at risk of being subjected to expedited removal under the [2025 Designation and Huffman Memorandum] . . . entitled under the Due Process Clause to meaningful process before they can be removed from the country."  J.A. 383 ¶ 108.

All told, due process does not wait for a final removal order to be issued before it is owed.  The constitutional safeguards due process affords leave "no doubt that at a minimum [it] require[s] that deprivation of life, liberty or property by adjudication be *preceded* by notice and opportunity for hearing appropriate to the nature of the case."  *Mullane*, 339

7

U.S. at 313 (emphasis added). Because that baseline was not satisfied here, I would affirm the District Court's entry of a § 705 stay for Plaintiffs.